IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BONNIE FISH, et al.,                    )
                                        )
                    Plaintiffs,         )
                                        )
        v.                              )    No.  09 C 1668
                                        )
GREATBANC TRUST COMPANY, et al.,        )
                                        )
                    Defendants.         )

<u>MEMORANDUM OPINION AND ORDER</u>

Bonnie Fish, Christopher Mino, Monica Lee Woosley, Lynda Hardman and Evolve Bank & Trust ("Evolve") have brought this action against GreatBanc Trust Company ("GreatBanc"), Lee Morgan ("Morgan"), Asha Morgan Moran ("Moran") and Chandra Attiken ("Attiken") for asserted violation of their fiduciary duties under several provisions of the Employee Retirement Income Security Act ("ERISA"):  29 U.S.C. §§1104, 1106 and 1108.[1]  All defendants have moved for summary judgment under Fed. R. Civ. P. ("Rule") 56, and the motion has been fully briefed.  For the reasons stated here, defendants' Rule 56 motion is denied and this action will proceed toward trial.[2]

_____

[1]  Further references to portions of the ERISA statute will take the form "Section --," using the numbering in Title 29 rather than ERISA's internal section numbering.

[2]  This opinion identifies plaintiffs' and defendants' respective submissions as "P." and "D." followed by appropriate designations:  memoranda as "Mem.--" and LR 56.1 statements as "St. --."  Submissions by the Secretary of Labor ("Secretary") as amicus curiae will be designated "S."  References to the deposition of Barry Hoskins will be designated "H. Dep."

## Summary of Facts

Antioch Company ("Antioch") is an Ohio corporation founded by the Morgan family (D. St. ¶10, H. Dep. Ex. 32 at 56). In 1979 Antioch established an Employee Stock Option Plan ("Plan"), in which each of the individual defendants participated with other Antioch employees (D. St. ¶¶1, 11). As of 2003, when the events leading to this lawsuit occurred, the Plan owned a little less than 43% of all Antioch stock, the Morgan family owned 46.5% (H. Dep. Ex. 34) and 38 other shareholders held the remaining 11% or so (id.).

Management of the Plan was conducted by the ESOP Advisory Committee ("Committee"), which comprised Morgan, Moran and Attiken (D. St. ¶¶4-6). They had complete discretionary authority over Plan administration and investments (H. Dep. 165). Until 2003 the Plan trustee was Barry Hoskins ("Hoskins"), who also served as an Antioch vice president (D. St. ¶¶12-13). Hoskins' actions as trustee were at all times directed by the Committee (H. Dep. 164-68).

In early 2003 Morgan and the Committee began to explore making Antioch a 100% Plan-owned company (see D. St. ¶15). Deloitte & Touche was retained by Antioch to help design a transaction that would accomplish that goal while also allowing the Morgan family to retain governance over the company (id. ¶¶16, 53). First a new entity was to be formed and merged into

2

Antioch by means of a tender offer for all non-Plan shares for cash or a combination of cash, notes and warrants (see D. St. ¶36).  In the case of the Morgan family, they could opt for the combination so as to obtain sufficient cash to pay their tax liabilities, guarantee a future income stream and receive warrants for a future share purchase at a negotiated price of $850 per share (see id.).

Hoskins, as a Plan participant, was conflicted from acting as Plan trustee during the course of the transaction, so GreatBanc was proposed to serve as Trustee during the transaction (D. St. ¶¶22-23).[3]  One of the conditions of the transaction was that GreatBanc had to decline to sell any Antioch shares in the tender offer, giving it effective power to approve or reject the transaction entirely (id. ¶47).

GreatBanc agreed to decline to sell in exchange for certain annual distributions (D. St. ¶56, P. St. ¶¶18-19).  It also required a Put Price Protection Agreement under which all Plan participants whose employment terminated between 2003 and 2006 would be subject to rules that established the amount Antioch would pay to buy back its stock from those employees based on when they terminated employment (id. ¶19).

Those employees who left before October 1, 2004 would be

---

[3] After the transaction was completed, Hoskins resumed his position as directed trustee for the Plan (D. St. ¶55).

3

paid about $841 per share (H. Dep. Ex. 22 at 55), while those who terminated after October 1, 2004 would be paid fair market value plus an incremental amount representing tax savings due to the transaction (id.). That amount varied from $12 to $21 depending on the date of termination (see id.). By contrast, before 2004 Plan shares had never been valued at more than $640 (see First Amended Complaint ["FAC"] ¶54, D. St. ¶65).

In the end the transaction set off a downward cycle that plaintiffs attribute to the overvaluation of Antioch stock in the tender offer (see FAC ¶¶55-59). Because the price guaranteed to Antioch employees was higher than any previous valuation of Plan stock, more employees left Antioch than might otherwise have been the case (see id. and D. St. ¶¶69-71).[4] That in turn increased Antioch's repurchase liability (D. St. ¶¶70-71),[5] which quickly exceeded Antioch's cash reserves, forcing it to take on additional debt to meet its Plan obligations (see id. ¶71).[6]

---

[4] This is the crux of plaintiffs' breach of fiduciary duty claim--that the breach by GreatBanc, Morgan, Moran and Attiken caused the price paid in the tender offer to be more than adequate consideration.

[5] Antioch's repurchase liability--the amount it spent to buy back stock from employees leaving the company--was always an issue for the company, representing an annual expense of anywhere between $12 and $14 million (see FAC ¶25).

[6] Antioch had already taken on a significant amount of debt to refinance the transaction (see H. Dep. 156-57). Plaintiffs contend that it was able to qualify for that financing based in part on its previous ability to meet its yearly repurchase obligation (see FAC ¶49).

Antioch's sales also began to decline during the same time period (D. St. ¶¶66-67). Eventually, due to a combination of declining profits and increasing debt, Antioch filed for bankruptcy (see FAC ¶64). Plaintiffs claim that the Plan is now worthless (id. ¶65).

Plaintiffs filed this lawsuit on March 17, 2009 (D. St. ¶14). Limited discovery was taken on the question whether or not plaintiffs' suit is timely (D. Mem. 1).

## Standard of Review

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). For that purpose courts consider evidentiary records in the light most favorable to nonmovants and draw all reasonable inferences in their favor (Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002)).

But to avoid summary judgment a nonmovant "must produce more than a scintilla of evidence to support his position" that a genuine issue of fact exists (Wheeler v. Lawson, 539 F.3d 629, 634 (7th Cir. 2008)) and "must come forward with specific facts demonstrating that there is a genuine issue for trial" (id.). Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

### Statute of Limitations

What is at stake here may hinge on the answer to a seemingly simple--even simplistic--question:  Who is the "plaintiff" for purposes of the limitations statute that controls the viability of this ERISA-based action?  Here is Section §1113 (emphasis added):

> No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the <u>earlier</u> of--
>
>> (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or
>>
>> (2) three years after the earliest date on which <u>the plaintiff</u> had actual knowledge of the breach or violation;
>
> except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

There is no question that the absence of knowledge under Section 1113(2) means no <u>actual</u> knowledge, not just the absence of "constructive" or "imputed" knowledge (as always, the qualifying label "constructive" or "imputed" betokens attribution through a legal fiction) (<u>Martin v. Consultants & Adm'rs, Inc.</u>, 966 F.2d 1078, 1086 (7th Cir. 1992)).  So the question here becomes whether, for purposes of the statute, the term "plaintiff" denotes the four individuals who were originally named in the case caption (or perhaps those four individuals plus

6

the more-recently-added corporate fiduciary) or instead denotes the Plan itself.  On that score it must be remembered that all those on the left side of the "v." sign in the case caption concededly act in a representative capacity (see FAC ¶13), seeking to recover damages payable to the Plan--not to the individuals or to the corporate fiduciary in their individual capacities.

Though the parties--and the Secretary of Labor as amicus curiae--have approached this issue as one of imputation of knowledge from one fiduciary to another and to the individual named plaintiffs, that is really not what is going on here. After all, actual knowledge by the Plan's trustees <u>is</u> the Plan's knowledge, in much the same way that our Court of Appeals has recently explained in <u>Prime Eagle Group Ltd. v. Steel Dynamics, Inc.</u>, No. 09-1663, 2010 WL 2899097, at *2 (7th Cir. July 27):

> Corporations do not have brains, but they do have employees.  One fundamental rule of agency law is that corporations "know" what their employees know--at least, what employees know about subjects that are within the scope of their duties.

So the question is not whether Hoskins' knowledge was to be <u>imputed</u> to the named plaintiffs.  Rather it is whether his knowledge--and therefore the Plan's knowledge--started the limitations clock ticking because the Plan is the "plaintiff" for purposes of Section 1113(2).

Unfortunately the statute itself does not provide a

definition of "plaintiff," leaving us with little guidance to interpret congressional intent.  And the few cases that have framed the issue as just stated here--as a question of what "plaintiff" means, rather than one of imputation--have focused not on intent but rather on the potentially perverse outcomes on either side:  the risk of manipulation of the statute of limitations on the one hand or, on the other hand, the possible unfairness to beneficiaries bringing suit.

For instance, <u>New Orleans Employers Int'l Longshoremen's Ass'n, AFL-CIO Pension Fund v. Mercer Inv. Consultants,</u> 635 F. Supp. 2d 1351, 1380 (N.D. Ga. 2009) expressed concern that if only the actual knowledge of named plaintiffs could start the Section 1113(2) limitations clock, then the parties bringing suit could be "carefully select[ed]" to include only those without actual knowledge--thus allowing for avoidance of the shorter statute of limitations.[7]  On the other hand, <u>Landwehr v. DuPree</u>, 72 F.3d 726, 732-33 (9th Cir. 1995), the only Court of Appeals opinion to come down on the issue posed here, focused on fairness, noting that if the Plan were viewed as the "plaintiff" under Section 1113(2), the shorter statute of limitations could

---

[7]  Similar manipulation could be effected by replacement of knowing fiduciaries with new fiduciaries without actual knowledge, allowing the clock to be continually restarted.  Note that such a manipulative tactic has been employed by plaintiffs' counsel here, with Evolve--a stranger to the restructuring transaction and hence lacking in "actual knowledge"--having been shoehorned in as an added named plaintiff.

be eviscerated entirely for beneficiaries wishing to bring suit:

> If the statute of limitations started to run on the
> first day that a fiduciary knew of the violation, then
> the statute of limitations would begin to run on the
> date that Kindred breached his duties--or, in the
> alternative, on the date that agents hired by Kindred
> were told of the underlying facts by Kindred in the
> course of seeking their advice.  That would obviously
> defeat the purpose of Section 1113's requirement that
> the limitations period run from the date when the
> plaintiff acquired actual knowledge of the breach,
> rather than on the date of the breach.[8]

Landwehr, id. at 733 opined that its holding was in tune

with congressional intent "[t]o protect pension plans from

looting by unscrupulous employers and their agents."  For its

part, New Orleans Employers, 635 F. Supp. 2d at 1378 quoted Brock

v. Nellis, 809 F.2d 753, 754 (11th Cir. 1987) as teaching that

the longer six-year statute of repose served "to impress upon

those vested with the control of pension funds the importance of

the trust they hold.  Thus, Congress evidently did not desire

that those who violate that trust could easily find refuge in a

time bar."  But New Orleans Employers, id. at 1381 also properly

noted that the statute of limitations, designed as it was to

protect pension plans, still does not allow "plaintiffs with

---

[8] [Footnote by this Court] Of course, it goes a bit far to
say that a breaching fiduciary's knowledge necessarily triggers
the commencement of the limitations period.  As the Secretary of
Labor correctly notes in her amicus brief, common law agency
principles teach that breaching fiduciaries act adversely to the
interests of the plan (S. Mem. 9-10 n.9).  Their actions--and
their knowledge--should not therefore start the clock as to
claims brought on the basis of their actions and knowledge.

actual knowledge of a breach to sit on their rights" (id.).

Interestingly, New Orleans Employers eventually held that "[t]he three-year statute should commence when the alleged breaches occurred, because that is when the Fund had knowledge of them through the vast majority of its Trustees." That holding seems to validate Landwehr's concern that the proper operation of the statute of repose can be subverted when the true "plaintiff" is the Plan rather than the named plaintiffs. Still, an analytical purist might well find fault with the manner in which Landwehr, 72 F.3d at 733 responded to the concern that potential manipulation can be fostered when the statute of limitations is a function of knowledge on the part of the named plaintiffs alone:

> However, if someday a case should arise in which the application of our rule would frustrate the statutory purpose, we will surely be able to apply it in a manner that does not permit such a result.

Happily, this Court need not come to an ultimate conclusion on the matter. Even if the Plan were to be regarded as the "plaintiff" for purposes of the statute, that would be dispositive of the defendants' motion only if it is clear that Hoskins could have acted effectively on any knowledge he might have had as to the breach of fiduciary duty alleged by the plaintiffs. And despite defendants' efforts to argue otherwise, plaintiffs really have met their burden on that question. At a minimum they have raised triable issues of material fact on that score.

10

Thus, even though Hoskins testified to his belief that he might have acted without direction from the Committee if there had been "some extreme violation of law or a fiduciary responsibility" (H. Dep. 167-68), that is far from undisputed factual evidence that he really could have done so--or that any action he could have essayed would not have been futile. And when the facts are read in the light most favorable to plaintiffs (as they must be), it would surely be reasonable to reach a legal conclusion in plaintiffs' favor in that regard.

First, Hoskins was tightly constrained by the Trustee Agreement ("Agreement") that defined his role as directed trustee (H. Dep. Ex. 75). That Agreement gave him very little authority to act without direction from the Committee, and more specifically it prohibited him from bringing any sort of lawsuit on behalf of the Plan without direction (id. at 3-5).[9] Second, Hoskins testified that in fact he never acted as directed trustee without direction from the Committee (H. Dep. 166-67). Though he did testify that he had some discretion to make certain decisions--as when he chose the independent appraiser--that discretion was exercised only after the Committee had given him authority to act (id. 168-69). And finally, Hoskins testified

---

[9] Indeed, a fair reading of the Agreement is that the only action Hoskins could have taken as to the alleged breach of fiduciary duty would have been to go to the Committee and ask for permission to sue them. It is hard to conceive a more futile act than that.

11

that there were times when he presented concerns to the Committee that it then disregarded (id. 230).

In sum, then, with the evidence viewed in the light most favorable to plaintiffs, defendants' motion must be denied.  At a minimum there are issues of material fact as to Hoskins' authority or as to his ability to act effectively even if actual knowledge of a claimed fiduciary breach were ascribed to him.

### Conclusion

For the foregoing reasons, defendants' motion is denied. This matter is set for a status hearing at 8:45 a.m. on September 7, 2010, to discuss the next steps in this litigation.

_____
Milton I. Shadur
Senior United States District Judge

Date:  August 31, 2010

12