IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BONNIE FISH, et al.,                )
                                    )
                Plaintiffs,         )
                                    )
    v.                              )   Case No. 09 C 1668
                                    )
GREATBANC TRUST COMPANY, et al.,    )
                                    )
                Defendants.         )

<u>MEMORANDUM OPINION AND ORDER</u>

This opinion addresses for a second time whether

plaintiffs -- Bonnie Fish ("Fish"), Christopher Mino ("Mino"),

Monica Lee Woosley ("Woosley"), Lynda Hardman ("Hardman") and

Evolve Bank & Trust -- filed this action under the Employee

Retirement Income Securities Act ("ERISA")[1] after the applicable

limitations period had elapsed.  Their Complaint invokes Sections

1104, 1006 and 1108 to charge GreatBanc Trust Company

("GreatBanc"), Lee Morgan ("Morgan"), Asha Morgan Moran ("Moran")

and Chandra Attiken ("Attiken") with breaches of fiduciary

duties.

Initially defendants said the suit was untimely because

actual knowledge of the alleged breaches existed more than three

---

[1]  All references to the ERISA statute will take the form
"Section --," using the statutory numbering in Title 29 rather
than ERISA's internal section numbering.

years before plaintiffs sued.  In that respect they argued that the true plaintiff was the retirement plan itself.  As they put it, because one of the plan's trustees -- Barry Hoskins ("Hoskins") -- had knowledge of the alleged breaches more than three years before the Complaint was filed, the plan too had knowledge and the suit was time-barred.  This Court rejected that argument in its August 31, 2010 memorandum opinion and order ("Opinion," 830 F. Supp. 2d 426 (N.D. Ill. 2010)), holding that even if Hoskins had knowledge of the alleged breaches, whether he was empowered to act on that knowledge was a disputed question of fact.

Now however defendants, having acquired new facts through discovery, have raised the argument again.[2]  They contend that each of Fish, Mino, Woosley and Hardman acquired knowledge of all of the relevant facts of the alleged breaches when they received two documents -- a Proxy Statement and a document answering frequently asked questions about the transaction -- as well as explanatory letters from Morgan.  Because those documents did indeed give plaintiffs actual knowledge of the alleged breaches

---

[2]  Both GreatBanc (in Dkt. 220) and the individual defendants (in Dkt. 227) have moved for summary judgment.  This opinion deals with the two motions collectively.

in 2003, the perspective expressed in the Opinion must be
revisited, and this action must be and is dismissed as untimely.

### Brief Account of the 2003 Transaction

It is unnecessary to repeat the Opinion's detailed
recitation of many of the facts.  What follows instead is a brief
sketch of the relevant facts.[3]

Plaintiffs were employees of Antioch Company ("Antioch"), a
corporation founded and controlled by the Morgan family.  Antioch
had an Employee Stock Option Plan ("Plan" or occasionally
"ESOP").  In 2003 the Plan owned almost 43% of Antioch's stock,
the Morgan family owned 46.5% and 38 other shareholders held the
remaining 11%.

Morgan, Moran and Attiken managed the Plan as the members of
the Plan Advisory Committee.  In early 2003 the Committee -- with
the aid of outside consultants -- designed a transaction that
would give the Plan 100% ownership of Antioch but would preserve
the Morgan family's control over the company.  GreatBanc was
hired to serve as the Plan's trustee during that transaction.

---

[3]  At this summary judgment stage plaintiffs must merely
demonstrate the existence of a genuine issue of material fact.
Facts listed in this section are undisputed and are read in a
light most favorable to plaintiffs.  This opinion cites to
GreatBanc's LR 56.1 statement of facts as "G. St. ¶--" and to the
individual defendants' statement as "M. St. ¶--."

To implement the transaction Antioch made a tender offer to all Antioch shareholders to buy back their shares for $850 per share (in either cash or some combination of cash, notes and warrants). Because the goal of the transaction was for the Plan to own 100% of Antioch's stock, the Plan had to decline to accept the offer as to its own shares. If the Plan did not decline, the transaction would be cancelled. GreatBanc negotiated a side deal: It would decline to turn in the Plan's shares for redemption if Plan members received additional cash distributions and if Antioch agreed to something the parties call the Put Price Protection Agreement. Under the Put Price Protection Agreement Antioch agreed that:

 - Plan participants who left the company between January 1, 2003 and October 1, 2004 would receive the greater of the fair market value of their shares or $840.26 per share.

 - Plan participants who left between October 1, 2004 and October 1, 2005 would receive fair market value plus $21.00 per share

 - Plan participants who left between October 1, 2005 and October 1, 2006 would received fair market value plus $12.80 per share.

To fund the transaction Antioch used $46 million of its cash and borrowed $109 million. That substantially increased Antioch's debt load.

- 4 -

After the transaction closed, GreatBanc hired Prairie Capital Advisors ("Prairie") to value Antioch's stock as of December 31, 2003. Prairie calculated Antioch's stock to be worth $894 per share. Before that the highest appraisal of Antioch stock had been $680 per share.

According to plaintiffs, Antioch employees wanted to lock in that high valuation of their stock and rushed to quit and cash in their shares. Redemptions exceeded what GreatBanc and Antioch had forecast, and so Antioch was unable to both service its existing debt and meet its redemption obligations. That created a bank run situation: As more employees quit, others saw the mounting financial crisis and hurried to cash in their shares before the coffers were empty. In 2008 Antioch was unable to make good on its various debt payments and share redemption obligations, and the company filed for bankruptcy. Company stock, the sole asset of the Plan, is now worthless.

## Statute of Limitations

Plaintiffs filed their complaint on March 17, 2009[4] -- too late according to Defendants. Here is the relevant statute of

---

[4] Although that date controls for filing purposes, later references to plaintiffs' allegations will be to the Amended Complaint (cited here as "AC ¶ --").

limitations from Section 1113:

> No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of—
>
> > (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or
> >
> > (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;
>
> except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

Defendants say that plaintiffs' had actual knowledge of the alleged breach or violation more than three years before filing their complaint. Plaintiffs say that they did not, so that the six-year limitations period applies (in which event their complaint was timely).

As the first step in the analysis, the breaches or violations that plaintiffs ascribe to defendants -- that is, the facts as to which plaintiffs had to have actual knowledge before the watershed date if a limitations defense were to defeat their claims -- should be identified. Although plaintiffs are not required to identify legal theories in complaints, here the

plaintiffs did that, and the theories that they expounded provide a helpful organizational structure for their claims.  In that respect plaintiffs laid out two alleged breaches in their complaint, one based on Section 1106 and the other based on Section 1104.

Section 1106 is the source of what will be referred to here as "Alleged Breach No. 1."  Section 1106 prohibits fiduciaries from causing an ERISA plan to engage in transactions with a "party in interest."  Plaintiffs are vague about the exact nature of the prohibited transaction, but they seem to argue that Morgan, Moran and Attiken were "parties in interest" (AC ¶73) and that the Plan engaged in an indirect exchange of property with them (D. Mem. 8-9).  Antioch agreed to redeem Morgan's, Moran's and Attiken's stock, and plaintiffs say that the redemption price was too high.  According to plaintiffs, Morgan, Moran and Attiken are liable for a self-dealing transaction and GreatBanc is liable for blessing the transaction.

Section 1106 is an inapt referent for the transaction, because by plaintiffs' own admission the Plan never bought or sold anything (D. Mem. 8).  Usually "indirect" exchange refers to a situation in which an ERISA plan and a party in interest engage in a transaction through some kind of intermediary.  When a plan

- 7 -

neither buys nor sells anything, it's strange to characterize it as having participated in a transaction (either directly or indirectly).

Perhaps plaintiffs mean that the Plan effectively (if not literally) paid for the share redemption, because after the redemption the Plan was the sole shareholder in Antioch and because the funds for the redemption came from Antioch's cash reserves and debt. Regardless, whether plaintiffs have a meritorious claim is not the question here. What matters is the set of facts and circumstances that they say gives them a claim for relief: that is, the redemption of Morgan's, Moran's and Attiken's shares of stock.

As "Alleged Breach No. 2," plaintiffs also say that all of the defendants violated Section 1104, which imposes the prudent man standard of care (from the common law of trusts) on ERISA fiduciaries. AC ¶78 lists 14 ways in which defendants assertedly violated that duty. But those are all variations on the same theme -- that defendants approved a transaction that put Antioch in financial distress by increasing its debt, decreasing the cash it had available to pay that debt and saddling it with a redemption obligation that was impossible to meet and caused employees to flee the company.

- 8 -

Martin v. Consultants & Adm'rs, Inc., 966 F.2d 1078, 1086
(7th Cir. 1992)(emphasis in original) explains that for
plaintiffs to have actual knowledge of those two claims for
limitations purposes, they must have:

> knowledge of the facts or transaction that constituted
> the alleged violation. Consequently, it is not
> necessary for a potential plaintiff to have knowledge
> of every last detail of a transaction, or knowledge of
> its illegality.

So the three-year clock would not start if plaintiffs merely had
knowledge that something was awry or that further investigation
might reveal a breach -- what is known in legal jargon as
"inquiry notice."

But the standard is not so strict that it requires
plaintiffs to know every detail of the breach.  As Martin, id.
put it (emphasis added):

> Suffice it to say that to have actual knowledge of a
> violation to trigger ERISA's three-year statute of
> limitations, a plaintiff must know of the essential
> facts of the transaction or conduct constituting the
> violation.

That means plaintiffs needed to know enough of the facts of the
transaction to establish a claim, though they need not have
realized that they have a legal claim.  That distinction has a
parallel in criminal law, where the term "willfully" can refer to
acting either with knowledge of what the law punishes or merely

- 9 -

with the intent to act (but without knowing of the action's illegality) -- see, e.g., <u>Kimani v. Holder</u>, Nos. 11-1497 and 11-2955, 2012 WL 3590816, at *2 (7th Cir. Aug. 22). <u>Martin</u>'s holding makes Section 1113 the equivalent of the latter definition of "willfully" -- knowledge of the action is enough, without knowledge of its illegality.

### Willful Blindness

GreatBanc and Antioch sent out information that sufficiently disclosed every purported breach about which plaintiffs now complain. Plaintiffs admit that they received those papers (G. St. ¶34). Some of the plaintiffs say that they skimmed the materials (<u>id</u>.). Each of them denies reading the materials carefully in 2003 or understanding the transaction in 2003. Defendants say that plaintiffs' failure to read those materials made them willfully blind to the breaches in 2003, and willful blindness is the same thing as actual knowledge. If so, that started the statute of limitations' clock in 2003, making the 2009 filing too late by three years.

Numerous other areas of the law equate willful blindness with actual knowledge, including for example trademark law (see <u>Lorillard Tobacco Co. v. A&E Oil, Inc.</u>, 503 F.3d 588, 592 (7th Cir. 2007) and criminal law (see <u>United States v. Nobles</u>, 69 F.3d

- 10 -

172, 185 (7th Cir. 1995)). <u>Martin</u>, 996 F.2d at 1086 teaches that the words "actual knowledge" in Section 1113 include willful blindness. And both the First Circuit (<u>Edes v. Verizon Commc'ns, Inc.</u>, 417 F.3d 133, 142 (1st Cir. 2005)(citing <u>Martin</u> as support for the statement that "we do not think Congress intended the actual knowledge requirement to excuse willful blindness by a plaintiff") and the Sixth Circuit (<u>Brown v. Owens Corning Inv. Review Comm.</u>, 622 F.3d 564, 571 (6th Cir. 2010))(repeating that language from <u>Edes</u>) have read Section 1113 the same way. Indeed, <u>Brown</u>, <u>id</u>. at 571 (internal quotation marks omitted) holds that "[a]ctual knowledge does not require proof that the individual Plaintiffs actually saw or read the documents that disclosed the allegedly harmful investments."

Because <u>Martin</u>, 966 F.3d at 1086 held firmly that constructive knowledge does not start the limitations period, it is important to distinguish willful blindness from constructive knowledge. <u>Eckstein v. Balcor Film Investors</u>, 58 F.3d 1162, 1168 (7th Cir. 1995) provides a helpful definition of constructive knowledge: "no actual knowledge, but the ability to acquire knowledge by reasonably diligent inquiry." By contrast, willful blindness is "a failure to investigate because one 'was afraid of what the inquiry would yield'" (<u>Lorillard Tobacco</u>, 503 F.3d at

592).

There is some overlap in the concepts:  Both require some limited knowledge on the part of a party that could allow her to uncover the full facts.  But while willful blindness requires a deliberate looking away -- which is why courts typically employ the ostrich metaphor (burying one's head in the sand) to illustrate the concept -- constructive knowledge requires only carelessness.  Separating the ERISA plaintiff who buries her head in the sand from the ERISA plaintiff who is merely careless can be difficult, but it is certainly feasible.

In this case the undisputed facts show that plaintiffs were willfully blind, not merely careless.  Each of the plaintiffs received from Antioch a package containing the following documents: a cover letter from Lee Morgan summarizing the contents of the other documents (G. St. ¶37), a letter from GreatBanc (id.), an information sheet explaining participants' rights to give voting directions to GreatBanc (id.) and the Offer to Purchase Statement--a large document that provided the details of the transaction (id.).  Morgan's cover letter pointed to several specific sections of the Offer to Purchase Statement: "Questions and Answers about the Transaction" (id. ¶38), "The Transaction (Background & Reasons)" (id.), "The ESOP" (id.), "The

- 12 -

Merger Agreement" (<u>id</u>.), and "Risks Related to the Transaction"

(<u>id</u>.).  Each of the named plaintiffs admitted to receiving those

materials (<u>id</u>. ¶37), and each admitted to at least skimming them

(M St. ¶34).  Those materials and an additional letter from Lee

Morgan (G. St. Ex. 32, MOR001193-96) contained all of the

information that plaintiffs needed to learn of the breach.

**Alleged Breach No.1**

Lee Morgan's two letters and accompanying materials

expressly disclosed Alleged Breach No.1 -- the redemption of the

individual defendants' shares.  First, as to their right to do so

and the corollary non-tender of the ESOP shares, here are

relevant excerpts from page 2 of the second (November 14, 2002)

letter:

> The Transaction provides shareholders with an
> opportunity to sell their shares of Common Stock of the
> Company (the Tender Offer) for either (i) $850 per
> share in cash (less a $5.00 tax distribution
> reimbursement), or (ii) a package of consideration per
> share [describes package].
>
>     *       *       *
>
> It is a condition to the closing of the transaction
> that the ESOP Trustee decides not to tender the shares
> owned by the ESOP.

And the same information as to the tender rights of shareholders

had been disclosed in the "Questions and Answers About the

- 13 -

Transaction" section of the materials enclosed with Morgan's first letter. Pages 1 and 2 of that document (Ex. 32 to G. St. at MOR001215-16) answer the questions "[w]hat are the classes and amounts of securities sought in the offer" and "[h]ow much are you offering to pay, what is the form of payment...." But most critically, page 4 of that document <u>specifically</u> told plaintiffs (and all other shareholders) that "Lee Morgan, Asha Morgan Moran, and the directors of the Company who own shares" planned to tender their shares in the redemption. So it is clear beyond cavil that plaintiffs had full disclosure of the parts of the transaction that they now claim were prohibited by Section 1106.

And there is added evidence that plaintiffs had actual and direct knowledge of this alleged breach -- that they were not just willfully blind to it. Hardman testified that Morgan "made it very clear that the Morgan family was going to cash in their shares right away, so we knew that going into it, yes" (M. St. ¶47). Plaintiffs say that such knowledge is insufficient to have given them actual knowledge of the breach because of the complexity of the transaction. They refer to it as an "'indirect' sale or exchange of any property between a plan and a party in interest" (again they view the individual defendants as the purported parties in interest)(P. Mem. 8-9).

- 14 -

But the two most basic -- and abundantly clear -- features of the transaction were (1) that Antioch would redeem shares not held by the Plan and (2) that the Plan would end up as the sole shareholder in Antioch.  Plaintiffs say the transaction was "highly complicated, ever evolving" (id. at 9), but those two features of the transaction were simple and constant.

### Alleged Breach No. 2

Another section identified in Morgan's letter, "The ESOP," disclosed a critical part of Alleged Breach No. 2 -- the so-called Put Price Protection Agreement that set a floor on the redemption price for Plan participants (Ex. 32 to G. St. at MOR001256-58).  Another section of the Questions and Answers document described the debt that Antioch took on with the transaction (id. at MOR001220).  And still another (MOR001283) spelled out the risk that those two actions, taken together, created:

> If the Company were unable to meet its repurchase obligations, the Company could be left insolvent and unable to pay other obligations, including the subordinated notes.

M. St. ¶¶41-46 collects additional disclosures of similar information that the Plaintiffs received.

Plaintiffs say that those documents were too technical for

- 15 -

them to read, and so they ignored them.    If the documents were
indeed incomprehensible for a law person, that would be the stuff
of which constructive rather than actual knowledge could be
fashioned (Eckstein, 58 F.3d at 1169).    Plaintiffs could not be
willfully blind to information that they could not comprehend.

    But that position does not withstand analysis here, for it
is grounded solely on arguments from plaintiffs' lawyers and
conclusory statements from the lawyers' clients -- the
plaintiffs.  What must control instead is evidence, and here
there is objective evidence that puts the lie to plaintiffs'
contention:  Morgan's letter pointed to specific sections of the
documents that plaintiffs cannot legitimately justify having
ignored (if they did indeed ignore them).  Those sections have
plain common-sense descriptions of the facts underlying the
alleged breach.  And reading those sections was critical to a
Plan participant's understanding how to direct GreatBanc to vote
his or her shares in the merger transaction (M. St. ¶38).

    There is even more to the evidence that torpedoes
plaintiffs' position--evidence that evokes the familiar saying
that actions speak louder than words.  Plaintiffs' counsel are
seemingly blind to the clear import of the allegation in AC ¶59
(emphasis added):

> Prior to October 1, 2004, a veritable "stampede of
> employees" gave notice of their resignation of
> employment so as to lock in the value of their ESOP
> accounts at $894.00 per share before the October 1,
> 2004 deadline in the Put Price Protection Agreement.
> This <u>predictable</u> stampede exacerbated the Company's
> repurchase obligations, drove the Company deeper into
> debt, and caused an immediate breach of Antioch's
> financial loan covenants with the lenders from the 2003
> Transaction.

Plainly a great many Plan participants knew from the selfsame

documents that they had a limited opportunity to redeem their

shares in the Plan for more than they were worth.

What plaintiffs and their counsel offer up is a dual

universe, one in which many other Plan participants participated

in a "predictable stampede" that acted on the plain explanation

conveyed by the documents delivered to them, while plaintiffs

found the same documents so abstruse as to defy reading.  But

this is not the place to import the "least sophisticated

consumer" standard from other congressional enactments -- yet

that standard, which plaintiffs essentially argue for themselves

in their desperate effort to save their lawsuit from dismissal on

limitations grounds, is in this instance the quintessence of

willful blindness.

And once again some of the plaintiffs themselves have

acknowledged the requisite actual knowledge.  Mino testified that

- 17 -

he was aware of the calculation of the redemption price under the
Put Price Protection Agreement, but decided not to cash in
because he wanted to see if the stock price would go up more
(M. St. Ex. F. at 123-25).  And Hardman testified about the large
increase in redemption obligations in 2003-04 (G. St. Ex. E at
175):

> I do recall in--whether it was this meeting or not, but
> the discussion, you know, Lee [Morgan] bringing it to
> our attention.  There again, you know, I thought that
> it had all been taken into consideration, no reason to
> get concerned.  It was so soon after the transaction
> that, you know, I felt that GreatBanc Trust had done
> their homework and that this was all taken into
> consideration.

Plaintiffs say that even if they knew the facts of the
transaction, they needed more information to have actual
knowledge of a breach -- they assert that they needed to know
what GreatBanc did to analyze the deal and determine its fairness
(P. Mem. 7-8).  But the asserted breach about which they really
complain is GreatBanc's setting the redemption price too high in
the face of Antioch's substantial debt (AC ¶¶75-76).  Their true
complaint is about the <u>substance</u> of the decision, not about the
<u>process</u> undertaken in reaching the decision, for no matter how
much process GreatBanc undertook, plaintiffs would still be
complaining that the ultimate decision that set the redemption

price too high was imprudent (AC ¶78(b)).[5]

In sum, plaintiffs had actual knowledge of -- or its equivalent, willful blindness to -- all of the critical facts underlying what they allege was an imprudent decision by GreatBanc.  Their claims are time-barred.

## Conclusion

At this Court's direction, plaintiffs initially filed only a limited memorandum response to the summary judgment motions. After reviewing defendants' joint reply, however, plaintiffs asked for leave to file a supplemental response.  This Court granted that motion, and plaintiffs later filed an additional response.

So while plaintiffs did not respond to defendants' Rule 56.1 statement as such, they have had ample opportunity to brief their case before this Court -- as this Court has frequently said in describing the burden of parties opposing other summary judgment

---

[5] To put the point a bit differently, plaintiffs would have to establish the excessiveness of the redemption price as an element of their claim.  If they cleared that hurdle, defendants could proffer the asserted reasonableness of GreatBanc's conduct in setting that price as a potential defense to the claim that would then have to be resolved -- but plaintiffs' clearing of the hurdle had to come first.

motions, they have wheeled out all of their artillery.[6]  And

because defendants have not contested -- and cannot contest --

the basic facts identified in this opinion, defendants' motions

are granted.  Plaintiffs' claims are barred by Section 1113, and

this action is dismissed with prejudice.


_____
Milton I. Shadur
Senior United States District Judge

Date: September 12, 2012

---

[6]  See, e.g., Employers Ins. of Wausau v. Bodi-Wachs Aviation Ins. Agency, Inc., 846 F. Supp. 677, 685 (N.D. Ill. 1994), which this Court believes is the first published opinion in which it used that locution.