**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **BONNIE FISH**, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 09 C 1668 |
| | ) |
| **GREATBANC TRUST COMPANY**, | ) |
| an Illinois corporation, et al., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Following the entry of judgment for defendants in this action that had sought to recover major damages from them stemming from the collapse of what had been a viable corporation until it engaged in a complex and unsuccessful effort to go private,[1] the prevailing defendants have sought to mulct the unsuccessful plaintiffs with some $7 million in attorneys' fees and costs. That -- as is so frequently the case -- has produced a controversy of its own, with the parties differing as to both the propriety of an award and, if found appropriate, the amount to be awarded.

As to the propriety of an award, Meredith v. Navistar Int'l Transp. Corp., 935 F.2d 124, 128 (7th Cir. 1991) confirmed that an often-used five-factor test devised by the caselaw "is

---

[1] To be more precise, the arrangement contemplated that an employee stock option plan ("ESOP"), which had owned something over 40% of the stock of Antioch Company ("Company"), would on completion of a tender offer become the 100% owner of the corporate stock. Plaintiffs had been participants in the ESOP who did not tender their shares, so that their stock became worthless when Antioch went bankrupt as a result of the large volume of acceptances of the tender offer at a high purchase price. For more particulars, the reader should take a look at this Court's earlier published opinions, 830 F.Supp.2d 426 (N.D. Ill. 2010) ("Opinion I") and 890 F.Supp.2d 1060 (N.D. Ill. 2012) ("Opinion II").

oriented toward the case where the plaintiff rather than the defendant prevails and seeks an award of attorney's fees." Meredith, id. (citation omitted) then went on to say:

> Thus, we suggested a more general and less cumbersome approach for requests for attorney's fees under ERISA. Under that approach (borrowed from the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A)), a prevailing party is entitled to reasonable attorney's fees unless the court finds that the position of the losing party was "substantially justified" or that
>
>> special circumstances make an award unjust. These words create a modest presumption (modest because of the 'special circumstances' exception) in favor of awarding reasonable attorney's fees to the winning party, plaintiff or defendant, unless the loser's position, while rejected by the court, had a solid base -- more than merely frivolous, but less than meritorious.

That same approach to the propriety of an award to a successful ERISA defendant has been echoed in such cases as Stark v. BPM America, Inc., 354 F.3d 666, 673 (7th Cir. 2004):

> Although we have articulated two tests for analyzing the propriety of a fee request, *Quinn v. Blue Cross and Blue Shield Ass'n*, 161 F.3d 472, 478 (7th Cir. 1998), both formulas essentially ask the same question, i.e., "was the losing party's position substantially justified and taken in good faith, or was the party simply out to harass its opponent?" *Bowerman v. Wal-Mart Stores, Inc.*, 226 F.3d 574, 593 (7th Cir. 2000) (citation omitted). In other words, because ERISA's remedial purpose is to protect, rather than penalize participants who seek to enforce their statutory rights, an award of fees to a successful defendant will be denied "if the plaintiff's position was both 'substantially justified' -- meaning something more than nonfrivolous, but something less than meritorious -- and taken in good faith, or if special circumstances make an award unjust." *Senese*, 237 F.3d at 826.

In that respect this Court need not decide that its view expressed, and the result reached, in Opinion II were mistaken -- it does not believe that to be the case. Defendants' Motion at 4 summarizes succinctly -- and accurately -- the predicate on which the three-year-limitation clock began to tick before 1996, so that the clock had run out even before plaintiffs filed suit in March 2009:

In 2011, Defendants deposed the four Individual Plaintiffs. Defendants presented this Court with substantial evidence of the Individual Plaintiffs' actual knowledge of the facts on which they based their claim, and the dates on which Plaintiffs obtained that knowledge. Tellingly, discovery established that the Individual Plaintiffs learned of ***no facts*** after March 17, 2006 (three years before the date this case was filed) to give rise to their claims against Defendants; everything the Individual Plaintiffs knew and alleged in their Complaint, they learned before 2006. (Dkt. No. 221, p. 5.). The depositions of all four Individual Plaintiffs established that by the end of 2005 Plaintiffs were aware that a large number of employees left the company and redeemed the shares in their ESOP accounts, that Antioch's sales, revenues and profits continued to decline, that Antioch faced financial problems, the level of Antioch's secured and unsecured debt taken on as part of the 2003 Transaction and afterwards, and other facts on which they based their claims. The Individual Plaintiffs admitted to receiving the Offer to Purchase and Proposed Tender Offer materials and ultimately voting for the Transaction (Dkt. No. 221, p. 9.) Their knowledge continued to grow in 2004 and 2005. (Dkt. No. 221, pp. 7-10.)

If all of the facts about a transaction are known by a certain date, and if there is no showing that some intervening legal development has cast a cloud on those facts that makes them actionable for the first time (and no such showing has even been hinted at here), just what element is missing that is needed to make those facts the basis for a lawsuit? In candor, this Court sees no legitimate answer to that question, and that is why Opinion II, 890 F.Supp.2d at 1064 charged plaintiffs with "willful blindness" -- which the caselaw has consistently treated as the equivalent of "actual knowledge," the language of ERISA's three-year statute of limitations.

There is a complicating factor that has now been added to the mix: On January 30, 2013 the Secretary of Labor filed an amicus brief in our Court of Appeals (cited here as "S. Br. --") in support of plaintiffs' appeal from this Court's decision in defendants' favor. In this Court's view that must be looked at in evaluating the "substantially justified" standard referred to earlier. Accordingly this opinion turns to that analysis.

Under ordinary circumstances the entry of a presumably responsible government agency onto the scene would provide a presumptive basis for determining the substantial justification of a legal position to which that agency has subscribed -- or at least the nonfrivolousness of that legal position. But regrettably the amicus brief that the Secretary of Labor's people have tendered to our Court of Appeals demonstrates that these are <u>not</u> ordinary circumstances. Because the best demonstration that such is the case is in the amicus brief's adoption of the individual plaintiffs' reliance on the insertion into the litigation of Evolve Bank & Trust ("Evolve") as a latecomer trustee, this opinion turns to that subject first.

As the original plaintiffs -- and now the Secretary of Labor's minions (at S. Br. 27-30) -- would have it, it is perfectly legitimate to have shoehorned into the litigation in May 2009 (<u>more than five years after</u> the Antioch transaction) a new trustee, Evolve, a total stranger to that Antioch transaction whose sole knowledge about it came to it second hand (at best) after it was appointed trustee in January 2008 (<u>more than four years after</u> the transaction). That, they say, rendered this lawsuit timely on a retrospective basis because suit had been brought in March 2009, less than three years after Evolve was injected into the picture. To be blunt, that distortion of the statutory limitation periods and their purpose has about as much legitimacy as a $3 bill -- to hold that a statute of limitations can evolve[2] in that fashion would eviscerate Darwin's view of evolution as the product of natural selection.

But "not to worry," say the authors of the Secretary of Labor's brief (S. Br. 28-29). In their lights this Court's characterization of the Evolve joinder as "a manipulative tactic" (Opinion I, 830 F.Supp.2d at 430 n.7) is claimed to be "groundless legally" (S. Br. 29) because the

---

[2] Bad pun intended.

statutory alternative six-year time limitation (measured from the occurrence of the operative event rather than from the "actual knowledge" date) precludes repetitive use of the manipulative conduct beyond the six-year deadline. That position is frankly irresponsible, because it candidly recognizes that the use of the tactic employed here -- an effort to start the three-year clock over again by the artificial insemination device of bringing a stranger, totally lacking in prior knowledge, into the litigation -- can simply read the three-year provision out of the statute, depriving it of any force. It seems to be time to remind the Secretary of Labor's people that we operate in a three-branch system of government, with neither the judiciary nor -- importantly here -- the executive branch having the power to trump the congressional will as unambiguously expressed through legislation.[3]

In short, the Secretary of Labor's position as to the introduction of Evolve (once again, a total stranger to the relevant events not only when they occurred but for more than three years thereafter) as a plaintiff <u>after</u> the end of the three-year period following the acquisition of the requisite actual knowledge by the individual plaintiffs -- the real parties in interest -- must be viewed as flunking the standard of nonfrivolousness. This opinion turns then to the Secretary of Labor's substantive position that the individual plaintiffs did not possess such actual knowledge more than three years before they chose to bring suit.

On that score it bears repeating what "actual knowledge" connotes. That is the reason this opinion earlier quoted the language from Defendants' Motion at 4 that stressed plaintiffs'

---

[3] Maybe the Secretary's people ought to be reminded as well that their ultimate boss -- the President as head of the executive branch -- endorsed the original enactment of an alternative statute of limitations, measured by the <u>earlier</u> of the three-year and six-year tests, by signing the legislation as the last step in its enactment.

knowledge before 2006 of every fact necessary to ground the claim that they first advanced in early 2009. Opinion II has set out in detail the scope of their actual knowledge of all of the relevant facts of what they have later claimed to be breaches of defendants' obligations to them, knowledge as to which they were not entitled to play ostrich -- to bury their heads in the sand.

What has been quoted above from Defendants' Motion is only a capsule characterization of what this Court expressed at length in Opinion II. This Court finds seriously wanting the attempt by the Secretary of Labor's people to transmute plaintiffs' actual knowledge into a lack of such knowledge. Plaintiffs knew full well the risks posed by the Antioch tender offer plan -- their own Complaint spoke of the expected "run on the bank" that actually took place. Unlike other employee shareholders who understandably jumped at the opportunity to cash out their Antioch stock on highly favorable terms, plaintiffs decided to take the known risks of retaining their holdings. They gambled and lost, and when the known risks materialized they inexplicably waited to bring suit based on the selfsame facts that they had known all along.

Nor can the individual plaintiffs find any legal comfort in the Secretary of Labor's position. That view rationalizes, but does not successfully support, plaintiffs' related effort to recoup the losses stemming from their unsuccessful gamble. In sum, plaintiffs' delay was not substantially justified in legal terms, so that their attempt to justify that delay is likewise frivolous in the legal sense.

That however is not the end of the story. What defendants' $7 million claim for attorneys' fees and costs has failed to do is to take account of the major part of this litigation where they and their counsel were earlier pursuing legally meritless paths to the attempted dismissal of this action. That activity generated major expenditures of the parties' time and resources -- and of

this Court's as well -- before defendants shifted their focus to the actual knowledge of the individual defendants themselves and found that to be the road to success.

This is not at all a situation in which a party's right to recover fees should not be discounted simply because it was not successful on all of its claims. It must be remembered that it was defendants who initially concentrated their efforts to advance groundless claims (see, e.g., the decision in Opinion I, which rejected their attempt to prevail via summary judgment on such a bootless claim).[4] In this Court's view the situation here calls for application of the other standard from EAJA, which our Court of Appeals' opinion in Meredith has found analogous in the fee-award situation: whether "special circumstances make an award unjust."

In that respect this Court would find it plainly unjust (1) to saddle plaintiffs with what had to be a very substantial portion of defendants' legal fees expended in pursuing unjustified positions that compelled plaintiffs' counsel to jump through figurative hoops to render those unjustified efforts unsuccessful, as well as (2) to tax plaintiffs with the defendants' fees attributable to their successful effort. This should not be misunderstood as awarding fees to plaintiffs on some "prevailing party" standard, but rather as diminishing defendants' award

---

[4] Neither side has noted -- or at least neither has commented on -- the ironic similarity between defendants' earlier unsuccessful approach and plaintiffs' equally unsuccessful and illogical approach based on the after-the-fact appointment of Evolve as trustee. Opinion I dealt with the effort by defendants that sought to characterize the Antioch ESOP as the "plaintiff" for purposes of the limitations statute, so that the actual knowledge of then trustee Barry Hoskins ("Hoskins") back in 2003 assertedly started the three-year limitations clock (at the time of that effort defendants had not raised actual knowledge on the part of the individual plaintiffs as a starting point). Defendants failed in that earlier approach because they were unsuccessful in establishing that Hoskins could then have acted effectively on any knowledge he might have had as to the breach of fiduciary duty alleged by the individual plaintiffs.

because of the needless expense that defendants imposed on plaintiffs through defendants' unsuccessful earlier positions.

All of this necessitates defendants' return to the drawing board to provide the required information that will enable this Court to quantify properly the reduction from defendants' original claim. When that information has been provided, this Court should be in a position to determine whether consideration of the five-factor test referred to earlier may also be in order. Finally, this action is set for a status hearing at 8:45 a.m. April 26, 2013 to discuss the procedure and a proposed timetable for completing the matter dealt with here.

                                                  _____
                                                  Milton I. Shadur
                                                  Senior United States District Judge

Date: April 22, 2013