**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| BONNIE FISH, CHRISTOPHER MINO, MONICA LEE WOOSLEY, LYNDA D. HARDMAN, EVOLVE BANK & TRUST, an Arkansas bank and trust company, | |
| Plaintiffs, | Case No. 1:09-cv-01668 |
| vs. | Honorable Thomas M. Durkin |
| GREATBANC TRUST COMPANY, an Illinois corporation; LEE MORGAN, ASHA MORGAN MORAN, and CHANDRA ATTIKEN, | |
| Defendants, | |
| MORGAN FAMILY FOUNDATION, | |
| New Party Defendant. | |

**SECOND AMENDED COMPLAINT**

**PARTIES**

1.     Plaintiff Bonnie Fish is an individual residing in Becker, Minnesota, who is and was at all relevant times an employee of Antioch Company ("Antioch," the "Company," or "TAC"), and a participant at all relevant times in the Antioch Employee Stock Ownership Plan (the "ESOP"), a retirement plan subject to ERISA.

2.     Plaintiff Christopher Mino is an individual residing in Xenia, Ohio, who is and was at all relevant times an employee of Antioch, and a participant in the ESOP.

3.     Plaintiff Monica Lee Woosley is an individual residing in Hampshire, Illinois, who is and was at all relevant times an employee of Antioch, and a participant in the ESOP.

4.      Plaintiff Lynda D. Hardman is an individual residing in Springfield, Ohio, who is and was at all relevant times an employee of Antioch, and a participant in the ESOP.

5.      Plaintiff Evolve Bank & Trust ("Evolve") is an Arkansas bank and trust company, with its principal place of business in Parkin, Arkansas, and engaged in the business, *inter alia*, of providing independent fiduciary services for ESOPs and other entities.  On or about January 17, 2008, Evolve was appointed as sole trustee for the ESOP by the Antioch Board of Directors, and has served in that position continuously through the present date.

6.      Defendant GreatBanc Trust Company ("GreatBanc") is an Illinois corporation with its principal place of business in Lisle, Illinois, and engaged in the business, *inter alia*, of serving as an independent Trustee for employee stock ownership plans.  GreatBanc served as Trustee for the Antioch ESOP with respect to the transaction as hereinafter set forth.

7.      Defendant Lee Morgan was, at all times referred to herein, President and Chairman of the Board of Directors of Antioch, a member of the ESOP Committee, a fiduciary under ERISA § 3(21), 29 U.S.C. § 1002(21), and the beneficial owner of not less than 14.2% of all Antioch common shares issued and outstanding as of November 14, 2003.

8.      Defendant Asha Morgan Moran was, at all times referred to herein, Vice-President, Secretary, Chief Operating Officer, and Director of Antioch, a member of the ESOP Committee, a fiduciary under ERISA,  and the beneficial owner of 19.7% of all Antioch common shares issued and outstanding as of November 14, 2003.

9.      Defendant Chandra Attiken was, at all times referred to herein, Vice President of Human Resources for Antioch, a member of the ESOP Committee, a fiduciary under ERISA, and a shareholder of Antioch as of November 14, 2003.

2

10.     New Party Defendant Morgan Family Foundation (hereinafter sometimes referred to as the "Foundation") is a charitable foundation created by Lee Morgan and members of his family to hold legal title to certain assets obtained in whole or in part from the sale of Antioch stock in December 2003, owned by the Morgan family, individually or through trusts.  Upon information and belief, Defendants Lee Morgan and Asha Morgan Moran made gratuitous transfers of over $40 million into the Morgan Family Foundation in 2004, representing a large portion of the proceeds received by Defendants Lee Morgan and Asha Morgan Moran for the sale of their Antioch stock in the subject transaction.

## JURISDICTION AND VENUE

11.     Plaintiffs bring this action in a representative capacity on behalf of the ESOP as a whole under ERISA and Plaintiff Evolve brings this action as ESOP Trustee, seeking monetary damages and equitable relief for losses sustained as a result of breaches of fiduciary duty by ERISA fiduciaries in violation of ERISA § 404, 29 U.S.C. § 1104, and as a result of a non-exempt prohibited transaction in violation of ERISA §§ 406 and 408, 29 U.S.C. §§ 1106 and 1108.

12.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 502 of ERISA, 29 U.S.C. § 1132.

13.     ERISA provides that an ERISA plan participant or beneficiary has standing to bring a civil action under ERISA § 502 when that person "is or may become eligible to receive a benefit of any type from an employee benefit plan."  ERISA § 3(7), 29 U.S.C. § 1002(7). Plaintiffs are or may become eligible to receive benefits under the ESOP.

14.     Plaintiffs Bonnie Fish, Christopher Mino, Monica Lee Woosley, and Lynda D. Hardman in their representative capacity as plan participants on behalf of the ESOP as a whole,

3

and Plaintiff Evolve in its capacity as an ESOP fiduciary, pursuant to 29 U.S.C. § 1132(a)(2), bring this Second Amended Complaint, to recover appropriate monetary relief for the ESOP under ERISA § 409(a), 29 U.S.C. § 1109(a), including restoration to the ESOP of any losses to the Plan resulting from each breach of fiduciary duty and each prohibited transaction and any profits of an ESOP fiduciary that have been made through use of the assets of the ESOP and to obtain appropriate equitable relief and other relief under 29 U.S.C. § 1109(a) and 29 U.S.C. § 1132(a)(3), including without limitation, the remedies of recision and constructive trust imposed upon Defendants Lee Morgan, Asha Morgan Moran, Chandra Attiken, and the New Party Defendant.

15.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) and § 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2) in that one of the Defendants, GreatBanc, resides or may be found in this district.

16.     By Stipulation of the parties dated December 29, 2009 (Dkt. 115), this action is governed by Fed.R.Civ.P. 23.1 in all respects except that Plaintiffs are not required to comply with the pleading requirements in Rule 23.1(b).

### FACTS COMMON TO ALL CLAIMS

### <u>Historical Background of Antioch</u>

17.     Antioch was founded in 1926 and was incorporated in the State of Ohio in 1946. Prior to 1985, Antioch was best known as a producer of bookplates, bookmarks, book covers, and calendars.  After certain acquisitions in 1985 and 1990, Antioch's predominant product became photo albums.  However after 1995, Antioch changed again and became primarily a direct marketer of scrap books and accessories sold through the party plan direct sales method by

4

thousands of independent sales "consultants." By 2002, approximately 85% of Antioch's total sales volume was sold through its Creative Memories business unit.

18.     In 1968, Defendant Lee Morgan, son of the Company founder, joined the Company, becoming President and Chief Executive Officer in 1971 and Chairman of the Board in 1993. By 2003, Antioch had over 1,200 full-time employees and maintained domestic manufacturing and/or distribution facilities in Yellow Springs, Ohio, St. Cloud, Minnesota, Sparks, Nevada, Richmond, Virginia, and Lenexa, Kansas, as well as four separate international facilities.

19.     In 1979, Antioch established the ESOP (hereinafter sometimes referred to as the "Plan") to provide retirement benefits for Antioch employees. As of November 14, 2003, the ESOP owned 205,330 shares of Antioch common stock, representing 42.8% of all shares issued and outstanding (out of 480,016 total shares). The Morgan family (including Defendants Lee Morgan and Asha Morgan Moran, individually and as Trustee for certain Morgan Family Trusts) (hereinafter referred to collectively as the "Morgan family") was the beneficial owner of 223,256 shares representing 46.5% of all shares issued and outstanding. The remaining 12% of issued and outstanding shares were beneficially owned by 38 other shareholders.

20.     Pursuant to the terms of the Plan, the ESOP Committee (consisting solely of Defendants Lee Morgan, Asha Morgan Moran, and Chandra Attiken) had complete discretionary authority over plan administration and investments and directed the ESOP Trustee Barry Hoskins, the Company's CFO, to take such action as determined by the ESOP Committee.

21.     Antioch employees began receiving allocations of Company stock to their Plan account starting one year after they joined the Company as a direct result of Plan contributions

by the Company. Over time, participant accounts grew in value as the Company prospered and Company stock appreciated in value.

## The Repurchase Obligation Under ERISA

22.    Pursuant to IRC § 409(h)(1)(B), if employer securities held in an ESOP account are not readily tradable on an established market, ESOP participants, under certain circumstances, have the right to require that the employer repurchase the employer securities held in an ESOP account under a fair market valuation formula. This ESOP participant right is known as the "Repurchase Obligation" of the sponsor company. The Repurchase Obligation represents a claim on the future cash flow of the company sponsoring an ESOP and it occurs as a result of distributions being made from the ESOP.

23.    The timing of the Repurchase Obligations depends on the company's **distribution rules** and on the demographics of the employee population.

24.    Pursuant to applicable law, distributions to retirees **must begin no later than** the end of the plan year after the year in which retirement occurred. However, distributions for employee terminations **must begin no later than** the end of the fifth plan year after the year in which a participant was terminated. Of course, the company may exercise its discretion to implement rules for earlier distribution to such retirees or terminees.

25.    One critical exception to the plan distribution rules is that leveraged ESOPs (an ESOP that purchases employer securities in a leveraged transaction) can delay distributions until the leveraged loan is repaid.

26.    The Company, in conjunction with the plan fiduciaries, have a duty to prudently manage the Repurchase Obligation and to develop a plan to assure there are adequate resources to meet the Repurchase Obligation as it may come due.

6

27.     This means that, in connection with any proposed transaction involving the ESOP, the plan fiduciaries must consider and assess the Repurchase Obligation and when it will occur, use reasonable assumptions when forecasting the Repurchase Obligation, consider the impact of any transaction upon the plan for managing and funding the Repurchase Obligation, test the Repurchase Obligation's strategy in multiple scenarios (including optimistic and pessimistic forecasts as well as a "most likely" scenario), and consider how the current distribution rules will affect the Repurchase Obligation on a post-transaction basis.

28.     The most critical variables in developing the amount and timing of the Repurchase Obligation liability are the employer stock value and the employee turnover rate projected into the future.  Such assumptions must be reasonable, internally consistent, and consistent with other company financial planning.

29.     The Repurchase Obligation can be managed through a variety of techniques that involve the modification of the distribution rules.  These techniques must be considered when a proposed transaction may have a material adverse impact on the amount or the timing of the Repurchase Obligation.

30.     A critical act in the administration of an ESOP for a non-publicly traded company is establishing the price at which an employee who leaves the company can redeem his shares. "If the price is set too low, employees who leave will feel short-changed.  If it is set too high, it may precipitate so many departures that it endangers the firm's solvency."  *Armstrong v. LaSalle National Assn.,* 446 F.3d 728, 730 (7th Cir. 2006).

2049710.1

## Antioch's Repurchase Obligation

31.     Because Antioch was a nonpublic Company, with employer securities not readily tradable upon an established market, IRC § 409(h)(1)(B) mandated the Repurchase Obligation and related participant put right for the benefit of all plan participants.

32.     Prior to November 2003, Antioch had an ESOP Distribution Policy in place for handling its Repurchase Obligation which provided for:

    a.      Redemption by the Company of ESOP shares allocated to participant accounts as each participant retires, dies, or is terminated as an employee;

    b.      Retirement of such shares redeemed as treasury stock;

    c.      Terminees who qualify as retirees (age 65 or age 50 with at least 5 years of service) were entitled to receive their vested account balance either in a single lump sum payment or in installments over 5 years;

    d.      Terminees who do not qualify as retirees (under age 50 or less than 5 years of service) were entitled to receive their vested account balance as deferred distributions either in a single lump sum payment or in installments over 5 years, beginning at the earlier of qualifying as a retiree (age 50 with 5 years of service) or the Sixth Plan Year following the Plan Year of employment termination; and

    e.      Qualifying retirees who terminate employment prior to October 1 and consent to an immediate distribution would receive a distribution of cash as soon as practical based on the preceding year end valuation.

This ESOP Distribution Policy is hereafter referred to as the "Old ESOP Distribution Policy."

33.     The Repurchase Obligation was a major expense for Antioch each year.  As stated by Defendant Lee Morgan in the Chairperson's Letter to all stockholders dated March 18, 2002:

8

> "The biggest cloud over our organization in my opinion, is our obligation
> to repurchase our stock both from ESOP participants as they retire and
> from other stockholders who have no other market for their shares. . . .
> [t]he potential impact on our cash position is huge."

The average expense for the repurchase of ESOP stock incurred by the Company for the five

years preceding 2003 was approximately $12-14 million per year.

34.     Because of the importance of the Antioch Repurchase Obligation, Antioch's

Chief Financial Officer would annually prepare a Report to the Board of Directors projecting

Antioch's future Repurchase Obligation during the next 20 years based upon certain

assumptions.  The assumptions included retirement age, employee terminations, compensation of

new hires, investment earnings, growth of stock values, share contributions and share

distributions *inter alia*.

35.     In each of these Repurchase Obligation Reports, it was assumed that participants

would retire at age 65 even though Retirement was defined in the Plan Document as:

> "Termination of Service after the earlier of (1) on or after attaining age 65, or (2)
> on or after the Allocation Date coinciding with or next following attaining age 50
> and completing at least 5 years of service."

36.     Antioch's Chief Financial Officer presented to the Board of Directors a

Repurchase Obligation Report in or about July 2003 and presented a revised Repurchase

Obligation Report to the Board of Directors on December 4, 2003.

37.     The value of Antioch's stock was recalculated annually by an independent

appraiser. This independent appraisal was customarily issued within 3 to 4 months after the close

of each calendar year.  However, the ESOP Committee was not bound by the appraisal, and it

made the final determination each year as to the fair market value of ESOP shares.  At all

relevant times prior to November 2003, the ESOP utilized Business Valuations, Inc. ("BVI") as its independent appraiser of the company.

38.     BVI valued Antioch's total equity as of December 31, 2002, at $333.2 million on a noncontrolling minority ownership interest basis, and BVI valued the ESOP's shares at $680.00 per share, after applying a 20% discount for lack of marketability ("DLOM").  In this valuation, BVI considered the Repurchase Obligation, and BVI determined that no valuation adjustment was required **for the Repurchase Obligation.** BVI reached this conclusion because the Company was financially able to redeem the shares for cash or was taking steps to assure that funds would be available to satisfy the Repurchase Obligation.

39.     A large percentage of the ESOP participants were approaching or were over 50 years of age by 2003, and the ESOP which was almost entirely invested in Antioch stock was their principal retirement asset.

## Background of the Proposed Transaction

40.     Antioch had elected Subchapter S status on January 1, 1999, thus eliminating taxation at the corporate level.  As an S-corporation, the non-ESOP shareholders were required to pay their share of tax on corporate earnings, while the ESOP was not subject to income tax liability on the dividends or other distributions that it received.[1]

41.     Each year after the S-corporation election, Antioch distributed to its shareholders approximately 45% of its taxable income.  The non-ESOP shareholders used this distribution to pay their income tax obligation at the shareholder level, while the ESOP kept its distribution and allocated same to the plan participant accounts.

---

[1] When an ESOP participant actually received cash for his ESOP shares, then he had to make payment for income taxes.

42.     For the year ended December 31, 2002, Antioch distributed approximately $35 million in cash to all shareholders, of which the ESOP received approximately $15 million in cash.

43.     In late 2002, Defendant Lee Morgan, Antioch's Chairman and owner of approximately 14% of its stock, became interested in methods that would eliminate the need to make annual shareholder distributions in the amount of about 45% of taxable income at the corporate level.

44.     During 2003, Defendant Lee Morgan understood that one way the Company could avoid having to make the enormous distributions to non-ESOP shareholders for payment of taxes at the shareholders level would be for the ESOP to own 100% of the Company stock. Having the ESOP own the entire Company would eliminate the need for the Company to make pro rata cash distributions to the ESOP that were required to allow the Company to make distributions to non-ESOP shareholders.

45.     However, Defendants Lee Morgan and Asha Morgan Moran, individually and as Trustee of certain Morgan Family Trusts, were adamant in their unwillingness to part with their control and beneficial ownership of the Company.

**Design and Structure of the Proposed Transaction**

46.     Thereafter, Antioch's financial advisor, Deloitte & Touche, designed and proposed a solution to this problem, in the form of a transaction to preferentially cash-out the non-ESOP shareholders.  Under this transaction, a new company would be formed (New Antioch) and merged into Antioch. The merged companies would make a tender offer in which only the non-ESOP shareholders would participate in a stock purchase transaction.  The proposed transaction would be financed entirely by use of the Company's cash and the

2049710.1

Company's borrowings. Under the tender offer, all non-ESOP shares would be redeemed in exchange for either cash only or a combination of cash, notes, and warrants. The Morgan family would be free to opt for the combination of cash, notes, and warrants. From this option, the Morgan family would obtain sufficient cash to pay their tax obligations, a future income stream from the note payments, and a warrant to purchase shares of common stock in 2014 at the proposed price of $875.00 per share. This proposed transaction was referred to as the "100% ESOP Transaction."

47.     Upon completion of the transaction, the ESOP would own 100% of the Company stock at least until 2014. At that time, the warrants could be exercised and the ESOP returned to approximately 43% ownership. And, the Morgan family would maintain control of the Company management, the Board of Directors, and the ESOP Committee during the period between December 2003 and 2014.

48.     This transaction was never intended to transfer true control and ownership of Antioch to the ESOP as a 100% ESOP owned Company. For example, even after the transaction was completed, the ESOP shares were valued each year **on a marketable, noncontrolling ownership interest basis rather than on a controlling ownership interest basis. This level of value acknowledged** the ESOP's minority (or noncontrolling) position after dilution from warrant holders and synthetic equity holders.

49.     By August 2003, Deloitte & Touche recommended $875.00 per share as the purchase price for the tender offer, and the Antioch Board of Directors determined that such a transaction should be pursued.

12

### Retention of GreatBanc and Duff & Phelps and Their Fiduciary Services

50.     In or about August – September 2003, GreatBanc was engaged to serve as Trustee for the ESOP with respect to the proposed tender offer for shares and the related merger (hereinafter referred to as the "Proposed Transaction").  In connection with the Proposed Transaction, GreatBanc had discretionary authority on behalf of the ESOP and was at all relevant times an ERISA fiduciary.

51.     Pursuant to the engagement, GreatBanc was expected to conduct due diligence and to determine the fairness of the transaction to the ESOP from a financial point of view.

52.     GreatBanc hired Duff & Phelps ("D&P") to prepare a fairness opinion and to advise GreatBanc with respect to the fairness of the proposed transaction to the ESOP.

53.     To determine financial fairness, GreatBanc and its financial advisor were required:

        a.     To determine whether the price paid for the stock of the selling shareholders exceeded adequate consideration (hereinafter referred to as the "absolute fairness test");

        b.     To determine whether the stock transaction is fair based on relative measures and not based on the share price alone (hereinafter referred to as the "relative fairness test"); and

        c.     To determine whether the transaction structured as a whole is truly fair to the ESOP given the differences in consideration among the various shareholders, other financial terms of the proposed transaction, and the financial alternatives that may have been available to the Company shareholders (hereinafter referred to as the "structural fairness test").

13

54. During August and September 2003, GreatBanc and D&P engaged in due diligence relating to the ESOP, the Company and the proposed Transaction. As part of the due diligence, GreatBanc requested that the Company provide Repurchase Obligation projections looking forward 25 years from December 31, 2002 based upon the following two scenarios:

      a.    TAC's existing and projected repurchase obligation assuming the Transaction was not consummated ("Status Quo Model"); and

      b.    TAC's existing and projected repurchase obligation assuming the Transaction was closed ("Post-Transaction Model").

55. Barry Hoskins, the former ESOP trustee and Antioch Chief Financial Officer, submitted these models to GreatBanc on August 28, 2003.

56. The Status Quo Model was a single page summary taken from Hoskins' 20-page Repurchase Obligation study prepared for the Board of Directors in July 2003. Hoskins never provided GreatBanc with the other 19 pages of the study and GreatBanc never asked for it. The Post-Transaction Model was also a single page document. Neither of the Hoskins' models explained any of the assumptions upon which each model was based and GreatBanc never asked Hoskins to provide such information.

57. After completion of their due diligence in September 2003, GreatBanc and D&P prepared a financial analysis of the Proposed Transaction which was never shared with nor disclosed to Antioch or the ESOP participants.

58. In October 2003, GreatBanc and D&P engaged in negotiations with TAC and its advisors regarding the terms of the Transaction. Such negotiations became acrimonious after GreatBanc and D&P rejected the initial proposal of TAC as unfair and described the proposed Transaction as "the most aggressive deal structure in the history of ESOPs." GreatBanc and

14

D&P thereafter began negotiating for additional benefits for the ESOP as a condition for their approval of the Transaction.

59.     By mid-October 2003, GreatBanc had negotiated and thereafter agreed to a transaction under which it would decline to sell ESOP shares in the Tender Offer in exchange for certain agreed annual distributions (dividends and contributions) to be paid to the ESOP by the Company over a five year period and in exchange for Put Price Protection ("PPP") for all ESOP participants who terminated their employment during a three-year period ending on September 30, 2006. The Proposed Transaction as revised is hereinafter referred to as the "Amended Transaction."

60.     During and after completion of these negotiations, GreatBanc and D&P prepared a financial and fairness analysis of the Amended Transaction, which was never shared with nor disclosed to Antioch or the ESOP participants.

61.     The Amended Transaction when consummated would and did result in the ESOP receiving at least 25% less in annual distributions (contributions and dividends) than it had been receiving pre-transaction pursuant to S-corporation rules.

62.     Pursuant to an Agreement implementing the PPP, the Company agreed to adopt special distribution rules applicable to all ESOP participants who terminated their employment during the period January 1, 2003, through September 30, 2006. These special distribution rules provided as follows:

- With respect to any ESOP participant who terminates employment after December 31, 2002 and prior to October 1, 2004 and who consents to a distribution, shares will be purchased at the greater of Fair Market Value or $840.26 per share;
- With respect to any ESOP participant who terminates employment on or after October 1, 2004 and prior to October 1, 2005 and who consents to a distribution, shares will be purchased at Fair Market Value plus $21.00 per share;

15

- With respect to any ESOP participant who terminates employment on or after October 1, 2005 and prior to October 1, 2006 and who consents to a distribution, shares will be purchased at Fair Market Value plus $12.80 per share.

63. The time between the implementation of the PPP and the annual deadline dates ending on September 30, for each of the three years, created special, one time termination liquidity events. These liquidity events which became applicable to all ESOP participants allowed the participants to terminate their employment and receive plan distributions under conditions far more favorable than those offered in most retirement plans.

## Adoption of the New ESOP Distribution Policy

64. In connection with the negotiation for and adoption of the PPP, neither GreatBanc nor D&P considered the need to reassess the Antioch Repurchase Obligation modeling projections previously utilized in their financial and fairness analysis in light of the new PPP terms. As a result, neither GreatBanc nor D&P ever analyzed the financial impact of the PPP upon the Repurchase Obligation nor modified its modeling projections used in determining financial fairness.

65. As management and financial advisors for the Company and the ESOP discussed the valuation method for PPP, the advisors shared "horror stories of 'run on the bank' type scenarios" where participants cashed in their ESOP shares to take advantage of PPP in other ESOP transactions.

66. After Antioch's CFO disclosed the PPP to the transaction lender Bank One, the lender demanded that Antioch quantify the impact of the ESOP Repurchase Obligation from PPP. Antioch was forced to admit to Bank One that Antioch's Repurchase Obligation projections had assumed retirement at age 65 and that the PPP may induce some employees to

16

terminate under Early Retirement between age 50 to 65 because of the enhanced payout from PPP.

67.     Thereafter, Bank One became concerned that a flood of employees age 50 and over would declare retirement and demand a lump sum cash payment for the ESOP shares allocated to their ESOP account.  To prevent this threat to Antioch's repayment of the transaction loan, Bank One demanded that the Old ESOP Distribution Policy be amended so that qualifying retirees could only be paid out by installment distributions over a 5-year period evidenced by a promissory note.

68.     Antioch agreed to this demand, but determined from its financial advisor that it was also necessary to modify the Old ESOP Distribution Policy to permit terminees under age 50 to also receive their payouts in five installments beginning in the year after retirement as opposed to waiting 5 years before any distribution.

69.     Antioch implemented these modifications (hereinafter referred to as the "New ESOP Distribution Policy") between November and December 2003 and made them effective December 1, 2003.  The New ESOP Distribution Policy, when combined with the PPP, created a new and substantial contingent liability that was incorporated into the Amended Transaction.

70.     The Individual Defendants and Antioch never disclosed to GreatBanc or D&P the concerns of Bank One, the demand of Bank One to modify the Old ESOP Distribution Policy, nor the discussions for and adoption of the New ESOP Distribution Policy.

17

**Undisclosed Concern That PPP and New ESOP Distribution Policy
Would Become an Incentive for Employees to Retire Early And
Demand Their Retirement Accounts**

71.　　After the PPP and the New ESOP Distribution Policy were put in place,

Defendant Lee Morgan expressed his concern to Defendants Asha Moran, Chandra Attiken and

the Antioch CFO that:

> "The scenario that concerns me is where the terminated participant is under age
> 50 and wants a distribution immediately . . .. The fear is that we have a number of
> folks with seven-figure accounts under the age of 50 who would likely terminate
> if they could get the money. I am concerned that the accounts not become an
> incentive for people to terminate employment before age 50 just to get the
> money."

72.　　As a result of these concerns, in November 2003, the Antioch CFO did a revised

2003 Repurchase Obligation analysis in light of the PPP and the New ESOP Distribution Policy

which, for the first time, was not based on an assumption that employees would only retire at the

normal retirement age of 65. At or about the same time, Defendant Chandra Attiken did a

similar analysis from a Human Relations ("HR") perspective on an employee-by-employee basis

as to who was likely to leave the Company as a result of the Amended Transaction and how

much this would cost the Company in Repurchase Obligation.

73.　　The Antioch CFO prepared a Repurchase Obligation Study for years 2003-2027

dated December 4, 2003 (the "Revised Repurchase Study") which projected that payments for

ESOP redemptions post-transaction would approximate $70 million during the PPP period of

2004 through 2006. This was **approximately $42 million higher than the amount of**

**repurchase payments projected during the same period in the Post-Transaction Model**

**provided by the CFO to GreatBanc and D&P in August 2003.**

74.　　Defendant Chandra Attiken conducted her detailed HR analysis and came to a

different and more serious conclusion. She concluded that it was more likely that payments for

ESOP redemptions during the PPP period **would approximate $95 million or approximately $25 million higher than projected by the Antioch CFO or $67 million higher than in the Post-Transaction Model previously provided to GreatBanc and D&P**.

75.     As a result of these revised Repurchase Obligation projections during the PPP period and the concern over the sufficiency of Antioch cash flow to pay its post-transaction debt, Defendant Lee Morgan scheduled a Board Meeting on December 4, 2003 to discuss these issues and vote upon whether to proceed with the Amended Transaction.

76.     At the Board Meeting, the CFO presented the Revised Repurchase Study and a 100% ESOP Recapitalization Study which reflected Antioch's projected cash flows in the event Antioch sales continued to decline and then flattened out with eroding margins (described as the "Downside Scenario").  Defendant Chandra Attiken also presented to the Board her analysis of the growing Repurchase Obligation projections.

77.     Notwithstanding the concerns and the analysis presented at the Board meeting, none of the Individual Defendants nor any knowledgeable members of Antioch management disclosed to GreatBanc or D&P:

A)     Lee Morgan's concerns alleged in paragraph 71;

B)     The Revised Repurchase Study;

C)     The Repurchase Obligation analysis by Defendant Chandra Attiken;

D)     The 100% ESOP Recapitalization Study; or

E)     The discussions at the December 4, 2003 Board meeting.

78.     Between October 1, 2003 and the close of the Amended Transaction, neither GreatBanc nor D&P made a diligent investigation or inquiry of any changes in the Company or ESOP administration which would have revealed these matters.

19

79.     Prior to approving the Amended Transaction for the ESOP and declining the tender of shares by the Company, GreatBanc should have assessed the Company share value impact of the contingent liability related to the New ESOP Distribution Policy and the PPP incorporated into the Amended Transaction.  However, both GreatBanc and D&P either failed to make this assessment and/or acted imprudently in making the assessment.

### GreatBanc and Antioch Disclosures to Participants

80.     On November 14, 2003, Antioch issued a Prospectus and Tender Offer to all Antioch shareholders offering to redeem their shares for $850.00 per share for either cash or a combination of one-third cash, one-third promissory note, and one-third warrants to purchase shares of common stock in 2014 at $850.00 per share.  No limit was placed on the amount of cash that shareholders could elect to take in the transaction. However, restrictions were placed on the cash/ note/warrant option, thereby limiting the number of shares subject to warrant in 2014.

81.     A condition to closing the transaction was that the ESOP Trustee must decline to sell Antioch shares in the Tender Offer.  Since approval of the Amended Transaction was conditioned upon an act of the ESOP Trustee, the ESOP Trustee effectively had the power to approve or reject the Amended Transaction.

82.     The prospectus and the tender offer issued to shareholders indicated that GreatBanc and D&P had made a preliminary determination that the Amended Transaction was fair from a financial point of view.  However, these materials did not include nor disclose any fairness analysis prepared by or relied upon by GreatBanc and/or D&P.

83.     On November 14, 2003, GreatBanc mailed written materials to ESOP participants. These written materials  indicated that GreatBanc and D&P were in the process of analyzing the Amended Transaction to determine its financial fairness and to determine whether

20

it was in the best interest of the ESOP. No financial analysis was included or disclosed therewith.

84. Thereafter, neither GreatBanc nor D&P ever provided any written or verbal communication to Antioch or to the ESOP participants which explained their financial fairness analysis of the Amended Transaction or their application of the absolute fairness test, relative fairness test, or structural fairness test.

85. As a result of never having been told anything about how GreatBanc and D&P had performed their fairness analysis, or about any of the defects in such analysis, neither the ESOP participants, nor anyone other than GreatBanc, had actual knowledge of the existence of ERISA claims against GreatBanc until 2009.

## Closing of the 100% Amended ESOP Transaction

86. In December 2003, each of the non-ESOP shareholders agreed to the Tender Offer and tendered in the aggregate 274,686 shares of Antioch common stock, and the Company redeemed all of the shares pursuant to the terms of the Tender Offer.

87. With regard to 155,000 of the shares redeemed, each share redeemed was funded by exchange consideration comprised of $280 per share in cash (less tax distribution reimbursement), a $280 per share principal amount 8% subordinated note, and a warrant to purchase one share of Antioch common stock for $850 per share in 2014, subject to pro-ration. The balance of the redemption was funded by externally borrowed funds.

88. After the Amended Transaction, the ESOP owned 100% of the outstanding common stock of Antioch. The ESOP's stock interest was expected to be diluted by the warrants

21

and by certain interim appreciation rights issued by the Company[2], as well as from the trend and treatment of future ESOP share repurchases over time. As such, the ESOP's stock interest was expected to be reduced to a fully-diluted 46% interest when the warrants were exercisable in 2014.

89.     In order to fund the Amended Transaction, Antioch used $46 million of its cash and borrowed $109 million from a consortium of lenders led by Bank One. GreatBanc's determination of this debt load was based upon the assumption by management that Antioch's annual expense for its post-transaction ESOP Repurchase Obligation would not exceed an average of $10-12 million per year.

90.     GreatBanc and D&P's determination of the fairness of the Amended Transaction was based on the assumption from information provided by Antioch management in August 2003 that the ESOP redemption payments during the PPP period would approximate only $28.5 million, leaving a significant cushion of cash flow to cover the transaction debt and grow the business in accordance with unreasonably rosy projections post-transaction. In fact, ESOP redemption payments for 2004 alone were approximately $108 million.

**Post-Transaction Impact of the Amended 100% ESOP Transaction**

91.     The enormous increase in Company debt from the Amended Transaction substantially increased Antioch's debt-equity ratio, with the result that Antioch's stock value "was much more volatile and its bankruptcy risk greater." *Steinman v. Hicks,* 352 F.3d 1101, 1106 (7th Cir. 2003).

---

[2] For the calendar year ended December 31, 2004, the dilution reduced the equity value of the Company by approximately $79.5 million or 33 1/3% of the Aggregate Equity Value (after reduction for long-term debt).

92.     As a result of the Amended Transaction, Antioch's interest bearing debt increased from $10.8 million as of December 31, 2002, to a staggering $201 million as of December 31, 2003.  This also caused Antioch's financial position to deteriorate from a positive net worth of $87 million as of December 31, 2002, to a negative net worth of $78 million as of December 31, 2003.

93.     GreatBanc never obtained any independent appraisal prior to the December 2003 transaction establishing that the price to be paid by the Company to the non-ESOP shareholders was not more than adequate consideration.  Rather, GreatBanc relied upon an informal valuation prepared by Antioch's adviser Deloitte & Touche and upon a fairness opinion obtained from D&P.

94.     After the Amended Transaction, GreatBanc terminated BVI and retained Prairie Capital Advisors ("Prairie") to value Antioch stock for ESOP purposes as of December 31, 2003.  Prairie issued its valuation report as of December 31, 2003 to the ESOP Trustee in June 2004.  That valuation report valued the Company equity to the ESOP at $894.00 per share on a noncontrolling (minority) ownership interest basis post-transaction.  In arriving at its valuation, Prairie only applied a 5% DLOM and it made no mention of the Repurchase Obligation as affecting the fair market value of the Company shares.

95.     Prior to the June 2004 valuation report, the ESOP appraisals had never concluded a fair market value per share in excess of $680.  Thus, when the Company reported to participants the valuation at $894.00 per share as of December 31, 2003, the participants saw a huge increase in their share value which they wanted to preserve for their retirements.

96.     Because the Put Price Protection Agreement permitted each employee to decide by September 30, 2004 whether to terminate his or her Antioch employment and have the

23

Company redeem their stock at the greater of fair market value or $840.26 per share, the huge increase in per share value to $894.00 was a strong incentive to employees to terminate and to cash in their ESOP holdings. In addition, any report to employees of a declining performance by Antioch after December 31, 2003 would likely increase the employee departure rate. This was because employees who expected the Company stock value to decline for the year ending December 31, 2004 could avoid the loss by termination of employment on or before September 30, 2004.

97.     Any increase in the employee departure rate was a serious risk to the Company. It would require the Company to borrow additional funds in order to finance stock redemptions exceeding $10 million per year. In turn, such additional borrowings would violate Antioch's financial covenants with its lenders and would threaten its ability to meet its obligations to lenders and to ESOP participants.

98.     Each of the Defendants were well aware of these risks prior to the transaction as evidenced by the Prospectus and Tender Offer which states as follows:

> The Company will experience significant repurchase obligations as employees with significant vested account balances in the ESOP die, become permanently disabled, resign, retire or diversify. These repurchase obligations will be exacerbated if, at the same time, the fair market value of the Common Stock subject to repurchase increases substantially. As a result, the Company's cash resources might be severely drained and could be insufficient to meet the Company's repurchase obligations. The Company has projected the potential Repurchase Obligation through the year 2013 under a set of assumptions that the Company believes to be reasonable. Because it is impossible to estimate future repurchase obligations accurately, there is a possibility that the Company's repurchase obligations will be significantly greater than anticipated. If the Company were unable to meet its repurchase obligations, the Company could be left insolvent and unable to pay other obligations, including the subordinated notes, and the warrants could become worthless.

24

99.    Consideration of these risks should have been factored into GreatBanc's fairness analysis and the decision whether to approve the Amended Transaction on its specific terms. Because GreatBanc and D&P never disclosed their fairness analysis to anyone but themselves, there was no basis for anyone to know, and no one did know, that the GreatBanc fairness analysis failed to properly consider and account for these risks and was thereby deficient.

100.    In 2004, Antioch provided financial reports to employee-participants that revealed a decline in sales from the prior year. By June 2004, employee-participants received their annual ESOP statements which reflected the increased value of their ESOP accounts as of December 31, 2003, based upon the Prairie valuation.

101.    Prior to October 1, 2004, approximately 175 employees gave notice of their resignation of employment so as to lock in the value of their ESOP accounts at $894.00 per share before the October 1, 2004 deadline in the Put Price Protection Agreement. These predictable events exacerbated the Company's Repurchase Obligation, drove the Company deeper into debt, and caused an immediate breach of Antioch's financial loan covenants with the lenders from the 2003 transaction.

102.    In 2004, Antioch was forced to restructure its debt and to borrow additional funds to pay its Repurchase Obligation. By the end of 2004, Antioch had paid out almost $75 million in cash to fulfill its ESOP Repurchase Obligation, and Antioch assumed an additional $30 million in note debt to terminees.

103.    However, Antioch managed to satisfy its Repurchase Obligation and service its bank debt until after June 2006 when it depleted its cash reserves and became too overleveraged from taking on new debt to fund the Repurchase Obligation.

104.    Net earnings of the Company decreased from $44.8 million as of December 31, 2003, to $9.4 million as of December 31, 2006.  Given Antioch's mounting financial problems, after 2006, Antioch stopped making the agreed cash dividend payments to the ESOP.

105.    Despite a declining financial performance, there was nothing to suggest nor did the ESOP Participants know that GreatBanc had failed to discharge its fiduciary duties in 2003.

106.    Effective January 1, 2007, Antioch amended and restated its Plan to eliminate lump sum payments for terminees and to defer the distribution of the capital accumulation in a participant's Plan account until six years following the year of termination (except for persons reaching retirement age).

107.    By 2007, Antioch acknowledged in its business records, that it had begun to experience a significant decline in sales and profitability in 2004, that the ESOP had become an incentive to leave the Company, that there had been a veritable stampede of employees that left the Company during 2004 through 2006 (800 out of 1,150 employees left the Company with the Company paying $190 million for repurchase of 50% of the stock), and that the Company had been at risk of failing IRC ¶ 409(p)[3] and thereby being subject to a penalty that would have put the Company out of business.

108.    In 2008, Antioch filed for bankruptcy when it was unable to meet its ESOP participant stock Repurchase Obligations, its former employee note payment obligations, and its banking obligations.

---

[3] ¶ 409(p) imposes large penalty taxes in situations where an S Corporation sponsoring an ESOP has "synthetic equity" (a term that includes warrants) held or constructively held by certain persons in amounts that exceed certain limits imposed by ¶ 409(p).

2049710.1

109.     The ESOP is now worthless and seeks to recover the losses sustained by the Plan as a result of the Defendants' breaches of fiduciary duty and from the prohibited transactions in violation of ERISA in which they engaged.

**FIRST CLAIM FOR RELIEF – VIOLATION OF
ERISA § 404, 29 U.S.C. § 1104
(Defendants GreatBanc, Lee Morgan, Asha Morgan and Chandra Attiken)**

110.     Plaintiffs incorporate by reference the foregoing allegations as if fully rewritten herein.

111.     Pursuant to § 404 of ERISA, 29 U.S.C. § 1104, a fiduciary with respect to a qualified retirement plan is required to discharge his duties solely in the interests of the participants and beneficiaries of the plan and for the exclusive purpose of providing benefits to participants and their beneficiaries, with the care, skill, prudence, and diligence that a prudent man acting in a like capacity and familiar with such matters would use for the conduct of an enterprise of like character and with like aims.

112.     At all relevant times herein, the buyout of the non-ESOP shareholders in December 2003, was a 100% ESOP Transaction that involved the exercise of discretionary authority by GreatBanc, as transactional ESOP trustee. Such discretionary authority was exercised by GreatBanc in the negotiation and establishment of the terms of the Amended Transaction and in the approval of same.

113.     To the extent that Defendants Lee Morgan, Asha Morgan Moran, and Chandra Attiken were in possession of material information relating to the financial fairness of the Amended Transaction, which they failed to disclose to GreatBanc prior to its approval of the Amended Transaction, said Defendants also exercised discretionary authority by omission in connection with the approval of the Amended Transaction.

27

114. Defendants Lee Morgan, Asha Morgan Moran, and Chandra Attiken, as Directors or as members of the ESOP Committee, also were required to exercise ERISA fiduciary duties in monitoring the actions of GreatBanc as Trustee after its appointment. Because Defendants Lee Morgan, Asha Morgan Moran, and Chandra Attiken, as ESOP fiduciaries, can be charged with knowledge of their self-dealing and with any improper or imprudent actions taken as officers of the Company, their failure to act prudently on the basis of that knowledge violates their fiduciary duties under ERISA.

115. At all relevant times herein, Defendants Lee Morgan, Asha Morgan Moran, and Chandra Attiken were fiduciaries as defined by ERISA.

116. Each of the Defendants was an ERISA fiduciary in connection with the Amended Transaction in December 2003, and was required to act with the highest degree of skill, prudence, diligence, loyalty, and due care to the ESOP participants and beneficiaries with respect to any decisions or acts affecting the ESOP.

117. The Proposed Transaction created a serious risk that a large block of employees would resign and demand redemption of their shares. Such a share redemption would create liquidity and other financial problems for the Company and trigger a severe decrease in the value of the employer shares. The Proposed Transaction also substantially increased Antioch's debt-equity ratio and created stock value volatility and greater bankruptcy risk.

118. The Amended Transaction as negotiated by GreatBanc exacerbated this risk by incentivizing employees to terminate their employment and to lock in their stock values at an inflated value. Such terminations created even more liquidity and financial problems and breach of loan covenants with lenders. And such terminations triggered an even greater decline in the value of ESOP shares.

119.     Defendant GreatBanc behaved imprudently and breached its fiduciary duty to plan participants including in the following respects:

a.     By failing to conduct adequate due diligence with respect to Antioch's historical and projected future performance, its debt coverage analysis and its Repurchase Obligation;

b.     By failing to obtain or prepare a Repurchase Obligation study to assure there was adequate cash flow after debt coverage to meet the Antioch Repurchase Obligation on a post-transaction basis;

c.     By failing to assess the Antioch Repurchase Obligation through the use of reasonable assumptions and to consider the impact of the 100% ESOP Transaction and its PPP upon the ESOP for managing and funding the Repurchase Obligation;

d.     By failing to test the Repurchase Obligation analysis on a post-transaction basis using multiple scenarios (including optimistic, pessimistic, and "most likely" forecasts);

e.     By failing to conduct adequate due diligence after D&P issued its financial fairness analysis and before closing of the Amended Transaction so as to determine whether any conditions had changed which materially altered the D&P financial fairness analysis;

f.     By failing to consider all options for preventing a stampede of employees out of the Company to take advantage of the benefits of the PPP;

g.     By failing to determine and use reasonable and internally consistent assumptions in any Repurchase Obligation analysis;

29

h. By failing to assess the impact of the liquidity events created by the PPP and the contingent liability which they created;

i. By failing to assess the impact of the contingent liability upon the value of the Company on a post-transaction basis;

j. By failing to properly consider and assess this contingent liability in connection with determining the absolute fairness, relative fairness, and structural fairness of the Amended Transaction taken as a whole;

k. By failing to determine the consequences of the Amended Transaction for the risk borne by the ESOP and its participants;

l. By failing to obtain an independent ESOP appraisal on a post-transaction basis to determine the valuation impact of the Amended Transaction;

m. By failing to obtain an independent appraisal as of the transaction date to confirm that the sellers were paid no more than fair or adequate consideration for their shares;

n. By basing its assessment of financial fairness upon projected value of shares repurchased as determined by sellers and/or their advisors that was unrealistic in light of historical experience and foreseeable circumstances;

o. By failing to negotiate for or condition approval on corporate action that would reduce the likelihood of a "stampede" of terminations and share redemptions;

p. By negotiating certain terms and approving the Amended Transaction which were under all circumstances imprudent to the ESOP and its participants;

30

q.  By approving a transaction which created a materially higher debt to equity ratio for Antioch with a resulting increase in stock value volatility and bankruptcy risk, thereby jeopardizing the principal retirement asset of over 1,200 Plan participants;

r.  By effectively approving a transaction price for the selling shareholders that was substantially greater than fair market value for their shares; and

s.  By failing to apply a DLOM (or other valuation adjustments) to the ESOP stock valuation as of December 31, 2003, to reflect the additional risk of loss to the Plan created by the Amended Transaction.

120.  Defendants Lee Morgan, Asha Morgan Moran, and Chandra Attiken behaved imprudently and breached their fiduciary duty to the ESOP, including in the following respects:

a.  By failing to disclose to GreatBanc and D&P in November and December, 2003:

(i) the Bank One concerns regarding the Old ESOP Distribution Policy;

(ii) the Bank One demands for modification of the Old ESOP Distribution Policy relating to qualified retirees;

(iii) the professional advice received by Antioch for modification of the Old ESOP Distribution Policy relating to terminees who were not qualified retirees;

(iv) the decision to adopt the New ESOP Distribution Policy effective December 1, 2003;

(v) the terms of the New ESOP Distribution Policy and the expected financial impact upon the Company;

(vi) the concerns of Antioch management that the New ESOP Distribution Policy would likely create a "run on the bank" by employees seeking to cash out during the PPP period;

(vii) the Revised Repurchase Study prepared by the Antioch CFO;

31

(viii) the 100% ESOP Recapitalization Sensitivity Analysis;

(ix) the HR Repurchase Obligation analysis prepared by Chandra Attiken; and

(x) the discussions at the December 4, 2003 Board of Directors meeting;

b.      By failing to permit GreatBanc to participate in the decision to adopt the New ESOP Distribution Policy;

c.      By failing to disclose to GreatBanc and D&P material financial and operational information regarding the business of Antioch, its future prospects and the unlikelihood of achieving management projections provided to GreatBanc and D&P;

d.      By failing to monitor the actions of GreatBanc as trustee and to assure that that GreatBanc was provided all material information relating to the determination of financial fairness to the ESOP; and

e.      By allowing their personal interests in consummating the Amended Transaction to cloud their judgment and to permit approval of the Amended Transaction without full disclosure of all material information to GreatBanc.

121.    By engaging in the acts and transactions set forth above, Defendants have engaged in breaches of fiduciary duty in violation of ERISA.

122.    Pursuant to § 409 of ERISA, 29 U.S.C. § 1109, Defendants are jointly and severally liable to make good to the ESOP any losses resulting from each breach.

123.    Defendants Lee Morgan, Asha Morgan Moran, and Chandra Attiken are also liable for failing to bring an action against GreatBanc and themselves for breach of their ERISA fiduciary duties ("that this would require the ESOP Trustee to bring suit against himself does not

32

relieve him of this duty under ERISA").  *Delta Star v. Patton,* 76 F. Supp. 2d 617, 637 (W.D. Pa. 1999).

124.    In breaching their duties and dealing with the assets imprudently or for their own personal interests, Defendants abused and put at risk ESOP assets belonging to the entire ERISA Plan.

125.    As a direct and proximate result of the breaches of fiduciary duty in violation of ERISA, the ESOP has been damaged in an amount to be determined at or before trial.

### SECOND CLAIM FOR RELIEF – VIOLATION OF ERISA § 406, 29 U.S.C. § 1106

### VIOLATION OF PROHIBITED TRANSACTION STATUTE
(Defendants GreatBanc, Lee Morgan, Asha Morgan and Chandra Attiken)

126.    Plaintiffs incorporate by reference the foregoing allegations as if fully rewritten herein.

127.    Pursuant to § 406 of ERISA, 29 U.S.C. § 1106, certain transactions such as a sale or exchange of any property between a plan and a party in interest or a fiduciary, are expressly prohibited unless the transaction is exempt under § 408 of ERISA, 29 U.S.C. § 1108.  Section 408(e) of ERISA would exempt any acquisition or sale of employer securities by an ESOP if the acquisition or sale is for "adequate consideration."

128.    In order to rely upon the "adequate consideration" exemption, a fiduciary has the burden to prove that the ESOP paid no more than fair market value for the asset and that the fair market value was determined in good faith by the fiduciary.  *Keach v. U.S. Trust Company,* 419 F.3d 626, 636 (7th Cir. 2005).

129.    The Amended Transaction was a prohibited transaction between a plan and parties in interest or fiduciaries, as defined in § 406 of ERISA, 29 U.S.C. § 1106.

33

130.     Each of the Defendants caused the ESOP to enter into a prohibited transaction in December 2003.  Defendants caused the ESOP to decline the Tender Offer and the Company to satisfy the conditions for redemption of all common shares (excepting the ESOP shares), which thereby resulted in the ESOP becoming the 100% owner of Antioch shares, subject to dilution from the warrants and Stock Appreciation Rights.

131.     At all relevant times, Defendants were parties in interest as defined in § 3(14) of ERISA, 29 U.S.C. § 1002(14).

132.     By engaging in the Amended Transaction as alleged herein, GreatBanc failed to make a careful and independent investigation of the circumstances prevailing at the time of the transaction and caused the ESOP to approve the Amended Transaction that paid the selling shareholders more than adequate consideration and which was unfair to the ESOP from a financial point of view.

133.     As a result, the Amended Transaction was a non-exempt prohibited transaction under § 408 of ERISA, 29 U.S.C. § 1108.  Defendants Lee Morgan, Asha Morgan Moran, and Chandra Attiken, received the unjust benefits of the non-exempt prohibited transaction and generated profits therefrom.

134.     Pursuant to §§ 406 and 408 of ERISA, 29 U.S.C. §§ 1106 and 1108, Defendants are jointly and severally liable to make good to the ESOP and losses of the ESOP, resulting from the prohibited transaction and to disgorge to the ESOP any and all profits generated from their wrongdoing.

135.     As a direct and proximate result thereof, the ESOP has been damaged in an amount to be determined at or before trial.

34

## THIRD CLAIM FOR RELIEF – VIOLATION OF
## ERISA § 405, 29 U.S.C. § 1105

## <u>CO-FIDUCIARY LIABILITY</u>
### (Defendants GreatBanc, Lee Morgan, Asha Morgan and Chandra Attiken)

136.    Plaintiffs incorporate by reference the foregoing allegations as if fully rewritten herein.

137.    Pursuant to § 405 of ERISA, 29 U.S.C. 1105, Defendants are also liable as co-fiduciaries, with respect to the above described violations where they participated knowingly in their co-fiduciaries breaches and/or knowingly undertook to conceal those breaches, enabled their co-fiduciaries to commit the breaches and failed to make reasonable efforts to remedy the breaches.

138.    As a direct and proximate result thereof, the ESOP has been damaged in an amount to be determined at or before trial.

## FOURTH CLAIM FOR RELIEF – VIOLATION OF
## ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)
## ERISA § 409(a), 29 U.S.C. § 1109(a)

## <u>EQUITABLE REMEDIES</u>
### (Defendants GreatBanc, Lee Morgan, Asha Morgan, Chandra Attiken
### and Morgan Family Foundation)

139.    Plaintiffs incorporate by reference the foregoing allegations as if fully rewritten herein.

140.    Pursuant to § 409 of ERISA, 29 U.S.C. § 1109, Defendants are liable to make good to the ESOP any losses of the ESOP resulting from each breach and/or to disgorge to the ESOP any and all benefits and profits generated from their wrongdoing.

141.    Upon information and belief, Defendants Lee Morgan and Asha Morgan Moran transferred all or part of the unjust benefits derived from the non-exempt prohibited transaction to New Party Defendant, the Morgan Family Foundation.

142.    New Party Defendant the Morgan Family Foundation received a transfer of such assets without payment of any consideration and with knowledge that such assets had been obtained in a prohibited transaction pursuant to ERISA § 406, 29 U.S.C. § 1106.  As a result, they were not bona fide purchasers for value.

143.    At the time the original Complaint was filed in this action, Plaintiffs incorrectly believed that gratuitous transfers of any unjust benefits derived from the non-exempt prohibited transaction by Defendants Lee Moran and Asha Morgan Moran would have been made into the Morgan Family Trusts.  As a result, the original Complaint alleged that Defendants Lee Morgan and Asha Morgan Moran that they were being sued not only individually, but as Trustee of the Morgan Family Trusts pursuant to the Constructive Trust Claim.  (Dkt. 1 at ¶¶ 20, 34.)

144.    Subsequently, Plaintiffs learned that Defendants Lee Morgan and Asha Morgan Moran had made gratuitous transfers of unjust benefits to the Morgan Family Foundation in an amount exceeding $40,000,000 and sought to add the Morgan Family Foundation as a New Party Defendant in this lawsuit in March 2010.

145.    Because Defendants Lee Morgan and Asha Morgan Moran have been executive officers and members of the Board of Directors of the Morgan Family Foundation at all times and personally made or were aware of the gratuitous transfers to the Foundation, the Foundation knew or should have known at the time the original Complaint was filed that the Foundation was an intended defendant on the Constructive Trust Claim and that but for Plaintiffs' mistake, the

36

Foundation would have been identified and sued instead of the Trustees of the Morgan Family Trusts or in addition to the Morgan Family Trusts.

146. Any delay in Plaintiffs discovering their mistake or joining the Foundation as a New Party Defendant has not impaired the ability of the Foundation to defend itself.

147. A constructive trust remedy is available under the catch-all relief provisions of both ERISA § 409(a) and § 502(a)(3). *Amalgamated Clothing & Textile Workers Union v. Murdock*, 861 F.2d 1406, 1413 (9th Cir. 1988); *Johnson v. Couturier,* 572 F.3d 1067 (9th Cir. 2009).

148. This remedy may be imposed in favor of plan participants against fiduciaries who were personally enriched by these wrongful acts as well as against their assignees of the wrongful assets who were not bona fide purchasers for value. *Harris Trust and Savings Bank v. Salomon, Smith, Barney,* 530 U.S. 238 (2000).

149. A constructive trust remedy is necessary to deny the breaching fiduciaries and their assignees' profits from their misappropriation of plan assets and to deter future breaches of ERISA's duty of loyalty. *Id.* at 1414.

150. Defendants Lee Morgan, Asha Morgan Moran, Chandra Attiken, and New Party Defendant the Morgan Family Foundation have personally enriched themselves by generating profits from their wrongful acts and retaining such profits which are traceable to their wrongdoing.

151. The ESOP is entitled to the imposition of a constructive trust upon Defendants Lee Morgan, Asha Morgan Moran, and Chandra Attiken, and New Party Defendant the Morgan Family Foundation with respect to all assets which they received directly or indirectly from the Amended Transaction and all ill-gotten profits derived therefrom.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

1.        That the Court hold Defendant GreatBanc liable to restore to the ESOP all losses resulting from its breach of fiduciary duty and/or participation in a prohibited transaction under ERISA, plus pre-judgment interest;

2.        That the Court hold Defendants Lee Morgan, Asha Morgan Moran, and Chandra Attiken, jointly and severally, liable to restore to the ESOP all losses resulting from their breach of fiduciary duty and/or participation in a prohibited transaction under ERISA, plus pre-judgment interest;

3.        That the Court impose a constructive trust upon the Defendants Lee Morgan, Asha Morgan Moran, Chandra Attiken, and New Party Defendant Morgan Family Foundation with respect to all assets received and profits generated that can be traced from the Amended Transaction;

4.        That the Court hold Defendants Lee Morgan, Asha Morgan Moran, Chandra Attiken and the New Party Defendant Morgan Family Foundation liable to restore to the ESOP its losses from the Amended Transaction to the extent of the assets received and profits generated from their participation as parties in interest or transferees of ill-gotten assets and profits (where such persons were not bona fide purchasers for value);

5.        That the Court award Plaintiffs their reasonable attorneys' fees and expenses pursuant to the common fund doctrine, ERISA § 502(g), 29 U.S.C. § 1132(g), and other applicable law; and

6.      That the Court grant such further equitable relief to which the Plaintiffs or

the ESOP are or may be entitled, whether or not otherwise specifically

demanded pursuant to Fed. R. Civ. P. 54(c).


RESPECTFULLY SUBMITTED this 27th day of August, 2014.

| | |
|---|---|
| SEBALY SHILLITO + DYER<br>By: __/s/ *James A. Dyer*__<br>James A. Dyer<br>Kathryn M. Mack<br>40 North Main Street<br>1900 Kettering Tower<br>Dayton, Ohio 45402<br>Telephone: (937) 222-2500<br>Facsimile: (937) 222-6554<br>jdyer@ssdlaw.com<br>kmack@ssdlaw.com | GUIN STOKES & EVANS, LLC<br>Charles R. Watkins<br>321 South Plymouth Court, Suite 1250<br>Chicago, Illinois 60604<br>Telephone: (312) 427-3600<br>Facsimile: (312) 427-1850<br>charlesw@gseattorneys.com |
| KELLER ROHRBACK LLP<br>Michael D. Woerner<br>1201 Third Avenue, Suite 3200<br>Seattle, Washington 98101<br>Telephone: (206) 623-1900<br>Facsimile: (206) 623-3384<br>mwoerner@kellerrohrback.com | KELLER ROHRBACK LLP<br>Gary D. Greenwald<br>Gary A. Gotto<br>3101 North Central Avenue, Suite 1400<br>Phoenix, Arizona 85012<br>Telephone: (602) 248-0088<br>Facsimile: (602) 248-2822<br>ggreenwald@kellerrohrback.com<br>ggotto@kellerrohrback.com |
| *Counsel for Plaintiffs* ||

2049710.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 27, 2014, I caused the foregoing *PLAINTIFF'S SECOND AMENDED COMPLAINT* to be filed with the Clerk of the Court using the CM/ECF system, which will send email notifications of such filings to counsel of record.  This document is available for viewing and downloading on the CM/ECF system.


*s/ James A. Dyer*
_____
James A. Dyer

2049710.1