# Exhibit A

# BENEFIT CONCEPTS SYSTEMS, INC.

19 West 44th Street, Suite 416 • New York, NY 10036 • Toll Free: 1-888-432-ESOP (3767) • Tel: 212-354-4530 • Fax: 212-354-5838
Web: http://www.benconsys.com • E-mail: dweinstock@benconsys.com

July 16, 2015

Mr. David Ko
Keller Rohrback L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101

Dear Mr. Ko:



EXHIBIT 813
WIT:
DATE: 8-12-15
E. Mulvenna, CSR/RMR/CRR

1







4

















## RESPONSES TO MR. MAY'S AFFIRMATIVE OPINIONS

I also offer the following comments in response to the Affirmative Opinions that Mr. May states in Section III of his report.

**OPINION 1:** <u>ANTIOCH WAS FOLLOWING BEST PRACTICES IN 2003 BY FOCUSING INFORMED AND DETAILED ATTENTION ON ITS FUTURE REPURCHASE OBLIGATION REQUIREMENTS AND USING STATE-OF-THE-ART SOFTWARE TO PROJECT ITS FUTURE REPURCHASE OBLIGATION CASH FLOW NEEDS.</u>

Mr. May indicates that the company used state-of-the-art tools (PERLS software) to perform its repurchase obligation, and that Mr. Hoskins was well trained in the procedures of using the tools to perform the analysis. May Report at 10-14. But whether PERLS is state-of-the-art or whether Mr. Hoskins had the proper training to use PERLS provide no insight into whether the software was used correctly, or whether all material facts and circumstances were considered in order to provide proper assumptions into the software. As explained above, PERLS performs calculations *after* inputting, among other things, assumptions into the program.

12

Thus my issue with Mr. May's opinion is that it offers an overly simplistic and narrow view of whether one is properly engaging in a repurchase liability analysis. It is not enough to have and/or be trained to utilize the right tools. A repurchase analysis project involves a thinking process to choose appropriate assumptions for the study. The output is only meaningful if the appropriate input is used which involves choosing appropriate assumptions.

Mr. Hoskins did not seem to do this in his 2003 repurchase analysis. Instead, he used assumptions based on a "business as usual" approach with no consideration in his choice of assumptions of the potential impact on the pending transaction. This historical analysis is the same one advocated by Mr. May and one that ignores the relevant circumstances facing Antioch in 2003 that had a material impact on its potential repurchase obligation.

Mr. May also indicates that Mr. Hoskins performed sensitivity testing using a variety of assumptions in his repurchase obligation projections. May Report at 12-14. However, in each of Mr. Hoskins repurchase liability results (set forth in Exhibit VI of my report), he illustrates results based only on one set of assumptions for each of the three studies he performed. There does not seem to be any other evidence in the documentation that indicates that he performed any kind of sensitivity testing whatsoever, or more importantly, that this sensitivity testing was provided to anyone in Antioch management or otherwise communicated to any of the advisors that assisted Antioch in executing the 2003 transaction. As a result, Mr. May's final conclusions that Mr. Hoskins ran multiple iterations of his repurchase obligation projections to look at the sensitivity is unsubstantiated in this instance. Merely citing to deposition testimony of Mr. Hoskins where he claims to have considered various assumptions without examining whether those considerations were reflected in his studies highlights the insignificance of Mr. May's first affirmative opinion.

**OPINION 2**: THE ACTUAL LEVEL OF ANTIOCH'S REPURCHASE OBLIGATION BETWEEN 2004-2006 WAS NOT REASONABLY PREDICTABLE AT THE TIME OF THE TRANSACTION.

Mr. May indicates that the software programs were not capable of accurately projecting particular individual's future behavior. Of course not. But people are capable of predicting, or at least considering the effect, of human behavior. And as I indicate repeatedly in this report, this did not occur. There was no consideration by the people involved with projecting Antioch's potential repurchase liability of the effect of the 2003 transaction and the prospective changes to turnover and retirement the transaction could potentially have from

2003 onwards. Furthermore, Mr. May fails to even mention in this section any discussion of Put Price Protection.

Mr. May nevertheless cites a variety of statistics to demonstrate that there was no "stampede of employees" leaving the company, and that the unusually high repurchase obligation was caused by a small group of high share balance employees. He indicates that this small group accounted for approximately $50 million of the repurchase obligation in 2004. This narrowly constructed opinion ignores the facts relevant to Antioch for a variety of reasons.

First, the total repurchase obligation for Antioch in 2004, as Mr. May indicates on Pages 17 and 30 of his report, was approximately $109 million. Part of this liability was funded by ESOP cash and the balance by the company. Assuming that Mr. May's statistics are accurate, if $50 million was a result of a small group of high balance participants, then approximately $59 million was a result of the rest of the participant population. Yet he claims that there was not excessive turnover to account for the "stampede" effect, in which the repurchase obligation for this group, excluding the small high balance group, was dramatically higher than the total repurchase obligation experienced in prior years for the total participant population. Where did the other $59 million come from?

In Exhibit 9 on page 22 of Mr. May's report he illustrates the number of shares put in 2001 through 2006. In 2001-2003 the number of shares put to the company were 20,860, 21,644 and 9,243 respectively. If we use the 2002 share price as an estimate of the payout liability in those years, this would translate to approximately $14 million, $15 million and $6 million, respectively. This compares to $109 million in 2004 of which $59 million comes from all but the small group of high balance participants. Even the $59 million is four times greater than the total liability in 2001 and 2002, and almost ten times greater than that of 2003. Thus, there is a significant disconnect in Mr. May's argument that the unusual repurchase obligation was from a small group of high balance employees, as more than 50% of $109 million did not come from this group. Even using Mr. May's narrow interpretation that a company should only look to past historical performance and data to measure the repurchase obligation, the $59 million repurchase obligation ends up being significantly higher than any of the three prior years.

In any event, my review of the documents provided to me reveals that management expressed concerns in 2003 that a number of long-tenured employees with high account balances (sometimes referred to by management as the "working poor") would in fact retire if the 2003 Transaction and/or Put Price Protection was implemented by the company. *See* Deposition Exhibit 212.

14

This completely undermines Mr. May's unfounded opinion that the actual level of Antioch's repurchase liability was not reasonably predictable. Based on my experience, the role of any repurchase liability advisor is to provide a range of potential repurchase obligation and to assist the company in determining which assumptions to use given the circumstances facing the company. Indeed, as set forth previously, Ms. Kornfeld understands that awareness of a future event that could have a significant impact should not be overlooked in anticipating future turnover. Here, the 2003 Transaction and Put Price Protection very clearly made it illogical and unreasonable to look solely at historical data. There was no attempt by any one at Antioch to consider the likelihood that turnover would increase relative to the transactions, even though there was clear evidence that this should have been considered.

Mr. May also claims that there are a number of deterrents and disincentives to employees leaving the company that made it impossible to predict that a large number of employees would in fact leave after 2003. He cites two examples to support this statement: (1) if employees were under age 59 ½ they would have to roll (transfer) the value of their ESOP proceeds into another retirement plan or pay a 10% penalty; and (2) employees would only receive payments in increments of 20% per year for five years if they had large balances, or if the company had more than $10 million of repurchase obligation payments in a year. May Report at 16-17. He concludes that this lack of liquidity is a strong disincentive to voluntary termination.

Receiving a plan distribution and having the ability to roll it over to another qualified plan, or an Individual Retirement Account, is hardly a disincentive to receiving a distribution early. Being able to cash out company stock and reinvest it in other investment types is a favorable position for employees to have. In fact, the whole concept of diversification in an ESOP (which is a statutorily required provision in ESOPs) is to provide partial cash-out options as employees approach their retirement years so they do not necessarily have all of their retirement eggs in one basket.

The fact that employees would only receive payments of 20% per year was also not a deterrent to cashing out early because of the guaranteed floor value offered in 2004. In some ESOPs, participants are paid 20% of the share balances over a five-year period and each distribution is subject to the market value in the particular year of distribution. In that scenario a fluctuating market value may have an effect on a participant's decision to cash out early or defer distribution. But in the case of Antioch, participants who received distributions in 2004 received 100% of their stock account at the guaranteed value (floor price). This guaranteed amount was then to be paid over five years in form of a promissory

15

note for certain participants with high account balances (e.g. retirees that had an ESOP account balance of over $1,000,000). As stated earlier, the floor price cash out provided significant incentive, in my opinion, for people cashing out and not deferring payment. And that is indeed what occurred.

Ultimately, Mr. May's suggestion that the actual repurchase obligation could not have reasonably been predictable lacks credibility and ignores the evidence I have seen that unequivocally suggests otherwise.

Please let me know if you need any additional information with respect to this response. I reserve the right to supplement my underlying report and this rebuttal report based upon further investigation conducted after the date of this report or additional evidence produced in this case.

Very truly yours,

David B. Weinstock, FSA, EA
Consulting Actuary

16