# Exhibit B



**Prudent Expert, LLC**
www.PrudentExpertLLC.com              Luray, VA.                    Washington, D.C.
Samuel W. Halpern
SkipHalpern@outlook.com

## ANTIOCH EXPERT REPORT

### August 3, 2015

I.      **Introduction**

        A.      **Background.**

I have been retained by counsel for the Plaintiffs as an expert witness to provide opinions regarding certain matters in connection with the case of Fish, et al v. Great Banc, et al., Case No. 1:09-cv-01668, in the U.S. District Court for the Northern District of Illinois. I understand from counsel for the Plaintiffs that they intend to submit this report in rebuttal to the report of Mr. Gregory Brown, dated June 1, 2015.

This report contains my opinions on the issue set forth below, along with an explanation of the grounds for those opinions. My resume, describing my qualifications as an expert, is attached as Tab 1. A list of the materials from the Fish litigation that I considered in forming my opinions is attached as Tab 2. In the past four years I have testified as an expert witness at trial or deposition in connection with only one case: Perez v. Bruister, Case No. 4:10-cv-00077-DPJ-FKB, in the U.S. District Court for the Southern District of Mississippi Eastern Division, opinion issued on October 16, 2014. Through my limited liability company, Prudent Expert, LLC, I am being compensated for my services on an hourly basis at the rate of $650 per hour. That compensation is in no way contingent on the nature of my opinions or the outcome of this matter.

In addition to the materials cited in Tab 2, my opinions are based on my many years of experience as an investment professional and practicing attorney concentrating on investments regulated by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). This experience includes providing advice (for most of my career from an investment perspective) to the "named fiduciaries" and other parties involved in investments regulated by ERISA, as well as central involvement in my firm's role as an "independent fiduciary," investment manager under Section 3(38) of ERISA and/or named fiduciary under Section 402, responsible for such investments.

Prudent Expert, LLC

**B.    Format and Organization of this Report.**

The format and organization of this report are as follows.  Section II, below, is a statement of the issues the report addresses.  Section III summarizes my opinions and Section IV is a detailed "Discussion" of my opinions.

The Discussion begins with Subsection IV(A), which sets forth several underlying principles regarding reasonable fiduciary conduct.  Subsection IV(B) sets forth my rebuttal to Mr. Brown's opinions concerning Great Banc's conduct and IV(C) sets forth my rebuttal to his opinions concerning the conduct of the individual Defendants.  Both those subsections begin with a summary of Mr. Brown's opinions with which I disagree and then explain the grounds for my rebuttal opinion—first, the evidence and then the reasoning on which I rely.  As explained below, a recurring theme is that I have considered substantial evidence which Mr. Brown did not address and which I consider essential to forming a sound opinion.

Section V is a brief "Conclusion" to this report.

The body of this report refers to considerable evidence from the record, but further detail is set forth in Tabs 3, 4 and 5.  Tab 6 sets forth a settlement agreement between Great Banc and the U.S. Department of Labor, which documents reasonable standards of investment due diligence by independent ESOP trustees.

**C.    Definitions.**

For convenience and clarity, this report uses the following defined terms:

- The Company—The Antioch Company.
- Duff—Duff & Phelps, financial adviser to Great Banc, the independent Trustee
- ESOP—the Antioch Employee Stock Ownership Plan.
- New ESOP Distribution Policy—the modifications to the rules in the ESOP plan document that were implemented in November and December 2003 to govern distribution of cash to plan participants who put back their Antioch stock to the ESOP.
- Old ESOP Distribution Policy—those rules as in effect prior to implementation of the New ESOP Distribution Policy.
- The ESOP Committee—the ESOP's named fiduciary, pursuant to Section 402(a) of ERISA and the governing plan document, Exhibit 280.
- PPP—put price protection that Great Banc negotiated for ESOP participants who terminated their employment during the three-year period ending September 30, 2006.

2

**Prudent Expert, LLC**

- Revised Repurchase Study—the study Barry Hoskins prepared of the ESOP's repurchase liability, issued in December, 2003 and presented to the Company's board of directors on December 4, 2003 (Exh. 258).
- The Transaction—the December 16, 2003 tender and merger transaction whereby shareholders of the Company other than the ESOP were entitled to tender their shares in exchange for cash or a package of consideration and the ESOP—by not tendering—became 100% owner of the Company's common stock.

**II.     Issues Addressed.**

    **A.**    Whether in evaluating the Transaction prior to closing, Great Banc, as Trustee of the ESOP, observed reasonable standards and practices for investment due diligence by fiduciaries.



**III.     Summary of Opinions.**

    **A.**    In evaluating the Transaction prior to closing, Great Banc did not observe reasonable standards and practices for investment due diligence by fiduciaries.



**IV.     Discussion.**

    **A.**    **Background: General Principles.**

In my opinion and experience, the general principles shaping standards and practices for investment due diligence and fiduciary conduct revolve around care, objectivity and independence.  By "care," I mean diligent, thorough analysis and conduct. By "objectivity," I mean the fiduciary should act from the perspective of the ERISA plan, not his or her self-interested personal perspective, nor the perspective of other third parties with a stake in the outcome different from that of the participants and beneficiaries. And by "independence," I mean a fiduciary should not rely blindly on advice from or analysis by others, but should critically evaluate such input and develop his/her own understanding, assessment and conclusion or course of action.

Prudent Expert, LLC

Applying such general principles to any particular situation requires considering all relevant facts. However, in forming his opinions, Mr. Brown omitted reference to substantial, essential evidence. That evidence— detailed below--establishes that contrary to Mr. Brown's opinions, the circumstances here (a) were neither "usual" nor "customary" (to use his words) and (b) warranted particular types of due diligence and other actions that neither Great Banc ███████████████ observed.

**B.**     **Rebuttal to Mr. Brown's Opinions regarding Great Banc.**

1.     *Opinions of Mr. Brown regarding Great Banc, with which I disagree*: Mr. Brown's primary opinion is that Great Banc, as Trustee, "acted in accordance with usual and customary practices in evaluating the Transaction prior to closing." Brown report, pg. 10, Paragraph 2. Subsumed under this conclusion are four more specific opinions from Mr. Brown, namely:

a.     *Significant due diligence:* "The Transaction Team conducted significant due diligence in order to determine the fairness of the Transaction to ESOP Participants." Brown report, pg. 11. Great Banc "diligently reviewed the proposed terms of the Transaction and examined the consequences of, and fairness of, those proposed terms." Pg. 12. (Notably, the latter phrase does not include any modifier regarding the adequacy of Great Banc's examination). In my opinion, however, Great Banc did not meet reasonable standards and practices of investment due diligence by fiduciaries. While I do not challenge the characterization that the Team conducted "significant" due diligence, I believe (for reasons detailed below) that this was insufficient under the circumstances to meet reasonable standards and practices of investment due diligence by fiduciaries.

b.     *Assuring accuracy and completeness of information:* According to Mr. Brown, Great Banc "worked carefully and diligently with Company management and the Company's advisors to assure themselves of the accuracy and completeness of the financial data and other information being used to evaluate the Transaction..." Pg. 12. Similarly, on page 16, paragraph number 4, Mr. Brown opines that, "It is usual and customary for an ESOP trustee and its financial advisor to rely on financial projections furnished by the management of the ESOP plan sponsor unless they uncover reasons why such projections may be unreasonable...the ESOP Trustees...followed a usual and customary practice when relying on financial projections supplied by Company management." For reasons detailed below, I disagree that Great Banc worked with sufficient care and diligence "to assure themselves of the accuracy and completeness of the financial data and information used to evaluate the Transaction."

4

Prudent Expert, LLC

      c.   **_Reviewing Duff's assumptions, underlying data and analysis:_** According to Mr. Brown, "Great Banc carefully reviewed the analysis, methodology and assumptions used by Duff in assessing the Transaction at all stages. " Pg. 12. He also opined that Great Banc carefully reviewed the terms of the Transaction "to understand those terms, the data and information on which its financial advisor based its conclusions, and the analysis, methodologies and assumptions used by its financial advisor and the reasonableness thereof." Pg. 12. To the contrary, in my opinion, detailed below, Great Banc did not sufficiently challenge and reach an independent, well-founded judgment regarding Duff's reliance on the Company's projections of repurchase liability and Duff's 13% discount rate for discounting the Company's projected future cash flows back to present value. Even accepting (as Mr. Brown states) that Great Banc "conferred frequently with its advisors" does not establish that under these circumstances it met reasonable standards and practices for investment due diligence by fiduciaries.

      d.   **_Reviewing repurchase obligation projections:_** Great Banc "carefully and diligently reviewed the repurchase obligation projections prepared by the Company, [was] comfortable that Antioch had an understanding of its future repurchase obligation and had the financial means, including cash in the ESOP, corporate owned life insurance, and other sources, to meet the Company's future repurchase obligation." Pg. 13. Mr. Brown also opined that Great Banc "carefully and diligently analyzed and considered the Company's ability to repay its debts." Pg. 13. I disagree with those opinions for reasons explained in detail below.

   2.     **_Grounds for my opinion: Evidence and Analysis._**

The following discussion first sets forth evidence that Mr. Brown overlooks but that I find very relevant to reaching an informed opinion here. Next, the discussion sets forth several opinions—and the analysis leading to them-- regarding Great Banc's failure to observe reasonable standards and practices of investment due diligence by fiduciaries.

      a.   **_Evidentiary support for my rebuttal: In forming his opinion, Mr. Brown overlooked substantial, pivotal evidence essential to evaluating whether, under the circumstances, Great Banc observed reasonable standards and practices for investment due diligence by fiduciaries._** Without considering this evidence, Mr. Brown's reference to "usual and customary practices" does not sufficiently address the circumstances here. Among the essential pieces of evidence he ignores are the following:

5

**Prudent Expert, LLC**

i. *Concern by Company and Bank One regarding repurchase liability*: Prior to the Transaction's closing, many of the Company's large shareholders and members of upper management, as well as Bank One, as the lead lender financing the Transaction, were very concerned – far more than Great Banc and Duff-- that the ESOP's repurchase obligations might prove too heavy for the Company to bear. These individuals included Lee Morgan, Nancy Blair, Chandra Attiken, Kim Lipson-Wilson and Barry Hoskins. For instance, on November 8, 2003, Defendant Lee Morgan himself acknowledged: "The scenario that concerns me is where the terminated participant is under age 50 and wants a distribution immediately...The fear is that we have a number of folks with seven-figure accounts under the age of 50 who would likely terminate if they could get the money. I am concerned that the accounts not become an incentive for people to terminate employment before age 50 just to get the money." Exhibits 211, 212. For further substantial evidence demonstrating the serious concerns of many of the Company's major shareholders and members of upper management, as well as Bank One, see Tab 3 to this report.

ii. *Concern by the Company and its Advisers regarding Internal Revenue Code 409(p)*: Both McDermott, Will and Emery as well as Deloitte & Touche were very concerned with the risk of the Company's losing its status as a Subchapter S corporation, and Mr. Morgan was aware of this concern. See Tab 3 and Exh. 519 (memo from Granados to Morgan). According to Luis Granados the impact on the Company of a nonallocation year under Section 409(p) would be "devastating." See Tab 3, pg. 3.

iii. *Warning in Offer and Proxy:* The Offer to Purchase and Proxy of November 14, 2003 (the "Offer and Proxy") (Exh. 32) also referenced the risk that "the Company will experience significant repurchase obligations as employees with significant vested account balances in the ESOP die, become permanently disabled, resign, retire or diversify....The Company has projected the potential Repurchase Obligation through the year 2013 under a set of assumptions that the Company believes to be reasonable... If the Company were unable to meet its repurchase obligations, the Company could be left insolvent..." Exh. 32, pg. 70.

iv. *Limited Concerns of Great Banc and Duff:* Despite and in contrast with the concerns of the Company, its shareholders and management, as well as Bank One, plus the disclosure in the Offer and Proxy, neither Great Banc nor Duff were duly concerned with the risk of the repurchase liability and both made only cursory efforts to analyze the

6

**Prudent Expert, LLC**

repurchase liability. See detailed evidence in that regard, at Tab 4. To take a single example: Mr. Hoskins' August 2003 repurchase liability study (Exh. 52) assumed a retirement age of 65 (Hoskins depo., Sept. 16, 2011, pg. 362 and see Exh. 274) and—as detailed in Tab 4—neither the Banc nor Duff questioned or realized that. As the U.S. Court of Appeals for the 7th Circuit stated in its opinion in this case, dated May 14, 2014:

*"Antioch provided GreatBanc Trust with one page from the report that Antioch's chief financial officer had prepared to assess its [repurchase] liability before and after the proposed transaction. The record does not indicate that GreatBanc Trust or Duff & Phelps ever reviewed or even requested the full report. Without the full report, GreatBanc Trust and Duff & Phelps were unable to verify the key assumptions. These key assumptions, which included the projected retirement age of Plan participants, were made back in July 2003, before the addition of the PPP and the new distribution policy....The evidence here could support a finding that Duff & Phelps failed to perform an independent assessment because it simply accepted Antioch's July 2003 assumptions regarding the company's projected repurchase liability." Pp. 6,7,19.*

Although the Banc and Duff relied on that outdated study of repurchase liability, in fact, by the date the Transaction closed, the ESOP allowed (a) employees with 5 years of service to take retirement at age 50 and to begin receiving their distribution immediately after terminating employment and (b) employees under 50 to begin receiving a distribution of their benefits immediately after terminating. Although these two factors were major variables in carefully projecting the repurchase obligation, neither Great Banc nor Duff ever sought or performed a repurchase study that took them into account.

Similarly, despite the concerns of the Company and its advisers regarding the risk of losing Subchapter S status, neither Great Banc nor its advisers sought an opinion on that subject pertaining to any year after 2003. See Tab 3, pp. 3-4 and Tab 5, pp. 3-4. Despite the expectation of the Company's counsel that Great Banc would seek an "extensive" opinion concerning 409(p), the opinion it sought was merely "fairly trivial," according to the Company's counsel. Exh. 516; see Tab 3.

v. ***Duff's Caveat:*** In its fairness opinion dated December 16, 2003, Duff warned Great Banc that it "relied upon the accuracy and completeness of all information provided to it, whether obtained from public or private sources, including Company management, and did not attempt to independently verify such information....Our Opinion further assumes

7

**Prudent Expert, LLC**

that information supplied and representations made by the Company's management are substantially accurate...." Exhibit 131, pg. 5. As the independent Trustee and governing fiduciary on behalf of the ESOP, Great Banc should have realized that in light of these caveats regarding Duff's duties and work product, the Banc itself was obligated to take special care in scrutinizing and challenging the accuracy, completeness and timeliness of information the Company and Duff provided it.

Despite its role as independent Trustee and the caveat in Duff's contract, there is no evidence that Great Banc seriously challenged or rigorously questioned Duff concerning the factual or analytical basis for its first and second draft reports entitled "Preliminary Review of Proposed Recapitalization of the Antioch Company," dated October 13 and October 27, 2003. Exhs. 78 and 79.

vi. ***Great Banc's Contract:*** Great Banc's contract with the Company (dated August 4, 2003) did not include any provision entitling the Banc to assume or rely on the accuracy, completeness or up to date nature of the documents and other information the Company and its agents provided to it. Exh. 365. Nor did the contract include any representations or warranties from the Company regarding the accuracy, completeness or currency of the information it provided the Banc. Thus, GreatBanc should have verified whether and to what extent the information the Company provided it was accurate, complete and up to date. Underscoring this were not only the caveats from Duff in its fairness opinion, described immediately above, but also the serious conflict of interest compromising the ESOP Committee members and Company board of directors, described immediately below.



**Prudent Expert, LLC**



**viii. *Reduced Discount Rate:*** The valuations of Company shares performed in years prior to 2003 by Business Valuations used a higher discount rate than Duff used for discounting to present value the Company's projected future earnings. For the most recent year prior to the Transaction, the Business Valuations appraisal as of December 31, 2002, used a discount rate of 17.26%. Exhibit 116, pg. 21 and Appendix II, DCF Exhibit VI. By contrast, Duff adopted a discount rate of only 13%. Exh. 119, pg. 20 (Duff's October 27, 2003, "Preliminary Review of Proposed Recapitalization of The Antioch Company"), citing a range of 12-14%. Each point difference in the discount rate represented a $35-$45 million swing in the Company's stock value. Bloom depo., pg. 161. The October 27 Preliminary Review explained almost nothing about how Duff arrived at the 13% figure. However, as I understand it, the record reflects no evidence that Great Banc seriously questioned or challenged how Duff arrived at the 13% discount rate and whether, from the ESOP's perspective, a higher rate would have been equally or more justified.

**ix. *Factors Duff's Analysis Did Not Discuss and Great Banc Did Not Question:*** Duff's valuation and fairness opinion did not discuss the potential impact on the Transaction of the Company's post-transaction debt or the PPP and repurchase liability. Bloom depo., pp. 169-171; see Exh. 119. Despite these concerns, neither Duff's October 27, 2003, "Preliminary Report" (Exh. 119) nor its final opinion of December 16, 2003 (Exh. 131) discussed (a) whether to include as a component within its 13% discount rate any company-specific risk premium (a regular component of "building up" to the total discount rate), (b) whether to

9

**Prudent Expert, LLC**

apply any discount for lack of marketability, (c) the significance of the repurchase obligation as a substantial contingent liability or (d) how any of these considerations figured into its conclusion that the overall Transaction was fair to the ESOP. See Exh. 119, pg. 20 (Duff analysis reflects a 5% ratio of debt to capital, despite large additional leverage the Transaction imposed on the Company, through the financing from Bank One and the promissory notes to tenderers who chose the "package" rather than all cash). See Exh. 684, pg. 2, where Helen Morrison of Deloitte states that in order to induce shareholders to sell, the valuation does not reflect any discount for lack of marketability. Nor is there evidence that Great Banc challenged Duff on any of these points.

x. *No Risk Premium concerning Section 409(p):* The Offer and Proxy (Exh. 32, pp. 69-71) disclosed that the Company faced long-term (not just immediate) risk of reduced tax savings, including being taxed as other than an S corporation. Referring to the risk under Internal Revenue Code Section 409(p) of the Company losing its Subchapter S status, counsel for the Company stated that if a "nonallocation year ever happened [under Section 409(p)], that would be devastating for the company." Exh. 516 (Granados memo to Matthews, Dec. 10, 2003, pg. 3). Nevertheless, Mr. Lee Bloom of Duff testified that in arriving at the discount rate for valuing the Company's stock, Duff did not consider the risk that under Section 409(p) the Company might lose its Subchapter S tax status and suffer taxation at the corporate level. Bloom, pp. 169-171. Moreover, neither Great Banc nor its counsel requested or negotiated for an opinion regarding the Company's S status for any years subsequent to 2003. See Exh. 509, pg. 2 (counsel for Great Banc sought opinion only regarding 2003) and Tab 3, pp. 3-4.

xi. *Absence of Updated Financial Projections and Analyses:* As I understand the record, there is no evidence establishing that Great Banc or Duff obtained and studied a variety of important, updated financial projections and other analysis of the Company's expected financial performance. The Company's board of directors reviewed some of these updated materials in connection with its meeting on December 4, 2003, before the Transaction closed – a meeting which (according to the minutes) neither Great Banc nor Duff attended it. Exh. 36. The updated materials included the 100% ESOP Recapitalization Sensitivity Analysis (the "100% Recap study") and its analysis of downside scenarios, (Exh. 213), which incorporated the downside scenario analysis Deloitte & Touche prepared as of December 2, 2003 (Exh. 583). The expert report of Robert Reilly references that December

10

Prudent Expert, LLC

2 downside analysis from Deloitte as well as the Company's own productivity metrics and records of monthly revenues from the Creative Memories division through the first 11 months of 2003. See, Reilly report at paragraphs 85-102 and, e.g., Exhs. 371-374, TAC-CC-0137099, TAC-CC-0085649, D&P A 002626 (financial results for 11 months ending Nov. 30, 2003, compared to business plan) and WIS 0001-12 (examples of monthly reports on productivity and sales achieved throughout 2003 compared to forecast). Paragraphs 95 and 97 of Mr. Reilly's report explain the many respects in which the projections Duff used were more optimistic than the Deloitte analysis of December 2. Duff's projections were also more optimistic in important respects than the previous analyses from Deloitte, dated July 11, 2003, and October 2, 2003. See Exhibits 680, 681, 682. There is no evidence demonstrating that Great Banc or Duff considered those analyses or the productivity metrics and monthly revenues of Creative Memories through the 11 months ending November 30, 2003. The chart at paragraph 102 of Mr. Reilly's report displays the substantial contrast between the relatively optimistic Company projections that Duff and Great Banc relied upon versus the figures from Deloitte and the Company's productivity metrics and revenue records.

b. *Rebuttal opinions:*

i. *By failing sufficiently to consider the repurchase obligation, Great Banc did not observe reasonable standards and practices for investment due diligence by fiduciaries.* In my opinion, an ERISA fiduciary in the position of Great Banc, observing reasonable standards and practices for investment due diligence by fiduciaries ("reasonable standards"), would have recognized the tremendous importance in this Transaction of carefully, independently and objectively examining the risk that the repurchase liability posed to the value of the Company's stock and even the Company's continued viability. With this recognition, a fiduciary observing reasonable standards would have taken many steps that Great Banc failed to take. These include, for instance:

- Probing the data and assumptions underlying the Hoskins August repurchase liability study (Exh. 52), including, for instance, his assumptions regarding the retirement age of ESOP participants and their account balances.
- Re-examining the projections of repurchase liability in light of the PPP and New ESOP Distribution Policy.

**Prudent Expert, LLC**

- o Requesting, obtaining and analyzing copies of the Revised Repurchase Study, e.g., to probe the large increase in projected repurchase liability compared to the August projections
- o Requesting, obtaining and analyzing Ms. Attiken's updated evaluation of repurchase liability

Further supporting the opinion that Great Banc failed to observe reasonable standards in its due diligence concerning the repurchase obligation is the "Agreement concerning Fiduciary Engagements and Process Requirements for Employer Stock Transactions," which Great Banc and the U.S. Department of Labor entered on June 2, 2014 (the "Fiduciary Agreement")(attached as Tab 6). Great Banc agreed with the Department that the "policies and procedures described below apply whenever the Trustee serves as a trustee or other fiduciary of any employee stock ownership plan subject to Title I of ERISA ("ESOP") in connection with transactions in which the ESOP is purchasing or selling, is contemplating purchasing or selling, or receives an offer to purchase or sell, employer securities that are not publicly traded." In my opinion, although the Fiduciary Agreement was executed in 2014, in respects relevant to this case, its provisions documented reasonable standards of investment due diligence observed by fiduciaries well before 2014, including 2003. Paragraph D(8) of the Fiduciary Agreement states that the Trustee should consider how the plan document provisions regarding stock distributions, age and tenure of participants, affect the repurchase obligation. The introduction to Section D states that if—as was the case here—the valuation firm (Duff) did not document how it considered these factors, the Trustee should do so. Paragraph D(1) states that the Trustee should consider whether the people providing projections are conflicted, including whether they have any interest in the transaction and whether they are agents of such persons, e.g. whether Mr. Hoskins was an agent of any shareholder such as Mr. Morgan, Ms. Morgan Moran or Ms. Attiken. Paragraph D(1) also requires the Trustee to document how it considered such conflicts. To my knowledge, there is no evidence in the record that Great Banc observed any of these requirements or documented such observance.

ii. ***By failing to obtain and carefully analyze up to date Company financial projections, Great Banc failed to observe reasonable standards.*** In my opinion, under the circumstances here, a fiduciary observing reasonable standards would have requested, obtained and carefully analyzed the downside projections in the December 4, 2003, 100% Recap study (Exh. 213) and the Deloitte & Touche downside analysis as of December 2,

12

Prudent Expert, LLC

2003. Exh. 583. A fiduciary observing reasonable standards would also have evaluated Deloitte's downside analyses of July and October 2003 (Exhs. 680, 681 and 682) as well as data regarding the first 11 months of 2003, such as the Company's productivity metrics and the monthly records of revenues from Creative Memories, as cited in paragraphs 101 and 102 of Mr. Reilly's expert report. See, e.g., Exhs. 371-374 and TAC-CC-0137099, TAC-CC-0085649, D&P A 002626 (financial results over 11 months ending Nov. 30, 2003) and WIS 0001-12 (examples of monthly reports on productivity and sales achieved throughout 2003 compared to forecast). As I understand the record, there is no evidence establishing that Great Banc obtained or carefully analyzed the 100% Recap study, Deloitte's downside analyses, or the Company's records through the 11 months ending November 30, 2003, of its productivity metrics and revenues and from Creative Memories. In my opinion, a fiduciary observing reasonable standards and practices of investment due diligence would have further questioned the validity of the projections on which Duff relied before determining whether the terms of the Transaction were reasonable from the ESOP's perspective and before approving that Transaction.

Further supporting this opinion is the Fiduciary Agreement. Paragraph F(2) requires the Trustee to critically evaluate the reasonableness of any projections, and especially management's projections. Paragraph F(3) requires the Trustee to document the basis for concluding whether the information provided to the valuation adviser was current, complete and accurate. See Tab 6.

iii. ***By failing to question and independently assess the discount rate Duff used in its valuation and other aspects of Duff's analysis, Great Banc failed to observe reasonable standards.*** In my opinion, a reasonable fiduciary in the Banc's position would have seriously challenged and rigorously questioned Duff concerning the factual grounds for and analysis supporting its first and second draft reports entitled "Preliminary Review of Proposed Recapitalization of the Antioch Company," dated October 13 and October 27, 2003. Exhs. 78 and 79. More specifically, a reasonable fiduciary would have observed the major difference in the discount rate that Business Valuations used in its 2002 valuation (17.26%, including a company-specific risk component of 3%) and would have questioned the grounds for and reasonableness of Duff's lowering that to 13% (apparently without identifying a company-

13

**Prudent Expert, LLC**

specific risk component) for discounting to present value the Company's projected earnings.

This is especially true in light of three considerations. First, as the independent Trustee, Great Banc's responsibility was to determine in good faith the fair market value of the shares, assure that the Company paid no more than fair market value for the tendered shares and assure that the overall Transaction was fair to the ESOP. In light of reasonable standards of investment due diligence by fiduciaries, having engaged Duff to assist it in determining the fair market value of Antioch's shares, Great Banc should have thoroughly reviewed and understood Duff's analysis, in order to independently assess its reasonableness and determine whether to adopt it. The process of review should have included questioning and evaluating the essential assumptions, variables and lines of analysis Duff used in arriving at its valuation conclusion. The discount rate is one essential variable in a discounted cash flow model, such as Duff employed. Significantly lower than the rate Business Valuations used, Duff's rate created substantial upward pressure on the supposed fair market value of Antioch shares. Yet Duff's appraisal did not explain the reason(s) for such a low rate. In my opinion, given light of reasonable standards of investment due diligence by fiduciaries, Great Banc should have seriously questioned Duff's discount rate in order to determine whether the four point drop in that rate was justified.

The second consideration arises from provisions in the Fiduciary Agreement. Paragraph G(5) requires the Trustee to document its conclusions regarding the discount rate. There is no evidence that Great Banc did that. Nor is there evidence that Great Banc questioned Duff's failure to place weight on the Company's post-transaction debt and/or repurchase liability. In my opinion, a fiduciary observing reasonable standards of investment due diligence would have questioned whether the valuation and/or fairness opinion should take these factors into account. [1] See Fiduciary Agreement, Paragraph D(9)(a) (valuation should address plan sponsor's ability to service debt assumed in the transaction and if valuation does not, then Trustee should consider and document that).

---

[1] This opinion applies regardless of whether these factors are most appropriately classified as pertaining to the level of the discount rate applied to future earnings, or a possible discount for lack of marketability (given the risk of Antioch not satisfying its repurchase obligations to ESOP participants who put back their shares upon termination of employment) or the overall fairness of the Transaction.

**Prudent Expert, LLC**

The third consideration is that in arriving at its valuation and overall opinion of fairness, Duff did not place weight on another factor that the party negotiating on behalf of the ESOP (i.e., Great Banc) should have considered (and even advocated). This was the risk the Transaction created under Section 409(p) of the Code that the Company might lose its Subchapter S status in future years (after 2003). There is no evidence that Great Banc questioned Duff on this issue. In my opinion, a fiduciary observing reasonable standards of investment due diligence would have questioned whether the valuation and/or fairness opinion should take into account the risk that the Transaction created under Section 409(p).



15

**Prudent Expert, LLC**



**Prudent Expert, LLC**



17

**Prudent Expert, LLC**



**Prudent Expert, LLC**



**Prudent Expert, LLC**



**Prudent Expert, LLC**



**Prudent Expert, LLC**

**V.    Conclusion.**

This concludes my rebuttal to the opinions of Mr. Gregory Brown.

In summary, my opinions are that:

**A.**    In evaluating the Transaction prior to closing, Great Banc did not observe reasonable standards and practices for investment due diligence by fiduciaries.



Respectfully submitted,

Samuel W. Halpern
Sole Member, Prudent Expert, LLC

Aug. 3, 2015
Date

# Tab 1

February 2015

EXPERIENCE AND EXPERTISE OF

SAMUEL W. HALPERN

SkipHalpern@outlook.com; 202-320-5147

Samuel Halpern has over 35 years experience with financial and fiduciary aspects of institutional investing, especially regarding ERISA-covered funds.  He has concentrated on institutional investing for more than 25 years from the perspective of investment consulting and acting as an independent fiduciary under ERISA, after an initial 10 years as a litigation lawyer, handling investment cases governed by ERISA's fiduciary responsibility provisions.  Over the years, Mr. Halpern has helped establish, build, manage and eventually sell a prominent investment advisory firm; has advised a wide range of institutional investors regarding nearly all facets of their investment programs and practices; and has led numerous teams acting as an ERISA "independent fiduciary."

Mr. Halpern is especially well-qualified to testify as an expert regarding standards of investment due diligence for fiduciaries investing across a wide range of investments.

Education

Mr. Halpern graduated Phi Beta Kappa from Brown University in 1972, earning a Bachelor of Arts degree with a combined major in Political Science and an interdisciplinary humanities program. During his junior year in college, he attended the London School of Economics.  In 1975, he earned his law degree from the George Washington National Law Center in Washington, D.C., where he was a winner of the school's moot court competition over two consecutive years.

Legal Practice—ERISA Litigation

In 1975-76, Mr. Halpern clerked for Senior District Court Judge Luther Youngdahl, of the U.S. District Court for the District of Columbia, and served also as a motions clerk to the U.S. Court of Appeals for the District of Columbia Circuit.

In early 1977, he joined the litigation staff of the Plan Benefits Security Division of the U.S. Department of Labor, responsible for nation-wide enforcement of what was then a new statute—the Employee Retirement Income Security Act.  In that role, through litigation, he helped develop standards for investing by ERISA fiduciaries, including due diligence processes and criteria for investing in private market assets such as employer stock and real estate.  These cases typically entailed preparing and

1

cross-examining expert witnesses regarding various aspects of investment due diligence. Among the many other matters he handled on behalf of the Secretary of Labor are several reported cases, including:

- <u>Marshall v. Teamsters 282 Pension Trust,</u> 458 F.Supp.986 (E.D.N.Y. 1978) (imprudent construction loan)
- <u>Donovan v. Mazzola</u>, 2 EBC 2115 (N.D. Cal. 1981), <u>aff'd</u>, 716 F.2d 1226 (9th Cir. 1983), <u>cert denied</u>, 464 U.S. 1040 (1984) (objective standards for prudence in real estate investing, portfolio diversification, selection of service providers)
- <u>Donovan v. Cunningham,</u> 541 F.Supp. 276 (S.D. Tex. 1982), <u>rev'd</u> , 716 F.2d 1455 (5th Cir. 1983) (ESOP purchasing private company employer stock)

After leaving the Department in 1982, Mr. Halpern practised law with a labor-side labor law firm, based in Washington, where he continued concentrating on ERISA-related investing. This included litigation from both a plaintiff's and defense perspective, as well as counselling ERISA fiduciaries on investment decisions and investment products. His reported cases from this period include:

- <u>Arakelian v National Western,</u> 680 F.Supp.440 (D.D.C. 1987) (due diligence regarding investing in group annuity contracts)
- <u>Fink v. NS&T Bank</u> , 772 F.2d 951 (D.C. Cir. 1985)(due diligence regarding profit sharing plan's investment in private company employer stock; claims not time-barred)

<u>Investment Advisory Experience—Consulting and Independent Fiduciary</u>

In 1986, Mr. Halpern joined the broker dealer and investment bank Bear, Stearns & Co. to help launch a new, wholly-owned, registered investment advisory subsidiary named Bear Stearns Fiduciary Services, Inc. Over the ensuing 10 years, he served as the firm's Executive Vice President and General Counsel, and helped establish its suite of investment advisory services, develop clients, advise clients on their investment portfolios and manage the business.

The firm's primary services were twofold. First, was investment consulting to ERISA-covered funds and other institutional investors, including advice on investment policy; asset allocation; selecting and monitoring investment managers and other types of investment due diligence; measuring and evaluating investment performance, risks and costs; investment best practices; new investment ideas; investment governance; and related matters. Second, the firm acted as an independent fiduciary, assuming discretionary fiduciary responsibility for particular investment decisions, when the regular fiduciaries confronted conflicts of interest, including, for instance, in kind contributions, employer securities and other party in interest transactions.

In 1996, he and his business partner purchased the firm from Bear Stearns and renamed it Independent Fiduciary Services, Inc. Over the next 15 years, as President of IFS and a member of its Management Committee, Mr. Halpern helped guide the firm's growth as an investment consultant and

independent fiduciary, to over 35 employees and assets under advisement or management of approximately $25 billion. He led numerous teams of investment consultants, advising a wide variety of institutional clients regarding their investment programs, including single and multiemployer ERISA pension, 401k and health benefit plans; public pension funds; and other institutional clients. He also served as Chairman of the Investment Committee, responsible for formal, final investment decisions on behalf of the firm when it exercised discretionary fiduciary responsibility over entire investment portfolios or particular assets.

In 2011, IFS sold substantially all its assets to a wholly owned subsidiary of the public company Arthur J. Gallagher (NYSE:AJG) and became the primary component of what is now known as Gallagher Fiduciary Advisors, LLC. From the time of that sale until transitioning to the successor he helped select, Mr. Halpern was president of the Washington/Newark branch of GFA; served as Chairman of the firm's Investment Committee; and remained centrally involved in guiding the firm and delivering its full range of services to clients.

Areas of Expertise

With his extensive, combined fiduciary and investment background, Mr. Halpern is highly experienced with investment due diligence and many other aspects of institutional (and particularly ERISA) investing.

- *Range of investments*. Over the years, Mr. Halpern has dealt with publicly traded securities (equities and fixed income), marketable "alternative" assets (e.g., hedge fund of funds, multi-asset class vehicles), real estate (equity and debt) and a wide range of private or illiquid assets (e.g., debt, equity, restricted stock, unregistered warrants, bankruptcy claims, etc.). Across these asset classes and subclasses, he has been heavily involved in selecting and evaluating investment management firms for separately managed accounts and various investment vehicles (limited partnerships, mutual funds, commingled funds, insurance company separate accounts, etc.)
- *Range of investors*. These include corporate and Taft Hartley (single and multiemployer) ERISA plans; defined benefit pension plans, defined contribution plans (401K, ESOP and "annuity" funds) and welfare funds (including VEBAs); as well as public pension funds, sovereign wealth funds, union treasuries and other institutional investors.
- *Investment consulting and independent fiduciary*. Mr. Halpern has led numerous consulting teams at IFS and GFA advising clients on their entire, diversified investment programs, including, for instance, advising on investment policy, asset allocation and diversification, manager due diligence, measuring and monitoring investment risk and expense, brokerage and trading practices and related matters. He also led the firm's role as a discretionary independent fiduciary to many other ERISA plans, e.g., The Ford Motor Subaccount of the United Auto Workers Retiree Medical Fund (unregistered warrants and private notes), Kaiser Aluminum VEBA (restricted stock and bankruptcy claims), Pan American World Airways Pension Plans (in kind contribution and leaseback of employer real estate) and many others.

- *Testifying and nontestifying expert.* Mr. Halpern qualified as an expert witness on behalf of the U.S. Department of Labor in Perez v Bruister, Civ Action No. 3:13cv1001-DPJ-FKB (S.D. Miss. 2014). In that case, he testified as a rebuttal witness concerning reasonable standards of investment due diligence for ERISA fiduciaries purchasing private market employer stock. In October 2014, the court entered an Order establishing the liability of the defendant trustees. Mr. Halpern also led several teams at IFS/GFA advising legal counsel as a nontestifying expert, regarding a range of other ERISA funds and types of investments.
- *Investment governance.* Over the years, Mr. Halpern has advised a wide range of clients on investment governance. These have included both domestic clients (e.g, Nestle in the U.S. Pension Trust) and -- either directly or through the Asian Development Bank or World Bank-- foreign institutional investment funds in China, Sri Lanka, Thailand and Brunei.
- *Investment best practices.* Mr. Halpern has led or was centrally involved on the IFS/GFA team on many of the firm's "Operational Reviews" -- investment best practice studies of major institutional investors, regarding asset allocation, due diligence practices, risk management and related matters. These included corporate and multiemployer ERISA pension and 401k plans as well as numerous statewide and other large public pension funds (including, for instance, the Texas Teacher Retirement System, New York City Bureau of Asset Management, New Jersey Division of Investments, Oregon Division of Investments, Virginia Retirement System and many others).

<u>Education</u>

Mr. Halpern graduated Phi Beta Kappa from Brown University in 1972, earning a Bachelor of Arts degree with a combined major in Political Science and an interdisciplinary humanities program. During his junior year in college, he attended the London School of Economics. In 1975, he earned his law degree from the George Washington National Law Center in Washington, D.C., where he was a winner of the school's moot court competition over two consecutive years.

<u>Legal Practice—ERISA Litigation</u>

In 1975-76, Mr. Halpern clerked for Senior District Court Judge Luther Youngdahl, of the U.S. District Court for the District of Columbia, and served also as a motions clerk to the U.S. Court of Appeals for the District of Columbia Circuit.

In early 1977, he joined the litigation staff of the Plan Benefits Security Division of the U.S. Department of Labor, responsible for nation-wide enforcement of what was then a new statute—the Employee Retirement Income Security Act. In that role, through litigation, he helped develop standards for investing by ERISA fiduciaries, including due diligence processes and criteria for investing in private market assets such as employer stock and real estate. These cases typically entailed preparing and cross-examining expert witnesses regarding various aspects of investment due diligence. Among the many other matters he handled on behalf of the Secretary of Labor are several reported cases, including:

4

- <u>Marshall v. Teamsters 282 Pension Trust,</u> 458 F.Supp.986 (E.D.N.Y. 1978) (imprudent construction loan)
- <u>Donovan v. Mazzola</u>, 2 EBC 2115 (N.D. Cal. 1981), <u>aff'd,</u> 716 F.2d 1226 (9th Cir. 1983), <u>cert denied</u>, 464 U.S. 1040 (1984) (objective standards for prudence in real estate investing, portfolio diversification, selection of service providers)
- <u>Donovan v. Cunningham,</u> 541 F.Supp. 276 (S.D. Tex. 1982), <u>rev'd</u>, 716 F.2d 1455 (5th Cir. 1983) (ESOP purchasing private company employer stock)

After leaving the Department in 1982, Mr. Halpern practised law with a labor-side labor law firm, based in Washington, where he continued concentrating on ERISA-related investing. This included litigation from both a plaintiff's and defense perspective, as well as counselling ERISA fiduciaries on investment decisions and investment products. His reported cases from this period include:

- <u>Arakelian v National Western,</u> 680 F.Supp.440 (D.D.C. 1987) (due diligence regarding investing in group annuity contracts)
- <u>Fink v. NS&T Bank</u>, 772 F.2d 951 (D.C. Cir. 1985)(due diligence regarding profit sharing plan's investment in private company employer stock; claims not time-barred)

<u>Publications</u>

Over the years, Mr. Halpern has authored a number of book chapters and articles regarding various aspects of institutional investing. Representative examples include "Identifying and Adopting Best Practices for Institutional Investors," chapter in <u>Core- Satellite</u> Portfolio Management, J. Clay Singleton (editor), McGraw- Hill (2005); "The Role of the Independent Fiduciary," <u>Journal of Compensation and Benefits,</u> Sept./Oct 2006; "Funding Retiree Healthcare Liabilities," <u>Journal of Compensation and Benefits,</u> March/April 2007; and "Key Ingredients in Developing Operational Policies and Procedures," in <u>Governance of Public Pension Assets,</u> Rajkumar and Dorfman (editors), World Bank (2010).

5

# Tab 2

**TAB 2—MATERIALS FROM <u>FISH, ET AL</u> VS. <u>GREAT BANC, ET AL</u> THAT I CONSIDERED**

**EXHIBITS**

Exhibit numbers—

5

18

22

23

26

29

30

32

36

51

52

64

65

68

77

78

79

81

82

83

85

86

87

102

114

116

119

120

130

131

135

200

201

210

211

212

213

215

221

232

235

256

258

261

274

275

280

284

290

301

346

365

366

367

370

371

379

380

383

478

372

373

374

375

376

377

385

457

478

500

507

509

511

512

517

518

654

657

680

681

682

684

**Deposition Transcripts (in whole or in part)**

Barry Hoskins

Marilyn Marchetti

Nancy Blair

Lee Bloom

Lee Morgan

Kimberly Lipson-Wilson

Chandra Attiken

Julie Williams

Helen Morrison

Asha Morgan Moran

**Expert Witness Reports**

Gregory Brown, June 1, 2015

Robert Reilly, April 20, 2015

**Other Documents**

GBT08392 (Minutes of ESOP Committee of Great Banc, Dec. 12, 2003)

GB-SOL 0002352 (First Amendment to Great Banc contract)

TAC-CC-0137099 et seq (Memo from Grong to Moran re: Feb. 2003 report on Creative Memories)

TAC-CC-0085649 et seq (Memo from Moran to Johnson, Marketing Narrative for Nov. 2003, dated Dec. 7, 2003)

TAC-CC-0196358 (email from Blair to Hoskins and Morgan, Nov. 7, 2003)

WIS 0001-12 et seq (compilation of Company monthly financial metrics)

PRA 00416 (2004 "By Period Financial Plans)

MM 0025991 (email from Ackerman to Matthews, Dec. 11, 2003)

Second Amended Complaint

Opinion of 7th Circuit Court of Appeals, dated May 14, 2014, in <u>Fish</u> litigation

# Tab 3

**TAB 3—EVIDENCE OF CONCERN ABOUT ADVERSE IMPACT OF REPURCHASE LIABILITY AND SECTION 409(p) OF THE INTERNAL REVENUE CODE**

### Concerns over Repurchase Liability

<u>Deposition of Barry Hoskins</u>

- A 5 year delay for terminated employees under age 50 would discourage employees from leaving the Company, but the Company didn't implement that. Hoskins depo., Feb. 2010, pg. 230.
- Exhibit 12 shows Mr. Hoskins' concern that the ESOP would "need every dollar" to cover its repurchase obligation. He was unsure if the Company would have sufficient cash to fund the future repurchase liability. Depo, Feb. 2010, pp. 252-52.
- Exhibit 258 shows the large increase in expected repurchase liability that Mr. Hoskins projected as of December 4, 2003, compared to his August projection (Exh. 52)(the "Revised Repurchase Study"). Sept. 2011 depo., pp. 355-358. This table shows the difference amounts of "total distributions and redemptions" set forth in his two projections:

|      | August 2003, Exh 52 | December 2003, Exh. 258 |
|------|---------------------|-------------------------|
| 2004 | $3.5 million        | $11.25                  |
| 2005 | $4.85               | $21.982                 |
| 2006 | $26                 | $36                     |

- Mr. Hoskins' December projections still assumed retirement at age 65. If he had assumed retirement at age 50, the numbers would be "considerably higher in the short-term." Sept. 2011 depo., pg. 362; pg. 326 (assuming age 50 would produce substantially higher projected repurchase liability). The PERLS software he used for repurchase liability studies for 2000-2005 used normal retirement age (65). Pp. 312, 316-19.
- Mr. Hoskins presented his updated projections at the December 4, 2003, board of directors meeting. Sept. 2011 depo., pg. 355. However, neither Great Banc nor Duff attended the December 4, 2003, board of directors meeting. Exh. 36, pg. 1; Hoskins Sept. 2011 depo., pp. 463-64.
- Bank One wanted him to quantify the impact of the PPP on the repurchase liability projection. Sept. 2011 depo., pp. 415-18.
- He was concerned in November 2003, with both anticipated and unanticipated retirements and risk of a run on the bank. Sept. 2011 depo., pg. 474. One of the risks set forth in the October 31, 2003, presentation to the board called "Take Stock in Your Future 100% ESOP" (Exh. 22, pg. 46) was the risk of underestimating the repurchase obligation. Depo., pp. 482-83. More specifically, he understood the risk of a "rush to the door" by the management team that the Company needed to help run the business. Pg. 483.
- The additional departures of just a few of the employees with very large ESOP balances would mean his projections were underestimated. Sept. 2011 depo., pp. 548-49.

### Deposition of Lee Morgan

- As set forth in the Company's 2001 Annual Report which he helped write, "The biggest cloud hanging over our organization is, in my opinion, our obligation to repurchase our stock both from ESOP participants as they retire and from other stockholders who have no other market for their shares…The potential impact on our cash position is huge." See Exh. 135, pg. 5 (Chairperson's letter, March 18, 2002) and Morgan depo., pp 252-53.
- Mr. Morgan also viewed the repurchase liability as a "dark side" of the Company's success, as early as 2001. Exh. 379 and depo. pp. 110-11.
- The risk of employees leaving was a factor in adopting a 5-year distribution policy to replace the lump sum for employees under age 50. Pp. 259-60. But he didn't inform Great Banc or Duff of that concern and thinks no one on the Committee did. Pp. 260-61.
- He remained concerned with the impact of employees under age 50 qualifying for an initial 20% of their balance immediately after retiring. Pp. 264-66. And the PPP was an incentive for employees to leave as well. He wanted the Committee and management to discuss the risk of a run on the bank. Pp. 266-67.
- He feared employees under age 50 with 7-figure account balances terminating employment in order to get immediate access to the first 20% of their balances. Pp. 271-72.

### Deposition of Nancy Blair

- Less than 10% of the employees owned more than 80% of the stock, so departure of only a few, select employees would present a large repurchase liability at a single point in time. Pp. 51-52.
- Repurchase liability—how much the Company would pay and when-- was a major concern in the Transaction. Pp. 48-52, 60-, 92-93. She was concerned whether the Company would have sufficient cash to meet that liability and concerned that to meet the liability might require selling the Company or pursuing an initial public offering. Pp. 87, 157-58.
- She was concerned that the new distribution policy and put protection provision ("PPP") could cause a run on the bank. Pp. 108-09, 2-3-04, 209, 296, 557 (she "agonized" over the impact of the repurchase liability).
- Lee Morgan thought the Transaction should incorporate more flexibility to deal with the repurchase obligation. Pp. 146-48, 190-92. He was concerned with accelerating the first 20% of distributions to employees under age 50 and that the new ESOP provision would incentivize those employees to leave the Company. Pp. 195-96.
- She was also concerned about employees with high balances who were over age 50, because with Lee Morgan withdrawing so much cash, they might worry he was leaving the Company and want to terminate employment themselves. Pp. 218-19, 224-25.
- She was concerned with the "horror stories" she had heard about runs on the bank. Pp. 335-36.

### Deposition of Kimberly Lipson-Wilson

- She testified that many of the employees were "sweatshop millionaires" who wanted to retire in order to cash in their shares in the Company. Pp. 186-87.
- Other employees viewed the stock as being so highly valued that they wanted to lock in their gains before risking a decline in value. Pp. 186-87.

- By January 2003, there was risk that employees with high balances would leave the Company. Pg. 188.

Deposition of Chandra Attiken

- She prepared an estimate from a human resources perspective of the Company's repurchase liability for 2004-2006. Pp. 179-87.
- She concluded that the total repurchase liability over those years would exceed by $25-$30 million what Barry Hoskins projected in the Revised Repurchase Study. Pp. 179-87.
- She presented her evaluation to the Board of Directors, before the Transaction closed. Pp. 179, 182-83, 185.
- She felt it wasn't her role to disclose her evaluation to Great Banc or Duff and doesn't know if anyone disclosed it to them. Pp. 183-84. She also felt it was not the Committee's responsibility to assure that Great Banc received accurate, complete and up to date financial information. Pp. 95-97.

Bank One's Concerns

- In Exhibit 274, Barry Hoskins email to Joey Williams of Bank One, Oct. 28, 2003, Hoskins responded to the Bank's concern over the impact of the repurchase liability on the Company's ability to repay the Bank in full and on time. The email provided the Bank detail on the number of shares owned by employees under age 50 with 5 years of service. Mr. Hoskins reassured Mr. Williams that the Company expects that as a matter of policy, the ESOP will begin using a 5-year distribution schedule instead of lump sum pay-outs, in order to discourage terminations of employment and reduce the outflow of payments. Hoskins also reassured Williams that Hoskins projected about $15 million per year in distributions because he recognized that employees may retire sooner than age 65.
- Exhibit 478 is an internal Bank One credit analysis memo regarding the potential loan to Antioch, dated Oct. 27, 2003. Pages 13-14 include an extended analysis of the repurchase liability, far more explicit and detailed than anything in the record from Great Banc or Duff. Unlike any analysis from Great Banc or Duff, Bank One's memo recognizes the new PPP "does pose risk to the Bank" and honed in on the number of shares (90,000) owned by ESOP participants who are either age 50 and up, with 5 years of service, or age 65 or more.

Please also see, Tab 5, listing information the ESOP Committee, Board and Company withheld from Great Banc and Duff.

## Concerns over Section 409(p) of the Internal Revenue Code

- Mr. Hoskins was concerned with the risk of violating Section 409(p) of the Internal Revenue Code, but never revealed that to Great Banc or Duff. Sept. 2011 depo., pp. 487-94. He feared violations would lead to the Company's bankruptcy, pg. 496, or would put the Company "out of business." Pp. 534-35.

- According to Mr. Granados, the risk of the Company's losing Subchapter S status was very serious. As he put it, if a "nonallocation year ever happened [under Section 409(p)], that would be devastating for the company." Exh. 516 (Granados memo to Matthews, Dec. 10, 2003, pg. 3).
- Memorandum from Luis Granados of McDermott, Will and Emery to Marsha Matthews, Dec. 10, 2003, Exh. 516, stating that he expected an "extensive" opinion to the Trustee regarding Section 409(p), but the opinion the Trustee requested was only "fairly trivial, since it seeks an opinion for a year in which Section 409(p) does not apply to this plan." Similarly, in Exh. 517, Mr. Granados states "There is no significant 409(p) opinion being requested by the trustee."

# Tab 4

**TAB 4—**          **LITTLE CONCERN AND LITTLE DUE DILIGENCE BY GREAT BANC AND DUFF**

                         **REGARDING REPURCHASE LIABILITY**

<u>Marilyn Marchetti Deposition</u>

- She didn't consider the PPP in the context of a possible run on the bank and didn't see any link between the two. Marchetti depo., pp. 83-87, 271, 276-77. Nobody was thinking about a possible run on the bank. Pp. 276-77.
- The Banc examined the August 2003 repurchase liability study by Mr. Hoskins but she doesn't recall who did that, what questions they may have asked or how long they examined it. Pp. 159-165, 180-83. She doesn't recall if the Banc did anything to analyze the reasonableness and accuracy of Mr. Hoskins' repurchase liability study. Pg. 213.
- She doesn't recall how it calculated the repurchase liability and that's not something the trustee discusses, i.e., Great Banc doesn't get into that level of detail. Pp. 159-65, 180-83.
- She doesn't recall discussing repurchase liability with Mr. Hoskins, pg. 192, or with Duff, pp. 192-94.
- She doesn't recall if the Banc asked for detail or backup for the August 2003 study, e.g., regarding retirement, death, disability or turn-over of employees, or age. Pp. 196, 216-217, 224-25. She doesn't recall if the Banc tried to learn the number of employees at or near age 50 or 65 and their account balances. Pg. 227. Nor does she recall if the Banc ever learned the assumptions Mr. Hoskins used, pg. 197, although normally the Banc does examine management projections for reasonableness. Pp. 283-84.
- She doesn't recall if Deloitte & Touche ran repurchase obligation projections or if Duff relied on those or learned the back-up or assumptions. Pp. 228-30.
- She doesn't recall seeking an updated repurchase liability study after the PPP was added to the Transaction. Pp. 268-69.
- The Banc never realized that Mr. Hoskins' August 2003 repurchase liability study assumed— incorrectly—that employees could retire and obtain distributions from the ESOP only at age 65. Pp. 213-227.

<u>Barry Hoskins Deposition</u>

- His repurchase liability study (Exhibit 52) was not a subject of discussion at negotiating sessions, Feb. 2010 depo. pg. 97, and even after the PPP was agreed-upon, neither Great Banc nor Duff suggested reevaluating the repurchase liability. Pp. 97-98. See Exh. 51, paragraphs 15 and 22. Neither the Banc nor Duff asked him questions about Exhibit 52. Pp. 187-88.
- Great Banc and Duff didn't review any study of repurchase liability from the Company except the two summary pages from his August 2003 study. Hoskins, pp. 176-79, 214.
- Although his full repurchase liability study from August 2003 included details and assumptions, he didn't provide those to Great Banc or Duff, pp. 176-79, 214.

- He has no recollection of running the repurchase liability software with the assumption of early retirement (rather than retirement at age 65) and providing that output to anyone, prior to December 31, 2003. Depo., Sept. 2011, pp. 384-85.

### Lee Morgan Deposition

- He never discussed the assumptions underlying the repurchase liability studies with Great Banc or Duff. Pp. 175-77.
- He never discussed the prospect of a run on the bank with either Ms. Marchetti or Mr. Bloom. Pg. 215.
- He never discussed with either Great Banc or Duff the New ESOP Distribution Policy. Pp. 415-16.

### Nancy Blair Deposition

- Approximately 10% of the Company's employees owned over 80% of the Company's shares and thus, this 10% disproportionately affected the amount, timing and impact of the ESOP's repurchase liability. However, neither Great Banc nor Duff sought to learn details regarding the August 2003 repurchase liability study, such as the identity of those employees, nor the ages of the ESOP's overall population of participants, nor the distribution of account balances by participant age. Blair, pp. 101-104.

### Lee Bloom Deposition

- Duff didn't do repurchase liability studies and didn't hold itself out as a repurchase liability expert. Pp. 39-41.
- Duff's projections of repurchase liability didn't equal those of the Company or Deloitte & Touche but he doesn't know why. Pp. 74-77; Exh. 117.
- Duff didn't request additional analysis about the impact of the PPP on repurchase liability. Pp. 177-78.
- He wasn't concerned with the possibility that the PPP might cause a run on the bank. Pp. 178-79, 184-85. This isn't a legitimate or sensible concern; the PPP shouldn't lead to changing the ESOP's expected repurchase amount, as on Schedule F-1 of its October 27, 2003, "Preliminary Review" (Exh. 119). Pg. 191.

# Tab 5

**TAB 5—**                 **CRITICAL INFORMATION THAT NEITHER THE ESOP COMMITTEE, NOR BOARD OF DIRECTORS, NOR ANYONE ELSE ON BEHALF OF THE ESOP OR COMPANY PROVIDED TO GREAT BANC AND DUFF**

### A. Evidence regarding Repurchase Liability

Exhibits

- Exhibit 64—
  Email from Nancy Blair to Attiken, Moran, Morgan, Nov. 4, 2003, explaining (a) policy change that shifted from lump sum payments to 5-year schedule for terminated employees over age 50, with balances of $800,000 or more, plus (b) plan document change for employees under 50, who would begin receiving the first 20% of their balance immediately (rather than existing provision allowing the Company a 5-year delay before any distribution was paid). Earlier in that email chain, Hoskins emailed Attiken, et al, on October 29, 2003, noting that Bank One "was alarmed with the $850 floor put…."

- Exh. 85—
  Email from Barry Hoskins to Lee Morgan, November 6, 2003, mentioning that paying terminees under age 50 immediately is "another surprise" arising from the PPP. In earlier email to Hoskins, Morgan says that if employees under age 50 can start receiving distributions immediately on leaving the Company, he foresees "a bit of a run on the bank."

- Exh. 86-
  November 22, 2003, email, between Barry Hoskins and Lee Morgan, where Morgan "frankly hope[s] we will be able to pay it [the immediate 20% distribution to terminees under age 50]".

- Exh. 211-
  Email from Helen Morrison to Lee Morgan, Barry Hoskins, et al, November 6, 2003, where at page 7, paragraph H she says a "Plan amendment permitting immediate distribution could be perceived to encourage termination of employment in order to obtain immediate distribution."

- Exh. 211, 212-
  In reaction to November 6 email from Morrison, Lee Morgan acknowledges by email his "fear…that we have a number of folks with 7 figure accounts under the age of 50, who would likely terminate if they could get the money. I am concerned that the accounts not become an incentive for people to terminate employment before age 50 just to get the money….a number of folks…are frustrated because they are 'working poor' but sitting on 7 figure retirement accounts and would like to improve their life style sooner rather than later."

- Exh. 274-
  Barry Hoskins email to Joey Williams of Bank One, Oct. 28, 2003, where Hoskins mentions that the software he uses to project repurchase liability uses normal retirement age and he usually

projects about $15 million a year—much less than his August 2003 study projected—because employees may retire before age 65.

- Exh. 301-
  Dan  Holthaus of Deloitte & Touche email to Morrison, et al, Jan. 13, 2003, relaying concern of Kimberly Lipson-Wilson that some participants are sweatshop millionaires who don't need or want to work anymore and others see high stock price and want to retire to lock in that price before the stock declines in value (the "enron effect").

<u>Depositions</u>

- Deposition of Lee Morgan, pp. 175-77, where he testifies that he did not discuss with Great Banc or Duff the assumptions in Mr. Hoskins' repurchase studies.  Nor did he speak with Mr. Bloom or Ms. Marchetti about the risk of a run on the bank.  Pg. 215. He never made any effort to discuss with Great Banc or Duff his views about the New ESOP Distribution Policy or his expectation (before the Transaction) that as a result of that Policy, 20 to 30 employee would leave the Company. Pp. 295-97, 415-16.  He thought that adopting a 5-year distribution policy to replace the lump sum for employees under age 50 entailed a risk of employees leaving. Pp. 259-60.  But he didn't inform Great Banc or Duff of that concern and thinks no one on the Committee did. Pp. 260-61.

- Deposition of Julie Williams, pp. 190-91, where she testifies that the Company should inform the Trustee and its financial adviser of material changes in circumstances, such as changes in the ESOP's distribution policies.

- Deposition of Barry Hoskins, regarding Exhibit 258.  This shows the large increase in expected repurchase liability that Mr. Hoskins projected as of December 4, 2003, compared to his August projection (Exh. 52)(the "Revised Repurchase Study").  Depo. Sept. 16, 2011, pp. 355-358.  This Revised Repurchase Study was not provided to Great Banc or Duff. Feb. 2010 depo., pp. 176-79, 214. The following table shows the difference amounts of "total distributions and redemptions" set forth in his two projections:

|  | August 2003, Exh 52 | December 2003, Exh. 258 |
|---|---|---|
| 2004 | $3.5 million | $11.25 |
| 2005 | $4.85 | $21.982 |
| 2006 | $26 | $36 |

- Mr. Hoskins' December projections still assumed retirement at age 65.  If he had assumed retirement at age 50, the numbers would be "considerably higher in the short-term."  Sept. 16, 2011 depo, pg. 362; pg. 326 (assuming age 50 would produce substantially higher projected repurchase liability). The PERLS software he used for repurchase liability studies for 2000-2005 used normal retirement age (65).  Sept. 16, 2011 depo., pp. 312, 316-19.
- Mr. Hoskins presented his updated projections at the December 4, 2003, board of directors meeting.  Sept. 2011 depo., pg. 355.  However, neither Great Banc nor Duff attended the December 4, 2003, board of directors meeting.  Exh. 36, pg. 1; Sept. 2011 depo., pp. 463-64.

**B.   Evidence regarding the Company's Recent Financial Performance and Downside Analysis**

- There is no evidence in the record establishing that the ESOP Committee or the Company provided Great Banc or Duff updated financial projections and other analysis of the Company's expected financial performance, which the Company's board reviewed at its meeting on December 4, 2003, before the Transaction closed. These included the 100% ESOP Recapitalization Sensitivity Analysis (the "100% Recap study"), presented to the Company's board of directors on December 4, 2003, (Exh. 213); and the downside scenario analysis from Deloitte & Touche, dated December 2, 2003, that it incorporated (Exh. 583).  See, e.g., Lee Morgan deposition testimony to the effect that the Committee made no efforts to assure that the information to Great Banc and Duff was complete, accurate and up to date. Pp. 70-72, 85-90, 163-65, 429-33.
- There is no evidence in the record that Great Banc studied the Company's own productivity metrics and records of monthly revenues from the Creative Memories division through the first 11 months of 2003, compared to the business plan. See, WIS 0001-12 and D&P A002626.

**C.   Evidence regarding IRC Section 409(p)**

- Mr. Hoskins was concerned with the risk of violating Section 409(p) of the Internal Revenue Code, but never revealed that to Great Banc or Duff.  Sept. 2011 depo., pp. 487-94.  He feared violations would lead to the Company's bankruptcy, pg. 496, or would put the Company "out of business."  Pp. 534-35.
- Memorandum from Luis Granados of McDermott, Will and Emery to Jared Kaplan of the same law firm, December 10, 2003, Exh. 511.  Mr. Granados expressed concern that the IRS might revise regulations interpreting Section 409(p) so as to increase risk of the Company's failing the test and losing its S corporation status ("Antioch is ok under 409(p) the way the regs are currently written, although they are very close to the edge.  However, the way the 409(p) regs are currently written is asinine…and I cannot believe they are going to stay that way forever.  Antioch would fail by a substantial margin if the test were applied the way I thought it should be….a problem might be brewing here.")  There is no evidence that Mr. Granados or anyone from McDermott Will or Deloitte & Touche disclosed this concern to Great Bank or Duff.  See, e.g., depo. of Helen Morrison, pp. 247-48.
- Memorandum from Luis Granados to Lee Morgan, Dec. 15, 2003, Exh 519, stating that the Company should not "stop worrying about Section 409(p)…especially since the Company is fairly close to the point of having a nonallocation year."  As currently written, according to Granados, the regulation "permits significant abuses and is contrary to the purpose of Section 409(p)…If the regulation is ever changed,… you would be even closer to the brink of having a non-allocation year."  I am unaware of anything in the record demonstrating that Mr. Morgan revealed this concern about

3

Section 409(p) to Great Banc, despite his duty as a member of the ESOP Committee to disclose information to Great Banc and to monitor the Banc's performance.

- Marsha Matthews email to Messrs. Granados and Kaplan, December 14, 2003, Exh. 512, saying she wants to avoid causing Great Banc's lawyer to realize he should seek a broader opinion from McDermott Will regarding the effect of Section 409(p).

# Tab 6

### AGREEMENT CONCERNING FIDUCIARY ENGAGEMENTS AND PROCESS REQUIREMENTS FOR EMPLOYER STOCK TRANSACTIONS

The Secretary of the United States Department of Labor (the "Secretary") and GreatBanc Trust Company ("the Trustee"), by and through their attorneys, have agreed that the policies and procedures described below apply whenever the Trustee serves as a trustee or other fiduciary of any employee stock ownership plan subject to Title I of ERISA ("ESOP") in connection with transactions in which the ESOP is purchasing or selling, is contemplating purchasing or selling, or receives an offer to purchase or sell, employer securities that are not publicly traded.

A.  Selection and Use of Valuation Advisor – General.  In all transactions involving the purchase or sale of employer securities that are not publicly traded, the Trustee will hire a qualified valuation advisor, and will do the following:

1.  prudently investigate the valuation advisor's qualifications;

2.  take reasonable steps to determine that the valuation advisor receives complete, accurate and current information necessary to value the employer securities; and

3.  prudently determine that its reliance on the valuation advisor's advice is reasonable before entering into any transaction in reliance on the advice.

B.  Selection of Valuation Advisor – Conflicts of Interest. The Trustee will not use a valuation advisor for a transaction that has previously performed work – including but not limited to a "preliminary valuation" – for or on behalf of the ESOP sponsor (as distinguished from the ESOP), any counterparty to the ESOP involved in the transaction, or any other entity that is structuring the transaction (such as an investment bank) for any party other than the ESOP or its trustee.  The Trustee will not use a valuation advisor for a transaction that has a familial or corporate relationship (such as a parent-subsidiary relationship) to any of the aforementioned persons or entities.  The Trustee will obtain written confirmation from the valuation advisor selected that none of the above-referenced relations exist.

C.  Selection of Valuation Advisor – Process.  In selecting a valuation advisor for a transaction involving the purchase or sale of employer securities, the Trustee will prepare a written analysis addressing the following topics:

1.  The reason for selecting the particular valuation advisor;

2.  A list of all the valuation advisors that the Trustee considered;

3.  A discussion of the qualifications of the valuation advisors that the Trustee considered;

4.  A list of references checked and discussion of the references' views on the valuation advisors;

5.  Whether the valuation advisor was the subject of prior criminal or civil proceedings; and

6.  A full explanation of the bases for concluding that the Trustee's selection of the valuation advisor was prudent.

If the Trustee selects a valuation advisor from a roster of valuation advisors that it has previously used, the Trustee need not undertake anew the analysis outlined above if the following conditions are satisfied: (a) the Trustee previously performed the analysis in connection with a prior engagement of the valuation advisor; (b) the previous analysis was completed within the 15 month period immediately preceding the valuation advisor's selection for a specific transaction; (c) the Trustee documents in writing that it previously performed the analysis, the date(s) on which the Trustee performed the analysis, and the results of the analysis; and (d) the valuation advisor certifies that the information it previously provided pursuant to item (5) above is still accurate.

       **D.**   <u>Oversight of Valuation Advisor – Required Analysis</u>.  In connection with any purchase or sale of employer securities that are not publicly traded, the Trustee will request that the valuation advisor document the following items in its valuation report,[1] and if the valuation advisor does not so document properly, the Trustee will prepare supplemental documentation of the following items to the extent they were not documented by the valuation advisor:

---

[1] As used herein, "valuation report" means the final valuation report as opposed to previous versions or drafts.

1.  Identify in writing the individuals responsible for providing any projections reflected in the valuation report, and as to those individuals, conduct reasonable inquiry as to: (a) whether those individuals have or reasonably may be determined to have any conflicts of interest in regard to the ESOP (including but not limited to any interest in the purchase or sale of the employer securities being considered); (b) whether those individuals serve as agents or employees of persons with such conflicts, and the precise nature of any such conflicts: and (c) record in writing how the Trustee and the valuation advisor considered such conflicts in determining the value of employer securities;

2.  Document in writing an opinion as to the reasonableness of any projections considered in connection with the proposed transaction and explain in writing why and to what extent the projections are or are not reasonable.  At a minimum, the analysis shall consider how the projections compare to, and whether they are reasonable in light of, the company's five-year historical averages and/or medians and the five-year historical averages and/or medians of a group of comparable public companies (if any exist) for the following metrics, unless five-year data are unavailable (in which case, the analyses shall use averages extending as far back as possible):

    a. Return on assets

    b. Return on equity

    c. EBIT margins

    d. EBITDA margins

    e. Ratio of capital expenditures to sales

    f. Revenue growth rate

    g. Ratio of free cash flows (of the enterprise) to sales

3.  If it is determined that any of these metrics should be disregarded in assessing the reasonableness of the projections, document in writing both the calculations of the metric (unless calculation is impossible) and the basis for the conclusion that the

metric should be disregarded. The use of additional metrics to evaluate the reasonableness of projections other than those listed in section D(2)(a)-(g) above is not precluded as long as the appropriateness of those metrics is documented in writing. If comparable companies are used for any part of a valuation – whether as part of a Guideline Public Company method, to gauge the reasonableness of projections, or for any other purpose – explain in writing the bases for concluding that the comparable companies are actually comparable to the company being valued, including on the basis of size, customer concentration (if such information is publicly available), and volatility of earnings.  If a Guideline Public Company analysis is performed, explain in writing any discounts applied to the multiples selected, and if no discount is applied to any given multiple, explain in significant detail the reasons.

4. If the company is projected to meet or exceed its historical performance or the historical performance of the group of comparable public companies on any of the metrics described in paragraph D(2) above, document in writing all material assumptions supporting such projections and why those assumptions are reasonable.

5. To the extent that the Trustee or its valuation advisor considers any of the projections provided by the ESOP sponsor to be unreasonable, document in writing any adjustments made to the projections.

6. If adjustments are applied to the company's historical or projected financial metrics in a valuation analysis, determine and explain in writing why such adjustments are reasonable.

7. If greater weight is assigned to some valuation methods than to others, explain in writing the weighting assigned to each valuation method and the basis for the weightings assigned.

8. Consider, as appropriate, how the plan document provisions regarding stock distributions, the duration of the ESOP loan, and the age and tenure of the ESOP participants, may affect the ESOP sponsor's prospective repurchase obligation, the prudence of the stock purchase, or the fair market value of the stock.

Case: 1:09-cv-01668 Document #: 499-2 Filed: 10/15/15 Page 54 of 61 PageID #:19281
Case 5:12-cv-01648-R-DTB   Document 166-1   Filed 06/02/14   Page 17 of 24   Page ID
#:3465

9. Analyze and document in writing (a) whether the ESOP sponsor will be able to
service the debt taken on in connection with the transaction (including the ability to
service the debt in the event that the ESOP sponsor fails to meet the projections
relied upon in valuing the stock); (b) whether the transaction is fair to the ESOP from
a financial point of view; (c) whether the transaction is fair to the ESOP relative to all
the other parties to the proposed transaction; (d) whether the terms of the financing of
the proposed transaction are market-based, commercially reasonable, and in the best
interests of the ESOP; and (e) the financial impact of the proposed transaction on the
ESOP sponsor, and document in writing the factors considered in such analysis and
conclusions drawn therefrom.

E.      <u>Financial Statements</u>.

1. The Trustee will request that the company provide the Trustee and its valuation
advisor with audited unqualified financial statements prepared by a CPA for the
preceding five fiscal years, unless financial statements extending back five years are
unavailable (in which case, the Trustee will request audited unqualified financial
statement extending as far back as possible).

2. If the ESOP Sponsor provides to the Trustee or its valuation advisor unaudited or
qualified financial statements prepared by a CPA for any of the preceding five fiscal
years (including interim financial statements that update or supplement the last available
audited statements), the Trustee will determine whether it is prudent to rely on the
unaudited or qualified financial statements notwithstanding the risk posed by using
unaudited or qualified financial statements.

3. If the Trustee proceeds with the transaction notwithstanding the lack of audited
unqualified financial statements prepared by a CPA (including interim financial
statements that update or supplement the last available audited statements), the Trustee
will document the bases for the Trustee's reasonable belief that it is prudent to rely on the
financial statements, and explain in writing how it accounted for any risk posed by using
qualified or unaudited statements.  If the Trustee does not believe that it can reasonably

conclude that it would be prudent to rely on the financial statements used in the valuation report, the Trustee will not proceed with the transaction.  While the Trustee need not audit the financial statements itself, it must carefully consider the reliability of those statements in the manner set forth herein.

F.    <u>Fiduciary Review Process – General</u>.  In connection with any transaction involving the purchase or sale of employer securities that are not publicly traded, the Trustee agrees to do the following:

1. Take reasonable steps necessary to determine the prudence of relying on the ESOP sponsor's financial statements provided to the valuation advisor, as set out more fully in paragraph E above;

2. Critically assess the reasonableness of any projections (particularly management projections), and if the valuation report does not document in writing the reasonableness of such projections to the Trustee's satisfaction, the Trustee will prepare supplemental documentation explaining why and to what extent the projections are or are not reasonable;

3. Document in writing its bases for concluding that the information supplied to the valuation advisor, whether directly from the ESOP sponsor or otherwise, was current, complete, and accurate.

G.    <u>Fiduciary Review Process – Documentation of Valuation Analysis</u>.  The Trustee will document in writing its analysis of any final valuation report relating to a transaction involving the purchase or sale of employer securities.  The Trustee's documentation will specifically address each of the following topics and will include the Trustee's conclusions regarding the final valuation report's treatment of each topic and explain in writing the bases for its conclusions:

1. Marketability discounts;

2. Minority interests and control premiums;

3. Projections of the company's future economic performance and the reasonableness or unreasonableness of such projections, including, if applicable, the bases for assuming

that the company's future financial performance will meet or exceed historical performance or the expected performance of the relevant industry generally;

4.  Analysis of the company's strengths and weaknesses, which may include, as appropriate, personnel, plant and equipment, capacity, research and development, marketing strategy, business planning, financial condition, and any other factors that reasonably could be expected to affect future performance;

5.  Specific discount rates chosen, including whether any Weighted Average Cost of Capital used by the valuation advisor was based on the company's actual capital structure or that of the relevant industry and why the chosen capital structure weighting was reasonable;

6.  All adjustments to the company's historical financial statements;

7.  Consistency of the general economic and industry-specific narrative in the valuation report with the quantitative aspects of the valuation report;

8.  Reliability and timeliness of the historical financial data considered, including a discussion of whether the financial statements used by the valuation advisor were the subject of unqualified audit opinions, and if not, why it would nevertheless be prudent to rely on them;

9.  The comparability of the companies chosen as part of any analysis based on comparable companies;

10. Material assumptions underlying the valuation report and any testing and analyses of these assumptions;

11. Where the valuation report made choices between averages, medians, and outliers (e.g., in determining the multiple(s) used under the "guideline company method" of valuation), the reasons for the choices;

12. Treatment of corporate debt;

13. Whether the methodologies employed were standard and accepted methodologies and the bases for any departures from standard and accepted methodologies;

14. The ESOP sponsor's ability to service any debt or liabilities to be taken on in connection with the proposed transaction;

15. The proposed transaction's reasonably foreseeable risks as of the date of the transaction;

16. Any other material considerations or variables that could have a significant effect on the price of the employer securities.

H.      <u>Fiduciary Review Process – Reliance on Valuation Report.</u>

1. The Trustee, through its personnel who are responsible for the proposed transaction, will do the following, and document in writing its work with respect to each:

   a.   Read and understand the valuation report;

   b.   Identify and question the valuation report's underlying assumptions;

   c.   Make reasonable inquiry as to whether the information in the valuation report is materially consistent with  information in the Trustee's possession;

   d.   Analyze whether the valuation report's conclusions are consistent with the data and analyses; and

   e.   Analyze whether the valuation report is internally consistent in material aspects.

2. The Trustee will document in writing the following:  (a) the identities of its personnel who were primarily responsible for the proposed transaction, including any person who participated in decisions on whether to proceed with the transaction or the price of the transaction; (b) any material points as to which such personnel disagreed and why; and (c) whether any such personnel concluded or expressed the belief prior to the Trustee's approval of the transaction that the valuation report's conclusions were inconsistent with the data and analysis therein or that the valuation report was internally inconsistent in material aspects.

3. If the individuals responsible for performing the analysis believe that the valuation report's conclusions are not consistent with the data and analysis or that the valuation report is internally inconsistent in material respects, the Trustee will not proceed with the transaction.

    I.    <u>Preservation of Documents</u>. In connection with any transaction completed by the Trustee through its committee or otherwise, the Trustee will create and preserve, for at least six (6) years, notes and records that document in writing the following:

1. The full name, business address, telephone number and email address at the time of the Trustee's consideration of the proposed transaction of each member of the Trustee's Fiduciary Committee (whether or not he or she voted on the transaction) and any other Trustee personnel who made any material decision(s) on behalf of the Trustee in connection with the proposed transaction, including any of the persons identified pursuant to H(2) above;

2. The vote (yes or no) of each member of the Trustee's Fiduciary Committee who voted on the proposed transaction and a signed certification by each of the voting committee members and any other Trustee personnel who made any material decision(s) on behalf of the Trustee in connection with the proposed transaction that they have read the valuation report, identified its underlying assumptions, and considered the reasonableness of the valuation report's assumptions and conclusions;

3. All notes and records created by the Trustee in connection with its consideration of the proposed transaction, including all documentation required by this Agreement;

4. All documents the Trustee and the persons identified in 1 above relied on in making their decisions;

5. All electronic or other written communications the Trustee and the persons identified in 1 above had with service providers (including any valuation advisor), the ESOP sponsor, any non-ESOP counterparties, and any advisors retained by the ESOP sponsor or non-ESOP counterparties.

    J.    <u>Fair Market Value</u>. The Trustee will not cause an ESOP to purchase employer securities for more than their fair market value or sell employer securities for less than their fair market value. The DOL states that the principal amount of the debt financing the transaction, irrespective of the interest rate, cannot exceed the securities' fair market value. Accordingly, the Trustee will not cause an ESOP to engage in a leveraged stock purchase transaction in which the

principal amount of the debt financing the transaction exceeds the fair market value of the stock acquired with that debt, irrespective of the interest rate or other terms of the debt used to finance the transaction.

      K.    <u>Consideration of Claw-Back</u>.  In evaluating proposed stock transactions, the Trustee will consider whether it is appropriate to request a claw-back arrangement or other purchase price adjustment(s) to protect the ESOP against the possibility of adverse consequences in the event of significant corporate events or changed circumstances.  The Trustee will document in writing its consideration of the appropriateness of a claw-back or other purchase price adjustment(s).

      L.    <u>Other Professionals</u>. The Trustee may, consistent with its fiduciary responsibilities under ERISA, employ, or delegate fiduciary authority to, qualified professionals to aid the Trustee in the exercise of its powers, duties, and responsibilities as long as it is prudent to do so.

      M.    This Agreement is not intended to specify all of the Trustee's obligations as an ERISA fiduciary with respect to the purchase or sale of employer stock under ERISA, and in no way supersedes any of the Trustee's obligations under ERISA or its implementing regulations.

IN WITNESS WHEREOF, the Secretary and GreatBanc have executed this Agreement in duplicate originals on the dates indicated by their respective signatures.

FOR THE SECRETARY:                     FOR GREATBANC TRUST COMPANY:


PATRICIA SMITH                         By:_____ Date:_____
Solicitor of Labor
                                       Title:_____
G. WILLIAM SCOTT
Acting Associate Solicitor
Plan Benefits Security Division

RISA D. SANDLER
Counsel for Fiduciary Litigation

ROBERT L. FURST
Senior Trial Attorney

_____ Date: 6/2/2014
SYMA AHMAD
JEFFREY M. HAHN
DAVID M. ELLIS
Attorneys for Plaintiff

IN WITNESS WHEREOF, the Secretary and GreatBanc have executed this Agreement in
duplicate originals on the dates indicated by their respective signatures.

FOR THE SECRETARY:                    FOR GREATBANC TRUST COMPANY:

PATRICIA SMITH                        By: _____  Date: 6/1/2014
Solicitor of Labor
                                      Title: _____Chairman_____
G. WILLIAM SCOTT
Acting Associate Solicitor
Plan Benefits Security Division

RISA D. SANDLER
Counsel for Fiduciary Litigation

ROBERT L. FURST
Senior Trial Attorney


_____  Date:_____

SYMA AHMAD
JEFFREY M. HAHN
DAVID M. ELLIS
Attorneys for Plaintiff

Page 11 of 11