**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| BONNIE FISH, et al., | Case No. 09 cv 1668 |
| Plaintiffs, | |
| | Judge Jorge L. Alonso |
| v. | |
| | Magistrate Judge Maria Valdez |
| GREATBANC TRUST COMPANY, et al., | |
| Defendants. | |

**DEFENDANTS LEE MORGAN'S, ASHA MORAN'S, AND CHANDRA ATTIKEN'S**
**MOTION IN LIMINE TO EXCLUDE ALL OF DAVID WEINSTOCK'S**
**OPINIONS AND TESTIMONY FROM EVIDENCE AT TRIAL**

Individual Defendants Lee Morgan, Asha Moran, and Chandra Attiken (the "Individual Defendants") move the Court *in limine* to exclude from evidence at trial all opinions and testimony from Plaintiffs' expert David Weinstock. Grounds for the motion are set forth in the attached memorandum in support.

Respectfully submitted,

s/Michael L. Scheier
Michael L. Scheier
Brian P. Muething
Anthony M. Verticchio
Jacob D. Rhode
Keating Muething & Klekamp PLL
One East Fourth Street, Suite 1400
Cincinnati, OH 45202
Phone: (513) 579-6400
Fax: (513) 579-6457
*Counsel for Defendants Lee Morgan, Asha Moran, and Chandra Attiken*

## MEMORANDUM IN SUPPORT

David Weinstock ("Weinstock") is Plaintiffs' purported repurchase obligation expert. Using the Antioch Company ESOP participant census and account balance information as of December 31, 2002, varying assumptions, the software program PERLS, and the benefit of "perfect hindsight," Weinstock attempts to project (as if he were in 2003) the amount of money the Antioch Company might need each year from 2004-2012 to repurchase shares from retiring and terminating employees. Plaintiffs' expert Robert Reilly relies upon Weinstock's repurchase obligation projections to calculate a portion of his alleged damages. Weinstock also purports to opine on the reasonableness of the repurchase obligation projections that the Antioch Company prepared in 2003.

Weinstock's purported expert opinions are the impermissible product of speculation and guesswork. In his deposition, Weinstock repeatedly testified that his opinions were the product of a so-called "gut experience," "gut feel," "subjective determination," and/or "best guess" rather than reliable principles and methods based on sufficient facts or data. Weinstock also testified he believes that, as a purported expert, it is acceptable if the ultimate opinions he is offering are unreasonable, so long as he somehow deems the underlying assumptions reasonable when they are considered in complete isolation from each other.[1]

---

[1]   Moreover, Weinstock does not even appear to possess the qualifications and specialized knowledge necessary to offer his purported expert opinions, which the Individual Defendants reserve the right to challenge at trial during *voir dire*. For example, Weinstock's expertise is that of a TPA handling the annual administration of ESOPs, which is unrelated and does not qualify him to testify on the subject matter of his purported expert opinions in this case. (Weinstock Deposition Transcript, attached as Exhibit A, at 18-21, 24-25) ("Weinstock Depo."). Weinstock has also never published or presented on repurchase obligation projections, never served on any committees of the NCEO or The ESOP Association regarding repurchase obligation studies, never provided TPA or repurchase obligation projection services to any direct sales organization, never advised a sponsor corporation board of directors or ESOP trustee about a company's repurchase obligation liabilities, never served as an advisor to a party in a transaction involving

Weinstock's purported expert opinions and testimony fall far short of the requirements for experts under Federal Rule of Evidence 702 and related Seventh Circuit precedent. This Court should exclude all of his opinions and testimony from evidence at trial.

## I. ARGUMENT

### A. Legal Standard

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009) (citing *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 607 (7th Cir. 2006)). Rule 702 charges trial judges with the responsibility of acting as "gatekeeper[s] with respect to testimony proffered under Rule 702 to ensure that the testimony is sufficiently reliable to qualify for admission." *Mihailovich v. Laatsch*, 359 F.3d 892, 918 (7th Cir. 2004) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)). "The purpose of [the *Daubert*] inquiry is to vet the proposed testimony under Rule 702's requirements that it be 'based on sufficient facts or data,' use 'reliable principles and methods,' and 'reliably appl[y] the principles and methods to the facts of the case." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 804 (7th Cir. 2012) (quoting Fed.R.Evid. 702)."

"Under Rule 702, '[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient

---

an ESOP company, never worked as a repurchase obligation advisor on a transaction with a negotiated floor price, and never prepared repurchase obligation projections as an expert witness (he was last qualified as an expert some 20 years ago on qualified domestic relations orders and splitting of pension assets). (Weinstock Depo., at 31-36, 39-42, 206).

facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.'" *Cage v. City of Chicago*, 979 F. Supp. 2d 787, 799 (N.D. Ill. 2013) (quoting Fed.R.Evid. 702) (citing *Ortiz v. City of Chicago*, 656 F.3d 523, 536 (7th Cir. 2011).

Moreover, "[t]he proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard by a preponderance of the evidence." *Cage*, 979 F. Supp. 2d at 799 (quoting *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 704 (7th Cir. 2009) (internal quotations omitted) (citing Fed.R.Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified . . ."); Fed.R.Evid. 702 advisory committee note (2000 Amends.) ("[T]he admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence.")).

### B. Weinstock's Opinions Are Not Based On Sufficient Facts Or Data Nor Upon Reliable Principles and Methods Applied To The Facts Of The Case.

In addition to adequate qualifications and specialized knowledge, Rule 702 and Seventh Circuit precedent specifically require an expert to base his opinions on "sufficient facts or data" and apply "reliable principles and methods." Fed. R. Evid. 702; *Cage*, 979 F. Supp. 2d at 799. "Even in instances where a formal scientific method is not necessary, a purported expert must consider obviously relevant information in forming his opinion. Put somewhat differently, such supposed 'expert' testimony cannot be a hunch or a gut feeling – it must be based on some specific data." *Klaczak ex rel. United States v. Consol. Med. Transp.*, 458 F. Supp. 2d 622, 667 (N.D. Ill. 2006) (emphasis added) (internal citations omitted).

"A witness who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines that term." *Zenith Elects. Corp. v. WH-TV Broad.*

*Corp.*, 395 F.3d 416, 419 (7th Cir. 2005). *See also id.* at 418 ("Asked repeatedly during his deposition what methods he had used to generate projections, [the expert] repeatedly answered 'my expertise' or some variant ('my industry expertise', '[my] awareness,' and 'my curriculum vitae') – which is to say that he either had no method or could not describe one. He was relying on intuition, which won't do.") (*citing McMahon v. Bunn-O-Matic Corp.*, 150 F.3d 651, 658 (7th Cir. 1998); *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996)); *Callpod, Inc. v. GN Netcom, Inc.*, 703 F. Supp. 2d 815, 821 (N.D. Ill. 2010) (citing *Zenith* and noting "a conclusion based solely on [] expert intuition [] is not an appropriate foundation for expert testimony."). Weinstock's projections of the Antioch Company's repurchase obligation from 2004-2012 are the product of this very type of impermissible "intuition" that lacks sufficient facts or data and reliable principles and methods.

To develop his schedules of repurchase obligation projections for the Antioch Company that are attached as Exhibits IV and V to his expert report [Doc. No. 438-2], Weinstock varied three principal assumptions in the PERLS software: (1) the age at which 100% of participants would retire in a given year ("retirement age"); (2) the percentage of participants under the retirement age who would also leave the Company in a given year ( "turnover rate"); and (3) the percentage growth of the Antioch Company stock from year-to-year ("stock appreciation").[2] (Weinstock Depo., at 146, 149, 162-163). Weinstock chose to use assumed retirement ages of 50, 60, and 65, turnover rates of 12%, 20%, and 35%, and stock appreciation of 0%, 3%, and 10%. So, for example, by assuming a retirement age of 50 and a turnover rate of 35%, Weinstock projected that each year beginning in 2004 every ESOP participant age 50 and older would leave

---

[2] Weinstock also assumed that the Antioch Company would make payments to all retiring and terminating participants from 2004-2012 in one "lump-sum." This is contrary to the Antioch Company's practice following the 2003 Transaction, which was to pay the higher balance terminees and retirees with equal 20% payments spread out over 5 years.

the Company, and 35% of the remaining ESOP participants would also leave the Company. (Weinstock Depo., at 162-163).

Far from sufficient facts or data and reliable principles and methods, Weinstock repeatedly conceded in his deposition that the selection and use of his assumptions was subjective and purportedly based upon his "gut experience," "gut feel," and "best guess." For example, even though Weinstock testified that an assumed retirement age of 65 is the "common practice" for repurchase obligation projections (Weinstock Depo., at 331-332), he nevertheless chose to use an assumed retirement age of 50 for various of his scenarios. (*Id*. at 157.)[3]

Moreover, Weinstock's selection of retirement ages of 50 and 55 was not based on any methodology or facts or data about the actual Antioch ESOP participant population. He admittedly did not attempt to evaluate various age demographics (such as all employees over the age of 50) in the record or consider evidence of their historical behavior to come to a reasonable conclusion about how that behavior may or may not continue in the future (Weinstock Depo., at 152). Unlike someone engaged to perform a repurchase obligation analysis in 2003, Weinstock did not speak to corporate representatives and employees who knew the business well and could help him choose assumptions that were appropriate for the task at hand. (Weinstock Depo., at 329). Indeed, he did not read a single deposition transcript – not even the deposition transcripts of the Company's CFO Barry Hoskins who was responsible for preparing the repurchase obligation analysis each year.

Similarly, Weinstock's selection of turnover rate assumptions was not based on any analysis or even review of the record regarding Antioch ESOP participants by business unit, nor

---

[3] Plaintiffs' expert Robert Reilly completely disregarded Weinstock's scenarios run with the industry standard retirement age of 65 in his damages analysis "[b]ased on instruction from legal counsel that the evidence of age 65 assumption was unreasonable," making those projections meaningless [Doc No. 438-1, at ¶216].

the effect that the 20-38% growth of the Antioch stock had on participant behavior in the five

years prior to 2003 (Weinstock Depo., at 153-154). Rather, it appears that Weinstock's turnover

rate assumptions were selected through a combination of instruction from Plaintiffs' expert

Robert Reilly (who has no experience or expertise of any kind related to repurchase obligation

projections) along with Weinstock's own subjective "gut experience" and what "seemed"

correct. (Weinstock Depo. at 158-159; 161-162).

Throughout his deposition, Weinstock reiterated that his assumed turnover rate of 35%

was nothing more than a "best guess" and a "gut feel" with no discernible methodology:

> Q.  Okay. And you deemed 35 percent employee turnover for all employees,
> for example, where retirement age is 50 – under 50 leaving the company as being
> a  reasonable worst-case scenario employee turnover projection; correct?
> **A.    Yes.**
> ***
> Q.  My question is what methodology did you use to determine that 35 percent
> is a reasonable assumption for a worst-case scenario of employee turnover in light
> of the risks that you saw could arise as a result of the transaction?
> **A.    Just a best guess.**
> ***
> Q.  What methodology did you use to determine the reasonableness of a 35
> percent employee turnover that you use in several of your models?
> **A.    Again, when we don't have anything to -- to go on -- you can't look at
> past history. You know that you expect turnover to be higher than it has
> been in the past. That's the feel based on the facts and circumstances.**
>
> Q.  So it's just a feel?
> A.  **It's -- yes, it's a gut feel. It's a best estimate.**
>
> Q.  Do you refer to any academic literature in determining what an
> appropriate turnover assumption should be when you're deviating from historical
> experience?
> **A.    No.**

(Weinstock Depo. at, 187-188, 201). Weinstock attempted to support his "gut feel" and "best

guess" that 35% percent turnover would have been a reasonable assumption to make had he been

hired to forecast the Company's potential repurchase obligation in 2003 by pointing in part to the

Put Price Protection feature of the 2003 Transaction. (Weinstock Depo., at 163-164).[4] Yet when examined on this point, Weinstock admitted he was not aware participants knew for approximately 5 months before they had to make a decision to retire in 2004 that the fair market value of the stock ($894) actually exceeded the one-year (2004) floor price in the Put Price Protection ($840.26) (Weinstock Depo., at 170), and that the additional $21.80 and $12.80 per share over fair market value that participants were guaranteed to receive in 2005 and 2006 under the Put Price Protection would not have actually changed participant behavior:

> Q.     Do you believe that adding $20 to shares valued at, in 2005, $943 a share by an independent appraiser acts as an incentive for employees to put their shares to the company and leave when they otherwise would not?
> **A.     No.**
>
> Q.     Do you believe that the addition of $12 per share to shares valued in 2006 of about $785 serves as an incentive for employees to leave the company and put their shares?
> **A.     No.**

(Weinstock Depo., at 221-222). Remarkably, Weinstock also testified he recalled seeing in "documentation" that the Company's *actual* turnover rate average from 2000-2005 was approximately 12% -- yet not even this caused him to reconsider his "gut feel" and "best guess" that 35% turnover would have been a reasonable assumption to make back in 2003. (Weinstock Depo., at 155-156).

    At one point when confronted with the sheer implausibility of some of his conclusions – such as the fact that using a retirement age of 50 and a turnover rate of 35% means that the Company would lose approximately 68% of all of its employees in the very next year (2004) – Weinstock went so far as to argue that it was not his job to ensure that his ultimate opinions were

---

[4] The Put Price Protection terms stated that participants who terminated employment between 12/31/02 and 9/30/04 would receive the greater of FMV or $840.26 per share, participants who terminated employment between 10/1/04 and 9/30/05 would receive FMV plus $12.80 per share, and participants who terminated employment between 10/1/05 and 9/30/06 would receive FMV plus $21.80 per share.

reasonable. (Weinstock Depo., at 193-197)[5] This, of course, is not the standard that Rule 702 requires for expert testimony. Moreover, Weinstock could offer no explanation or methodology for why he believes projecting that 68% or 56% of all employees would leave in 2004 is an acceptable expert opinion, but projecting that 100% of all employees would leave in 2004 is not:

> Q.      What methodology did you apply that led you to believe it wasn't reasonable to project that 100 percent of the employees would take advantage of what you deem to be aspects of the transaction that would allow them to cash out their shares at a floor price and go on their way?
> **A.      Well, again, just a subjective determination.**
>
> Q.      What methodology did you use to make your subjective determination?
> **A.      No methodology in particular.**

(Weinstock Depo., at 200-201).

Weinstock's stock appreciation assumptions were likewise based solely on his "general feel" without any actual supporting facts or data or reliable principles and methods:

> Q.      So other than a general feel you had of how your ESOP clients performed with regard to ESOP's share appreciation, without ever looking back to verify it into your records, you chose 0 percent, 3 percent and 10 percent because it felt right?
> **A.      Basically, yes.**

(Weinstock Depo., at 219) (objection omitted).

Weinstock's purported expert opinions are not based on any discernible methodology or underlying facts or data, and his explanation that they are the products of his "best guess," "gut feel," and "subjective determination" fall far short of Rule 702's requirements. As the Seventh Circuit has stated, "if [an expert] could or would not explain how his conclusions met the Rule's requirements, he [is] not entitled to give expert testimony. As we so often reiterate: 'An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.'"

---

[5] Weinstock also testified that he has never experienced a situation where a client company has lost 56% if its population through voluntary terminations or retirements in a single year, as his combined assumptions of retirement age 50 and turnover rate 12% predict would happen with the Antioch Company in 2004. (Weinstock Depo., at 203).

*Zenith*, 395 F.3d at 419-420 (7th Cir. 2005) (quoting *Mid-State Fertilizer Co. v. Exchange National Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989) (citing *Bucklew v. Hawkins, Ash, Baptie & Co.*, 329 F.3d 923, 933 (7th Cir. 2003). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Id.* at 420 (citing *GE v. Joiner*, 522 U.S. 136, 146 (U.S. 1997)).

Weinstock admits, as he must, that a repurchase obligation projection should involve "a thinking process to choose appropriate assumptions" and the "output is only meaningful if appropriate input is used which involves choosing appropriate assumptions." (Weinstock Depo., at 333). The output that Weinstock offers is not meaningful and completely disconnected from any discernible methodology. Weinstock's purported expert opinions and testimony have no basis in sufficient facts or data and are not the product of reliable principles or methods. They should be excluded from evidence at trial because they are unreliable and not helpful to the Court.

## II. <u>CONCLUSION</u>

For the reasons stated above, this Court should exclude all opinions and testimony of David Weinstock from the evidence at trial.

Respectfully submitted,

s/Michael L. Scheier
Michael L. Scheier
Brian P. Muething
Anthony M. Verticchio
Jacob D. Rhode
Keating Muething & Klekamp PLL
One East Fourth Street, Suite 1400
Cincinnati, OH 45202
Phone: (513) 579-6400
Fax: (513) 579-6457
*Counsel for Defendants Lee Morgan, Asha
Moran, and Chandra Attiken*

## CERTIFICATE OF SERVICE

I hereby certify that on October 15, 2015, I caused true and correct copies of the foregoing to be filed electronically using the Court's CM/ECF system and to thereby be served upon all registered participants identified in the Notice of Electronic Filing in this matter on this date. This document is available for viewing and downloading on the CM/ECF system.

*/s/ Michael L. Scheier*
Michael L. Scheier

6374614