**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| BONNIE FISH, et al., <br>     Plaintiffs, <br><br> vs. <br><br> GREATBANC TRUST COMPANY, et al., <br>     Defendants. | Case No. 1:09-cv-01668 <br><br> Honorable Jorge L. Alonso <br><br> Honorable Maria Valdez |

**DEFENDANTS LEE MORGAN'S, ASHA MORAN'S,**
**AND CHANDRA ATTIKEN'S TRIAL MEMORANDUM**

## I.  PRELIMINARY STATEMENT

The era of advancing technology in which we live has been wonderful for many reasons—big things like advances in medicine and small things like not getting lost while driving. But the emergence of new technologies carries with it casualties, entire businesses or products that are changed forever or made obsolete with seemingly no warning and almost overnight. Consider just a few examples of things that have been radically changed or even no longer exist: newspapers, magazines, compact discs, movie rental stores (Blockbuster went from nationwide to out of business), national book sellers, travel agents, newspaper classified ads.

Perhaps the best example of changing technology and creative destruction is photography. Not so long ago, a person purchased a roll of film—it provided room for 24, maybe 36 pictures—and loaded that film into a camera. When the roll was complete, the person took the roll of film off to a camera/film store to be developed. And when the pictures came back from the store (days later), many people sought a way to organize, preserve, and share those photos.

Consider what has changed. Film and film-based cameras went (mostly) away. Kodak, long an American corporate icon, filed bankruptcy and now operates as a printing company.

Polaroid filed for bankruptcy too, once in 2001 and again in 2009. A national leader in camera sales, Ritz Camera filed for bankruptcy in 2009 and then in 2012. Digital cameras became very popular and then almost as quickly became a relic in favor of cameras included on smartphones. And the concept of sharing pictures online—heard of in few places a decade ago—has become ubiquitous for many (and for young people, a central part of social existence).

This context frames the history of the Antioch Company. In 1979, a share of Antioch stock was independently valued at $3.88. Over the next two-and-a-half decades, under the leadership of Defendant Lee Morgan and his daughter, Defendant Asha Moran, the Company introduced photo album products that were wildly successful. By 2002 revenues had grown to $351 million and the Company earned a profit of $209 million. Antioch employees had to have been thrilled—shares of stock they had been given as an employee benefit once worth $4 were now worth $680. The momentum did not end there. As of December 31, 2004, a year after the transaction at issue, the stock reached its all-time high of $943. Soon thereafter the technology wave described above—violent and unpredictable—crashed in on the Company. People could share pictures online faster and more cheaply and thus bought fewer photo albums. Factor in a worldwide economic collapse and the Company found survival to be difficult. The Company reorganized its capital structure under the Bankruptcy Code in 2008 (and then again in 2013).

This case is an ERISA case which means it is about a retirement plan. In 1979, the Antioch Company decided to sponsor an Employee Stock Ownership Plan (ESOP). This ESOP was a new benefit for Antioch employees and would allow them to receive shares of ownership in the Company. Consider the benefit that this conveyed on many Antioch employees. Shares of stock they received appreciated, in some cases nearly 200-fold, an increase that makes even early purchasers of Apple stock jealous. The growth of this stock made many Antioch employee-

owners very wealthy. Indeed from 2002 to 2006, the Company paid approximately over $200 million dollars to shareholders, many of whom were employees working blue collar jobs. Unfortunately, some ESOP participants who remained with the Company suffered losses.

Plaintiffs' claims focus on a corporate transaction in 2003. Plaintiffs' claims have factual problems—the transaction featured the nation's most talented ESOP professionals doing everything by the book and a company that did everything right. And Plaintiffs' claims have legal problems—the causes of action simply do not apply to the transactions at issue in 2003. But more than anything, stripped to its essentials, Plaintiffs blame Defendants for not having a crystal ball, for not being able to predict the wholesale disruption of the Antioch Company's business model. That is not a viable cause of action under any law. And certainly Plaintiffs will be unable to bring to this Court sufficient evidence to carry their substantial burdens as to alleged ERISA violations in connection with the 2003 Transaction. Judgment for Defendants on all claims will therefore be appropriate.

## II.    FACTS THAT WILL BE PROVEN AT TRIAL

### A.    Background of the Antioch Company

Antioch was founded in 1921 and, in periods relevant to this case, sold photo albums and accessories primarily through a party plan direct selling method. As noted above, under the leadership of Lee Morgan, the Company's CEO from 1971 to 2008, and other members of the Antioch leadership team (which eventually included Ms. Moran and Ms. Attiken), Antioch experienced significant growth from 1990 until the early 2000s.

At Mr. Morgan's initiative, the Antioch Board voted to establish the Antioch's Employee Stock Ownership Plan ("ESOP") in 1979 as the primary employer-funded retirement savings benefit for Antioch's employees. By its nature as an ESOP, it was designed to invest primarily in Antioch's stock. Unlike in the typical case where a preexisting company like Antioch is owned

3

by its founding family who sell shares for profit to the new ESOP, Antioch, instead authorized new shares to be placed in ESOP accounts. The effect of this was to reduce substantially the Morgan family's ownership of the Company. By 2003, the ESOP owned 43% of the Company, with the remaining 57% owned by "non-ESOP" shareholders. Prior to 2003, and for much of the ESOP's history, the Trustee for the ESOP was directed in its actions by the ESOP Advisory Committee, which in 2003 consisted of the Defendants.

Antioch elected to become an IRS Subchapter S corporation in 1998. S corporations do not incur tax liability on earnings, but rather shareholders of S corporations incur personal income tax liability on their share of the S corporation's earnings—with the notable exception of ESOPs, which are tax-exempt. Historically, as is typical in S corporations, Antioch made distributions (as dividends) to its non-ESOP shareholders to enable them to pay their individual income taxes arising from corporate profit. To treat all shareholders the same, Antioch also made a proportionate "tax" distribution to the ESOP. As the ESOP was not subject to taxation, it principally allocated the cash to individual ESOP accounts.

Between 1999 and 2002, the ESOP allocated the tax-related dividends to its participants 75% by compensation and 25% by account value. This method of allocation fit within Antioch's share-the-wealth corporate culture because it allowed newer employees, with smaller account balances, to share more in Antioch's increasing profits, instead of simply compensating seniority.[1] Near the end of 2002, Antioch was informed that the IRS no longer approved of

---

[1] By way of a very simple example, consider two ESOP shareholders: the first is a long-serving member of upper management that has an account value of $97,000 and is paid $100,000 a year and the second is a relatively new hire that works in production, has an account value of $3,000 and is paid $50,000 a year. The ESOP then receives $100 as a dividend and that must be allocated among these two shareholders. If allocated by account size, the member of management would receive 97% of the allocation (because she has a much larger account value by virtue of having worked at the Company much longer). But if allocated by compensation, the production worker (even though having just joined the company) receives 33% of the distribution, a ten-fold increase.

allocating dividends in this manner. Antioch's outside counsel also advised that the 75/25 split likely violated the corporate law concept that dividends should be allocated on a per share basis.

**B.**     **The 2003 Transaction**

Against this backdrop, in January 2003, Antioch company representatives, lawyers, and professionals from Deloitte & Touche met to explore options to address these issues. One idea raised by Deloitte or the ESOP's independent counsel, Karen Ng, was that the Company could redeem all non-ESOP shares, leaving all remaining outstanding shares in the ESOP. This would resolve the allocation problem (income-tax related distributions would no longer be necessary so the method of allocation would be moot) and cash otherwise paid to the shareholders as dividends would stay in the Company (estimated at $130 million over the next ten years). The Company decided to proceed with Deloitte's suggestion (the "2003 Transaction").

The Company hired some of the country's most talented professionals to advise regarding the 2003 Transaction: Antioch retained Deloitte as a financial advisor and McDermott Will & Emery ("MWE") as Company legal counsel; Houlihan Lokey Howard & Zukin ("Houlihan") was asked to determine whether the consideration was financially fair to non-ESOP shareholders; GreatBanc Trust Company was retained as an independent ESOP Trustee to evaluate whether the terms as developed by Deloitte were financially fair to the ESOP. GreatBanc engaged Duff & Phelps as an independent financial advisor and Jenkens & Gilchrist as its independent legal counsel.

In appointing an independent ESOP Trustee, the Antioch Board stripped the ESOP Advisory Committee of all decision-making and discretionary authority with respect to the 2003 Transaction. (e.*g.* GreatBanc's Trust Agreement ("the decision whether or not to tender shares of Company Stock to the Company in December 2003 shall be effected by the Trustee (without directions from the Committee) . . ."); Amendment No. 1 to the Amended and Restated Plan

5

(decision whether or not to tender shares "shall be effected by the Trustee (without directions from the [ESOP] Committee)").) Whereas the ESOP Advisory Committee typically was responsible for decisions affecting the ESOP, for the 2003 Transaction (desiring independence and institutional expertise) the Board assigned this responsibility to GreatBanc. The Board also assigned principal responsibility for due diligence of the transaction to two seasoned corporate executives, the company CFO Barry Hoskins, and Director of Corporate Strategy, Nancy Blair.

Deloitte designed the general structure of the 2003 Transaction, understanding that the fairness advisors may negotiate different or additional terms. The 2003 Transaction contemplated that Antioch would make a tender offer to all common stock shareholders; the Company—not the ESOP—would pay to selling shareholders in exchange for their shares either all cash or a package of cash, promissory notes (paid by the Company to the seller over time) and warrants (to buy Company stock in the future); and Antioch would undergo a cash-out merger to purchase the shares of those that would not accept the tender. Antioch would retire the redeemed shares to its treasury, and all remaining Antioch shares would be held in the ESOP.

At no time did the 2003 Transaction contemplate that the ESOP would buy any non-ESOP shares or receive any of the shares purchased by Antioch as part of the 2003 Transaction. Nor would the ESOP borrow any money for the Transaction or pledge assets to secure bank loans to the Company. The ESOP neither received nor parted with any assets of any kind in connection with the 2003 Transaction. GreatBanc had to agree not to tender the ESOP's shares in the Transaction or the Transaction would not proceed. GreatBanc thus had veto power over the Transaction, which it could exercise if it found that the tender offer was unfair to the ESOP.

As part of an exhaustive due diligence process regarding the 2003 Transaction, the financial advisors considered Company management's projected future financial performance.

Two facts are notable about management's projections: First, the Company had been very accurate with its past projections (within 2.1% of actual sales over the past four years except one year when revenues exceeded projections by 13%; in other words, there had been no material misses). Second, the projections used in evaluating the 2003 Transaction called for substantially slower growth than the Company had recently experienced.

The Board believed that these projections were "very conservative." Board members also testified that the projections incorporated the threats that the Company perceived at the time, including increasing competition and the rise of digital photography and digital scrapbooking products. The Company also incorporated a recent decline in consultant productivity into its forecasts. Antioch further acknowledged this decline in materials presented at Board meetings at which the advisors and GreatBanc were present, in its due diligence meetings with the independent fairness advisors and GreatBanc, and in the tender offer proxy materials.

The Company also took into account the amount of cash that would be needed in future years to repurchase Company shares from retiring employees. This duty fell to Mr. Hoskins. As described in the expert report of Richard May, Mr. Hoskins was highly competent in preparation of repurchase obligation forecasts and used state of the art software based on actuarial data that was delivered to GreatBanc and the fairness advisors during due diligence. Although Mr. Hoskins prepared a revised repurchase obligation study in December 2003 that differed from the study he conducted earlier in the year, the 10-year redemption projections were revised upward only 4%. And though the projected redemptions increased more sharply in 2004–2006 when compared to the previous study, the Board determined—especially in light of incremental increases in retained cash through tax savings, more than $65 million in cash in the ESOP, and $18.5 million that the ESOP would receive as part of the 2003 Transaction—that the Company

would be able to fund this increased projected repurchase obligation, which proved correct as Antioch did meet its post-transaction repurchase obligations.

The parties and advisors negotiated over the terms of the Transaction through late October 2003, when GreatBanc determined that the terms as developed by Deloitte were not fair to the ESOP. As part of the negotiations, GreatBanc and Duff (recall, they were independently negotiating on behalf of the ESOP) proposed a "Put Price Protection," ("PPP") which provided the greater of a floor price of $840.26 per share or FMV for employees choosing to terminate their employment before October 1, 2004, and $21.00 and $12.80 over the fair market value of the stock in the following two years. The evidence in the record is that these modest premiums— 2.2% in 2005 and 1.6% in 2006— did not incent any employees to terminate their employment.

Deloitte informed the Company that it believed the PPP necessitated—to ensure compliance with IRS regulations and so as not to place the Company's S-corporation status at risk—a plan amendment changing the policy for making distributions to terminating employees. Although Plaintiffs are correct that the plan amendment allowed employees under the age of 50 to receive their ESOP distribution over a five-year period instead of waiting five years for a lump-sum payment, the plan amendment also made distributions more restrictive for employees over 50 years old. Regardless, there is no evidence that any employees terminated their employment due to the plan amendment. Nor have Plaintiffs developed any evidence causally connecting damages to the plan amendment or the PPP.

On October 27, 2003, the parties agreed on the final terms of the 2003 Transaction. Duff opined that the 2003 Transaction as negotiated was financially fair to the ESOP. Houlihan likewise opined that the 2003 Transaction was fair to the non-ESOP shareholders. Three days later, after extensive presentations to the Board from all advisors including GreatBanc and

discussion among the Board members, Antioch's Board preliminarily voted without dissent to go forward with the 100% ESOP Transaction at an offer price of $850 per share (final approval came at a meeting in December).

All outside, non-ESOP shareholders tendered their shares of stock to the Company in response to the tender offer. GreatBanc declined to tender the shares held by the ESOP. On December 15, 2003, more than 90% of the ESOP Participants approved the merger, and the Transaction closed on December 16, 2003. Lee Morgan and his family and/or estate planning trusts associated with his family, by virtue of being the founding family of Antioch, held most of the non-ESOP shares. They exchanged their shares for as many units of the "package" (the cash, warrants, and Company debt) as they could under the terms of the 2003 Transaction, expressing their belief that the Company would continue to prosper, and to show employees that the founding family's financial interest remained aligned with the Company's interests

## C.    The Antioch Company Post-Transaction (2003–2008)

Antioch's financial performance in 2003, the year of the transaction, was strong: sales rose to $374 million (+6.7%) and profit reached $226 million (+8.5%). An independent company valued Antioch's stock as of December 31, 2003—two weeks after the Transaction closed—at $894 per share, $44 per share higher than the 2003 Transaction price. The value of the stock rose to $943 per share in 2004 (available to employees terminating from October 2004 through September 2005).

In 2004, an unexpectedly high number of employees with large account balances (i.e., longer-term employees from the non-scrapbook legacy business) left Antioch and therefore "put" their shares.[2] Despite the repurchase obligation of about $110 million that this high number of

---

[2] Plaintiffs have made vague and unsubstantiated allegations that the 2003 Transaction caused a "run on the bank," apparently a contention that Antioch employees left the company in unusually high numbers after the transaction.

share redemptions created, the Company's strong overall performance allowed Antioch to pay its retiring employees in cash and notes (as per the Plan), and also pre-pay its secured debt ahead of its repayment schedule. Even with the issuance of $34.9 million in notes to terminated ESOP participants, Antioch reduced its net debt by the end of 2004. In 2005, the Company refinanced its bank debt on more favorable terms, with the lead bank in the lending syndicate, fully aware of the level of unexpected post–transaction shares put by departing employees, offering praise for the Company and its business model. In 2006, the lending syndicate increased the Company's borrowing capacity, and in 2007 again refinanced the Company's debt.

As noted above, an unpredictable technology-driven change in customer behavior narrowed the traditional scrapbooking market by giving consumers different ways to showcase and preserve their photos and memories. This meant fewer people would make a physical photo album and that, of course, had a substantial effect on Antioch's sale of such albums and thus the Company's financial performance. Yet, though sales and income dropped in 2005 and 2006, the per share value remained relatively stable at $786 (2005) and $725 (2006). It was not until early in 2008, more than four years after the 2003 Transaction and as broader markets sold off sharply, that the market changes nearly demolished the traditional scrapbooking industry. The per share value of Antioch stock, as determined in about April 2008, was $114 as of December 31, 2007.

Despite declining sales, Antioch made all payments on its secured bank debt, the ESOP Notes and other unsecured debt until its lenders prohibited further payment of the ESOP notes in July 2008 (even then the Company had the ability and intent to pay the notes as scheduled). The secured lenders eventually forced Antioch to abandon the Board's effort to sell or recapitalize the Company. These lenders preferred to restructure Antioch's secured debt through a pre-packaged

---

The evidence is otherwise. There were years prior to the transaction where more employees terminated and put their ESOP shares to the Company. The impact, however, was not as great because the share prices in those earlier years were much lower than the then record high of $894 per share as of December 31, 2003.

chapter 11 reorganization, filed in November 2008. The company reorganized and emerged from bankruptcy in January 2009. This litigation was filed in March 2009.

## III.  ARGUMENT

Plaintiffs allege four causes of action against Defendants are: (1) breach of ERISA section 404, (2) breach of ERISA section 406, (3) breach of ERISA section 405, and (4) a claim for equitable remedies under ERISA. The following section shows why these claims will fail at trial.

### A.  Plaintiffs' Section 404 Claim

#### 1.  Defendants Were Not ERISA Fiduciaries For Purposes of the 2003 Transaction

ERISA section 404 requires a fiduciary to discharge his duties for the exclusive purpose of participants; with the care that a prudent person under the then prevailing circumstances would act; and in accordance with the documents governing the plan. 29 U.S.C. § 1104(a). By its terms, § 404 extends only to a "fiduciary," so judgment for the Defendants is required if they were not fiduciaries. *Id.*  The evidence is that they were not.

Under ERISA, a person is a fiduciary to the extent "he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets," or "has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A)(i) and (iii). ERISA thus "ties fiduciary responsibilities to a person's actual authority…[.]" *Leigh v. Engle*, 727 F.3d 113, 133 (7th Cir. 1984). When evaluating liability for the actions of ERISA fiduciaries who also make decisions in non-fiduciary, corporate capacities, "the threshold question is . . . whether [the defendant] was acting as a fiduciary (that is, was

performing a fiduciary function) when taking the action subject to complaint." *Brooks v. Pactiv Corp.*, 729 F.3d 758, 765 (7th Cir. 2013).

The Seventh Circuit has interpreted the terms "'discretionary authority,' 'discretionary control,' and 'discretionary responsibility,'" "as speaking to actual decision-making power rather than to…influence…[.]" *Pappas v. Buck Consultants, Inc.*, 923 F.2d 531, 535 (7th Cir. 1991). Therefore, "the power to act for the plan is essential to status as a fiduciary under ERISA." *Klosterman v. Western Gen. Mgmt.*, 32 F.3d 1119, 1123 (7th Cir. 1994).

A plan sponsor, Antioch in this case, may allocate distinct fiduciary responsibilities among several named fiduciaries under the plan. 29 U.S.C. § 1105(c). The language of the plan controls, as in contract law, when looking to see how, if at all, the plan sponsor allocated fiduciary responsibility under ERISA Section 405(c).

In the present case, Defendants were not acting as fiduciaries with respect to the 2003 Transaction. The Antioch plan assigned the fiduciary responsibility to analyze the proposed transaction and determine whether the ESOP should veto it to GreatBanc. And the Antioch Board of Directors stripped the ESOP Advisory Committee (the Defendants) of *all* discretionary authority with respect to the transaction, following the advice of corporate counsel, MWE. Since the Plan stripped Defendants of discretionary authority in regard to the 2003 Transaction, Defendants were not fiduciaries with respect to the 2003 Transaction and thus not liable under section 404. *Leigh*, 727 F.3d at 133 ("The key language in the statutory definition is that a person is a fiduciary 'to the extent' he or she exercises control or authority over the plan."). *Neil v. Zell*, 677 F. Supp. 2d. 1010, 1024 (N.D. Ill. 2010) (dismissing benefits committee when fiduciary duties had been delegated to an independent trustee).

The Company's decision to strip discretionary authority from the ESOP Advisory Committee was not thoughtless or reckless or an attempt to shirk responsibility to another. Rather, doing so was the exact best practice under the circumstances. ESOPs allow for employee ownership of a company and align the interests of employees with shareholders. But by their very nature—sponsored by a company, often administered or governed by that company or its officials, and principally invested in the stock of the company—ESOPs present the possibility for potential conflicts. The existence of a potential or actual conflict is not itself a problem—and certainly not a breach of duty—but rather something for a company or fiduciaries to manage.

Caselaw, including from the Seventh Circuit, teaches that where "the potential for conflicts is substantial, it may be virtually impossible for fiduciaries to discharge their duties with an 'eye single' to the interests of the beneficiaries, and the fiduciaries may need to step aside, at least temporarily, from the management of assets where they face potentially conflicting interests." *Leigh*, 727 F.3d at 125. *See also Bussain v. RJR Nabisco Inc.*, 223 F.3d 286, 299 (5th Cir. 2000) ("In some instances [where a potential conflict exists], the only open course of action may be to appoint an independent fiduciary."); *Chesemore v. Alliance Holdings,* 948 F. Supp. 2d 928, 938-47 (W.D. Wis. 2010) (absence of independent fiduciary key fact in liability finding).

Thus, when the Company stripped the ESOP Advisory Committee of all discretionary authority, and instead went to the marketplace and retained a professional independent fiduciary, Antioch was doing exactly what it was supposed to do. The effect from a liability perspective, though, is to shift the analysis from Defendants to GreatBanc, a party no longer participating in this litigation. The case Plaintiffs wish they could pursue—the ESOP Advisory Committee members were sellers in the transaction *and* exercised discretion on behalf of the ESOP without the safeguard of an independent trustee—simply does not exist.

13

###### 2. Defendants Did Not Breach a Fiduciary Duty as Members of the ESOP Advisory Committee Even if They Had One

Plaintiffs tacitly admit through their pleadings that it was GreatBanc, and not Defendants as members of the ESOP Advisory Committee, that exercised discretionary authority on behalf of the ESOP. For example, in their Second Amended Complaint, Plaintiffs allege GreatBanc performed inadequate due diligence and improperly approved the transaction. (Doc. 380, ¶ 119.) Plaintiffs make none of these same allegations against Defendants. Plaintiffs nevertheless seek to impose section 404 liability on Defendants by alleging that the ESOP Advisory Committee insufficiently provided information to GreatBanc in December 2003, at a time after due diligence was complete. (Doc. 380, ¶ 120.)

First, ERISA only imposes liability to the extent a fiduciary fails to act "in accordance with the documents and instruments governing the plan[.]" *See* 29 U.S.C. § 1104(a). As noted above, the Antioch Board of Directors appointed an independent fiduciary to exercise all discretionary authority on behalf of the ESOP with respect to the 2003 Transaction. The plan did not, as Plaintiffs might hope, assign certain duties to GreatBanc while assigning to the ESOP Advisory Committee a role in communicating transaction-related information to GreatBanc or any other party. In fact, the "documents…governing the plan" removed Defendants from the process entirely. Indeed it was the Company's responsibility to provide GreatBanc (and other fairness advisors) with information requested in due diligence or otherwise requested after due diligence.[3]

Beyond this, Plaintiffs face materiality, causation, and damages hurdles that they will never be able to clear. Even if Plaintiffs are able to convince the Court that information was not

---

[3] Moreover, Plaintiffs will be unable to cite any authority holding that the passing along of information is an exercise of discretionary authority under ERISA that gives rise to non-derivative liability under section 404.

provided to GreatBanc and that Defendants were under an ERISA duty to provide that information, Plaintiffs have no fact evidence or expert opinion that suggests *any* of the supposedly missing information was material to GreatBanc's fairness analysis.

Plaintiffs also have no evidence—from a fact witness or an expert—to meet their burden of proof that had GreatBanc received the information, it would have lead it to conclude that the transaction terms or price were not fair and would have re-negotiated terms or killed the deal. This forecloses Plaintiffs claims. *See Keach*, 419 F.3d at 636 (because "the record establishes that the overlooked matter was one that no one perceived to be a material concern at the time or to be outcome determinative, it cannot be said that the overall investigation was imprudent or in bad faith."). And finally, Plaintiffs have no evidence that remotely suggests that any damages were caused by the alleged failure to provide information to GreatBanc in December 2003.

### B.      Plaintiffs' Duty to Monitor Claim is Legally and Factually Unsupported.

Plaintiffs so-called duty to monitor claim under section 404 has no legal or factual support.  The evidence (or lack of it) will require judgment for Defendants.  As the Court will see, the duty to monitor claim fails because all evidence shows that the Antioch Board of Directors fulfilled its duty to monitor GreatBanc.[4]

As the Seventh Circuit recognized, "[t]here is no doubt that those who appoint plan administrators have an ongoing fiduciary duty under ERISA to monitor the activities of their appointees." *Howell v. Motorola, Inc.*, 633 F.3d 552, 573 (7th Cir. 2011).  The duty to monitor requires clear allegations and proof of misconduct by defendants acting in their capacities as members of the appointing entity. Accordingly, Plaintiffs may premise their duty to monitor

---

[4] Plaintiffs' duty to monitor allegations are confusing.  Only the Antioch Board, as the entity appointing GreatBanc, had a duty to monitor GreatBanc.  Plaintiffs will have to show that the Board as a whole breached its duty to monitor GreatBanc before imposing liability on two of the nine directors, Mr. Morgan and Ms. Moran (Ms. Attiken was not a director and therefore cannot be liable if the Board failed in its duty).

claim only against the Company's Board of Directors and individual directors acting in their capacity as directors. *Chesemore v. Alliance Holdings, Inc.*, 886 F. Supp. 2d 1007, 1050 (W.D. Wis. 2012) (no duty to monitor liability for non-appointing fiduciaries and for parties sued in a non-appointing capacity). Here, Antioch's Board had a duty to monitor because it had the sole power to appoint and remove GreatBanc. The Board's duty, however, has important limitations.

First, it requires only monitoring "at reasonable intervals" to ensure that "performance has been in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan." *Id.* (citing 29 C.F.R. § 2509.75-8 at FR-17 (Department of Labor questions and answers)). Applying that idea, the Seventh Circuit faulted the plaintiffs in *Howell* for failing to identify the specific missteps in monitoring by the appointing fiduciary. And the court criticized the plaintiffs for "essentially ask[ing] us to recognize a duty to monitor that would require every appointing Board member to review all business decisions of Plan administrators. As the district court rightly pointed out, that standard would defeat the purpose of having trustees appointed to run a benefits plan in the first place." *Id.* The plaintiffs' position defined the duty to monitor "much too broadly" and indeed "border[ed] on frivolous." *Id.*

This Court applied *Howell* in *Lingis v. Motorola, Inc.*, 649 F.Supp.2d 861, 881-82 (N.D. Ill. 2009) to find that the board of directors did not breach its duty to monitor where it planned an annual review of a named fiduciary committee's investment decisions. *Id.* at 882-83. A finding otherwise would "defeat the efficiency gains corporate boards routinely achieve by delegating primary responsibility for particular functions…[.]" *Id.*

Against this legal backdrop, the Court will see that Plaintiffs have not developed any evidence that the Antioch Board failed to prudently monitor GreatBanc. There were only five months between GreatBanc's retention and the 2003 Transaction. In that time, GreatBanc

16

representatives met with the Board of Directors on two separate occasions. Moreover, members of Antioch's management team were in nearly daily communication with GreatBanc during the negotiation of this transaction, and at an important Board meeting on October 16, 2003, presented the Board with a written and verbal report about GreatBanc's negotiating positions that were jeopardizing a deal and GreatBanc's financial and analytical rationales supporting its position. This evidence easily clears the Seventh Circuit's modest hurdle of the duty to monitor.

In any event, the duty to monitor claim is a derivative claim that will fail because Plaintiffs will be unable to establish, as they must, that GreatBanc breached *its* fiduciary duty, a requisite to establishing liability of the Defendants for breach of the duty to monitor. As the Court will see from the evidence, GreatBanc was perhaps the premier independent fiduciary in the industry. It engaged in protracted, contentious negotiations on the ESOP's behalf. Along with its financial advisor, it rejected one iteration of the transaction as being unfair to the ESOP and negotiated for terms that, in its view, made the transaction as a whole fair to the ESOP. As will be described below, the range of value of the Company (and a share of Antioch stock) that GreatBanc and its financial adviser reached was consistent with other participants to the transaction representing other constituencies. Defendants will offer the testimony of Jeff Risius who is expected to opine that GreatBanc and Duff's methodology and work followed best practices. In sum, though Defendants have no burden of proof on this issue, Defendants will show the Court that everything GreatBanc did was well within the bounds of prudence.

### C.    Plaintiffs' Section 406 Claim

Pursuant to 29 U.S.C § 1106(a)(1)(A), "a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect sale or exchange, or leasing, of any property between the plan and a party in interest." Defendants anticipate asking the Court to dismiss Plaintiffs' section 406 claims at the

17

close of Plaintiffs' case under Federal Rule 52(c) because: (1) the undisputed evidence is that Defendants did not "cause" the plan to engage in the 2003 Transaction; and/or (2) the 2003 Transaction was not a direct or indirect transaction between the plan and a party in interest.

### 1. Defendants Did Not Cause the Plan To Engage in Any Transaction

The plain language of section 406 imposes liability only on a fiduciary that "cause[s]" the "plan" to "engage" in a transaction. Here Defendants did not "cause" the plan to do anything.

"Cause" is defined in a general sense as "to make something happen."[5] Consistent with this basic definition, a person cannot "cause" a prohibited transaction unless he or she "exercise[s] discretionary authority or control" over whether the plan enters into the transaction. *Sommers Drug Stores Co. Emp. Profit Sharing Trust v. Corrigan*, 883 F.2d 345, 352 (5th Cir. 1989) ("The jury's finding that the defendants did not exercise discretionary authority or control over the trustees' decision to sell the trust stock is also a finding that they did not 'cause' the plan to enter into such a transaction.").

The evidence will show that the Board stripped the ESOP Advisory Committee (and therefore Defendants) of all discretionary authority with respect to the 2003 Transaction. Acting as named fiduciaries, they had no discretion in regard to the ESOP as it related to the tender offer, and they took no actions to "cause"—as a matter of fact or law—the plan to enter into the 2003 Transaction. GreatBanc alone had the discretionary authority to decide whether or not the plan would tender its shares to Antioch. Defendants therefore cannot be held liable for a prohibited transaction. *See Chesemore*, 886 F. Supp. 2d at 1050-51 (party without discretionary control with respect to transaction "did not cause" the transaction and was thus not liable under section 406).

---

[5] http://www.merriam-webster.com/dictionary/cause.

Perhaps realizing the problem with their position, Plaintiffs appear to ask the Court to judicially rewrite the ERISA statute. In their statement of disputed issues of law in their section of the pretrial order (*see* Doc. 521, PAGEID: # 20147 (Issue of Law #5)), Plaintiffs state that a disputed legal issue is whether Defendants "caus[ed] or allow[ed] the Plan to enter into prohibited transactions…" Plaintiffs ask the Court to judicially rewrite ERISA even though the Supreme Court, mindful of Congress' balance of competing interest in drafting ERISA, has counseled against expansion beyond the text of the statute. *Mertens v. Hewitt Assoc.*, 508 U.S. 248 261-62 (1993). Plaintiffs' suggestion that liability can be based on "allowing" a prohibited transaction has no basis in the statute which expressly premises liability on "causing" a prohibited transaction.  In fact, a court recently stated that "section 406 of ERISA clearly prohibits fiduciaries from causing the plan to engage in prohibited transactions, rather than simply allowing such transactions to occur."  *Tullis v. UMB Bank, N.A.*, 640 F. Supp. 2d 974, 981 (N.D. Ohio 2009).  Moreover, Plaintiffs' effort to graft a verb onto ERISA that Congress did not would premise liability on Defendants for "not stopping" a transaction they had no power or authority to stop.  Mr. Morgan and Ms. Moran were two of nine directors so could not mathematically have "stopped" the transaction even acting in their director capacities.  And the Committee certainly could not since, as the evidence will show, the Board stripped them of all discretion and authority.

## 2.    The Plan Did Not Engage In a Transaction With a Party In Interest

There is an additional statutory problem with Plaintiffs' prohibited transaction claim. The plan did not "engage" in a transaction, as the statute requires.  The Plaintiffs will be unable to identify a single judicial decision imposing section 406 liability in a transaction like the 2003 Transaction.  In fact, Plaintiffs ask the Court to take an extreme position that the plan engaged in

19

a transaction where the sole fiduciary with authority to "cause" the plan to enter into the transaction – GreatBanc – actually decided to refrain from tendering shares.

Recall the structure of this transaction. The Antioch Company entered into an agreement to purchase shares from its non-ESOP shareholders. GreatBanc exercised its discretionary authority on behalf of the ESOP *not* to tender the ESOP's shares in the proposed tender offer. GreatBanc's decision meant that only the *Company* "engaged" in a transaction with non-ESOP selling shareholders. The ESOP—the only party relevant for purposes of the prohibited transaction analysis—sat on the sidelines, making an explicit decision *not* to engage in a transaction at all.

Because the ESOP did not *engage* in a transaction of any sort, it logically follows that the ESOP did not engage in a transaction with a party in interest.  The only transaction that occurred was between selling shareholders and the Company which purchased the shares, and retired them into treasury. The ESOP neither parted with nor received any consideration in any transaction. And certainly the ESOP did not purchase shares from, for example, Defendants—the ESOP did not come into possession of the selling shareholders' shares of stock in the Company, nor did the selling shareholders receive assets of the ESOP. This lack of a sale or exchange of plan property is fatal to a prohibited transaction claim. *Middleton v. J. Hoyt Stephenson*, Case No. 2:11-CV-313 TS, 2011 U.S. Dist. LEXIS 141495 *4-7*, (D. Utah, Dec. 8, 2011) (finding no prohibited transaction because "a sale or exchange between a plan and a party in interest would involve an exchange of some form of *plan property*" which was absent) (emphasis in original).

Plaintiffs rejoinder to the above argument is to say that the facts of our case show an *indirect* prohibited transaction. But that concept is not some general catchall. Rather, "Section 406 specifically includes indirect transactions in order to prevent parties from avoiding its

restrictions through 'the interjection of a third party into an otherwise prohibited transaction.'" *Neil v. Zell*, 677 F. Supp. 2d. 1010, 1027 (N.D. Ill. 2010) (citing *Brock v. Citizens Bank of Clovis*, 841 F.2d 344, 347 (10th Cir. 1988)). For example, says *Zell*, "just as a plan could not purchase an aircraft from a party in interest, neither could it buy the aircraft from a third party that had purchased it from the party in interest in an attempt to avoid ERISA's restrictions." *Id*. (citing *McDougall v. Donovan*, 552 F. Supp. 1206, 1216 (N.D. Ill. 1982)).

In other words, even in an alleged indirect prohibited transaction, a plaintiff must still demonstrate that the plan participated in a transaction and a party in interest received plan property. The plaintiff in *Zell*, for example, showed that the ESOP made a $250 million payment at the time of the transaction at issue. *Id*. at 1027. And the court in *McDougall* found an indirect prohibited transaction when the plan purchased an airplane from a party in interest for nearly $3 million with both the plane and the purchase funds routed through an intermediary. 552 F. Supp. at 1216. In both instances, the plans at issue engaged in transactions and what made them indirect prohibited transactions was that plan assets found their way to the hands of a party in interest indirectly, through a third party. Nothing like that occurred here because the plan never parted with any plan assets and certainly Defendants did not receive any plan assets.

Nor can it be said that a transaction between the selling shareholders and the Company was an indirect transaction merely because the ESOP would come to be the 100% owner of the Company. A company and the owners of a company's equity are not interchangeable in the eyes of the law. This remains true with respect to companies wholly owned by an ESOP. For example, in *Middleton*, just as in this case, the plaintiff based its indirect prohibited transaction claim "on the assumption that, because NFSM was wholly owned by the ESOP, transacting with NFSM is the same as transacting with the Plan." The *Middleton* court "close[ly] inspect[ed]

the language of section 406 and rejected the idea that property of the ESOP and property of the company are the same. *Middleton*, 2011 U.S. Dist. LEXIS 141495 at *4-7.

In fact, Plaintiffs' claim asks this Court to go where no Court has ever gone by accepting a factual fiction. Plaintiffs have cited not a single case since Congress enacted ERISA in 1974 that found a prohibited transaction where a plan, through its named fiduciary, actively chose not to engage in a transaction. But that is precisely what the evidence will show at trial.

And if Plaintiffs' claim survives a Rule 52(c) motion, Defendants will offer the testimony of Richard May in the defense case. Mr. May is a leading expert in the fields of ESOPs and ESOP finance. Consistent with his expert report, Mr. May will testify that the 2003 Transaction was not the same as one between the ESOP and non-ESOP selling shareholders because the ESOP's purchase of the selling shareholders' shares would have materially altered the number of shares outstanding, the share price, and value to existing ESOP participants in a way that did not occur under the 2003 Transaction.[6]

### D.    The Price Paid For Each Share of Stock Was Adequate Consideration

Even if the Court finds both that Defendants "caused" the transaction and that the transaction was between the plan and a party in interest, Defendants are still not liable under §406 because the "adequate consideration" exemption applies.

ERISA provides that an otherwise prohibited transaction does not give rise to liability where the sale or purchase of employer securities is for "adequate consideration." 29 U.S.C § 1108(e)(1). Adequate consideration is defined in the statute as the fair market value of the asset at issue "as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with regulations promulgated by the Secretary." 29 U.S.C § 1002(18)(B). The evidence at trial will show that GreatBanc "arrived at their determination of

---

[6] In *Fish*, the Seventh Circuit did not rule otherwise, for the reasons set out in our Motion in Limine. (Doc. 496.)

fair market value by way of a prudent investigation in the circumstances then prevailing." *Eyler v. Comm'r,* 88 F.3d 445, 454-55 (7th Cir. 1996). *See also Keach v. U.S. Trust Co.*, 419 F.3d 626, 636 (7th Cir. 2005) (applying same concept).

If we get there, the evidence during the defense case will show that $850 was a fair price for Antioch's stock that GreatBanc determined through a good faith process. First, the evidence will show that the $850 transaction price the GreatBanc deemed fair to the ESOP fell comfortably within historical growth rates for the share price, particularly for a year like 2003 which was the Company's highest revenue year ever. Second, the $850 transaction price fell within fair market value ranges independently calculated by Duff ($774 to $932) and Houlihan ($825 and $920). And third, an independent valuation expert placed a precise fair market value on a per share basis after the transaction at $894 (as of December 31, 2003, 2 weeks after the transaction closed) and one year later, as of December 31, 2004, at $943.

Plaintiffs will not be able to provide the court with any contemporaneous evidence that the top advisors in ESOP valuations and top fairness opinion advisors as of 2003 (Duff, Houlihan, Prairie Capital) got it wrong. What they will provide the Court is a litigation-driven valuation by Robert Reilly that suffers many methodological and factual flaws.

Mr. Reilly, Plaintiffs' expert witness, concluded that the per share price in December 2003 was actually $500. As shown below, Mr. Reilly's decade-later, hindsight-infected, litigation-driven valuation is a substantial and unjustifiable outlier from those valuation analyses prepared by independent advisors outside of the litigation context around the transaction date.



Consider what the information reflected on the above chart means for what Plaintiffs are asking of this Court. On one hand, there is a transaction price—set through vigorous, arms-length negotiation in 2003—at $850. In a cluster around that price are the midpoints of value ranges calculated by Houlihan and Duff in 2003. What is notable about these two similar value ranges is that Houlihan and Duff represented constituencies with differing participation in the 2003 Transaction; Houlihan reviewed fairness for those selling shares in the transaction and Duff reviewed fairness for the ESOP which was *not* selling shares. And then Prairie Capital independently valued the shares for the two years after the transaction at $894 and $943. That is all on one hand, all of it contemporaneous with the transaction, and all of it outside litigation.

On the other hand is Mr. Reilly, his analysis coming a decade later and prepared with hindsight in the context of litigation. And Mr. Reilly not only says the shares are worth less than anyone else, but hundreds of dollars less than anyone else. Indeed Mr. Reilly values the Company for 2003 just a few dollars more than it was valued in 2001 even though the

24

Company's EBITDA rose from $60 million in 2001 to $85.2 million in 2002. Plaintiffs ask a great deal of the Court to ignore all the contemporaneous evidence, clustered around the sale price, and instead adopt the litigation-driven outlier.

The Court may wonder just how Mr. Reilly valued the shares as of 2003 in 2015. His opinion is based on sales "forecasts" prepared in 2015 "as if" the forecaster, another of Plaintiffs' experts, Michael Buchanan, was at Antioch in 2003. This hindsight bias risk aside, Mr. Buchanan prepares projections using a statistical model called ARIMA even though he will testify that he knows of no company that uses ARIMA to project sales for budgeting purposes or for pricing a transaction. His frank admission is consistent with what the Court will hear from defense expert, Jeffrey Risius, who will testify that in his 30 years as a valuation expert and fairness advisor in large ESOP transactions, he has never seen a company, or a buyer or seller, use ARIMA for any purpose. But there's more. Richard Wiser, a client of Plaintiffs' counsel, has testified that ARIMA is not reliable to project sales for more than a six month period into the future; Buchanan does so for more than ten years (2003-2013, in 2015).[7]

Moreover, there is no evidentiary question that the transaction price was reached in good faith. *Keach* and *Eyler* instruct that for this analysis, "the degree to which a fiduciary makes an independent inquiry is critical." *Keach*, 419 F.3d at 636 (quoting *Eyler*, 88 F.3d at 456). *Keach* further states that "securing an independent assessment from a financial advisor or legal counsel is evidence of a thorough investigation…[.]" *Id.* (citing *Howard v. Shay*, 100 F.3d 1484, 1489 (9th Cir. 1996) (internal quotations omitted)). "A fiduciary must investigate the expert's

---

[7] Another defense expert, Harris Antoniades, will testify consistent with Mr. Wiser: ARIMA is not reliable and is not used in the marketplace to forecast long term sales. Moreover, we will show the Court that Mr. Buchanan further skewed his "projections" by building in a "guesstimate" for international sales because he claims that there was too little history to allow him to apply ARIMA to Antioch's planned international expansion. We will also show the Court that Mr. Buchanan's projections are unsound methodologically, and because of this and other factors, Mr. Reilly's valuation based on Buchanan's "forecast" is unreliable.

qualifications, provide the expert with complete and accurate information and make certain that reliance on the expert's advice is reasonably justified under the circumstances." *Id.* (internal quotation and citation omitted).

Under these standards, GreatBanc's determination of value was clearly made in good faith. For one, GreatBanc hired Duff, a leading financial advisory firm, to serve as its financial advisor for the transaction. And GreatBanc hired experienced and talented lawyers from Jenkins & Gilchrist to advise it on legal matters with respect to the transaction. As noted above, securing independent financial and legal advice is "evidence of a thorough investigation." *Id.* at 636. And no one has questioned those firms' qualifications.

Moreover, the Court will hear no credible evidence that GreatBanc and Duff failed to undertake an exhaustive, independent analysis of the 2003 Transaction. Indeed, all of the evidence will be that those parties engaged in arms-length, sometimes contentious negotiations; that Duff counseled GreatBanc to reject an earlier iteration of the deal as being unfair to the ESOP, which GreatBanc did, the parties negotiating more favorable terms for the ESOP and that GreatBanc and Duff acted reasonable under the circumstances.[8]

### E. No Evidence Supports Plaintiffs' Section 405 Claim

We submit that there will be no evidence presented in Plaintiffs' case to support their claim of co-fiduciary liability pursuant to 29 U.S.C. §405(a)(1-3). Liability under §405 requires that a fiduciary have actual knowledge of a breach. *Keach v. U.S. Trust Co., N.A.*, 240 F. Supp. 2d 840, 844 (C.D. Ill. 2002); *Donovan v. Cunningham*, 716 F.2d 1455, 1475 (5th Cir. 1983); *Mejia v. Verizon Mgmt. Pension Plan*, No. 11C3949, 2012 U.S. Dist. LEXIS 61090, at *32 (N.D.

---

[8] The Plaintiffs position that after due diligence closed the Company failed to give GreatBanc some additional information has no impact on the "good faith" analysis. But in any event, we cite the Court to *Keach* as instructive on the need of a plaintiff to show that the material the independent trustee did not consider was material. In other words, plaintiff is under a burden to show that had the fiduciary considered the information, it would have made a different decision. *Keach*, 419 F.3d at 637-38.

Ill. May 2, 2012). In fact, courts have referred to liability arising under §405(a) as "knowing participation liability." *In re Touch Am. Holdings, Inc.*, No. CV-02-106, 2006 U.S. Dist. LEXIS 94707, at *37 (D. Mont. June 15, 2006).[9]

Plaintiffs will be unable to bring to this Court any evidence that satisfies any of the required aspects of a section 405 claim. This is because even if Plaintiffs meet their burden of proof to make out a prima facie case of breach by GreatBanc they have absolutely no evidence— indeed did not even really attempt to develop any—that Defendants had actual knowledge that GreatBanc had breached a duty to the ESOP, or that they participated in or concealed the breach.

### F.     Plaintiffs' Have No Viable Damages Theories

Even if they were able to establish liability against Defendants, Plaintiffs have a burden with respect to proving their damages that they will not be able to overcome.

ERISA is a "'comprehensive and reticulated statute,' the product of a decade of congressional study of the Nation's private employee benefit system." *Mertens v. Hewitt Assocs.,* 508 U.S. 248, 251 (1993) (quoting *Nachman Corp. v. Pension Benefit Guar. Corp.,* 446 U.S. 359, 361 (1980)). ERISA's "carefully crafted and detailed enforcement scheme provides 'strong evidence that Congress did not intend to authorize other remedies that it simply forgot to incorporate expressly.'" *Great-West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 209 (2002).  ERISA §409(a) provides for the liability of a fiduciary for breach of a fiduciary duty in violation of ERISA §§ 404 (general fiduciary duties) or 406 (prohibited transactions).

Plaintiffs' pretrial order (Doc 521, PageID #: 20142-43) indicates the damages theories Plaintiffs seek to advance. The primary remedy is rescission of the 2003 Transaction, seeking a

---

[9] It is not sufficient for a plaintiff to claim that merely because one fiduciary committed a breach, each co-fiduciary is also liable under §406(a).  Instead, the plaintiff must plead facts establishing both the underlying breach and the grounds giving rise to the co-fiduciary liability. *Howell v. Motorola, Inc.*, 337 F. Supp. 2d 1079, 1102 (N.D.Ill. 2004).

cash award of $233,483,100, representing the cash, notes, and warrants said to have been received by the selling shareholders. Plaintiffs are not entitled to such relief.

"A rescission is an avoidance of a transaction….Except as the parties might agree to the contrary, rescission will normally be accompanied by restitution on both sides." *Griggs v. E.I. DuPont de Nemours & Co.,* 385 F.3f 440, 445 (4th Cir. 2004) (citing Dan B. Dobbs, Handbook on the Law of Remedies § 4.3 at 254 (West 1973)). "Broadly speaking, rescission at law occurs when the plaintiff has a right to unilaterally avoid a contract. The rescission itself is effected when the plaintiff gives notice to the defendant that the transaction has been avoided and tenders to the defendant the benefits received by the plaintiff under the contract." *Id.* at 445-46.

Plaintiffs' rescission claim simply does not fit the facts of this case. Since the ESOP did not part with any assets, Defendants are not in possession of any Plan assets to return to the ESOP. Also, because Defendants tendered their non-ESOP Antioch shares to the Company, Plaintiffs are not in possession or control of those shares to return to Defendants to effectuate a rescission remedy. Accordingly, if Plaintiffs fail to show in their case in chief that Defendants are in possession and control of Plan assets and that the Plan, or Plaintiffs, are in possession and control of the Antioch shares tendered by Defendants to the Company in 2003, judgment on this claim under Rule 52(c) will be appropriate. This is the precise result reached by the Court denying a disgorgement remedy in *Zell,* 2010 U.S. Dist. LEXIS 80744, at *7 ("Plaintiffs cannot explain why they are entitled to repayment of funds that originated with [the company]." *See also Chesemore,* 948 F. Supp. 2d at 947 (rescission inappropriate where Plaintiff was unable to return stock to the defendant).)[10]

---

[10] In addition, rescission is inappropriate because Plaintiffs do not seem to seek return of the notes and warrants that Defendants received; they want a cash asset when Defendants received a combination of case, notes and warrants. Moreover, Plaintiffs figure of over $200 million includes assets received by parties that are not before the Court.

Plaintiffs alternative damages theories also suffer from legal and factual impediments. One such proposed damages model is to recover cash that was in the ESOP that was used to pay ESOP repurchase liability in 2004. This damages theory does not work. Not only is it waived as set forth in our Motion in Limine (Doc. 497), but it is nonsensical. The evidence will show that in 2004, the ESOP and not the Company redeemed shares *put to the ESOP* by employees and the ESOP thereafter recycled the shares into participant accounts. Said another way, the ESOP simply replaced one asset (cash) with another (Antioch stock) in participant accounts. The evidence will show that this was a net benefit to those participants since a year later, unlike cash, the Antioch stock that was substituted for cash at $894, grew to a value of $943 per share, thereby *increasing* the ESOP's value. Moreover, because the Company did not take the cash in the ESOP and keep the shares redeemed, there is nothing to "pay back" to the ESOP. And last, Plaintiffs have no evidence on a participant by participant basis whether some, none, or all participants preferred cash as opposed to the Antioch shares that had been increasing in value over the prior ten years in their accounts. This is an insurmountable evidentiary hole.

Plaintiffs also identify several additional damages theories that are all doomed due to lack of causation evidence. ERISA makes a fiduciary liable only for losses "resulting from" a breach, a causal connection is required to award damages or impose monetary liability. 29 U.S.C. § 1109(a); *see Brandt v. Grounds*, 687 F.2d 895, 898 (7th Cir. 1982) ("a causal connection is required between the breach of fiduciary duty and the losses incurred by the plan"). By way of example only, Plaintiffs assert a proper measure of damages is the difference in net plan assets available in 2003 compared to today when that number is $0. Plaintiffs will be unable to offer evidence that will delineate between what loss to the ESOP was proximately caused by what term or provision of the 2003 Transaction and what loss is attributable to, for example, dramatic

shifts in photography habits between 2005 and 2008 or the worldwide economic crash in 2008. *See e.g., Chesemore,* 948 F. Supp. 2d at 941 (plaintiffs did not meet burden of proof on causation because they "ignore[d] the tsunami that was the 2008 financial crisis.").[11]

Plaintiffs' damages calculations also suffer from an internal inconsistency. If the Court accepts Mr. Reilly's valuation of $500 sponsored by the Plaintiffs, the ESOP's value as of the transaction date was $171,533,470 (205,330 ESOP shares times $500, plus $68,868,470 in non-employer stock ESOP assets). Because the post-2003 distributions were at least $188,374,868, the ESOP plan suffered no damages (recall that Plaintiffs must pursue their claims on behalf of the ESOP and if it suffered no damage, then there can be no recovery in this case, even if individual participants suffered some claimed losses).

Finally, Plaintiffs damages theories ignore the substantial losses that Defendants suffered as participants in the ESOP. Defendants are entitled to a setoff for their losses against any damages award (Mr. Morgan: $20,274,950; Ms. Attiken: $648,141.72; Ms. Moran: $306,138.78). *Crawford v. La Boucherie Bernard Ltd.,* 815 F.2d 117 (D.C. Cir. 1987); *Parker v. Bain,* 68 F.3d 1131 (9th Cir. 1995) (breaching fiduciaries entitled to offset).

## IV.    CONCLUSION

Plaintiffs will be unable to meet their burden of proof on their section 404, 405, and 406 claims against Defendants. And, as to their duty of monitor claim, the overwhelming evidence will show that the Antioch Board prudently monitored GreatBanc. A judgment for Defendants is what the evidence at trial will require.

---

[11] By way of example only, Mr. Risius will present the Court with evidence that micro and macro economic factors caused the Company's sales to decline, thereby causing the ultimate loss in per share value.

Respectfully Submitted,

KEATING MUETHING & KLEKAMP, PLL

By:    */s/ Michael L. Scheier*
     Michael L. Scheier
     Brian P. Muething
     Anthony M. Verticchio
     Jacob D. Rhode
     One East Fourth Street, Suite 1400
     Cincinnati, Ohio 45202
     mscheier@kmklaw.com
     bmuething@kmklaw.com
     averticchio@kmklaw.com
     jrhode@kmklaw.com
     Attorneys for Defendants Lee Morgan,
     Asha Morgan Moran, and Chandra Attiken

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 26, 2015, I caused true and correct copies of the foregoing to be filed electronically using the Court's CM/ECF system and to thereby be served upon all registered participants identified in the Notice of Electronic Filing in this matter on this date. This document is available for viewing and downloading on the CM/ECF system.


/s/ Michael L. Scheier
Michael L. Scheier


6342607.6