**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| BONNIE FISH, CHRISTOPHER MINO, MONICA LEE WOOSLEY, LINDA D. HARDMAN and EVOLVE BANK & TRUST, <br><br> Plaintiffs, <br><br> vs. <br><br> GREATBANC TRUST COMPANY, LEE MORGAN, ASHA MORAN, CHANDRA ATTIKEN and MORGAN FAMILY FOUNDATION, <br><br> Defendants. | Case No. 1:09-cv-01668 <br><br> Honorable Jorge L. Alonso <br><br> Honorable Magistrate Maria Valdez |

## PLAINTIFFS' PRETRIAL MEMORANDUM

# TABLE OF CONTENTS

I.      NATURE OF THE CASE .................................................................................. 1

II.     RELEVANT FACTS PLAINTIFFS WILL ESTABLISH AT TRIAL ............................ 3

   A.   Historical Background of TAC ................................................................. 3

   B.   The ESOP and Its Fiduciaries ................................................................. 4

   C.   Threats to TAC from Sweeping Changes to the Scrapbooking Marketplace .................... 5

   D.   Threats to TAC from the Repurchase Obligation ...................................... 6

   E.   CM's Business Performance Weakened in 2002 and 2003 ................................. 7

   F.   Early Stages of 2003 Transaction ............................................................ 8

   G.   Due Diligence and Negotiations for the 2003 Transaction ............................. 11

   H.   December 4, 2003 TAC Board Meeting .................................................. 13

   I.   Defendants Withheld Material Financial Information from GreatBanc ......................... 14

   J.   GreatBanc Relied on a Flawed Fairness Opinion by Duff & Phelps and
        Breached Its Fiduciary Duty .................................................................. 15

III.    PLAINTIFFS' THEORY OF LIABILITY .......................................................... 16

   A.   Defendants' Liability Under ERISA § 404 ............................................... 16

      1.   The Defendants' Fiduciary Status ...................................................... 17

      2.   The Defendants' Fiduciary Duties ...................................................... 18

   B.   Defendants' Liability Under ERISA § 405 ............................................... 22

      1.   Defendants Enabled GreatBanc's Breaches ...................................... 23

      2.   Defendants Had Knowledge of GreatBanc's Breaches And Failed To Take
           Reasonable Steps To Remedy ........................................................... 23

   C.   Defendants' Liability Under ERISA § 406 ............................................... 25

IV.     PLAINTIFFS' THEORY OF DAMAGES ......................................................... 29

V.      POTENTIAL MOTIONS FOR JUDGMENT ON PARTIAL FINDINGS ..................... 30

## TABLE OF AUTHORITIES

**Cases**

*Brieger v. Tellabs, Inc.*,
   629 F. Supp. 2d 848 (N.D. Ill. 2009) ......................................................... 2, 17, 18

*Brosted v. Unum Life Ins. Co. of Am.*,
   421 F.3d 459 (7th Cir. 2005) ................................................................ 17

*Chao v. Hall Holding, Inc.*,
   285 F.3d 415 (6th Cir. 2002) ................................................................ 25

*Chao v. Wheeler*,
   2007 WL 4233464 (N.D. Ind. Nov. 28, 2007) ................................................ 24

*Chesemore v. Alliance Holdings, Inc.*,
   886 F. Supp. 2d 1007 (W.D. Wis. 2012) ...................................................... 23, 27

*Donavan v. Cunningham*,
   716 F.2d 1455 (5th Cir. 1983) ............................................................... 18, 26

*Ed Miniat, Inc. v. Globe Life Ins. Group, Inc.*,
   805 F.2d 732 (7th Cir. 1986) ................................................................ 17

*Eyler v. Comm'r of Internal Revenue*,
   88 F.3d 445 (7th Cir. 1996) ........................................................... 18, 20, 25, 26

*Fish v. GreatBanc Trust Co.*,
   749 F.3d 671 (7th Cir. 2014) ............................................................. 20, 26, 27

*In re Gen. Growth Properties, Inc.*,
   2010 WL 1840245 (N.D. Ill. May 6, 2010) .................................................... 18

*George v. Kraft Foods Global, Inc.*,
   800 F. Supp. 2d 911 (N.D. Ill 2011) .......................................................... 18

*Henry v. Champlain Enterprises, Inc.*,
   445 F.3d 610 (2d Cir. 2006) ................................................................. 25

*Howard v. Shay*,
   100 F.3d 1484 (9th Cir. 1996) ............................................................... 25, 26

*Howell v. Motorola, Inc.*,
   337 F.Supp.2d 1079 (N.D.Ill. 2004) .......................................................... 2

*Jenkins v. Yager*,
   444 F.3d 916 (7th Cir.2006) ............................................................................18

*Keach v. U.S. Trust Co.*,
   419 F.3d 626 (7th Cir. 2005) .........................................................................26

*Leigh v. Engle*,
   727 F. 2d 113 (7th Cir. 1984) ..................................................................18, 20

*Leister v. Dovetail, Inc.*,
   546 F.3d 875 (7th Cir. 2008) .........................................................................22

*Lowen v. Tower Asset Management, Inc.*,
   829 F.2d 1209 (2nd Cir.1987) .......................................................................26

*McDougall v. Donovan*,
   552 F. Supp. 1206 (N.D. Ill. 1982) ..............................................................27

*Montgomery v. Aetna Plywood, Inc.*,
   39 F. Supp. 2d 915 (N.D. Ill. 1998) .......................................................19, 26

*In re Morgan Stanley ERISA Litig.*,
   696 F. Supp. 2d 345 (S.D.N.Y. 2009)...........................................................23

*Neil v. Zell*,
   677 F. Supp. 2d 1010 (N.D. Ill. 2009) ..........................................................27

*Rush v. Martin Petersen Co., Inc.*,
   83 F.3d 894 (7th Cir. 1996) ...........................................................................24

*Sandoval v. Simmons*,
   622 F. Supp. 1174 (C.D. Ill. 1985) ...............................................................27

*In re WorldCom, Inc.*,
   263 F. Supp. 2d 745 (S.D.N.Y. 2003)...........................................................19

**Statutes**

I.R.C. § 409(p) .........................................................................................16, 24, 28

Employee Ret. Income Sec. Act of 1974 (ERISA)............................................ *passim*

ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A)...............................................25, 27

ERISA § 3(18)(B), 29 U.S.C. § 1002(18)(B) .....................................................25

ERISA § 402(a), 29 U.S.C. § 1102(a) ................................................................17

ERISA § 404, 29 U.S.C. § 1104 .........................................................................16

ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) ...................................................................22

ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A) ........................................................20

ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B) .........................................................18

ERISA § 405, 29 U.S.C. § 1105 .................................................................................22, 24

ERISA § 405(a), 29 U.S.C. § 1105(a) ...........................................................................22

ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2) ...................................................................23

ERISA § 406, 29 U.S.C. § 1106 .........................................................................25, 27, 29

ERISA § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A). ........................................................25

ERISA § 406(b), 29 U.S.C. § 1106(b) ......................................................................27, 28

ERISA § 408, 29 U.S.C. § 1108 .....................................................................................25

ERISA § 408(e), 29 U.S.C. § 1108(e) ........................................................25, 26, 28, 30

ERISA § 409, 29 U.S.C. § 1109 .....................................................................................16

**Rules and Regulations**

1974-3 C.B. 415 (I.R.S. 1974) ........................................................................................24

29 C.F.R. § 2509.75–8 ...................................................................................................18

Fed. R. Civ. P. 52(c) .......................................................................................................30

Pursuant to the Court's pretrial scheduling order (Doc. No. 435), Plaintiffs respectfully submit this Memorandum for the Court's consideration in advance of trial.

## I. NATURE OF THE CASE

This case seeks to recover the losses suffered by the Antioch Company Employee Stock Ownership Plan (the "ESOP" or the "Plan") resulting from violations of ERISA's fiduciary obligation and prohibited transaction provisions. These violations occurred in connection with the 2003 buyout (the "2003 Transaction" or "Transaction") of the stock held by the non-ESOP shareholders in the Antioch Company ("TAC"). The individual defendants ("Defendants"), who received approximately $190 million in the 2003 Transaction either personally or through trusts established for their family, were all fiduciaries of the ESOP and are obligated restore the losses that resulted from those fiduciary breaches and prohibited transactions.[1] The individual Plaintiffs are former employees of TAC and former participants of the ESOP. Plaintiff Evolve Bank & Trust is a trust company that was appointed as sole trustee for the ESOP on January 17, 2008.

In the 2003 Transaction, TAC redeemed all outstanding non-ESOP shares, the majority of which were owned by Defendants and their family members, at the inflated price of $850 per share ($232 million in total). A condition to the 2003 Transaction was that the ESOP would *decline* to participate in this redemption, and would instead hold its shares and thereby become the owner of 100% of TAC. This result—100% ESOP ownership of the outstanding TAC shares—was no different than had the ESOP purchased directly the shares held by Defendants and the other TAC shareholders.

---

[1] The Morgan Family Foundation ("MFF"), to whom a significant portion of the proceeds of the 2003 Transaction were transferred, is also a Defendant in this case. The claims against MFF have been bifurcated for trial and will not be addressed in this Memorandum.

1

Various advisors were retained in connection with the 2003 Transaction, including GreatBanc Trust Company ("GreatBanc"), who was appointed by TAC's directors (including Defendants Lee Morgan and Asha Morgan Moran) as trustee in August 2003 (and terminated as trustee shortly after the 2003 Transaction). While Defendants will argue that GreatBanc and the other advisors were qualified to perform their tasks, it is black letter law under ERISA in the Seventh Circuit and elsewhere that appointing credentialed third parties does not insulate fiduciaries from liability. Fiduciaries are still responsible for monitoring the activities of their appointees and providing them with complete, accurate and up-to-date information. *See Brieger v. Tellabs, Inc.*, 629 F. Supp. 2d 848, 867 (N.D. Ill. 2009) ("Individuals who appoint ERISA fiduciaries have a duty to monitor those fiduciaries' actions and to provide them with the information necessary to carry out their responsibilities.") (citing *Leigh v. Engle*, 727 F. 2d 113, 135 (7th Cir. 1984) and *Howell v. Motorola, Inc*., 337 F.Supp.2d 1079, 1099 (N.D.Ill. 2004). Further, nothing in the appointment of a third party has the effect of exonerating a transaction prohibited by ERISA.

The evidence will establish that GreatBanc breached its fiduciary obligation of prudence in its review and ultimate approval of the 2003 Transaction. The evidence will further establish that Defendants inexcusably withheld from GreatBanc and their other advisors, *inter alia*: (1) updated, revised, and alternative projections that showed sharp downturns in future financial results of the Company that had a direct impact on the valuation of TAC's shares; (2) revised repurchase obligation studies and other information that showed substantially greater repurchase obligations than were considered by GreatBanc, which would drain TAC of needed capital; (3) revisions to the manner in which Plan assets would be distributed that accelerated TAC's obligation to repurchase ESOP shares; (4) a sensitivity analysis that showed the ESOP would be

"worse off" under the 2003 Transaction; and (5) information related to substantial external and internal threats to the Company's business model. Tantalized by the prospect of the 2003 Transaction—under which Defendants and their family members would receive at least $125 million in cash for its stock and also receive warrants that were expected to enable it to reacquire majority ownership of TAC in the future—the Defendants withheld this information because they knew or should have known that neither GreatBanc nor anyone else in possession of it could conclude that the 2003 Transaction was in the ESOP's best interests.

The 2003 Transaction was a catastrophe for TAC and the ESOP. Hundreds of employees lost their jobs and their retirement savings. Plaintiffs will establish that the Plan suffered damages in excess of a $100 million (discussed in Section IV, *infra*), while Defendants and their family walked away with $190 million based on a bloated valuation that ignored critical information, including substantial material information concealed by the Defendants. Ultimately, the severe capital reduction caused by the 2003 Transaction and the stock repurchase obligations that predictably followed placed TAC into a death spiral that resulted in its 2008 bankruptcy.

## II. RELEVANT FACTS PLAINTIFFS WILL ESTABLISH AT TRIAL

### A. Historical Background of TAC

TAC was founded in 1926, and originally produced bookplates, bookmarks, book covers, and calendars. In 1987, TAC teamed up with a customer, Rhonda Anderson, to work out a new vision to sell scrapbooking supplies through Tupperware-style home parties in a division that would later be known as Creative Memories ("CM"). This direct selling business model depended on thousands of consultants (mostly seeking a part-time job or supplemental income) to serve as the sales force in the multilevel marketing fashion of Mary Kay and Amway. New consultants purchased a startup kit and were responsible for satisfying minimum buying requirements. Those

products could all be marked up and sold at a profit. Consultants who recruited new consultants rose up the ranks in the sales pyramid and earned commission from sales by their team.

CM's revenues grew from about $1 million in 1991 to $327 million in 2002, accounting for over 96% of TAC's sales. By 2003, TAC had over 1,200 full-time employees in addition to the volunteer consultants. The average full-time employee made approximately $35,000 per year.

Defendant Lee Morgan, the son of TAC's founder, became President and Chief Operating Officer in 1971 and Chairman of the Board in 1993. His daughter, Defendant Asha Morgan Moran, became Vice-President and Chief Operating Officer in 2001. In 2003, Asha Moran functioned as the CEO of CM and was formally appointed to that position later that year.[2] Lee Morgan remained the CEO of TAC and a Board member until he retired in 2008. Defendant Chandra Attiken was the Vice President of Human resources for TAC. She attended nearly all Board meetings while the 2003 Transaction was under consideration. All three Defendants were fiduciaries to the Plan.

## B.    The ESOP and Its Fiduciaries

In 1979, TAC established the ESOP for the primary purpose of providing retirement benefits for its employees. TAC employees began receiving allocations of TAC stock to their Plan account starting one year after they joined the Company. Long-term employees amassed a large percentage of their wealth in the ESOP as more shares were allocated to them, and those shares appreciated over time and cash dividends were paid on those shares. By 2003, 48 employees had ESOP balances exceeding $1 million, and many others had over $500,000. The top 10 account balances totaled over $50 million. At year-end 2003, approximately 25% of the ESOP's assets ($66 million) were in cash and cash equivalents, largely the result of dividends paid over the years.

---

[2] Despite her inexperience, Asha Moran could not be removed as President of the Company unless by unanimous approval by the Board.

Under the Plan, the ESOP Advisory Committee (the "EAC") was the named fiduciary with complete discretionary authority to control and manage the Plan. Before, during, and after the 2003 Transaction, the Defendants were the sole members of the EAC. In August 2003, GreatBanc was appointed by TAC's directors as trustee in place of TAC's CFO, Barry Hoskins. The appointment was made in connection with the 2003 Transaction then under consideration, and GreatBanc was terminated as trustee shortly after the transaction. No amendment to the Plan provisions regarding the EAC or its duties to the Plan were made in connection with the appointment of GreatBanc.

## C.     Threats to TAC from Sweeping Changes to the Scrapbooking Marketplace

As it did for many industries, digital technology caused a paradigm shift for the scrapbooking industry beginning in the late 1990s. Until that time, CM was the market leader in the sale of traditional scrapbooks, commanding high profit margins with few competitors. But beginning in 1999, senior executives at TAC began to alert Lee Morgan that the digital camera market was rapidly growing and warned him that CM needed to urgently embrace the new technology to continue to thrive. Because digital photography provided consumers with a new way to take, store, edit, print and organize photos, it was a fundamental challenge to CM's physical cut and paste scrapbook model. Flushed by market leadership in the traditional scrapbooking arena and with confidence uncomplicated by humility, Morgan ignored these concerns. Characteristic of his leadership style, Morgan even instructed his team to quit updating him on digital technology developments in 2000.

By 2002, a TAC consultant that was later added to the Board urged Morgan to accept that incorporating digital imaging capability into TAC's business was "a strategic given," and the only issue was how fast the Company needed to get there. Confirming his point, by the closing of the 2003 Transaction, the use of digital cameras was growing rapidly and major film makers were

reporting declining sales of photographic film. Consumers began storing digital photos by internet and other media. Also, computer software programs had hit the market to simplify the manipulation, image correction and printing of digital and traditional photos.

In addition, by 2003, TAC faced competition from several larger competitors, along with a number of local and regional competitors. For example, Michael's sold scrapbooking products and had started a new chain of stores devoted to scrapbooking. In fact, Michael's had over 240 stores nationwide by 2002 that sold scrapbooking products. Walmart, Target and Best Buy were also increasing their focus on the scrapbooking market. The CM management team, led by Asha Moran, told the TAC Board on August 21, 2003 that digital photography and scrapbooking competitors were key threats facing the Company during the 2004 through 2008 timeframe.

### D.      Threats to TAC from the Repurchase Obligation

ERISA requires private company ESOPs to repurchase shares allocated to vested retiring or otherwise terminating employees at fair market value. This repurchase obligation can represent a significant call on the sponsor company's cash. The Defendants recognized that TAC's repurchase obligation was a serious risk factor, particularly given the rapidly increasing fair market value of the shares between 1999 and 2002. In a letter to TAC shareholders, Lee Morgan noted:

> **The biggest cloud over our organization** in my opinion, is our obligation to repurchase our stock both from ESOP participants as they retire and from other shareholders who have no other market for their shares.  Last year we spent $11 million buying back our stock.  **The potential impact on our cash position is huge.**

(PX 0059-0059) (emphasis added). At the outset of exploring the feasibility of the 2003 Transaction, Morgan and other key TAC Management recognized the impact of this repurchase obligation and the potential negative cash flow consequences:

> [The] ESOP has been around a long time and they have many participants with $1 million accounts which is causing them to have work ethic issues.

> **(Sweatshop millionaires retiring because don't need or want to work anymore)** Also, some people are looking at the stock price and saying wow I better retire and get this $ value in case the stock price goes down. **Perhaps the enron effect**.

(PX 0101) (emphasis added). Talk about sweatshop millionaires was not hyperbole. All employees with more than 18 years of tenure had ESOP accounts worth at least a million dollars. Multiple longer term employees had ESOP accounts worth multiple millions of dollars.

As the 2003 Transaction approached, estimates for both the short-term and long-term repurchase obligation skyrocketed. Originally, TAC's Board was told in August 2003 that the Company's repurchase obligation for 2004-2006 was approximately $34 million. But on December 4, 2003, just prior to the closing of the Transaction, the Board was informed that the repurchase obligation estimates for 2004-2006 nearly tripled from the original estimates given to GreatBanc. By year-end 2003, Lee Morgan continued to warn shareholders about the threat from the repurchase obligation cloud hanging over TAC and its ESOP:

> There is one major thing missing from our balance sheet, our 'repurchase obligation.' This is the cash required to buy back our stock from employee-owners as they retire. I estimate the obligation over the next 20 years at nearly $1 billion.

(PX 0432-0003).

## E. CM's Business Performance Weakened in 2002 and 2003

Prior to the 2003 Transaction, CM accounted for 96% of TAC's revenue. But by November 2003, gross sales for CM U.S. were $28.3 million lower than had been forecast. In fact, monthly gross sales for CM U.S. were lower than forecast by an amount ranging from 11% to 27% in seven of the 11 months ending in November. In the other four months, sales exceeded the forecasts only by a 1% to 4% margin. Poor sales of new products introduced by TAC—which missed forecasts by 10 to 30%—partially explained some of this poor performance.

In addition, the productivity of TAC's consultants (*i.e.,* monthly wholesale revenue per consultant)—one of TAC's Key Operating Indicators ("KOI")—declined from $734 to $617 in the thirteen months leading up to the 2003 Transaction, and average monthly production for 2003 declined to $643 from $721 for 2002. These sharp declines, which reflected not only the changes in the marketplace and TAC's failure to adapt, but also the growing disenchantment of the consultant sales force,[3] boded ill for TAC's prospects going forward.

The signs of TAC's declining fortunes continued right up to the close of the 2003 Transaction. At the end of 2002, TAC forecasted total Company sales for 2003 to be $400.7 million. By September 2003, TAC lowered its forecast to $381 million. At the December 4, 2003 Board meeting, TAC again lowered its forecast for year-end to $377 million.

## F. Early Stages of 2003 Transaction

In early 2003, Deloitte & Touche ("Deloitte") was engaged to perform a feasibility analysis about the viability of converting TAC to a 100%-owned ESOP. TAC asserted that it was obligated to undertake the 2003 Transaction because the IRS indicated that allocations of new contributions to participants' account based 75% on compensation and 25% on account balance was improper. But this rationalization is dubious at best. Converting TAC to a 100% ESOP-owned company through the 2003 Transaction allowed Mr. Morgan and his family to cash out, ensure that Ms. Moran would succeed him as TAC's CEO (her ouster would require unanimous action by the

---

[3] This disenchantment concerned a number of issues, including: the structure of TAC;s career plan for consultants, the, lack of retirement plan, inability to move inventory, lack of training, failure to introduce digital scrapbooking products, and new products (which drive sales) that lacked the "sizzle" necessary to generate excitement among consultants and their customers. In fact, TAC was losing many of its consultants to TAC's rivals in the marketplace. CM sent Rhonda Anderson, the Co-Founder of the business, on an 18-month RV journey to criss-cross the country, to meet with the "volunteer army" of consultants, listen to them, and report back to Asha Moran and other CM leaders about the consultants' concerns.

Board, so Mr. Morgan's concurrence would have been required), and enable the family to reacquire majority ownership in the future through the exercise of warrants.

With Deloitte's help, TAC structured the 2003 Transaction so the ESOP would own 100% of TAC's common stock. Non-ESOP shareholders were given a choice to either receive all cash for their shares at $850/share, or a package of cash, warrants (rights to purchase stock back from the Company in 2013), and promissory notes. The outside shareholders who chose the package would own "synthetic equity," meaning they would enjoy the option to buy back stock at the $850 price in 10 years. Put another way, the 2003 Transaction was set up so the ESOP would own 100% of the stock only for 10 years, at which point the warrant holders could buy majority ownership back at the 2003 valuation price.

Lee Morgan elected all cash and received approximately $58 million for his stock. The remainder of the Morgan Family and trusts established by Morgan chose all cash or the package. The total amount of consideration paid to the Morgan Family was $190 million, of which approximately $125 million was in cash for those shareholders that elected the cash option. Significantly, in order to finance the buyout of all non-ESOP shares, TAC had to borrow approximately $150 million, thereby substantially increasing TAC's debt burden.

The feasibility study conducted by Deloitte to support the Transaction moving forward was based entirely upon projections prepared by TAC's management and approved by Lee Morgan and Asha Moran. Deloitte inserted data received from TAC into a model to analyze the resulting valuations, cash flow and other outcomes if the 2003 Transaction took place. Peter Abrahamson at Deloitte created the feasibility model with Nancy Blair and periodically sent different versions of the model to TAC using financial data and projections provided by TAC. Deloitte performed no independent verification of the Management projections and disregarded TAC's projected

repurchase obligation in calculating the projected statement of cash flows to determine the feasibility of the Transaction. Based on the feasibility analysis, the TAC Board preliminarily approved moving forward with the Transaction at its July 2003 meeting.

The TAC Board then appointed GreatBanc as ESOP trustee. GreatBanc assigned Marilyn Marchetti to lead the assignment. GreatBanc engaged Duff & Phelps ("D&P") as its financial advisor with respect to the fairness of the Transaction. D&P and GreatBanc made clear in their engagement agreements that they would rely upon TAC's financial projections in performing their analysis without independent verification.

Once the advisors were hired, TAC assembled a Transaction team: Nancy Blair as Project Manager, Barry Hoskins as CFO, Kim Lipson-Wilson as Tax Manager, Asha Moran, and Lee Morgan (the "Transaction Team"). TAC initially projected sales for the 10-year period starting in 2004 to range from $444 million to $1.17 billion. By late August, TAC had reduced its sales forecasts to range from $425 million in 2004 to $1.085 billion in 2014.

While considering its future sales outlook, TAC instructed Deloitte to run much lower sales' revenue forecasts through the model to check on the outcome. In one of these downside scenarios, TAC asked Deloitte to run the model using projected sales of $414 million in 2004 followed by a relatively flat sales performance ending in a projection of $446.9 million in 2013. Reflecting the level of concern about deteriorating market conditions and Company performance, TAC also asked Deloitte to run the model using sales' revenues from $391 million in 2004 to $221 million in 2013. Despite providing Deloitte with those much reduced forecasts and asking it to run the feasibility model using these much lower sales numbers, Defendants never took any steps to ensure that GreatBanc and D&P were provided with any of these downside scenarios or even to inform GreatBanc of their existence.

## G.     Due Diligence and Negotiations for the 2003 Transaction

From the beginning, Lee Morgan expected GreatBanc to rubber stamp the 2003 Transaction. He viewed GreatBanc as expensive and unnecessary complication to a Transaction he had already determined was best for "his" company. At their initial meeting, Lee Morgan told Marilyn Marchetti that the GreatBanc team was like a horde of "locusts descending on the Company to suck all the money out." As negotiations progressed, GreatBanc and D&P raised genuine concerns about many of the proposed terms of the deal. Indeed, Lee Bloom from D&P characterized the deal proposed by TAC and Deloitte as the "most aggressive deal in the history of ESOPs." In return, Lee Morgan attacked the professionalism of GreatBanc and D&P and threatened to terminate them as ESOP advisors unless they accepted a revised deal put on the table by TAC.  Ultimately, the following provisions were added to the Transaction:

- An $8 million cash dividend from TAC to the ESOP in 2003 to the ESOP and a $2.5 million dividend in 2004 – 2008;

- TAC's payment of an amount equal to 21% of the eligible compensation of TAC employees to the ESOP in 2004; and

- A per-share value to terminating employees between 2004 and 2006 based on the following formula: higher of Fair Market Value or $840.26 per share in 2004; Fair Market Value, plus $20.55 for 2005; and Fair Market Value, plus $12.55 for 2006 (this formula is sometimes called the "Put Price Protection" or "PPP").

In October 2003, GreatBanc and the TAC Board tentatively approved going forward based on the deal described above. But during due diligence and after the tentative deal was reached, TAC's financial performance continued to decline. Asha Moran and others at CM openly discussed a concern about whether CM had hit a period of a "plateau" or flattening of sales. Asha Moran and her team identified digital photography, new competitors, and the growing discontent among the sales force of consultants as threats facing CM. On October 2, 2003, Management provided Deloitte with sales projections which showed sales of $352 million in 2004, decreasing

11

to $180M in 2014. Two months later, on December 2, 2003, TAC asked Deloitte to prepare a less-troubling downside analysis to present at the December 4, 2003 Board meeting showing TAC's sales decreasing from $381 million in 2004 to $304 million in 2014.

In addition, the Defendants grew more concerned about a potential "run on the bank" by employees seeking to cash out their ESOP accounts in the three-year period after the Transaction during which PPP was in place. A "run on the bank" is a scenario where ESOP participants exercise their statutory right to put shares back to the Company for purchase, not because they want to retire or quit, but instead to lock in a stock valuation without enduring a risk of a future decline in the stock price, or simply to lock in a price to get all of their retirement nest egg out of the one basket of their employer's stock so they can invest in a more diverse portfolio.

Bank One, the lead bank financing the Transaction, was also concerned about a "run on the bank." To placate Bank One, the distribution rules were amended to stretch out the payout of retirees with account balances of over $1 million over 5 years, rather than giving them an immediately lump sum payout, as had been the practice in prior years. IRS S-corporation concerns prompted the Board to make a similar change to allow terminees below retirement age to get paid in equal amounts over a five-year period, rather than having to wait to get any money for six years as was the case prior to the Transaction. Lee Morgan was particularly fearful about these changes in the distribution rules causing a run on the bank following the Transaction:

> The scenario that concerns me is where the terminated participant is under age 50 and wants a distribution immediately. We require the distributee to reach age 50 or be gone 6 years to get the money. The fear is that we have a number of folks with 7 figure accounts under the age of 50, who would likely terminate if they could get the money. I am concerned that the accounts not [sic] become an incentive for people to terminate employment before age 50 just to get the money.

(PX-0337). Recognizing the new incentives to terminate arising from PPP and the relaxed distribution rules, on December 4, 2013, Barry Hoskins revised the repurchase obligation he previously sent to GreatBanc and D&P upward from $34 million to $69 million. Defendant Chandra Attiken also performed an analysis of the Repurchase Obligation facing TAC if the Transaction closed. She told the Board at its December 4, 2003 meeting that the repurchase obligation would be $90-$95 million based on the Human Resource Department's detailed study of which employees were likely to stay and which were likely to go (particularly focused on the employees with larger ESOP account balances). Neither GreatBanc nor D&P were less informed of these revised studies showing that TAC needed $60 million *more* in cash to meet their repurchase obligation.

## H.    December 4, 2003 TAC Board Meeting

On December 4, 2003, the Transaction Team presented to the Board a sensitivity analysis requested by the Board at a previous meeting. Rather than relying on any of the downside models showing sharp decline in sales, the analysis (which was never shared with GreatBanc or D&P) relied upon a December 2, 2003 downside scenario that showed sales ranging from $381 million in 2004 to $304 million in 2014. The Board was not told about the other downside projections sent to Deloitte and the Transaction Team never explained why it selected the less severe December 2 downside version.

The sensitivity analysis concluded that the "ESOP was **worse off**" under the transaction (*i.e.* the stock value does not make up for the reduction in annual **[S-CORPORATION TAX]** distributions). (PX-0381) (emphasis added). In addition, the sensitivity analysis ignored the new repurchase obligation study prepared on that same day by Mr. Hoskins showing significantly higher cash outlay in the three years immediately following the Transaction during the Put Price

Protection period, and it ignored the even greater cash outlays predicted by Chandra Attiken. There is no evidence that the Board was informed that other downside scenarios had been run which showed even worse outcomes for TAC.

Lee Morgan and Nancy Blair presented the business plan for 2004 at the December 4 Board meeting as well. This plan showed a further deteriorating business outlook, projected net sales were again lowered from the already lowered forecast for 2004 ($425 million) which had previously been provided to GreatBanc and D&P for analysis of the transaction fairness to $415 million. So, in the three months prior to the Board meeting, the Transaction Team reduced expected sales from $448 million to $425 million to $415 million.

## I.    Defendants Withheld Material Financial Information from GreatBanc

GreatBanc was not invited to the December 4, 2003 Board meeting, nor did the Defendants make any effort to pass along the critical information discussed at that meeting. The acrimonious tone set by Mr. Morgan at his first meeting with GreatBanc only worsened over time.  Morgan considered firing GreatBanc in several communications with other members of the Transaction Team, and he angrily threatened to fire GreatBanc and D&P on a conference call with Lee Bloom, Marilyn Marchetti, and numerous others.  Mr. Morgan resented that GreatBanc did not behave like the rubber stamp he had expected, but instead substantively evaluated the 2003 Transaction.  With respect to D&P in particular, Morgan commented that:

> [I]t has been Duff & Phelps' lack of preparation, unprofessionalism, arrogance and unwillingness to compromise that has led to all of the additional time that we have all spent trying to get this transaction completed.

(PX-0338-0001).

One of the key responsibilities of GreatBanc was to determine whether the price paid by TAC to selling shareholders was fair to the ESOP. In order to do so, GreatBanc asked D&P to

determine whether the ESOP would financially be better or worse off if the 2003 Transaction was closed. In order to complete their analyses, GreatBanc and D&P needed current, complete and accurate information about TAC's projected future cash flows. But Defendants withheld key information from them, including *inter alia*: (1) updated, revised, and alternative downside financial forecasts; (2) amendments and modifications to the ESOP distribution rules; (3) revised repurchase study presented to the Board on December 4, 2003 by Mr. Hoskins; (4) the review of that revised repurchase study by Ms. Attiken and the Human resources Department showing Mr. Hoskins still understated the payments likely due to departing employees in the 2004 through 2006 by $25-$30 million; (5) explicit concerns about a "run on the bank"; (6) deterioration in the projected year-end sales for both 2003 and 2004; (7) the sensitivity analysis showing the ESOP would be "worse off" if the 2003 Transaction occurred; (8) information provided to Lee Morgan and other senior managers at TAC indicating a potential violation of the 409(p) requirements; (9) threats to TAC's traditional business model; (10) information related to the decline in the number of independent consultants, serious issues in the field, and discontent of consultants with the product; and (11) and slipping sales and profits in most foreign markets, even though the international markets were projected to account for more than 30% of TAC's revenue by 2008.

**J.      GreatBanc Relied on a Flawed Fairness Opinion by Duff & Phelps and Breached Its Fiduciary Duty**

D&P's final opinion did not change from the interim report prepared on October 27, 2003. D&P's conclusion that the 2003 Transaction was fair to the ESOP is flawed for a number of reasons. First, D&P suffered from the same problem as GreatBanc as it was not provided with complete, accurate and current financial and other material information identified above. Second, D&P largely adopted TAC's financial projections provided to it, without regard to the information available to D&P concerning the changes in the industry and consumer behavior that challenged

15

TAC's business model, and without adjustment to reflect the risks posed by those and other circumstances confronting TAC and by the deterioration in TAC performance that had occurred during 2003. Third, D&P failed to adequately consider the magnitude and effect of TAC's repurchase obligation going forward. Fourth, D&P failed to consider the I.R.C. § 409(p) implications of the 2003 Transaction going forward.[4] The evidence will establish that as a result of these circumstances, D&P's fairness conclusion was deeply flawed. GreatBanc's reliance on that conclusion and its failures to otherwise perform a thorough and effective review of the 2003 Transaction was equally flawed its decision to decline the tender offer and permit the Transaction to go forward was a breach of its fiduciary duty of prudence.

### III.    PLAINTIFFS' THEORY OF LIABILITY

Plaintiffs bring three causes of action against Defendants, any one of which independently establishes Defendants' liability to the Plan.

### A.    Defendants' Liability Under ERISA § 404

Defendants Lee Morgan, Asha Morgan Moran and Chandra Attiken breached their fiduciary duties to the Plan in violation of ERISA § 404, 29 U.S.C. § 1104. They are liable under ERISA § 409, 29 U.S.C. § 1109, to make good to the Plan the losses caused by their breach of fiduciary duty. To establish Defendants' liability under ERISA § 404, Plaintiffs must show that each Defendant was an ERISA fiduciary, that he or she breached fiduciary duties, and that the

---

[4] Before, during, and after the 2003 Transaction, management expressed significant concerns that the Transaction would result in violation of I.R.C. § 409(p). This provision imposes severe penalties (the loss of S corporation status and imposition of a huge excise tax) if any shareholder and his family from collectively own more than 50% of the stock of an ESOP company (taking into account warrants and other synthetic equity). TAC teetered on the edge of a 409(p) violation (due to the warrant holdings of the Morgan Family, and the redemption of other shareholders) after 2003. This problem became so acute prior to the 2008 bankruptcy that TAC seriously considered converting to a C-corporation and paying taxes, rather than risk the penalties associated with a 409(p) violation if it continued as a tax free S-corporation

breach caused a loss to the Plan. *See Brosted v. Unum Life Ins. Co. of Am.*, 421 F.3d 459, 465 (7th Cir. 2005) (citing *Kamler v. H/N Telecomm. Serv., Inc.*, 305 F.3d 672, 681 (7th Cir. 2002)).

1.      **The Defendants' Fiduciary Status**

The fiduciary status of each Defendant is clear. Each of the Defendants was a "named fiduciary" per ERISA § 402(a), 29 U.S.C. § 1102(a) by virtue of his or her membership on the ESOP Committee. Section 18(a) of the Plan states the members of the ESOP Committee "shall be the named fiduciaries with authority to control and manage the operation and administration of the Plan." Section 18(f) of the Plan permitted the ESOP Committee to delegate rights and powers with respect to the Plan to other persons, but no such delegation was ever made by the ESOP Committee with respect to the 2003 Transaction.

In addition, Lee Morgan and Asha Moran were members of the TAC Board of Directors. Because the Board of Directors had the power to appoint, retain, and remove members of the ESOP Committee and the ESOP Trustee, each member of the Board of Directors was an ERISA fiduciary with a fiduciary duty to monitor its appointees. *See Brieger*, 629 F. Supp. 2d 848 at 867 (N.D. Ill. 2009) ("Individuals who appoint ERISA fiduciaries have a duty to monitor those fiduciaries' actions and to provide them with the information necessary to carry out their responsibilities.") (citing *Leigh*, 727 F. 2d at 135 and *Motorola*, 337 F.Supp.2d at 1099); *see also Ed Miniat, Inc. v. Globe Life Ins. Group, Inc.*, 805 F.2d 732, 735-36 (7th Cir. 1986) (same). Indeed, the Department of Labor has issued interpretative Bulletin 75-8 to provide guidance to appointing fiduciaries:

> At reasonable intervals the performance of trustees and other fiduciaries should be reviewed by the appointing fiduciary in such manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan.

29 C.F.R. § 2509.75–8 at FR–17. Here, at no time did any action, including, without limitation, the appointment of GreatBanc Trust as trustee, relieve any Defendant of his or her fiduciary duties as named fiduciary under the Plan or as a member of the Board of Directors of TAC.

### 2. The Defendants' Fiduciary Duties

As ERISA fiduciaries, the Defendants were obligated to act "solely in the interest of the participants and beneficiaries and . . . and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B). This requires fiduciaries to exercise "complete and undivided loyalty to the beneficiaries of the trust" with an "eye single to the interests of the participants and beneficiaries." *Leigh*, 727 F.2d at 123 (internal citations omitted). Their conduct is evaluated in accordance with the standard of an objective prudent person, both with regard to the process used to reach decisions as well as with regard to an evaluation of the merits of those decisions. *Eyler v. Comm'r of Internal Revenue*, 88 F.3d 445, 454-55 (7th Cir. 1996); *See also George v. Kraft Foods Global, Inc.*, 800 F. Supp. 2d 911, 916 (N.D. Ill 2011). The duties are akin to those of a common law trustee. *Jenkins v. Yager*, 444 F.3d 916, 924 (7th Cir.2006) (quoting *Ameritech Benefit Plan Comm. v. Comm. Workers of Am.*, 220 F.3d 814, 825 (7th Cir. 2000)). Because the standard is an objective one, subjective good faith is not a defense; a "pure heart and an empty head are not good enough." *Cunningham*, 716 F.2d at 1467.

Defendants' fiduciary obligations as Board Members required them to reasonably monitor GreatBanc, and to take reasonable steps to assure that GreatBanc was provided with all information materials to its evaluation of the 2003 Transaction. *See Brieger*, 629 F. Supp. 2d at 867; *In re Gen. Growth Properties, Inc.*, 2010 WL 1840245, at *11 (N.D. Ill. May 6, 2010) ("ERISA imposes

upon fiduciaries a duty to monitor those they appoint to carry out plan functions."). Further, because Defendants were named fiduciaries as members of the ESOP Committee, and because they never delegated any of their fiduciary duties as named fiduciaries, they had a continuing duty to provide GreatBanc with all material information, assess the tender offer themselves, and evaluate the reasonableness of GreatBanc's actions with respect to the 2003 Transaction.

The Defendants breached their fiduciary duties of loyalty and prudence in several regards. First, the failure to provide key information to GreatBanc, described *supra* at 14-15, is an egregious breach of the duty to monitor that arises both out of Lee Morgan and Asha Moran's fiduciary responsibility as directors who appointed GreatBanc, and out of all Defendants' duties as EAC members who never delegated their fiduciary duties to GreatBanc. *See, e.g., In re WorldCom, Inc.*, 263 F. Supp. 2d 745, 765 (S.D.N.Y. 2003) (CEO could be held liable for breach of fiduciary duty to monitor by failing to provide information to investment fiduciaries: "When a corporate insider puts on his ERISA hat, he is not assumed to have forgotten adverse information he may have acquired while acting in his corporate capacity.").

Second, as the ESOP's named fiduciaries, the Defendants had continuing plenary fiduciary responsibility for all aspects of the ESOP's management and administration, including the interaction with GreatBanc as trustee. While the Plan permitted the EAC to delegate fiduciary responsibilities, the *EAC never did so*. Accordingly, at all times the full responsibilities as named fiduciaries of the Plan were the Defendants' at all times. *See Montgomery v. Aetna Plywood, Inc.*, 39 F. Supp. 2d 915, 936 (N.D. Ill. 1998) ("The fiduciary must (1) investigate the expert's qualifications . . . (2) provide the expert with complete and accurate information . . . and (3) make certain that reliance on the expert's advice is reasonably justified under the circumstances.") (citations omitted).

In addition, when determining whether fiduciaries complied with their duties to act in the best interests of the plan, as set forth above and as recognized by the Seventh Circuit *in this case*, courts must "examine both the *process* used by the fiduciaries to reach their decision as well as an *evaluation* of the merits." *Fish v. GreatBanc Trust Co.*, 749 F.3d 671, 680 (7th Cir. 2014) (emphasis added) (citing *Eyler*, 88 F.3d at 455). In other words, this Court must consider "whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." *Eyler*, 88 F.3d at 455 (citing *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984)). Defendants wholly failed to properly evaluate and investigate the risks to the ESOP associated with the 2003 Transaction, and also failed to take reasonable steps to monitor GreatBanc (and each other) and ensure that GreatBanc was provided with all material and necessary information. Nevertheless, Defendants now claim they had essentially no fiduciary responsibility with respect to the 2003 Transaction. This position is legally untenable, as discussed above. It explains, however, why the Defendants can now only point to processes or methods employed by them to discharge their fiduciary obligations, rather than the substance of the 2003 Transaction.

Third, Defendants placed their own interests ahead of the ESOP and its participants, and thereby breached their ERISA fiduciary duty of loyalty. The duty of loyalty imposed on fiduciaries by ERISA § 404(a)(1)(A) requires fiduciaries to act with an "eye single" to their interests and "for the exclusive purpose of providing them with benefits" *Leigh*, 727 F.2d at 125. "Where it might be possible to question the fiduciaries' loyalty, they are obliged at a minimum to engage in an intensive and scrupulous independent investigation of their options to insure that they act in the best interests of the plan beneficiaries." *Id.* at 125-26. Any loyal fiduciary would have assured that GreatBanc and its advisors were provided with the key information that was not provided here.

The most obvious explanation of the Defendants' failure to provide that information is a desire not to derail a transaction under which they would receive millions.

Finally, Defendants breached their fiduciary duties by using substantial Plan assets to satisfy the Company's repurchase obligation after the 2003 Transaction. As of December 31, 2003, the Plan had amassed over $66 million in cash and non-Company stock cash equivalents constituting approximately 25% of the Plan's assets and a significant diversification hedge against the risks associated with the holding of Company stock. Consistent with fears that had been voiced internally during 2003, in 2004 the Company experienced a nearly tenfold increase in Plan stock repurchases. This placed a severe strain on the Company's liquidity. To meet the repurchase demands at least in part, the Company sought to take the unprecedented step of using all of the Plan cash to meet the Company's stock repurchase obligations. The Plan was amended to permit the fiduciaries to consider taking this action, and they did so without going through *any* procedural or substantive evaluation regarding the fairness of this decision. But the fiduciaries' duty of prudence required appropriate procedures and a thorough evaluation of such an important action. Instead, putting the interests of TAC and themselves (as TAC note and warrant holders) ahead of the interests of the Plan and its participants, the Defendants made the fiduciary decision to authorize the use of approximately $60 million in Plan assets to repurchase Company stock without any evaluation of the prudence of this step or its impact on the Plan and its participants. The Plan was damaged both because the fair market value of the shares acquired was substantially less than the amount paid by the ESOP, and the ESOP lost the benefit of diversification that had existed when the $60 million was held in cash. Furthermore, in distributing the Plan's assets without any evaluation of the impact of their decision, Defendants violated their duties under § 18 of the Plan to "distribute trust assets . . . solely in the interests of the Participants" of the Plan. The Defendants

decision to allow Plan assets to satisfy the Company's repurchase obligation also violated § 5(b) of the Plan which established that "[a]ny decision by the Committee to direct the Trustee to sell Company stock . . . must comply with the fiduciary duties application under Section 404(a)(1) of ERISA."[5]

The Defendants imprudently and disloyally denied the Plan the benefit of this significant asset diversification, and instead increased the Plan's 75% concentration in Company stock to essentially 100%. Tragically, this entire investment ultimately became worthless, resulting in a $60 million loss to the Plan for which the Defendants are liable.

**B.      Defendants' Liability Under ERISA § 405**

Defendants are also liable as co-fiduciaries under ERISA § 405, 29 U.S.C. § 1105. This section provides that, under certain specified circumstances, "a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan." 29 U.S.C. § 1105(a). Specifically, a fiduciary will be jointly and severally liable for the breaches of another fiduciary if any of the following conditions is satisfied:

> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

> (2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

*Id.*; *see also Leister v. Dovetail, Inc.*, 546 F.3d 875, 878 (7th Cir. 2008) ("co-fiduciary liability is joint and several under ERISA."). Plaintiffs will establish these conditions are present here. Each

---

[5] Indeed, the EAC had no minutes memorializing any meetings they conducted with respect to the 2003 Transaction or this specific decision to use ESOP assets. There is simply no evidence that they completed any procedural process whatsoever.

Defendant was a fiduciary as set forth above. Likewise, GreatBanc was a fiduciary under ERISA under the terms of the Trust Agreement appointing it as trustee, and GreatBanc breached its fiduciary duty of prudence in its evaluation of the 2003 Transaction and its decision to permit the Transaction to go forward.

### 1. Defendants Enabled GreatBanc's Breaches

Where information is withheld by a fiduciary that is material to the decisions of co-fiduciaries and those decisions constitute fiduciary breaches, the failure to provide such material information qualifies as "enabling" the breaches of the co-fiduciaries within the meaning of ERISA § 405(a)(2). *See, e.g.*, *In re Morgan Stanley ERISA Litig.*, 696 F. Supp. 2d 345, 367 (S.D.N.Y. 2009) (complaint stated claim for co-fiduciary liability where it alleged that fiduciary, "who was intimately aware of the serious problems facing the Company, enabled the breaches of other fiduciaries, namely the Investment Committee, by failing the provide members of that committee with information concerning the imprudent of investing in Company Stock.").

Here, there is an overwhelming amount of evidence (discussed at 14-16, *supra*) that shows that Defendants enabled GreatBanc's breach by failing to provide GreatBanc with material information relevant to its evaluation of the 2003 Transaction. Defendants knew or should have known of the significance of the information to GreatBanc's due diligence and therefore knowingly participated in a fiduciary breach by allowing the 2003 Transaction to proceed.

### 2. Defendants Had Knowledge of GreatBanc's Breaches And Failed To Take Reasonable Steps To Remedy

"A delegating fiduciary who knows of a breach by the delegated fiduciary cannot escape liability by simply casting a blind eye toward the breach." *Chesemore v. Alliance Holdings, Inc.*, 886 F. Supp. 2d 1007, 1050 (W.D. Wis. 2012) (citing *Willett v. Blue Cross & Blue Shield*, 953 F.2d 1335, 1341 (11th Cir.1992)). Here, Defendants had knowledge of GreatBanc's fiduciary

breaches, but failed to take any steps to remedy these breaches. For example, Defendants knew that GreatBanc and D&P had (i) greatly underestimated the business risks facing TAC going forward, (ii) had largely accepted projections provided to them without appropriate adjustment or risk consideration, (iii) employed unrealistic low repurchase estimations, and (iv) had failed to adequately consider the I.R.C. § 409(p) implications of the 2003 Transaction.

In short, Defendants had actual knowledge both that GreatBanc had imprudently concluded to decline the tender offer and the resulting transaction would not be in the best interests of the Plan. Thus, GreatBanc violated its ERISA fiduciary duties. *See, e.g.*, *Chao v. Wheeler*, 2007 WL 4233464, at *6 (N.D. Ind. Nov. 28, 2007) (noting, in the context of ERISA § 405, that "'[a]ctual knowledge' of a breach has been defined as 'knowledge of all relevant facts at least sufficient to give the [defendant] knowledge that a fiduciary duty has been breached or an ERISA provision violated.'" (citing *Richard B. Roush, Inc. Profit Sharing Plan v. New England Mut. Life Ins. Co.*, 311 F.3d 581, 585 (3d Cir. 2002); *Rush v. Martin Petersen Co., Inc.*, 83 F.3d 894, 896 (7th Cir. 1996) (actual knowledge requires knowledge of the "essential facts of the transaction or conduct constituting the violation," but not necessarily "knowledge of every last detail of a transaction or knowledge of its illegality.") (internal quotations omitted).

Accordingly, Defendants were obligated to remedy the breach, but failed to do so. The Conference Committee Report on ERISA explains that the remedy envisioned by this provision, depends on the facts and circumstances, but generally includes the obligation to take action reverse the imprudent transaction, proceed to an appropriate Federal court for instructions, or bring the matter to the attention of the Secretary of Labor. *See* Employee Ret. Income Sec. Act of 1974, 1974-3 C.B. 415 (I.R.S. 1974) at 45. Here, however, far from taking any action to prevent or reverse the 2003 Transaction—much less seeking guidance from a court or the Secretary of

Labor— Defendants actually *prevented the correction* of the breaches by terminating GreatBanc in December 2003, before GreatBanc was able to acquire knowledge of material facts withheld from it in 2003.

## C.    Defendants' Liability Under ERISA § 406

Defendants are also liable for causing the Plan to enter into a prohibited transaction. ERISA § 406 prohibits certain transactions, including "a direct or indirect … sale or exchange ... of any property between the plan and a party in interest."   ERISA § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A). "Party in interest" is defined under ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A) to include "any fiduciary . . . of such employee benefit plan." Defendants Lee Morgan and Asha Moran were parties in interest at the time of the 2003 Transaction. The statute provides that a fiduciary may not cause a plan to enter into a transaction that the fiduciary "knows or should know" is prohibited.  *Id*.

ERISA § 408 exempts certain transactions from the prohibitions of § 406, including transactions in which an employee benefit plan purchases or sells employer securities for "adequate consideration." ERISA § 408(e), 29 U.S.C. § 1108(e). Adequate consideration is defined in the case of a privately held corporation as "the fair market value of the asset as determined in good faith by the trustee." ERISA § 3(18)(B), 29 U.S.C. § 1002(18)(B).  Adequate consideration is paid if (a) the price paid reflects the fair market value of the asset, (2) the fiduciary conducts a careful and independent investigation of the circumstances prevailing at the time the investment is made, and (3) reliance on the expert's advice is reasonably justified under the circumstances. *See Eyler*, 88 F.3d at 455 (7th Cir. 1996); *Howard v. Shay,* 100 F.3d 1484, 1488 (9th Cir. 1996); *Henry v. Champlain Enterprises, Inc.*, 445 F.3d 610, 619-20 (2d Cir. 2006); *Chao*

*v. Hall Holding, Inc.*, 285 F.3d 415, 430 (6th Cir. 2002); *Donavan v. Cunningham*, 716 F.2d 1455, 1467-68 (5th Cir. 1983).[6]

The applicability of the adequacy of consideration exemption is an affirmative defense that the defendant has the burden of pleading and proving. *Keach v. U.S. Trust Co.*, 419 F.3d 626, 636 (7th Cir. 2005) ("In order to rely on the adequate consideration exemption, a trustee or fiduciary has the burden to establish that the ESOP paid no more than fair market value for the asset, and that the fair market value was determined in good faith by the fiduciary."); *cf Howard v. Shay,* 100 F.3d 1484, 1488 (9th Cir. 1996); *Lowen v. Tower Asset Management, Inc.,* 829 F.2d 1209, 1215 (2nd Cir.1987); *Donovan v. Cunningham,* 716 F.2d 1455, 1467-68 (5th Cir.1983); *Montgomery,* 39 F. Supp. 2d at 919, 935. https://scholar.google.com/scholar_case?case=68346378091959019&q=235+f.supp+2d+886&hl=en&as_sdt=40000006"ESOP fiduciaries will carry the burden of proving that adequate consideration was paid by showing that they arrived at their determination of fair market value by way of a prudent investigation in the circumstances then prevailing . . . Thus, the adequate consideration test focuses on the conduct of the fiduciaries in determining the price, not the price itself." *Eyler*, 88 F.3d at 455 (internal quotations and citation omitted). As the Seventh Circuit in this case has held, "when determining . . . whether an otherwise prohibited transaction under § 1106 is saved by 'adequate consideration' under § 1108(e)," ERISA "requires consideration of

---

[6] Department of Labor proposed regulations define fair market value as the "price at which an asset would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, and both parties are able, as well as willing, to trade and are well informed about the asset and the market for that asset." Prop. Dep. of Labor Reg. § 2510.3-18(b)(2). The Seventh Circuit recognizes that "this court and other courts of appeals have adopted this two-part standard for evaluating the adequacy of consideration" under ERISA § 408(e). *See Keach*, 419 F.3d at 636, n.5.

both the substantive reasonableness of the fiduciary's actions and the procedures by which the fiduciary made its decision." *Fish*, 749 F.3d at 680.

Here, Plaintiffs will easily establish a prima facie case of a prohibited transaction under ERISA § 406. Lee Morgan and Asha Moran were fiduciaries and therefore parties in interest under ERISA. *See* ERISA § 3(14)(A) (defining "parties in interests" as any fiduciary of the Plan). Further, the 2003 Transaction was conditioned upon the Plan's rejection of the Company's tender offer and the Company becoming 100% ESOP-owned through its acquisition of the outstanding stock held by all persons other than the Plan, including from Lee Morgan and Asha Moran. Indeed, the Defendants benefitted from this prohibited transaction. Defendants received approximately $125 million in cash in the 2003 Transaction in exchange for their stock at $850 per share.

Numerous courts have held that transactions following this or similar patterns are indirect prohibited transactions under ERISA. *E.g., Sandoval v. Simmons*, 622 F. Supp. 1174, 1213 (C.D. Ill. 1985) (finding an indirect prohibited transaction where a fiduciary voted not to tender ESOP shares in response to a stock purchase offer); *Chesemore*, 886 F. Supp. 2d at 1047 (finding an indirect prohibited transaction where trustees knew that ESOP acquired shares from a party-in-interest in two steps); *Neil v. Zell*, 677 F. Supp. 2d 1010, 1027-28 (N.D. Ill. 2009) (finding an indirect prohibited transaction where an employer purchased shares from inside shareholders that were later redeemed along with the shares of public shareholders leaving the ESOP as the sole shareholder); *McDougall v. Donovan*, 552 F. Supp. 1206, 1216 (N.D. Ill. 1982) (finding an indirect prohibited transaction even though a Plan acquired the property at issue from a third party).[7]

---

[7] The Seventh Circuit in this case has additionally recognized that "[t]he economic substance of the transaction was that the Plan would buy Antioch stock (indirectly] from the Morgan family and other shareholders." *Fish*, 749 F.3d at 675.

In addition, the use of approximately $60 million in Plan assets to repurchase stock from Participants in 2004 was a prohibited transaction which Defendants approved in their fiduciary capacity. ERISA § 406(b) prohibits transactions in which fiduciaries deal with plan assets for their own account or act on behalf of a party whose interests are adverse to that of the plan. The 2004 repurchases greatly benefitted TAC, because they relieved TAC of its obligation to repurchase the subject stock. Defendants derived a significant benefit from this, because they personally held notes from TAC and held warrants to purchase TAC stock. Thus, by authorizing the ESOP to use $60 million of its assets to fund an obligation that otherwise would have fallen to TAC the Defendants dealt with ESOP assets for their own interest and acted on behalf of TAC to the detriment of the ESOP, in violation of ERISA § 406(b).

Furthermore, Defendants have the burden of proving that they satisfy the "adequate consideration" exemption under ERISA § 408(e). But Defendants will be unable to carry their burden because the evidence will clearly show that:

1. Defendants failed to conduct a careful and independent investigation of the circumstances prevailing at the time of the 2003 Transaction, including by failing to disclose material and accurate information to GreatBanc and D&P;

2. Defendants failed to take appropriate action to prevent the 2003 Transaction and the resulting payment to the selling shareholders of more than the fair market value of their shares;

3. Defendants did not engage in proper process of determining fair market value of stock in connection with the 2003 Transaction, as no person performed an actual valuation in accordance with appropriate valuation standards, and the general valuation and fairness analysis that was done ignored the serious challenges facing TAC in the marketplace, greatly understated both the business risks faced by TAC going forward and TAC's repurchase obligation post-transaction, and ignored the implications of the transaction on I.R.C. § 409(p) compliance; and

4. Defendants caused the ESOP to expend approximately $60 million of its cash to acquired TAC stock at a price greatly in excess of its fair market value and without engaging in a reasonable process to ascertain its fair market value.

In fact, as Plaintiffs' expert Robert Reilly will establish, the fair market value of the stock was significantly lower than the $850 per share paid to the Defendants. The actual value was approximately $500 per share. Moreover, after the post-transaction repurchase obligations of the Company are properly considered, the value of the stock the Plan continued to hold was further reduced, to approximately $468 per share.[8]

## IV.    PLAINTIFFS' THEORY OF DAMAGES

Plaintiffs have two primary theories of damages. First, Plaintiffs seek a rescission of all cash and cash equivalents paid to the non-ESOP selling shareholders in this Prohibited Transaction under ERISA § 406 which resulted in the ESOP becoming the 100% shareholder of the Company. This amounts to $233,483,100, representing cash, notes, and warrants.

Second, and in the alternative, Plaintiffs seek to recover money damages from Defendants for breach of their fiduciary duties as ESOP trustee or fiduciary and for engaging in a prohibited transaction as trustee, fiduciary and/or as knowing parties in interest to a prohibited transaction. Plaintiffs will present evidence as to the ESOP's monetary damages under four separate and alternative damage models:

1.    The difference between the amount the non-ESOP selling shareholders received in connection with the 2003 Transaction and the actual fair market value ("FMV") of the shares, plus the diminution in value of the 205,330 Plan shares resulting from the 2003 Transaction. This can be determined in two ways:

First, as determined by Plaintiffs' Expert Robert Reilly, the actual FMV of the 272,826 shares tendered by the non-ESOP selling shareholders in the 2003 Transaction was $500 per share, rather than the $850 per share they received in the 2003 Transaction. This overvaluation of $350 per share damaged the ESOP in the amount of $95,490,000 (Mr. Reilly identified a range of damages of $70.94 million to $145.97 million in connection with this analysis, and Plaintiffs will offer each of these separate indications of damages at trial).

---

[8] Notably, despite having the burden of proving the 2003 Transaction involved adequate consideration, Defendants did not even retain an expert to value the shares as of 2003.

Second, Mr. Reilly also concluded that the FMV of the shares held by the ESOP immediately *after* the 2003 Transaction was $468 per share. The difference between the $850 per share used in the 2003 Transaction and the $468 per share value determined by Mr. Reilly damaged the ESOP in the amount of approximately $102.1 million.

2. Plaintiffs will seek damages equal to the ESOP cash of approximately $60 million (held by the ESOP prior to the 2003 Transaction) which Defendants Lee Morgan, Asha Morgan Moran and Chandra Attiken permitted to be misappropriated by the TAC Company to partially cover its Repurchase Obligations to the Plan in 2004.

3. Plaintiffs will seek the difference between the FMV of Net Assets Available for Plan Benefits as of December 31, 2003 ($252,433,490), and the FMV of such Net Assets today ($0), less all cash distributions of Plan Benefits of approximately $167 million[9] paid to the ESOP participants after December 31, 2003.

4. Plaintiffs will seek a recovery of the value of the ESOP shares (205,330 shares times $850 per share = $174,530,500) related to the failure to tender the ESOP shares on December 15, 2003, plus the value of all ESOP Net Assets Available for Plan Benefits excluding employer securities ($68,868,470) less all cash distributions of Plan Benefits of approximately $167 million[10] paid to ESOP participants after December 31, 2003.

## V.    POTENTIAL MOTIONS FOR JUDGMENT ON PARTIAL FINDINGS

The Local Rules advise parties to include in their pretrial briefs their "theory of any anticipated motion for directed verdict." Because this is a bench trial, Plaintiffs believe motions under Fed. R. Civ. P. 52(c) by either side are inappropriate. But Plaintiffs reserve all rights to file any such motion at the appropriate time after the close of Plaintiffs' case, or at the close of Defendants' case if Defendants fail to meet their burden of proof on any of the affirmative defenses they raise, including most notably their burden to establish that the transaction meets the ERISA § 408(e) adequate consideration standard.

---

[9] Plaintiffs believe that as a legal matter, the approximately $60 million in Plan assets that were misappropriated in 2004 to pay Plan benefits should not be included in the calculation of cash distributions of Plan Benefits for purposes of this specific calculation of damages. After excluding the $60 million, the cash distributions of Plan Benefits would be reduced to approximately $107 million.

[10] The $60 million in Plan assets that were misappropriated in 2004 mentioned in the previous damage model should also be excluded from this specific calculation of damages.

DATED this 26th day of October, 2015.

By */s/ Gary A. Gotto*

| | |
|---|---|
| KELLER ROHRBACK L.L.P. | GUIN STOKES & EVANS, LLC |
| Gary A. Gotto | Charles R. Watkins |
| Gary D. Greenwald | 321 South Plymouth Court, Suite 1250 |
| 3101 North Central Avenue, Suite 1400 | Chicago, Illinois 60604 |
| Phoenix, Arizona 85012 | Telephone: (312) 878-8391 |
| Telephone: (602) 248-0088 | Facsimile: (312) 263-2942 |
| Facsimile: (602) 248-2822 | charlesw@gseattorneys.com |
| ggotto@kellerrohrback.com | |
| ggreenwald@kellerrohrback.com | |

David J. Ko        SEBALY SHILLITO + DYER

| | |
|---|---|
| David J. Ko | SEBALY SHILLITO + DYER |
| 1201 Third Avenue, Suite 3200 | James Dyer |
| Seattle, Washington 98101 | Jon M. Sebaly |
| Telephone: (206) 623-1900 | Kathryn M. Mack |
| Facsimile: (206) 623-3384 | 40 North Main Street |
| dko@kellerrohrback.com | 1900 Kettering Tower |
| | Dayton, Ohio 45402 |
| | Telephone: (937) 222-2500 |
| | Facsimile: (937) 222-6554 |
| | jdyer@ssdlaw.com |
| | jsebaly@ssdlaw.com |
| | kmack@ssdlaw.com |

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 26, 2015, I caused true and correct copies of the foregoing to be filed electronically using the Court's CM/ECF system and to thereby be served upon all registered participants identified in the Notice of Electronic Filing in this matter on this date. This document is available for viewing and downloading on the CM/ECF system.


By: ___*/s/ Gary A. Gotto*_____