# Fish, et al. vs. GreatBanc Trust Company

**Videotaped Deposition of**

**ROBERT REILLY**

**August 28, 2015**





**Robert Reilly**                                    **Fish, et al. vs. GreatBanc Trust Company**

---

**Page 1**

```
1            UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF ILLINOIS

3

4   BONNIE FISH, CHRISTOPHER MINO, )

5   MONICA LEE WOOSLEY, LYNDA D.   )

6   HARDMAN, EVOLVE BANK & TRUST,  )

7   an Arkansas bank and trust     )

8   company,                       )

9         Plaintiffs,     ) Case No.

10  vs.                    ) 1:09-cv-01668

11  GREATBANC TRUST COMPANY, an    )

12  Illinois corporation; MORGAN   )

13  FAMILY FOUNDATION, LEE MORGAN, )

14  ASHA MORGAN MORAN, and CHANDRA )

15  ATTIKEN,                       )

16        Defendants.     )

17

18       VIDEOTAPED DEPOSITION OF ROBERT F. REILLY

19            Chicago, Illinois

20            August 28, 2015

21

22

    Reported By:

23  Donna M. Kazaitis

    CSR, RPR, CLR, CRR

24  IL-CSR No. 084-003145

25  Job No.: 10018085
```

**Page 2**

```
1            UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF ILLINOIS

3

4   BONNIE FISH, CHRISTOPHER MINO, )

5   MONICA LEE WOOSLEY, LYNDA D.   )

6   HARDMAN, EVOLVE BANK & TRUST,  )

7   an Arkansas bank and trust     )

8   company,                       )

9         Plaintiffs,     ) Case No.

10  vs.                    ) 1:09-cv-01668

11  GREATBANC TRUST COMPANY, an    )

12  Illinois corporation; MORGAN   )

13  FAMILY FOUNDATION, LEE MORGAN, )

14  ASHA MORGAN MORAN, and CHANDRA )

15  ATTIKEN,                       )

16        Defendants.     )

17

18      Video-recorded deposition of ROBERT F. REILLY,

19  taken at Willamette Management Associates, 8600

20  West Bryn Mawr Avenue, Chicago, Illinois, before

21  Donna M. Kazaitis, IL-CSR, RPR, CLR, and CRR,

22  commencing at the hour of 9:00 a.m. on Friday,

23  August 28, 2015.

24

25
```

**Page 3**

```
1   APPEARANCES:

2

3   ON BEHALF OF THE PLAINTIFFS AND THE WITNESS:

4

        KELLER ROHRBACK LAW OFFICES

5       BY:  GARY A. GOTTO, ESQ.

            3101 North Central Avenue

6           Suite 1400

            Phoenix, Arizona 85012-2600

7           602.230.6322

            ggotto@kellerrohrback.com

8

9

10  ON BEHALF OF THE DEFENDANTS:

11

        KEATING MUETHING & KLEKAMP PLL

12      BY:  MICHAEL L. SCHEIER, ESQ.

             JACOB D. RHODE, ESQ.

13           One East Fourth Street

             Suite 1400

14           Cincinnati, Ohio 45202-3752

             513.579.6400

15           mscheier@kmklaw.com

             jrhode@kmklaw.com

16

17

18

19  ALSO PRESENT:

20      Aziz J. El-Tahch

        Jesse A. Ultz

21      Gary D. Greenwald (Telephonically)

        James Porter (Legal Videographer)

22

23

24

25
```

**Page 4**

```
1                 INDEX

2                          PAGE

3   ROBERT F. REILLY

4       Examination by Mr. Scheier        6

5

6                EXHIBITS

7                          PAGE

8   Exhibit 821  Engagement letter,       33

                 RFR 00001 - 006

9

    Exhibit 822  Expert report of Robert F.  42

10               Reilly, 4/20/15

11  Exhibit 823  Marilyn Marchetti 3/8/12    54

                 summary, RFR 01103 - 137

12

    Exhibit 824  Rebuttal report of Robert   57

13               F. Reilly, 7/15/15

14  Exhibit 825  7/5/05 e-mail,             165

                 WISER 068339

15

    Exhibit 826  11/1/05 e-mail,            166

16               WISER 103209

17  Exhibit 827  8/3/05 e-mail,             167

                 RFR 00316 - 318

18

19

20           PREVIOUSLY MARKED EXHIBITS

21                         PAGE

22  Exhibit 653  6/13/05 e-mail,           161

                 TAC-CC 0008206 - 216

23

    Exhibit 657  6/3/05 e-mail,            164

24               WISER 068784 - 785

25
```

**Robert Reilly**                                    **Fish, et al. vs. GreatBanc Trust Company**

Page 5

1       THE VIDEOGRAPHER:  The time on the
2   record is 9:00 o'clock a.m.  Today's date is
3   August 28, 2015.  My name is James Porter of
4   Aptus Court Reporting.  The court reporter
5   today is Donna Kazaitis of Aptus Court
6   Reporting located at 600 West Broadway,
7   Suite 300, in San Diego, California.
8           This begins the video-recorded
9   deposition of Robert Reilly testifying in
10  the matter of Fish, et al., versus GreatBanc
11  Trust Company, et al., Case Number
12  09-cv-1688, taken at 8600 West Bryn Mawr
13  Avenue in Chicago, Illinois.
14          The video and audio recordings
15  will take place at all times during this
16  deposition unless all counsel agree to go
17  off the record.  The beginning and end of
18  each video recording will be announced.
19          Will counsel please identify
20  yourselves and state whom you represent.
21      MR. SCHEIER:  My name is Mike
22  Scheier.  I represent the defendants Lee
23  Morgan, Asha Moran, Chandra Attiken, and the
24  Morgan Family Foundation.
25      MR. GOTTO:  Gary Gotto, Keller

Page 6

1   Rohrback, for the plaintiffs and the
2   witness.
3       THE VIDEOGRAPHER:  Please swear in
4   the witness.
5   (Witness sworn.)
6           ROBERT F. REILLY,
7   having been first duly sworn, was examined and
8   testified as follows:
9               EXAMINATION
10  BY MR. SCHEIER:
11      Q.  What's your name?
12      A.  Robert Reilly.
13      Q.  Mr. Reilly, you heard me introduce
14  myself just a moment ago.  My name is Mike Scheier
15  and I represent several of the defendants in this
16  case, Lee Morgan, Asha Moran, Chandra Attiken, and
17  the Morgan Family Foundation.
18          As we proceed today, may I call you
19  "Robert"?
20      A.  Yes, surely.
21      Q.  And if you need to address me for
22  clarification or for any other reason, please feel
23  free to call me "Mike."
24      A.  Thank you.
25      MR. SCHEIER:  Gary, before we

Page 7

1   start, I did want to say that we're going to
2   take Robert's testimony subject to the
3   motion we have pending before the court in
4   regard to his July report and the other
5   reports.
6       MR. GOTTO:  I understand.
7   BY MR. SCHEIER:
8       Q.  You're currently employed with
9   Willamette Management Associates; is that correct?
10      A.  That's correct.
11      Q.  And your title is managing director I
12  understand?
13      A.  Yes.
14      Q.  I had seen the CV you included with
15  your report, and I just wanted to confirm that
16  everything that was in it as of the date you
17  provided the report was accurate with regard to
18  professional and educational background.
19      A.  I believe it is.
20      Q.  Are you familiar with a firm known as
21  Duff & Phelps?
22      A.  Yes, I am.
23      Q.  Are they a competitor with Willamette
24  Management?
25      A.  I would say for many of the services

Page 8

1   we provide, yes, they are.
2       Q.  Have you worked with an individual
3   that at one time was a member of Duff & Phelps,
4   Lee Bloom?
5       A.  Yes.
6       Q.  Were you able through your
7   interactions with Mr. Bloom to form an opinion
8   about his competency?
9       A.  I would say so.
10      Q.  And what is that opinion?
11      A.  I've worked on transactions both on
12  the same side and on the other side as Lee many
13  times over the years and I've always found him to
14  be competent.
15      Q.  And have you had any opportunity to
16  work with him on engagements where Mr. Bloom or
17  Duff was called upon to value the stock of an ESOP
18  company?
19      A.  Yes.
20      Q.  Have you ever heard of Craig Jackson
21  who is with Houlihan Lokey?
22      A.  Yes, I have.
23      Q.  Have you worked with Craig before?
24      A.  I have, and I'm trying to think of
25  when, but yes, I have, and our firm has.

Robert Reilly                                    Fish, et al. vs. GreatBanc Trust Company

Page 9

1    Q.  With enough frequency to form an
2  opinion as to Craig's competency and
3  professionalism, in particular with regard to
4  valuations of ESOP companies?
5    A.  I would say so, in that with regard to
6  both Lee and Craig, while we work with and against
7  Houlihan, work with and against Duff, for those
8  individuals it's always been ESOP related
9  transactions and I've always found Craig to be
10  competent.
11    Q.  I understand that in your position
12  with Willamette Management, as you're doing today,
13  you often give expert testimony in litigation.
14    A.  Yes, sir.
15    Q.  Does your work, at least in the last
16  two or three years, include nonlitigation
17  engagements?
18    A.  Yes.  The overwhelming majority of my
19  work is nonlitigation.
20    Q.  And what percentage of your work would
21  you say in the last let's say three years, and
22  just a ballpark, would be related to nonlitigation
23  or transactional matters?
24    A.  I would say between 80 and 90 percent.
25    Q.  Do you keep time records when you are

Page 10

1  serving as an expert witness in litigation?
2    A.  Yes.
3    Q.  Have you retained time records over
4  the last two or three years for the engagements
5  you've worked on as expert witness in litigation?
6    A.  Yes, I have.
7    Q.  I don't mean to pry unnecessarily into
8  Willamette's business and I'll only have a
9  question, maybe two, and so I apologize in
10  advance, I hope I don't make it uncomfortable.
11  And if you need to make this part of the
12  transcript "Confidential," please let me know.  I
13  don't want to discomfort you in any way.
14    But are you able to tell me as a
15  percentage of Willamette's revenues in the last
16  year how much of it was derived from your
17  litigation related services?
18    A.  Just mine --
19    Q.  Yes, sir.
20    A.  -- or the firm's?
21    Q.  Initially just yours.
22    A.  Oh, I would say that's a really small
23  part.  On average per year maybe five percent of
24  the firm's revenue are my litigation cases.  And
25  I'd say 10, again 10 to 20 percent, depending on

Page 11

1  the year, sometimes we have a particularly big
2  case, of the firm's revenue are litigation related
3  cases.  But I'm going to be a relatively small
4  portion of our forensic practice, and our forensic
5  practice by design is always a very small portion
6  of our overall practice.
7    Q.  And, Robert, when you say "forensic
8  practice," is that just a synonym for the
9  litigation related work that you do?
10    A.  That's right.  CPAs decided some years
11  ago that we get higher billing rates if we call
12  ourselves forensic analysts than litigation
13  support experts.
14    Q.  And I suspect that you then call
15  yourself that so you can get those higher rates?
16    A.  Ever since then I've been a forensic
17  analyst.
18    Q.  Okay.  I understand.  Thank you very
19  much.
20    With respect to in general
21  Willamette's revenues generated from litigation
22  assignments, can you, again just a ballpark, give
23  me a dollar figure let's say in the last year, if
24  you can?
25    A.  Sure.  So I would say year to date, in

Page 12

1  our fiscal year -- well, I probably estimate the
2  last 12 months, approximately our revenue is going
3  to be $18 million let's say in professional fees
4  and 2 to 2 and a half million dollars of that will
5  be litigation related cases.
6    The overwhelming majority, the
7  majority of the revenue will be transaction
8  related, a good portion of the other revenue will
9  be taxation related engagements, and then there
10  will be some financial accounting and corporate
11  planning and those types of engagements.
12    Q.  Which of those nonrevenue type
13  engagements do you principally work on?
14    A.  Well, I try to work on all of the
15  firm's engagements.  So at any point in time or
16  throughout the year my next engagement could be a
17  transfer pricing engagement not related to
18  litigation, it could be a gift and estate tax
19  planning engagement, it could be an ESOP related
20  transaction, it could be a nonESOP related
21  transaction where we're offering a fairness
22  opinion or a solvency opinion.  It could be a
23  purchase price allocation for fair value
24  accounting purposes.
25    So we perform valuation related

**Robert Reilly**                    **Fish, et al. vs. GreatBanc Trust Company**

Page 13

1  services for I often say for a couple of handfuls
2  of different reasons, only one is litigation.  So
3  I would say on average maybe one out of 10 cases I
4  work on is litigation related, and for the firm it
5  may be one out of 20 cases that we work on.
6       Q.  You mentioned nonlitigation ESOP
7  valuation services, Robert.  What percentage of
8  your professional time is spent on nonlitigation
9  transactional related work on ESOP transactions?
10      A.  I would say -- it varies by year
11  because, you know, we could have a number and then
12  we could have one.
13      Q.  That's a good point.  Let's say
14  ballpark the last five years.
15      A.  Sure.  I would say, this is typical,
16  right now I'm working on two ESOP transactions for
17  our clients, and that would be pretty typical.  On
18  average I probably have about two different cases
19  that are either the purchase or sale of one of our
20  ESOP clients.
21          So sometimes more, sometimes less.
22  So for my practice I would say that could be,
23  again, 10 to 20 percent of my time.  For the firm
24  overall, it's probably about that, about 10 to
25  20 percent of the collective time.

Page 14

1       Q.  And what you were just discussing, the
2  10 to 20 percent of yours and the firm's
3  collective time on ESOP related transactions, are
4  those typically valuation engagements?
5       A.  Indirectly.  I mean the typical work
6  product is a fairness opinion.  So right now we
7  have one case, one client, who we have performed
8  annual valuations for for many years who has
9  received an unsolicited tender offer, so we're
10 evaluating that.  We'll ultimately be asked to
11 either issue or not issue a fairness opinion.  And
12 obviously a valuation is one step of that.
13         We have another client, a large
14 grocery store, grocery store chain, that is
15 thinking about going from a minority ESOP to a
16 100 percent owned ESOP.  So, again, ultimately our
17 work product will be a fairness opinion, but
18 obviously a valuation would be a component of
19 that.
20      Q.  In the 100 percent ESOP transaction
21 you just mentioned, who are you representing?  Who
22 is your client in that particular matter?
23      A.  The ESOP trustee, the current ESOP
24 trustee.
25      Q.  Are you familiar with the party plan

Page 15

1  method of direct selling?
2       A.  Pretty much.  I've worked on
3  engagements over the years for Mary Kay, for Avon,
4  for a couple of other direct selling companies.
5  So I've seen that before.
6       Q.  When did you work on a Mary Kay
7  engagement?
8       A.  That was, I'm pretty sure it was more
9  than five years ago, but it was certainly less
10 than 10.  It was an employee dispute.  There was
11 an employee that owned a block of stock who had
12 been terminated and then the question was what was
13 the value of that stock that was being purchased
14 back by the Mary Kay Company.
15      Q.  Other than that -- I think you did
16 mention one other company that --
17      A.  Well, I was thinking of Avon --
18      Q.  Okay.
19      A.  -- just because those are recognizable
20 names.  We've worked for a lot of smaller
21 companies, but those are names that people think
22 of when they think of direct selling, having a
23 party in your house and demonstrating products.
24      Q.  And when you refer now to the party
25 and selling products in the home, do you

Page 16

1  understand that to be the party plan method of
2  direct selling?
3       A.  Yes.
4       Q.  What did you do for Avon?
5       A.  Avon was a while ago.  It's got to be,
6  I want to say at least 10 years ago, maybe about
7  10 years ago.  That was -- that wasn't a
8  litigation related, it was a transaction.  And I
9  just don't recall if they were -- it was a foreign
10 transaction.  They were either buying or selling
11 an international subsidiary because I remember we
12 had to travel for that.  But it was a transaction
13 where we had to give an opinion.  So it wasn't a,
14 it was not a litigation case.
15      Q.  What type of opinion were you asked to
16 give in that case, or in that transaction I should
17 say?
18      A.  It would be a fairness opinion that
19 they wanted some independent confirmation that the
20 transaction price was fair.
21      Q.  They were the buyer?
22      A.  I believe in that case I want to say
23 they were the seller, and the concern was the
24 board, or the legal -- the special counsel to the
25 special committee of the board's concern was they

**Robert Reilly**                    Fish, et al. vs. GreatBanc Trust Company

Page 17

1  didn't want any stockholder to allege afterwards
2  that they had sold off their subsidiary at less
3  than a fair market value price.
4      **Q.  Was the subsidiary in a business that**
5  **marketed its products through a party plan?**
6      A.  Yes.  It had been a business that they
7  had.  It was their Avon business that they just
8  decided to spin off.  They didn't want to continue
9  operating in that country.
10     **Q.  Did they directly market the product**
11 **to the end consumer using independent contractor**
12 **consultants in the overseas, I'm talking about**
13 **solely the overseas subsidiary that was subject to**
14 **the transaction?**
15     A.  Yes, exactly.
16     **Q.  And did you come to learn in this case**
17 **that the Creative Memories division of Antioch was**
18 **also a party plan, that also used the party plan**
19 **method of selling to market its products to the**
20 **end user?**
21     A.  Yes, I agree with that.  And they
22 have, for the most part, independent contractors
23 as opposed to employed salespeople.
24     **Q.  Other than the Avon engagement and the**
25 **Mary Kay engagement, can you identify any other**

Page 18

1  **clients of Willamette over the last five to 10**
2  **years let's say who marketed their products to the**
3  **end user through a party plan method of sales?**
4      A.  I can't think of any.  I could look
5  up that.  I just can't think of any.  I mentioned
6  those just because those are household name type
7  companies.
8          I'm pretty sure we performed work
9  for other similar companies.  I just can't think
10 of any other names right now.
11     **Q.  Can you think of the type of work you**
12 **performed for them?**
13     A.  Well, you know, it would be pretty
14 typical.  Our cases are either transaction, so
15 they're fairness opinions.  It's some type of
16 litigation, so some type of damages analysis.
17 Very often we're performing a purchase price
18 allocation.  That's a common assignment for us.
19 It could be the valuation of a division or
20 subsidiary that's either being purchased or sold.
21     **Q.  You just don't remember one way or the**
22 **other on these smaller engagements that you're**
23 **kind of trying to dredge your memory now to see if**
24 **you can recall.**
25     A.  Right, exactly.

Page 19

1      **Q.  Okay.  On the Mary Kay, I'm sorry, can**
2  **you tell me whether that was a fairness opinion**
3  **engagement -- oh, no, I'm sorry.  That was the**
4  **employee who was having, there was an employee**
5  **dispute and you were called in to do a stock**
6  **valuation.**
7      A.  That's right.  It never went -- it was
8  threatened litigation.  I don't think it even went
9  to deposition.  It certainly never went to trial.
10 But we were asked by the company to value this
11 block of stock.
12         It was one of these cases, which I
13 guess lawyers probably see more often than we do,
14 where an executive had a block of stock and when
15 she -- it was a she -- she left, it was going to
16 be purchased back at some term like fair value or
17 fair market value, some unidentified term in the
18 contract.
19         The employee leaves.  Of course she
20 thinks the stock is worth $100 million.  The
21 company thinks it's worth $10 million.  Both sides
22 hire valuation analysts and we both issued
23 reports, and after a while the case settled.
24     **Q.  Yes.  Did the fairness opinion or**
25 **stock valuation rather that you were called upon**

Page 20

1  **to do in that case require you to look at the**
2  **company's historical and projected sales in**
3  **conjunction with determining the value of the**
4  **stock?**
5      A.  Yes.
6      **Q.  Both Mary Kay and Avon are private**
7  **companies as opposed to companies whose stock is**
8  **sold in public markets?**
9      A.  At the time, I think they still are,
10 at the time Avon was public.  And Mary Kay was and
11 is private.
12     **Q.  Have you ever been engaged by a**
13 **company in a market similar to Creative Memories,**
14 **meaning scrapbooking services?**
15     A.  I don't believe so.
16     **Q.  How about engagements with direct**
17 **selling organizations who are in whole or in part**
18 **owned by an ESOP?**
19     A.  I may have.  I can't think of any
20 right now.
21     **Q.  In either your Avon or Mary Kay**
22 **engagement or any of the smaller engagements that**
23 **you can't recall specifically right now, were you**
24 **ever called upon to analyze direct selling**
25 **organization specific KOIs?**

**Robert Reilly**                                          **Fish, et al. vs. GreatBanc Trust Company**

Page 21

1    A.  Well, not really to analyze that
2  separately.  I mean typically every company that
3  we work for has their own set of what they would
4  consider key indicators.  We're provided with that
5  and we perform due diligence of that and we
6  compare those key indicators for that company, for
7  that industry, to other companies in the industry,
8  to industry averages, to that company historically
9  and to that company's projections of their key
10  indicators.
11         So we often look at key indicators.
12  We're not asked to really opine on the key
13  indicators.  What we're asked to do is opine on
14  value.  But typically if there's an indicator of
15  some operational or financial metric that's
16  important to the company, it's probably important
17  to the valuation.
18    **Q.  Do you recall ever analyzing KOI in**
19  **either of your direct selling organization**
20  **assignments that related to consultant or**
21  **independent contractor productivity?**
22    A.  Well, I would say yes, but not only in
23  that context.  I mean when you think about it,
24  sales per salesperson, whether they're independent
25  contractors or employee salespeople, is just a

Page 22

1  really common metric.  In just about, I won't say
2  every case, but in every case that's a marketing
3  type organization.  And including professional
4  services firm like yours or mine, we're going to
5  analyze some measure, some metric, of sales or
6  revenue per salesperson.
7    **Q.  And you had understood that to be the**
8  **productivity metric that Creative Memories had**
9  **tracked for several years while it was operating**
10  **as a direct selling organization?**
11    A.  Yes.
12    **Q.  And you, in fact, looked at that**
13  **metric as part of the report that you delivered in**
14  **this case; correct?**
15    A.  Yes, I did.
16    **Q.  In your prior engagements with Mary**
17  **Kay, Avon, or some of the smaller engagements that**
18  **you mentioned that you don't specifically recall,**
19  **had you been given an opportunity to analyze**
20  **consultant activity rates, as you understand that**
21  **term?**
22    A.  Yes.  And, again, it's not just
23  related to party plan direct selling companies --
24    **Q.  I do get that.  I'm asking though**
25  **about in your party planning engagements.**

Page 23

1    A.  Sure.
2    **Q.  So I apologize for cutting you off.  I**
3  **just wanted to be sure that you understand the**
4  **scope of the question.**
5    A.  I would say yes in those cases, and,
6  again, in almost every engagement where it's
7  really a marketing oriented company we're going to
8  look at, particularly if they're outside
9  contractors versus employees, what percentage of
10  contractors of the salesforce sold this month
11  versus didn't sell this month, what number of
12  units they sold, what amount of gross and net
13  sales they sold.  So those are really common
14  metrics.
15    **Q.  Did you need to look at consultant**
16  **activity rates in your Mary Kay engagement in**
17  **determining the value of the stock that the**
18  **employee was tendering to the company upon his or**
19  **her resignation, just to the best of your**
20  **recollection?**
21    A.  We had that data.  When you say did we
22  look at it, I'm sure we looked at it because we
23  had that information.
24    **Q.  Well, I'm asking if you analyzed it as**
25  **part of your valuation of the stock that was at**

Page 24

1  issue in that particular engagement.
2    A.  My -- and, again, this goes back a
3  number of years.
4    **Q.  More than 10 years?**
5    A.  No, but more than five, I would say
6  five to 10.
7    **Q.  Okay.**
8    A.  I would say that's one of the factors
9  we considered, but we considered it within the
10  context of, and I'm saying I considered it, within
11  the context of a due diligence on the financial
12  projections that we received.
13    **Q.  I'm not sure I follow.**
14         **Did you use it, for example, we're**
15  **now talking about consultant productivity, as a**
16  **metric to value the shares at issue in the Mary**
17  **Kay dispute?**
18    A.  Not directly.
19    **Q.  Did you use it to value the shares in**
20  **coming up with your fairness opinion in regard to**
21  **the Avon foreign subsidiary spinoff?**
22    A.  Not directly.
23         Again, what I'm using it for is to
24  assess the reasonableness of a set of financial
25  projections that management provided to us.

**Robert Reilly**　　　　　　　　　　　　　　　　**Fish, et al. vs. GreatBanc Trust Company**

Page 25

1　　Q.　What about consultant attrition, do
2　you recognize that as a KOI in a direct selling
3　organization?
4　　　A.　For most companies, yes.
5　　Q.　Okay.  In your experience looking
6　at -- KOI is from direct selling organizations,
7　again, you referenced Mary Kay and Avon.  Did you
8　ever recognize a relationship between national or
9　regional unemployment rates and increases or
10　decreases in the number of consultants or
11　independent contractors that throw parties for
12　purposes of selling a product directly to the end
13　consumer?
14　　　A.　Well, there is a relationship.
15　　Q.　What is that relationship?
16　　　A.　It's an inverse relationship.  But
17　we -- maybe I'm jumping ahead to your next
18　question.  We didn't use it directly as a
19　valuation metric.  But there is an inverse
20　relationship as unemployment rates increase, then
21　people switch from being employees because they
22　are unemployed to becoming consultants and selling
23　products as, you know, through all types of home
24　demonstration and similar party plans.
25　　Q.　Did you in preparing your report in

Page 26

1　this case analyze Antioch's or Creative Memories'
2　consultant count as it was increasing or
3　decreasing relative to regional or national
4　unemployment rates?
5　　　A.　Not specifically.
6　　Q.　Is that a no, you did not or you did?
7　　　A.　I guess I would say no.  I just don't
8　remember looking at that specifically.
9　　Q.　Have you or folks at your direction at
10　Willamette ever run a discounted cash flow
11　analysis with regard to a company that sells its
12　products through a direct selling or party plan
13　method?
14　　　A.　Yes.  That would probably be the most
15　common valuation method we would use.
16　　Q.　And what engagements did you run a DCF
17　other than this litigation related engagement for
18　a party plan direct selling organization, which I
19　guess would be either Avon or Mary Kay?
20　　　A.　Well, certainly for those and any
21　other cases that I've worked on, it would
22　certainly more likely than not, it would be the
23　exception not to perform an income approach and it
24　would be the exception within the income approach
25　not to perform a discounted cash flow valuation

Page 27

1　method.
2　　Q.　In the several publications that I saw
3　in your CV, I didn't think I saw one that related
4　to direct selling organizations or party plan.
5　Did I miss something or; is that right?
6　　　A.　I think that's correct.  I don't
7　recall ever writing anything specifically about
8　that.
9　　Q.　Just moving topics, Robert.  Do you
10　recall serving as an expert witness in litigation
11　several years ago where you were adverse to Gary
12　Greenwald?
13　　　A.　Well, I would say I wasn't adverse to
14　Gary Greenwald.  He was the opposing counsel --
15　　Q.　Okay, fair enough.
16　　　A.　-- on a case, on an ESOP related case,
17　for the Tharaldson Motels, Inc. ESOP.
18　　Q.　Do you recall seeing papers submitted
19　in the case where Mr. Greenwald argued that your
20　opinions are based upon reasoning and methodology
21　which lacked the necessary intellectual rigor,
22　testing, peer-reviewed publication, and general
23　acceptance in the ESOP valuation community?
24　　　A.　I don't recall seeing those.  But I
25　would put that description you just gave me in

Page 28

1　every sentence that starts with opposing counsel.
2　So that's the job of opposing counsel, to make
3　those assertions.
4　　Q.　So is it your experience that in all
5　cases where you served as an expert witness,
6　opposing counsel submits briefs that say your
7　methodologies were not reliable?
8　　　A.　I think it's pretty common in the
9　cases I work on and the cases I've seen that we as
10　Willamette don't work on that counsel on both
11　sides make Daubert challenges for the experts on
12　the other side.
13　　　　I mean in the last certainly five
14　or 10 years, that's been more common than not in
15　my experience.
16　　Q.　Do you know how the court ultimately
17　ruled on Mr. Greenwald's motion to exclude your
18　opinions in that case?
19　　　A.　No, I don't specifically.  I know I
20　did testify, so I assume the court didn't
21　reject -- well, I know the court didn't reject me
22　because they allowed me to testify.  So I don't
23　know exactly what the legal exchange was.
24　　Q.　In your experience have you ever had a
25　court exclude your opinion or your testimony from

**Robert Reilly**                                    **Fish, et al. vs. GreatBanc Trust Company**

Page 29

1  trial?
2      A.  Not that I'm aware of, no.
3      Q.  Have you ever based on your
4  recollection been in a case where a federal or
5  state court did not qualify you as an expert
6  witness?
7      A.  No.  I don't believe so.
8      Q.  Before this case had you ever worked
9  for or against a party represented by Jim Dyer?
10     A.  I don't believe so.
11     Q.  In this particular engagement with
12 regard to Creative Memories and the Antioch
13 Company, was your principal attorney contact
14 Mr. Greenwald?
15     A.  I'd agree with the phrase "principal
16 contact," but my recollection was, and we've
17 worked on this case, as you know, for six years,
18 almost every call that Greenwald was on Dyer was
19 also on.  So I got the impression they worked as a
20 team.
21     Q.  Prior to this case, had you ever
22 worked with Richard Weinstock before?
23     A.  No.
24     Q.  And prior to this particular
25 engagement, had you ever worked with Mr. Buchanan

Page 30

1  before?
2      A.  No.  I worked with Weinstock's firm.
3  I mean not worked with.  We received over the
4  years a lot of ESOP repurchase obligation studies
5  from Weinstock's firm.  But I had never worked
6  with him directly until this case.
7      Q.  And who did you work with at his firm?
8      A.  Ted Israel.
9      Q.  Ted Israel?
10     A.  Yes.  I think that's his name.  I mean
11 that's my recollection.
12     Q.  Did you come to understand that
13 Mr. Israel has an expertise in analyzing ESOP
14 companies repurchase obligations?
15     A.  I guess I would say that was my
16 understanding.  We've received their reports in
17 the normal course of valuing employer corporation
18 stock.  Not always, but typically we're going to
19 ask for a repurchase obligation study and we
20 receive it from a lot of different actuarial
21 providers but often from Weinstock's firm.
22     Q.  So in those cases Weinstock and that
23 firm were not doing repurchase obligation studies
24 for the sponsor company or the trustee, they were
25 doing it at your direction?

Page 31

1      A.  Well, certainly not at our direction.
2  What we would do is we would ask the, either the
3  trustee or the sponsor company for a repurchase
4  obligation study, if there was not one that was
5  performed internally or if there was not one that
6  was performed externally for a couple of years and
7  it was a mature ESOP.  I mean if it's a brand new
8  ESOP, it may or may not be as important.  But if
9  it's a mature ESOP, we'd ask for a repurchase
10 obligation study, and then it's up to the company
11 to decide who they hire and we just look at the
12 report and bake that into our valuation.
13     Q.  I see.  So when you would receive
14 repurchase obligation studies over the many years
15 of your engagements, occasionally a company or a
16 trustee would engage Ted Israel and you would then
17 receive the report through that means?
18     A.  That's correct.
19     Q.  My understanding, Robert, is that
20 you're engaged to give opinions on behalf of the
21 plaintiffs in this case.  Is that your
22 understanding?
23     A.  I believe that's correct, yes.
24     Q.  All right.  And I also have come to
25 understand that you, in fact, have formulated

Page 32

1  several opinions that you, on behalf of plaintiffs
2  in this case?
3      A.  Yes, sir.
4      Q.  I've also received from Mr. Gotto and
5  his colleagues two reports from you, one in April
6  and one in July.  I presume you prepared those two
7  reports?
8      A.  Yes, I did.
9      Q.  Are all of the opinions you intend to
10 give in this case contained in those two reports?
11     A.  As of now, unless something new comes
12 up after today.  But I mean those really are my
13 opinions.
14     Q.  And when you say "unless something new
15 comes up after today," what do you have in mind?
16     A.  Well, unless there's a new expert
17 report that your side produces that I'm asked to
18 respond to.  But after today I'm not planning to
19 do any additional work or conclude any additional
20 opinions.  As far as I'm concerned, I'm finished
21 now.
22     Q.  Okay.  And the only exception you
23 leave yourself would be if counsel asked you to do
24 further work for one reason or another?
25     A.  Yes, I mean exactly right.

**Robert Reilly**                    **Fish, et al. vs. GreatBanc Trust Company**

Page 33

1     Now, it may be counsel asks me
2  directly or indirectly.  I mean if you ask me what
3  would happen if one of your analyses changed from
4  X to Y and I say well, it's going to take me a
5  couple days and counsel says let's perform that
6  analyses in response to your request, I'm
7  certainly willing to do that.  But I'm not
8  planning on doing any more work until somebody
9  asks me to do more work.
10        (Deposition Exhibit 821 was marked
11        for identification.)
12  BY MR. SCHEIER:
13     Q.  Robert, Donna has been kind enough to
14  hand you Exhibit 821.  And if you would just
15  please confirm after flipping through the few
16  pages -- and they're double sided you'll notice --
17  that this is, in fact, the engagement letter
18  between Willamette Management Associates and in
19  this case it appears to be signed by Mr. Greenwald
20  as plaintiffs' counsel?  (Document tendered to the
21  witness.)
22     A.  Yes, it is.  We had sent the
23  engagement letter to Mr. Dyer, but ultimately it
24  came back signed by Mr. Greenwald.
25     Q.  I was going to ask you about that, but

Page 34

1  I appreciate that clarification, so I don't need
2  to ask you about it.
3        Now, I don't have very many
4  questions on this exhibit at all.  The questions I
5  do though have relate to some remarks on Page 2 of
6  Exhibit 821.
7     A.  Yes.
8     Q.  Specifically, Robert, if you'd please
9  turn your attention to the paragraphs under
10  "Purpose and Objectives of the Analysis" --
11     A.  Yes.
12     Q.  -- at the top.  There are three
13  numbered paragraphs that follow that bold point
14  heading.  The first one says that the objectives
15  of our analysis are threefold, the first being to
16  estimate fair market value of the Antioch common
17  stock just prior to the December 16, 2003 stock
18  purchase transaction.
19        Did I read that correctly?
20     A.  Yes.
21     Q.  And, in fact, in general, and we'll
22  talk about it more a little bit later, you
23  undertook such an analysis; correct?
24     A.  Yes.  And it really was --
25  effectively, I think the three objectives were

Page 35

1  reversed.  I really performed the before and after
2  valuations within the context of reviewing the
3  Duff & Phelps report, but ultimately I think I
4  performed all three objectives.
5     Q.  Yeah, I didn't ask you that, but I
6  appreciate that clarification.  I was just
7  wondering if you had performed the first
8  objective.
9        The reason I asked, Robert, is I
10  was unclear what you meant by "fair market value."
11  Can you please explain that to the court?
12     A.  Sure.  It's the typic ESOP ERISA IRS
13  definition, willing buyer, willing seller.
14     Q.  I had seen some references to
15  something called the fair value standard.  Are you
16  familiar with that?
17     A.  Yes, yes.
18     Q.  How does that differ from the fair
19  market value standard?
20     A.  Well, there are actually -- that's
21  easier asked than answered because there are two
22  different fair value standards.  Well, there are
23  two different categories of fair value standards.
24        The fair value is the standard of
25  value that analysts use for GAAP compliance

Page 36

1  purposes.  So it's defined by ASC accounting
2  standards codification 820 and has a number of
3  provisions in it that make it different in some
4  cases, not always, but often different than fair
5  market value.  So there is the accounting fair
6  value.
7        Then there is the statutory fair
8  value that would apply in dissenting shareholder
9  appraisal rights cases and shareholder oppression
10  claims cases under state statutes.  Those
11  definitions are generally consistent state by
12  state but often have some inconsistencies between
13  states.  So you really have to look at the
14  statutes of that state to see what the definition
15  of "fair value" is for that specific legal
16  purpose.
17     Q.  Well, in general with regard to fair
18  value, what methodologies would you use, again, a
19  very general sense, in valuing stock using a fair
20  value standard that differ from valuing a stock
21  under a fair market value standard?
22     A.  Sure.  And I would say for all fair
23  values on one hand fair market value on the other,
24  the approaches and methods are going to be the
25  same.  You're going to have an income approach, a

**Page 33..36**

**Robert Reilly**                    **Fish, et al. vs. GreatBanc Trust Company**

Page 37

1  market approach, and an asset based approach,
2  you're going to have two or three methods under
3  each of those approaches.
4        So the approaches and methods will
5  be the same.  It's not until you get down to the
6  third category of things you do which are called
7  procedures.  The procedures will be different and
8  they'll be different depending upon which fair
9  value standard would be applicable to the
10  assignment.
11      **Q.  Well, let's talk then initially about**
12  **the accounting fair value standard.**
13      **What procedures would be different**
14  **in the general analysis in valuing a stock under a**
15  **fair value standard as opposed to valuing the**
16  **stock under a fair market value standard?**
17      A.  Sure.  Effectively the definition of
18  fair market value is a hypothetical willing buyer
19  and a hypothetical willing seller both who are
20  unidentified.  So that's a market value.  In fact,
21  that's why the term "market" is in the definition.
22        The one word that's not in the term
23  fair value is "market."  So we're really not
24  looking for a market value because under fair
25  value it's the price that the current owner would

Page 38

1  pay to a seller.  So now we have one of the
2  parties identified.
3        So we're looking at what's called,
4  under GAAP, an exit price, what would the current
5  owner pay, or accept, and what would the next
6  owner pay to the current owner.
7        So the individual valuation
8  variables are going to be more specific to the
9  current owner in a fair value case than they would
10  be in a fair market value case.
11        In a fair market value case, I'm
12  going to look at market derived discount rates,
13  capitalization rates, tax rates, and any other
14  specific valuation variable you can think of.
15        In a fair value for GAAP compliance
16  purposes, I'm going to look at the discount rates,
17  capitalization rates, tax rates, et cetera, of the
18  current company.
19      **Q.  And you're not doing that in a fair**
20  **market value analysis.**
21      A.  That's correct.
22      **Q.  Okay.**
23      A.  You know, I can go through different
24  examples, but basically it's the difference
25  between an unidentified willing buyer and willing

Page 39

1  seller and in a case where you know who the seller
2  is, it's the current company, and then you simply
3  have to come up with a category or a class of
4  typical willing buyers.
5      **Q.  And would that put Antioch in that**
6  **sort of category where you knew the seller, in**
7  **this case it would be the sponsor company, and you**
8  **would know a category of buyers, in that case the**
9  **employees, the ESOP participants, where you could**
10  **run a fair value analysis, for example, as opposed**
11  **to a fair market value analysis on the Antioch**
12  **stock?**
13      A.  That's correct.
14      **Q.  Okay.**
15      A.  You could do that.
16      **Q.  Okay, great.**
17        **What, Robert, would you have done**
18  **differently in your report in valuing Antioch's**
19  **stock prior to the transaction in a fair value**
20  **analysis as opposed to what I understand you did**
21  **which was a fair market value analysis?**
22      A.  I don't know specifically.  I mean I
23  just haven't thought about it.
24      **Q.  Okay.  Is it fair to say then that you**
25  **don't know one way or the other whether a fair**

Page 40

1  **value analysis of Antioch's shares would have**
2  **yielded a different value conclusion than you**
3  **reached using the fair market value analysis?**
4      A.  I can't tell you in this case it
5  would.  I can tell you typically it does.
6        We are often asked to perform, for
7  ESOP sponsored companies, fair market value
8  valuations and fair value valuations of the same
9  company on the same date.
10        And the reason for that is, as you
11  know, the DOL and the IRS require fair market
12  value valuations.  Audited financial statements
13  and most plans have audited financial statements
14  audited in compliance with GAAS, and they have to
15  be presented in compliance with GAAP.  The plan
16  has to represent or present the sponsor company
17  value at fair value for GAAP compliance purposes.
18        So not every client but some
19  clients will ask for both a fair value and a fair
20  market value.  Sometimes fair value is higher,
21  sometimes it's lower.  It's often different.
22      **Q.  And is it sometimes equal to fair**
23  **market value?**
24      A.  It could be.
25      **Q.  Okay.  Thank you.**

Page 37..40

**Robert Reilly**                              **Fish, et al. vs. GreatBanc Trust Company**

Page 41

1      **What would you have done**
2   **differently in valuing Antioch's shares at fair**
3   **value than you did at valuing Antioch's shares at**
4   **fair market value, to the extent you know?**
5       A.   I don't know.  I mean I really just
6   haven't thought about that at all.  In this case I
7   really started with the Duff & Phelps fair market
8   value valuation and looked at what would I do
9   differently to adjust their fair market value
10  valuation.
11          So there was never, that I saw, a
12  fair value valuation on the table for me to
13  adjust.  So I just never gave it any thought at
14  all.
15      **Q.   Let's move to the meat of the matter,**
16  **and that is initially your April 2015 report.  I**
17  **have bound a copy for you.  I hope that makes it**
18  **easy for you to look through.  That was my intent.**
19      A.   Okay.
20      **Q.   You don't mind using the copy I'm**
21  **going to present you now?**
22      A.   No, whatever you want.
23      **Q.   Okay, great.  So I'm going to mark it**
24  **by putting the --**
25          MR. SCHEIER:  I guess, Gary, should

Page 42

1   I put the exhibit number on the front of the
2   binder or the front of the report.  I didn't
3   think about that before I bound it.
4           MR. GOTTO:  Well, I guess we put it
5   -- how would the court reporter deal with
6   it?
7           MR. SCHEIER:  What do you think?
8           THE REPORTER:  I would say on the
9   front.
10          MR. SCHEIER:  Okay, done.
11          (Deposition Exhibit 822 was marked
12           for identification.)
13  BY MR. SCHEIER:
14      **Q.   I'm handing you what's been marked as**
15  **Exhibit 822.  And just initially if you would**
16  **identify that for the record as the report you**
17  **tendered in this case dated April 20, 2015?**
18  (Document tendered to the witness.)
19      A.   Yes.  This is my April expert report.
20      **Q.   Thank you.  Did you draft the entire**
21  **report?**
22      A.   Yes, I did.
23      **Q.   Did anyone at Willamette assist you in**
24  **drafting portions of the report?**
25      A.   I would say in terms of typing, the

Page 43

1   manager who worked on the case with me, Kevin
2   Zanni, typed parts of this and prepared the
3   exhibits for me.  I am a terribly slow one-finger
4   typist but I do my best.
5           So there are sections that Kevin
6   and I sat down and discussed almost verbatim and
7   then I asked him to actually sit down and type
8   just because he's so much faster than I am.  But
9   in terms of the actual language, I developed all
10  of the language.  Of course, I take responsibility
11  for every word and every number in the report.
12      **Q.   Okay.  Thank you.  That's helpful.**
13          **You also mentioned that Kevin Zanni**
14  **prepared the exhibits.  Can you describe that**
15  **process a little bit, please, Robert?**
16      A.   Sure.  In each case -- and it's the
17  exhibits that start on Page 66 and I think it's
18  Exhibits 1 through 22.  In each case I told Kevin
19  exactly what I wanted on each exhibit and he
20  prepared a draft for me and I reviewed it, and any
21  single number at all that I wanted to change I
22  would have changed it.  But, again, since the
23  exhibits are primarily, if not exclusively, in
24  Excel, and he's just a faster typist than I am, it
25  was easier for him to prepare the exhibits than it

Page 44

1   was for me.
2           But, again, I take full
3   responsibility for deciding what goes on the
4   exhibit and what the analysis does and certainly
5   what the conclusion is.
6       **Q.   I take it from your answer though, I**
7   **need to ask it, that none of the attorneys who**
8   **engaged you drafted any portion of the report?**
9       A.   No.  They did not.
10      **Q.   Did any of the attorneys who engaged**
11  **you edit any portion of the report?**
12      A.   I wouldn't say "edit" in that they
13  made any changes.  There may have been one or two
14  others.  I can only think of one suggestion that
15  they made to add an additional description here or
16  there, and I wasn't opposed to that so I added an
17  additional description here or there.
18      **Q.   And was that basically issues of a**
19  **factual nature?**
20      A.   It was supplemental support I guess
21  where they -- in fact, I have to recall now
22  whether it was the original report or the rebuttal
23  report, but there was a suggestion from
24  Mr. Greenwald that --
25          MR. GOTTO:  I'm going to interrupt

**Robert Reilly**                                   **Fish, et al. vs. GreatBanc Trust Company**

Page 45

1   you here.  I just want to be sure we're
2   confining ourselves to the Rule 26(b) for
3   categories of properly discoverable
4   communications.
5          I'll admonish the witness that
6   it's limited to communications with respect
7   to your compensation, with respect to any
8   factual information provided to you by
9   counsel, or with respect to any assumptions
10  provided to you by counsel.
11         If that's fair, I think that's a
12  fair characterization of the rule.
13       MR. SCHEIER:  I think, Gary, my
14  only issue would be if Mr. Reilly's
15  testimony is going to be that Mr. Greenwald
16  directed him to actually draft a portion of
17  the report in a certain way, I believe I'm
18  entitled to explore that.
19       MR. GOTTO:  Well, I would say that
20  my understanding is it's within the confines
21  of the rule.  If it was a direction through
22  providing factual matters or providing
23  assumptions, surely.  And maybe it's
24  theoretical -- if you can answer the
25  question subject to that admonishment --

Page 46

1        MR. SCHEIER:  I hear your
2   instruction.
3        MR. GOTTO:  -- let's see where it
4   goes from there.
5        MR. SCHEIER:  Fair enough.
6        THE WITNESS:  Maybe this might.  It
7   wasn't to draft the narrative.  It was a
8   request could you add a couple more
9   citations here, and I said yes, give me a
10  couple of days and I'll add a couple more
11  citations.
12  BY MR. SCHEIER:
13      Q.  Did Mr. Weinstock or Mr. Buchanan
14  receive drafts of your report before it was
15  delivered to the defendants --
16      A.  I don't believe --
17      Q.  -- to the best of your knowledge?
18      A.  I don't believe so.  I know I didn't
19  send them drafts.  So unless legal counsel did, I
20  did not.
21      Q.  To the best of your recollection, you
22  didn't ask them to review portions of your report
23  where you relied on either Mr. Weinstock's or
24  Mr. Buchanan's analyses?
25      A.  That's correct.

Page 47

1       Q.  Did you review their reports or drafts
2   of their reports in conjunction with your reliance
3   on their studies for purposes of your report?
4       A.  I wouldn't say that I reviewed drafts
5   of their reports.  I did receive in both cases the
6   exhibits ahead of the narrative report just so I
7   had an extra couple of days to start baking their
8   numbers into my numbers.
9          But I wasn't asked to review,
10  comment, critique.  I was just told these are the
11  exhibits that will go into my report for FTI or
12  for Weinstock and you'll get the full narrative
13  report a week from now.
14      Q.  And did you receive the full narrative
15  report of Weinstock and Buchanan prior to
16  finalizing your draft report?
17      A.  Yes, I.
18      Q.  Did your review of their narrative
19  reports cause you to change any aspect of your
20  report that's Exhibit 822, the April 2015 report?
21      A.  No.  I don't believe so.
22      Q.  Robert, if you'd be so kind, can you
23  please, I see your binder is untabbed, but I'm
24  going to ask you to turn to your Appendix I.
25  Which maybe it'll make it easier, it's the very

Page 48

1   last appendix.  So it's probably just the last few
2   pages.
3          I probably should have tabbed it
4   for you.  I apologize about that.  Are you there?
5       A.  I'm there.
6       Q.  Great.  If you could take a moment and
7   flip through the few pages, the question is going
8   to be whether it's a complete list of the material
9   that you relied on in undertaking the analysis in
10  your report and in forming the opinions that are
11  contained in the report.
12      A.  I would say it is.  The only thing --
13  and I've reviewed the report a few days ago in
14  preparation for the deposition.  The only thing
15  that I saw that was missing here that isn't in my
16  final workpaper file, in the final workpaper file
17  there are three depositions that I did rely upon.
18  Here I think I only mentioned two.  I don't think
19  I mentioned the Attiken deposition.
20      Q.  Chandra Attiken's deposition?
21      A.  Yes.  But that is in my final
22  workpaper file as a document that I relied upon.
23  I didn't specifically quote it in my report, so
24  that may be why I inadvertently left it off this
25  list.

Robert Reilly                                    Fish, et al. vs. GreatBanc Trust Company

Page 49

1    But this list really was intended
2    to represent the -- of all the documents I looked
3    at, this was the subset of documents that I
4    selected as documents I'm going to rely upon and
5    that set of documents included three depositions,
6    I think I only mentioned the Hoskins deposition
7    and the Marchetti deposition, but the workpapers
8    do include the Attiken deposition as well.
9        **Q.  Actually, so we're clear, Robert, and
10   I might have missed something, I saw that you had
11   relied upon several exhibits from Mr. Hoskins'
12   deposition but I did not see that you relied upon
13   his testimony or that you had read his deposition.
14   So could you clarify that for me, please?**
15       A.  I did.  And I noticed that a few days
16   ago.  I could have been certainly more clear.
17       I had said separate -- and it's
18   simply a matter of actually the way I prepared
19   this exhibit.  These are separate manila file
20   folders in a set of bankers boxes.  But I did read
21   his entire deposition, and I did rely on his
22   entire deposition.
23       **Q.  Mr. Hoskins was deposed, believe it or
24   not, three separate times in the case.  Do you
25   have any recollection which of his three**

Page 50

1    **depositions you read?  Maybe it's the one to which
2    the exhibits you list here is associated?**
3        A.  I'm pretty sure I received all three
4    days.  I recall two.  As I'm sitting here, I only
5    recall --
6        **Q.  I just want to be clear.  There wasn't
7    three days of depositions.  There were three
8    separate depositions at different points in time.**
9        A.  Yeah.
10       **Q.  Okay.**
11       A.  And I recall -- if you had asked me, I
12   would have said two, but I think I did receive all
13   three.
14       **Q.  And did you review the entire
15   transcript of all three?**
16       A.  Yes, I did.
17       **Q.  And did you -- again, is that an
18   omission from the materials you relied upon in
19   Exhibit I?**
20       A.  Yes.  I certainly intended to mean
21   when I reference his exhibits I merely simply
22   should have said the Hoskins depositions and all
23   of the exhibits.  These are the ones that I had
24   set up separate manila file folders for, but
25   there's really nothing special about these

Page 51

1    exhibits compared to the rest of the depositions.
2        **Q.  And I thought you might have
3    mentioned, Robert, another deposition you relied
4    upon that you inadvertently omitted from Exhibit
5    I?**
6        A.  I think it's in here.  It's the
7    Marchetti deposition.
8        **Q.  Oh, yes.  I did have a question about
9    that.**
10       **What I saw produced in your
11   production was a summary of Ms. Marchetti's
12   deposition.  Is that what you're referencing in
13   Exhibit I, or did you read the actual transcript
14   of her deposition in the Fish case?**
15       A.  No.  I have the actual transcript.
16   That's what I read.  I received the summary from
17   legal counsel, but actually I wanted to read the
18   deposition itself.
19       **Q.  And I do see that listed.  So I
20   apologize that I mentioned that I didn't see any
21   deps listed.  I assumed reading it that it was a
22   summary, but now your recollection is you read her
23   entire transcript?**
24       A.  Yes.
25       **Q.  And I apologize again if you said this**

Page 52

1    **and I missed it, but did you rely upon any portion
2    of Chandra Attiken's deposition in formulating
3    your opinions in this case, to the best of your
4    recollection?**
5        A.  Not specifically.  That may be why I
6    inadvertently didn't include it in here.  I don't
7    quote her.  I don't rely on her as a source for a
8    specific fact.  But why I put it, of all the
9    depositions I put those three in the box,
10   particularly Ms. Attiken's.  It had a good factual
11   history of how the process worked and who talked
12   to who and who did what to who.
13       So I would say I relied upon it for
14   general background information, but I'm not using
15   her as a source for any specific factual
16   representation.
17       **Q.  Robert, other than Ms. Marchetti's
18   deposition, Mr. Hoskins' deposition, Ms. Attiken's
19   deposition, did you rely upon any other deposition
20   testimony given in the case by fact witnesses?**
21       A.  I would say not specifically, no.  I
22   mean I did receive a lot of depositions.  I
23   skimmed through a lot of depositions.  The
24   assistant -- and at different points in time there
25   were three different managers I had working for

**Robert Reilly**                    **Fish, et al. vs. GreatBanc Trust Company**

Page 53

1  me, but the managers who I had working for me read
2  through a lot of depositions.  But the ones that I
3  specifically I would say relied upon are the ones
4  I tried to mention in Appendix I.
5      Q.  Okay.  So if it's not mentioned in
6  Appendix I or it's not Mr. Hoskins' deposition,
7  which you inadvertently omitted, you did not rely
8  on any other deposition testimony in this case in
9  formulating your opinions.
10     A.  That's correct.
11     Q.  Thank you.
12         Robert, again, I know it's a long
13 list and I'm not saying you purposefully failed to
14 list anything here, but because you inadvertently
15 left out the Hoskins transcript, I'm wondering are
16 there any documents you can think of now or that
17 came to mind while you were preparing for the
18 deposition that you relied upon but were not
19 listed in Exhibit I of your original report in
20 preparing your original report.
21     A.  I don't think so.  It was hard to
22 compare.  And the difference is -- I recall what
23 happened was.  When I prepared Exhibit I, my
24 workpapers were actually in this order.  So I
25 could simply go through and read the tab of each

Page 54

1  manila file folder and that's how this list was
2  created.
3      Q.  I see.
4      A.  Since I issued my report, I've
5  reorganized the workpapers by category.  So it was
6  easy for me to --
7      Q.  My question was a simple one.  Have
8  you been able to identify any documents you relied
9  upon in preparing Exhibit 822 that are not listed
10 in Exhibit I -- in Appendix I?  I'm sorry.
11     A.  I don't believe so.
12     Q.  Okay.  We'll of course get back to
13 Exhibit 822, Robert, throughout the day.  I do
14 want to mark another exhibit for you at this
15 point, and it is 823.
16         (Deposition Exhibit 823 was marked
17           for identification.)
18 BY MR. SCHEIER:
19     Q.  I just want to confirm that Exhibit
20 823 is the summary of Marilyn Marchetti's
21 deposition testimony that I think you said you
22 understood counsel prepared and provided to you.
23 (Document tendered to the witness.)
24     A.  Yes, it is.
25     Q.  And you reviewed this in addition to

Page 55

1  reviewing her actual transcript?
2      A.  Well, I did look at it, but, to tell
3  you the truth, after the first page or so there
4  was information on here that -- I mean I really
5  wanted to rely on the actual transcript.  I don't
6  know why it was important to put on this summary
7  that Marilyn is 64 years old and not on medication
8  today.
9          So there's a lot of items that were
10 in this summary that I didn't think Marilyn wanted
11 me to know.  So I'd rather rely on the actual, you
12 know, instead of someone else's summary of a
13 deposition, I'd rather rely on the entire
14 deposition.
15         So this was in the file.  I didn't
16 ask for it.  It was provided to me.  I would say I
17 relied on the deposition itself.
18     Q.  All right.  But you did review in
19 general the deposition summary that's now marked
20 as Exhibit 823, to the best of your recollection?
21     A.  Yes.
22     Q.  Okay.  Since reviewing Exhibit 823,
23 has counsel provided you with an affidavit that
24 Marilyn Marchetti recently signed in this case?
25     A.  No.  They have not.

Page 56

1      Q.  Have they disclosed to you that she
2  has signed an affidavit based on an interview that
3  Mr. Gotto and others had with her in the last few
4  weeks?
5      A.  I understood that someone from
6  GreatBanc had issued an affidavit, and I could
7  have assumed it was Marilyn Marchetti.  I don't
8  remember that either Mr. Gotto or Mr. Greenwald
9  specifically mentioned Marilyn Marchetti, but I
10 understand that there had been some new document
11 that had been produced.
12     Q.  Did you ask to review that affidavit
13 to see, to assure it's consistent with certain
14 positions taken in your report?
15     A.  No.  I did not.
16     Q.  Will you?
17     A.  I certainly could.  I mean I --
18     Q.  I know you could.  I'm asking as we
19 sit here today do you intend to?
20     A.  Well, the reason I didn't ask, I
21 assumed that if there was some inconsistency that
22 either Mr. Gotto or Mr. Greenwald would say you
23 ought to read this because there's some new
24 information that has come forward.  And if there's
25 any reason to think there was new information, I

Robert Reilly                                    Fish, et al. vs. GreatBanc Trust Company

Page 57

1 certainly would want to look at it.
2       Q.   And I will confirm with counsel of
3 course, but I would ask you to update your
4 disclosures in terms of what you reviewed and what
5 you relied upon if, in fact, you look at
6 Ms. Marchetti's deposition and rely on it for any
7 new opinions or for any other reason with regard
8 to the report.
9       A.   I understand.
10          MR. GOTTO:  You mean affidavit?
11          MR. SCHEIER:  I'm sorry.  What did
12 I say?
13          MR. GOTTO:  You said deposition.
14          MR. SCHEIER:  I'm sorry.  Yeah,
15 affidavit.  Thank you, Gary.
16          (Deposition Exhibit 824 was marked
17             for identification.)
18 BY MR. SCHEIER:
19      Q.   I have now marked Exhibit 824, and I
20 would ask you to please identify that on the
21 record and confirm it is in fact what's titled
22 your "Rebuttal Report" dated July 15, 2015?
23 (Document tendered to the witness.)
24      A.   Yes.  This is the rebuttal report that
25 I submitted in July of this year.

Page 58

1       Q.   And you drafted the entire report
2 under the process similar to what you described
3 for the April report?
4       A.   Yes, I did.
5       Q.   Did any lawyers edit or contribute to
6 the report?
7       A.   No, not to my knowledge.
8       Q.   Now, I believe the documents you
9 relied upon in the report that we've now marked as
10 Exhibit 824 are listed in Tab 3.  Did I get that
11 right?
12      A.   Well, it's Appendix B.
13      Q.   Appendix B.
14      A.   It's Page 40.
15      Q.   Okay.  I missed that.  Right.  It's
16 your report, so I'm not surprised you know.
17          Can you confirm for the record that
18 the documents listed on Appendix B are, in fact,
19 the universe of documents you relied on or
20 considered in preparing the July report that's
21 Exhibit 824?
22      A.   Yes, I believe so.  I can't recall any
23 other documents that I relied on.
24      Q.   Okay.  Thank you.
25          MR. SCHEIER:  Let's take a short

Page 59

1 break, please.
2          THE VIDEOGRAPHER:  Off the record
3 at 10:09 a.m.
4          (A recess was taken.)
5          THE VIDEOGRAPHER:  This begins Disk
6 Number 2.  Back on the record at 10:20 a.m.
7 BY MR. SCHEIER:
8       Q.   Welcome back, Robert.
9          Were you asked to formulate any
10 opinion in this case that, other than those you
11 just described, that you were unable to -- strike
12 that.
13          What I should say is were you asked
14 to form any opinion in this case other than the
15 ones that appear in both of your reports, Exhibits
16 822 and 824, that you felt you were incapable of
17 forming?
18      A.   No.  I was not.
19      Q.   And in your professional judgment,
20 have you reviewed all the materials that you deem
21 necessary in order to form the opinions that are
22 contained in Exhibits 822 and 824?
23      A.   Yes, I believe so.
24      Q.   And do you hold any opinions that you
25 plan to testify to at trial in this case that are

Page 60

1 not found in Exhibits 822 and 824?
2       A.   No.  I do not.
3       Q.   If you could turn to Exhibit 822,
4 Robert.  I want to just talk a little bit about
5 the structure of your report as it relates to what
6 you call I believe the first flaw in Duff's
7 valuation analysis.
8       A.   Yes.
9       Q.   If you could please turn your
10 attention initially to Page 12.  And in particular
11 I just want to confirm that Paragraphs 35 to 42
12 summarize your opinion in regard to what you've
13 called the first flaw in regard to Duff's fairness
14 opinion; is that right?
15      A.   Yes, that's correct.
16      Q.   Let's focus on Paragraph 35 at this
17 point.  Paragraph 35 begins where you write "For
18 the first flaw, the GreatBanc analysis did not
19 adequately consider."  I just wanted to stop
20 there.
21          When you refer to the "GreatBanc
22 analysis," you're referring to Duff & Phelps'
23 fairness opinion?
24      A.   Effectively.  I define "GreatBanc
25 analysis" a little bit earlier as really all of

**Robert Reilly**                    **Fish, et al. vs. GreatBanc Trust Company**

Page 61

1 the Duff & Phelps work culminating in the fairness
2 opinion.
3    Q.  The first is industry technological
4 changes facing Antioch.
5       Do you see that?
6    A.  Yes.
7    Q.  And I just want to understand.  Are
8 those fully described at Pages 33 through 36 in
9 Paragraphs 117 through 131?  And, again, I just
10 want to kind of wrap my arms around the structure
11 of your report.
12    A.  That's correct.  And I added a little
13 bit more detail in the rebuttal report, but it's
14 the same issue that I'm describing on Page 33.
15    Q.  And I appreciate that qualification.
16 We'll get to the rebuttal report.  But right now
17 I'm just focused on this report in relationship
18 between Paragraph 35(i) and the paragraphs that we
19 just discussed that set out the industry trends
20 that in your view GreatBanc did not adequately
21 consider.
22    A.  Okay.
23    Q.  And those are found in Paragraphs 117
24 to 131, and there might be some additional stuff
25 in your rebuttal report.

Page 62

1    A.  Yes.
2    Q.  Okay.  The second area where your view
3 is that Duff or the area of information that in
4 your view Duff did not adequately consider was
5 industry consumer preference changes facing
6 Antioch.
7       Do you see that?
8    A.  Yes.
9    Q.  Is that also subsumed within the
10 industry technological changes that you describe
11 in Paragraphs 117 to 131?
12    A.  Yes, it is.
13    Q.  Then the third area that in your view
14 Duff did not adequately consider were the two
15 Deloitte projection models or feasibility models
16 from later in 2003; is that right?
17    A.  That's correct.
18    Q.  Okay.  Later on in the report, and
19 this is what I thought might be missing from
20 Paragraph 35, you write extensively that Duff did
21 not adequately consider Antioch's company specific
22 business trends.
23       I didn't see a reference to that in
24 Paragraph 35, but I just want to confirm that, in
25 fact, that is your view and you set those out in

Page 63

1 your Paragraphs 100 to 116.
2    A.  That's correct.  I don't know if I
3 really -- you could call that a separate topic.  I
4 really meant to incorporate that.
5    Q.  I wasn't being critical.  I was just
6 wondering if that was --
7    A.  That's part of Paragraph 35.  I guess
8 I could have considered saying those are some of
9 the topics that were considered by Deloitte &
10 Touche but not by Duff & Phelps.
11       But I do mean to say that the
12 information that starts on Paragraph 100 should
13 have somehow been baked into the Duff & Phelps
14 analysis and I did not see that it was.
15    Q.  And, again, you're referring right now
16 specifically to what you've written in Paragraphs
17 100 to 116.
18    A.  Yes.
19    Q.  And that could be an independent
20 Romanette added to Paragraph 35, you just chose
21 structurally not to do it that way.
22    A.  That's correct.
23    Q.  When you say that the Deloitte &
24 Touche models accounted for the company trends in
25 Paragraphs 100 to 116, are you referring to any

Page 64

1 actual evidence you saw or is that an assumption
2 you're making based on the actual projections
3 going out over the study period?
4    A.  Well, it's really a combination of
5 looking at the projections that Duff relied upon
6 and the discount rate that Duff selected to apply
7 to those projections.
8       I didn't see, and as I said in my
9 report I looked through not only the actual
10 documents themselves, the several reports that
11 Duff & Phelps issued to GreatBanc, but I also
12 provided all their workpaper files.  So I looked
13 through boxes of workpaper files and I didn't see
14 any specific consideration of these topics.
15    Q.  I might have misasked the question or
16 you misunderstood my question.  I was focused on
17 the two Deloitte models.
18    A.  Oh, I'm sorry.
19    Q.  No, that's okay.
20       My question is did you see any
21 evidence in the record other than the projections
22 themselves and the direction they went indicating
23 that Deloitte, in fact, took into account the
24 company trends identified in Paragraphs 100 to 116
25 of your report?

Page 61..64

Robert Reilly                                    Fish, et al. vs. GreatBanc Trust Company

Page 65

1    A.  I'm with you now.  I would say no,
2  it's my interpretation of the projections that
3  they relied upon.
4    **Q.  Other than the categories of**
5  **information that Duff's analysis did not**
6  **adequately consider in your view listed in**
7  **Paragraph 35 and in Paragraphs 100 to 116 in**
8  **regards to company trends, anything else that's**
9  **not listed in your report that you believe Duff &**
10 **Phelps did not adequately consider in preparing**
11 **its fairness analysis?**
12   A.  I would say not, not within the first
13 flaw.  Then there's the second and third flaws.
14 But within the first flaw it's really the issue
15 we've just talked about.
16   **Q.  Okay.  Great, Robert.  I'm not trying**
17 **to be tricky or leave something out.  We'll get to**
18 **each of the flaws independently because I**
19 **understood you analyzed them independently.**
20   A.  Yes, I did.
21   **Q.  Okay.  Now, in conjunction with your**
22 **first flaw analysis, Robert, is my understanding**
23 **accurate that you ran five discounted cash flow**
24 **models that in your opinion accounted for the**
25 **categories of information that we just identified?**

Page 66

1    A.  Yes, sir.
2    **Q.  And are those found in your Exhibits**
3  **14 to 18?**
4    A.  That sounds about right.  Let me get
5  to that.  That is correct.
6    **Q.  Let's look at those, if you wouldn't**
7  **mind, so I can get an understanding of the**
8  **methodology that you or, to your understanding,**
9  **Mr. Buchanan used to quantify the risks we just**
10 **discussed that you view are not adequately**
11 **considered by GreatBanc and Duff.  Why don't we**
12 **start with Exhibit 14.**
13   A.  Okay.
14   **Q.  My understanding is Exhibit 14 is a**
15 **spreadsheet showing a DCF that incorporates the**
16 **Duff & Phelps projected financial statements but**
17 **you add a company specific risk factor to get to,**
18 **or a company specific risk premium, to Duff's**
19 **analysis to get to what you deem to be fair market**
20 **value of the company's stock.**
21   A.  That's right.  Really, the only change
22 in Exhibit 14 is the change in the discount rate.
23 So I'm ultimately saying that Duff & Phelps could
24 have either changed the projections or relied on
25 different projections and used its discount rate

Page 67

1  or relied on the projections it did rely upon and
2  use a higher discount rate.  And for Exhibit 14 I
3  keep the same Duff & Phelps projections and I
4  increase the discount rate.
5    **Q.  I see.  And you increase the discount**
6  **rate by application I think, I might be wrong, I'm**
7  **just a dumb lawyer, right, you're the expert, but**
8  **by a factor that's known generally in your world**
9  **as a company specific risk premium?**
10   A.  That's correct.
11   **Q.  All right.**
12   A.  That's really the only difference
13 between Exhibit 19A and 19B.
14   **Q.  Yeah, we'll get to that.  I want to**
15 **stick with Exhibit 14 for the moment, please.**
16   **So on Exhibit 14 on this**
17 **spreadsheet, am I to understand that all of the**
18 **inputs under cash flow components up to discount**
19 **periods is drawn from Duff's projected financial**
20 **statements?**
21   A.  That's correct.
22   The only thing that I added here
23 above the discount rate that's different is the
24 last two weeks of 2003, which really is not a
25 material change at all.

Page 68

1    **Q.  Then just below discount rates you**
2  **have the present value factored at 18 percent.**
3  **Do you see that?**
4    A.  Yes.
5    **Q.  And this is where Exhibit 14 differs**
6  **from Duff's equivalent spreadsheet that you were**
7  **looking at; correct?**
8    A.  That's correct.
9    **Q.  And Duff used there a present value**
10 **factor of between 12 and 14 percent; correct?**
11   A.  That's right.  They used 12, 13, and
12 14.
13   **Q.  So 13 fell in their middle, the middle**
14 **of their WAC range, their discount factor range.**
15   A.  That's correct.  And their ultimate
16 enterprise value conclusion is based on their
17 13 percent discount rate.
18   **Q.  And when you use a present value**
19 **factor there, the 18 percent, the components are**
20 **13 percent present value discount rate that you**
21 **independently arrived at plus your company**
22 **specific risk premium of 5 percent?**
23   A.  Effectively, yes.
24   **Q.  Now, let's turn to Exhibit 19 that you**
25 **had mentioned a moment ago.**

**Robert Reilly**                                    **Fish, et al. vs. GreatBanc Trust Company**

1    And so I understand, Exhibit 19A is
2  showing the means by which you arrived at what's
3  known as a weighted average cost of capital or I
4  think known as WAC.
5    A.  Yes.
6    Q.  And it shows that through a couple of
7  I think two different methods, you arrived at WACs
8  of 12 percent and 14 percent and took the average
9  of 13 percent.
10    A.  Not really.  Technically what I do is
11  average the two cost of equity capitals --
12    Q.  I see.
13    A.  -- to come up with an average cost of
14  equity capital, then weight that in with a cost of
15  debt capital to come up with an overall average of
16  13 percent.
17    Q.  I see.  And that is one of the WACs
18  that Duff also came up with that you testified to?
19    A.  Yes.
20    Q.  Okay.  Then if you turn to Exhibit
21  19B, you've basically done the same analysis but
22  there's a line item here known as company specific
23  risk premium 5 percent; is that right?
24    A.  That's correct.  So I'm adding a
25  5 percent company specific risk premium to my two

1  cost of equity capital indications to come up with
2  a cost of equity and then again I'm weighting that
3  with the cost of debt to come up with an overall
4  discount rate.
5    Q.  Which was 13 percent and then you
6  added to that 19B company specific risk premium?
7    A.  Well, technically not, although the
8  math is pretty similar.
9      I'm not adding 13 plus 5 to get 18.
10  The 5 percent is added into the cost of equity
11  capital, but based on rounding, because equity is
12  such a big component of the cost of capital here,
13  if you add 5 percent to the cost of equity capital
14  you're effectively adding 5 percent to the WAC.
15    Q.  I see.  And that 5 percent entry is
16  listed I see twice on Exhibit 19B, once in Model
17  Number 1 and once in Model Number 2; correct?
18    A.  That's correct.
19    Q.  I noted that the sources are
20  Willamette Management Associates estimate.
21    A.  Yes.
22    Q.  Did I read that right?
23      I didn't see an exhibit, and maybe
24  I missed it, Robert, where you did a similar sort
25  of calculation to arrive at that 5 percent.  Did I

1  miss that?
2    A.  No, not at all.  And that line could
3  also say simply Robert Reilly estimate.  That is
4  my estimate of the company specific risk premium.
5    Q.  What methodology did you use, Robert,
6  to quantify the risks identified in your report
7  that Duff did not take into account in arriving at
8  your 5 percent company specific risk premium in
9  this case?
10    A.  It's based entirely on my judgment.
11    Q.  Okay.  Is your judgment informed by
12  any sort of a treatise or scholarly writing?
13    A.  I would say not with regard to a
14  conclusion of 5 percent versus 6 percent.  I would
15  say if you look at any of the general business
16  valuation textbooks, there are going to be
17  chapters on coming up with the cost of equity
18  capital and several pages or entire chapters in
19  the case of the book called "The Cost of Capital"
20  textbook on how do you come up with the cost of
21  equity capital, how do you come up with the
22  company specific risk.  But all of the factors are
23  subjective, they're not quantifiable.
24    Q.  So, as you state, it was purely your
25  judgment and your decision to apply a 5 percent as

1  opposed to a 6 percent or a 4 percent?
2    A.  That's correct.
3    Q.  Why didn't you apply a 6 percent
4  company specific risk premium or a 4 percent
5  company specific risk premium?
6    A.  Well, I looked at -- typically what
7  I'm trying to do here is, in this case I believe,
8  and, again, this is a judgment, that there's
9  another quantum level of risk that's associated
10  with this company, with Antioch, that's not
11  identified or not quantified in other companies
12  because you derived the weighted average cost of
13  capital from other companies.
14    Q.  Yes, and that's where my question
15  goes.  You've identified industry trends, business
16  trends, consumer trends that you perceive were
17  risks that were known or knowable in
18  December 2003, and I get that.
19      What I don't understand, and maybe
20  you've answered it and I apologize if I've asked
21  you, how you then quantify the risks that you've
22  identified in your report, and I understand there
23  are no other risks you considered, into a
24  5 percent company specific risk premium.  Was
25  there any methodology at all that you used?

**Robert Reilly**                                    **Fish, et al. vs. GreatBanc Trust Company**

Page 73

1    A.   Yeah.  I was in the process of
2  explaining that.  I just didn't get to the
3  conclusion.
4          So the first step is to decide that
5  there's a quantum level of risk.  Then I looked at
6  the top of Page 19A or 19B.
7          MR. SCHEIER:  Let's go off the
8  record for a second.
9          THE VIDEOGRAPHER:  Off the record
10  at 10:39 a.m.
11          (A recess was taken.)
12          THE VIDEOGRAPHER:  Back on the
13  record at 10:41 a.m.
14          THE WITNESS:  So I was looking at
15  the top of Page 19A which is pretty much the
16  top of Page 19B --
17          MR. GREENWALD:  I can't hear
18  anything, guys.
19          MR. SCHEIER:  Let's go off the
20  record again, please.
21          THE VIDEOGRAPHER:  Off the record
22  at 10:41 a.m.
23          (Brief pause.)
24          THE VIDEOGRAPHER:  Back on the
25  record at 10:42 a.m.

Page 74

1          THE WITNESS:  So the one method
2  that Duff & Phelps and I both used is the
3  capital asset pricing model.  In fact, I
4  think just about all of our variables except
5  for the 5 percent are pretty much exactly
6  the same.
7          Now, there are three quantum
8  levels of risk identified in the capital
9  asset pricing model.
10  BY MR. SCHEIER:
11     Q.   I'm talking about the company specific
12  risk premium.
13     A.   I'm getting to that.
14     Q.   Can you prepare an exhibit similar to
15  the one we're looking at now, 19B, that shows me
16  how you arrived at a 5 percent company specific
17  risk premium?
18     A.   Give me 60 seconds.  The answer is
19  yes, average 5.1, 7.0, and 2.1.
20     Q.   And are you deriving that methodology
21  from a treatise?  Because you said it was just
22  your judgment and now you're telling me it was a
23  calculation that you undertook.  Which is it?
24     A.   My judgment is I wanted to add one
25  quantum level of risk.

Page 75

1     Q.   I see.
2     A.   We know what the three quantum levels
3  of risk are already, and we know that those
4  average about 5 percent.  Obviously I'm rounding
5  off here.
6     Q.   Yeah.
7     A.   I wanted to add another quantum level
8  of risk.  If I know the three quantum levels of
9  risk that are identified in CAPM that both Duff &
10  Phelps and I agree to are 5, 7, and 2 --
11     Q.   Yeah.
12     A.   -- and I wanted to identify one more
13  quantum level of risk, it's going to be in the
14  range of 5, 7, and 2 and it's going to be about
15  the middle of that range.  The middle of that
16  range, both as a mean and a median, is about
17  5 percent.  So I wanted to add about 5 percent.
18  And there's no more science or mathematics to it
19  than that.
20          Someone else could say, and here
21  would be the disagreement and I think it would be
22  a legitimate area of debate.  Another analyst
23  would say well, I think there should be a half of
24  a quantum level of risk.  So I'm not going to --
25     Q.   Actually, you raise a good point.  I'm

Page 76

1  wondering how you derive now that you've
2  explained -- and I do appreciate that.  Thank you
3  for taking the time.
4          How did you derive one quantum
5  level of risk from the specific company, consumer,
6  and industry trends that in your view Duff did not
7  adequately consider in valuing the company's stock
8  in December 2003?
9     A.   Well, that is entirely a judgment.
10  There's no formula for that.
11     Q.   There's no methodology for getting
12  from those specific risks to one quantum level of
13  risk?  Is that what you're saying?
14     A.   Right, because there are different
15  methodologies you could use, none of which are
16  quantitative.
17     Q.   Okay.
18     A.   And --
19     Q.   I appreciate that.  If we can now
20  maybe turn back to Exhibit 14.  I see there's a
21  line item in fair market value of invested
22  capital.
23     A.   Yes.
24     Q.   Is invested capital a synonym for
25  enterprise value?

**Robert Reilly**                          **Fish, et al. vs. GreatBanc Trust Company**

Page 77

1    A. Yes, it is.
2    Q. Okay. Now, your ultimate conclusion
3  after applying the WAC of 13 percent and the
4  company specific risk premium of 5 percent is that
5  the fair market value or the enterprise value of
6  Antioch as of December 15, 2003 was $261,683,000?
7    A. Almost. The only thing I would change
8  there is the WAC is 18 percent, the WAC
9  incorporates the 5 percent. It's not added onto
10 the WAC. It's built into the WAC.
11   Q. I see.
12   A. But I concluded a WAC of 18 percent as
13 opposed to the Duff WAC of 13 percent, and I
14 concluded an enterprise value of 261,
15 $262 million.
16   Q. And if you back the 5 percent company
17 specific risk premium out of the WAC, you and Duff
18 would have the same enterprise value at the end of
19 your calculations, more or less. There would be
20 no material difference; right?
21   A. There would be no material difference.
22 The only material difference between my Exhibit 14
23 and their analysis is they use 13 percent discount
24 rate, I use an 18 percent discount rate.
25   Q. Understood. Thanks, Robert.

Page 78

1    Now, if you would turn back to
2  Exhibit 20, I just want to confirm that -- I
3  apologize. I shouldn't ask until you're there.
4  Let me know when you get to Exhibit 20.
5    A. I'm there.
6    Q. Okay. Now look at Exhibit 20 and also
7  kind of keeping Exhibit 14 in mind, your
8  enterprise value conclusion after applying the
9  18 percent WAC, which incorporated your 5 percent
10 company specific risk premium, is found in the
11 second column, is that right, that says Duff &
12 Phelps 10/27/03 and it's the first, it's the top
13 line, the 261,683?
14   A. Exactly.
15   Q. I see.
16   Then if we turn to Exhibit 15,
17 which I believe is the second DCF you ran, the
18 first being the one with the company specific risk
19 factor, or premium, on Exhibit 14, now we're on
20 Exhibit 15. The second DCF uses, or used, revenue
21 projections based on Deloitte's October 2003
22 model?
23   A. Yes. Technically it's October 2002,
24 October 2, 2003 model.
25   Q. Yes, you're right. It is. Thank you.

Page 79

1    A. And it's not just a revenue
2  projection. It's their entire financial
3  projection.
4    So I took their entire financial
5  projection, and all I'm really doing on Exhibit 15
6  is reformatting the big downside scenario Deloitte
7  projection and now -- so I'm using different
8  projections but the same discount rate that Duff &
9  Phelps used.
10   Q. And you just used the words "big
11 downside." Did you derive that -- that's what
12 Duff called that particular version of their
13 model; correct?
14   A. That's actually what Deloitte calls
15 their particular version of the model.
16   Q. If I said "Duff," I'm sorry, I meant
17 Deloitte. Thank you.
18   So I'm clear, similar to Exhibit
19 14, the inputs under cash flow components from
20 pretax income down to net cash flow are derived
21 from Deloitte's big downside dated October 2,
22 2003?
23   A. Yes, sir.
24   Q. And then the next two lines are your
25 partial period adjustments that you referenced in

Page 80

1  conjunction with Exhibit 14?
2    A. That's right. And that's only for the
3  two weeks of 2003, the last two weeks.
4    Q. Yes. And then the present value
5  factor, 13 percent, is consistent with your WAC.
6    A. That's right, and the --
7    Q. And Duff's WAC.
8    A. The Duff & Phelps WAC.
9    Q. And then I see using the Duff big
10 downside and the discounted cash flow analysis,
11 you arrive at the bottom of Exhibit 15 of an
12 enterprise value as of December 15, 2003, of just
13 under 124 million?
14   A. Yes.
15   Q. And then that translates into Exhibit
16 20 on the third column that's labeled "Deloitte &
17 Touche 10/2/2003"?
18   A. Yes, it is.
19   Q. Then if you would be so kind, Robert,
20 as to turn to Exhibit 16. Exhibit 16, as I
21 understand it, is the third of your five DCFs,
22 this one based on a Deloitte model known as
23 downside.
24   A. That's correct.
25   Q. And I see you I believe accurately

**Robert Reilly**                                                    Fish, et al. vs. GreatBanc Trust Company

Page 81

1  show that that model was dated December 2, 2003?
2      A.  That's correct.  So that's the closest
3  to the transaction date.  That's the Deloitte
4  December 2, 2003 big, not big downside, downside
5  scenario.
6      Q.  And similar to the prior DCFs we
7  looked at that you prepared, the cash flow
8  components other than the partial period
9  adjustment are inputs derived from Deloitte's
10  December 2, '03 downside projections; correct?
11      A.  That's correct.
12      Q.  And this, again, applies your and
13  Duff's 13 percent WAC, "this" being Exhibit 16?
14      A.  Yes.
15      Q.  And you arrive at an equity value of
16  just above 145 million; correct?
17      A.  That's correct.
18      Q.  And then that is, I've just learned
19  this from you, that's baked into your Exhibit 20
20  on the column that's listed Deloitte & Touche
21  12/2/2003?
22      A.  Yes.
23      Q.  Okay.  Then if we can turn, please, to
24  the fourth of your five DCFs.  That is a DCF, as I
25  understand it, Robert, based on the projections

Page 82

1  prepared by Mr. Buchanan and that he labels as
2  "FTI 1"; is that right?
3      A.  Yes.
4      Q.  I just want to be sure the structures
5  are all the same.  All of the inputs under cash
6  flow components, except for the partial period
7  adjustment, are derived from Mr. Buchanan's FTI 1
8  projections; correct?
9      A.  That's the starting point.
10      Q.  Yes, well, I don't know what your
11  qualification meant, so I want to be clear.
12          I'm just trying to find out
13  structurally the spreadsheet that's Exhibit 17
14  follows form to the others in the sense that all
15  of the inputs under cash flow components you took
16  from work of Mr. Buchanan, or is that not right?
17      A.  That's not right.
18      Q.  Okay.
19      A.  That's what I wanted to explain.
20      Q.  Yes, please do.
21      A.  The format of 15, 16, and 17 are all
22  the same.
23      Q.  Yes.
24      A.  On 17 and 18 what I want to emphasize
25  is Buchanan, or FTI, comes up with the top line

Page 83

1  projection only.  So they're projecting -- in
2  fact, it's not even on here.
3      Q.  Yes.
4      A.  They project revenues and they did not
5  project anything below revenues.  Well, revenues
6  is the starting point for me.  It's not the ending
7  point for me.
8          So I had to take their revenue
9  projection and convert that into an income
10  statement projection and then convert the income
11  statement projection into a cash flow projection
12  on Exhibit 17.
13          So there's another exhibit we can
14  look at that's an intermediate step where I take
15  the FTI revenue projection and I apply various
16  expense ratios.  The various expense ratios for
17  each line item is the average of the expense
18  ratios in Duff & Phelps and Deloitte & Touche.
19      Q.  And I recall those exhibits.  They're
20  prior to this.  So thanks for reminding me of
21  those.
22          Okay.  So I think I understand then
23  how you populated the rows that are under cash
24  flow components with your starting point being FTI
25  1's revenue projections.

Page 84

1      A.  Yes, sir.
2      Q.  And then following form with the prior
3  exhibits, except for Exhibit 14, you apply yours
4  and Duff's 13 percent WAC.
5      A.  That's correct.
6      Q.  And then make some other adjustments
7  to arrive at an enterprise value based on the DCF
8  in Exhibit 17 of just above 216 million?
9      A.  That's correct.
10      Q.  And then that is found on your Exhibit
11  20 in the column labeled "FTI Sales Forecast 1."
12      A.  Yes.
13      Q.  All right.  And then FTI 2, which I'm
14  not going to ask you any questions about, is just
15  based on a second set of projections that FTI
16  prepared.  And the enterprise value conclusion of
17  Exhibit 18 is the last column on Exhibit 20;
18  correct?
19      A.  That is correct.
20      Q.  And then on Exhibit 20 this is showing
21  fair market value on a per share basis using as
22  the top line the various enterprise values from
23  the DCFs we just looked at and then the first
24  column being, with the first column being the
25  exception, that's Duff's actual number derived in

**Robert Reilly**                    **Fish, et al. vs. GreatBanc Trust Company**

Page 85

1  **December, in or around December 2003; correct?**
2      A.  That's correct.  The first column is
3  Duff & Phelps unadjusted, that comes directly from
4  their analysis.
5      **Q.  Correct.  And then the balance are the**
6  **DCFs we just looked at and you derive a per share**
7  **value from those DCFs; correct?**
8      A.  That is correct.
9      **Q.  My understanding, again, in kind of a**
10 **structural sense, Robert, in respect to your**
11 **report is that your damages opinion, which is**
12 **approximately $95 million in regard to the first**
13 **flaw, in getting there you rely on FTI 1's**
14 **projections as your starting point; correct?**
15     A.  That's correct.  That's why I selected
16 95 million, within the range that's on Exhibit 20.
17     **Q.  Yes.  I think you used the word I'm**
18 **relying on FTI 1 to formulate my opinion that the**
19 **damages under my first flaw analysis to the**
20 **company is approximately $95 million.**
21     A.  Yes, sir.
22     **Q.  And the other DCFs that you've run,**
23 **the four others, are basically checks on the FTI 1**
24 **analysis; correct?**
25     A.  Well, I wouldn't say it that way

Page 86

1  because that wasn't the sequence.
2          The sequence was I believed that
3  the Duff & Phelps analysis didn't include all of
4  the risks of the business going forward.  There
5  are two ways that the analysis could be changed
6  either by changing the discount rate and leaving
7  the projections or changing the projections and
8  leaving the discount rate.
9      **Q.  Okay.**
10     A.  So I performed several different
11 analyses to look at alternative valuation
12 conclusions, and that's how I prepared Exhibit 20
13 up until the very bottom row across.  And now I
14 have five different indications of stock price
15 that range from a low of $315 per share to a high
16 of $590 per share.  Ultimately that gives me
17 damage indications of $70 million to $145 million
18 and I had to, now I have to pick something.
19     **Q.  Yes.  And I understand that you picked**
20 **FTI 1 because it incorporated in your view all**
21 **known and knowable information that existed as of**
22 **the transaction date.**
23     A.  That's right.  But that wasn't -- I
24 didn't perform that analysis first and then look
25 for supplemental confirmatory evidence.

Page 87

1      **Q.  Yeah.**
2      A.  I performed all five different
3  analyses and asked myself what do I do now.  And
4  there are different things I could have done.  I
5  could have used a mean or a medium or an
6  inter-cortile range or just picked one.  And
7  ultimately I just picked one, but it was intended
8  to represent a representative damages estimate
9  from within that range.
10     **Q.  Why did you not choose to do the other**
11 **analyses as opposed to exercising your judgment in**
12 **picking FTI 1 on the basis that it incorporated**
13 **all known and knowable information that existed as**
14 **of the transaction date?**
15     A.  Well, I would say it really is for the
16 reasons that I mentioned.  There are positive
17 elements and negative elements.  The positive
18 element is I thought FTI 1 --
19     **Q.  I can tell where you're going.  I'm**
20 **wondering why you didn't do any sort of additional**
21 **analysis and instead chose to pick one of these.**
22 **You had mentioned you could have done a cortile**
23 **analysis --**
24     A.  Sure.
25     **Q.  -- you could have done a weighted**

Page 88

1  average, you could have done a median or a mean.
2          **My question is why did you exercise**
3  **your judgment not to undertake those analyses, use**
4  **those methodologies, and instead chose to pick one**
5  **of the results that's derived from one of your DCF**
6  **analyses.**
7      A.  No, I understand.  I was trying to
8  answer that.  And, by the way, I did do all of
9  those.  All of the alternatives give me a higher
10 damages estimate than the one I selected.
11     **Q.  And are those other alternatives found**
12 **anywhere in your report?**
13     A.  No.
14     **Q.  Okay.**
15     A.  But the reason I calculate them and
16 you're averaging five numbers and it's easy to do.
17     **Q.  I see.  I just didn't see any of that**
18 **in your workpapers either.**
19     A.  That's right.
20     **Q.  So I'm just wondering did you retain**
21 **any of that work?**
22     A.  Well, I don't know that I even printed
23 that out.  I mean you do that on the computer
24 screen just by looking at it.
25     **Q.  Oh, is that because sometimes**

**Robert Reilly**                    **Fish, et al. vs. GreatBanc Trust Company**

Page 89

1  analysts, whether they work in a litigation
2  context or not, sometimes run financial analyses
3  on computers and don't always see a need to print
4  them out?  They recognize the result and move on
5  and don't print the result of their work product?
6      A.  Well, I guess that's possible.  That
7  wasn't the reason --
8      Q.  Sounds like that's what you did here.
9      A.  Well, what I did is what I described.
10         I considered looking at a mean,
11  looking at a median, looking at an
12  inter-cortile --
13     Q.  Well, I understood you did look at
14  those.
15     A.  I did, yeah.
16     Q.  And you looked at that on your
17  computer?
18     A.  Well, I may have looked at it by
19  looking at the numbers.  It's not hard to average
20  five numbers.
21     Q.  Well, for me it is.  I would have to
22  actually write down the five numbers and do a
23  division, but that's neither here nor there.
24         What I'm asking you is I thought
25  you testified you, in fact, did those analyses on

Page 90

1  a computer but didn't print them out which is why
2  they're not in your workpaper, sir.  That's what
3  I'm exploring.
4      A.  I can't testify -- I don't recall
5  whether I did it on a computer, on a calculator,
6  or on a napkin.  I just don't recall.  But I do
7  recall calculating the mean, the median, and the
8  inter-cortiles, all of which are higher than
9  $95 million.
10     Q.  And why did you choose not to use the
11  results of those analyses?
12     A.  Well, I was trying to answer that
13  question before.
14         There are positive reasons and
15  there are negative reasons.  The positive reasons
16  are the ones that I mentioned in the report, which
17  is the FTI analysis includes all of the
18  information that was available to anyone close to
19  the valuation date.
20     Q.  I see.
21     A.  And it includes subjective data -- I'm
22  sorry -- it includes objective data.  In other
23  words, it's prepared without any subjective
24  influences by the preparer.
25         All of the other analyses, whether

Page 91

1  it's Deloitte or Duff & Phelps, have subjective
2  input.  And I'm not saying there's a bias in
3  there.  They just have subjective input as opposed
4  to objective input.
5      Q.  So what was attractive to you was that
6  the FTI analysis used solely objective input and
7  at the same time incorporated all known and
8  knowable information that existed as of the
9  transaction date.
10     A.  Yes, sir.
11     Q.  Okay.  And when you talk about the
12  information, is that inclusive of the information
13  that you believe Duff did not adequately consider
14  in its valuation analysis pre-transaction?
15     A.  Well, either it wasn't provided to
16  them or it was provided and they didn't consider
17  it.  But I would say the FTI revenue projection,
18  because it's based on historical factual
19  information, captured all of the market trends
20  that were influencing Antioch as of the time of
21  the data cutoff point for FTI, not the analysis
22  that's prepared in 2015, but as of the data cutoff
23  in 2003.
24         So I think that made that an
25  attractive selection for me.  But that was a,

Page 92

1  again, a judgment.  Another analyst could make the
2  same judgment that I'm going to use the mean or
3  the median or some other indication from within
4  this range.
5      Q.  Is it also fair to say another analyst
6  might choose to use your calculation that
7  incorporated a company specific risk premium into
8  the WAC?  That would be another analyst might
9  choose reasonably to rely on that, correct, as a
10  damages calculation?
11     A.  I'm sorry.  I didn't understand.
12     Q.  You had said -- I thought you were
13  saying that another analyst could reasonably
14  choose to use a mean, median, cortile sort of
15  approach.  You chose not to.  Instead, you chose
16  FTI 1.
17         I'm wondering if the same could be
18  said about using the other DCF results to measure
19  damages.  A reasonable analyst could choose any of
20  the calculations, the DCFs, any of your five DCFs,
21  as a measure of the damages resulting from flaw 1.
22     A.  I'm not quite sure I understand.  I
23  think we're agreeing that there are five different
24  indications of damages here.  That's the
25  reasonable range.  I selected one point within

**Robert Reilly**                     **Fish, et al. vs. GreatBanc Trust Company**

Page 93

1 that range. Someone else could select another
2 point within that range, and I don't think they'd
3 be wrong by doing that.
4          I think you're asking me could
5 another analyst select another company specific
6 risk factor, if that's what you're asking.
7     **Q. No. That's not what I'm asking.**
8     A. Oh, I'm sorry then.
9     **Q. I'm asking whether another analyst can**
10 **pick, for example, your DCF adding the company**
11 **specific risk premium as the model to calculate**
12 **the damages arising from the first flaw.**
13    A. I think we're agreeing on that.
14    **Q. Okay.**
15    A. In other words, I'm saying there are
16 five different indications of damages. I
17 obviously gave more weight to one of those
18 indications, but I think the five indications
19 represent the reasonable range. And as long as
20 you're somewhere within that reasonable range,
21 probably not at either extreme of the range, then
22 that would be a good indication of damages.
23    **Q. And so a reasonable analyst can pick**
24 **any of the five indications of damages that you**
25 **have set out in Exhibit 20 and it would not be**

Page 94

1 unreasonable; correct?
2     A. Well, I did have one modifier in
3 there. Don't forget I also said and not at either
4 end of the range.
5     **Q. Okay.**
6     A. So I wouldn't recommend either the
7 high point in the range or the low point in the
8 range because then you're kind of at the extreme
9 points.
10         That's why before I suggested you
11 could be at the average, you could be at the
12 median, the midpoint, you could be at the
13 inter-cortile range. In other words, you can take
14 out the two extremes and average what's left over.
15    **Q. Yes.**
16    A. And in all of those cases, you get to
17 a number that's higher than $95 million. But I'm
18 not saying that 95 is right and no other
19 indication within this range is wrong. If I was
20 saying that, I would have only presented Column 4
21 and nothing else.
22    **Q. Right.**
23    A. I do believe that Duff & Phelps didn't
24 adequately consider certain risks facing the
25 company in 2003, and there are a number of

Page 95

1 different ways you could take those risks into
2 consideration. And if you do that, any of those
3 ways will give you damages in the about $100
4 million range.
5     **Q. Yeah, nothing specific. It's just any**
6 **of these, other than the extremes, could be used,**
7 **including calculations you've done that you either**
8 **didn't retain or never printed out, and those**
9 **would be, to your mind, acceptable measures of**
10 **damages in regard to the first flaw.**
11    A. That's correct.
12    **Q. Okay.**
13    A. But, again, of that range, however you
14 measure it, I thought $95 million was the best
15 point estimate. But I couldn't say that one of
16 the other indications would be wrong.
17    **Q. You thought it was the best point**
18 **estimate because you had understood that**
19 **Mr. Buchanan's projections took into account all**
20 **known and knowable information that existed as of**
21 **the transaction date.**
22    A. And the revenue projections and were
23 based entirely upon factual information as opposed
24 to subjectively manipulated information. Again,
25 not making that sound like there's a deliberate

Page 96

1 bias, but in any set of financial projections
2 there's a subjectivity factor that enters into
3 this.
4          And the other thing about FTI is
5 those projections were prepared outside of the
6 context of a transaction. In a transaction --
7     **Q. Right. They were prepared in the**
8 **context of litigation; correct?**
9     A. Well --
10    **Q. Is that a "Yes" or "No"? That's a**
11 **simple question, sir.**
12         MR. GOTTO: Mike --
13 BY MR. SCHEIER:
14    **Q. The FTI projections were prepared in**
15 **the context of litigation, correct, not in the**
16 **context of a transaction?**
17         MR. GOTTO: Mike, you've cut him
18 off in the middle of his answer, and you've
19 done that a number of times. So I'd
20 appreciate if you give him the opportunity
21 to complete his answer.
22         MR. SCHEIER: That's fine.
23 BY MR. SCHEIER:
24    **Q. The question is very simple --**
25    A. No, I understand the question.

**Robert Reilly**                    **Fish, et al. vs. GreatBanc Trust Company**

Page 97

1    Q.   Okay.
2    A.   And the answer is yes and no.
3    Q.   No.
4    A.   No, it has to be.
5    Q.   Sir --
6    A.   No, it really is.
7    Q.   Sir, who asked FTI to prepare its
8    projections?  Was it plaintiffs' counsel in this
9    case?
10    A.   Plaintiffs' counsel.
11    Q.   Okay.  Was the FTI projection prepared
12    for any reason other than use in this litigation,
13    to your knowledge?
14    A.   Not that I'm aware of.
15    Q.   Okay.  Thank you.
16    A.   But that does not invalidate my answer
17    of yes and no.  And if you'd let me explain the
18    answer, the methodology that FTI uses -- because
19    you're going to hear this in the trial.  Don't you
20    want to hear this today, Counselor.  At the trial
21    I'm going to say the method that's used here is a
22    method that is uninfluenced at all by the purpose
23    of the analysis.  The method that FTI used is like
24    using the Pythagorean theorem.  And we all
25    remember that from high school; right?

Page 98

1    Q.   Well, I don't --
2    A.   A squared plus B squared equals C
3    squared.
4    Q.   No.  I don't remember the Pythagorean
5    theorem.  But what I can --
6    A.   All right.  Well, quickly, A squared
7    plus B squared --
8    THE REPORTER:  Hold on.
9    BY MR. SCHEIER:
10    Q.   Sir, I have limited time and so you
11    need to answer my questions.  And what I choose to
12    bring out to discover what you're going to say at
13    trial, it's to my detriment if I don't.
14    A.   All right.  I was just trying to help
15    you.
16    Q.   I appreciate that.
17    A.   I didn't realize you were short on
18    time.
19    Q.   I appreciate that -- well, I might not
20    be.  Are you willing to sit for longer than seven
21    hours?
22    A.   Oh, I'm willing to go all day.  I'll
23    tell you that.
24    Q.   Well, are you willing to give me more
25    than seven hours of testimony?

Page 99

1    A.   I didn't know there's a rule.
2    MR. GOTTO:  There's a seven-hour
3    rule.
4    THE WITNESS:  Oh, okay.
5    MR. SCHEIER:  There you go.  So I'm
6    on limited time.
7    THE WITNESS:  Okay.
8    BY MR. SCHEIER:
9    Q.   Do you have any knowledge of how
10    Mr. Buchanan's ARIMA model projecting out revenues
11    into the future took into account what you say is
12    the known and knowable information including, for
13    example, the company industry and consumer
14    preference trends that were going to occur far out
15    into the future?
16    A.   Sure.  And I can't explain to you all
17    of the statistics but it's an auto correlation,
18    auto regression model, that is based entirely on
19    factual data.  And whatever micro or macro
20    economic factors have influenced that factual
21    data, those will be picked up in the auto
22    correlation and auto regression analysis.
23    Q.   Got it.  And do you have any knowledge
24    of how that auto regression analysis and in
25    general the ARIMA model picked up the number of

Page 100

1    digital cameras that were being purchased in the
2    market generally by consumers in 2003?
3    A.   Sure.  To the extent that the digital
4    cameras affected the sales of Antioch products,
5    they are included in the FTI projection because
6    the FTI projection is based entirely upon
7    historical sales of Antioch products.
8    Q.   Well, let's stick with that then.
9    Did Mr. Buchanan confirm to you
10    that the increase in the sale of the number of
11    digital cameras in 2003 in fact had an impact on
12    Antioch sales that year, which was the highest
13    sales they ever had historically?
14    A.   I didn't discuss that with him.
15    Q.   Okay.  Do you have any knowledge one
16    way or the other that in fact -- or I should take
17    a step back.
18    Can you identify for me any
19    evidence or study indicating the impact that the
20    sale of digital cameras in 2003 had on Antioch's
21    revenues in 2003?
22    A.   I don't know.  I haven't seen a study.
23    There's a file of documents that I
24    listed in Appendix I that we looked at before
25    that, there are different groups of it.  The

**Robert Reilly**                                          **Fish, et al. vs. GreatBanc Trust Company**

Page 101

1  largest group I've called the Mizen memos that
2  talk about how the company was concerned about the
3  influence of digital technology in 2001 and 2002
4  and 2003.
5          I haven't seen any study that says
6  with digital cameras our sales are 100, without
7  digital cameras our sales would have been 150.  I
8  haven't seen anything like that.
9          MR. SCHEIER:  Thank you.  Take a
10  short break, please.
11          MR. GOTTO:  Sure.
12          THE VIDEOGRAPHER:  Off the record
13  at 11:14 a.m.
14          (A recess was taken.)
15          THE VIDEOGRAPHER:  This begins Disk
16  Number 3.  Back on the record at 11:33 a.m.
17  BY MR. SCHEIER:
18      Q.  Sir, focusing on the statements in
19  your report and what you agree with here today
20  that a factor or the principal factor that you
21  considered in relying upon the FT 1 projections
22  that incorporate all known and knowable
23  information that exist as of the transaction date,
24  I wanted to explore that a little bit more.
25          Based on your understanding of

Page 102

1  Mr. Buchanan's work, do his projections take into
2  account any plans by the company to introduce new
3  products in 2003 or 2004, to the best of your
4  knowledge?
5      A.  Not that I'm aware of.
6      Q.  Do you know whether Mr. Buchanan's
7  projections took into account any plans by the
8  company to acquire new businesses in 2003 or 2004?
9      A.  Not that I'm aware of.
10      Q.  Do you know if Mr. Buchanan's
11  methodologies took into account any other
12  promotions or plans intended to incentivise the
13  salesforce to sell more product into the future?
14      A.  Not that I'm aware of.
15      Q.  And do you know whether Mr. Buchanan's
16  forecasting methodologies took into account any of
17  Antioch's plans to expand into new markets that it
18  hadn't been servicing in the years 2003 and 2004?
19      A.  Not that I'm aware of.
20      Q.  Okay.  Are you aware of whether or do
21  you have any knowledge that Mr. Buchanan's
22  projections took into account any of the
23  information that company management and company
24  employees gave to Duff & Phelps and Houlihan Lokey
25  and GreatBanc during the due diligence interviews

Page 103

1  that those entities undertook in the second and
2  third quarters of 2003?
3      A.  I don't believe so.  I think it's
4  based entirely on historical sales.
5      Q.  Do you share my understanding that
6  Mr. Buchanan used a statistical model to project
7  out Antioch's revenues known by the acronym ARIMA?
8      A.  Yes, sir.
9      Q.  Do you know what that acronym stands
10  for?
11      A.  I did, but I don't recall.  It's in my
12  report someplace, but I --
13      Q.  Just sitting here today, you've
14  forgotten?
15      A.  Yeah.  The only part that's important
16  to me is it's an auto regression model.
17      Q.  Have you ever been involved in
18  nonlitigation based valuation of an ESOP company
19  where ARIMA was used to project the sponsor
20  company's future revenues?
21      A.  I don't know.
22      Q.  You just don't have a recollection one
23  way or the other?
24      A.  I just don't know one way or the
25  other.

Page 104

1      Q.  Whether you were involved in such a
2  transaction?  That's what I'm asking.
3      A.  I know what you're asking, but my
4  answer is I don't know.
5      Q.  Oh, I see.  Okay.  Got it.
6          Have you ever been involved in a
7  nonlitigation based valuation of any type of
8  company that used ARIMA to project the subject
9  company's revenue stream over a 10-year period?
10      A.  I don't know.
11      Q.  Have you ever been an advisor to a
12  transaction where you relied on sales or revenue
13  projections derived from an ARIMA model?
14      A.  I just don't know.
15      Q.  What do you mean you don't know?  Have
16  you ever as an advisor in a transaction relied
17  upon sales or revenue projections at all?
18      A.  Surely.
19      Q.  And you just don't know whether any of
20  those sales or revenue projections were based on
21  an ARIMA analysis one way or the other?
22      A.  That's correct.
23      Q.  Have you ever prepared in the context
24  of a nonlitigation engagement forecasts of a
25  company's sales and revenues?

**Robert Reilly**                                    **Fish, et al. vs. GreatBanc Trust Company**

Page 105

1     A.  I have not.  It's not related to
2  litigation.  We just don't project sales.  We
3  don't do that.
4          We typically rely on management.
5  Management gives us financial statement
6  projections.  The financial statement projections
7  include revenue projections.  How the actual
8  procedure that management uses, the formula or
9  equation that management uses to project their
10  revenue, I don't know.  They may be based on
11  ARIMA.  They may not be based on ARIMA.  I just
12  don't know.
13     Q.  Is it not part of your regular due
14  diligence as an analyst or an advisor to gain an
15  understanding of how management came up with its
16  projections that they're asking you to rely upon?
17     A.  Not with regard to what formula that
18  they use.  What I want to know is how do those
19  projections compare to history, I want to know how
20  do those projections that were prepared in prior
21  years where I can test those projections because I
22  now have history, how good has management been in
23  the past in projecting revenues, how are these
24  revenue projections consistent with guideline
25  publicly traded company revenue projections, how

Page 106

1  are these projections consistent with projections
2  that are industry revenue projections.
3          But we don't sit down with
4  management and ask them what formula or equation
5  do you use.  Typically the people we speak to may
6  not know that answer either.  If we're speaking to
7  the CEO or the CFO or the CMO, they probably have
8  the revenue projections prepared by one or two
9  levels of management below them and they may just
10  not know that answer.
11     Q.  So is it your experience that CFOs you
12  work with sometimes don't know how the folks that
13  answer to the CFO prepare the company's financial
14  projections or what methodology was used to
15  prepare those financial projections?
16     A.  That wasn't my testimony.
17     Q.  I thought I heard you say that the CFO
18  of a company, in your experience, sometimes does
19  not know how the finance group prepared or the
20  sales group prepared financial projections from a
21  methodological perspective.
22     A.  No.  What I said was --
23     Q.  Okay.
24     A.  -- the CFO may not know how the sales
25  projection was prepared.  The sales projection was

Page 107

1  prepared by someone who may be several levels
2  below the CMO who then gives that input to someone
3  who's several levels below the CFO.
4     Q.  And you think, just based on your
5  experience as an advisor to businesses, that CMOs
6  and CFOs and CEOs typically when they're looking
7  at sales projections or revenue projections don't
8  inquire as to the methodology that the underlings
9  or people down the line used to project out those
10  sales?
11     A.  They may or may not.  I don't ask them
12  that question.  I ask them the question how can I
13  convince myself that these projections are
14  reliable and supportable.
15     Q.  And other than, and I understood your
16  testimony comparing how management does by hitting
17  their projections from a historical basis is
18  important to you, you don't ever, in the ordinary
19  course of your work, Mr. Reilly, or Robert, look
20  at the methodology that management uses to prepare
21  its sales and revenue projections to determine
22  whether or not it is a methodology that's
23  generally accepted in that business' industry for
24  making such projections?
25     A.  Well, honestly, I don't know what that

Page 108

1  means, generally accepted in that business or
2  industry.  We get --
3     Q.  Well, let me explain.  That's used
4  typically by companies in that industry to project
5  their sales.  Do you not find that to be a
6  question you want to ask when determining whether
7  or not you should rely on management's projections
8  in valuations that you're asked to perform?
9     A.  That's right.  I don't ask that
10  question.
11     Q.  Okay.
12     A.  I perform the due diligence I
13  described a few minutes ago.
14     Q.  That's fine.
15          Do you sometimes participate as an
16  advisor in any lending transactions?
17     A.  Yes.
18     Q.  And in any such lending transactions,
19  have you ever run across a lender that analyzes a
20  potential borrower's sales by using an ARIMA
21  statistical approach?
22     A.  I don't know how borrowers analyze
23  sales.  Typically they're analyzing --
24     Q.  I asked you about lenders.  I'm sorry.
25     A.  Oh, I'm sorry.  I misspoke.  Lenders.

**Robert Reilly**                                    **Fish, et al. vs. GreatBanc Trust Company**

Page 109

1  Typically the lenders are analyzing the same set
2  of financial statements that we're analyzing.  I
3  don't know if they do any different due diligence
4  on any line item than we do.
5      Q.  In choosing to rely on Mr. Buchanan's
6  ARIMA projections, Robert, did you undertake any
7  due diligence to determine whether companies
8  generally use ARIMA on a regular basis to project
9  out over a 10-year study period sales and/or
10 revenues?
11     A.  No.  I don't know either way.
12     Q.  Did you ask Mr. Buchanan as part of
13 your due diligence before relying on his
14 projections whether in his experience companies
15 generally, or company managements, generally rely
16 on ARIMA projections to base, ARIMA projections of
17 sales and revenues?
18     A.  I don't think I asked him that.
19         I did ask him is this the
20 methodology you normally use for your clients to
21 project revenue, and he said that it was.  I
22 didn't pursue it further than that.
23     Q.  And who are his clients?  Do you know?
24     A.  I don't know.
25     Q.  Do you know anything about

Page 110

1      Mr. Buchanan's business, what his specific
2  business line is?
3      A.  No, I don't.
4      Q.  Okay.  Robert, if you'd be so kind,
5  can you please turn your attention to Paragraph
6  137 in your report.  It's on Page 36 if that's
7  more helpful.
8      A.  I have that.
9      Q.  In Paragraph 137 you state that the
10 FTI sales forecast 1, if you look in kind of
11 towards the middle of the paragraph, incorporates
12 other management directed and Deloitte & Touche
13 prepared financial statement preparation.
14         Do you see that?
15     A.  Yes.
16     Q.  How do you understand the FTI 1 sales
17 forecast incorporated either Deloitte's two
18 financial statements or two models that you looked
19 at as part of your DCFs or management projections?
20     A.  I don't know that it does.  I think
21 that's incorrect.
22     Q.  Okay.  And how, to the extent you have
23 an understanding, Robert, does FTI sales forecast
24 1 take into account, or incorporate rather, the
25 current as of the transaction date direction of

Page 111

1  industry trends?
2      A.  Well, again, FTI has to explain
3  exactly how the statistics work.
4          As I understand ARIMA, trends
5  continue.  So if there's an upward trend, the
6  model will project an upward trend.  If there's a
7  flat trend, it will continue to project a flat
8  trend.  If there's a downward trend, it will
9  continue to project a downward trend based on a
10 time series regression analysis.
11         So it will project whatever trends
12 are currently manifesting themselves in the entity
13 that it is projecting.
14     Q.  And do you understand that ARIMA -- is
15 it your understanding, I should say, that ARIMA
16 takes into account company performance relative to
17 management's projections at any given timeframe?
18     A.  No.
19     Q.  Okay.  Did you come to an
20 understanding generally in this engagement that as
21 of December 15, 2003, on a year-to-year basis in
22 the prior 10 years, including year to date to
23 December 1, 2003, Antioch's sales had always
24 increased when measured against the prior year?
25     A.  Yes, that's correct.

Page 112

1      Q.  Okay.  I want to look a little bit at
2  the industry trends that you had understood FTI 1
3  takes into account, or took into account, in
4  analyzing or projecting out Antioch's sales and
5  revenues over a 10-year period.
6          And, if you would, turn to
7  initially Page 33.  I just wanted to be sure.  I
8  wanted to ask you, you have no prior experience in
9  either a litigation context or a nonlitigation
10 context with the scrapbooking or hobby
11 marketplace?
12     A.  Well, you asked -- I would say that
13 sounds like two different questions to me.
14     Q.  Okay.  That's called a compound
15 question I think.
16     A.  I can't recall other scrapbook
17 companies that I've analyzed.  I have analyzed
18 other hobby companies.  I think it's well known we
19 installed the ESOP at Hobbico and I performed an
20 ESOP appraisal for that for about seven or eight
21 years.  I think they use someone else now.
22         So we have worked for hobby
23 companies that are ESOP owned companies.
24     Q.  Was the one you mentioned Hobbico?
25     A.  Yes.

**Page 109..112**

**Robert Reilly**                    **Fish, et al. vs. GreatBanc Trust Company**

Page 113

1    Q.  I apologize.  It's not well known
2  enough, at least to reach me.
3    A.  Oh.
4    Q.  But I appreciate your testimony.
5    A.  It's called Hobby Corporation of
6  America.
7    Q.  Okay.
8    A.  H-O-B-B-I-C-O.  And they're
9  headquartered here in Illinois.
10    Q.  When you say "we," are you referring
11  to Robert Reilly?  Did you head up that engagement
12  or --
13    A.  For the initial transaction opinion I
14  did.  I've been reviewing the updated appraisals,
15  I haven't been performing them.
16    Q.  And what is the business of Hobby
17  Corporation of America?
18    A.  Actually, they are pretty well known
19  under their brand names.  They're a manufacturer.
20  So they're more of a competitor I would say to the
21  hobby market to Antioch.
22        They make models, model air, the
23  types of models that you put together, model
24  planes and model trains.  If you go into a hobby
25  -- if you are a craft person and you want to make

Page 114

1  crafts, it's probably manufactured by Hobbico.
2    Q.  So in the segment of the hobby market
3  which is scrapbooking, you have no experience
4  advising companies or in litigation related
5  engagements; correct?
6    A.  Not that I recall, no.
7    Q.  This would have been the first one?
8    A.  As far as I know.
9    Q.  Okay.  In conjunction with your
10  report, did you or, to the best of your knowledge,
11  the plaintiffs' counsel commission any study of
12  that marketplace as it was in 2003 for purposes of
13  your opinion?
14    A.  Not that I'm aware of.
15    Q.  If you look at your report in
16  Paragraph 119 -- sorry.  One moment.  As Jacob
17  pointed out to me, I'm referring to Paragraph 118,
18  where you reference an additional analysis of the
19  industry.
20        I presume you mean the scrapbooking
21  industry?
22    A.  Yes.
23    Q.  And when you say "an additional
24  analysis," you mean in addition to the industry
25  overview that Duff had provided in a document in

Page 115

1  this case known as Deposition Exhibit 119?
2    A.  Yes.  Paragraph 118 just refers to
3  117, right below it.
4    Q.  And then the additional analysis
5  follows in the Paragraphs 119 through 131?
6    A.  Right, the next page or so.
7    Q.  And is that the sum total of your
8  analysis of the industry in addition to what you
9  learned from the industry overview in the Duff
10  report?
11    A.  Well, I think these quotes are
12  representative.  You could see from Exhibit I that
13  I have in my workpaper files and read a lot of
14  industry research.  And for the next couple of
15  pages, 33, 34, and 35, I tried to present facts
16  and quotations that are representative of what the
17  condition of the industry was as of the end of
18  2003.
19    Q.  And so what I'm seeing in terms of
20  what your additional analysis is, it's basically
21  regurgitating what you read in data that you
22  pulled from an Internet search?
23    A.  I don't know if it was an Internet
24  search.  It was research of the type we normally
25  perform when we're performing a transactional

Page 116

1  fairness opinion or valuation with regard to the
2  subject industry.
3    Q.  Can you describe for me in detail the
4  analysis you did of what you found through your
5  search for information as it existed in 2003 about
6  the scrapbooking industry?
7    A.  Well, I don't know what more detail
8  other than I read through a lot of documents.  In
9  fact, the documents are listed, as I mentioned, in
10  Exhibit I.  They are industry reports, security
11  analyst reports, information from the industry
12  trade association, there are industry
13  publications, and then there are general
14  publications like the Wall Street Journal, the New
15  York Times, and so forth, all of which describe
16  the scrapbooking industry within the context of
17  the hobby industry and some of this goes back to
18  2001 and 2002 and 2003.
19    Q.  Got it.
20        So as I understand your answer, the
21  analysis you undertook was researching materials
22  from the relevant time period and then reading
23  them.
24    A.  Yes.
25    Q.  You didn't do any sort of modeling of

**Page 113..116**

**Robert Reilly**                                    **Fish, et al. vs. GreatBanc Trust Company**

Page 117

1  sales trends in the industry or revenue trends in
2  the industry; is that right?
3      A.  That is correct.
4      Q.  How did you define the industry?  And
5  I mean specifically the scrapbooking industry.
6  How did you come to a definition of that industry?
7      A.  Well, I don't know that I came to a
8  definition.  If the word "scrapbooking" was in the
9  article, I read it.  If the word "scrapbooking"
10  wasn't in the article, I didn't read it.
11      Q.  Did you find "scrapbooking" had a
12  consistent meaning among the articles?  Were you
13  able to define that?
14      A.  I didn't see any differences.
15      Q.  Were you able to make a reasonable
16  conclusion that the industry you were reading
17  about in all these articles was the same industry
18  that Creative Memories sold into or was a part of?
19      A.  As far as I could tell.
20      Q.  Right.  On what basis were you able to
21  conclude that Creative Memories, in fact, was a
22  participant in what you were finding as the, quote
23  unquote, scrapbooking industry?
24      A.  Well, I didn't see any, that I can
25  recall, I didn't see any discussion as I would

Page 118

1  have seen in the past in other industries, I
2  didn't see any discussion of various subsectors of
3  an industry and certainly not with regard to the
4  topics that I was looking for, which is what are
5  the general trends, is the industry increasing or
6  decreasing, is there more or less competition.
7      Q.  And my understanding was that you had
8  found the scrapbooking industry was increasing in
9  terms of potential revenues and technological
10  advances; correct?
11      A.  That's correct.
12      Q.  And I think in Paragraph 125 you note
13  that the increase in digital cameras was based on
14  your analysis and research team to be a benefit to
15  the scrapbooking market; correct?
16      A.  That's correct.
17      Q.  I also understood, I actually found it
18  fascinating because I hadn't known it before, in
19  Paragraph 120 you had discovered that scrapbooking
20  generated 2.5 billion in revenue in 2002 and was
21  poised to grow?
22      A.  According to the industry trade
23  association.
24      Q.  Did you have any reason to doubt the
25  statistics that were in that report?

Page 119

1      A.  No.  We typically rely on data from
2  independent industry trade associations.
3      Q.  Did you do any calculation of what the
4  Antioch Company's percentage of that $2.5 billion
5  market was in 2002?
6      A.  No, but obviously it would be a very
7  small percentage.
8      Q.  Like less than 1 percent?
9      A.  It would be about 1 percent, yeah, I
10  guess.
11      Q.  So what were their sales in 2002, if
12  you recall?
13      A.  For Creative Memories for 2002,
14  $200 million and change I would say.
15      Q.  And I also take from your report, I
16  believe it's Paragraph 129, Robert, that the
17  presence of Michaels and Walmart in the
18  scrapbooking market was a factor, a piece of
19  information, that Duff did not adequately consider
20  in discounting management's projections?
21      A.  Well, I didn't try to identify any one
22  specific factor separately, but I did identify and
23  say in my report that that is a, the retail
24  segment of scrapbooking appeared to be growing
25  very rapidly.  All of the data that I was able to

Page 120

1  obtain indicated that that was the growing segment
2  of the scrapbooking market, the Michaels, the
3  Targets, and the Walmart's, those however are not
4  distributors of Antioch products, they're
5  competitors to Antioch products, and that seemed
6  to be a risk factor.  And I did not see any
7  specific analysis or consideration of that in the
8  Duff & Phelps workpapers.
9      Q.  Did you consider anything about
10  Creative Memories that mitigated that risk factor?
11      A.  Well, I mean if I was working for
12  Antioch I would say --
13      Q.  Well, no, I'm sorry, sir.  My question
14  is did you, Robert Reilly, identify or recognize
15  anything about the Antioch Company or Creative
16  Memories or its business models or products that
17  mitigated the risk of increasing competition that
18  you identify in your report?
19      A.  Well, generally every company wants to
20  mitigate competition.
21      Q.  Sir, I really need you to answer my
22  questions.  I'm not here to have a nice, you know,
23  chat with you over coffee.  I need you to answer
24  my questions.
25          In, for example, choosing your

**Robert Reilly**　　　　　　　　　　　　　**Fish, et al. vs. GreatBanc Trust Company**

Page 121

1 company specific premium, just as an example, did
2 you take into account or consider any factors
3 attributable to Antioch, its business model, or
4 its products that mitigated the competitive risk
5 you identified from the presence in the market of
6 big box stores and other competitors?
7 　　A. I'm sure there are mitigating factors.
8 　　Q. That's not what I asked.
9 　　A. Well, I don't know what --
10 　　Q. I'm asking you if you considered it in
11 coming up with your company's specific risk
12 premium.
13 　　A. Well, that's the first time you've
14 asked that question.
15 　　Q. No, it isn't. It's the second time.
16 　　A. No, it's not.
17 　　Q. I'm not here to fence with you.
18 　　　　In coming up with your company
19 specific risk premium, I guess I'll ask this
20 question: How much of that 5 percent is
21 attributable to the increased competition that you
22 deemed Antioch was going to be facing in the
23 future?
24 　　A. I can't answer that.
25 　　Q. Okay. With regard to your company

Page 122

1 specific risk premium, did you consider any aspect
2 of Antioch's or Creative Memories' business that
3 mitigated the competitive risk you've identified
4 several times in your report?
5 　　A. Yes.
6 　　Q. What mitigating factors did you
7 consider?
8 　　A. Their size and reputation.
9 　　Q. Anything else?
10 　　A. Not that I can think of, but there may
11 have been other factors. I just can't recall
12 right now.
13 　　Q. I'm trying to avoid a situation where
14 you're going to recall them at trial. I'm here
15 now to exhaust your knowledge that you have. So
16 I'm going to ask you to think real hard, Robert.
17 　　　　Were there any aspects of Antioch's
18 business or Creative Memories' business that was
19 unique to their business that served to mitigate
20 the risks from increasing competition in the
21 scrapbooking market in the period that was going
22 to follow 2003?
23 　　A. Well, you asked me that and I gave you
24 the best answer I could as I'm sitting here today.
25 　　Q. You can only think of two, its size

Page 123

1 and the quality of its products?
2 　　A. Those are the only factors I can think
3 of right now. I didn't create a pro and a con
4 list.
5 　　Q. Right.
6 　　A. That wasn't the way the 5 percent was
7 developed.
8 　　Q. Okay. I think a moment ago you had
9 estimated that Creative Memories' sales
10 constituted a percent or less of the $2.5 billion
11 market?
12 　　A. According to the hobby industry
13 association.
14 　　Q. Which you rely upon in a sense because
15 it's in your report as part of your industry
16 analysis; correct?
17 　　A. Yes.
18 　　Q. Do you have any sense of how much of
19 that market share Creative Memories was at risk of
20 losing to retail competition?
21 　　A. No.
22 　　Q. Did you determine that Walmart and
23 Target, for example, were -- or let me strike
24 that.
25 　　　　In your analysis of determining

Page 124

1 whether Duff & Phelps properly took into account
2 the competitive environment that Antioch was
3 operating in, did you consider Target and Walmart
4 to be direct competitors with Creative Memories
5 for the same subset of customers?
6 　　A. No. I did not.
7 　　Q. You did not consider whether they were
8 or you didn't consider them to be competitors?
9 　　A. Oh, I'm sorry. I considered them to
10 be indirect competitors and not direct
11 competitors.
12 　　Q. And what do you mean by "indirect
13 competitors"?
14 　　A. Well, they sell the same products but
15 they sell the products in a different way. As we
16 talked about before, the Creative Memories'
17 procedure is to sign up a consultant who is going
18 to have parties in her house or the lady's house
19 down the street and get a group of ladies together
20 who are interested in scrapbooking and
21 periodically sell them products as these ladies,
22 they're typically ladies, develop their
23 scrapbooking hobby.
24 　　　　In the case of Walmart and Michaels
25 and Target, obviously there's no party plan there.

**Page 121..124**

**Robert Reilly**                                    **Fish, et al. vs. GreatBanc Trust Company**

Page 125

1  Consumers will walk into Walmart and decide
2  they're going to, they're looking for either a
3  photo album or a scrapbook and they're looking for
4  all the materials that they put into the
5  scrapbook, all the pictures and that sort of
6  thing.
7      **Q. Sure, sure.**
8      A. So it's a different way of selling.
9          The only point I'm trying to make
10 is a few years earlier, these gigantic retailers
11 were not in the scrapbooking business in any
12 material way. They entered into the scrapbooking
13 business --
14     **Q. Do you know when?**
15     A. Each is different.
16     **Q. Because in 2002 you noted it's a**
17 **$2.5 billion industry. I'm wondering when you're**
18 **saying a few years earlier they weren't in the**
19 **market, what's your basis and what year did they**
20 **enter the market is what I'm asking you.**
21     A. Each one is going to be different.
22 And I have to look up each one separately.
23     **Q. Well, had you looked that up in**
24 **preparing your report, or is that something you**
25 **would have to do after we leave here today and**

Page 126

1  turn out the lights?
2      A. No. It's in my workpaper files.
3      **Q. I didn't see that in your workpaper**
4  **files.**
5      A. Well, I'm sure it's in there.
6      **Q. Okay.**
7      A. But the answer is each one would be
8  different --
9      **Q. That's fine. I want to talk about --**
10     A. I think I'm going to answer your
11 question. They entered the industry in the 2000
12 plus, not the '99 minus. So, in other words,
13 we're talking the last couple of years. We're not
14 talking five or 10 years ago.
15     **Q. And you're sure of that?**
16     A. That's my recollection.
17     **Q. Okay.**
18     A. I mean everything I'm answering you is
19 my recollection as I'm sitting here today.
20     **Q. Do you know what the size of the**
21 **scrapbooking industry was from a sales perspective**
22 **in 2001 relative to the $2.5 billion market that**
23 **you discovered existed through your research in**
24 **2002?**
25     A. I don't recall.

Page 127

1      **Q. Do you know what the size of the**
2  **scrapbooking market was from a sales perspective**
3  **in 2000?**
4      A. I don't recall.
5      **Q. Do you know what the size of the**
6  **scrapbooking market was, the same market that was**
7  **$2.5 billion in 2002, in 1998?**
8      A. I don't recall.
9      **Q. Do you think it might have been**
10 **important to know that information to see how**
11 **Creative Memories' sales or to see if there was a**
12 **relationship between Creative Memories' sales**
13 **historically and the growth or retraction of the**
14 **scrapbooking market generally, to understand the**
15 **relationship, because you identified it as a risk**
16 **as of 2003?**
17     A. Well, I didn't identify the growth of
18 the market as a risk. What I identified primarily
19 is the increase in digital technology. That's the
20 risk I'm really identifying here.
21     **Q. Oh, I'm sorry. I misunderstood. I**
22 **thought you were saying that the presence of big**
23 **box competition, other competition, was a risk to**
24 **Creative Memories and that's a risk that Duff &**
25 **Phelps didn't properly consider. Did I**

Page 128

1  misunderstand your report and your testimony?
2      A. No, no. You're absolutely right. But
3  that's not the primary risk. The primary risk
4  is --
5      **Q. Let's get --**
6      A. -- digital technology.
7      **Q. -- to that.**
8          **Okay. So when you say it wasn't**
9  **the primary risk, what type of risk was it? A**
10 **nonmaterial risk? A secondary risk? A tertiary**
11 **risk? Can you explain?**
12     A. It's none of the above.
13     **Q. Okay.**
14     A. But it's not the primary risk.
15     **Q. What was it then in terms of I guess**
16 **risk levels if it wasn't a primary risk?**
17     A. I don't think I have risk levels. It
18 was a risk factor. And all I'm trying to say here
19 in my analysis is these are large competitors that
20 are now devoting more time and more attention and
21 more space to the scrapbooking industry.
22     **Q. Well, but that's what I'm asking you.**
23          **Do you know how much time and**
24 **attention they were giving the space, as you just**
25 **called it, in 2000 and how that impacted, if at**

**Page 125..128**

**Robert Reilly**                                    Fish, et al. vs. GreatBanc Trust Company

Page 129

1  all, Creative Memories' sales of indirectly
2  competitive products?
3      A.  I just don't recall that.
4      Q.  Wouldn't you have liked to have seen
5  that to understand if there's a relationship
6  between the growth of the scrapbooking industry
7  and Creative Memories' sales of indirectly
8  competing products to see whether or not in fact
9  historically it had been a risk?
10     A.  I may have seen that.  I just don't
11  recall.
12     Q.  Okay.  Do you believe if you had seen
13  that it would be -- or wouldn't you agree, I
14  should say, that had you seen that it would be an
15  important piece of information to take into
16  account if historically it appeared that
17  increasing competition in fact did not depress or
18  negatively impact Creative Memories' sales of its
19  products?
20     A.  Well, I don't know that it did.  I
21  mean two things are happening simultaneously.
22     Q.  It's really a "Yes" or "No" question.
23          I'm asking whether you would have
24  considered it to be important information in
25  analyzing whether or not in fact increasing

Page 130

1  competition was a risk to know whether
2  historically as competition in the scrapbooking
3  industry grew it impacted in a negative way or in
4  any way Creative Memories' sales of its products
5  through its party plan method?
6      A.  I think that would be relevant, and I
7  believe I have that information.  I just can't
8  recall.  But what I can recall is both the
9  industry is growing and Creative Memories are
10  growing simultaneously throughout 2002 certainly
11  and for a while during 2003.  So both entities are
12  growing.
13          That does not mean that the fact
14  that there are large competitors entering the
15  industry there's not a risk factor to Creative
16  Memories.
17     Q.  Again, you keep using words that
18  really don't make any sense to me, and I
19  apologize.  You keep saying that competitors are
20  entering the industry.  You're making some very
21  serious claims in your report, and you're just now
22  giving me fluff.
23          I've asked you several times when
24  did these competitors enter the industry, sir.  It
25  wasn't in 2003; was it?

Page 131

1      MR. GOTTO:  Object.  It's asked and
2  answered.
3      MR. SCHEIER:  No.  It hasn't been
4  answered.  It's been asked several times.
5  You're right about that, Gary.
6      MR. GOTTO:  And he answered that it
7  varied for the three that he's talking
8  about.
9      MR. SCHEIER:  I'm sorry.  I don't
10  believe he's answering the question.
11     THE WITNESS:  Well, my answer
12  remains.  I don't recall specifically.  My
13  recollection is that these competitors were
14  not all in the industry in the 1990s but
15  were subsequent to 2000.
16  BY MR. SCHEIER:
17     Q.  And you don't know one way or the
18  other when they entered the market and how their
19  entry into the market, whenever that was, impacted
20  from a historical perspective sitting in a chair
21  in December 2003 Creative Memories' sales of its
22  products to its end users or end consumers?
23     A.  Well, you asked a lot of questions in
24  there.
25     Q.  It was one single question.  It really

Page 132

1  was.
2      A.  No, it wasn't.
3      Q.  Sure, it was.
4      A.  Then I can't understand.
5      Q.  That's fine.
6      A.  Break it down into smaller bits for
7  me.
8      Q.  I'll be happy to do that.
9          I just want to establish sitting
10  here today you can't tell me when competition from
11  big box outlets like Target and Walmart began to
12  increase in the scrapbooking industry; correct?
13     MR. GOTTO:  Asked and answered.
14     THE WITNESS:  I can't recall
15  without looking at my workpaper file.
16  BY MR. SCHEIER:
17     Q.  And you also, sitting here today,
18  don't recall ever looking at historically the
19  impact, if any, that the entry into the
20  scrapbooking market of competition from big box
21  stores had on Creative Memories' sales; correct?
22     A.  I don't think I analyzed that because
23  I don't know that you can analyze that.
24     Q.  I asked if you looked at it.  That's
25  all.  Have you looked historically at increasing

**Robert Reilly**                                    Fish, et al. vs. GreatBanc Trust Company

Page 133

1  competition and how it compared to Creative
2  Memories' sales?
3      A.  They were both increasing.  I've said
4  that several times now.
5      Q.  Okay.  Very good.
6          And you said that the increasing
7  competition wasn't a primary risk.  What do you
8  mean, what do you consider to be a primary risk
9  and how do you define that?
10     A.  Well, a primary risk I think would be
11  the first risk, and the first risk that I
12  identified and I thought I made clear in my report
13  is the rise of digital photography.
14     Q.  Okay.  Did you in determining that
15  risk -- or strike that.
16          How much of, for example, your
17  5 percent company's specific risk premium is
18  attributable to, did you say the rise in digital
19  photography?
20     A.  Yes.
21     Q.  Okay.
22     A.  I can't quantify that.
23     Q.  And with regard to the rise in digital
24  photography, did you in coming up with your
25  opinion that Duff didn't take that development,

Page 134

1  industry development, into account, consider any
2  potential aspects or marketing plans or product
3  development plans of Antioch that would have
4  mitigated that risk that you identified of
5  emerging digital photography?
6      A.  Not specifically.
7      Q.  Did you do so generally?
8      A.  Well, I would say yes, I did.
9      Q.  Explain to me that risk mitigation
10  analysis that you went through in a general sense.
11     A.  Sure.  I conducted, as my report
12  describes, a number of interviews with former
13  employees, including Mr. Mizen, primarily on this
14  topic.  I spoke to other individuals, but --
15     Q.  The other individuals are Wiser and
16  Anderson?
17     A.  Yes.
18     Q.  Okay.
19     A.  But with regard to Mizen in
20  particular, he indicated to me, as I indicated in
21  my report, that he believed that management, his
22  recollection and the summation of a lot of
23  documentation he had prepared contemporaneously,
24  that management was not adequately addressing the
25  impact of digital photography.

Page 135

1      Q.  Did you ever see any writing,
2  contemporaneous writing, by Mr. Mizen telling
3  management or anybody at the company that they
4  weren't adequately addressing the emergence of
5  digital photography in the marketplace or did you
6  only hear him say that now 10 years later?
7      A.  I don't recall anything in writing
8  with the words "you're not adequately addressing
9  this."
10         What I do recall, and, again, I
11  don't have the documents in front of me, I do
12  recall documentation that he prepared saying this
13  is a serious threat to us.
14     Q.  And did you then from that interview
15  and seeing those documents endeavor to discover
16  whether, in fact, the company took that
17  information it was receiving from Mr. Mizen and
18  others by the way and was, in fact, implementing
19  strategies to enhance its business through digital
20  photography friendly products?
21     A.  I did not see that.
22     Q.  All right.  And is what you saw what
23  the lawyers gave you access to?
24     A.  Well --
25     Q.  In terms of evidence in the case I

Page 136

1  should say.
2      A.  I would think so.  I mean I didn't
3  have any other independent access to the case
4  files.
5      Q.  As I looked at Exhibit I, I didn't see
6  there any monthly narratives by an Antioch
7  employee named Suzanne Johnson in 2003 that often
8  reported on training the company was giving to its
9  consultants on digital photography and digital
10  photography products that were in research and
11  development.
12         Did you see any of those?
13     A.  I don't recall seeing that.
14     Q.  Do you recall the lawyers providing
15  you with any documents generated by Antioch's
16  so-called digital team starting in about 2000 and
17  proceeding forward?
18     A.  I don't recall seeing that either.
19     Q.  Do you think sitting here today if I'm
20  able to prove at trial that those documents
21  existed and that in fact Creative Memories was
22  paying attention to the increasing use of digital
23  cameras in the marketplace and developing products
24  and services to meet that increasing use, that
25  would have been information you would have liked

**Robert Reilly**                                    **Fish, et al. vs. GreatBanc Trust Company**

Page 137

1  to have known in analyzing the actual risks
2  Antioch was facing as it was proceeding from 2003
3  onward?
4      A.  Well, surely I would like to know all
5  information.
6      Q.  Well, I'm talking about that specific
7  piece of information.  You have identified a risk,
8  and in particular a company risk, that Antioch was
9  not in fact heeding what you call warnings or
10 statements by Mr. Mizen that digital photography
11 was a threat.
12         So my question is if I'm able to
13 prove at trial that, in fact, the company was
14 providing services and developing products to meet
15 that increase in the use of digital products in
16 the marketplace, it would have been important for
17 you to see and factor into your analysis that it
18 was, in fact, a risk?
19         MR. GOTTO:  Object to form.
20         THE WITNESS:  I certainly would
21   have liked to have seen that information.
22 BY MR. SCHEIER:
23     Q.  And did you come across any evidence
24 in this case that was provided to you by the
25 lawyers that you considered to provide some

Page 138

1  mitigation against the risk that the emerging
2  digital photography market was posing or, as you
3  understood, was posing on Antioch?
4      A.  Not that I can specifically recall
5  right now.
6      Q.  When you were analyzing the risks
7  facing Antioch, did you at any time look at or
8  study the trends in the party plan sector
9  generally of the direct sales market?
10     A.  Not that I can recall.
11     Q.  Through plaintiffs' counsel or
12 otherwise, did you have an opportunity to review
13 any board of directors minutes or presentations
14 from 2002 or 2003 addressing digital photography?
15     A.  Not that I can recall that directly
16 focused on digital photography.
17     Q.  That's my question.
18     A.  Yeah, I mean I reviewed other board
19 minutes related to the transaction and related to
20 the Deloitte & Touche projections, but not that
21 related specifically to digital photography.
22     Q.  Did you review any, to the best of
23 your recollection, documents because I didn't see
24 them in your Exhibit I that were either provided
25 to you by plaintiffs' counsel or that you came

Page 139

1  into possession otherwise that showed Antioch's
2  strategic initiatives in regard to the emergence
3  of digital photography?
4      A.  I did see a couple of strategic plans.
5  There was at least one and I want to say two
6  strategic planning meetings, and I had minutes
7  from those, but I don't recall any specific, in
8  those documents I did see, I don't recall seeing
9  any specific plan to address digital photography.
10 There were bullet points that indicated the
11 company had to address it.  I didn't see any
12 documents that said and here is how we propose to
13 address digital photography.
14     Q.  Was Mr. Mizen your sole source of
15 information regarding the company's plans or lack
16 of plans in light of the increasing use of digital
17 cameras in the marketplace in or around 2002 and
18 2003?
19     A.  As an individual, you know, I'd have
20 to say yes.  I only spoke to the three people.
21 Wiser indicated, who of course joined the firm
22 later, that he looked back and didn't see that the
23 company had responded quickly and sufficiently to
24 digital photography.  But he's looking at that
25 issue after the fact.

Page 140

1      Q.  And what's the problem with that?
2  Hindsight bias or --
3      A.  Oh, no.  I just thought you would say
4  but he wasn't there in 2003.
5      Q.  Oh.  Well, please try not to
6  anticipate what I say.  I might not be as good a
7  lawyer as you think I am or --
8      A.  Okay.
9      Q.  -- ask the questions that you think I
10 am.  You probably shouldn't be doing that.
11     A.  Okay.  Well, it's not hindsight bias.
12 It's just that his observations are all.  I joined
13 in 2005 but I analyzed the last five years when I
14 joined and I saw that the company had not
15 adequately addressed or adequately responded to
16 the changes in technology.
17         But everything else I looked at was
18 factual information.  In other words, when you
19 look through the company's annual reports, there's
20 not a lot of, I don't recall any discussion about
21 here's our plans for new products with regard to
22 digital photography.
23     Q.  That could just mean that the company
24 traditionally didn't talk about their products in
25 their annual reports.

**Page 137..140**

**Robert Reilly**                                    **Fish, et al. vs. GreatBanc Trust Company**

Page 141

1    A.   That may be true.

2    Q.   Right.

3    A.   But there were also substantial files
4  that I reviewed with regard to the current, each
5  year, that went back several years, through 2003,
6  that were the company's current brochures and
7  advertising and product offerings, the information
8  that they gave to the sales consultants.  And I
9  just didn't see the issue of digital photography
10  created scrapbooking addressed in any of those
11  product offerings.

12    Q.   Would you have the expertise or the
13  eye to recognize in marketing materials provided
14  to consultants products or services that were
15  driven by the increased use of digital photography
16  in the marketplace?

17    A.   Well, I may not be able to identify
18  everyone.  If they used some sort of trademark or
19  code name, then that could be hidden.  But if this
20  was the issue in the industry that my research
21  indicated, I guess what I would have expected is
22  no ambiguity.  In other words, I would have
23  expected the company to say to its sales
24  consultants, Great news, Here are our new digital
25  photography friendly scrapbooking products.

Page 142

1    Q.   And that's based on what experience of
2  yours in the scrapbooking business?

3    A.   It's not scrapbooking.  It's the
4  experience I've had in frankly a couple of hundred
5  industries, that when a company invents sliced
6  bread they don't hide it, they promote it.

7    Q.   And if I'm able to develop at trial
8  and produce at trial documents indicating that, in
9  fact, consultants were being trained to educate
10  the end user on how to incorporate digital
11  photography to scrapbooking, would those have been
12  documents you would have liked to have seen in
13  analyzing the impact of the risk as you saw it of
14  digital photography on Creative Memories'
15  business?

16    MR. GOTTO:  Object to form, calls
17  for speculation.

18    THE WITNESS:  Well, sure.  I'd like
19  to see any additional documents, including
20  those.

21  BY MR. SCHEIER:

22    Q.   Thank you.

23    And would you agree that had you
24  seen such documents, if I'm able to produce them
25  at trial and get them into evidence, it would have

Page 143

1  had an impact or you would have used it to further
2  analyze the severity of the risk the company was
3  facing in regard to digital photography?

4    MR. GOTTO:  Same objection.

5    THE WITNESS:  Well, I certainly
6  would have considered it.

7  BY MR. SCHEIER:

8    Q.   Okay.

9    A.   I'd consider any evidence.  I just
10  can't tell you what impact it would have.

11    Q.   One last category of evidence.  Did
12  the plaintiffs' lawyers give you or did you come
13  across any interview notes from either Julie
14  Williams of Duff & Phelps, Craig Jackson of
15  Houlihan Lokey, or Terry Trimark of Houlihan Lokey
16  of interviews with Mark Mizen and others in regard
17  to digital technology as part of the due diligence
18  process prior to the transaction?

19    A.   Yeah, I saw a lot of due diligence
20  files.  I don't recall seeing those interview
21  notes.

22    Q.   You don't recall seeing those notes?

23    A.   No, sir.

24    Q.   Okay.  So you don't know -- when you
25  were sitting here in judgment of Duff & Phelps and

Page 144

1  its analysis 12 years ago, you didn't have the
2  benefit of seeing what Duff & Phelps is being told
3  by company management during due diligence
4  interviews about the company's plans to address
5  the emergence of digital cameras and the growing
6  popularity of digital cameras?

7    A.   Well, what you're asking me is do you
8  know what you don't know and the answer is no, I
9  don't know what I didn't see.

10    What I did see didn't indicate that
11  specifically Duff & Phelps, that's who we're
12  talking about, considered the impact of digital
13  photography either in their projections or in
14  their discount analysis.

15    Q.   By the way, when you conduct a due
16  diligence investigation in an effort to prepare a
17  valuation of an ESOP company or otherwise, do you
18  incorporate interviews with company management
19  into the due diligence that Willamette does or
20  you, Robert Reilly, do?

21    A.   Typically, yes.

22    Q.   When you were discussing with the
23  lawyers the opinions you were going to be
24  providing and some of your conclusions, did you
25  think to ask them about whether there were any

**Robert Reilly**                                    Fish, et al. vs. GreatBanc Trust Company

Page 145

1  notes or evidence from what Duff was being told in
2  due diligence about the company's plans as they
3  related to the popularity of digital cameras in
4  the marketplace?
5         MR. GOTTO:  I'll have you just
6  answer that "Yes" or "No," please.
7         THE WITNESS:  Okay.  Can I hear the
8  question again?
9         MR. SCHEIER:  Can you read it back,
10  please, Donna?
11         THE REPORTER:  "When you were
12  discussing with the lawyers the opinions you
13  were going to be providing and some of your
14  conclusions, did you think to ask them about
15  whether there were any notes or evidence
16  from what Duff was being told in due
17  diligence about the company's plans as they
18  related to the popularity of digital cameras
19  in the marketplace?"
20         THE WITNESS:  I think the answer is
21  yes.  I understood that I had the entire
22  Duff & Phelps workpaper file.
23  BY MR. SCHEIER:
24     **Q.  Understood.  Thank you.**
25         **Focusing back on Paragraph 129.  In**

Page 146

1  your conclusion that Antioch was facing
2  significant industry risk factors as of the
3  transaction date, you note rapid industry changes
4  due to the advancement of the digital market.
5  Then B is the need to reinvest in business
6  operations in order to implement new technologies.
7         I didn't understand what you meant
8  there.
9     A.  All I'm trying to say there is to the
10  extent that Antioch would respond to the digital
11  transition, they would have to make investments to
12  do that.  They'll either have to make investments
13  in R&D or investments in capital expenditures or
14  both.
15     **Q.  And based on the information you were**
16  **getting from the lawyers, the universe of**
17  **information, is it your testimony that you didn't**
18  **see any documents indicating that Creative**
19  **Memories was investing both employee power and**
20  **money in its efforts to develop services and**
21  **products to meet the popularity and use of digital**
22  **cameras?**
23     A.  No.  What I'm saying is what I looked
24  at is R&D expense in the projections compared to
25  history, and it was flat or decreasing.  I looked

Page 147

1  at capital expenditures in the projections
2  compared to history, and it was flat or
3  decreasing.
4         I would have expected in the case
5  of any company in any industry responding to a
6  technological change that they would have
7  increasing expenditures in selling expenses,
8  increasing expenditures in R&D, and increasing
9  expenditures in capital expenditures, and I just
10  didn't see that.
11     **Q.  Did you look at any of Antioch's**
12  **financial statements between the years of 1999 and**
13  **2002 to determine what the level of R&D was in**
14  **those years?**
15     A.  Yes, sure.
16     **Q.  And did you then do any sort of deeper**
17  **dive to determine what Antioch was devoting its**
18  **R&D dollars to in those years to meet what was**
19  **already then the emerging use of digital cameras?**
20     A.  No.  I did not.
21     **Q.  Did you do any analysis, to the extent**
22  **there was a line item for research and development**
23  **in Antioch's projected financial statements, how**
24  **much of that R&D was devoted to addressing**
25  **emerging technologies?**

Page 148

1     A.  I did not have that detail.
2     **Q.  So as you looked at the R&D line item,**
3  **you didn't know to what issues Antioch was going**
4  **to be devoting its R&D spend?**
5     A.  That is correct.
6         MR. SCHEIER:  I'd like to take a
7  short break.
8         MR. GOTTO:  Okay.  I'll see if
9  lunch is here.
10         THE VIDEOGRAPHER:  Off the record
11  at 12:35 p.m.
12         (A lunch recess was taken, and said
13         deposition continued as follows:)
14         THE VIDEOGRAPHER:  This begins Disk
15  Number 4.  Back on the record at 1:12 p.m.
16  BY MR. SCHEIER:
17     **Q.  Robert, we just were addressing prior**
18  **to the short break the portion of your opinion**
19  **related to industry trends that you viewed as**
20  **risks to the company that Duff did not take into**
21  **account.**
22         **I want to move now to company**
23  **specific trends that you identify and discuss in**
24  **Paragraphs 100 to 111 of Exhibit 822.**
25         **One company trend that you focus on**

**Robert Reilly**                                    Fish, et al. vs. GreatBanc Trust Company

Page 149

1  is called productivity.
2      A.  Yes.
3      Q.  Prior to being asked to prepare this
4  analysis in this particular case, had you ever
5  been called upon to interpret the productivity
6  metric in a party planning organization?
7      A.  Not that I can recall.
8      Q.  Let's look at Footnote 22, please, of
9  your report.  You note there specifically that you
10  write, quote, "I understand that Antioch
11  management considered the productivity metric to
12  be a critical indicator of company health."
13      Did I read that correctly?
14      A.  Yes.
15      Q.  From whom or from what did you gain an
16  understanding?
17      A.  I don't recall specifically.  I think
18  that was just my reading of general management
19  documents.
20      Q.  Can you give me an example of any
21  management document that said that, that was
22  created at a time prior to the transaction?
23      A.  I don't recall any document that used
24  the term "company health."  That was my term.  It
25  seemed to be a statistic that was obviously

Page 150

1  calculated every month and seemed to be important.
2  And that's all that I wanted to say.  There's
3  nothing magic about the term "company health."
4      Q.  So you don't know how Antioch
5  management in 2003 used or considered
6  productivity, the productivity metric I should
7  say?
8      A.  Well, not specifically.  As I say,
9  they calculated it and commented on it in various
10  monthly memos and in various annual meetings, they
11  commented about both what the productivity was and
12  what they intended it to be in the future and what
13  they needed to do to get it from what it was to
14  what they wanted it to be.
15      Q.  Couple of questions.  Did you read
16  Asha Moran's testimony about how management used
17  the productivity metric in the period prior to the
18  transaction?
19      A.  If I did, I don't recall that.
20      Q.  All right.  Did you ever review or
21  gain an understanding of whether, in fact, the
22  company used the productivity metric as a
23  stand-alone indicator of anything much less
24  company health?
25      A.  I wouldn't say that I ever saw it

Page 151

1  being used as a stand-alone indicator.
2      Q.  The next question I have is in looking
3  at the productivity metric for purposes of your
4  report, did you ever bother to go back and look at
5  how management's projection of productivity
6  historically stacked up against the actual
7  productivity performance of the consultants?
8      A.  I don't believe I did that.
9      Q.  Okay.  Did you ever look historically
10  to determine whether the productivity metric
11  standing alone had any correlation to the
12  company's, or I should say Creative Memories',
13  sales performance?
14      A.  I don't recall looking at that.
15      Q.  I understand, Robert, if you can look
16  real quick, I don't have any substantive questions
17  about it, but at Table 1 on Page 30 of your report
18  that's Exhibit 822.
19      I understood from your sources, the
20  sources that you identify as the, the sources for
21  the information contained in Table 1 -- sorry.
22  That was very inarticulate.  Let me start again.
23      I note that the caption under Table
24  1 identifies the sources from which you got the
25  information that appears in your Table 1; is that

Page 152

1  right?
2      A.  Yes.
3      Q.  The first source is WIS 00004.  Do you
4  see that, Robert?
5      A.  Yes.
6      Q.  Did you only have that page, to the
7  best of your recollection, or did you have the
8  benefit of the entire report of which Page 4 was
9  only apart?  Just based on your recollection.
10      A.  I just don't recall without looking.
11      Q.  What would you have to look at?  Your
12  workpapers?
13      A.  Yes.
14      Q.  You know, about that, did you provide
15  your counsel with all of your workpapers to in
16  turn produce to us in this case, to the best of
17  your recollection?
18      A.  Well, my understanding is that we did
19  provide to the plaintiffs' counsel all of the
20  workpapers that we retained as part of our final
21  workpaper file.
22      Q.  And when you talk to me about going
23  back to look at your workpapers, that would be
24  going back to look at information that you, in
25  fact, turned over to the plaintiffs' lawyers to

**Robert Reilly**                                          **Fish, et al. vs. GreatBanc Trust Company**

Page 153

1  provide to us in discovery, as you understood it?
2      A.  If it was a document that I relied
3  upon, yes.  I mean we received many, many, six,
4  eight, or more, ten, bankers boxes of documents I
5  didn't rely upon.  So there could be documents in
6  there that we still have but are not part of our
7  actual engagement workpaper file that I could look
8  at.
9      Q.  I think I understand.
10          So whatever documents you relied
11  upon and retained, you provided to counsel to turn
12  over to us in the process of discovery?
13      A.  Yes, sir.
14      Q.  Okay.  Thank you.
15          Did you, Robert, destroy any of
16  your workpapers between the time that you, at any
17  time before counsel approached you and asked you
18  to provide them in response to my clients'
19  document requests?  E-mails aside for now.  I'm
20  talking about your substantive workpapers.
21      A.  I don't believe so.
22      Q.  And when you discuss your workpapers,
23  are those documents that you store hard copy in a
24  box or file cabinet somewhere in this office?
25      A.  Yes.  They're actually on two medium,

Page 154

1  but the one we ultimately save is a hard copy that
2  we print out in manila file folders in bankers
3  boxes and at the end of the engagement we'll send
4  it to an off-site warehouse.  But ultimately when
5  the case is finished and when the report is
6  finished --
7      Q.  That's okay.  I appreciate it.
8          So it's that universe of documents
9  then that you don't recall destroying any and that
10  you handed over to counsel to produce to us?
11      A.  Yes.
12      Q.  Other than the sales metrics in Table
13  1, the productivity metrics in Table 1, I believe
14  that you derived your company trends information
15  from your interviews with Mr. Mizen, Mr. Wiser,
16  and Ms. Anderson; is that correct?
17      A.  They gave me input, yes.  Is that what
18  you're asking?
19      Q.  I think that's what I was asking.
20          I thought you had said that you
21  considered those interviews in identifying company
22  trends that GreatBanc or Duff & Phelps didn't
23  adequately consider in its analysis.
24      A.  Yes.  I'd agree with that.
25      Q.  Okay.  And that's indicated in

Page 155

1  Paragraph 100, Subsection C; correct?
2      A.  Yes, that's right.
3      Q.  Was it Mr. Greenwald that put you in
4  contact with Mr. Mizen?
5      A.  Yes, it was.
6      Q.  Was that several years ago already at
7  this point, if memory serves?
8      A.  Yes, that's correct.
9      Q.  Have you spoken to Mr. Mizen at any
10  time in the last year or so or in connection with
11  preparing this report in the last several months?
12      A.  Oh, no.
13      Q.  So the last time that you recall
14  speaking to Mr. Mizen back in the 2012 timeframe
15  approximately?
16      A.  I was going to say 2012, yes.
17      Q.  And did you speak to him once or
18  several times?
19      A.  For Mizen, Mizen may have been twice,
20  I want to say twice.
21      Q.  And in crediting what Mr. Mizen was
22  telling you, did you do anything to verify that he
23  would have been part of the Antioch Company's
24  strategic business planning at the board or the
25  management level?

Page 156

1      A.  Well, I had his, I believe I have his
2  resume.  I don't think I asked specifically if he
3  attended board meetings.
4      Q.  That wasn't my question.  I was asking
5  whether you made an inquiry to verify or to
6  understand whether he was a part of the company's
7  strategic business planning or had any input to
8  the board of directors in regard to strategic and
9  business planning?
10      A.  I don't recall asking that.
11      Q.  Did you talk to Mr. Mizen at all about
12  his testimony that in his view the purchase price
13  that the company paid to outside shareholders
14  tendering shares at $850 was, to his mind, fair, a
15  fair price for the shares?
16      A.  No.  I don't recall talking about the
17  share price at all.
18      Q.  You did credit several of Mr. Mizen's
19  remarks about the company's projects and prospects
20  with regard to the emergence of digital
21  photography?
22      A.  Yes.
23      Q.  Would it have been an important piece
24  of information for you to know in undertaking your
25  financial analysis in Exhibit 22 that Mr. Mizen

**Page 153..156**

**Robert Reilly**                              Fish, et al. vs. GreatBanc Trust Company

Page 157

1  believed $850 was a fair price for the shares that
2  he tendered along with my clients and other
3  nonESOP shareholders in the December 2003
4  transaction?
5      A.  No, I don't believe so.
6      Q.  Why not?
7      A.  Well, I don't recall that Mizen had
8  any financial analysis or CPA or CFA or valuation
9  or fairness opinion experience.
10         So he may have personally believed
11  that the price was fair, he may have accepted the
12  price, but I had no reason to believe that
13  performing fairness opinions on a professional
14  basis was part of his experience.
15     Q.  And would it be your view the same if
16  Mr. -- would your view be the same as to
17  Mr. Mizen's ability to interpret sales projections
18  and revenue projections, for example if you
19  thought that they were reasonable or reliable, you
20  have no reason to credit that sort of analysis on
21  his part based on what you know about his
22  background?
23     A.  I think I'd agree with that, yes.
24     Q.  You also spoke to -- let me take one
25  more step back and ask another question, I'm

Page 158

1  sorry, before we leave Mizen.
2         In analyzing the reliability or
3  credibility of what Mr. Mizen was telling you, did
4  you take into account the fact that he engaged
5  Mr. Greenwald and Mr. Dyer to be his counsel?
6      A.  I don't believe I knew that.
7      Q.  You also spoke to Rhonda Anderson;
8  correct?
9      A.  Yes.
10     Q.  When you spoke to Rhonda Anderson,
11  were you aware that she had engaged plaintiffs'
12  counsel to represent her in this case?
13     A.  No.
14     Q.  Do you recall speaking to Ms. Anderson
15  also back in 2012 around the same time you were
16  speaking to Mr. Mizen?
17     A.  Yes.
18     Q.  Since that time have you spoken to
19  Ms. Anderson?
20     A.  No.
21     Q.  Have you read Ms. Anderson's
22  deposition testimony?
23     A.  I did receive it, I skimmed through
24  it, but I did not read it in detail.
25     Q.  Did you read Mr. Mizen's deposition

Page 159

1  testimony?
2      A.  I did read it, but, again, I didn't
3  rely on it in any specific way.
4      Q.  I noted that in your report, and I'll
5  try to get it in a moment -- if you could please
6  focus, Robert, on Paragraph 110.  You there?
7      A.  Yes.
8      Q.  Great.  Thanks.  You'll note, well,
9  I'll note and ask you to focus on, please, the
10  last sentence where you I presume are relating
11  Ms. Anderson's remark to you that sales
12  consultants started to leave Antioch during 2003.
13         Do you see that?
14     A.  Yes.
15     Q.  Let's put the reasons aside for a
16  moment.
17         What did you understand she was
18  telling you when she told you that sales
19  consultants started to leave Antioch during 2003?
20     A.  Yes, and certainly that sentence, now
21  that I read it, could be more descriptive.  It's
22  not to say that sales consultants had never left
23  Antioch before but they were leaving at an
24  increasing pace compared to previously and they
25  were leaving for concerns that she thought she

Page 160

1  could not address as part of management.
2      Q.  So I'm going to restate it, and please
3  tell me if I'm wrong because I don't mean to
4  misstate what you had said.
5         You understood Ms. Anderson to be
6  telling you that consultants during 2003 were
7  leaving the company or not serving as consultants
8  any longer in numbers greater than the company's
9  historical experience prior to 2003?
10     A.  Yes, that the turnover rate or churn
11  rate had increased.
12     Q.  Okay.  Do you recall whether there was
13  any specific point in 2003 that that began to
14  occur, according to Ms. Anderson?
15     A.  I don't recall that she mentioned a
16  specific time.
17     Q.  And, Robert, did you do anything by
18  way of reviewing the evidence in the case that you
19  had possession of and access to to verify whether
20  what Ms. Anderson was telling you was accurate?
21     A.  I don't believe I did.
22     Q.  Lastly, I understand with regard to
23  interviews, you spoke to Richard Wiser and I also
24  believe -- and this will be a compound question --
25  that that happened in 2012.

**Robert Reilly**                                    **Fish, et al. vs. GreatBanc Trust Company**

Page 161

1    A.  Yes.

2    Q.  Since you spoke to Mr. Wiser in 2012,

3  have you spoken to him since, to the best of your

4  recollection?

5    A.  No.  I have not.

6    Q.  Did you review Mr. Wiser's deposition

7  testimony in this case that was taken after that

8  time?

9    A.  Yes, I did.  Again, I didn't rely on

10  it, but I did read through it quickly.

11    Q.  Did you, Robert, have access to

12  e-mails that Mr. Wiser authored during his time

13  with the company in 2005, 2006, about ARIMA

14  statistical modeling and its reliability?

15    A.  I don't recall seeing that.

16    Q.  Robert, I'm going to hand you what's

17  been marked in a prior deposition Exhibit 653, and

18  if you'd just take a look at that.  (Document

19  tendered to the witness.)

20       I only have a question in regard to

21  the third page of the exhibit which is labeled

22  Page 2 on the bottom, but feel free to peruse it

23  so that you're comfortable with the context.

24       Robert, Exhibit 653, if you see on

25  the first page, is an e-mail from Mr. Wiser to

Page 162

1  Asha Moran and Jeff Grong and Barry Hoskins dated

2  June 13, 2005.

3       Do you see that?

4    A.  Yes, I do.

5    Q.  And he notes there that he's attaching

6  a forecast and analysis of our sales and sales

7  forecast.

8       Do you see that's the first

9  sentence of the e-mail to Asha?

10    A.  Yes.

11    Q.  And then if you look at the second

12  page of the exhibit, please, there's a heading

13  there "U.S. Gross Wholesale Forecast."  And do you

14  see just below that the first sentence of the

15  following paragraph reads "A time series ARIMA

16  model continues to project declining sales in

17  2005"?

18    A.  Yes.

19    Q.  If you then look over at the next

20  page, there's a table where in June 2005 Mr. Wiser

21  is projecting out sales for the 12 months 2006?

22    A.  Yes.

23    Q.  So about one to one and a half years

24  out he's projecting sales.

25       Do you see that?

Page 163

1    A.  Yes.

2    Q.  Now, if you'll look at the paragraph

3  immediately below that, he writes "the ARIMA model

4  that projects trends, seasonality, and cycles

5  currently yields a 2006 forecast of $230 million,

6  a 15 percent decline."  He then writes "Since we

7  have just finished May 2005, the ARIMA 2006 model

8  is too far out in the future to be reliable."

9       Did you have any discussions with

10  Mr. Wiser about his view that -- well, let

11  me strike that.

12       Is that the first time you're

13  seeing a statement like that by Mr. Wiser?

14    A.  Yes, it is.

15    Q.  Okay.  You can put Exhibit 653 aside.

16       And I'm going to hand you now,

17  Robert, what's --

18    MR. GREENWALD:  Hey, Mike --

19    MR. SCHEIER:  Yes, Gary.

20    MR. GREENWALD:  Can you just tell

21  me what exhibit number that was?

22    MR. SCHEIER:  The one we just went

23  over, Gary?

24    MR. GREENWALD:  Yes.

25    MR. SCHEIER:  It was 653.

Page 164

1    MR. GREENWALD:  Okay.  Thank you.

2    MR. SCHEIER:  You're welcome.

3  BY MR. SCHEIER:

4    Q.  I'm now handing Robert an exhibit

5  marked in a prior deposition as Exhibit 657.  657

6  is an e-mail from June 2005 from Mr. Wiser

7  Ms. Moran, Mr. Hoskins, and Mr. Grong.  It's dated

8  June 30, 2005.  (Document tendered to the

9  witness.)

10       In the first paragraph he writes

11  "As I look at U.S. sales trends, including initial

12  May results and think about the planning cycle, I

13  find it difficult to recommend a growth scenario

14  until we see a turning point.  U.S. sales through

15  May project to about $273 million, wholesale in

16  2005 as compared to $295 million last year."  Then

17  he writes, quote, "While it is too far in the

18  future to reasonably trust the projection

19  methodology, 2006 projects to be below

20  $250 million."

21       Did I read that paragraph

22  correctly?

23    A.  Yes.

24    Q.  Other than the last e-mail we saw, is

25  this also the first time that you're seeing

Robert Reilly Fish, et al. vs. GreatBanc Trust Company

Page 165

1 Mr. Wiser remark that the ARIMA projection
2 methodology was not reliable to project out from
3 2006 sales in June 2005?
4 A. Yes. I have not seen this memo
5 before.
6 (Deposition Exhibit 825 was marked
7 for identification.)
8 BY MR. SCHEIER:
9 Q. Next, Robert, I'm handing you Exhibit
10 825. (Document tendered to the witness.)
11 Exhibit 825, Robert, is an e-mail
12 now a month after the last one and two months
13 after the first one we looked at just now dated
14 July 5, 2005, from Mr. Wiser to Ms. Moran,
15 subject: June sales.
16 If you look at the third
17 paragraph -- and, again, I don't mean to be
18 forcing you only to focus on what I want you to
19 read. If you feel a need to read other paragraphs
20 or other segments, please feel free to do so and
21 let me know if you need the time. But the third
22 paragraph begins "While I feel these forecasts are
23 too low, they are picking up the downward trend
24 very similarly. I can argue that the ARIMA model
25 is reliable only for about six months through

Page 166

1 2005. The sales response model has a trend
2 variable which I do not like conceptually."
3 Again, you hadn't seen prior to
4 this Mr. Wiser's view that the ARIMA model is
5 reliable for only about six months out into the
6 future?
7 A. I have not seen this memo before, no.
8 Q. Nor have you heard that being
9 Mr. Wiser's view?
10 A. That is correct.
11 (Deposition Exhibit 826 was marked
12 for identification.)
13 BY MR. SCHEIER:
14 Q. Robert, Exhibit 826 is another e-mail
15 from Richard Wiser, this time to somebody named
16 Bobby Cariber, dated November 1, 2005. I'll
17 represent to you Bobby Cariber was an Antioch
18 employee on that date. (Document tendered to the
19 witness.)
20 In the second paragraph, Mr. Wiser
21 is writing to Ms. Cariber "2006 becomes
22 188 million using the same model. It is not that
23 reliable out that far but does give you our
24 current direction."
25 Again, I'll represent to you that

Page 167

1 the model Mr. Wiser is referring to here is ARIMA.
2 I just want to confirm that you hadn't seen this
3 e-mail before either or Mr. Wiser's articulation
4 of the reliability of ARIMA going out in the
5 future expressed as he has in this e-mail before?
6 A. No. I have not seen this e-mail
7 before.
8 (Deposition Exhibit 827 was marked
9 for identification.)
10 BY MR. SCHEIER:
11 Q. Thank you. Robert, here is an e-mail
12 from Richard Wiser. I've marked it as Exhibit
13 827. It is from Richard Wiser to Nancy -- well,
14 the top e-mail is from Richard Wiser to Nancy
15 Blair dated August 3, 2005. (Document tendered to
16 the witness.)
17 Had you read, to the best of your
18 recollection, even at kind of a cursory level
19 Nancy Blair's deposition in this case?
20 A. Yes, I did. Again, I didn't study it
21 but I did read it, yes.
22 Q. Richard is forwarding to Nancy an
23 e-mail he wrote earlier that day, even though you
24 couldn't tell from the timestamp because I think
25 there's a time zone issue, an e-mail he wrote

Page 168

1 earlier in that date to Asha Moran, Barry Hoskins,
2 and Jeff Grong. And if you look on the second
3 page of the memo, on the third paragraph below the
4 ARIMA projection above, Richard writes -- you'll
5 see in that paragraph at the start he's using an
6 ARIMA model.
7 Do you see that in the first
8 sentence of the third paragraph under the graph?
9 A. Yes, I do.
10 Q. He notes in the very last sentence of
11 that paragraph after a narrative explanation of
12 what the graph is showing, "Just as a note, it is
13 too far in the future to be reliable, but 2006
14 projects to be below $200 million."
15 That's similar to the message
16 Mr. Wiser has been giving Ms. Moran and others in
17 the last few e-mails we've seen about the
18 unreliability of ARIMA going out much more than
19 six months. Would you agree?
20 A. That seems to be his opinion, yes.
21 Q. The only thing that strikes me about
22 this particular e-mail unlike the others, Robert,
23 is that you produced this one.
24 I'm just wondering if this
25 refreshes your recollection that you might have

**Robert Reilly**                                    **Fish, et al. vs. GreatBanc Trust Company**

Page 169

1  seen Mr. Wiser's view before.  I'm not implying
2  anything other than it's easy to forget with all
3  the documents you've seen.  But after noticing the
4  Bates stamp here that's coming from you, if it
5  refreshes your recollection that you might have
6  been aware of Mr. Wiser's view previously?
7      A.  Well, this was certainly in my file.
8  I don't recall reading that paragraph, and I don't
9  recall this being his view.
10         I don't recall ever discussing his
11  view about ARIMA.  I mean that just never ever
12  came up at all.  Because at the time I spoke to
13  Wiser, that was I believe a couple of years before
14  FTI entered into the picture and there was any
15  discussion of a sales forecast based upon a
16  Box-Jenkins analysis.
17     Q.  And just to confirm.  Even though you
18  produced this, understandably, you've either
19  forgotten looking at it or just don't recall it
20  being something you focused on when you received
21  this document from the plaintiffs' lawyers?
22     A.  Well, that's right.  If I received
23  this, I probably received this two or three years
24  ago, again, long before the issue of sales
25  forecasting entered into my part of the analysis.

Page 170

1      Q.  If you had known Mr. Wiser's view
2  prior to your reliance on Mr. Buchanan's
3  projections, would it raise a question in your
4  mind of just the reliability of a 10-year
5  projection of sales or revenues using ARIMA?
6      A.  Well, it may have encouraged me to go
7  back and want to talk to Wiser again, which I did.
8  My recollection is I spoke to Anderson once and
9  Wiser once, again, three years ago now, maybe
10  more.
11         So if I had focused on this being
12  his opinion, I think I would have asked him why he
13  had this opinion.  As I mentioned earlier, we had
14  outperformed sales forecasts here.
15     Q.  Sure, sure.
16     A.  But when I seen the Box-Jenkins method
17  used, it's pretty regularly used for long-term
18  forecasting purposes.
19         My understanding is frankly it's
20  more reliable for long-term purposes than it is
21  for short-term purposes.  I don't know that I'd
22  ever want to rely upon Box-Jenkins or any time
23  series regression model to project out sales for
24  say the third month from now for any one
25  particular month.

Page 171

1      Q.  So your view is diametrically opposed
2  to Mr. Wiser's who thinks it is good for that
3  purpose?
4      A.  Exactly.  My understanding has always
5  been --
6      Q.  And what's your experience with the
7  Box-Jenkins projections?  Because I thought
8  earlier I had asked if you had seen that used in
9  transactional context or in business context and
10  you told me you don't know.
11     A.  Well, I don't know when we receive it
12  and when we don't, but I'm familiar with
13  Box-Jenkins just as a general forecasting
14  technique.
15     Q.  When have you ever seen a client of
16  yours use a Box-Jenkins forecasting technique?
17     A.  I can't tell you when.  I mean,
18  again --
19     Q.  Have you ever seen a client of yours
20  use a Box-Jenkins forecasting technique for a
21  period five to 10 years out of the projection
22  date?
23     A.  I just don't know if they've used it
24  or not.  My --
25     Q.  Okay.  Well, you just said to me that

Page 172

1  you've always seen --
2         MR. GREENWALD:  Mike, let the
3  witness answer the question, for crying out
4  loud.  You're blocking him every time he
5  starts to say something.
6         MR. SCHEIER:  Gary Greenwald or
7  Gary Gotto can defend this deposition.  I'm
8  not going to fight with the Garys.
9         MR. GREENWALD:  Then Mr. Gotto
10  should be saying it.
11         MR. SCHEIER:  You know, Gary, I
12  wish you all the best, as you know --
13         MR. GREENWALD:  And I'll keep my
14  mouth shut.
15         MR. SCHEIER:  My understanding is
16  you're not even supposed to be in the case,
17  okay.  I don't want to get into unnecessary
18  discussions here.  But we've made many, many
19  accommodations to the plaintiffs' team based
20  on the current situation.
21         I'd appreciate if you're going
22  to make an appearance at this deposition to
23  defend this witness, that you do so and you
24  let me know you're substituting in for
25  Mr. Gotto.  Otherwise, I'd ask you to please

**Robert Reilly**                    Fish, et al. vs. GreatBanc Trust Company

Page 173

1  reserve your comments and keep them to
2  yourself.
3          MR. GREENWALD:  Well, I've told you
4  that the witness has a right to answer a
5  question, and you know that, and you don't
6  have a right to cut him off.
7          So if Mr. Gotto's not going to
8  make the objection, than I am.  But I'm
9  going to keep my mouth shut from here on in.
10         MR. SCHEIER:  Thank you, Gary.
11         But I will tell you it's
12  actually a pleasure hearing your voice and
13  hearing that kind of the fight that you
14  have, and I appreciate that, and so be well.
15         MR. GREENWALD:  Thank you, Mike.
16         MR. SCHEIER:  You can tell I have
17  great respect for Gary and have worked with
18  him for many years, and it is truly good to
19  hear his voice, but go ahead.
20         MR. GREENWALD:  We do like each
21  other, believe it or not.
22         THE WITNESS:  Well, I can't tell
23  you what clients use ARIMA and what clients
24  don't.  I didn't, frankly didn't know until
25  just now that Antioch used ARIMA in its own

Page 174

1  internal analysis.
2          But I am familiar with it from
3  the literature about business forecasting.
4  And I don't perform Box-Jenkins analyses in
5  our practice.  We would subcontract that out
6  to statisticians, someone else.
7  BY MR. SCHEIER:
8      Q.  Have you subcontracted out to a
9  statistician ever in any engagement you've been
10  working on personally the project of forecasting
11  sales or revenues using a Box-Jenkins methodology?
12      A.  Not specifically.
13      Q.  Well, I'm talking about specifically.
14         MR. GOTTO:  Let him finish his
15  answer.
16         THE WITNESS:  Not specifically we
17  haven't.  But what we've done in other
18  cases, as we did in this case, we didn't
19  request ARIMA, we didn't request
20  Box-Jenkins, we didn't request FTI.  We went
21  to counsel and said you want us, you want us
22  to perform a valuation separately from Duff
23  & Phelps, separately from Deloitte & Touche.
24  I can't do that without a forecast of, a
25  projection of Antioch financial statements

Page 175

1  that's separate from Duff & Phelps and
2  separate from Deloitte & Touche.  We can't
3  do that.  You need, Counsel, you need to
4  give us a set of projections.  And counsel
5  then located FTI who decided to use
6  Box-Jenkins.
7          So I didn't request a
8  Box-Jenkins analysis.  But I've made that
9  request before in other cases.
10  BY MR. SCHEIER:
11      Q.  What request?  To counsel to go out
12  and procure projections?
13      A.  Exactly.
14      Q.  Do you recall any case, and now you
15  must be talking about litigation if you're
16  referring to counsel, where making that request of
17  counsel the work product you got back was sales or
18  revenue projections using an ARIMA or Box-Jenkins
19  approach?
20      A.  Not that I'm aware of because, again,
21  in the other cases, I can't think of an exception,
22  what we get back is a set of financial statements
23  that go out for five or ten years.
24      Q.  Well, in this case did you know that
25  you were working with financial projections that

Page 176

1  were developed using an ARIMA or Box-Jenkins
2  methodology?
3      A.  Well, we didn't receive financial
4  projections.  We only received revenue
5  projections.
6      Q.  Were you aware that those revenue
7  projections were created using an ARIMA or
8  Box-Jenkins methodology?
9      A.  Yes.
10      Q.  Okay.  Now, earlier on what prompted
11  this part of the discussion was your remark that
12  you've always seen Box-Jenkins or ARIMA used to
13  project out on a 10-year period.
14      A.  Yes.
15      Q.  The question I didn't get answered was
16  can you name for me each and every instance where
17  you have either been advisor on a transaction or
18  advisor to a company or expert witness in a
19  litigation where the ARIMA or Box-Jenkins approach
20  was used to project out sales or revenues over a
21  10-year period?
22      A.  I can't give you -- I don't know that
23  that's ever happened before.
24      Q.  Okay.  Thank you.
25      A.  I wasn't talking about previous cases.

Page 173..176

Robert Reilly                                    Fish, et al. vs. GreatBanc Trust Company

Page 177

1  I was talking about the literature with regard to
2  business forecasting.
3      Q.  What literature are you referring to?
4      A.  I can't tell you.  Books.
5      Q.  Even a one?
6      A.  Not a one.
7      Q.  Okay.  Thank you.
8          Now, as I understand it, we've
9  covered the industry trends that you believe Duff
10 didn't adequately take into account.  We've
11 covered the company trends that you don't believe
12 Duff took into account.  And the last, I believe
13 the last pieces of information that you in your
14 report state that Duff didn't adequately take into
15 account were the two Deloitte projections.  Is
16 that a fair summary?
17     A.  Yes.  I can agree with that.
18     Q.  Okay.  Now, as I understand it,
19 Robert, Mr. Greenwald had provided you with
20 Deloitte's October 2, 2003 and December 2, 2003
21 models.  Is that how you got ahold of them?
22     A.  Yes.
23     Q.  Do you recall when he gave them to
24 you?
25     A.  No, I don't, but it was fairly

Page 178

1  recently.  In other words, it was in the 2014,
2  2015 timeframe, not in our first work, which was
3  2009 through 2012.  And then there was about a
4  two-year hiatus when we did nothing.
5      Q.  After that two-year hiatus when you
6  received the Deloitte projections from
7  Mr. Greenwald and reviewed them, did they change
8  any of the damages calculations numerically that
9  you had previously prepared in the 2012 timeframe?
10     A.  Not conceptually.  But now there were
11 two different scenarios that I didn't have before.
12 Before I had the, just the Duff & Phelps scenario,
13 period.  That was my only scenario.
14     Q.  Oh, you didn't have FTI at that time
15 either?
16     A.  I didn't have FTI until 2015.
17     Q.  I understand.  Okay.  Thank you.
18         If I'm remembering right, Robert,
19 and I might have a document to show you if you
20 don't remember, Gary Greenwald had sent you more
21 than just the two Deloitte models that are labeled
22 "Big Downside" from October 2, 2003 and "Downside"
23 from December 2, 2003; is that right?
24     A.  Yes.  There were a series of
25 projections.

Page 179

1      Q.  Yes.  In fact, Deloitte had run
2  approximately 25 different series of projections
3  during 2003.  Is that your recollection based on
4  materials you saw working with Mr. Greenwald?
5      A.  That sounds about right.
6      Q.  Other than the two models that you've
7  cherrypicked to use in your report, the big
8  downside and the downside, did you review any of
9  Deloitte's other models?
10         MR. GOTTO:  Object to form,
11 characterization.
12         THE WITNESS:  Yes, I did.
13 BY MR. SCHEIER:
14     Q.  And is there any reason you didn't
15 rely on any of those but instead chose the two
16 labeled "Big Downside" and "Downside"?
17     A.  No.  I'm really prepared to work with
18 any of their models, any of their projections.
19     Q.  Did you work with the big downside and
20 the downside at Mr. Greenwald's direction?
21     A.  No.
22     Q.  So why did you choose those two and
23 not any of the others that he provided you with?
24     A.  Well, I could have selected any of
25 them.  In fact, I did analyze in some detail the

Page 180

1  upside models.  There were two upside models.
2          I believed at that point you, not
3  knowing you yet, but opposing counsel that I would
4  meet, would then cheer for the use of the upside
5  models.  But the argument then, the battleground
6  would be the discount rate.  Why I'm indifferent
7  about the models to use is I would select a
8  discount rate commensurate with the achievability
9  of the projections.
10         So I looked at the upside models
11 and thought well, I can use these but I'm going to
12 be using a 25 or 30 percent discount rate and I'm
13 going to have to add a 15 percent company specific
14 risk and then frankly I'll have a lot of cross
15 examination about that.
16     Q.  I see.  And that's of course something
17 you want to avoid.
18     A.  Well, and the reason for that is, in
19 full disclosure, as we've learned this morning,
20 that there is no specific formula or equation or
21 model that quantifies the company specific risk.
22         So I felt more comfortable using
23 downward bias -- and "bias" doesn't mean
24 deliberately bias, it just means downward
25 sloping -- financial projections and a discount

**Robert Reilly**                    Fish, et al. vs. GreatBanc Trust Company

Page 181

1  rate that's easy to explain and easy to justify
2  and frankly consistent with Duff & Phelps as
3  opposed to using upward bias projections and then
4  have to justify a discount rate consistent with
5  those projections.
6       Q.  Fair enough.  Actually I am not
7  sitting here as a cheerleader for any upside
8  projections, nor am I a cheerleader for downside
9  projections.
10          But you've mentioned four out of 25
11  models.  Many of those models were management's
12  expected performance, what has been known you've
13  probably seen evidence in the case as management's
14  base case projections.
15          So I just wanted -- I don't have a
16  question.  I just wanted you to know that I'm not
17  a cheerleader for the two upside models.  That's
18  certainly not what I was getting at.  I just
19  wanted to be sure that you had available to you
20  management's base case projections modeled by
21  Deloitte and then you mentioned you saw two upside
22  and you've chosen to use two downside.
23       A.  Right.  And I did look.  I mean I know
24  that's not your question, but I did look at the
25  base case models which were not -- and, again, I

Page 182

1  don't have it front of me -- but my recollection
2  is they're not fundamentally inconsistent with the
3  Duff & Phelps projections.  I mean obviously there
4  are some differences, but they're in the same
5  ballpark.  And I believed well, if I used those
6  models at an 18 percent discount rate, I'm going
7  to get to about my adjusted Duff & Phelps
8  conclusion, I wanted to pick something different
9  so I could actually say here's a range of
10  different ways of looking at this problem.  In
11  some of these ways I leave the projections alone,
12  which I would do with the base case projections
13  and adjust the discount rate.  And some of these
14  analyses I'm going to leave the discount rate
15  alone and use the more conservative projections.
16       Q.  Now, you were aware as you were doing
17  your DCFs, discount cash flow analysis to the
18  extent we have to play this video in court, I
19  think commonly discount cash flow is known as a
20  DCF; is that right?
21       A.  Yes.
22       Q.  So when you chose to run DCFs using
23  the two Deloitte models labeled "Big Downside" and
24  "Downside," were you aware of the reasons that
25  management prepared downside projections for

Page 183

1  Deloitte to run through models?
2       A.  My understanding was that the reasons
3  were consistent with the reasons -- when we're
4  acting as Duff & Phelps, we often ask for downside
5  projections.  We want to see what could
6  potentially go wrong.  If something goes wrong
7  with our product, with the competition, with the
8  industry, with the company, what's the downside
9  risk.
10          And that's what we -- and when we
11  get that, we typically also get most likely case
12  and an upward bias case.  And we analyze all three
13  of those at different discount rates, and you
14  should get to about the same answer more or less.
15       Q.  And did you understand that, in fact,
16  Antioch's management had prepared upside case,
17  base case, and two downside cases at least?
18       A.  Yes.  And I have all of those.
19       Q.  And you don't dispute that the reason
20  management prepared those was not as a replacement
21  base case but instead as I think what you called a
22  scenario analysis to test cash flows should the
23  company's performance fall in one case below and
24  the other case far below what management expected
25  performance to be.

Page 184

1       A.  That is correct.
2       Q.  Okay.  So if I understood part of what
3  you said properly, it's basically that your
4  valuation is basically, I guess is derived from
5  your ability to always manipulate a discount rate.
6          So you could have used the upside
7  but would have applied a larger discount rate.  So
8  instead you relied upon the downside to run your
9  DCF with a lower discount rate to avoid any
10  argument with me that might arise as to why you
11  chose such a large discount rate for the upside?
12       A.  Well, I'd change two things.  One is
13  it's not that analysts manipulate the discount
14  rate.  There is a discount rate -- a lot of
15  analysts, and frankly some judges, make the
16  mistake of thinking there's one discount rate for
17  a company and that can be calculated independently
18  of the projections.
19          There's really -- the discount rate
20  relates to the projections, not to the company.
21  So if there are aggressive projections that are
22  risky, you have a risky discount rate.  If there
23  are base case projections, you have a base case
24  discount rate.  If there are downward bias
25  projections, you'd have a lower discount rate.

Page 181..184

**Robert Reilly**                    **Fish, et al. vs. GreatBanc Trust Company**

Page 185

1    I believe it was easier to explain
2  and justify using the downward bias projections
3  and not adjusting the discount rate than having to
4  explain an adjustment to the discount rate.
5    I'm not opposed to using base case
6  projections. For example, we know that BVI did
7  that the year before in their ESOP valuation and
8  we know that Prairie did that the year after. We
9  know that the year before BVI add the 2 percent
10  company risk factor. Had they had a much higher
11  discount rate than Duff & Phelps did.
12    The year after, which is only two
13  weeks after, it's only two weeks after, Prairie
14  adds a 6 point company specific risk premium
15  higher than my company specific risk premium and
16  analyzes essentially the same projections that
17  Duff & Phelps uses, and I'm perfectly willing to
18  do that. I'm perfectly willing to base my
19  analysis on base case scenarios as long as the
20  analyst, whether it's myself or Duff & Phelps or
21  Prairie, uses a discount rate that recognizes the
22  risk in the base case scenario.
23    **Q. Okay. And you just in this case chose**
24  **not to do that. Instead you glommed onto the two**
25  **big downsides and used a lower discount rate.**

Page 186

1    A. Well, I wouldn't say that because one
2  of my scenarios, don't forget, is the base case.
3  Duff & Phelps is the base case scenario.
4    **Q. And to achieve the valuation that you**
5  **did, you needed to apply to the WAC the 5 percent**
6  **company specific risk premium; right?**
7    MR. GOTTO: Object to form.
8    THE WITNESS: Well, again, it's not
9  to the WAC. It's part of the WAC.
10  BY MR. SCHEIER:
11    **Q. You incorporate it into the WAC in**
12  **that model to Duff's projections, if I'm**
13  **remembering right, the company specific risk**
14  **premium?**
15    A. Of 5 percent, exactly as Prairie does
16  two weeks later when they add a 6 percent company
17  specific risk premium and applies that risk
18  premium and they use a discount rate of I believe
19  18 or 19 percent to, they apply that discount rate
20  to effectively the same projections that Duff &
21  Phelps did.
22    And, of course, we know that the
23  company certainly accepted the Prairie valuation
24  and used and implemented repurchase transactions
25  for a year based on the Prairie valuation. So...

Page 187

1    **Q. And that Prairie valuation using a**
2  **company specific risk -- well, is it fair to say**
3  **that the higher the company specific risk premium**
4  **the lower the valuation?**
5    A. If the projection stays the same, yes.
6    **Q. If the projection stays the same,**
7  **right. Got it. All right. I think I understood**
8  **what you're telling me.**
9    **I just want to be clear that you**
10  **and I don't have a problem, as you know, at trial.**
11  **You don't dispute that the board of directors**
12  **asked management to prepare downside scenarios in**
13  **conjunction with the two meetings where the board**
14  **was going to consider the transaction so that the**
15  **board could understand in a future where**
16  **performance is less than expected that the company**
17  **could still withstand its obligations based on**
18  **cash flows, lower cash flows?**
19    A. Oh, I would agree with that
20  characterization. That's a downward bias
21  projection. And I applied what I believed to be a
22  downward bias discount rate to that. And I think
23  that gets you to the right conclusion.
24    What I would say is, and this is
25  maybe the one thing that was bothering me, if

Page 188

1  that's the right word, about Duff & Phelps, we
2  have, as you know, been involved over the last,
3  well, since 1981, I've been involved with a lot of
4  ESOP transactions, not that many updates anymore,
5  but a lot of ESOP transactions. And if there are
6  three projections or 25 projections that
7  management gives to me, one that I really want to
8  focus on, I'm not going to say I use it
9  exclusively, but if I'm working for the trustee
10  who's worried about the ESOP not overpaying, I
11  want to analyze the heck out of that downside
12  scenario.
13    **Q. And if you didn't get a down -- well,**
14  **have you ever worked for a trustee who's operating**
15  **independently of the board and of any sort of**
16  **other fiduciary within the company? In other**
17  **words, a nondirected trustee it's called.**
18    A. Oh, yeah, sure.
19    **Q. And in those cases when you're**
20  **working, when you're the financial advisor --**
21  **which I presume you have been to a nondirector**
22  **trustee. Yes? Have you?**
23    A. Yes.
24    **Q. Do you here at Willamette when you're**
25  **running those engagements prepare your own set of**

**Page 185..188**

**Robert Reilly**                                    **Fish, et al. vs. GreatBanc Trust Company**

Page 189

1  downside scenarios or analysis scenarios based on
2  company's base case projections that they give
3  you?
4       A.  I don't recall that I've ever done
5  that.  I mean I would say I consistently, and I
6  think my colleagues consistently, go back to
7  management.
8           Now, when you say do we project.
9  We may actually put it into Excel.  We certainly
10  put it into our report, but we're going to go back
11  to management and say okay, you gave us the base
12  case, now what inputs would you give us in order
13  to come up with a downside scenario and an upside
14  scenario.
15      Q.  And would you say it's also customary
16  at times for a financial advisor to an independent
17  trustee who's supposedly working independent of
18  the company to do its own independent analysis of
19  what a downside can look like based on its own
20  understandings of the risks and mitigating factors
21  to those risks that it perceives based on its due
22  diligence?
23          MR. GOTTO:  Object to form.
24          THE WITNESS:  I won't say I've
25  never seen that.  I don't think we've ever

Page 190

1  done that.  I would be reluctant to do that,
2  totally independently of the company because
3  if something goes wrong, if it turns into an
4  Antioch and people are suing each other
5  right and left, what you don't want to have
6  as the financial advisor are the types of
7  question you are very legitimately asking
8  me, for how many years have you managed a
9  scrapbooking company, I've never managed a
10  scrapbooking company, how many scrapbooking
11  companies have you bought or sold, I've
12  never done that, how many do you own, I've
13  never done that, well, why are you making
14  projections of a scrapbooking company.
15  BY MR. SCHEIER:
16      Q.  Yeah.
17      A.  I want to be able to say I didn't.
18  Management, they gave me the variables.  I may
19  have plugged it into Excel, I may have run the
20  final numbers, but the inputs came from
21  management.  In fact, they do run scrapbooking
22  companies.  That's why I'm relying on them.
23      Q.  Sure.  Because management has a lot
24  more information, for example, than you would have
25  and they understand what their expected case is,

Page 191

1  what their downside case is, and what their upside
2  case is; correct?  Is that the concept behind the
3  statement you just made?
4      A.  Yes, sir.
5      Q.  Okay.  Now, you are aware, aren't you,
6  that Duff, in fact, ran downside scenarios?
7      A.  Yes.  I did see that, not within the
8  adjusted discount rate.
9      Q.  No, no.  I'm asking you -- I had
10  thought -- I wasn't sure if you were aware that
11  Duff, in fact, did run downside scenarios either
12  on a management downside or on their own projected
13  downside; right?
14      A.  Yes.  I did see that.
15      Q.  I thought in your report you state
16  that they did not do so?
17      A.  Oh, if I did, I didn't mean to say
18  that.
19          What I would say is my recollection
20  is they just used one discount rate.  They didn't
21  adjust a discount rate to the scenarios.
22      Q.  Okay.  They did not adjust a discount
23  rate but they adjusted the projections which would
24  have an impact on reducing value or reducing cash
25  flows under those DCF models; right?

Page 192

1      A.  Yes, but --
2      Q.  That's what you understood.
3      A.  Yes, but you can't adjust one without
4  the other.  You have to match the discount rate
5  with the projections is what I'm saying.  And I
6  don't believe they did that.
7      Q.  Well, you're using the same discount
8  rate when you look at both of the Deloitte
9  projections I thought.
10      A.  Well, yes, because I think my
11  13 percent I think is the appropriate discount
12  rate for a downward set of projections.
13      Q.  Yes.  And you would not alter that in
14  a downward set of projections similar to the fact
15  that Duff didn't alter that discount rate in their
16  downward set of projections; correct?
17      A.  Well, that's because they're starting
18  with the wrong discount rate.  They're starting
19  with a discount rate that they believe is
20  appropriate to a base case projection and then
21  they're applying that discount rate to a downward
22  projection.
23          What they should have done -- I'm
24  not saying I would agree with their numbers --
25  they should have applied 13 percent to the base

Page 193

1  case and maybe 8 percent to the downward case.  In
2  other words --
3  　　**Q.  But if they would have stuck with**
4  **13 percent on, like you have done on two different**
5  **downward cases, they would have ended up with a**
6  **lower valuation and a worse performance than had**
7  **they done as you suggested which is using**
8  **8 percent discount rate on the downside**
9  **projections; right?**
10  　　A.  Mathematically that's correct.  Their
11  analysis is not right, but I agree with your
12  conclusion.
13  　　MR. SCHEIER:  Okay.  Let's take a
14  short break.
15  　　MR. GOTTO:  Sure.
16  　　THE VIDEOGRAPHER:  Off the record
17  at 2:09 p.m.
18  　　(A recess was taken.)
19  　　THE VIDEOGRAPHER:  This begins Disk
20  Number 5.  Back on the record at 2:27 p.m.
21  BY MR. SCHEIER:
22  　　**Q.  Hi, Robert.  Can you please turn to**
23  **Paragraph 155.**
24  　　A.  Yes.
25  　　**Q.  In that paragraph am I right in**

Page 194

1  **understanding that you did not use the comparable**
2  **company valuation analysis as a check against or**
3  **to compare your DCF analyses?**
4  　　A.  That is correct.
5  　　**Q.  And for the reasons you state in that**
6  **paragraph?**
7  　　A.  Yes, sir.
8  　　**Q.  Now, what about Antioch's financial**
9  **risk profile that you deemed is unique to Antioch**
10  **and you couldn't find a single other company that**
11  **had a similar financial risk profile in and around**
12  **2003?**
13  　　A.  Simply, this is based upon the
14  assumption that future results of operations are
15  downward trending.
16  　　So if you look at the companies
17  that Duff & Phelps selected as guideline
18  companies, all of which I selected and used to
19  come up with components of my DCF analysis, so my
20  beta coefficient, my debt equity mix, are based on
21  the same guideline companies that Duff & Phelps
22  used.  So I don't have any issue with those
23  companies.
24  　　If you look at security analyst
25  projections, those companies are all projected to

Page 195

1  have increasing revenue profitability, and cash
2  flow.  If you believe the four nonDuff & Phelps
3  projections, there are decreasing revenues,
4  profitability, and cash flow with regard to
5  Antioch.  Therefore, Antioch would be different
6  than the Duff & Phelps selected companies.
7  　　**Q.  Okay.  Maybe I'm probably not**
8  **understanding.  It seems to me, and I'm probably**
9  **wrong, that you're in a sense kind of putting the**
10  **cart before the horse.**
11  　　**Don't you work through your DCF**
12  **analysis, and if that's using downward trends in**
13  **sales so be it.  You ultimately apply that to a**
14  **method that gets you a value for the company;**
15  **correct?**
16  　　A.  Yes, that is correct.
17  　　**Q.  Why then wouldn't you look at several**
18  **comparable companies regardless of how their**
19  **revenues and sales are projected to move going**
20  **forward as a check to see whether or not, in fact,**
21  **the projections you're using and your ultimate**
22  **valuation result is correct?**
23  　　A.  Well, because their pricing multiples
24  then really would not be applicable.  If you had
25  two sets of companies in the exact same industry

Page 196

1  and you had five public companies that had
2  expected increased revenue, profitability, and
3  cash flow and you had five identical companies,
4  otherwise identical companies, except decreasing
5  revenue, profitability, and cash flow, the pricing
6  multiples from my second group are going to be a
7  lot lower than the pricing multiples from my first
8  group.
9  　　So if I applied these multiples,
10  and these multiples are the Duff & Phelps
11  guideline companies, if I applied these multiples
12  to the subject company then I'm going to overstate
13  the value of the subject company.
14  　　**Q.  But what I'm not getting is that the**
15  **declining revenues and sales projections you're**
16  **talking about are either downside projections or**
17  **FTI's projections.  What Duff had before it was a**
18  **set of management projections, management who knew**
19  **the business, who understood work in progress, who**
20  **understood future prospects, and used the base**
21  **case to determine comparable companies.**
22  　　**Why, Robert, wouldn't you use the**
23  **base case assumption of increasing revenues or**
24  **Duff's assumption of increasing revenues, though**
25  **not at the level of management's projections, to**

**Robert Reilly**                                    Fish, et al. vs. GreatBanc Trust Company

Page 197

1  test where you ultimately came out on value?
2      A.  Well, I see what you're saying.  And
3  you could do that.  You could use the same
4  guideline companies that Duff & Phelps used.
5          The difference is, again, and it's
6  just another area of controversy, that I don't
7  think would really make the analysis any more
8  supported or unsupported because it's
9  controversial to this analysis.  You take the Duff
10  & Phelps guideline companies, what they do is they
11  extract -- they actually don't price Antioch based
12  on those companies, as you know.  They price
13  Antioch 100 percent based upon a DCF.
14          They take their DCF conclusion,
15  compare that to the financial fundamentals of
16  Antioch, come up with pricing multiples, look at
17  the guideline companies and say oh, we're in that
18  range so the guideline companies support.
19          Based upon my value, I'd come up
20  with pricing multiples, I would look at the same
21  guideline companies and say I'm at the very bottom
22  of that range.  I think that's fine because I
23  think my company has a lot more risk than those
24  companies.  Therefore, I think I should be at the
25  bottom of the range.  And then the controversy

Page 198

1  would be well, why are you at the bottom of the
2  range, why aren't you at the middle of the range
3  where Duff & Phelps is?  And we still get back to
4  well, I think those companies, the guideline
5  companies, are bigger, better capitalized, are
6  responding to their industry risks, technological
7  changes, better and faster than Antioch is going
8  to be.  And, therefore, since Antioch is, in my
9  opinion based on my analysis that you can agree or
10  disagree with, I think they're in a riskier
11  position, I would expect their multiples to be
12  lower than the average guideline company
13  multiples.
14      Q.  And did you run a risk analysis for
15  each of the guideline companies before making your
16  determination that the risk profiles were
17  incompatible with the Antioch Company's risk
18  profiles?
19          In other words, for example, did
20  you look at any of those guideline companies and
21  analyze how they were reacting to technological,
22  the same sort of technological developments that
23  were facing the Antioch Company?
24      A.  We can argue about whether I did or
25  not.  I'll tell you what I did do.  I did in

Page 199

1  detail, I spent a lot of time reading their 10-Ks,
2  annual reports, security analyst reports.  I read
3  a lot about those companies, and I concluded they
4  were just in a better position than Antioch was.
5      Q.  Did you produce any of those reports
6  that you read analyzing the comparable companies
7  to your lawyers in turn produce to us so that I
8  could see that in your workpapers?
9      A.  No.  I think we still have it if you
10  want it, but I didn't produce it.
11      Q.  Do you have any recollection of what
12  the comparable companies or how many of Duff's
13  comparable companies you analyzed by looking at
14  their 10-Ks?
15      A.  All of them.  I didn't do anything
16  other than look at the Duff companies.  I didn't
17  independently select companies.
18          MR. SCHEIER:  Gary, we can write a
19  letter, but to the extent if you recall if
20  you can run that through with Mr. Reilly
21  afterwards and produce those to us if you
22  have no objection to their production and
23  I'd appreciate it if you'd do so.
24          MR. GOTTO:  Okay.
25

Page 200

1  BY MR. SCHEIER:
2      Q.  Did you look at any of Houlihan
3  Lokey's valuation work on behalf of the tendering
4  shareholders?
5      A.  I did read through it.  I didn't study
6  it, you know.  Our job was to study Duff & Phelps,
7  not Houlihan Lokey.  But I did have the, and do
8  have, the Houlihan Lokey file.  Again, I don't
9  think I copied that because we simply didn't rely
10  upon it at all.
11      Q.  Can you identify for me any document
12  or testimony in this record that supports your
13  view, which I think is a lone-wolf view, that the
14  projections management provided to the advisors in
15  the case were unsupportable?
16          MR. GOTTO:  Object to form.
17          THE WITNESS:  I can't think of any
18  as I'm sitting here.
19  BY MR. SCHEIER:
20      Q.  I'd like to move on to your second
21  flaw I think you call it; is that right?
22      A.  Yes.
23      Q.  And then the distinction between, what
24  distinguishes the second flaw from the first flaw
25  is -- actually, you see, Robert, when I say the

Page 201

1  word "flaw," it's kind of like a New Yorker's way
2  of saying "floor," right.
3         But all kidding aside because this
4  is serious stuff. Your second flaw is your effort
5  to value Antioch on a per share basis post
6  transaction; correct?
7      A.  Effectively. It's the consideration
8  of the put price protection and the repurchase
9  obligation.
10      Q.  And in your view that justified a --
11  well, let me take a step back.
12         I think we're saying the same
13  thing. When you were valuing the company on an
14  enterprise value and on a per share basis post
15  transaction, you felt that certain attributes of
16  the put price protection agreement impacted value
17  and you wanted to test that through an analysis.
18      A.  That is correct.
19      Q.  If I understand it right, probably the
20  most material factor that you took into account in
21  valuing the shares post transaction that Duff did
22  not, at least sufficiently in your view, was the
23  projected repurchase obligation; is that correct?
24      A.  Yes.
25      Q.  And just a few initial questions so I

Page 202

1  kind of understand what's going on here between
2  your report and Weinstock. So I'm not intending
3  anything other than just to try to understand your
4  general professional background.
5         You don't hold yourself out as an
6  expert at forecasting an ESOP company's repurchase
7  obligation; correct?
8      A.  No. I think that's an actuary's job,
9  and we're not actuaries.
10      Q.  And you personally don't have or
11  wouldn't hold yourself out as having the expertise
12  sufficient to run a repurchase obligation study
13  for an ESOP company?
14      A.  That's right. We specifically do not
15  do that.
16      Q.  And you rely on Mr. Weinstock's
17  repurchase obligation studies for purposes of your
18  post transaction stock valuation; right?
19      A.  Yes.
20      Q.  Do I understand correctly, Robert,
21  that in really kind of the simplest terms you took
22  Mr. Weinstock's repurchase obligation study using
23  the retirement age assumptions of 50 and 55 and
24  his six assumptions regarding stock price
25  appreciation and turnover rates, basically

Page 203

1  averaged them, discounted them to present value,
2  and came to a conclusion that Duff underprojected
3  the company's repurchase obligation by about
4  $80 million?
5      A.  Almost correct. The only
6  clarification is Weinstock actually has nine
7  assumptions instead of six.
8      Q.  Maybe my six is an upsidedown nine.
9      A.  Well, that could be.
10      Q.  Okay.
11      A.  I would say I really wouldn't blame
12  the Duff & Phelps, which is the same as the
13  Deloitte & Touche future ESOP benefit expense on
14  either Duff & Phelps or Deloitte & Touche. I
15  understand both of those professional firms
16  receive that projection from management. So
17  management tells them basically we've been
18  repurchasing about, whatever it was, 20,000 shares
19  per year historically, we'll repurchase that or
20  less going forward, whatever the number was. I
21  think it was less than that.
22      Q.  Your point is that whatever
23  information Duff had, it led to an
24  underprojection, the use of an underprojection in
25  their post transaction valuation analysis.

Page 204

1      A.  That's right. An underprojection of
2  the --
3      Q.  Repurchase obligation?
4      A.  -- cash flow outflow required to fund
5  the repurchase obligations.
6      Q.  Okay. Gotcha.
7         Now, one thing -- that was a little
8  bit of a digression. I appreciate the
9  explanation. When I accurately stated what you
10  did with Weinstock's study other than I thought it
11  was six assumptions, you corrected me with nine,
12  your analysis that I described, and you said I
13  generally described accurately, is found in your
14  Exhibit 6A; is that correct?
15      A.  I believe that's correct. I'll double
16  check.
17      Q.  Yeah, if you would double check I'd
18  sure appreciate it so I know that that is in fact
19  correct.
20      A.  That's right. The summary is in 6A.
21      Q.  Okay. Very good. Thank you.
22         And then is it fair to say that
23  your valuation analysis and conclusion regarding
24  the second flaw is in your Exhibit 21?
25      A.  That is correct.

Robert Reilly                                    Fish, et al. vs. GreatBanc Trust Company

Page 205

1    Q.  Richard, engagements that -- well,
2  strike that.
3         Did you and Mr. Weinstock jointly
4  choose the assumptions that he used for his
5  repurchase obligation study?
6    A.  No.  I would say that ultimately he
7  selected -- I can't tell you if he had -- I'm sure
8  he had correspondence with counsel.  I don't know
9  if he had instructions from counsel.  But I would
10  say ultimately Weinstock selected all of the
11  assumptions early on when he was first retained by
12  counsel.  I think at one point we may have
13  suggested different scenarios just to get the ball
14  rolling, just to see what type of output he would
15  provide to us.
16         But in terms of ultimately his
17  analysis, his assumptions with regard to growth
18  rates and stock value and retirement rates and
19  employee turnover rates and retirement ages and so
20  forth, those certainly didn't come from us.  I
21  believe they came from Weinstock.
22    Q.  Do you recall ever directing or any of
23  your staff directing Mr. Weinstock to run
24  repurchase obligation studies with turnover rates
25  higher than he had been using in early iterations

Page 206

1  of his study?
2    A.  I don't recall that.  I do recall
3  there was some memos back and forth from my first
4  manager on this case, who has since left,
5  suggesting different alternative assumptions.  I
6  don't remember if they were higher or lower.
7         I don't know at that point in time
8  we had ever even received Weinstock's analysis
9  because I recall asking Corey Chiovari,
10  C-H-I-O-V-A-R-I, who was the first manager who
11  worked on the case with me in '9 through '11, 2009
12  through 2011, I suggested to Corey to suggest some
13  alternatives, to say Weinstock we'd like the
14  output in this format.  But we never actually got
15  the output in that format.  We got the output in
16  Weinstock's format.
17         And ultimately he selected
18  variables that we didn't recommend.  But I think
19  we did recommend here are the types of variables
20  that you should be thinking about or we'd like to
21  see just to see what type of output you're going
22  to give to us.
23    Q.  You don't remember directing Corey to
24  request that Richard Weinstock run repurchase
25  obligation models using a 50 percent turnover rate

Page 207

1  for Antioch employees?
2    A.  I don't remember that.  Corey may have
3  sent Weinstock an e-mail.  I don't remember asking
4  Corey to do that.  But, again, I would say, I
5  would interpret -- we never gave Weinstock an
6  instruction that we're going to rely upon that.
7  It would have been, you know, so far Weinstock,
8  we've never seen anything from you, you know,
9  let's just start the information flow going back
10  and forth, run any variables you want, you know,
11  are you going to actually give us a number in a
12  format that we can convert into a value
13  adjustment.
14    Q.  Just to the best of your recollection,
15  you don't recall directing Corey or you yourself
16  contacting Richard Weinstock to specifically ask
17  him to run models with a higher turnover rate than
18  the models he had previously been providing to
19  you?
20    A.  Not that I can recall, no.
21    Q.  Can we turn our attention to Exhibit
22  21, please.
23    A.  I have that.
24    Q.  Okay.  Do you see the line item
25  "Present value of repurchase obligation

Page 208

1  liability"?  It's marked as E.
2    A.  Yes.
3    Q.  I just wanted, E, it's pretty
4  self-explanatory, but just so the record is clear,
5  that number for the repurchase obligation
6  liability of $80 million or so is derived from
7  your Exhibit 6A?
8    A.  Exactly.  It should be the same
9  number.
10    Q.  Okay.  And is it also true that in
11  your calculation on Exhibit 21 an important
12  assumption you make is that over the 10-year
13  repurchase obligation study period the Antioch
14  Company will be redeeming shares put to it by its
15  employees above fair market value?
16    A.  I don't think that's the case.  I mean
17  I do -- I thought you were going to stop at is the
18  assumption that the sponsor company is going to
19  redeem the stock and that that is the assumption.
20         I don't believe the assumption is
21  that they are going to redeem the stock at above
22  fair market value -- well, let me see.  Now that
23  I'm thinking about that question, the answer
24  probably is yes because we assume, I assume and
25  Weinstock assumes, that the company will redeem

**Robert Reilly**                                    **Fish, et al. vs. GreatBanc Trust Company**

Page 209

1  the stock at the Duff & Phelps value increased at,
2  what does he use, 0 percent, 3 percent, and
3  10 percent.
4          I believe that the Duff & Phelps
5  value is above fair market value.  So now that I
6  think about it, I guess the answer is yes.  I'm
7  assuming that the company will redeem the stock at
8  850 plus as opposed to 550 plus.
9      **Q.  And the reason why that assumption is**
10  **critical, Exhibit 21, is because if the company or**
11  **the assumption was the company was going to be**
12  **redeeming shares going forward on a fair market**
13  **value basis, that would be the equivalent of a**
14  **capital transaction, and that would have no impact**
15  **on value; correct, all other things being equal?**
16      A.  Not entirely.  I think it's always a
17  capital, redemption is always a capital
18  transaction.
19          The difference is -- and if this
20  gets too complicated just cut me off.  The
21  difference is for any individual redemption, if
22  the individual redemption or even for an entire
23  year of redemptions, if the redemptions occur at
24  fair market value, then there should be no impact
25  on the price of the company stock for any

Page 210

1  individual or group of redemptions.
2          On the other hand, you can take a
3  projection of 10 year redemptions going forward,
4  even if those are at fair market value on any
5  given redemption, that's not going to decrease the
6  value of the stock.  We as valuation, ESOP
7  valuation analysts, still consider that and would
8  still potentially adjust the pricing multiple, the
9  discount rate, the projection, because while that
10  may not affect the value of the stock per share it
11  could affect the liquidity of the company.  In
12  other words, that company could run out of cash
13  while still paying fair market value just because
14  it runs out of cash.
15          So the whole repurchase obligation
16  could affect the company value while the
17  redemption of any block of stock would not affect
18  the stock value.
19      **Q.  I don't think it was too complicated.**
20  **It's just I have a simple mind.  So let me try to**
21  **understand.**
22          **When I said "all things being**
23  **equal," what I meant is a company over a 10-year**
24  **projection period is assumed to be redeeming**
25  **shares at fair market value.  All things being**

Page 211

1  **equal includes the ability to stand by and fund**
2  **those redemptions as time proceeds.**
3      A.  Sure.
4      **Q.  So my question is assuming that the**
5  **company has sufficient cash flows to cover the**
6  **redemptions, if the redemptions are being made at**
7  **fair market value it should not impact the value**
8  **of the company, correct, with the valuation?**
9      A.  I agree entirely with that caveat, as
10  long as you don't have the liquidity problem, then
11  as long as you redeem at fair market value it's
12  not going to hurt the per share price.
13      **Q.  In any event, we now agree that**
14  **there -- is the Exhibit 121 is based on an**
15  **assumption that the company for the 10-year period**
16  **going forward is going to be redeeming employee**
17  **puts at a per share value in excess of fair market**
18  **value; correct?**
19      A.  Yes, sir.
20      **Q.  Did you also take into account the**
21  **general assumption make an assumption about the**
22  **amount above fair market value that the company**
23  **would be redeeming shares for each of the 10 years**
24  **of the study period?**
25      A.  Not specifically, no.

Page 212

1      **Q.  How about generally?**
2      A.  Well, I didn't.  Now, I would think
3  that the Weinstock model may do that because it
4  has, it assumes share prices are growing, so,
5  therefore, the delta is going to be growing at
6  0 percent, 3 percent, and 10 percent.  But I
7  didn't give him that input.
8      **Q.  As I understand it, those share**
9  **appreciation assumptions in the Weinstock analysis**
10  **is based on a base price of $840.26.  Is that your**
11  **understanding?**
12      A.  I think that's right.  Whatever the
13  Duff & Phelps post transaction value was which I
14  think was 840 and change.
15      **Q.  Right, okay.  So to properly do --**
16  **well, okay.  So then let's just, let's follow this**
17  **a little bit further.**
18          **Wouldn't the only portion of the**
19  **redemption price that impacts value in the**
20  **scenario that we're describing be that amount paid**
21  **to departing employees in excess of fair market**
22  **value?**
23          **In other words, the amount of the**
24  **share, the price per share the company is paying**
25  **the employee up to fair market value, has no**

**Robert Reilly**                    **Fish, et al. vs. GreatBanc Trust Company**

Page 213

1  impact on valuation.  The impact begins to occur
2  for each dollar above fair market value that the
3  company is paying.  And the impact I'm referring
4  to is impact on a valuation analysis.
5      A.  Impact on a per share value I would
6  agree with that.
7      Q.  Then do you need to revise your
8  $80 million figure here in this line?  In other
9  words, is it incorrect in overstating the actual
10  valuation impact on the company post transaction
11  because it takes into account the entire
12  repurchase obligation as opposed to only that
13  portion of the repurchase obligation that is above
14  fair market value?
15      A.  No.  I don't think so.  And the
16  difference that I'm trying to distinguish is a
17  difference between a per share value and a total
18  value.
19          Ignore the per share value for a
20  moment.  If you have two companies, one of which
21  projects out say $7 million a year of repurchase
22  expense, repurchase expenditures.  It's
23  technically not an expense, but an expenditure.
24  And another company it projects out $70 million a
25  year of repurchase expenditures.

Page 214

1          So this company is going to have
2  $7 million out the door, this company is going to
3  have $70 million out the door.  The second company
4  is going to be worth a lot less than the first
5  company.  So the company value will go down.
6          Now, the reconciling factor, why we
7  can still agree with each other is, the first
8  company is going to have a lot more shares
9  outstanding than the second company is going to
10  have.  So when you divide both values by the then
11  number of shares outstanding, the share price will
12  be the same between the two companies.  The equity
13  value in total will be the difference between
14  those two companies.
15          What I'm saying is the equity value
16  in my revised company with the Weinstock analysis
17  is going to be $80 million lower.
18          So I don't think your -- the
19  question I would ask is not should you subtract
20  the $80 million.  I think the answer is yes, of
21  course you should.  The question I would have
22  asked is should you divide it by 222,000 shares.
23      Q.  Well, we're getting there, we're
24  getting there.
25      A.  Okay.  The answer is I still think yes

Page 215

1  because on day one we still have 222,000 shares
2  outstanding.
3      Q.  Well, you haven't heard the question
4  I'm going to ask because it's going to be a really
5  good question.
6      A.  I'm sure it will be.
7      Q.  But we're not there yet because I
8  don't quite get what you're telling me about the
9  80 million.
10          I understand your own writings and
11  in general I don't think your writings are the
12  Bible, I think you follow an orthodox valuation
13  approach, is that, all things being equal, when a
14  company, an ESOP company, redeems shares put to it
15  by its retiring or departing employees at fair
16  market value, it has no or no material valuation
17  impact on the company.
18      A.  No, no, no.  That's not what I said.
19  No material impact per share.  Not on the company.
20  Per share.
21      Q.  Fair enough.
22      A.  But that's a big difference.
23      Q.  Well, you know, it may or may not be.
24  I think in this case the per share -- let's stick
25  with the per share value at this point.

Page 216

1          A per share value -- you'll agree
2  with me that my statement is correct if I revise
3  it to state that company's redemption of shares at
4  fair market value, all else being equal, has no
5  impact on a per share valuation for the company.
6      A.  That's correct.
7      Q.  Okay.  Your $80 million figure here, a
8  portion of it, captures the fair market value of
9  the shares.  So up to that point the per share
10  value should not be impacted.  The valuation
11  impact occurs, correct, Robert, for each dollar
12  above fair market value that the company is
13  paying.  At that point orthodox or traditional
14  valuation theory would almost uniformly say has an
15  impact on the valuation analysis.  For every
16  dollar above fair market value it has a
17  corresponding reduction in, it causes a
18  corresponding reduction at some ratio of company
19  per share value; correct?
20          MR. GOTTO:  Object to form.
21          THE WITNESS:  I think we agree that
22  moving around redemptions should not change
23  the per share value.
24  BY MR. SCHEIER:
25      Q.  Then I probably asked a bad question,

**Page 213..216**

Robert Reilly                                    Fish, et al. vs. GreatBanc Trust Company

1   and that justifies Gary's objection.
2           Here's what I'm saying:  If paying
3   fair market value has no impact on the per share
4   value of an ESOP company, then to my mind your
5   $80 million figure has to take that into account
6   and needs to be reduced by what the fair market
7   value of those shares are because up to that
8   dollar there should be no negative impact on the
9   company's per share valuation.
10          MR. GOTTO:  Object to form.
11          THE WITNESS:  No, I disagree.
12  BY MR. SCHEIER:
13      Q.  Okay.
14      A.  It has to affect the company value;
15  otherwise, the value per share will be increasing
16  because the value of the company has to go down as
17  the number of shares goes down because you're
18  redeeming stock and there are fewer shares
19  outstanding.
20          So the total company value has to
21  decrease.  And I think Exhibit 6A I think really
22  shows that.
23      Q.  Well, I want to move away from Exhibit
24  6A for a second.  I think maybe I should ask you
25  the question about the number of shares here.

1       A.  Sure.
2       Q.  The way I look at this sheet, if
3   you're going to deduct out the entire amount of
4   the repurchase obligation, you're deducting out
5   from the company's enterprise value the full
6   amount of its repurchase obligation over a 10-year
7   period, present valued, to $80 million.
8       A.  That's correct.
9       Q.  But you're not making a corresponding
10  adjustment to the number of shares down here.  And
11  to my mind, I want to see if you agree, it's an
12  error because, on the one hand, you have the
13  company paying cash, deducting cash from its
14  value, but you're not taking into account that
15  it's buying back and redeeming its shares which
16  the Antioch Company always had historically and
17  always intended to do.
18          So would you agree then that the
19  defect in your methodology on Exhibit 21, or a
20  defect, is that you have not reduced the number of
21  shares in the line item that's identified as
22  number of fully diluted common shares outstanding?
23          MR. GOTTO:  Object to form.
24          THE WITNESS:  No, I understand your
25  question.  I just disagree.  Because on

1   December 15, 2003, those are the number of
2   shares outstanding.  No one disagrees with
3   that.
4   BY MR. SCHEIER:
5       Q.  But don't you have to do some sort of
6   a projection out so that the company is getting,
7   the company's being burdened with an expense but
8   you're not accounting for the benefit, which is
9   it's buying back shares.
10          So it seems to me that don't you
11  have to do a corresponding analysis to determine
12  how many shares over that 10-year period are being
13  redeemed and then whatever calculation you need to
14  do in terms of a present value or some sort of
15  other factor that you would apply because these
16  events are occurring in the future, it would have
17  to adjust that number down in the number of fully
18  outstanding shares because the way you have it
19  laid out it's showing no benefit to the company of
20  the $80 million expense.
21          MR. GOTTO:  Object to form.
22          THE WITNESS:  Sure.  I understand
23  what you're saying.  I mean that's a great
24  question.  And the answer is not only have I
25  never done it that way, I've just never seen

1   it done.
2           The shares are the number of
3   shares -- the value of the company is the
4   present value of future income.  The future
5   income or future cash flow in my Exhibit 6
6   is $80 million less in Scenario B than
7   Scenario A.
8           So everything else being equal,
9   ignore what they are but there's a Scenario
10  A that has a present value of 200, Scenario
11  B present value of 140, that company is
12  worth less.
13          On this day the number of shares
14  is 222,000.  It's not the present value of
15  future shares, it's the number of shares.
16          Now what happens, I think this
17  is what you're asking me, this is the
18  reconciling factor and you might say I
19  didn't take that into account, but I don't
20  know how to, I've never seen it done, going
21  forward when we look at the value per share
22  in 2006, '7, '8, '9 and '10, that value is
23  going to go up because in reality in 2006,
24  '7, '8, '9, and '10 there will be fewer
25  shares outstanding.

Robert Reilly                                    Fish, et al. vs. GreatBanc Trust Company

Page 221

1    So even though the company value
2  is 140 instead of 200, at future dates the
3  stock prices increase, which is exactly what
4  happened. That's why if you look at the
5  Prairie Capital stock values, the value of
6  the company keeps going down while the value
7  per share keeps going up because there are
8  fewer shares outstanding. But that doesn't
9  happen in real life, in Prairie Capital, or
10  in this analysis until 2006, '7, '8, and '9.
11    As of 2003 there were 222,000
12  shares outstanding. There's nothing I can
13  do about that.
14 BY MR. SCHEIER:
15    Q. And, sir, as of 2003 the company has
16  $80 million in its treasury and hasn't yet spent
17  it.
18    A. But they have a liability.
19    MR. GOTTO: Object to form.
20 BY MR. SCHEIER:
21    Q. Yeah, that liability -- and isn't it
22  true that that liability has a corresponding buy,
23  has a corresponding benefit to the company, that
24  this table doesn't take into account?
25    A. It doesn't -- I'm sorry. I didn't

Page 222

1  mean to cut you off.
2    Q. It has a corresponding benefit in that
3  the number of shares are going to be reduced. In
4  other words, the company is getting something for
5  that $80 million over that 10-year period, and
6  you're not reflecting it in your Exhibit 21.
7    A. Well, because that benefit is not a
8  cash benefit. And it's not a benefit to the
9  company. It's a benefit to the remaining
10  shareholders.
11    Q. But it's a benefit that affects value,
12  that impacts the per share valuation.
13    MR. GOTTO: Object to form.
14    THE WITNESS: Going forward.
15    I mean I understand this is a
16  great conceptual issue. We should debate it
17  at the next NCEO conference, but I don't
18  know how -- this really is the way to deal
19  with it.
20 BY MR. SCHEIER:
21    Q. Okay. Let's move back to the
22  deduction you make of enterprise value of
23  $80 million.
24    Would you agree that if you assume
25  the company was purchasing shares for fair market

Page 223

1  value, that line item, all other things being
2  equal, would not be an appropriate adjustment to
3  enterprise value?
4    A. Oh, no. It's still an appropriate
5  adjustment to enterprise value because the value
6  of the company is lower. The value of the shares
7  go up over time as there are fewer shares
8  outstanding.
9    Q. Right, because there are few shares
10  outstanding. But that's not what's happening in
11  your model here. You're not reducing the number
12  of shares. That's exactly I think the conceptual
13  issue that we're talking about. And you might be
14  right but I'm not understanding and my job is to
15  try to understand.
16    A. No, I understand.
17    Q. And you're not reducing the shares.
18    A. I'm not.
19    Q. And I find that -- and I'm questioning
20  whether that, now having pointed that out and
21  having gone through this discussion, you recognize
22  is a methodological problem with this particular
23  table and the valuation that you're presenting
24  here.
25    MR. GOTTO: Object to form.

Page 224

1    THE WITNESS: I don't think it's a
2  methodological problem. I would say that's
3  how the methodology works. You may not like
4  it, I may not like it, but that's how the
5  methodology works. And I just can't imagine
6  a change.
7    Again, you go back to my
8  scenario that we can agree to disagree why
9  it happens. But if we have two companies in
10  my Exhibit 6, one has a present value of
11  cash flow of 200, one has a present value of
12  cash flow of 140. B is worth $60 million
13  less than A. It's just going to pay out
14  $60 million more in cash than A does. And
15  the reason for that is what actually happens
16  with the stock redemption.
17 BY MR. SCHEIER:
18    Q. Yeah.
19    A. Keep in mind, what actually happens
20  with a stock redemption is this transaction:
21  You're an employee, I'm the company, you give me
22  10 shares of stock that we agree is worth $10 per
23  share. Here's the transaction: Debit capital
24  stock $100, credit cash $100. That affects cash
25  flow. The credit cash $100. Debit capital stock

Page 221..224

**Robert Reilly**                    **Fish, et al. vs. GreatBanc Trust Company**

Page 225

1  doesn't affect cash flow.  There is no cash flow
2  benefit to the company of buying back stock.
3  There is a credit to the company.  Cash is out the
4  door.  The value of that company just went down by
5  $100.
6          Why does the value per share stay
7  the same, because there are 10 fewer shares.  But
8  the value of the company just went down by $100.
9  There's no offsetting increase to the value of the
10 company for that debit to capital stock.
11     **Q.  Yeah, but now you're back to the value**
12 **of the company and you're calculating damages on a**
13 **per share basis.**
14     A.  So normally we stop there, we value
15 the company and we're done.  Now you're right, we
16 have to calculate damages on a per share basis.
17     **Q.  Let's try this again.**
18         **You disagree that under your**
19 **assumption that the Antioch Company's redeeming**
20 **shares in excess of fair market value over the**
21 **10-year period, that the correct deduction from a**
22 **valuation perspective from enterprise value in the**
23 **model you present on Exhibit 21 is the present**
24 **value of only that portion of the redemption price**
25 **over fair market value.**

Page 226

1      A.  That's right.
2      **Q.  You disagree with that.**
3      A.  I disagree with that.
4      **Q.  Okay.**
5      A.  Because that doesn't affect the value
6  of the company.  The total cash out the door
7  affects the value of the company.
8      **Q.  But this -- okay.  I don't want to**
9  **argue.  This exhibit is not looking at the value**
10 **of the company.  It's analyzing per share value.**
11     A.  Well, not yet.  Before you get to the
12 divide by 222,000, it's analyzing the value of the
13 company.
14         The value of the company -- I'm
15 saying the correct value of the equity is instead
16 of $236 million, it's $156 million.
17         My analysis is based on decrease to
18 the value of the company.  Honestly, I think we
19 would agree on that.  The only thing we're really
20 disagreeing on is I'm saying I'm compelled because
21 I don't know what to do otherwise by saying on
22 this date, December 15, how many shares are
23 outstanding, 222,000.
24         You're suggesting, which is really
25 conceptually interesting, I mean conceptually I

Page 227

1  like what you're suggesting, I just don't know how
2  to justify it from a professional standpoint.
3  You're saying well, but the present value of the
4  remaining outstanding shares is 100,000, it's not
5  222,000 if you present value what the shares are
6  going to be going forward.
7          I've never seen any -- really, I've
8  been doing this for 40 years, I've never seen any
9  analysis that divides today's company value by the
10 present value of the future shares outstanding.
11 That's a meaningless calculation.
12     **Q.  I think it's very meaningful when**
13 **you're analyzing for litigation purposes damages**
14 **on a per share basis.**
15         MR. SCHEIER:  But with that remark,
16 let's take a short break.
17         THE WITNESS:  Okay.
18         MR. GOTTO:  Perfect.
19         THE VIDEOGRAPHER:  Off the record
20 at 3:10 p.m.
21         (A recess was taken.)
22         THE VIDEOGRAPHER:  Back on the
23 record at 3:26 p.m.
24 BY MR. SCHEIER:
25     **Q.  Robert, I'd like you for the next**

Page 228

1  **question to assume that I'm able to prove at trial**
2  **the transaction price of $850 per share was fair.**
3          **With that assumption in mind, in**
4  **preparing Exhibit 21 would you still deduct the**
5  **$80 million of repurchase obligation that you**
6  **baked in from Weinstock's report?**
7          MR. GOTTO:  Object to form.
8          THE WITNESS:  I believe so.  I'm
9  trying to think of some reason why I
10 wouldn't and I can't think of a reason why I
11 would not.  So I think the answer is that I
12 would.
13 BY MR. SCHEIER:
14     **Q.  With that answer in mind and keeping**
15 **in mind the assumption that I'm able to prove at**
16 **trial that 850 was a fair price in the**
17 **transaction, what adjustment, if any, would you**
18 **make to any of the inputs on Exhibit 21 to end up**
19 **with a corrected Antioch common stock fair market**
20 **value per share post transaction of 850?**
21         MR. GOTTO:  Object to form.
22         THE WITNESS:  Well, I haven't
23 thought about this.  I mean this is the
24 first time I'm thinking about this.  I don't
25 know what I would do differently.

**Robert Reilly**                    **Fish, et al. vs. GreatBanc Trust Company**

Page 229

1   Exhibit 21 starts with the Duff
2   & Phelps enterprise value conclusion of 395
3   which leaves them to 850. So it does start
4   with $850 per share.
5        So at this point I don't know
6   what I would do differently. But I haven't
7   thought it all the way through. This is the
8   first time I thought about that scenario,
9   but I don't know that I would change
10  anything on Exhibit 21. It would presumably
11  affect my earlier exhibits, but I don't know
12  that it would affect Exhibit 21.
13  BY MR. SCHEIER:
14      Q.  Earlier you and I agreed, all things
15  being equal, that if the company is redeeming
16  shares as it did under my hypothetical for fair
17  market value of 850, it would have no per share
18  valuation impact.
19      So if that is still the case in
20  your mind and you and I remain in agreement on
21  that, what, if anything, would change other than
22  deleting the line item for the repurchase
23  obligation on Exhibit 21 to comport with the
24  concept that redemption and fair market value does
25  not impact the per share value of the sponsor

Page 230

1   company?
2        MR. GOTTO:  Object to form.
3        THE WITNESS:  Well, I think this
4   actually -- this exhibit is not inconsistent
5   with that conclusion. In other words, I
6   don't see that this exhibit is at all
7   inconsistent with the conclusion that if a
8   company redeems stock at fair market value,
9   the value per share stays the same.
10  BY MR. SCHEIER:
11      Q.  Well, isn't it inconsistent with my
12  hypothetical?
13      MR. GOTTO:  Let him finish his
14  answer, please.
15      MR. SCHEIER:  Oh, I thought you
16  were.
17      THE WITNESS:  I thought I was
18  finished as well.
19      MR. GOTTO:  Sorry.
20      MR. SCHEIER:  That's okay.
21      THE WITNESS:  I don't see that it
22  is consistent. In fact, I think it has to
23  be.
24      In other words, over time as the
25  number of shares decrease, the value of the

Page 231

1   company has to decrease; otherwise, the
2   share price would increase, not stay the
3   same.
4   BY MR. SCHEIER:
5       Q.  I think you keep jumping back to the
6   value of the company.
7       My question I think is a relatively
8   simple one. Assuming my hypothetical that I'm
9   proving at trial 850 was a fair price, isn't it
10  true that the price reflected on Exhibit 21 on a
11  per share basis immediately post transaction
12  should also be 850?
13      MR. GOTTO:  Object to form.
14      THE WITNESS:  Oh, it never would be
15  850.
16  BY MR. SCHEIER:
17      Q.  What if you eliminated your line item
18  present value repurchase obligation liability,
19  that would get you pretty close to 850; wouldn't
20  it?
21      MR. GOTTO:  Object to form.
22      THE WITNESS:  It wouldn't get you
23  anywhere close to 850. I mean you're
24  missing the big issue here. That's not the
25  big issue.

Page 232

1   BY MR. SCHEIER:
2       Q.  That's not the first time I've been
3   told that, Robert.
4       A.  Well, the big issue, keep in mind, the
5   moment before the transaction, look at the number
6   above that, the moment before the transaction the
7   company has $20 million of debt outstanding. At
8   the moment after the transaction it has $175
9   million of debt outstanding. That's the impact.
10      Q.  On a per share basis you're telling me
11  that has a valuation impact on a per share impact?
12      A.  Counselor, you don't think that adding
13  $150 million of debt has a per share impact? You
14  really may want to take another break.
15      Q.  Well, you can imply to the court that
16  I'm some sort of a dumbbell, and that's okay if
17  that's the way you want to play it. But no, I
18  don't understand it that way.
19      I'm asking you whether now you're
20  telling me immediately post transaction because of
21  the transaction debt the per share value
22  decreases.
23      A.  Yeah, because you have debt in the
24  company.
25      Q.  Okay.

**Robert Reilly**                                    **Fish, et al. vs. GreatBanc Trust Company**

Page 233

1    A.   That's what happens with a leveraged
2 ESOP.  That is the definition of a leveraged ESOP.
3    Q.   This wasn't a leveraged ESOP.  You
4 understand that.
5    A.   It's a leveraged transaction.
6    Q.   But it wasn't a leveraged ESOP;
7 correct?
8    A.   All right.  But --
9        MR. GOTTO:  Object to the form.
10 BY MR. SCHEIER:
11    Q.   Sir, would you agree with me this was
12 not a --
13    A.   You can call it whatever you want.
14 Adding $150 million --
15    Q.   Stop arguing --
16        THE REPORTER:  Hold on.
17        MR. SCHEIER:  Stop arguing with me,
18 stop arguing with me.
19        MR. GOTTO:  Let him finish his
20 question.
21        MR. SCHEIER:  Stop arguing with me.
22 BY MR. SCHEIER:
23    Q.   You called this a leveraged ESOP.  And
24 now you --
25    A.   I never called this a leveraged ESOP.

Page 234

1 I said in a leveraged ESOP.
2    Q.   Which this is not; correct?  So your
3 testimony is irrelevant to me.  This was not a
4 leveraged ESOP; correct?
5    A.   If my testimony is irrelevant, then
6 it's time to go home; right?
7    Q.   Well, other things have been relevant.
8        I don't want to talk about
9 leveraged ESOP when the case we're litigating has
10 nothing to do with leveraged ESOP and there's no
11 leveraged ESOP in the case.  That's what I'm
12 explaining to you.
13    A.   I can agree with that.
14    Q.   Okay.
15    A.   This case adds $150 million of
16 leverage.  That decreases the value of the stock
17 of the company, period, full stop.
18    Q.   And so when I look at Duff's
19 spreadsheet which starts with the $395 million
20 enterprise value, as you have, and also the Duff's
21 interest bearing debt of $173 million, my
22 recollection, it might be faulty, my recollection,
23 sir, is that they end up at a per share value
24 significantly in excess of $800.  And the only
25 difference between your Exhibit 21 and Duff's

Page 235

1 analysis is you deducted out $80 million that is
2 not a deduction off of Duff's analysis.
3        So your implication that I'm some
4 sort of a dumbbell that doesn't understand the
5 obvious, when I look at Duff's analysis it
6 indicates I ain't so dumb.
7    A.   Well --
8        MR. GOTTO:  There's no question
9 pending.
10        THE WITNESS:  If you thought that I
11 meant that you're dumb, I apologize.  I did
12 not mean to imply that at all.  But you can
13 divide --
14        MR. GOTTO:  There's no question
15 pending.
16 BY MR. SCHEIER:
17    Q.   Could the reason that the transaction
18 debt in this case doesn't have the impact you
19 implied on per share value because the debt was
20 taken on to redeem shares in the transaction?
21        MR. GOTTO:  Object to form.
22 BY MR. SCHEIER:
23    Q.   So the number of shares was reduced by
24 the amount of debt?
25    A.   The number of shares was reduced.  So

Page 236

1 the value per share is going to increase, that is
2 correct.
3    Q.   Is it your recollection when you
4 prepared Exhibit 21 that the only adjustment you
5 made to the Duff & Phelps post transaction
6 valuation is the addition of an $80 million
7 deduction from enterprise value based on
8 Mr. Weinstock's repurchase obligation study?
9    A.   I don't recall either way.  It may be.
10 I just don't recall.
11    Q.   You have no recollection of making any
12 other adjustments?
13    A.   I don't, no.
14    Q.   I guess to close the line of
15 questioning, Robert, on the assumption that 850
16 was a fair price in the transaction, how do you
17 get to a value of 468 --
18        MR. GOTTO:  Object to form.
19 BY MR. SCHEIER:
20    Q.   -- post transaction.
21    A.   Well, I would use Exhibit 21.  I
22 wouldn't do anything differently.
23    Q.   Okay.  I guess then the conclusion I'm
24 hearing you reach is that the transaction itself,
25 even at fair market value, assuming again that I'm

**Page 233..236**

**Robert Reilly**                                    **Fish, et al. vs. GreatBanc Trust Company**

Page 237

1  proving 850 was within the range of fair market
2  value, impacted the per share value of the stock
3  to the extent reflected in Exhibit 21.
4         In other words, pre-transaction
5  fair market value was 850, immediately post
6  transaction it's 468. Is that your testimony?
7      A. That's not my testimony because that's
8  not my conclusion.
9      Q. Well, your conclusion is it's 468 post
10 transaction. You have to work with me because I'm
11 able to ask you a hypothetical. You're an expert.
12        The hypothetical is that I prove my
13 case that 850 was within the range of fair market
14 value and Duff's pre-transaction valuation was
15 reasonable and within fair market value.
16        With that hypothetical in mind, is
17 it your testimony that immediately post
18 transaction the per share value of Antioch's stock
19 drops from 850 to 468?
20        MR. GOTTO: Object to form.
21        THE WITNESS: Well, all I can say
22 is I don't know what I would do differently.
23 That's not my analysis.
24        My analysis is that the value is
25 $500 per share and drops to 468. So in my

Page 238

1  analysis, this is not an important issue.
2  Of my $100 million damages number, this is a
3  $5 million number. This is a rounding
4  error.
5         I haven't analyzed your
6  situation, but I don't know as I'm sitting
7  here without analyzing it I don't know what
8  I would do differently or why I would do
9  anything differently. But I can't tell you
10 what the final answer would be because I'm
11 not subtracting 468 from 850. I'm
12 subtracting 458 from 500 and I'm concluding
13 $32 per share damages because I believe, and
14 I believed at 8:00 o'clock this morning and
15 I believe at 3:00 o'clock this afternoon,
16 that the value per share is $500, not 850.
17 BY MR. SCHEIER:
18     Q. I get that, I do get that. But you
19 told me that nothing about Exhibit 21 would change
20 if in fact Duff's equity value, you wouldn't make
21 any adjustments to the numbers below the equity
22 value line if Duff correctly determined the post
23 transaction equity value to be 395,054,000. Did I
24 understand your testimony correctly?
25     A. Well, I think what I said is I can't

Page 239

1  think of any change that I would make. I couldn't
2  think of any change an hour ago, 30 minutes ago,
3  or right now. Maybe if you ask me, you know,
4  three weeks from now, I'll keep thinking about
5  this. It's a really interesting question.
6      Q. That's the second one I've asked you.
7      A. But that's not my analysis. My
8  analysis is 500 minus 468, and I don't know, as
9  I'm looking at Exhibit 1, I don't know what I
10 would do differently. Because your question
11 implies if 850 is the right number, shouldn't you
12 simply ignore the repurchase liability. I mean
13 effectively that's the logical conclusion of your
14 question.
15     Q. Ignore it in a post transaction
16 valuation analysis, yes.
17     A. Well, but all of the literature says
18 you're wrong --
19     Q. Per share. Per share; right? We're
20 talking about per share?
21     A. Well, but there is no such thing as a
22 per share in a vacuum. Per share is always the
23 equity value divided by the number of shares.
24        You can't get to a per share value
25 without having an equity value. And in valuing

Page 240

1  the equity of an ESOP-owned company before or
2  after, all of the literature says the analyst has
3  to consider the repurchase obligation.
4         Your question suggests I should
5  ignore the repurchase obligation, and that's just
6  inconsistent with valuation methodology.
7      Q. Well, my analysis suggests that you
8  ignore it for purposes of valuing on a per share
9  basis. And, in fact, that's I thought exactly
10 what you attempt to illustrate in the table that
11 you've provided us in your rebuttal report.
12        Do you recall the table that you
13 pulled together in Exhibit 824?
14     A. Well, honestly, I don't recall it, but
15 I'd be happy to look at it.
16        MR. GOTTO: What page?
17        MR. SCHEIER: I'm sorry. Page 14,
18 Paragraph 55.
19 BY MR. SCHEIER:
20     Q. What you're showing there is the
21 impact of purchasing a share in excess of fair
22 market value; correct? And it has an impact on a
23 per share basis; correct?
24     A. That's correct.
25     Q. And what you're doing here is

**Robert Reilly**                                    **Fish, et al. vs. GreatBanc Trust Company**

Page 241

1 responding to Mr. Risius's table that showed when
2 a share is redeemed at fair market value, it has
3 no impact on a per share valuation.
4     A.  That's correct.
5     Q.  Okay.  And you, as we sit here today,
6 regardless of our discussion we just had, believe
7 that the way those two scenarios I just described
8 play out is accurate.
9         In other words, when shares are
10 redeemed at fair market value, it has no per share
11 valuation impact.  When shares are redeemed in
12 excess of fair market value, it has some impact on
13 per share values.
14     A.  I certainly agree with that.  But to
15 get to the per share value, in my table on
16 Paragraph 55 and at any time you need to start
17 with, as I say here, the aggregate equity value.
18 The aggregate equity value has to reconsider the
19 repurchase obligation.
20     Q.  You keep talking to me about the
21 aggregate equity value.  And we can just stop
22 shortly, but what Mr. Risius was showing that
23 although the equity value of the company is
24 reduced by a fair market value redemption, so is
25 the number of shares.  And so the per share value

Page 242

1 remains the same.
2         Your table was intended to show, as
3 I understand it, correct, that when you make your
4 redemption for an amount in excess of fair market
5 value, not only is the company's equity value
6 reduced but also the share value of that company
7 is reduced.
8     A.  That's the purpose of the table.
9 Regardless of what the purpose of the table is, to
10 get to the correct fair market value of the stock,
11 you need to have the correct fair market value of
12 the equity.  To get to the correct fair market
13 value of the equity, you need to consider the
14 repurchase obligation correctly, and Duff & Phelps
15 didn't do that.
16     Q.  That's much different than what you
17 and I were talking about just now on the two
18 tables.
19     A.  I don't think it is.  So we can agree
20 to disagree.
21     Q.  Well, we don't have to agree to
22 disagree.  I need to understand why you were
23 responding to Mr. Risius's table the way you did.
24         Mr. Risius's table showed a stock
25 redemption at fair market value.  It further

Page 243

1 showed a reduction in that company's equity value
2 but a corresponding reduction in that company's
3 number of shares.  The result was that on a per
4 share value, although the company's enterprise
5 value went down, its share value was not impacted
6 and remained the same.
7         Do you recall seeing that table?
8     A.  Sure.
9     Q.  And I believe in your rebuttal report
10 you had no issue with the table.  You took issue
11 with what you believed to be Mr. Risius's
12 misunderstanding of your assumption which was that
13 the company was going to be redeeming shares in
14 excess of fair market value.
15     A.  That's correct.
16     Q.  And so you went ahead then and
17 prepared a table showing that in the latter
18 situation, the company pays out in excess of fair
19 market value corresponding reduction in enterprise
20 value, corresponding reduction in shares, but
21 because it was in excess of fair market value,
22 unlike in Mr. Risius's fair market value table, in
23 your above fair market table not only did the
24 enterprise value go down, the per share value went
25 down; correct?

Page 244

1     A.  I agree with all that.
2     Q.  Okay.  Thank you.
3         And I guess theoretically that same
4 concept would apply, those two tables would apply,
5 where in Table 1, Risius's table, Antioch redeemed
6 shares at fair market value.  In other words, it
7 would pay fair market value for those shares, thereby
8 reducing its enterprise value, but its shares
9 would be redeemed and taken out of circulation.
10 The result would be a company with a lower
11 enterprise value but a per share value that was
12 not impacted by that redemption transaction;
13 correct?
14     A.  That sounds correct.
15     Q.  And in another scenario, the one you
16 believe, Antioch redeemed shares for an amount in
17 excess of fair market value, its enterprise value
18 goes down.  But not only does that happen, there's
19 a corresponding reduction in the share value as
20 illustrated in the table that's appended to
21 Paragraph 55 of your rebuttal report; correct?
22     A.  That's correct.
23     Q.  Robert, I wanted to ask you a couple
24 of brief questions about your Exhibit 22.  You
25 there?

**Robert Reilly**                                    **Fish, et al. vs. GreatBanc Trust Company**

Page 245

1  A.  Yes, I am.

2      Q.  Thank you.  Does the analysis on your

3  Exhibit 22 feed into any of your damage

4  calculations relative to either flaw 1 or flaw 2?

5  A.  No.

6      Q.  Do you have an understanding of how,

7  if at all, the plaintiffs intend to use the

8  analysis that you prepared at their direction on

9  Exhibit 22?

10  A.  No.

11      MR. SCHEIER:  Robert, I am going to

12  I believe move on to some questions

13  regarding your third flaw.  I'm sorry to do

14  this, but I'd like to take a short break

15  before I do that.

16      MR. GOTTO:  Sure.

17      MR. SCHEIER:  Thank you.

18      THE VIDEOGRAPHER:  Off the record

19  at 3:49 p.m.

20      (A recess was taken.)

21      THE VIDEOGRAPHER:  This begins Disk

22  Number 6.  Back on the record at 3:59 p.m.

23  BY MR. SCHEIER:

24      Q.  Robert, I wanted to talk a little bit

25  about the third flaw that you discuss in Exhibit

Page 246

1  822 and again in Exhibit 824.

2      In Exhibit 822 which is the report

3  that you delivered to the defendants, you did not

4  attribute any damages to the 409P issue that is

5  the subject of your third flaw analysis; correct?

6  A.  That is correct.

7      Q.  You did, however, at the request of

8  counsel calculate damages attributable to, for

9  lack of a better term, the 409P issue in the

10  report that you tendered on July 15, 2015;

11  correct?

12  A.  That is correct.

13      Q.  If I understand the analysis you

14  ultimately landed on in regard to 409P related

15  damages to the third flaw, you chose to use a

16  company specific risk premium of 1 percent applied

17  to the Duff based DCF in Exhibit 14 to your April

18  report; correct?

19  A.  That's correct.

20      Q.  As I understand it, that is the only

21  adjustment you made to the Duff DCF on Exhibit 14

22  to account for damages related to the 409P issue;

23  correct?

24  A.  That's correct.

25      Q.  Is it your view that the 409P risk was

Page 247

1  known and knowable as of December 15, 2003?

2  A.  I would say yes.

3      Q.  Then why didn't you apply a company

4  specific risk premium or some other means to

5  calculate the damages attributable to this 409P

6  issue in reference, or with FTI 1's, the FTI 1 DCF

7  which you've written several times was chosen by

8  you because it accounted for all known and

9  knowable risks?

10  A.  Sure.  The only opinion I have with

11  regard to this issue is that it was a risk to the

12  company that could have been and should have been

13  considered somehow by Duff & Phelps.

14      In my rebuttal report I'm

15  recommending an illustrative methodology for one

16  potential way to quantify it only in response to

17  Mr. Risius who says there's no way to quantify

18  this so it's not relevant.  I wanted to illustrate

19  it's potentially quantifiable.  So whether it's

20  quantifiable or not, I think it's still relevant.

21      So my intention in my original

22  report and my intention today is not to quantify

23  this risk, not to assign a dollar value to the

24  third flaw, just to indicate that there was

25  another serious risk that was facing this company

Page 248

1  Antioch in December of 2003 that Duff & Phelps

2  either didn't know about, wasn't informed about,

3  or ignored, and, therefore, the Duff & Phelps

4  analysis is just unreliable.

5      As I say, I wasn't trying in my

6  first report or my second report to measure the

7  damages and my opinion of damages does not include

8  flaw 3.

9      My opinion is that this was an

10  issue that a financial advisor like Duff & Phelps

11  should have been aware of, should have considered

12  somehow, and they didn't do it.  Therefore, their

13  fairness opinion is just not reliable.

14      Q.  Couple follow-ups.  Do I understand

15  you saying that as we sit here today you are not

16  giving the opinion and will not be giving an

17  opinion at trial that the failure of Duff & Phelps

18  to take into account the 409P risk damaged the

19  company in a way that you're going to quantify?

20  A.  That is correct.

21      Q.  I see.  Is it my understanding also

22  that you what I believe -- well, strike that.

23      Did I understand you to say that

24  you understood Mr. Risius in his report wrote that

25  it was not possible to calculate damages

**Robert Reilly**                                    **Fish, et al. vs. GreatBanc Trust Company**

Page 249

1 attributable to 409P?
2    A.  I think he said that.  I may not be
3 correct.  That's my recollection as I'm sitting
4 here.
5    **Q.  For the record, I don't believe he**
6 **said that.  He simply noted that you didn't**
7 **attribute damages to it.  He was unclear then why**
8 **you had written about it.  But that's okay.**
9    A.  Sure.
10    **Q.  It might have been a misunderstanding.**
11    A.  That's right.
12         And, again, I can explain why I did
13 it.  But my intention was never to quantify that
14 damage.  It was simply to say that this is an
15 issue that a financial advisor should have
16 considered, particularly at this time period,
17 2003, and it just wasn't considered, that I saw,
18 by Duff.
19    **Q.  So I just want to be very clear in**
20 **light of what you just said.  You're not going to**
21 **be giving an opinion at trial that the ESOP or the**
22 **company suffered damages in the amount of**
23 **$20.5 million, the number set out in Paragraph 78**
24 **of Exhibit 824 as a result of Duff's failure to**
25 **properly account for the 409P related risks**

Page 250

1 discussed in your first report?
2    A.  That's exactly right.  I just
3 considered the $20 million number an illustrative
4 number to show that there is some way that Duff
5 could have quantified this issue.
6         Alternatively -- but that's not my
7 opinion of damages.  That's just to show that one
8 way you could possibly look at the damages would
9 be to increase the discount rate for this risk.
10         Alternatively, the other
11 possibility, which I think is the more serious
12 possibility, and I'm not saying Duff should have
13 reached this conclusion but potentially should
14 have considered it, is to raise their hand and say
15 until this issue is resolved to our satisfaction I
16 can't give you, GreatBanc I can't give you a
17 fairness opinion, this is a serious unresolved
18 issue.  Geez, Louise, the company could lose its S
19 election status.  Before I give you any fairness
20 opinion, we got to really understand this better.
21 I think that would have been a responsible thing
22 for a financial advisor to do.
23    **Q.  Did you see in any of Duff's**
24 **workpapers recognition that a year and a half**
25 **after the transaction the company would be**

Page 251

1 obligated to comply with the restrictions in Rule
2 409P?
3    A.  I don't recall.  I just don't recall
4 either way.
5    **Q.  And you've not seen any evidence that**
6 **the company in fact ever violated Internal Revenue**
7 **provision 409P?**
8    A.  I would say technically not.
9         I have seen subsequent meaning
10 2005, '6, and '7 board minutes and so forth and
11 other memoranda where the company had to either
12 buy back shares or buy back warrants to avoid
13 violating 409P.
14         So it became an issue that the
15 company had to address by actually borrowing money
16 specifically to buy back shares and warrants from
17 the Morgan family to keep the Morgan family under
18 the 50 percent threshold.
19    **Q.  Sure.**
20    A.  So could the company avoid the issue?
21 Yeah, but they'd have to actually do something.
22 And in fact they did.  They did actually spend
23 real money to avoid a 409P violation.
24    **Q.  But, again, you're not attributing any**
25 **damages to the company or that the plaintiffs can**

Page 252

1 **prove at trial, certainly you're not going to**
2 **support it, that in regard to any sort of**
3 **additional borrowings or any other actions of the**
4 **board of directors of the company post**
5 **transaction?**
6    A.  That is correct.  That is not my
7 opinion.
8    **Q.  I understand.**
9         MR. SCHEIER:  You know, Gary, I
10 hope you and Robert don't get angry with me,
11 but we'll have to take another break because
12 I could be close to being done.
13         MR. GOTTO:  All right.
14         MR. SCHEIER:  I just want to now
15 review my notes and be sure.  I'll come back
16 in and let you know.  But thank you for
17 being patient with me.
18         MR. GOTTO:  Great.
19         THE VIDEOGRAPHER:  Off the record
20 at 4:10 p.m.
21         (A recess was taken.)
22         THE VIDEOGRAPHER:  Back on the
23 record at 4:21 p.m.
24 BY MR. SCHEIER:
25    **Q.  Robert, thanks for your patience with**

**Robert Reilly**                    **Fish, et al. vs. GreatBanc Trust Company**

Page 253

1  me. I do have only a few more questions, but we
2  should be out of here in short order.
3          On one of the -- I just wanted to
4  follow up on a couple of questions, a couple of
5  questions and answers you and I went through on
6  your flaw 1.
7          You had mentioned aside from just
8  exercising your judgment and choosing a company
9  specific risk premium of 5 percent, that you had
10  looked at I think it's called a quantum of risk
11  factors.
12      A. Yes.
13      Q. I'm not sure why I did it but I was
14  not familiar with that term, and so I Googled it a
15  little earlier, and the only hits I was coming up
16  with were hits related to physics science.
17      A. Sure.
18      Q. Is this quantum of risk concept a part
19  of the customary nomenclature or vernacular of
20  valuation experts?
21      A. Well, I think so. Although valuation
22  analysts could use synonyms.
23          All it means when I say a quantum,
24  quantum of course just means a measure. The word
25  "quantum" is Latin for measure. So sometimes it's

Page 254

1  called a quantum layer of risk or a layer of risk
2  or a level of risk.
3          So all I'm trying to say, and I
4  think different books would use different words,
5  but they all mean there are different categories
6  of risks, some of which we can measure. You can
7  measure the risk-free rate, you can measure the
8  general equity risk premium, you can measure the
9  size risk premium. Those are levels or layers of
10  risk that you can measure. Then when you get to
11  the final layer, the company specific risk, or the
12  investment specific risk, or the unsystematic or
13  nonsystematic risk, then that's just another layer
14  of risk or level of risk or quanta of risk, and
15  that's all it means.
16      Q. If I look through treatises on the
17  proper way to value stock in a private company,
18  would I find, to the best of your knowledge, use
19  of the phrase "quantum of risk" or would I most
20  likely find one of the synonyms that you just
21  referenced?
22      A. Well, you'll probably -- if you find
23  it in the literature, I would say this, and this
24  will sound arrogant, but if you Google this you'll
25  find it. I don't know anyone who's written more

Page 255

1  journal articles on quantifying company specific
2  risk than me. I mean I think that's truly a fact.
3          So you'll probably find the word
4  "quantum" or "quanta" or "quantum level of risk"
5  in my articles. But if you look in the books
6  related not just to business valuation but coming
7  up with discount rates because that's really the
8  issue here, coming up with discount rates.
9          So look in like the Pratt and
10  Grabowski textbook on cost of capital, if you look
11  in cost of capital texts, the Damodaran textbooks
12  on cost of capital. You may find words like
13  "level of risk" or "layer of risk" or "category of
14  risk." And that's all I mean.
15      Q. Okay. Your "quantum of risk" is
16  simply a synonym for those phrases you just now
17  mentioned.
18      A. Yes.
19      Q. Understood.
20          Okay. Just another follow-up. In
21  forming a capital asset pricing model to determine
22  the cost of equity, are there any differences
23  between that analysis under fair value standard
24  versus a fair market value standard in terms of
25  inputs or assumptions?

Page 256

1      A. For CAPM alone I think the answer
2  still would be yes. For most of the differences
3  in the WAC would be in the debt equity mix and the
4  cost of debt because in fair value again we're
5  assuming company specific fair market value, we're
6  thinking willing buyer willing seller. Willing
7  buyer willing seller could have a different debt
8  equity mix and could have a different cost of debt
9  because they're going to releverage.
10          But even under fair value, under
11  fair market value, we would look at the, even
12  something like the risk-free rate is going to be
13  the same presumably, general equity risk premium
14  probably is the same, beta probably the same, size
15  could be different because it's the difference
16  between willing buyer and willing seller and
17  knowing the buyer and seller. The company
18  specific risk could be different. The types of
19  company specific risk I'm looking at here I
20  believe are still nondiversifiable.
21          In other words, whoever buys the
22  Antioch Company a hundred percent, whether it's
23  the ESOP, whether the company goes public in an
24  IPO, whether it's a competitive acquirer, whether
25  it's an Avon or whoever, the risks that I'm

**Page 253..256**

Page 257

1  talking about, whether we agree with them or not,
2  are risks that this company has to face and they
3  just have to deal with them. In other types of
4  CAPMs -- so that would go into a marketplace,
5  willing buyer willing seller.
6          In a fair value, which is really
7  what's it worth to me effectively, there are other
8  company specific risks that we potentially could
9  consider, I don't think they apply here, but key
10  person risk, you know, key executive, key manager
11  risk, would be something that could be diversified
12  away by a willing buyer and a willing seller.
13          I can't diversify it away. I have
14  a key sales executive, a key CEO, a key whatever,
15  key customer list, key customer risk, key salesman
16  risk, key supplier risk, something that is truly
17  unique that the next owner could fix. I can
18  ignore it in a fair market value valuation but I
19  consider it in a fair value valuation because I
20  know who the seller is. It's me. I have one
21  supplier, one customer, one key executive who
22  brings in 99 percent of my business. I have a
23  unique location that is sitting on top of a
24  Uranium mine, or something, that would be unique
25  to me and I would have to consider those factors

Page 258

1  in my company specific risk.
2          So the discount rate could be
3  different between different standards of value.
4      Q.  Okay. Why is some of those risks not
5  considered or don't you consider in a fair market
6  value valuation?
7      A.  Sure. Because fair market value,
8  again, is the typical buyer and the typical
9  seller. So the typical buyer, instead of thinking
10  about basically identifying buyers and sellers,
11  the typical buyer would come in and say, and I'm
12  just going to pick a name, I'm Berkshire Hathaway,
13  I'm Warren Buffet, I got executives to spare, you
14  have key supplier dependents, or, you know, key
15  executive dependents, I've got a hundred guys I
16  can assign to you, I make that problem go away.
17  You have key supplier dependents, I've got a
18  hundred suppliers, they now work for you.
19      Q.  Okay. So those are risks then that --
20      A.  Can go away depending on who the buyer
21  is.
22      Q.  Okay. All right. And that's in --
23      A.  That's in fair market value because
24  we're assuming any seller and any buyer -- if any
25  seller and any buyer can make these risks go away,

Page 259

1  even if I haven't, I'm the current owner, I'm
2  going to ignore them in a fair market value
3  valuation, as everyone has done here, including
4  me.
5      Q.  And now explain those risks in a fair
6  value valuation.
7      A.  Sure. In a fair value valuation,
8  again it's an exit price, the exit price is how
9  much am I, I'm the current owner, how much am I
10  willing to sell to you.
11          If you're the buyer, if you're
12  Berkshire Hathaway, now you could make those risks
13  go away, but you're going to come to me and say
14  I'm going to assume those risks are in place, I'm
15  not going to pay you a higher value assuming all
16  of those risks just went away because to you
17  you've got those risks.
18          The company may only be worth $100
19  million to you. It may be worth $150 million to
20  me. That's closer to fair market value. If it's
21  only worth $100 million to you, I'm only going to
22  pay you $100 million because you have one
23  customer, one supplier, one executive, a unique
24  source of supply that's under your property,
25  whatever the problem is.

Page 260

1      Q.  Were you just describing the only
2  difference in the inputs and the assumptions
3  that -- those are the differences in inputs and
4  assumptions that you would make in a fair value
5  versus a fair market value?
6      A.  Only with regard to CAPM.
7      Q.  Right, yes. That was just in regard
8  to CAPM.
9      A.  Yes.
10      Q.  Okay. Robert, other than the opinions
11  you've written in your two reports that are
12  Exhibits 822 and 824 and any other opinions that
13  we discussed in the room today, do you hold any
14  other affirmative or rebuttal opinions that you
15  plan to testify to at trial that are either not in
16  the reports or that we didn't discuss today?
17      A.  No. I don't believe so.
18          MR. SCHEIER: I think we're done.
19  Thank you very much for your time.
20          MR. GOTTO: We'll read and sign.
21          THE VIDEOGRAPHER: Off the record
22  at 4:32 p.m.
23          (Said deposition was so concluded
24          at 4:32 p.m.)
25

**Robert Reilly**                                    **Fish, et al. vs. GreatBanc Trust Company**

**Page 261**

1    DECLARATION UNDER PENALTY OF PERJURY

2    Case Name: Fish, et al. vs. GreatBanc Trust Company

3    Date of Deposition: 08/26/2015

4    Job No.: 10018085

5

6         I, ROBERT REILLY, hereby certify

7    under penalty of perjury under the laws of the State of

8    _____ that the foregoing is true and correct.

9         Executed this _____ day of

10   _____, 2015, at _____.

11

12

13                   _____

14                   ROBERT REILLY

15

16   NOTARIZATION (If Required)

17   State of _____

18   County of _____

19   Subscribed and sworn to (or affirmed) before me on

20   this _____ day of _____, 20__,

21   by_____,    proved to me on the

22   basis of satisfactory evidence to be the person

23   who appeared before me.

24   Signature: _____ (Seal)

25

**Page 262**

1    STATE OF ILLINOIS )
                        ) SS:
2    COUNTY OF C O O K )

3         I, Donna M. Kazaitis, CRR, CLR, RPR, CSR

4    No. 084-003145, do hereby certify:

5         That the foregoing deposition of ROBERT F.

6    REILLY was taken before me at the time and place

7    therein set forth, at which time the witness was

8    put under oath by me;

9         That the testimony of the witness and all

10   objections made at the time of the examination

11   were recorded stenographically by me, were

12   thereafter transcribed under my direction and

13   supervision and that the foregoing is a true

14   record of same.

15       I further certify that I am neither counsel

16   for any party to said action, nor related to any

17   in any way interested in the outcome thereof.

18       IN WITNESS WHEREOF, I have subscribed my name

19   this 10th day of September, 2015.

20

21   DONNA M. KAZAITIS, CSR, RPR, CLR, CRR
     Certified Shorthand Reporter
22   State of Illinois
     Registered Professional Reporter
23   Certified Livenote Reporter
     Certified Realtime Reporter
24   CSR License No. 084-003145

25

**Page 263**

1    DEPOSITION ERRATA SHEET

2    Case Name: Fish, et al. vs. GreatBanc Trust Company
     Name of Witness: Robert Reilly
3    Date of Deposition: 08/26/2015
     Job No.: 10018085
4    Reason Codes:  1. To clarify the record.
                    2. To conform to the facts.
5                   3. To correct transcription errors.
6    Page _____ Line _____ Reason _____
7    From _____ to _____
8    Page _____ Line _____ Reason _____
9    From _____ to _____
10   Page _____ Line _____ Reason _____
11   From _____ to _____
12   Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
15   From _____ to _____
16   Page _____ Line _____ Reason _____
17   From _____ to _____
18   Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
21   From _____ to _____
22   Page _____ Line _____ Reason _____
23   From _____ to _____
24   Page _____ Line _____ Reason _____
25   From _____ to _____

**Page 264**

1    DEPOSITION ERRATA SHEET

2    Page _____ Line _____ Reason _____

3    From _____ to _____

4    Page _____ Line _____ Reason _____

5    From _____ to _____

6    Page _____ Line _____ Reason _____

7    From _____ to _____

8    Page _____ Line _____ Reason _____

9    From _____ to _____

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   _____ Subject to the above changes, I certify that the
            transcript is true and correct

23   _____ No changes have been made. I certify that the
            transcript  is true and correct.

24                   _____

25                   ROBERT REILLY

**Page 261..264**

Robert Reilly                                Fish, et al. vs. GreatBanc Trust Company

## Exhibits

**PREVIOUSLY MARKED EXHIBIT 653** 4:22 161:17,24 163:15

**PREVIOUSLY MARKED EXHIBIT 657** 4:23 164:5

**EXHIBIT 821** 4:8 33:10, 14 34:6

**EXHIBIT 822** 4:9 42:11, 15 47:20 54:9,13 60:3 148:24 151:18 245:25 246:1,2

**EXHIBIT 823** 4:11 54:16, 19,20 55:20,22

**EXHIBIT 824** 4:12 57:16, 19 58:10,21 240:13 246:1 249:24

**EXHIBIT 825** 4:14 165:6, 9,10,11

**EXHIBIT 826** 4:15 166:11,14

**EXHIBIT 827** 4:17 167:8, 12,13

---

### $

**$10** 19:21 224:22

**$100** 19:20 95:3 224:24, 25 225:5,8 238:2 259:18,21,22

**$145** 86:17

**$150** 232:13 233:14 234:15 259:19

**$156** 226:16

**$173** 234:21

**$175** 232:8

**$18** 12:3

**$2.5** 119:4 123:10 125:17 126:22 127:7

**$20** 232:7 250:3

**$20.5** 249:23

**$200** 119:14 168:14

**$230** 163:5

**$236** 226:16

**$250** 164:20

**$261,683,000** 77:6

**$262** 77:15

**$273** 164:15

**$295** 164:16

**$315** 86:15

**$32** 238:13

**$395** 234:19

**$5** 238:3

**$500** 237:25 238:16

**$590** 86:16

**$60** 224:12,14

**$7** 213:21 214:2

**$70** 86:17 213:24 214:3

**$80** 203:4 208:6 213:8 214:17,20 216:7 217:5 218:7 219:20 220:6 221:16 222:5,23 228:5 235:1 236:6

**$800** 234:24

**$840.26** 212:10

**$850** 156:14 157:1 228:2 229:4

**$95** 85:12,20 90:9 94:17 95:14

---

### 0

**0** 209:2 212:6

**00004** 152:3

**03** 81:10

**09-cv-1688** 5:12

---

### 1

**1** 43:18 70:17 82:2,7 84:11 85:18,23 86:20 87:12,18 92:16,21 101:21 110:10,16,24 111:23 112:2 119:8,9

151:17,21,24,25 154:13 166:16 239:9 244:5 245:4 246:16 247:6 253:6

**1's** 83:25 85:13 247:6

**10** 10:25 13:3,23,24 14:2 15:10 16:6,7 18:1 24:4,6 28:14 111:22 126:14 135:6 171:21 209:3 210:3 211:23 212:6 220:22,24 224:22 225:7

**10-ks** 199:1,14

**10-year** 104:9 109:9 112:5 170:4 176:13,21 208:12 210:23 211:15 218:6 219:12 222:5 225:21

**10/2/2003** 80:17

**10/27/03** 78:12

**100** 14:16,20 63:1,12,17, 25 64:24 65:7 101:6 148:24 155:1 197:13

**100,000** 227:4

**10:09** 59:3

**10:20** 59:6

**10:39** 73:10

**10:41** 73:13,22

**10:42** 73:25

**11** 206:11

**110** 159:6

**111** 148:24

**116** 63:1,17,25 64:24 65:7

**117** 61:9,23 62:11 115:3

**118** 114:17 115:2

**119** 114:16 115:1,5

**11:14** 101:13

**11:33** 101:16

**12** 12:2 60:10 68:10,11 69:8 144:1 162:21

**12/2/2003** 81:21

**120** 118:19

**121** 211:14

**124** 80:13

**125** 118:12

**129** 119:16 145:25

**12:35** 148:11

**13** 68:11,13,17,20 69:9, 16 70:5,9 77:3,13,23 80:5 81:13 84:4 162:2 192:11,25 193:4

**131** 61:9,24 62:11 115:5

**137** 110:6,9

**14** 66:3,12,14,22 67:2, 15,16 68:5,10,12 69:8 76:20 77:22 78:7,19 79:19 80:1 84:3 240:17 246:17,21

**140** 220:11 221:2 224:12

**145** 81:16

**15** 57:22 77:6 78:16,20 79:5 80:11,12 82:21 111:21 163:6 180:13 219:1 226:22 246:10 247:1

**150** 101:7

**155** 193:23

**16** 34:17 80:20 81:13 82:21

**17** 82:13,21,24 83:12 84:8

**18** 66:3 68:2,19 70:9 77:8,12,24 78:9 82:24 84:17 182:6 186:19

**188** 166:22

**19** 68:24 186:19

**1981** 188:3

**1990s** 131:14

**1998** 127:7

**1999** 147:12

**19A** 67:13 69:1 73:6,15

**19B** 67:13 69:21 70:6,16 73:6,16 74:15

**Robert Reilly**                                    **Fish, et al. vs. GreatBanc Trust Company**

**1:12**  148:15

---

**2**

**2**  12:4 34:5 59:6 70:17 75:10,14 78:24 79:21 81:1,4,10 84:13 161:22 177:20 178:22,23 185:9 245:4

**2.1**  74:19

**2.5**  118:20

**20**  10:25 13:5,23,25 14:2 42:17 78:2,4,6 80:16 81:19 84:11,17,20 85:16 86:12 93:25

**20,000**  203:18

**200**  220:10 221:2 224:11

**2000**  126:11 127:3 128:25 131:15 136:16

**2001**  101:3 116:18 126:22

**2002**  78:23 101:3 116:18 118:20 119:5,11,13 125:16 126:24 127:7 130:10 138:14 139:17 147:13

**2003**  34:17 62:16 67:24 72:18 76:8 77:6 78:21, 24 79:22 80:3,12 81:1,4 85:1 91:23 94:25 100:2, 11,20,21 101:4 102:3,8, 18 103:2 111:21,23 114:12 115:18 116:5,18 122:22 127:16 130:11, 25 131:21 136:7 137:2 138:14 139:18 140:4 141:5 150:5 157:3 159:12,19 160:6,9,13 177:20 178:22,23 179:3 194:12 219:1 221:11,15 247:1 248:1 249:17

**2004**  102:3,8,18

**2005**  140:13 161:13 162:2,17,20 163:7 164:6,8,16 165:3,14 166:1,16 167:15 251:10

**2006**  161:13 162:21 163:5,7 164:19 165:3

166:21 168:13 220:22, 23 221:10

**2009**  178:3 206:11

**2011**  206:12

**2012**  155:14,16 158:15 160:25 161:2 178:3,9

**2014**  178:1

**2015**  5:3 41:16 42:17 47:20 57:22 91:22 178:2,16 246:10

**21**  204:24 207:22 208:11 209:10 218:19 222:6 225:23 228:4,18 229:1, 10,12,23 231:10 234:25 236:4,21 237:3 238:19

**216**  84:8

**22**  43:18 149:8 156:25 244:24 245:3,9

**222,000**  214:22 215:1 220:14 221:11 226:12, 23 227:5

**25**  179:2 180:12 181:10 188:6

**26(b)**  45:2

**261**  77:14

**261,683**  78:13

**28**  5:3

**2:09**  193:17

**2:27**  193:20

---

**3**

**3**  58:10 101:16 167:15 209:2 212:6 248:8

**30**  151:17 164:8 180:12 239:2

**300**  5:7

**33**  61:8,14 112:7 115:15

**34**  115:15

**35**  60:11,16,17 62:20,24 63:7,20 65:7 115:15

**35(i)**  61:18

**36**  61:8 110:6

**395**  229:2

**395,054,000**  238:23

**3:00**  238:15

**3:10**  227:20

**3:26**  227:23

**3:49**  245:19

**3:59**  245:22

---

**4**

**4**  72:1,4 94:20 148:15 152:8

**40**  58:14 227:8

**409P**  246:4,9,14,22,25 247:5 248:18 249:1,25 251:2,7,13,23

**42**  60:11

**458**  238:12

**468**  236:17 237:6,9,19, 25 238:11 239:8

**4:10**  252:20

**4:21**  252:23

**4:32**  260:22,24

---

**5**

**5**  68:22 69:23,25 70:9, 10,13,14,15,25 71:8,14, 25 72:24 74:5,16 75:4, 10,14,17 77:4,9,16 78:9 121:20 123:6 133:17 165:14 186:5,15 193:20 253:9

**5.1**  74:19

**50**  202:23 206:25 251:18

**500**  238:12 239:8

**55**  202:23 240:18 241:16 244:21

**550**  209:8

---

**6**

**6**  71:14 72:1,3 185:14 186:16 220:5 224:10 245:22 251:10

**60**  74:18

**600**  5:6

**64**  55:7

**653**  161:17,24 163:15,25

**657**  164:5

**66**  43:17

**6A**  204:14,20 208:7 217:21,24

---

**7**

**7**  75:10,14 220:22,24 221:10 251:10

**7.0**  74:19

**78**  249:23

---

**8**

**8**  193:1,8 220:22,24 221:10

**80**  9:24 215:9

**820**  36:2

**821**  33:10,14 34:6

**822**  42:11,15 47:20 54:9, 13 59:16,22 60:1,3 148:24 151:18 246:1,2 260:12

**823**  54:15,16,20 55:20, 22

**824**  57:16,19 58:10,21 59:16,22 60:1 240:13 246:1 249:24 260:12

**825**  165:6,10,11

**826**  166:11,14

**827**  167:8,13

**840**  212:14

**850**  209:8 228:16,20

Case: 1:09-cv-01668 Document #: 559 Filed: 10/30/15 Page 70 of 98 PageID #:25805

Robert Reilly                                                    Fish, et al. vs. GreatBanc Trust Company

229:3,17 231:9,12,15, 19,23 236:15 237:1,5, 13,19 238:11,16 239:11

**8600** 5:12

**8:00** 238:14

---

**9**

**9** 206:11 220:22,24 221:10

**90** 9:24

**95** 85:16 94:18

**99** 126:12 257:22

**9:00** 5:2

---

**A**

**a.m.** 5:2 59:3,6 73:10,13, 22,25 101:13,16

**ability** 157:17 184:5 211:1

**absolutely** 128:2

**accept** 38:5

**acceptable** 95:9

**acceptance** 27:23

**accepted** 107:23 108:1 157:11 186:23

**access** 135:23 136:3 160:19 161:11

**accommodations** 172:19

**account** 64:23 71:7 95:19 99:11 102:2,7,11, 16,22 110:24 111:16 112:3 121:2 124:1 129:16 134:1 148:21 158:4 177:10,12,15 201:20 211:20 213:11 217:5 218:14 220:19 221:24 246:22 248:18 249:25

**accounted** 63:24 65:24 247:8

**accounting** 12:10,24 36:1,5 37:12 219:8

**accurate** 7:17 65:23 160:20 241:8

**accurately** 80:25 204:9, 13

**achievability** 180:8

**achieve** 186:4

**acquire** 102:8

**acquirer** 256:24

**acronym** 103:7,9

**acting** 183:4

**actions** 252:3

**activity** 22:20 23:16

**actual** 43:9 51:13,15 55:1,5,11 64:1,2,9 84:25 105:7 137:1 151:6 153:7 213:9

**actuarial** 30:20

**actuaries** 202:9

**actuary's** 202:8

**add** 44:15 46:8,10 66:17 70:13 74:24 75:7,17 180:13 185:9 186:16

**added** 44:16 61:12 63:20 67:22 70:6,10 77:9

**adding** 69:24 70:9,14 93:10 232:12 233:14

**addition** 54:25 114:24 115:8 236:6

**additional** 32:19 44:15, 17 61:24 87:20 114:18, 23 115:4,20 142:19 252:3

**address** 6:21 139:9,11, 13 144:4 160:1 251:15

**addressed** 140:15 141:10

**addressing** 134:24 135:4,8 138:14 147:24 148:17

**adds** 185:14 234:15

**adequately** 60:19 61:20 62:4,14,21 65:6,10 66:10 76:7 91:13 94:24

119:19 134:24 135:4,8 140:15 154:23 177:10, 14

**adjust** 41:9,13 182:13 191:21,22 192:3 210:8 219:17

**adjusted** 182:7 191:8,23

**adjusting** 185:3

**adjustment** 81:9 82:7 185:4 207:13 218:10 223:2,5 228:17 236:4 246:21

**adjustments** 79:25 84:6 236:12 238:21

**admonish** 45:5

**admonishment** 45:25

**advance** 10:10

**advancement** 146:4

**advances** 118:10

**adverse** 27:11,13

**advertising** 141:7

**advising** 114:4

**advisor** 104:11,16 105:14 107:5 108:16 176:17,18 188:20 189:16 190:6 248:10 249:15 250:22

**advisors** 200:14

**affect** 210:10,11,16,17 217:14 225:1 226:5 229:11,12

**affected** 100:4

**affects** 222:11 224:24 226:7

**affidavit** 55:23 56:2,6,12 57:10,15

**affirmative** 260:14

**afternoon** 238:15

**age** 202:23

**ages** 205:19

**aggregate** 241:17,18,21

**aggressive** 184:21

**agree** 5:16 17:21 29:15 75:10 101:19 129:13 142:23 154:24 157:23 168:19 177:17 187:19 192:24 193:11 198:9 211:9,13 213:6 214:7 216:1,21 218:11,18 222:24 224:8,22 226:19 233:11 234:13 241:14 242:19,21 244:1 257:1

**agreed** 229:14

**agreeing** 92:23 93:13

**agreement** 201:16 229:20

**ahead** 25:17 47:6 173:19 243:16

**ahold** 177:21

**air** 113:22

**album** 125:3

**allege** 17:1

**allocation** 12:23 18:18

**allowed** 28:22

**alter** 192:13,15

**alternative** 86:11 206:5

**Alternatively** 250:6,10

**alternatives** 88:9,11 206:13

**ambiguity** 141:22

**America** 113:6,17

**amount** 23:12 211:22 212:20,23 218:3,6 235:24 242:4 244:16 249:22

**analyses** 33:3,6 46:24 86:11 87:3,11 88:3,6 89:2,25 90:11,25 174:4 182:14 194:3

**analysis** 18:16 26:11 34:10,15,23 37:14 38:20 39:10,11,20,21 40:1,3 44:4 48:9 60:7,18,22,25 63:14 65:5,11,22 66:19 69:21 77:23 80:10 85:4,

**Robert Reilly**　　　　　　　　　　　　　　Fish, et al. vs. GreatBanc Trust Company

19,24 86:3,5,24 87:21,
23 90:17 91:6,14,21
97:23 99:22,24 104:21
111:10 114:18,24 115:4,
8,20 116:4,21 118:14
120:7 123:16,25 128:19
134:10 137:17 144:1,14
147:21 149:4 154:23
156:25 157:8,20 162:6
169:16,25 174:1 175:8
182:17 183:22 185:19
189:1,18 193:11 194:2,
19 195:12 197:7,9
198:9,14 201:17 203:25
204:12,23 205:17 206:8
212:9 213:4 214:16
216:15 219:11 221:10
226:17 227:9 235:1,2,5
237:23,24 238:1 239:7,
8,16 240:7 245:2,8
246:5,13 248:4 255:23

**analyst** 11:17 75:22
92:1,5,8,13,19 93:5,9,23
105:14 116:11 185:20
194:24 199:2 240:2

**analysts** 11:12 19:22
35:25 89:1 184:13,15
210:7 253:22

**analyze** 20:24 21:1 22:5,
19 26:1 108:22 132:23
143:2 179:25 183:12
188:11 198:21

**analyzed** 23:24 65:19
112:17 132:22 140:13
199:13 238:5

**analyzes** 108:19 185:16

**analyzing** 21:18 30:13
108:23 109:1,2 112:4
129:25 137:1 138:6
142:13 158:2 199:6
226:10,12 227:13 238:7

**and/or** 109:9

**Anderson** 134:16
154:16 158:7,10,14,19
160:5,14,20 170:8

**Anderson's** 158:21
159:11

**angry** 252:10

**announced** 5:18

**annual** 14:8 140:19,25
150:10 199:2

**answering** 126:18
131:10

**answers** 253:5

**anticipate** 140:6

**Antioch** 17:17 29:12
34:16 39:5,11 61:4 62:6
72:10 77:6 91:20 100:4,
7,12 113:21 119:4
120:4,5,12,15 121:3,22
124:2 134:3 136:6
137:2,8 138:3,7 146:1,
10 147:17 148:3 149:10
150:4 155:23 159:12,19,
23 166:17 173:25
174:25 190:4 194:9
195:5 197:11,13,16
198:7,8,17,23 199:4
201:5 207:1 208:13
218:16 225:19 228:19
244:5,16 248:1 256:22

**Antioch's** 26:1 39:18
40:1 41:2,3 62:21
100:20 102:17 103:7
111:23 112:4 122:2,17
136:15 139:1 147:11,23
183:16 194:8 237:18

**anymore** 188:4

**apologize** 10:9 23:2 48:4
51:20,25 72:20 78:3
113:1 130:19 235:11

**appearance** 172:22

**appeared** 119:24 129:16

**appears** 33:19 151:25

**appended** 244:20

**appendix** 47:24 48:1
53:4,6 54:10 58:12,13,
18 100:24

**applicable** 37:9 195:24

**application** 67:6

**applied** 184:7 187:21
192:25 196:9,11 246:16

**applies** 81:12 186:17

**apply** 36:8 64:6 71:25
72:3 83:15 84:3 186:5,
19 195:13 219:15 244:4
247:3 257:9

**applying** 77:3 78:8
192:21

**appraisal** 36:9 112:20

**appraisals** 113:14

**appreciation** 202:25
212:9

**approach** 26:23,24
36:25 37:1 92:15 108:21
175:19 176:19 215:13

**approached** 153:17

**approaches** 36:24 37:3,
4

**approximately** 12:2
85:12,20 155:15 179:2

**April** 32:5 41:16 42:17,
19 47:20 58:3 246:17

**Aptus** 5:4,5

**area** 62:2,3,13 75:22
197:6

**argue** 165:24 198:24
226:9

**argued** 27:19

**arguing** 233:15,17,18,21

**argument** 180:5 184:10

**ARIMA** 99:10,25 103:7,
19 104:8,13,21 105:11
108:20 109:6,8,16
111:4,14,15 161:13
162:15 163:3,7 165:1,24
166:4 167:1,4 168:4,6,
18 169:11 170:5 173:23,
25 174:19 175:18 176:1,
7,12,19

**arise** 184:10

**arising** 93:12

**arms** 61:10

**arrive** 70:25 80:11 81:15
84:7

**arrived** 68:21 69:2,7
74:16

**arriving** 71:7

**arrogant** 254:24

**article** 117:9,10

**articles** 117:12,17 255:1,
5

**articulation** 167:3

**ASC** 36:1

**Asha** 5:23 6:16 150:16
162:1,9 168:1

**asks** 33:1,9

**aspect** 47:19 122:1

**aspects** 122:17 134:2

**assertions** 28:3

**assess** 24:24

**asset** 37:1 74:3,9 255:21

**assign** 247:23 258:16

**assignment** 18:18 37:10

**assignments** 11:22
21:20

**assist** 42:23

**assistant** 52:24

**Associates** 7:9 33:18
70:20

**association** 116:12
118:23 123:13

**associations** 119:2

**assume** 28:20 208:24
222:24 228:1 259:14

**assumed** 51:21 56:7,21
210:24

**assumes** 208:25 212:4

**assuming** 209:7 211:4
231:8 236:25 256:5
258:24 259:15

**assumption** 64:1 194:14
196:23,24 208:12,18,19,
20 209:9,11 211:15,21
225:19 228:3,15 236:15
243:12

**assumptions** 45:9,23
202:23,24 203:7 204:11

**Robert Reilly**                                    Fish, et al. vs. GreatBanc Trust Company

205:4,11,17 206:5 212:9 255:25 260:2,4

**assure** 56:13

**attaching** 162:5

**attempt** 240:10

**attended** 156:3

**attention** 34:9 60:10 110:5 128:20,24 136:22 207:21

**Attiken** 5:23 6:16 48:19 49:8

**Attiken's** 48:20 52:2,10, 18

**attorney** 29:13

**attorneys** 44:7,10

**attractive** 91:5,25

**attributable** 121:3,21 133:18 246:8 247:5 249:1

**attribute** 246:4 249:7

**attributes** 201:15

**attributing** 251:24

**attrition** 25:1

**audio** 5:14

**audited** 40:12,13,14

**August** 5:3 167:15

**authored** 161:12

**auto** 99:17,18,21,22,24 103:16

**Avenue** 5:13

**average** 10:23 13:3,18 69:3,8,11,13,15 72:12 74:19 75:4 83:17 88:1 89:19 94:11,14 198:12

**averaged** 203:1

**averages** 21:8

**averaging** 88:16

**avoid** 122:13 180:17 184:9 251:12,20,23

**Avon** 15:3,17 16:4,5 17:7,24 20:6,10,21

22:17 24:21 25:7 26:19 256:25

**aware** 29:2 97:14 102:5, 9,14,19,20 114:14 158:11 169:6 175:20 176:6 182:16,24 191:5, 10 248:11

---

**B**

**back** 15:14 19:16 24:2 33:24 54:12 59:6,8 73:12,24 76:20 77:16 78:1 100:17 101:16 116:17 139:22 141:5 145:9,25 148:15 151:4 152:23,24 155:14 157:25 158:15 170:7 175:17,22 189:6,10 193:20 198:3 201:11 206:3 207:9 218:15 219:9 222:21 224:7 225:2,11 227:22 231:5 245:22 251:12,16 252:15,22

**background** 7:18 52:14 157:22 202:4

**bad** 216:25

**bake** 31:12

**baked** 63:13 81:19 228:6

**baking** 47:7

**balance** 85:5

**ball** 205:13

**ballpark** 9:22 11:22 13:14 182:5

**bankers** 49:20 153:4 154:2

**Barry** 162:1 168:1

**base** 109:16 181:14,20, 25 182:12 183:17,21 184:23 185:5,18,19,22 186:2,3 189:2,11 192:20,25 196:20,23 212:10

**based** 27:20 29:3 37:1 56:2 64:2 68:16 70:11 71:10 78:21 80:22 81:25

84:7,15 91:18 95:23 99:18 100:6 101:25 103:4,18 104:7,20 105:10,11 107:4 111:9 118:13 142:1 146:15 152:9 157:21 169:15 172:19 179:3 186:25 187:17 189:1,19,21 194:13,20 197:11,13,19 198:9 211:14 212:10 226:17 236:7 246:17

**basically** 38:24 44:18 69:21 85:23 115:20 184:3,4 202:25 203:17 258:10

**basis** 84:21 87:12 107:17 109:8 111:21 117:20 125:19 157:14 201:5,14 209:13 225:13, 16 227:14 231:11 232:10 240:9,23

**Bates** 169:4

**battleground** 180:5

**bearing** 234:21

**began** 132:11 160:13

**beginning** 5:17

**begins** 5:8 59:5 60:17 101:15 148:14 165:22 193:19 213:1 245:21

**behalf** 31:20 32:1 200:3

**believed** 86:2 134:21 157:1,10 180:2 182:5 187:21 238:14 243:11

**benefit** 118:14 144:2 152:8 203:13 219:8,19 221:23 222:2,7,8,9,11 225:2

**Berkshire** 258:12 259:12

**beta** 194:20 256:14

**bias** 91:2 96:1 140:2,11 180:23,24 181:3 183:12 184:24 185:2 187:20,22

**Bible** 215:12

**big** 11:1 70:12 79:6,10, 21 80:9 81:4 121:6 127:22 132:11,20

178:22 179:7,16,19 182:23 185:25 215:22 231:24,25 232:4

**bigger** 198:5

**billing** 11:11

**billion** 118:20 119:4 123:10 125:17 126:22 127:7

**binder** 42:2 47:23

**bit** 34:22 43:15 60:4,25 61:13 101:24 112:1 204:8 212:17 245:24

**bits** 132:6

**Blair** 167:15

**Blair's** 167:19

**blame** 203:11

**block** 15:11 19:11,14 210:17

**blocking** 172:4

**Bloom** 8:4,7,16

**board** 16:24 138:13,18 155:24 156:3,8 187:11, 13,15 188:15 251:10 252:4

**board's** 16:25

**Bobby** 166:16,17

**bold** 34:13

**book** 71:19

**books** 177:4 254:4 255:5

**borrower's** 108:20

**borrowers** 108:22

**borrowing** 251:15

**borrowings** 252:3

**bother** 151:4

**bothering** 187:25

**bottom** 80:11 86:13 161:22 197:21,25 198:1

**bought** 190:11

**bound** 41:17 42:3

**box** 52:9 121:6 127:23

Case: 1:09-cv-01668 Document #: 559 Filed: 10/30/15 Page 73 of 98 PageID #:25805

Robert Reilly                                                          Fish, et al. vs. GreatBanc Trust Company

132:11,20 153:24

**Box-jenkins** 169:16 170:16,22 171:7,13,16, 20 174:4,11,20 175:6,8, 18 176:1,8,12,19

**boxes** 49:20 64:13 153:4 154:3

**brand** 31:7 113:19

**bread** 142:6

**break** 59:1 101:10 132:6 148:7,18 193:14 227:16 232:14 245:14 252:11

**briefs** 28:6

**bring** 98:12

**brings** 257:22

**Broadway** 5:6

**brochures** 141:6

**Bryn** 5:12

**Buchanan** 29:25 46:13 47:15 66:9 82:1,16,25 100:9 103:6 109:12

**Buchanan's** 46:24 82:7 95:19 99:10 102:1,6,10, 15,21 109:5 110:1 170:2

**Buffet** 258:13

**built** 77:10

**bullet** 139:10

**burdened** 219:7

**business** 10:8 17:4,6,7 62:22 71:15 72:15 86:4 108:1 110:1,2 113:16 120:16 121:3 122:2,18, 19 125:11,13 135:19 142:2,15 146:5 155:24 156:7,9 171:9 174:3 177:2 196:19 255:6 257:22

**business'** 107:23

**businesses** 102:8 107:5

**buy** 221:22 251:12,16

**buyer** 16:21 35:13 37:18 38:25 256:6,7,16,17 257:5,12 258:8,9,11,20,

24,25 259:11

**buyers** 39:4,8 258:10

**buying** 16:10 218:15 219:9 225:2

**buys** 256:21

**BVI** 185:6,9

---

**C**

**C-h-i-o-v-a-r-i** 206:10

**cabinet** 153:24

**calculate** 88:15 93:11 225:16 246:8 247:5 248:25

**calculated** 150:1,9 184:17

**calculating** 90:7 225:12

**calculation** 70:25 74:23 92:6,10 119:3 208:11 219:13 227:11

**calculations** 77:19 92:20 95:7 178:8 245:4

**calculator** 90:5

**California** 5:7

**call** 6:18,23 11:11,14 29:18 60:6 63:3 137:9 200:21 233:13

**called** 8:17 19:5,25 20:24 35:15 37:6 38:3 60:13 71:19 79:12 101:1 112:14 113:5 128:25 149:1,5 183:21 188:17 233:23,25 253:10 254:1

**calls** 79:14 142:16

**cameras** 100:1,4,11,20 101:6,7 118:13 136:23 139:17 144:5,6 145:3,18 146:22 147:19

**capital** 69:3,14,15 70:1, 11,12,13 71:18,19,21 72:13 74:3,8 76:22,24 146:13 147:1,9 209:14, 17 221:5,9 224:23,25 225:10 255:10,11,12,21

**capitalization** 38:13,17

**capitalized** 198:5

**capitals** 69:11

**CAPM** 75:9 256:1 260:6, 8

**CAPMS** 257:4

**caption** 151:23

**captured** 91:19

**captures** 216:8

**Cariber** 166:16,17,21

**cart** 195:10

**case** 5:11 6:16 11:2 14:7 16:14,16,22 17:16 19:23 20:1 22:2,14 26:1 27:16, 19 28:18 29:4,8,17,21 30:6 31:21 32:2,10 33:19 38:9,10,11 39:1,7, 8 40:4 41:6 42:17 43:1, 16,18 49:24 51:14 52:3, 20 53:8 55:24 59:10,14, 25 71:9,19 72:7 97:9 115:1 124:24 135:25 136:3 137:24 147:4 149:4 152:16 154:5 158:12 160:18 161:7 167:19 172:16 174:18 175:14,24 181:13,14,20, 25 182:12 183:11,12,16, 17,21,23,24 184:23 185:5,19,22,23 186:2,3 189:2,12 190:25 191:1,2 192:20 193:1 196:21,23 200:15 206:4,11 208:16 215:24 229:19 234:9,11, 15 235:18 237:13

**cases** 10:24 11:3 12:5 13:3,5,18 18:14 19:12 23:5 26:21 28:5,9 30:22 36:4,9,10 47:5 94:16 174:18 175:9,21 176:25 183:17 188:19 193:5

**cash** 26:10,25 65:23 67:18 79:19,20 80:10 81:7 82:5,15 83:11,23 182:17,19 183:22 187:18 191:24 195:1,4 196:3,5 204:4 210:12,14 211:5 218:13 220:5

**capitalization** 222:8 224:11,12,14,24, 25 225:1,3 226:6

**categories** 35:23 45:3 65:4,25 254:5

**category** 37:6 39:3,6,8 54:5 143:11 255:13

**caveat** 211:9

**CEO** 106:7 257:14

**CEOS** 107:6

**cetera** 38:17

**CFA** 157:8

**CFO** 106:7,13,17,24 107:3

**CFOS** 106:11 107:6

**chain** 14:14

**chair** 131:20

**challenges** 28:11

**Chandra** 5:23 6:16 48:20 52:2

**change** 43:21 47:19 66:21,22 67:25 77:7 119:14 147:6 178:7 184:12 212:14 216:22 224:6 229:9,21 238:19 239:1,2

**changed** 33:3 43:22 66:24 86:5

**changing** 86:6,7

**chapters** 71:17,18

**characterization** 45:12 179:11 187:20

**chat** 120:23

**check** 194:2 195:20 204:16,17

**checks** 85:23

**cheer** 180:4

**cheerleader** 181:7,8,17

**cherrypicked** 179:7

**Chicago** 5:13

**Chiovari** 206:9

**choose** 87:10 90:10

**Robert Reilly**                                    Fish, et al. vs. GreatBanc Trust Company

92:6,9,14,19 98:11
179:22 205:4

**choosing** 109:5 120:25
253:8

**chose** 63:20 87:21 88:4
92:15 179:15 182:22
184:11 185:23 246:15

**chosen** 181:22 247:7

**churn** 160:10

**circulation** 244:9

**citations** 46:9,11

**claims** 36:10 130:21

**clarification** 6:22 34:1
35:6 203:6

**clarify** 49:14

**class** 39:3

**clear** 49:9,16 50:6 79:18
82:11 133:12 187:9
208:4 249:19

**client** 14:7,13,22 40:18
171:15,19

**clients** 13:17,20 18:1
40:19 109:20,23 157:2
173:23

**clients'** 153:18

**close** 90:18 231:19,23
236:14 252:12

**closer** 259:20

**closest** 81:2

**CMO** 106:7 107:2

**CMOS** 107:5

**code** 141:19

**codification** 36:2

**coefficient** 194:20

**coffee** 120:23

**colleagues** 32:5 189:6

**collective** 13:25 14:3

**column** 78:11 80:16
81:20 84:11,17,24 85:2
94:20

**combination** 64:4

**comfortable** 161:23
180:22

**commensurate** 180:8

**comment** 47:10

**commented** 150:9,11

**comments** 173:1

**commission** 114:11

**committee** 16:25

**common** 18:18 22:1
23:13 26:15 28:8,14
34:16 218:22 228:19

**commonly** 182:19

**communications** 45:4,6

**community** 27:23

**companies** 9:4 15:4,21
18:7,9 20:7 21:7 22:23
25:4 30:14 40:7 72:11,
13 108:4 109:7,14
112:17,18,23 114:4
190:11,22 194:16,18,21,
23,25 195:6,18,25
196:1,3,4,11,21 197:4,
10,12,17,18,21,24
198:4,5,15,20 199:3,6,
12,13,16,17 213:20
214:12,14 224:9

**company** 5:11 8:18
15:14,16 19:10,21 20:13
21:2,6,8,16 23:7,18
26:11 29:13 30:24 31:3,
10,15 38:18 39:2,7 40:9,
16 62:21 63:24 64:24
65:8 66:17,18 67:9
68:21 69:22,25 70:6
71:4,8,22 72:4,5,10,24
74:11,16 76:5 77:4,16
78:10,18 85:20 92:7
93:5,10 94:25 99:13
101:2 102:2,8,23 103:18
104:8 105:25 106:18
109:15 111:16 120:15,
19 121:1,18,25 135:3,16
136:8 137:8,13 139:11,
23 140:14,23 141:23
142:5 143:2 144:3,17,18
147:5 148:20,22,25
149:12,24 150:3,22,24
154:14,21 156:13 160:7

161:13 176:18 177:11
180:13,21 183:8 184:17,
20 185:10,14,15 186:6,
13,16,23 187:2,3,16
188:16 189:18 190:2,9,
10,14 194:2,10 195:14
196:12,13 197:23
198:12,23 201:13
202:13 208:14,18,25
209:7,10,11,25 210:11,
12,16,23 211:5,8,15,22
212:24 213:3,10,24
214:1,2,3,5,8,9,16
215:14,17,19 216:5,12,
18 217:4,14,16,20
218:13,16 219:6,19
220:3,11 221:1,6,15,23
222:4,9,25 223:6 224:21
225:2,3,4,8,10,12,15
226:6,7,10,13,14,18
227:9 229:15 230:1,8
231:1,6 232:7,24 234:17
240:1 241:23 242:6
243:13,18 244:10
246:16 247:3,12,25
248:19 249:22 250:18,
25 251:6,11,15,20,25
252:4 253:8 254:11,17
255:1 256:5,17,19,22,23
257:2,8 258:1 259:18

**company's** 20:2 21:9
66:20 76:7 103:20
104:9,25 106:13 119:4
121:11 133:17 139:15
140:19 141:6 144:4
145:2,17 151:12 155:23
156:6,19 160:8 183:23
189:2 198:17 202:6
203:3 216:3 217:9 218:5
219:7 225:19 242:5
243:1,2,4

**comparable** 194:1
195:18 196:21 199:6,12,
13

**compare** 21:6 53:22
105:19 194:3 197:15

**compared** 51:1 133:1
146:24 147:2 159:24
164:16

**comparing** 107:16

**compelled** 226:20

**compensation** 45:7

**competency** 8:8 9:2

**competent** 8:14 9:10

**competing** 129:8

**competition** 118:6
120:17,20 121:21
122:20 123:20 127:23
129:17 130:1,2 132:10,
20 133:1,7 183:7

**competitive** 121:4 122:3
124:2 129:2 256:24

**competitor** 7:23 113:20

**competitors** 120:5 121:6
124:4,8,10,11,13 128:19
130:14,19,24 131:13

**complete** 48:8 96:21

**compliance** 35:25 38:15
40:14,15,17

**complicated** 209:20
210:19

**comply** 251:1

**component** 14:18 70:12

**components** 67:18
68:19 79:19 81:8 82:6,
15 83:24 194:19

**comport** 229:23

**compound** 112:14
160:24

**computer** 88:23 89:17
90:1,5

**computers** 89:3

**con** 123:3

**concept** 191:2 229:24
244:4 253:18

**conceptual** 222:16
223:12

**conceptually** 166:2
178:10 226:25

**concern** 16:23,25

**concerned** 32:20 101:2

**concerns** 159:25

**Robert Reilly**

Fish, et al. vs. GreatBanc Trust Company

conclude 32:19 117:21

concluded 77:12,14 199:3 260:23

concluding 238:12

conclusion 40:2 44:5 68:16 71:14 73:3 77:2 78:8 84:16 117:16 146:1 182:8 187:23 193:12 197:14 203:2 204:23 229:2 230:5,7 236:23 237:8,9 239:13 250:13

conclusions 86:12 144:24 145:14

condition 115:17

conduct 144:15

conducted 134:11

conference 222:17

Confidential 10:12

confines 45:20

confining 45:2

confirm 7:15 33:15 54:19 57:2,21 58:17 60:11 62:24 78:2 100:9 167:2 169:17

confirmation 16:19

confirmatory 86:25

conjunction 20:3 47:2 65:21 80:1 114:9 187:13

connection 155:10

conservative 182:15

consideration 64:14 95:2 120:7 201:7

considered 24:9,10 58:20 63:8,9 66:11 72:23 89:10 101:21 121:10 124:9 129:24 137:25 143:6 144:12 149:11 150:5 154:21 247:13 248:11 249:16, 17 250:3,14 258:5

consistent 36:11 56:13 80:5 105:24 106:1 117:12 181:2,4 183:3 230:22

consistently 189:5,6

constituted 123:10

consultant 21:20 22:20 23:15 24:15 25:1 26:2 124:17

consultants 17:12 25:10,22 136:9 141:8, 14,24 142:9 151:7 159:12,19,22 160:6,7

consumer 17:11 25:13 62:5 72:16 76:5 99:13

consumers 100:2 125:1 131:22

contact 29:13,16 155:4

contacting 207:16

contained 32:10 48:11 59:22 151:21

contemporaneous 135:2

contemporaneously 134:23

context 21:23 24:10,11 35:2 89:2 96:6,8,15,16 104:23 112:9,10 116:16 161:23 171:9

continue 17:8 111:5,7,9

continued 148:13

continues 162:16

contract 19:18

contractor 17:11 21:21

contractors 17:22 21:25 23:9,10 25:11

contribute 58:5

controversial 197:9

controversy 197:6,25

convert 83:9,10 207:12

convince 107:13

copied 200:9

copy 41:17,20 153:23 154:1

Corey 206:9,12,23 207:2,4,15

corporate 12:10

corporation 30:17 113:5,17

correct 7:9,10 22:14 27:6 31:18,23 34:23 38:21 39:13 46:25 53:10 60:15 61:12 62:17 63:2, 22 66:5 67:10,21 68:7,8, 10,15 69:24 70:17,18 72:2 79:13 80:24 81:2, 10,11,16,17 82:8 84:5,9, 18,19 85:1,2,5,7,8,14, 15,24 92:9 94:1 95:11 96:8,15 104:22 111:25 114:5 117:3 118:10,11, 15,16 123:16 132:12,21 148:5 154:16 155:1,8 158:8 166:10 184:1 191:2 192:16 193:10 194:4 195:15,16,22 201:6,18,23 202:7 203:5 204:14,15,19,25 209:15 211:8,18 216:2,6,11,19 218:8 225:21 226:15 233:7 234:2,4 236:2 240:22,23,24 241:4 242:3,10,11,12 243:15, 25 244:13,14,21,22 246:5,6,11,12,18,19,23, 24 248:20 249:3 252:6

corrected 204:11 228:19

correctly 34:19 149:13 164:22 202:20 238:22, 24 242:14

correlation 99:17,22 151:11

correspondence 205:8

cortile 87:22 92:14

cost 69:3,11,13,14 70:1, 2,3,10,12,13 71:17,19, 20 72:12 255:10,11,12, 22 256:4,8

counsel 5:16,19 16:24 27:14 28:1,2,6,10 32:23 33:1,5,20 45:9,10 46:19 51:17 54:22 55:23 57:2 97:8,10 114:11 138:11, 25 152:15,19 153:11,17 154:10 158:5,12 174:21 175:3,4,11,16,17 180:3

205:8,9,12 246:8

Counselor 97:20 232:12

count 26:2

country 17:9

couple 13:1 15:4 31:6 33:5 46:8,10 47:7 69:6 115:14 126:13 139:4 142:4 150:15 169:13 244:23 248:14 253:4

court 5:4,5 7:3 28:16,20, 21,25 29:5 35:11 42:5 182:18 232:15

cover 211:5

covered 177:9,11

CPA 157:8

CPAS 11:10

craft 113:25

crafts 114:1

Craig 8:20,23 9:6,9 143:14

Craig's 9:2

create 123:3

created 54:2 141:10 149:22 176:7

Creative 17:17 20:13 22:8 26:1 29:12 117:18, 21 119:13 120:10,15 122:2,18 123:9,19 124:4,16 127:11,12,24 129:1,7,18 130:4,9,15 131:21 132:21 133:1 136:21 142:14 146:18 151:12

credibility 158:3

credit 156:18 157:20 224:24,25 225:3

crediting 155:21

critical 63:5 149:12 209:10

critique 47:10

cross 180:14

crying 172:3

**Robert Reilly**                                              Fish, et al. vs. GreatBanc Trust Company

**culminating** 61:1

**current** 14:23 37:25 38:4,6,9,18 39:2 110:25 141:4,6 166:24 172:20 259:1,9

**cursory** 167:18

**customary** 189:15 253:19

**customer** 257:15,21 259:23

**customers** 124:5

**cut** 96:17 173:6 209:20 222:1

**cutoff** 91:21,22

**cutting** 23:2

**CV** 7:14 27:3

**cycle** 164:12

**cycles** 163:4

---

**D**

**damage** 86:17 245:3 249:14

**damaged** 248:18

**damages** 18:16 85:11,19 87:8 88:10 92:10,19,21, 24 93:12,16,22,24 95:3, 10 178:8 225:12,16 227:13 238:2,13 246:4, 8,15,22 247:5 248:7,25 249:7,22 250:7,8 251:25

**Damodaran** 255:11

**data** 23:21 90:21,22 91:21,22 99:19,21 115:21 119:1,25

**date** 5:2 7:16 11:25 40:9 81:3 86:22 87:14 90:19 91:9 95:21 101:23 110:25 111:22 146:3 166:18 168:1 171:22 226:22

**dated** 42:17 57:22 79:21 81:1 162:1 164:7 165:13 166:16 167:15

**dates** 221:2

**Daubert** 28:11

**day** 54:13 98:22 167:23 215:1 220:13

**days** 33:5 46:10 47:7 48:13 49:15 50:4,7

**DCF** 26:16 66:15 78:17, 20 81:24 84:7 88:5 92:18 93:10 182:20 184:9 191:25 194:3,19 195:11 197:13,14 246:17,21 247:6

**DCFS** 80:21 81:6,24 84:23 85:6,7,22 92:20 110:19 182:17,22

**deal** 42:5 222:18 257:3

**debate** 75:22 222:16

**debit** 224:23,25 225:10

**debt** 69:15 70:3 194:20 232:7,9,13,21,23 234:21 235:18,19,24 256:3,4,7, 8

**December** 34:17 72:18 76:8 77:6 80:12 81:1,4, 10 85:1 111:21,23 131:21 157:3 177:20 178:23 219:1 226:22 247:1 248:1

**decide** 31:11 73:4 125:1

**decided** 11:10 17:8 175:5

**deciding** 44:3

**decision** 71:25

**decline** 163:6

**declining** 162:16 196:15

**decrease** 210:5 217:21 226:17 230:25 231:1

**decreases** 25:10 232:22 234:16

**decreasing** 26:3 118:6 146:25 147:3 195:3 196:4

**deduct** 218:3 228:4

**deducted** 235:1

**deducting** 218:4,13

**deduction** 222:22 225:21 235:2 236:7

**deem** 59:20 66:19

**deemed** 121:22 194:9

**deeper** 147:16

**defect** 218:19,20

**defend** 172:7,23

**defendants** 5:22 6:15 46:15 246:3

**define** 60:24 117:4,13 133:9

**defined** 36:1

**definition** 35:13 36:14 37:17,21 117:6,8 233:2

**definitions** 36:11

**deleting** 229:22

**deliberate** 95:25

**deliberately** 180:24

**delivered** 22:13 46:15 246:3

**Deloitte** 62:15 63:9,23 64:17,23 79:6,14,17 80:16,22 81:3,20 83:18 91:1 110:12 138:20 174:23 175:2 177:15 178:6,21 179:1 181:21 182:23 183:1 192:8 203:13,14

**Deloitte's** 78:21 79:21 81:9 110:17 177:20 179:9

**delta** 212:5

**demonstrating** 15:23

**demonstration** 25:24

**departing** 212:21 215:15

**dependents** 258:14,15, 17

**depending** 10:25 37:8 258:20

**deposed** 49:23

**deposition** 5:9,16 19:9 33:10 42:11 48:14,19,20 49:6,7,8,12,13,21,22 51:3,7,12,14,18 52:2,18, 19 53:6,8,18 54:16,21 55:13,14,17,19 57:6,13, 16 115:1 148:13 158:22, 25 161:6,17 164:5 165:6 166:11 167:8,19 172:7, 22 260:23

**depositions** 48:17 49:5 50:1,7,8,22 51:1 52:9, 22,23 53:2

**depress** 129:17

**deps** 51:21

**derive** 76:1,4 79:11 85:6

**derived** 10:16 38:12 72:12 79:20 81:9 82:7 84:25 88:5 104:13 154:14 184:4 208:6

**deriving** 74:20

**describe** 43:14 62:10 116:3,15

**describes** 134:12

**describing** 61:14 212:20 260:1

**description** 27:25 44:15, 17

**descriptive** 159:21

**design** 11:5

**destroy** 153:15

**destroying** 154:9

**detail** 61:13 116:3,7 148:1 158:24 179:25 199:1

**determination** 198:16

**determine** 107:21 109:7 123:22 147:13,17 151:10 196:21 219:11 255:21

**determined** 238:22

**determining** 20:3 23:17 108:6 123:25 133:14

**Robert Reilly**

Fish, et al. vs. GreatBanc Trust Company

**detriment** 98:13

**develop** 124:22 142:7 146:20

**developed** 43:9 123:7 176:1

**developing** 136:23 137:14

**development** 133:25 134:1,3 136:11 147:22

**developments** 198:22

**devoted** 147:24

**devoting** 128:20 147:17 148:4

**diametrically** 171:1

**Diego** 5:7

**differ** 35:18 36:20

**difference** 38:24 53:22 67:12 77:20,21,22 197:5 209:19,21 213:16,17 214:13 215:22 234:25 256:15 260:2

**differences** 117:14 182:4 255:22 256:2 260:3

**differently** 39:18 41:2,9 228:25 229:6 236:22 237:22 238:8,9 239:10

**differs** 68:5

**difficult** 164:13

**digital** 100:1,3,11,20 101:3,6,7 118:13 127:19 128:6 133:13,18,23 134:5,25 135:5,19 136:9,16,22 137:10,15 138:2,14,16,21 139:3,9, 13,16,24 140:22 141:9, 15,24 142:10,14 143:3, 17 144:5,6,12 145:3,18 146:4,10,21 147:19 156:20

**digression** 204:8

**diligence** 21:5 24:11 102:25 105:14 108:12 109:3,7,13 143:17,19 144:3,16,19 145:2,17

189:22

**diluted** 218:22

**direct** 15:1,4,22 16:2 20:16,24 21:19 22:10,23 25:2,6 26:12,18 27:4 124:4,10 138:9

**directed** 45:16 110:12

**directing** 205:22,23 206:23 207:15

**direction** 26:9 30:25 31:1 45:21 64:22 110:25 166:24 179:20 245:8

**directly** 17:10 24:18,22 25:12,18 30:6 33:2 85:3 138:15

**director** 7:11

**directors** 138:13 156:8 187:11 252:4

**disagree** 198:10 217:11 218:25 224:8 225:18 226:2,3 242:20,22

**disagreeing** 226:20

**disagreement** 75:21

**disagrees** 219:2

**disclosed** 56:1

**disclosure** 180:19

**disclosures** 57:4

**discomfort** 10:13

**discount** 38:12,16 64:6 66:22,25 67:2,4,5,18,23 68:1,14,17,20 70:4 77:23,24 79:8 86:6,8 144:14 180:6,8,12,25 181:4 182:6,13,14,17,19 183:13 184:5,7,9,11,13, 14,16,19,22,24,25 185:3,4,11,21,25 186:18,19 187:22 191:8, 20,21,22 192:4,7,11,15, 18,19,21 193:8 210:9 250:9 255:7,8 258:2

**discounted** 26:10,25 65:23 80:10 203:1

**discounting** 119:20

**discover** 98:12 135:15

**discoverable** 45:3

**discovered** 118:19 126:23

**discovery** 153:1,12

**discuss** 100:14 148:23 153:22 245:25 260:16

**discussed** 43:6 61:19 66:10 250:1 260:13

**discussing** 14:1 144:22 145:12 169:10

**discussion** 117:25 118:2 140:20 169:15 176:11 223:21 241:6

**discussions** 163:9 172:18

**Disk** 59:5 101:15 148:14 193:19 245:21

**dispute** 15:10 19:5 24:17 183:19 187:11

**dissenting** 36:8

**distinction** 200:23

**distinguish** 213:16

**distinguishes** 200:24

**distributors** 120:4

**dive** 147:17

**diversified** 257:11

**diversify** 257:13

**divide** 214:10,22 226:12 235:13

**divided** 239:23

**divides** 227:9

**division** 17:17 18:19 89:23

**document** 33:20 42:18 48:22 54:23 56:10 57:23 114:25 149:21,23 153:2, 19 161:18 164:8 165:10 166:18 167:15 169:21 178:19 200:11

**documentation** 134:23 135:12

**documents** 49:2,3,4,5 53:16 54:8 58:8,18,19, 23 64:10 100:23 116:8,9 135:11,15 136:15,20 138:23 139:8,12 142:8, 12,19,24 146:18 149:19 153:4,5,10,23 154:8 169:3

**DOL** 40:11

**dollar** 11:23 213:2 216:11,16 217:8 247:23

**dollars** 12:4 147:18

**Donna** 5:5 33:13 145:10

**door** 214:2,3 225:4 226:6

**double** 33:16 204:15,17

**doubt** 118:24

**downside** 79:6,11,21 80:10,23 81:4,10 178:22 179:8,16,19,20 181:8,22 182:23,24,25 183:4,8,17 184:8 187:12 188:11 189:1,13,19 191:1,6,11, 12,13 193:8 196:16

**downsides** 185:25

**downward** 111:8,9 165:23 180:23,24 184:24 185:2 187:20,22 192:12,14,16,21 193:1,5 194:15 195:12

**draft** 42:20 43:20 45:16 46:7 47:16

**drafted** 44:8 58:1

**drafting** 42:24

**drafts** 46:14,19 47:1,4

**drawn** 67:19

**dredge** 18:23

**driven** 141:15

**drops** 237:19,25

**due** 21:5 24:11 102:25 105:13 108:12 109:3,7, 13 143:17,19 144:3,15, 19 145:2,16 146:4 189:21

**Robert Reilly**

Fish, et al. vs. GreatBanc Trust Company

**Duff** 7:21 8:3,17 9:7 35:3
41:7 60:22 61:1 62:3,4,
14,20 63:10,13 64:5,6,
11 65:9 66:11,16,23
67:3 68:9 69:18 71:7
74:2 75:9 76:6 77:13,17
78:11 79:8,12,16 80:8,9
83:18 85:3 86:3 91:1,13
94:23 102:24 114:25
115:9 119:19 120:8
124:1 127:24 133:25
143:14,25 144:2,11
145:1,16,22 148:20
154:22 174:22 175:1
177:9,12,14 178:12
181:2 182:3,7 183:4
185:11,17,20 186:3,20
188:1 191:6,11 192:15
194:17,21 195:6 196:10,
17 197:4,9 198:3 199:16
200:6 201:21 203:2,12,
14,23 209:1,4 212:13
229:1 236:5 238:22
242:14 246:17,21
247:13 248:1,3,10,17
249:18 250:4,12

**Duff's** 60:6,13 65:5
66:18 67:19 68:6 80:7
81:13 84:4,25 186:12
196:24 199:12 234:18,
20,25 235:2,5 237:14
238:20 249:24 250:23

**duly** 6:7

**dumb** 67:7 235:6,11

**dumbbell** 232:16 235:4

**Dyer** 29:9,18 33:23
158:5

---

**E**

**e-mail** 161:25 162:9
164:6,24 165:11 166:14
167:3,5,6,11,14,23,25
168:22 207:3

**e-mails** 153:19 161:12
168:17

**earlier** 60:25 125:10,18
167:23 168:1 170:13
171:8 176:10 229:11,14
253:15

**early** 205:11,25

**easier** 35:21 43:25 47:25
185:1

**easy** 41:18 54:6 88:16
169:2 181:1

**economic** 99:20

**edit** 44:11,12 58:5

**educate** 142:9

**educational** 7:18

**effectively** 34:25 37:17
60:24 68:23 70:14
186:20 201:7 239:13
257:7

**effort** 144:16 201:4

**efforts** 146:20

**election** 250:19

**element** 87:18

**elements** 87:17

**eliminated** 231:17

**else's** 55:12

**emergence** 135:4 139:2
144:5 156:20

**emerging** 134:5 138:1
147:19,25

**emphasize** 82:24

**employed** 7:8 17:23

**employee** 15:10,11 19:4,
19 21:25 23:18 136:7
146:19 166:18 205:19
211:16 212:25 224:21

**employees** 23:9 25:21
39:9 102:24 134:13
207:1 208:15 212:21
215:15

**employer** 30:17

**encouraged** 170:6

**end** 5:17 17:11,20 18:3
25:12 77:18 94:4 115:17
131:22 142:10 154:3
228:18 234:23

**endeavor** 135:15

**ended** 193:5

**ending** 83:6

**engage** 31:16

**engaged** 20:12 31:20
44:8,10 158:4,11

**engagement** 12:16,17,
19 15:7 17:24,25 19:3
20:22 23:6,16 24:1
26:17 29:11,25 33:17,23
104:24 111:20 113:11
153:7 154:3 174:9

**engagements** 8:16 9:17
10:4 12:9,11,13,15 14:4
15:3 18:22 20:16,22
22:16,17,25 26:16 31:15
114:5 188:25 205:1

**enhance** 135:19

**enter** 125:20 130:24

**entered** 125:12 126:11
131:18 169:14,25

**entering** 130:14,20

**enterprise** 68:16 76:25
77:5,14,18 78:8 80:12
84:7,16,22 201:14 218:5
222:22 223:3,5 225:22
229:2 234:20 236:7
243:4,19,24 244:8,11,17

**enters** 96:2

**entire** 42:20 49:21,22
50:14 51:23 55:13 58:1
71:18 79:2,4 145:21
152:8 209:22 213:11
218:3

**entities** 103:1 130:11

**entitled** 45:18

**entity** 111:12

**entry** 70:15 131:19
132:19

**environment** 124:2

**equal** 40:22 209:15
210:23 211:1 215:13
216:4 220:8 223:2
229:15

**equals** 98:2

**equation** 105:9 106:4
180:20

**equity** 69:11,14 70:1,2,
10,11,13 71:17,21 81:15
194:20 214:12,15
226:15 238:20,21,23
239:23,25 240:1 241:17,
18,21,23 242:5,12,13
243:1 254:8 255:22
256:3,8,13

**equivalent** 68:6 209:13

**ERISA** 35:12

**error** 218:12 238:4

**ESOP** 8:17 9:4,8 12:19
13:6,9,16,20 14:3,15,16,
20,23 20:18 27:16,17,23
30:4,13 31:7,8,9 35:12
39:9 40:7 103:18
112:19,20,23 144:17
185:7 188:4,5,10 202:6,
13 203:13 210:6 215:14
217:4 233:2,3,6,23,25
234:1,4,9,10,11 249:21
256:23

**ESOP-OWNED** 240:1

**essentially** 185:16

**establish** 132:9

**estate** 12:18

**estimate** 12:1 34:16
70:20 71:3,4 87:8 88:10
95:15,18

**estimated** 123:9

**et al** 5:10,11

**evaluating** 14:10

**event** 211:13

**events** 219:16

**evidence** 64:1,21 86:25
100:19 135:25 137:23
142:25 143:9,11 145:1,
15 160:18 181:13 251:5

**exact** 195:25

**examination** 6:9 180:15

**examined** 6:7

**examples** 38:24

**Robert Reilly**　　　　　　　　　　　　　　　　　　Fish, et al. vs. GreatBanc Trust Company

**Excel** 43:24 189:9 190:19

**exception** 26:23,24 32:22 84:25 175:21

**excess** 211:17 212:21 225:20 234:24 240:21 241:12 242:4 243:14,18, 21 244:17

**exchange** 28:23

**exclude** 28:17,25

**exclusively** 43:23 188:9

**executive** 19:14 257:10, 14,21 258:15 259:23

**executives** 258:13

**exercise** 88:2

**exercising** 87:11 253:8

**exhaust** 122:15

**exhibit** 33:10,14 34:4,6 42:1,11,15 43:19 44:4 47:20 49:19 50:19 51:4, 13 53:19,23 54:9,10,13, 14,16,19 55:20,22 57:16,19 58:10,21 60:3 66:12,14,22 67:2,13,15, 16 68:5,24 69:1,20 70:16,23 74:14 76:20 77:22 78:2,4,6,7,16,19, 20 79:5,18 80:1,11,15, 20 81:13,19 82:13 83:12,13 84:3,8,10,17, 20 85:16 86:12 93:25 115:1,12 116:10 136:5 138:24 148:24 151:18 156:25 161:17,21,24 162:12 163:15,21 164:4, 5 165:6,9,11 166:11,14 167:8,12 204:14,24 207:21 208:7,11 209:10 211:14 217:21,23 218:19 220:5 222:6 224:10 225:23 226:9 228:4,18 229:1,10,12,23 230:4,6 231:10 234:25 236:4,21 237:3 238:19 239:9 240:13 244:24 245:3,9,25 246:1,2,17, 21 249:24

**exhibits** 43:3,14,17,18,

23,25 47:6,11 49:11 50:2,21,23 51:1 59:15, 22 60:1 66:2 83:19 84:3 229:11 260:12

**exist** 101:23

**existed** 86:21 87:13 91:8 95:20 116:5 126:23 136:21

**exit** 38:4 259:8

**expand** 102:17

**expect** 198:11

**expected** 141:21,23 147:4 181:12 183:24 187:16 190:25 196:2

**expenditure** 213:23

**expenditures** 146:13 147:1,7,8,9 213:22,25

**expense** 83:16,17 146:24 203:13 213:22, 23 219:7,20

**expenses** 147:7

**experience** 25:5 28:4, 15,24 106:11,18 107:5 109:14 112:8 114:3 142:1,4 157:9,14 160:9 171:6

**expert** 9:13 10:1,5 27:10 28:5 29:5 32:16 42:19 67:7 176:18 202:6 237:11

**expertise** 30:13 141:12 202:11

**experts** 11:13 28:11 253:20

**explain** 35:11 82:19 97:17 99:16 108:3 111:2 128:11 134:9 181:1 185:1,4 249:12 259:5

**explained** 76:2

**explaining** 73:2 234:12

**explanation** 168:11 204:9

**explore** 45:18 101:24

**exploring** 90:3

**expressed** 167:5

**extensively** 62:20

**extent** 41:4 100:3 110:22 146:10 147:21 182:18 199:19 237:3

**externally** 31:6

**extra** 47:7

**extract** 197:11

**extreme** 93:21 94:8

**extremes** 94:14 95:6

**eye** 141:13

---

**F**

**face** 257:2

**facing** 61:4 62:5 94:24 121:22 137:2 138:7 143:3 146:1 198:23 247:25

**fact** 22:12 31:25 33:17 34:21 37:20 44:21 52:8, 20 57:5,21 58:18 62:25 64:23 74:3 83:2 89:25 100:11,16 116:9 117:21 129:8,17,25 130:13 135:16,18 136:21 137:9, 13,18 139:25 142:9 150:21 152:25 158:4 179:1,25 183:15 190:21 191:6,11 192:14 195:20 204:18 230:22 238:20 240:9 251:6,22 255:2

**factor** 66:17 67:8 68:10, 14,19 78:19 80:5 93:6 96:2 101:20 119:18,22 120:6,10 128:18 130:15 137:17 185:10 201:20 214:6 219:15 220:18

**factored** 68:2

**factors** 24:8 71:22 99:20 121:2,7 122:6,11 123:2 146:2 189:20 253:11 257:25

**facts** 115:15

**factual** 44:19 45:8,22 52:10,15 91:18 95:23

99:19,20 140:18

**failed** 53:13

**failure** 248:17 249:24

**fair** 12:23 16:20 17:3 19:16,17 27:15 34:16 35:10,15,18,22,23,24 36:4,5,7,15,17,19,21,22, 23 37:8,12,15,16,18,23, 24 38:9,10,11,15,19 39:10,11,19,21,24,25 40:3,7,8,11,17,19,20,22 41:2,4,7,9,12 45:11,12 46:5 66:19 76:21 77:5 84:21 92:5 156:14,15 157:1,11 177:16 181:6 187:2 204:22 208:15,22 209:5,12,24 210:4,13,25 211:7,11,17,22 212:21, 25 213:2,14 215:15,21 216:4,8,12,16 217:3,6 222:25 225:20,25 228:2, 16,19 229:16,24 230:8 231:9 236:16,25 237:1, 5,13,15 240:21 241:2, 10,12,24 242:4,10,11, 12,25 243:14,18,21,22, 23 244:6,7,17 255:23,24 256:4,5,10,11 257:6,18, 19 258:5,7,23 259:2,5,7, 20 260:4,5

**fairly** 177:25

**fairness** 12:21 14:6,11, 17 16:18 18:15 19:2,24 24:20 60:13,23 61:1 65:11 116:1 157:9,13 248:13 250:17,19

**fall** 183:23

**familiar** 7:20 14:25 35:16 171:12 174:2 253:14

**family** 5:24 6:17 251:17

**fascinating** 118:18

**faster** 43:8,24 198:7

**faulty** 234:22

**feasibility** 62:15

**federal** 29:4

**feed** 245:3

**Robert Reilly**                                    Fish, et al. vs. GreatBanc Trust Company

**feel** 6:22 161:22 165:19, 20,22

**fees** 12:3

**fell** 68:13

**felt** 59:16 180:22 201:15

**fence** 121:17

**fewer** 217:18 220:24 221:8 223:7 225:7

**fiduciary** 188:16

**fight** 172:8 173:13

**figure** 11:23 213:8 216:7 217:5

**file** 48:16,22 49:19 50:24 54:1 55:15 100:23 132:15 145:22 152:21 153:7,24 154:2 169:7 200:8

**files** 64:12,13 115:13 126:2,4 136:4 141:3 143:20

**final** 48:16,21 152:20 190:20 238:10 254:11

**finalizing** 47:16

**finance** 106:19

**financial** 12:10 21:15 24:11,24 40:12,13 66:16 67:19 79:2,4 89:2 96:1 105:5,6 106:13,15,20 109:2 110:13,18 147:12, 23 156:25 157:8 174:25 175:22,25 176:3 180:25 188:20 189:16 190:6 194:8,11 197:15 248:10 249:15 250:22

**find** 82:12 108:5 117:11 164:13 194:10 223:19 254:18,20,22,25 255:3, 12

**finding** 117:22

**fine** 96:22 108:14 126:9 132:5 197:22

**finish** 174:14 230:13 233:19

**finished** 32:20 154:5,6 163:7 230:18

**firm** 7:20 8:25 13:4,23 22:4 30:2,5,7,21,23 139:21

**firm's** 10:20,24 11:2 12:15 14:2

**firms** 203:15

**fiscal** 12:1

**Fish** 5:10 51:14

**fix** 257:17

**flat** 111:7 146:25 147:2

**flaw** 60:6,13,18 65:13, 14,22 85:13,19 92:21 93:12 95:10 200:21,24 201:1,4 204:24 245:4, 13,25 246:5,15 247:24 248:8 253:6

**flaws** 65:13,18

**flip** 48:7

**flipping** 33:15

**floor** 201:2

**flow** 26:10,25 65:23 67:18 79:19,20 80:10 81:7 82:6,15 83:11,24 182:17,19 195:2,4 196:3,5 204:4 207:9 220:5 224:11,12,25 225:1

**flows** 183:22 187:18 191:25 211:5

**fluff** 130:22

**focus** 60:16 148:25 159:6,9 165:18 188:8

**focused** 61:17 64:16 138:16 169:20 170:11

**focusing** 101:18 145:25

**folder** 54:1

**folders** 49:20 50:24 154:2

**folks** 26:9 106:12

**follow** 24:13 34:13 122:22 212:16 215:12 253:4

**follow-up** 255:20

**follow-ups** 248:14

**Footnote** 149:8

**forcing** 165:18

**forecast** 84:11 110:10, 17,23 162:6,7,13 163:5 169:15 174:24

**forecasting** 102:16 169:25 170:18 171:13, 16,20 174:3,10 177:2 202:6

**forecasts** 104:24 165:22 170:14

**foreign** 16:9 24:21

**forensic** 11:4,7,12,16

**forget** 94:3 169:2 186:2

**forgotten** 103:14 169:19

**form** 8:7 9:1 59:14,21 82:14 84:2 137:19 142:16 179:10 186:7 189:23 200:16 216:20 217:10 218:23 219:21 221:19 222:13 223:25 228:7,21 230:2 231:13, 21 233:9 235:21 236:18 237:20

**format** 82:21 206:14,15, 16 207:12

**forming** 48:10 59:17 255:21

**formula** 76:10 105:8,17 106:4 180:20

**formulate** 59:9 85:18

**formulated** 31:25

**formulating** 52:2 53:9

**forward** 56:24 86:4 136:17 195:20 203:20 209:12 210:3 211:16 220:21 222:14 227:6

**forwarding** 167:22

**found** 8:13 9:9 60:1 61:23 66:2 78:10 84:10 88:11 116:4 118:8,17 204:13

**Foundation** 5:24 6:17

**fourth** 81:24

**frankly** 142:4 170:19 173:24 180:14 181:2 184:15

**free** 6:23 161:22 165:20

**frequency** 9:1

**friendly** 135:20 141:25

**front** 42:1,2,9 135:11 182:1

**FT** 101:21

**FTI** 47:11 82:2,7,25 83:15,24 84:11,13,15 85:13,18,23 86:20 87:12,18 90:17 91:6,17, 21 92:16 96:4,14 97:7, 11,18,23 100:5,6 110:10,16,23 111:2 112:2 169:14 174:20 175:5 178:14,16 247:6

**FTI'S** 196:17

**full** 44:2 47:12,14 180:19 218:5 234:17

**fully** 61:8 218:22 219:17

**fund** 204:4 211:1

**fundamentally** 182:2

**fundamentals** 197:15

**future** 99:11,15 102:13 103:20 121:23 150:12 163:8 164:18 166:6 167:5 168:13 187:15 194:14 196:20 203:13 219:16 220:4,5,15 221:2 227:10

**G**

**GAAP** 35:25 38:4,15 40:15,17

**GAAS** 40:14

**gain** 105:14 149:15 150:21

**Gary** 5:25 6:25 27:11,14 41:25 45:13 57:15 131:5 163:19,23 172:6,7,11 173:10,17 178:20

**Robert Reilly**                                          **Fish, et al. vs. GreatBanc Trust Company**

199:18 252:9

**Gary's** 217:1

**Garys** 172:8

**gave** 27:25 41:13 93:17
102:24 122:23 135:23
141:8 154:17 177:23
189:11 190:18 207:5

**Geez** 250:18

**general** 11:20 27:22
34:21 36:17,19 37:14
52:14 55:19 71:15 99:25
116:13 118:5 134:10
149:18 171:13 202:4
211:21 215:11 254:8
256:13

**generally** 36:11 67:8
100:2 107:23 108:1
109:8,15 111:20 120:19
127:14 134:7 138:9
204:13 212:1

**generated** 11:21 118:20
136:15

**gift** 12:18

**gigantic** 125:10

**give** 9:13 11:22 16:13,16
31:20 32:10 46:9 74:18
88:9 95:3 96:20 98:24
143:12 149:20 166:23
175:4 176:22 189:2,12
206:22 207:11 212:7
224:21 250:16,19

**giving** 128:24 130:22
136:8 168:16 248:16
249:21

**glommed** 185:24

**good** 12:8 13:13 52:10
75:25 93:22 105:22
133:5 140:6 171:2
173:18 204:21 215:5

**Google** 254:24

**Googled** 253:14

**Gotcha** 204:6

**Gotto** 5:25 7:6 32:4 42:4
44:25 45:19 46:3 56:3,8,
22 57:10,13 96:12,17
99:2 101:11 131:1,6

132:13 137:19 142:16
143:4 145:5 148:8
172:7,9,25 174:14
179:10 186:7 189:23
193:15 199:24 200:16
216:20 217:10 218:23
219:21 221:19 222:13
223:25 227:18 228:7,21
230:2,13,19 231:13,21
233:9,19 235:8,14,21
236:18 237:20 240:16
245:16 252:13,18
260:20

**Gotto's** 173:7

**Grabowski** 255:10

**graph** 168:8,12

**great** 39:16 41:23 48:6
65:16 141:24 159:8
173:17 219:23 222:16
252:18

**Greatbanc** 5:10 56:6
60:18,21,24 61:20 64:11
66:11 102:25 154:22
250:16

**greater** 160:8

**Greenwald** 27:12,14,19
29:14,18 33:19,24 44:24
45:15 56:8,22 73:17
155:3 158:5 163:18,20,
24 164:1 172:2,6,9,13
173:3,15,20 177:19
178:7,20 179:4

**Greenwald's** 28:17
179:20

**grew** 130:3

**grocery** 14:14

**Grong** 162:1 164:7
168:2

**gross** 23:12 162:13

**group** 101:1 106:19,20
124:19 196:6,8 210:1

**groups** 100:25

**grow** 118:21

**growing** 119:24 120:1
130:9,10,12 144:5
212:4,5

**growth** 127:13,17 129:6
164:13 205:17

**guess** 19:13 26:7,19
30:15 41:25 42:4 44:20
63:7 89:6 119:10 121:19
128:15 141:21 184:4
209:6 236:14,23 244:3

**guideline** 105:24
194:17,21 196:11 197:4,
10,17,18,21 198:4,12,
15,20

**guys** 73:18 258:15

———————————

**H**

**H-o-b-b-i-c-o** 113:8

**half** 12:4 75:23 162:23
250:24

**hand** 33:14 36:23 161:16
163:16 210:2 218:12
250:14

**handed** 154:10

**handfuls** 13:1

**handing** 42:14 164:4
165:9

**happen** 33:3 221:9
244:18

**happened** 53:23 160:25
176:23 221:4

**happening** 129:21
223:10

**happy** 132:8 240:15

**hard** 53:21 89:19 122:16
153:23 154:1

**Hathaway** 258:12
259:12

**head** 113:11

**heading** 34:14 162:12

**headquartered** 113:9

**health** 149:12,24 150:3,
24

**hear** 46:1 73:17 97:19,20
135:6 145:7 173:19

**heard** 6:13 8:20 106:17
166:8 215:3

**hearing** 173:12,13
236:24

**heck** 188:11

**heeding** 137:9

**helpful** 43:12 110:7

**Hey** 163:18

**hiatus** 178:4,5

**hidden** 141:19

**hide** 142:6

**high** 86:15 94:7 97:25

**higher** 11:11,15 40:20
67:2 88:9 90:8 94:17
185:10,15 187:3 205:25
206:6 207:17 259:15

**highest** 100:12

**hindsight** 140:2,11

**hire** 19:22 31:11

**historical** 20:2 91:18
100:7 103:4 107:17
131:20 160:9

**historically** 21:8 100:13
127:13 129:9,16 130:2
132:18,25 151:6,9
203:19 218:16

**history** 52:11 105:19,22
146:25 147:2

**hits** 253:15,16

**hitting** 107:16

**Hobbico** 112:19,24
114:1

**hobby** 112:10,18,22
113:5,16,21,24 114:2
116:17 123:12 124:23

**hold** 59:24 98:8 202:5,11
233:16 260:13

**home** 15:25 25:23 234:6

**honestly** 107:25 226:18
240:14

**hope** 10:10 41:17 252:10

**Robert Reilly**                                                   **Fish, et al. vs. GreatBanc Trust Company**

---

**horse** 195:10

**Hoskins** 49:6,23 50:22 53:15 162:1 164:7 168:1

**Hoskins'** 49:11 52:18 53:6

**Houlihan** 8:21 9:7 102:24 143:15 200:2,7,8

**hour** 239:2

**hours** 98:21,25

**house** 15:23 124:18

**household** 18:6

**hundred** 142:4 256:22 258:15,18

**hurt** 211:12

**hypothetical** 37:18,19 229:16 230:12 231:8 237:11,12,16

---

**I**

---

**identical** 196:3,4

**identification** 33:11 42:12 54:17 57:17 165:7 166:12 167:9

**identified** 38:2 64:24 65:25 71:6 72:11,15,22 74:8 75:9 121:5 122:3 127:15,18 133:12 134:4 137:7 218:21

**identifies** 151:24

**identify** 5:19 17:25 42:16 54:8 57:20 75:12 100:18 119:21,22 120:14,18 127:17 141:17 148:23 151:20 200:11

**identifying** 127:20 154:21 258:10

**ignore** 213:19 220:9 239:12,15 240:5,8 257:18 259:2

**Illinois** 5:13 113:9

**illustrate** 240:10 247:18

**illustrated** 244:20

**illustrative** 247:15 250:3

**imagine** 224:5

**immediately** 163:3 231:11 232:20 237:5,17

**impact** 100:11,19 129:18 132:19 134:25 142:13 143:1,10 144:12 191:24 209:14,24 211:7 213:1, 3,4,5,10 215:17,19 216:5,11,15 217:3,8 229:18,25 232:9,11,13 235:18 240:21,22 241:3, 11,12

**impacted** 128:25 130:3 131:19 201:16 216:10 237:2 243:5 244:12

**impacts** 212:19 222:12

**implement** 146:6

**implemented** 186:24

**implementing** 135:18

**implication** 235:3

**implied** 235:19

**implies** 239:11

**imply** 232:15 235:12

**implying** 169:1

**important** 21:16 31:8 55:6 103:15 107:18 127:10 129:15,24 137:16 150:1 156:23 208:11 238:1

**impression** 29:19

**inadvertently** 48:24 51:4 52:6 53:7,14

**inarticulate** 151:22

**incapable** 59:16

**incentivise** 102:12

**include** 9:16 49:8 52:6 86:3 105:7 248:7

**included** 7:14 49:5 100:5

**includes** 90:17,21,22 211:1

**including** 22:3 95:7 99:12 111:22 134:13 142:19 164:11 259:3

**inclusive** 91:12

**income** 26:23,24 36:25 79:20 83:9,10 220:4,5

**incompatible** 198:17

**inconsistencies** 36:12

**inconsistency** 56:21

**inconsistent** 182:2 230:4,7,11 240:6

**incorporate** 63:4 101:22 110:24 142:10 144:18 186:11

**incorporated** 78:9 86:20 87:12 91:7 92:7 110:17

**incorporates** 66:15 77:9 110:11

**incorrect** 110:21 213:9

**increase** 25:20 67:4,5 100:10 118:13 127:19 132:12 137:15 221:3 225:9 231:2 236:1 250:9

**increased** 111:24 121:21 141:15 160:11 196:2 209:1

**increases** 25:9

**increasing** 26:2 118:5,8 120:17 122:20 129:17, 25 132:25 133:3,6 136:22,24 139:16 147:7, 8 159:24 195:1 196:23, 24 217:15

**independent** 16:19 17:11,22 21:21,24 25:11 63:19 119:2 136:3 189:16,17,18

**independently** 65:18,19 68:21 184:17 188:15 190:2 199:17

**indicating** 64:22 100:19 142:8 146:18

**indication** 92:3 93:22 94:19

**indications** 70:1 86:14, 17 92:24 93:16,18,24 95:16

**indicator** 21:14 149:12 150:23 151:1

**indicators** 21:4,6,10,11, 13

**indifferent** 180:6

**indirect** 124:10,12

**indirectly** 14:5 33:2 129:1,7

**individual** 8:2 38:7 139:19 209:21,22 210:1

**individuals** 9:8 134:14, 15

**industries** 118:1 142:5

**industry** 21:7,8 61:3,19 62:5,10 72:15 76:6 99:13 106:2 107:23 108:2,4 111:1 112:2 114:19,21,24 115:8,9, 14,17 116:2,6,10,11,12, 16,17 117:1,2,4,5,6,16, 17,23 118:3,5,8,22 119:2 123:12,15 125:17 126:11,21 128:21 129:6 130:3,9,15,20,24 131:14 132:12 134:1 141:20 146:2,3 147:5 148:19 177:9 183:8 195:25 198:6

**influence** 101:3

**influenced** 99:20

**influences** 90:24

**influencing** 91:20

**information** 23:23 45:8 52:14 55:4 56:24,25 62:3 63:12 65:5,25 86:21 87:13 90:18 91:8, 12,19 95:20,23,24 99:12 101:23 102:23 116:5,11 119:19 127:10 129:15, 24 130:7 135:17 136:25 137:5,7,21 139:15 140:18 141:7 146:15,17 151:21,25 152:24 154:14 156:24 177:13

---

**Robert Reilly**  Fish, et al. vs. GreatBanc Trust Company

190:24 203:23 207:9

**informed** 71:11 248:2

**initial** 113:13 164:11 201:25

**initially** 10:21 37:11 41:16 42:15 60:10 112:7

**initiatives** 139:2

**input** 91:2,3,4,6 107:2 154:17 156:7 212:7

**inputs** 67:18 79:19 81:9 82:5,15 189:12 190:20 228:18 255:25 260:2,3

**inquire** 107:8

**inquiry** 156:5

**installed** 112:19

**instance** 176:16

**instruction** 46:2 207:6

**instructions** 205:9

**intellectual** 27:21

**intend** 32:9 56:19 245:7

**intended** 49:1 50:20 87:7 102:12 150:12 218:17 242:2

**intending** 202:2

**intent** 41:18

**intention** 247:21,22 249:13

**inter-cortile** 87:6 89:12 94:13

**inter-cortiles** 90:8

**interactions** 8:7

**interest** 234:21

**interested** 124:20

**interesting** 226:25 239:5

**intermediate** 83:14

**internal** 174:1 251:6

**internally** 31:5

**international** 16:11

**Internet** 115:22,23

**interpret** 149:5 157:17 207:5

**interpretation** 65:2

**interrupt** 44:25

**interview** 56:2 135:14 143:13,20

**interviews** 102:25 134:12 143:16 144:4,18 154:15,21 160:23

**introduce** 6:13 102:2

**invalidate** 97:16

**invents** 142:5

**inverse** 25:16,19

**invested** 76:21,24

**investigation** 144:16

**investing** 146:19

**investment** 254:12

**investments** 146:11,12, 13

**involved** 103:17 104:1,6 188:2,3

**IPO** 256:24

**irrelevant** 234:3,5

**IRS** 35:12 40:11

**Israel** 30:8,9,13 31:16

**issue** 14:11 24:1,16 45:14 61:14 65:14 139:25 141:9,20 167:25 169:24 194:22 222:16 223:13 231:24,25 232:4 238:1 243:10 246:4,9,22 247:6,11 248:10 249:15 250:5,15,18 251:14,20 255:8

**issued** 19:22 54:4 56:6 64:11

**issues** 44:18 148:3

**item** 69:22 76:21 83:17 109:4 147:22 148:2 207:24 218:21 223:1 229:22 231:17

**items** 55:9

**iterations** 205:25

_____

**J**

**Jackson** 8:20 143:14

**Jacob** 114:16

**James** 5:3

**Jeff** 162:1 168:2

**Jim** 29:9

**job** 28:2 200:6 202:8 223:14

**Johnson** 136:7

**joined** 139:21 140:12,14

**jointly** 205:3

**journal** 116:14 255:1

**judges** 184:15

**judgment** 59:19 71:10, 11,25 72:8 74:22,24 76:9 87:11 88:3 92:1,2 143:25 253:8

**Julie** 143:13

**July** 7:4 32:6 57:22,25 58:20 165:14 246:10

**jumping** 25:17 231:5

**June** 162:2,20 164:6,8 165:3,15

**justified** 201:10

**justifies** 217:1

**justify** 181:1,4 185:2 227:2

_____

**K**

**Kay** 15:3,6,14 17:25 19:1 20:6,10,21 22:17 23:16 24:17 25:7 26:19

**Kazaitis** 5:5

**keeping** 78:7 228:14

**Keller** 5:25

**Kevin** 43:1,5,13,18

**key** 21:4,6,9,11,12 257:9,10,14,15,16,21

**kidding** 201:3

**kind** 18:23 33:13 47:22 61:10 78:7 80:19 85:9 94:8 110:4,10 167:18 173:13 195:9 201:1 202:1,21

**knew** 39:6 158:6 196:18

**knowable** 72:17 86:21 87:13 91:8 95:20 99:12 101:22 247:1,9

**knowing** 180:3 256:17

**knowledge** 46:17 58:7 97:13 99:9,23 100:15 102:4,21 114:10 122:15 254:18

**KOI** 21:18 25:2,6

**KOIS** 20:25

_____

**L**

**labeled** 80:16 84:11 161:21 178:21 179:16 182:23

**labels** 82:1

**lack** 139:15 246:9

**lacked** 27:21

**ladies** 124:19,21,22

**lady's** 124:18

**laid** 219:19

**landed** 246:14

**language** 43:9,10

**large** 14:13 128:19 130:14 184:11

**larger** 184:7

**largest** 101:1

**Lastly** 160:22

**Latin** 253:25

**lawyer** 67:7 140:7

**lawyers** 19:13 58:5 135:23 136:14 137:25 143:12 144:23 145:12

**Robert Reilly**                                    Fish, et al. vs. GreatBanc Trust Company

146:16 152:25 169:21
199:7

**layer** 254:1,11,13 255:13

**layers** 254:9

**learn** 17:16

**learned** 81:18 115:9
180:19

**leave** 32:23 65:17
125:25 158:1 159:12,19
182:11,14

**leaves** 19:19 229:3

**leaving** 86:6,8 159:23,25
160:7

**led** 203:23

**Lee** 5:22 6:16 8:4,12 9:6

**left** 19:15 48:24 53:15
94:14 159:22 190:5
206:4

**legal** 16:24 28:23 36:15
46:19 51:17

**legitimate** 75:22

**legitimately** 190:7

**lender** 108:19

**lenders** 108:24,25 109:1

**lending** 108:16,18

**letter** 33:17,23 199:19

**level** 72:9 73:5 74:25
75:7,13,24 76:5,12
147:13 155:25 167:18
196:25 254:2,14 255:4,
13

**levels** 74:8 75:2,8 106:9
107:1,3 128:16,17 254:9

**leverage** 234:16

**leveraged** 233:1,2,3,5,6,
23,25 234:1,4,9,10,11

**liability** 208:1,6 221:18,
21,22 231:18 239:12

**life** 221:9

**light** 139:16 249:20

**lights** 126:1

**limited** 45:6 98:10 99:6

**lines** 79:24

**liquidity** 210:11 211:10

**list** 48:8,25 49:1 50:2
53:13,14 54:1 123:4
257:15

**listed** 51:19,21 53:19
54:9 58:10,18 65:6,9
70:16 81:20 100:24
116:9

**literature** 174:3 177:1,3
239:17 240:2 254:23

**litigating** 234:9

**litigation** 9:13 10:1,5,17,
24 11:2,9,12,21 12:5,18
13:2,4 16:8,14 18:16
19:8 26:17 27:10 89:1
96:8,15 97:12 105:2
112:9 114:4 175:15
176:19 227:13

**located** 5:6 175:5

**location** 257:23

**logical** 239:13

**Lokey** 8:21 102:24
143:15 200:7,8

**Lokey's** 200:3

**lone-wolf** 200:13

**long** 53:12 93:19 169:24
185:19 211:10,11

**long-term** 170:17,20

**longer** 98:20 160:8

**looked** 22:12 23:22 41:8
49:2 64:9,12 72:6 73:5
81:7 84:23 85:6 89:16,
18 100:24 110:18
125:23 132:24,25 136:5
139:22 140:17 146:23,
25 148:2 165:13 180:10
253:10

**lose** 250:18

**losing** 123:20

**lot** 15:20 30:4,20 52:22,
23 53:2 55:9 115:13
116:8 131:23 134:22

140:20 143:19 180:14
184:14 188:3,5 190:23
196:7 197:23 199:1,3
214:4,8

**loud** 172:4

**Louise** 250:18

**low** 86:15 94:7 165:23

**lower** 40:21 184:9,25
185:25 187:4,18 193:6
196:7 198:12 206:6
214:17 223:6 244:10

**lunch** 148:9,12

_____

**M**

**macro** 99:19

**made** 44:13,15 91:24
133:12 156:5 172:18
175:8 191:3 211:6 236:5
246:21

**magic** 150:3

**majority** 9:18 12:6,7

**make** 10:10,11 28:2,11
36:3 47:25 84:6 92:1
113:22,25 117:15 125:9
130:18 146:11,12
172:22 173:8 184:15
197:7 208:12 211:21
222:22 228:18 238:20
239:1 242:3 258:16,25
259:12 260:4

**makes** 41:17

**making** 64:2 95:25
107:24 130:20 175:16
190:13 198:15 218:9
236:11

**managed** 190:8,9

**management** 7:9,24
9:12 24:25 33:18 70:20
102:23 105:4,5,8,9,15,
22 106:4,9 107:16,20
110:12,19 134:21,24
135:3 144:3,18 149:11,
18,21 150:5,16 155:25
160:1 182:25 183:16,20,
24 187:12 188:7 189:7,
11 190:18,21,23 191:12

196:18 200:14 203:16,
17

**management's** 108:7
111:17 119:20 151:5
181:11,13,20 196:25

**managements** 109:15

**manager** 43:1 206:4,10
257:10

**managers** 52:25 53:1

**managing** 7:11

**manifesting** 111:12

**manila** 49:19 50:24 54:1
154:2

**manipulate** 184:5,13

**manipulated** 95:24

**manufactured** 114:1

**manufacturer** 113:19

**Marchetti** 49:7 51:7
55:24 56:7,9

**Marchetti's** 51:11 52:17
54:20 57:6

**Marilyn** 54:20 55:7,10,24
56:7,9

**mark** 41:23 54:14 143:16

**marked** 33:10 42:11,14
54:16 55:19 57:16,19
58:9 161:17 164:5 165:6
166:11 167:8,12 208:1

**market** 17:3,10,19 19:17
20:13 34:16 35:10,19
36:5,21,23 37:1,16,18,
20,21,23,24 38:10,11,
12,20 39:11,21 40:3,7,
11,20,23 41:4,7,9 66:19
76:21 77:5 84:21 91:19
100:2 113:21 114:2
118:15 119:5,18 120:2
121:5 122:21 123:11,19
125:19,20 126:22 127:2,
6,14,18 131:18,19
132:20 138:2,9 146:4
208:15,22 209:5,12,24
210:4,13,25 211:7,11,
17,22 212:21,25 213:2,
14 215:16 216:4,8,12,16
217:3,6 222:25 225:20,

Case: 1:09-cv-01668 Document #: 559 Filed: 10/30/15 Page 85 of 98 PageID #:25805

Robert Reilly                                                    Fish, et al. vs. GreatBanc Trust Company

25 228:19 229:17,24 230:8 236:25 237:1,5, 13,15 240:22 241:2,10, 12,24 242:4,10,11,12,25 243:14,19,21,22,23 244:6,7,17 255:24 256:5,11 257:18 258:5, 7,23 259:2,20 260:5

**marketed** 17:5 18:2

**marketing** 22:2 23:7 134:2 141:13

**marketplace** 112:11 114:12 135:5 136:23 137:16 139:17 141:16 145:4,19 257:4

**markets** 20:8 102:17

**Mary** 15:3,6,14 17:25 19:1 20:6,10,21 22:16 23:16 24:16 25:7 26:19

**match** 192:4

**material** 48:8 67:25 77:20,21,22 125:12 201:20 215:16,19

**materials** 50:18 59:20 116:21 125:4 141:13 179:4

**math** 70:8

**Mathematically** 193:10

**mathematics** 75:18

**matter** 5:10 14:22 41:15 49:18

**matters** 9:23 45:22

**mature** 31:7,9

**Mawr** 5:12

**meaning** 20:14 117:12 251:9

**meaningful** 227:12

**meaningless** 227:11

**means** 31:17 69:2 108:1 180:24 247:4 253:23,24 254:15

**meant** 35:10 63:4 79:16 82:11 146:7 210:23 235:11

**measure** 22:5 92:18,21 95:14 248:6 253:24,25 254:6,7,8,10

**measured** 111:24

**measures** 95:9

**meat** 41:15

**median** 75:16 88:1 89:11 90:7 92:3,14 94:12

**medication** 55:7

**medium** 87:5 153:25

**meet** 136:24 137:14 146:21 147:18 180:4

**meetings** 139:6 150:10 156:3 187:13

**member** 8:3

**memo** 165:4 166:7 168:3

**memoranda** 251:11

**Memories** 17:17 20:13 22:8 29:12 117:18,21 119:13 120:10,16 123:19 124:4 127:24 130:9,16 136:21 146:19

**Memories'** 26:1 122:2, 18 123:9 124:16 127:11, 12 129:1,7,18 130:4 131:21 132:21 133:2 142:14 151:12

**memory** 18:23 155:7

**memos** 101:1 150:10 206:3

**mention** 15:16 53:4

**mentioned** 13:6 14:21 18:5 22:18 43:13 48:18, 19 49:6 51:3,20 53:5 56:9 68:25 87:16,22 90:16 112:24 116:9 160:15 170:13 181:10, 21 253:7 255:17

**message** 168:15

**method** 15:1 16:1 17:19 18:3 26:13,15 27:1 74:1 97:21,22,23 130:5 170:16 195:14

**methodological** 106:21

223:22 224:2

**methodologies** 28:7 36:18 76:15 88:4 102:11,16

**methodology** 27:20 66:8 71:5 72:25 74:20 76:11 97:18 106:14 107:8,20, 22 109:20 164:19 165:2 174:11 176:2,8 218:19 224:3,5 240:6 247:15

**methods** 36:24 37:2,4 69:7

**metric** 21:15 22:1,5,8,13 24:16 25:19 149:6,11 150:6,17,22 151:3,10

**metrics** 23:14 154:12,13

**Michaels** 119:17 120:2 124:24

**micro** 99:19

**middle** 68:13 75:15 96:18 110:11 198:2

**midpoint** 94:12

**Mike** 5:21 6:14,23 96:12, 17 163:18 172:2 173:15

**million** 12:3,4 19:20,21 77:15 80:13 81:16 84:8 85:12,16,20 86:17 90:9 94:17 95:4,14 119:14 163:5 164:15,16,20 166:22 168:14 203:4 208:6 213:8,21,24 214:2,3,17,20 215:9 216:7 217:5 218:7 219:20 220:6 221:16 222:5,23 224:12,14 226:16 228:5 232:7,9,13 233:14 234:15,19,21 235:1 236:6 238:2,3 249:23 250:3 259:19,21, 22

**mind** 32:15 41:20 53:17 66:7 78:7 95:9 156:14 170:4 210:20 217:4 218:11 224:19 228:3,14, 15 229:20 232:4 237:16

**mine** 10:18 22:4 257:24

**minority** 14:15

**minus** 126:12 239:8

**minutes** 108:13 138:13, 19 139:6 239:2 251:10

**misasked** 64:15

**missed** 49:10 52:1 58:15 70:24

**missing** 48:15 62:19 231:24

**misspoke** 108:25

**misstate** 160:4

**mistake** 184:16

**misunderstand** 128:1

**misunderstanding** 243:12 249:10

**misunderstood** 64:16 127:21

**mitigate** 120:20 122:19

**mitigated** 120:10,17 121:4 122:3 134:4

**mitigating** 121:7 122:6 189:20

**mitigation** 134:9 138:1

**mix** 194:20 256:3,8

**Mizen** 101:1 134:13,19 135:2,17 137:10 139:14 143:16 154:15 155:4,9, 14,19,21 156:11,25 157:7 158:1,3,16

**Mizen's** 156:18 157:17 158:25

**model** 70:16,17 74:3,9 78:22,24 79:13,15 80:22 81:1 93:11 99:10,18,25 103:6,16 104:13 111:6 113:22,23,24 121:3 162:16 163:3,7 165:24 166:1,4,22 167:1 168:6 170:23 180:21 186:12 212:3 223:11 225:23 255:21

**modeled** 181:20

**modeling** 116:25 161:14

**models** 62:15 63:24 64:17 65:24 110:18

Robert Reilly

Fish, et al. vs. GreatBanc Trust Company

113:22,23 120:16 177:21 178:21 179:6,9, 18 180:1,5,7,10 181:11, 17,25 182:6,23 183:1 191:25 206:25 207:17, 18

**modifier** 94:2

**moment** 6:14 48:6 67:15 68:25 114:16 123:8 159:5,16 213:20 232:5, 6,8

**money** 146:20 251:15,23

**month** 23:10,11 150:1 165:12 170:24,25

**monthly** 136:6 150:10

**months** 12:2 155:11 162:21 165:12,25 166:5 168:19

**Moran** 5:23 6:16 162:1 164:7 165:14 168:1,16

**Moran's** 150:16

**Morgan** 5:23,24 6:16,17 251:17

**morning** 180:19 238:14

**Motels** 27:17

**motion** 7:3 28:17

**mouth** 172:14 173:9

**move** 41:15 89:4 148:22 195:19 200:20 217:23 222:21 245:12

**moving** 27:9 216:22

**multiple** 210:8

**multiples** 195:23 196:6, 7,9,10,11 197:16,20 198:11,13

---

**N**

**named** 136:7 166:15

**names** 15:20,21 18:10 113:19

**Nancy** 167:13,14,19,22

**napkin** 90:6

**narrative** 46:7 47:6,12, 14,18 168:11

**narratives** 136:6

**national** 25:8 26:3

**nature** 44:19

**NCEO** 222:17

**needed** 150:13 186:5

**negative** 87:17 90:15 130:3 217:8

**negatively** 129:18

**net** 23:12 79:20

**news** 141:24

**nice** 120:22

**nomenclature** 253:19

**nondirected** 188:17

**nondirector** 188:21

**nondiversifiable** 256:20

**nonduff** 195:2

**nonesop** 12:20 157:3

**nonlitigation** 9:16,19,22 13:6,8 103:18 104:7,24 112:9

**nonmaterial** 128:10

**nonrevenue** 12:12

**nonsystematic** 254:13

**normal** 30:17

**note** 118:12 146:3 149:9 151:23 159:8,9 168:12

**noted** 70:19 125:16 159:4 249:6

**notes** 143:13,21,22 145:1,15 162:5 168:10 252:15

**notice** 33:16

**noticed** 49:15

**noticing** 169:3

**November** 166:16

**number** 5:11 13:11 23:11 24:3 25:10 36:2 42:1 43:11,21 59:6

70:17 84:25 94:17,25 96:19 99:25 100:10 101:16 134:12 148:15 163:21 193:20 203:20 207:11 208:5,9 214:11 217:17,25 218:10,20,22 219:1,17 220:2,13,15 222:3 223:11 230:25 232:5 235:23,25 238:2,3 239:11,23 241:25 243:3 245:22 249:23 250:3,4

**numbered** 34:13

**numbers** 47:8 88:16 89:19,20,22 160:8 190:20 192:24 238:21

**numerically** 178:8

---

**O**

**Object** 131:1 137:19 142:16 179:10 186:7 189:23 200:16 216:20 217:10 218:23 219:21 221:19 222:13 223:25 228:7,21 230:2 231:13, 21 233:9 235:21 236:18 237:20

**objection** 143:4 173:8 199:22 217:1

**objective** 35:8 90:22 91:4,6

**objectives** 34:10,14,25 35:4

**obligated** 251:1

**obligation** 30:4,19,23 31:4,10,14 201:9,23 202:7,12,17,22 203:3 204:3 205:5,24 206:25 207:25 208:5,13 210:15 213:12,13 218:4,6 228:5 229:23 231:18 236:8 240:3,5 241:19 242:14

**obligations** 30:14 187:17 204:5

**observations** 140:12

**obtain** 120:1

**obvious** 235:5

**occasionally** 31:15

**occur** 99:14 160:14 209:23 213:1

**occurring** 219:16

**occurs** 216:11

**October** 78:21,23,24 79:21 177:20 178:22

**off-site** 154:4

**offer** 14:9

**offering** 12:21

**offerings** 141:7,11

**office** 153:24

**offsetting** 225:9

**omission** 50:18

**omitted** 51:4 53:7

**one-finger** 43:3

**onward** 137:3

**operating** 17:9 22:9 124:3 188:14

**operational** 21:15

**operations** 146:6 194:14

**opine** 21:12,13

**opinion** 8:7,10 9:2 12:22 14:6,11,17 16:13,15,18 19:2,24 24:20 28:25 59:10,14 60:12,14,23 61:2 65:24 85:11,18 113:13 114:13 116:1 133:25 148:18 157:9 168:20 170:12,13 198:9 247:10 248:7,9,13,16,17 249:21 250:7,17,20 252:7

**opinions** 18:15 27:20 28:18 31:20 32:1,9,13, 20 48:10 52:3 53:9 57:7 59:21,24 144:23 145:12 157:13 260:10,12,14

**opportunity** 8:15 22:19 96:20 138:12

**opposed** 17:23 20:7 37:15 39:10,20 44:16 72:1 77:13 87:11 91:3

**Robert Reilly**                                                        Fish, et al. vs. GreatBanc Trust Company

95:23 171:1 181:3 185:5 209:8 213:12

**opposing** 27:14 28:1,2,6 180:3

**oppression** 36:9

**order** 53:24 59:21 146:6 189:12 253:2

**ordinary** 107:18

**organization** 20:25 21:19 22:3,10 25:3 26:18 149:6

**organizations** 20:17 25:6 27:4

**oriented** 23:7

**original** 44:22 53:19,20 247:21

**orthodox** 215:12 216:13

**outflow** 204:4

**outlets** 132:11

**outperformed** 170:14

**output** 205:14 206:14, 15,21

**outstanding** 214:9,11 215:2 217:19 218:22 219:2,18 220:25 221:8, 12 223:8,10 226:23 227:4,10 232:7,9

**overpaying** 188:10

**overseas** 17:12,13

**overstate** 196:12

**overstating** 213:9

**overview** 114:25 115:9

**overwhelming** 9:18 12:6

**owned** 14:16 15:11 20:18 112:23

**owner** 37:25 38:5,6,9 257:17 259:1,9

---

**P**

---

**p.m.** 148:11,15 193:17, 20 227:20,23 245:19,22 252:20,23 260:22,24

**pace** 159:24

**pages** 33:16 48:2,7 61:8 71:18 115:15

**paid** 156:13 212:20

**papers** 27:18

**paragraph** 60:16,17 61:18 62:20,24 63:7,12, 20 65:7 110:5,9,11 114:16,17 115:2 118:12, 19 119:16 145:25 155:1 159:6 162:15 163:2 164:10,21 165:17,22 166:20 168:3,5,8,11 169:8 193:23,25 194:6 240:18 241:16 244:21 249:23

**paragraphs** 34:9,13 60:11 61:9,18,23 62:11 63:1,16,25 64:24 65:7 115:5 148:24 165:19

**part** 10:11,23 17:22 20:17 22:13 23:25 63:7 103:15 105:13 109:12 110:19 117:18 123:15 143:17 152:20 153:6 155:23 156:6 157:14,21 160:1 169:25 176:11 184:2 186:9 253:18

**partial** 79:25 81:8 82:6

**participant** 117:22

**participants** 39:9

**participate** 108:15

**parties** 25:11 38:2 124:18

**parts** 43:2

**party** 14:25 15:23,24 16:1 17:5,18 18:3 22:23, 25 25:24 26:12,18 27:4 29:9 124:25 130:5 138:8 149:6

**past** 105:23 118:1

**patience** 252:25

**patient** 252:17

**pause** 73:23

**pay** 38:1,5,6 224:13

244:7 259:15,22

**paying** 136:22 210:13 212:24 213:3 216:13 217:2 218:13

**pays** 243:18

**peer-reviewed** 27:22

**pending** 7:3 235:9,15

**people** 15:21 25:21 106:5 107:9 139:20 190:4

**perceive** 72:16

**perceives** 189:21

**percent** 9:24 10:23,25 13:23,25 14:2,16,20 68:2,10,17,19,20,22 69:8,9,16,23,25 70:5,10, 13,14,15,25 71:8,14,25 72:1,3,4,24 74:5,16 75:4,17 77:3,4,8,9,12, 13,16,23,24 78:9 80:5 81:13 84:4 119:8,9 121:20 123:6,10 133:17 163:6 180:12,13 182:6 185:9 186:5,15,16,19 192:11,25 193:1,4,8 197:13 206:25 209:2,3 212:6 246:16 251:18 253:9 256:22 257:22

**percentage** 9:20 10:15 13:7 23:9 119:4,7

**Perfect** 227:18

**perfectly** 185:17,18

**perform** 12:25 21:5 26:23,25 33:5 40:6 86:24 108:8,12 115:25 174:4,22

**performance** 111:16 151:7,13 181:12 183:23, 25 187:16 193:6

**performed** 14:7 18:8,12 31:5,6 35:1,4,7 86:10 87:2 112:19

**performing** 18:17 113:15 115:25 157:13

**period** 64:3 79:25 81:8 82:6 104:9 109:9 112:5

116:22 122:21 150:17 171:21 176:13,21 178:13 208:13 210:24 211:15,24 218:7 219:12 222:5 225:21 234:17 249:16

**periodically** 124:21

**periods** 67:19

**person** 113:25 257:10

**personally** 157:10 174:10 202:10

**perspective** 106:21 126:21 127:2 131:20 225:22

**peruse** 161:22

**Phelps** 7:21 8:3 35:3 41:7 61:1 63:10,13 64:11 65:10 66:16,23 67:3 74:2 75:10 78:12 79:9 80:8 83:18 85:3 86:3 91:1 94:23 102:24 120:8 124:1 127:25 143:14,25 144:2,11 145:22 154:22 174:23 175:1 178:12 181:2 182:3,7 183:4 185:11, 17,20 186:3,21 188:1 194:17,21 195:2,6 196:10 197:4,10 198:3 200:6 203:12,14 209:1,4 212:13 229:2 236:5 242:14 247:13 248:1,3, 10,17

**Phelps'** 60:22

**photo** 125:3

**photography** 133:13,19, 24 134:5,25 135:5,20 136:9,10 137:10 138:2, 14,16,21 139:3,9,13,24 140:22 141:9,15,25 142:11,14 143:3 144:13 156:21

**phrase** 29:15 254:19

**phrases** 255:16

**physics** 253:16

**pick** 86:18 87:21 88:4 93:10,23 182:8 258:12

---

**Robert Reilly**                                    **Fish, et al. vs. GreatBanc Trust Company**

**picked** 86:19 87:6,7 99:21,25

**picking** 87:12 165:23

**picture** 169:14

**pictures** 125:5

**piece** 119:18 129:15 137:7 156:23

**pieces** 177:13

**place** 5:15 259:14

**plaintiffs** 6:1 31:21 32:1 245:7 251:25

**plaintiffs'** 33:20 97:8,10 114:11 138:11,25 143:12 152:19,25 158:11 169:21 172:19

**plan** 14:25 16:1 17:5,18 18:3 22:23 26:12,18 27:4 40:15 59:25 124:25 130:5 138:8 139:9 260:15

**planes** 113:24

**planning** 12:11,19 22:25 32:18 33:8 139:6 149:6 155:24 156:7,9 164:12

**plans** 25:24 40:13 102:2, 7,12,17 134:2,3 139:4, 15,16 140:21 144:4 145:2,17

**play** 182:18 232:17 241:8

**pleasure** 173:12

**plugged** 190:19

**point** 12:15 13:13 34:13 54:15 60:17 75:25 82:9 83:6,7,24 85:14 91:21 92:25 93:2 94:7 95:15, 17 125:9 155:7 160:13 164:14 180:2 185:14 203:22 205:12 206:7 215:25 216:9,13 229:5

**pointed** 114:17 223:20

**points** 50:8 52:24 94:9 139:10

**poised** 118:21

**popularity** 144:6 145:3, 18 146:21

**populated** 83:23

**Porter** 5:3

**portion** 11:4,5 12:8 44:8, 11 45:16 52:1 148:18 212:18 213:13 216:8 225:24

**portions** 42:24 46:22

**posing** 138:2,3

**position** 9:11 198:11 199:4

**positions** 56:14

**positive** 87:16,17 90:14, 15

**possession** 139:1 160:19

**possibility** 250:11,12

**possibly** 250:8

**post** 201:5,14,21 202:18 203:25 212:13 213:10 228:20 231:11 232:20 236:5,20 237:5,9,17 238:22 239:15 252:4

**potential** 108:20 118:9 134:2 247:16

**potentially** 183:6 210:8 247:19 250:13 257:8

**power** 146:19

**practice** 11:4,5,6,8 13:22 174:5

**Prairie** 185:8,13,21 186:15,23,25 187:1 221:5,9

**Pratt** 255:9

**pre-transaction** 91:14 237:4,14

**preference** 62:5 99:14

**premium** 66:18 67:9 68:22 69:23,25 70:6 71:4,8 72:4,5,24 74:12, 17 77:4,17 78:10,19 92:7 93:11 121:1,12,19 122:1 133:17 185:14,15

**price** 12:23 16:20 17:3 18:17 37:25 38:4 86:14 186:6,14,17,18 187:3 246:16 247:4 253:9 254:8,9 256:13

**preparation** 48:14 110:13

**prepare** 43:25 74:14 97:7 106:13,15 107:20 144:16 149:3 187:12 188:25

**prepared** 32:6 43:2,14, 20 49:18 53:23 54:22 81:7 82:1 84:16 86:12 90:23 91:22 96:5,7,14 97:11 104:23 105:20 106:8,19,20,25 107:1 110:13 134:23 135:12 178:9 179:17 182:25 183:16,20 236:4 243:17 245:8

**preparer** 90:24

**preparing** 25:25 53:17, 20 54:9 58:20 65:10 125:24 155:11 228:4

**presence** 119:17 121:5 127:22

**present** 40:16 41:21 68:2,9,18,20 80:4 115:15 203:1 207:25 218:7 219:14 220:4,10, 11,14 224:10,11 225:23 227:3,5,10 231:18

**presentations** 138:13

**presented** 40:15 94:20

**presenting** 223:23

**presume** 32:6 114:20 159:10 188:21

**pretax** 79:20

**pretty** 13:17 15:2,8 18:8, 13 28:8 50:3 70:8 73:15 74:5 113:18 170:17 208:3 231:19

**previous** 176:25

**previously** 159:24 169:6 178:9 207:18

**price** 12:23 16:20 17:3 18:17 37:25 38:4 86:14

**156:12,15,17 157:1,11, 12 197:11,12 201:8,16 202:24 209:25 211:12 212:10,19,24 214:11 225:24 228:2,16 231:2, 9,10 236:16 259:8**

**prices** 212:4 221:3

**pricing** 12:17 74:3,9 195:23 196:5,7 197:16, 20 210:8 255:21

**primarily** 43:23 127:18 134:13

**primary** 128:3,9,14,16 133:7,8,10

**principal** 29:13,15 101:20

**principally** 12:13

**print** 89:3,5 90:1 154:2

**printed** 88:22 95:8

**prior** 22:16 29:21,24 34:17 39:19 47:15 81:6 83:20 84:2 105:20 111:22,24 112:8 143:18 148:17 149:3,22 150:17 160:9 161:17 164:5 166:3 170:2

**private** 20:6,11 254:17

**pro** 123:3

**problem** 140:1 182:10 187:10 211:10 223:22 224:2 258:16 259:25

**procedure** 105:8 124:17

**procedures** 37:7,13

**proceed** 6:18

**proceeding** 136:17 137:2

**proceeds** 211:2

**process** 43:15 52:11 58:2 73:1 143:18 153:12

**procure** 175:12

**produce** 142:8,24 152:16 154:10 199:5,7, 10,21

**Robert Reilly**                                        **Fish, et al. vs. GreatBanc Trust Company**

**produced** 51:10 56:11 168:23 169:18

**produces** 32:17

**product** 14:6,17 17:10 25:12 89:5 102:13 134:2 141:7,11 175:17 183:7

**production** 51:11 199:22

**productivity** 21:21 22:8 24:15 149:1,5,11 150:6, 11,17,22 151:3,5,7,10 154:13

**products** 15:23,25 17:5, 19 18:2 25:23 26:12 100:4,7 102:3 120:4,5, 16 121:4 123:1 124:14, 15,21 129:2,8,19 130:4 131:22 135:20 136:10, 23 137:14,15 140:21,24 141:14,25 146:21

**professional** 7:18 12:3 13:8 22:3 59:19 157:13 202:4 203:15 227:2

**professionalism** 9:3

**profile** 194:9,11

**profiles** 198:16,18

**profitability** 195:1,4 196:2,5

**progress** 196:19

**project** 83:4,5 103:6,19 104:8 105:2,9 107:9 108:4 109:8,21 111:6,7, 9,11 162:16 164:15 165:2 170:23 174:10 176:13,20 189:8

**projected** 20:2 66:16 67:19 147:23 191:12 194:25 195:19 201:23

**projecting** 83:1 99:10 105:23 111:13 112:4 162:21,24

**projection** 62:15 79:2,3, 5,7 83:1,9,10,11,15 91:17 97:11 100:5,6 106:25 151:5 164:18 165:1 168:4 170:5 171:21 174:25 187:5,6,

21 192:20,22 203:16 210:3,9,24 219:6

**projections** 21:9 24:12, 25 64:2,5,7,21 65:2 66:24,25 67:1,3 78:21 79:8 81:10,25 82:8 83:25 84:15 85:14 86:7 95:19,22 96:1,5,14 97:8 101:21 102:1,7,22 104:13,17,20 105:6,7, 16,19,20,21,24,25 106:1,2,8,14,15,20 107:7,13,17,21,24 108:7 109:6,14,16 110:19 111:17 119:20 138:20 144:13 146:24 147:1 157:17,18 170:3 171:7 175:4,12,18,25 176:4,5, 7 177:15 178:6,25 179:2,18 180:9,25 181:3,5,8,9,14,20 182:3, 11,12,15,25 183:5 184:18,20,21,23,25 185:2,6,16 186:12,20 188:6 189:2 190:14 191:23 192:5,9,12,14,16 193:9 194:25 195:3,21 196:15,16,17,18,25 200:14

**projects** 156:19 163:4 164:19 168:14 213:21, 24

**promote** 142:6

**promotions** 102:12

**prompted** 176:10

**proper** 254:17

**properly** 45:3 124:1 127:25 184:3 212:15 249:25

**property** 259:24

**propose** 139:12

**prospects** 156:19 196:20

**protection** 201:8,16

**prove** 136:20 137:13 228:1,15 237:12 252:1

**provide** 8:1 137:25 152:14,19 153:1,18

205:15

**provided** 7:17 21:4 24:25 45:8,10 54:22 55:16,23 64:12 91:15,16 114:25 137:24 138:24 141:13 153:11 177:19 179:23 200:14 240:11

**providers** 30:21

**providing** 45:22 136:14 137:14 144:24 145:13 207:18

**proving** 231:9 237:1

**provision** 251:7

**provisions** 36:3

**pry** 10:7

**public** 20:8,10 196:1 256:23

**publication** 27:22

**publications** 27:2 116:13,14

**publicly** 105:25

**pulled** 115:22 240:13

**purchase** 12:23 13:19 18:17 34:18 156:12

**purchased** 15:13 18:20 19:16 100:1

**purchasing** 222:25 240:21

**purely** 71:24

**purpose** 34:10 36:16 97:22 171:3 242:8,9

**purposefully** 53:13

**purposes** 12:24 25:12 36:1 38:16 40:17 47:3 114:12 151:3 170:18,20, 21 202:17 227:13 240:8

**pursue** 109:22

**put** 27:25 39:5 42:1,4 52:8,9 55:6 113:23 125:4 155:3 159:15 163:15 189:9,10 201:8, 16 208:14 215:14

**puts** 211:17

**putting** 41:24 195:9

**Pythagorean** 97:24 98:4

---

**Q**

**qualification** 61:15 82:11

**qualify** 29:5

**quality** 123:1

**quanta** 254:14 255:4

**quantifiable** 71:23 247:19,20

**quantified** 72:11 250:5

**quantifies** 180:21

**quantify** 66:9 71:6 72:21 133:22 247:16,17,22 248:19 249:13

**quantifying** 255:1

**quantitative** 76:16

**quantum** 72:9 73:5 74:7, 25 75:2,7,8,13,24 76:4, 12 253:10,18,23,24,25 254:1,19 255:4,15

**quarters** 103:2

**question** 10:9 15:12 23:4 25:18 45:25 48:7 51:8 54:7 64:15,16,20 72:14 88:2 90:13 96:11, 24,25 107:12 108:6,10 112:15 120:13 121:14, 20 126:11 129:22 131:10,25 137:12 138:17 145:8 151:2 156:4 157:25 160:24 161:20 170:3 172:3 173:5 176:15 181:16,24 190:7 208:23 211:4 214:19,21 215:3,5 216:25 217:25 218:25 219:24 228:1 231:7 233:20 235:8,14 239:5, 10,14 240:4

**questioning** 223:19 236:15

**questions** 34:4 84:14 98:11 112:13 120:22,24

**Robert Reilly**                                    **Fish, et al. vs. GreatBanc Trust Company**

131:23 140:9 150:15
151:16 201:25 244:24
245:12 253:1,4,5

**quick** 151:16

**quickly** 98:6 139:23
161:10

**quotations** 115:16

**quote** 48:23 52:7 117:22
149:10 164:17

**quotes** 115:11

---

**R**

**R&d** 146:13,24 147:8,13,
18,24 148:2,4

**raise** 75:25 170:3 250:14

**ran** 65:23 78:17 191:6

**range** 68:14 75:14,15,16
85:16 86:15 87:6,9 92:4,
25 93:1,2,19,20,21 94:4,
7,8,13,19 95:4,13 182:9
197:18,22,25 198:2
237:1,13

**rapid** 146:3

**rapidly** 119:25

**rate** 64:6 66:22,25 67:2,
4,6,23 68:17,20 70:4
77:24 79:8 86:6,8
160:10,11 180:6,8,12
181:1,4 182:6,13,14
184:5,7,9,11,14,16,19,
22,24,25 185:3,4,11,21,
25 186:18,19 187:22
191:8,20,21,23 192:4,8,
12,15,18,19,21 193:8
206:25 207:17 210:9
250:9 254:7 256:12
258:2

**rates** 11:11,15 22:20
23:16 25:9,20 26:4
38:12,13,16,17 68:1
183:13 202:25 205:18,
19,24 255:7,8

**ratio** 216:18

**ratios** 83:16,18

**reach** 113:2 236:24

**reached** 40:3 250:13

**reacting** 198:21

**read** 34:19 49:13,20 50:1
51:13,16,17,22 53:1,25
56:23 70:22 115:13,21
116:8 117:9,10 145:9
149:13 150:15 158:21,
24,25 159:2,21 161:10
164:21 165:19 167:17,
21 199:2,6 200:5 260:20

**reading** 51:21 116:22
117:16 149:18 169:8
199:1

**reads** 162:15

**real** 122:16 151:16 221:9
251:23

**reality** 220:23

**realize** 98:17

**reason** 6:22 32:24 35:9
40:10 56:20,25 57:7
88:15 89:7 97:12 118:24
157:12,20 179:14
180:18 183:19 209:9
224:15 228:9,10 235:17

**reasonable** 92:19,25
93:19,20,23 117:15
157:19 237:15

**reasonableness** 24:24

**reasoning** 27:20

**reasons** 13:2 87:16
90:14,15 159:15 182:24
183:2,3 194:5

**rebuttal** 44:22 57:22,24
61:13,16,25 240:11
243:9 244:21 247:14
260:14

**recall** 16:9 18:24 20:23
21:18 22:18 27:7,10,18,
24 44:21 50:4,5,11
53:22 58:22 83:19 90:4,
6,7 103:11 112:16 114:6
117:25 119:12 122:11,
14 126:25 127:4,8
129:3,11 130:8 131:12
132:14,18 135:7,10,12
136:13,14,18 138:4,10,
15 139:7,8 140:20

143:20,22 149:7,17,23
150:19 151:14 152:10
154:9 155:13 156:10,16
157:7 158:14 160:12,15
161:15 169:8,9,10,19
175:14 177:23 189:4
199:19 205:22 206:2,9
207:15,20 236:9,10
240:12,14 243:7 251:3

**receive** 30:20 31:13,17
46:14 47:5,14 50:12
52:22 158:23 171:11
176:3 203:16

**received** 14:9 24:12
30:3,16 32:4 50:3 51:16
153:3 169:20,22,23
176:4 178:6 206:8

**receiving** 135:17

**recently** 55:24 178:1

**recess** 59:4 73:11
101:14 148:12 193:18
227:21 245:20 252:21

**recognition** 250:24

**recognizable** 15:19

**recognize** 25:2,8 89:4
120:14 141:13 223:21

**recognizes** 185:21

**recollection** 23:20 29:4,
16 30:11 46:21 49:25
51:22 52:4 55:20 103:22
126:16,19 131:13
134:22 138:23 152:7,9,
17 161:4 167:18 168:25
169:5 170:8 179:3 182:1
191:19 199:11 207:14
234:22 236:3,11 249:3

**recommend** 94:6 164:13
206:18,19

**recommending** 247:15

**reconciling** 214:6
220:18

**reconsider** 241:18

**record** 5:2,17 42:16
57:21 58:17 59:2,6
64:21 73:8,9,13,20,21,
25 101:12,16 148:10,15
193:16,20 200:12 208:4

227:19,23 245:18,22
249:5 252:19,23 260:21

**recording** 5:18

**recordings** 5:14

**records** 9:25 10:3

**redeem** 208:19,21,25
209:7 211:11 235:20

**redeemed** 219:13 241:2,
10,11 244:5,9,16

**redeeming** 208:14
209:12 210:24 211:16,
23 217:18 218:15
225:19 229:15 243:13

**redeems** 215:14 230:8

**redemption** 209:17,21,
22 210:5,17 212:19
216:3 224:16,20 225:24
229:24 241:24 242:4,25
244:12

**redemptions** 209:23
210:1,3 211:2,6 216:22

**reduced** 217:6 218:20
222:3 235:23,25 241:24
242:6,7

**reducing** 191:24 223:11,
17 244:8

**reduction** 216:17,18
243:1,2,19,20 244:19

**refer** 15:24 60:21

**reference** 50:21 62:23
114:18 247:6

**referenced** 25:7 79:25
254:21

**references** 35:14

**referencing** 51:12

**referring** 60:22 63:15,25
113:10 114:17 167:1
175:16 177:3 213:3

**refers** 115:2

**reflected** 231:10 237:3

**reflecting** 222:6

**reformatting** 79:6

**Robert Reilly**

Fish, et al. vs. GreatBanc Trust Company

**refreshes** 168:25 169:5

**regard** 7:4,17 9:3,5
24:20 26:11 29:12 36:17
57:7 60:12,13 71:13
85:12 95:10 105:17
116:1 118:3 121:25
133:23 134:19 139:2
140:21 141:4 143:3,16
156:8,20 160:22 161:20
177:1 195:4 205:17
246:14 247:11 252:2
260:6,7

**regional** 25:9 26:3

**regression** 99:18,22,24
103:16 111:10 170:23

**regular** 105:13 109:8

**regularly** 170:17

**regurgitating** 115:21

**Reilly** 5:9 6:6,12,13 71:3
107:19 113:11 120:14
144:20 199:20

**Reilly's** 45:14

**reinvest** 146:5

**reject** 28:21

**relate** 34:5

**related** 9:8,22 10:17
11:2,9 12:5,8,9,17,19,
20,25 13:4,9 14:3 16:8
21:20 22:23 26:17 27:3,
16 105:1 114:4 138:19,
21 145:3,18 148:19
246:14,22 249:25
253:16 255:6

**relates** 60:5 184:20

**relating** 159:10

**relationship** 25:8,14,15,
16,20 61:17 127:12,15
129:5

**relative** 26:3 111:16
126:22 245:4

**relevant** 116:22 130:6
234:7 247:18,20

**releverage** 256:9

**reliability** 158:2 161:14
167:4 170:4

**reliable** 28:7 107:14
157:19 163:8 165:2,25
166:5,23 168:13 170:20
248:13

**reliance** 47:2 170:2

**relied** 46:23 48:9,22
49:11,12 50:18 51:3
52:13 53:3,18 54:8
55:17 57:5 58:9,19,23
64:5 65:3 66:24 67:1
104:12,16 153:2,10
184:8

**reluctant** 190:1

**rely** 48:17 49:4,21 52:1,
7,19 53:7 55:5,11,13
57:6 67:1 85:13 92:9
105:4,16 108:7 109:5,15
119:1 123:14 153:5
159:3 161:9 170:22
179:15 200:9 202:16
207:6

**relying** 85:18 101:21
109:13 190:22

**remain** 229:20

**remained** 243:6

**remaining** 222:9 227:4

**remains** 131:12 242:1

**remark** 159:11 165:1
176:11 227:15

**remarks** 34:5 156:19

**remember** 16:11 18:21
26:8 56:8 97:25 98:4
178:20 206:6,23 207:2,3

**remembering** 178:18
186:13

**reminding** 83:20

**reorganized** 54:5

**replacement** 183:20

**report** 7:4,15,17 22:13
25:25 31:12,17 32:17
35:3 39:18 41:16 42:2,
16,19,21,24 43:11 44:8,
11,22,23 45:17 46:14,22
47:3,6,11,13,15,16,20
48:10,11,13,23 53:19,20
54:4 56:14 57:8,22,24

58:1,3,6,9,16,20 60:5
61:11,13,16,17,25 62:18
64:9,25 65:9 71:6 72:22
85:11 88:12 90:16
101:19 103:12 110:6
114:10,15 115:10
118:25 119:15,23
120:18 122:4 123:15
125:24 128:1 130:21
133:12 134:11,21 149:9
151:4,17 152:8 154:5
155:11 159:4 177:14
179:7 189:10 191:15
202:2 228:6 240:11
243:9 244:21 246:2,10,
18 247:14,22 248:6,24
250:1

**reported** 136:8

**reporter** 5:4 42:5,8 98:8
145:11 233:16

**Reporting** 5:4,6

**reports** 7:5 19:23 30:16
32:5,7,10 47:1,2,5,19
59:15 64:10 116:10,11
140:19,25 199:2,5
260:11,16

**represent** 5:20,22 6:15
40:16 49:2 87:8 93:19
158:12 166:17,25

**representation** 52:16

**representative** 87:8
115:12,16

**represented** 29:9

**representing** 14:21

**repurchase** 30:4,14,19,
23 31:3,9,14 186:24
201:8,23 202:6,12,17,22
203:3,19 204:3,5 205:5,
24 206:24 207:25 208:5,
13 210:15 213:12,13,21,
22,25 218:4,6 228:5
229:22 231:18 236:8
239:12 240:3,5 241:19
242:14

**repurchasing** 203:18

**reputation** 122:8

**request** 33:6 46:8
174:19,20 175:7,9,11,16

206:24 246:7

**requests** 153:19

**require** 20:1 40:11

**required** 204:4

**research** 115:14,24
118:14 126:23 136:10
141:20 147:22

**researching** 116:21

**reserve** 173:1

**resignation** 23:19

**resolved** 250:15

**respect** 11:20 45:6,7,9
85:10 173:17

**respond** 32:18 146:10

**responded** 139:23
140:15

**responding** 147:5 198:6
241:1 242:23

**response** 33:6 153:18
166:1 247:16

**responsibility** 43:10
44:3

**responsible** 250:21

**rest** 51:1

**restate** 160:2

**restrictions** 251:1

**result** 89:4,5 195:22
243:3 244:10 249:24

**resulting** 92:21

**results** 88:5 90:11 92:18
164:12 194:14

**resume** 156:2

**retail** 119:23 123:20

**retailers** 125:10

**retain** 88:20 95:8

**retained** 10:3 152:20
153:11 205:11

**retirement** 202:23
205:18,19

**retiring** 215:15

**Robert Reilly**                                                    **Fish, et al. vs. GreatBanc Trust Company**

retraction 127:13

revenue 10:24 11:2
12:2,7,8 22:6 78:20 79:1
83:8,15,25 91:17 95:22
104:9,12,17,20 105:7,
10,24,25 106:2,8 107:7,
21 109:21 117:1 118:20
157:18 175:18 176:4,6
195:1 196:2,5 251:6

revenues 10:15 11:21
83:4,5 99:10 100:21
103:7,20 104:25 105:23
109:10,17 112:5 118:9
170:5 174:11 176:20
195:3,19 196:15,23,24

reversed 35:1

review 46:22 47:1,9,18
50:14 55:18 56:12
138:12,22 150:20 161:6
179:8 252:15

reviewed 43:20 47:4
48:13 54:25 57:4 59:20
138:18 141:4 178:7

reviewing 35:2 55:1,22
113:14 160:18

revise 213:7 216:2

revised 214:16

Rhonda 158:7,10

Richard 29:22 160:23
166:15 167:12,13,14,22
168:4 205:1 206:24
207:16

rights 36:9

rigor 27:21

rise 133:13,18,23

Risius 241:22 247:17
248:24

Risius's 241:1 242:23,
24 243:11,22 244:5

risk 66:17,18 67:9 68:22
69:23,25 70:6 71:4,8,22
72:4,5,9,24 73:5 74:8,
12,17,25 75:3,8,9,13,24
76:5,13 77:4,17 78:10,
18 92:7 93:6,11 120:6,
10,17 121:4,11,19

122:1,3 123:19 127:15,
18,20,23,24 128:3,9,10,
11,14,16,17,18 129:9
130:1,15 133:7,8,10,11,
15,17 134:4,9 137:7,8,
18 138:1 142:13 143:2
146:2 180:14,21 183:9
185:10,14,15,22 186:6,
13,17 187:2,3 194:9,11
197:23 198:14,16,17
246:16,25 247:4,11,23,
25 248:18 250:9 253:9,
10,18 254:1,2,8,9,10,11,
12,13,14,19 255:2,4,13,
14,15 256:13,18,19
257:10,11,15,16 258:1

risk-free 254:7 256:12

riskier 198:10

risks 66:9 71:6 72:17,21,
23 76:12 86:4 94:24
95:1 122:20 137:1 138:6
148:20 189:20,21 198:6
247:9 249:25 254:6
256:25 257:2,8 258:4,
19,25 259:5,12,14,16,17

risky 184:22

Robert 5:9 6:6,12,19
11:7 13:7 27:9 31:19
33:13 34:8 35:9 39:17
43:15 47:22 49:9 51:3
52:17 53:12 54:13 59:8
60:4 65:16,22 70:24
71:3,5 77:25 80:19
81:25 85:10 107:19
109:6 110:4,23 113:11
119:16 120:14 122:16
144:20 148:17 151:15
152:4 153:15 159:6
160:17 161:11,16,24
163:17 164:4 165:9,11
166:14 167:11 168:22
177:19 178:18 193:22
196:22 200:25 202:20
216:11 227:25 232:3
236:15 244:23 245:11,
24 252:10,25 260:10

Robert's 7:2

Rohrback 6:1

rolling 205:14

Romanette 63:20

room 260:13

rounding 70:11 75:4
238:3

row 86:13

rows 83:23

rule 45:2,12,21 99:1,3
251:1

ruled 28:17

run 26:10,16 39:10
85:22 89:2 108:19 179:1
182:22 183:1 184:8
190:19,21 191:11
198:14 199:20 202:12
205:23 206:24 207:10,
17 210:12

running 188:25

runs 210:14

**S**

sale 13:19 100:10,20

sales 18:3 20:2 21:24
22:5 23:13 84:11 100:4,
7,12,13 101:6,7 103:4
104:12,17,20,25 105:2
106:20,24,25 107:7,10,
21 108:5,20,23 109:9,17
110:10,16,23 111:23
112:4 117:1 119:11
123:9 126:21 127:2,11,
12 129:1,7,18 130:4
131:21 132:21 133:2
138:9 141:8,23 151:13
154:12 157:17 159:11,
18,22 162:6,16,21,24
164:11,14 165:3,15
166:1 169:15,24 170:5,
14,23 174:11 175:17
176:20 195:13,19
196:15 257:14

salesforce 23:10 102:13

salesman 257:15

salespeople 17:23 21:25

salesperson 21:24 22:6

San 5:7

sat 43:6

satisfaction 250:15

save 154:1

scenario 79:6 81:5
164:13 178:12,13
183:22 185:22 186:3
188:12 189:13,14
212:20 220:6,7,9,10
224:8 229:8 244:15

scenarios 178:11
185:19 186:2 187:12
189:1 191:6,11,21
205:13 241:7

Scheier 5:21,22 6:10,14,
25 7:7 33:12 41:25 42:7,
10,13 45:13 46:1,5,12
54:18 57:11,14,18 58:25
59:7 73:7,19 74:10
96:13,22,23 98:9 99:5,8
101:9,17 131:3,9,16
132:16 137:22 142:21
143:7 145:9,23 148:6,16
163:19,22,25 164:2,3
165:8 166:13 167:10
172:6,11,15 173:10,16
174:7 175:10 179:13
186:10 190:15 193:13,
21 199:18 200:1,19
216:24 217:12 219:4
221:14,20 222:20
224:17 227:15,24
228:13 229:13 230:10,
15,20 231:4,16 232:1
233:10,17,21,22 235:16,
22 236:19 238:17
240:17,19 245:11,17,23
252:9,14,24 260:18

scholarly 71:12

school 97:25

science 75:18 253:16

scope 23:4

scrapbook 112:16
125:3,5

scrapbooking 20:14
112:10 114:3,20 116:6,
16 117:5,8,9,11,23
118:8,15,19 119:18,24
120:2 122:21 124:20,23
125:11,12 126:21 127:2,

**Robert Reilly**

Fish, et al. vs. GreatBanc Trust Company

6,14 128:21 129:6 130:2 132:12,20 141:10,25 142:2,3,11 190:9,10,14, 21

**screen** 88:24

**search** 115:22,24 116:5

**seasonality** 163:4

**secondary** 128:10

**seconds** 74:18

**sections** 43:5

**sector** 138:8

**security** 116:10 194:24 199:2

**segment** 114:2 119:24 120:1

**segments** 165:20

**select** 93:1,5 180:7 199:17

**selected** 49:4 64:6 85:15 88:10 92:25 179:24 194:17,18 195:6 205:7, 10 206:17

**selection** 91:25

**self-explanatory** 208:4

**sell** 23:11 102:13 124:14,15,21 259:10

**seller** 16:23 35:13 37:19 38:1 39:1,6 256:6,7,16, 17 257:5,12,20 258:9, 24,25

**sellers** 258:10

**selling** 15:1,4,22,25 16:2,10 17:19 20:17,24 21:19 22:10,23 25:2,6, 12,22 26:12,18 27:4 125:8 147:7

**sells** 26:11

**send** 46:19 154:3

**sense** 36:19 82:14 85:10 123:14,18 130:18 134:10 195:9

**sentence** 28:1 159:10,20 162:9,14 168:8,10

**separate** 49:17,19,24 50:8,24 63:3 175:1,2

**separately** 21:2 119:22 125:22 174:22,23

**sequence** 86:1,2

**series** 111:10 162:15 170:23 178:24 179:2

**served** 28:5 122:19

**serves** 155:7

**services** 7:25 10:17 13:1,7 20:14 22:4 136:24 137:14 141:14 146:20

**servicing** 102:18

**serving** 10:1 27:10 160:7

**set** 21:3 24:24 49:5,20 50:24 61:19 62:25 84:15 93:25 96:1 109:1 175:4, 22 188:25 192:12,14,16 196:18 249:23

**sets** 195:25

**settled** 19:23

**seven-hour** 99:2

**severity** 143:2

**share** 84:21 85:6 86:15, 16 103:5 123:19 156:17 201:5,14 210:10 211:12, 17 212:4,8,24 213:5,17, 19 214:11 215:19,20,24, 25 216:1,5,9,19,23 217:3,9,15 220:21 221:7 222:12 224:23 225:6,13, 16 226:10 227:14 228:2, 20 229:4,17,25 230:9 231:2,11 232:10,11,13, 21 234:23 235:19 236:1 237:2,18,25 238:13,16 239:19,20,22,24 240:8, 21,23 241:2,3,10,13,15, 25 242:6 243:4,5,24 244:11,19

**shareholder** 36:8,9

**shareholders** 156:13 157:3 200:4 222:10

**shares** 24:16,19 40:1 41:2,3 156:14,15 157:1 201:21 203:18 208:14 209:12 210:25 211:23 214:8,11,22 215:1,14 216:3,9 217:7,17,18,25 218:10,15,21,22 219:2, 9,12,18 220:2,3,13,15, 25 221:8,12 222:3,25 223:6,7,9,12,17 224:22 225:7,20 226:22 227:4, 5,10 229:16 230:25 235:20,23,25 239:23 241:9,11,25 243:3,13,20 244:6,7,8,16 251:12,16

**sheet** 218:2

**short** 58:25 98:17 101:10 148:7,18 193:14 227:16 245:14 253:2

**short-term** 170:21

**shortly** 241:22

**show** 81:1 178:19 242:2 250:4,7

**showed** 139:1 241:1 242:24 243:1

**showing** 66:15 69:2 84:20 168:12 219:19 240:20 241:22 243:17

**shows** 69:6 74:15 217:22

**shut** 172:14 173:9

**side** 8:12 28:12 32:17

**sided** 33:16

**sides** 19:21 28:11

**sign** 124:17 260:20

**signed** 33:19,24 55:24 56:2

**significant** 146:2

**significantly** 234:24

**similar** 18:9 20:13 25:24 58:2 70:8,24 74:14 79:18 81:6 168:15 192:14 194:11

**similarly** 165:24

**simple** 54:7 96:11,24 210:20 231:8

**simplest** 202:21

**simply** 39:2 49:18 50:21 53:25 71:3 194:13 200:9 239:12 249:6,14 255:16

**simultaneously** 129:21 130:10

**single** 43:21 131:25 194:10

**sir** 9:14 10:19 32:3 66:1 79:23 84:1 85:21 90:2 91:10 96:11 97:5,7 98:10 101:18 103:8 120:13,21 130:24 143:23 153:13 191:4 194:7 211:19 221:15 233:11 234:23

**sit** 43:7 56:19 98:20 106:3 241:5 248:15

**sitting** 50:4 103:13 122:24 126:19 131:20 132:9,17 136:19 143:25 181:7 200:18 238:6 249:3 257:23

**situation** 122:13 172:20 238:6 243:18

**size** 122:8,25 126:20 127:1,5 254:9 256:14

**skimmed** 52:23 158:23

**sliced** 142:5

**sloping** 180:25

**slow** 43:3

**small** 10:22 11:3,5 119:7

**smaller** 15:20 18:22 20:22 22:17 132:6

**so-called** 136:16

**sold** 17:2 18:20 20:8 23:10,12,13 117:18 190:11

**sole** 139:14

**solely** 17:13 91:6

**solvency** 12:22

**Robert Reilly**                                    **Fish, et al. vs. GreatBanc Trust Company**

someplace 103:12

sort 39:6 70:24 71:12
87:20 92:14 116:25
125:5 141:18 147:16
157:20 188:15 198:22
219:5,14 232:16 235:4
252:2

sound 95:25 254:24

sounds 66:4 89:8
112:13 179:5 244:14

source 52:7,15 139:14
152:3 259:24

sources 70:19 151:19,
20,24

space 128:21,24

spare 258:13

speak 106:5 155:17

speaking 106:6 155:14
158:14,16

special 16:24,25 50:25

specific 20:25 36:15
38:8,14 52:8,15 62:21
64:14 66:17,18 67:9
68:22 69:22,25 70:6
71:4,8,22 72:4,5,24
74:11,16 76:5,12 77:4,
17 78:10,18 92:7 93:5,
11 95:5 110:1 119:22
120:7 121:1,11,19 122:1
133:17 137:6 139:7,9
148:23 159:3 160:13,16
180:13,20,21 185:14,15
186:6,13,17 187:2,3
246:16 247:4 253:9
254:11,12 255:1 256:5,
18,19 257:8 258:1

specifically 20:23 22:18
26:5,8 27:7 28:19 34:8
39:22 48:23 52:5,21
53:3 56:9 63:16 117:5
131:12 134:6 138:4,21
144:11 149:9,17 150:8
156:2 174:12,13,16
202:14 207:16 211:25
251:16

speculation 142:17

spend 148:4 251:22

spent 13:8 199:1 221:16

spin 17:8

spinoff 24:21

spoke 134:14 139:20
157:24 158:7,10 160:23
161:2 169:12 170:8

spoken 155:9 158:18
161:3

sponsor 30:24 31:3 39:7
40:16 103:19 208:18
229:25

sponsored 40:7

spreadsheet 66:15
67:17 68:6 82:13 234:19

squared 98:2,3,6,7

stacked 151:6

staff 205:23

stamp 169:4

stand 211:1

stand-alone 150:23
151:1

standard 35:15,19,24
36:20,21 37:9,12,15,16
255:23,24

standards 35:22,23 36:2
258:3

standing 151:11

standpoint 227:2

stands 103:9

start 7:1 43:17 47:7
66:12 151:22 168:5
207:9 229:3 241:16

started 41:7 159:12,19

starting 82:9 83:6,24
85:14 136:16 192:17,18

starts 28:1 63:12 172:5
229:1 234:19

state 5:20 29:5 36:10,11,
12,14 71:24 110:9
177:14 191:15 194:5
216:3

stated 204:9

statement 83:10,11
105:5,6 110:13 163:13
191:3 216:2

statements 40:12,13
66:16 67:20 101:18
109:2 110:18 137:10
147:12,23 174:25
175:22

states 36:13

statistic 149:25

statistical 103:6 108:21
161:14

statistician 174:9

statisticians 174:6

statistics 99:17 111:3
118:25

status 250:19

statutes 36:10,14

statutory 36:7

stay 225:6 231:2

stays 187:5,6 230:9

step 14:12 73:4 83:14
100:17 157:25 201:11

stick 67:15 100:8 215:24

stock 8:17 15:11,13
19:5,11,14,20,25 20:4,7
23:17,25 30:18 34:17
36:19,20 37:14,16
39:12,19 66:20 76:7
86:14 202:18,24 205:18
208:19,21 209:1,7,25
210:6,10,17,18 217:18
221:3,5 224:16,20,22,
24,25 225:2,10 228:19
230:8 234:16 237:2,18
242:10,24 254:17

stockholder 17:1

stop 60:19 208:17
225:14 233:15,17,18,21
234:17 241:21

store 14:14 153:23

stores 121:6 132:21

strategic 139:2,4,6
155:24 156:7,8

strategies 135:19

stream 104:9

street 116:14 124:19

strike 59:11 123:23
133:15 163:11 205:2
248:22

strikes 168:21

structural 85:10

structurally 63:21 82:13

structure 60:5 61:10

structures 82:4

stuck 193:3

studies 30:4,23 31:14
47:3 202:17 205:24

study 30:19 31:4,10 64:3
100:19,22 101:5 109:9
114:11 138:8 167:20
200:5,6 202:12,22
204:10 205:5 206:1
208:13 211:24 236:8

stuff 61:24 201:4

subcontract 174:5

subcontracted 174:8

subject 7:2 17:13 45:25
104:8 116:2 165:15
196:12,13 246:5

subjective 71:23 90:21,
23 91:1,3

subjectively 95:24

subjectivity 96:2

submits 28:6

submitted 27:18 57:25

Subsection 155:1

subsectors 118:2

subsequent 131:15
251:9

subset 49:3 124:5

subsidiary 16:11 17:2,4,
13 18:20 24:21

substantial 141:3

substantive 151:16

**Robert Reilly**                                                              **Fish, et al. vs. GreatBanc Trust Company**

153:20

**substituting** 172:24

**subsumed** 62:9

**subtract** 214:19

**subtracting** 238:11,12

**suffered** 249:22

**sufficient** 202:12 211:5

**sufficiently** 139:23 201:22

**suggest** 206:12

**suggested** 94:10 193:7 205:13 206:12

**suggesting** 206:5 226:24 227:1

**suggestion** 44:14,23

**suggests** 240:4,7

**suing** 190:4

**Suite** 5:7

**sum** 115:7

**summarize** 60:12

**summary** 51:11,16,22 54:20 55:6,10,12,19 177:16 204:20

**summation** 134:22

**supplemental** 44:20 86:25

**supplier** 257:16,21 258:14,17 259:23

**suppliers** 258:18

**supply** 259:24

**support** 11:13 44:20 197:18 252:2

**supportable** 107:14

**supported** 197:8

**supports** 200:12

**supposed** 172:16

**supposedly** 189:17

**surely** 6:20 45:23 104:18 137:4

**surprised** 58:16

**suspect** 11:14

**Suzanne** 136:7

**swear** 6:3

**switch** 25:21

**sworn** 6:5,7

**synonym** 11:8 76:24 255:16

**synonyms** 253:22 254:20

---

**T**

**tab** 53:25 58:10

**tabbed** 48:3

**table** 41:12 151:17,21, 23,25 154:12,13 162:20 221:24 223:23 240:10, 12 241:1,15 242:2,8,9, 23,24 243:7,10,17,22,23 244:5,20

**tables** 242:18 244:4

**takes** 111:16 112:3 213:11

**taking** 76:3 218:14

**talk** 34:22 37:11 60:4 91:11 101:2 126:9 140:24 152:22 156:11 170:7 234:8 245:24

**talked** 52:11 65:15 124:16

**talking** 17:12 24:15 74:11 126:13,14 131:7 137:6 144:12 153:20 156:16 174:13 175:15 176:25 177:1 196:16 223:13 239:20 241:20 242:17 257:1

**Target** 123:23 124:3,25 132:11

**Targets** 120:3

**tax** 12:18 38:13,17

**taxation** 12:9

**team** 29:20 118:14 136:16 172:19

**technically** 69:10 70:7 78:23 213:23 251:8

**technique** 171:14,16,20

**technological** 61:3 62:10 118:9 147:6 198:6,21,22

**technologies** 146:6 147:25

**technology** 101:3 127:19 128:6 140:16 143:17

**Ted** 30:8,9 31:16

**telling** 74:22 135:2 155:22 158:3 159:18 160:6,20 187:8 215:8 232:10,20

**tells** 203:17

**ten** 153:4 175:23

**tender** 14:9

**tendered** 33:20 42:17,18 54:23 57:23 157:2 161:19 164:8 165:10 166:18 167:15 246:10

**tendering** 23:18 156:14 200:3

**term** 19:16,17 22:21 37:21,22 149:24 150:3 246:9 253:14

**terminated** 15:12

**terms** 42:25 43:9 57:4 115:19 118:9 128:15 135:25 202:21 205:16 219:14 255:24

**terribly** 43:3

**Terry** 143:15

**tertiary** 128:10

**test** 105:21 183:22 197:1 201:17

**testified** 6:8 69:18 89:25

**testify** 28:20,22 59:25 90:4 260:15

**testifying** 5:9

**testimony** 7:2 9:13 28:25 45:15 49:13 52:20 53:8 54:21 98:25 106:16 107:16 113:4 128:1 146:17 150:16 156:12 158:22 159:1 161:7 200:12 234:3,5 237:6,7, 17 238:24

**testing** 27:22

**textbook** 71:20 255:10

**textbooks** 71:16 255:11

**texts** 255:11

**Tharaldson** 27:17

**theorem** 97:24 98:5

**theoretical** 45:24

**theoretically** 244:3

**theory** 216:14

**thing** 48:12,14 67:22 77:7 96:4 125:6 168:21 187:25 201:13 204:7 226:19 239:21 250:21

**things** 37:6 87:4 129:21 184:12 209:15 210:22, 25 215:13 223:1 229:14 234:7

**thinking** 14:15 15:17 184:16 206:20 208:23 228:24 239:4 256:6 258:9

**thinks** 19:20,21 171:2

**thought** 39:23 41:6,13 51:2 62:19 87:18 89:24 92:12 95:14,17 106:17 127:22 133:12 140:3 154:20 157:19 159:25 171:7 180:11 191:10,15 192:9 204:10 208:17 228:23 229:7,8 230:15, 17 235:10 240:9

**threat** 135:13 137:11

**threatened** 19:8

**threefold** 34:15

**threshold** 251:18

**Robert Reilly**

Fish, et al. vs. GreatBanc Trust Company

**throw** 25:11

**time** 5:1 8:3 9:25 10:3 12:15 13:8,23,25 14:3 20:9,10 50:8 52:24 76:3 91:7,20 98:10,18 99:6 111:10 116:22 121:13, 15 128:20,23 138:7 149:22 153:16,17 155:10,13 158:15,18 160:16 161:8,12 162:15 163:12 164:25 165:21 166:15 167:25 169:12 170:22 172:4 178:14 199:1 206:7 211:2 223:7 228:24 229:8 230:24 232:2 234:6 241:16 249:16 260:19

**timeframe** 111:17 155:14 178:2,9

**times** 5:15 8:13 49:24 96:19 116:15 122:4 130:23 131:4 133:4 155:18 189:16 247:7

**timestamp** 167:24

**title** 7:11

**titled** 57:21

**today** 5:5 6:18 9:12 32:12,15,18 55:8 56:19 97:20 101:19 103:13 122:24 125:25 126:19 132:10,17 136:19 241:5 247:22 248:15 260:13, 16

**today's** 5:2 227:9

**told** 43:18 47:10 144:2 145:1,16 159:18 171:10 173:3 232:3 238:19

**top** 34:12 73:6,15,16 78:12 82:25 84:22 167:14 257:23

**topic** 63:3 134:14

**topics** 27:9 63:9 64:14 118:4

**total** 115:7 213:17 214:13 217:20 226:6

**totally** 190:2

**Touche** 63:10,24 80:17 81:20 83:18 110:12 138:20 174:23 175:2 203:13,14

**tracked** 22:9

**trade** 116:12 118:22 119:2

**traded** 105:25

**trademark** 141:18

**traditional** 216:13

**traditionally** 140:24

**trained** 142:9

**training** 136:8

**trains** 113:24

**transaction** 12:7,20,21 14:20 16:8,10,12,16,20 17:14 18:14 34:18 39:19 81:3 86:22 87:14 91:9 95:21 96:6,16 101:23 104:2,12,16 110:25 113:13 138:19 143:18 146:3 149:22 150:18 157:4 176:17 187:14 201:6,15,21 202:18 203:25 209:14,18 212:13 213:10 224:20, 23 228:2,17,20 231:11 232:5,6,8,20,21 233:5 235:17,20 236:5,16,20, 24 237:6,10,18 238:23 239:15 244:12 250:25 252:5

**transactional** 9:23 13:9 115:25 171:9

**transactions** 8:11 9:9 13:9,16 14:3 108:16,18 186:24 188:4,5

**transcript** 10:12 50:15 51:13,15,23 53:15 55:1, 5

**transfer** 12:17

**transition** 146:11

**translates** 80:15

**travel** 16:12

**treasury** 221:16

**treatise** 71:12 74:21

**treatises** 254:16

**trend** 111:5,6,7,8,9 148:25 165:23 166:1

**trending** 194:15

**trends** 61:19 62:22 63:24 64:24 65:8 72:15, 16 76:6 91:19 99:14 111:1,4,11 112:2 117:1 118:5 138:8 148:19,23 154:14,22 163:4 164:11 177:9,11 195:12

**trial** 19:9 29:1 59:25 97:19,20 98:13 122:14 136:20 137:13 142:7,8, 25 187:10 228:1,16 231:9 248:17 249:21 252:1 260:15

**tricky** 65:17

**Trimark** 143:15

**true** 141:1 208:10 221:22 231:10

**trust** 5:11 164:18

**trustee** 14:23,24 30:24 31:3,16 188:9,14,17,22 189:17

**truth** 55:3

**turn** 34:9 47:24 60:3,9 68:24 69:20 76:20 78:1, 16 80:20 81:13 105:5 112:6 126:1 152:16 153:11 193:22 199:7 207:21

**turned** 152:25

**turning** 164:14

**turnover** 160:10 202:25 205:19,24 206:25 207:17

**turns** 190:3

**two-year** 178:4,5

**type** 12:12 16:15 18:6, 11,15,16 22:3 43:7 104:7 115:24 128:9 205:14 206:21

**typed** 43:2

**types** 12:11 25:23 113:23 190:6 206:19 256:18 257:3

**typic** 35:12

**typical** 13:15,17 14:5 18:14 39:4 258:8,9,11

**typically** 14:4 21:2,14 30:18 40:5 72:6 105:4 106:5 107:6 108:4,23 109:1 119:1 124:22 144:21 183:11

**typing** 42:25

**typist** 43:4,24

---

**U**

**U.S.** 162:13 164:11,14

**ultimate** 68:15 77:2 195:21

**ultimately** 14:10,16 28:16 33:23 35:3 66:23 86:16 87:7 154:1,4 195:13 197:1 205:6,10, 16 206:17 246:14

**unable** 59:11

**unadjusted** 85:3

**unclear** 35:10 249:7

**uncomfortable** 10:10

**underlings** 107:8

**underprojected** 203:2

**underprojection** 203:24 204:1

**understand** 7:6,12 9:11 11:18 16:1 22:20 23:3 30:12 31:25 39:20 56:10 57:9 61:7 67:17 69:1 72:19,22 80:21 81:25 83:22 86:19 88:7 92:11, 22 96:25 110:16 111:4, 14 116:20 127:14 129:5 132:4 146:7 149:10 151:15 153:9 156:6 159:17 160:22 177:8,18 178:17 183:15 187:15 190:25 201:19 202:1,3,

**Robert Reilly**                                    Fish, et al. vs. GreatBanc Trust Company

20 203:15 210:21 212:8
215:10 218:24 219:22
222:15 223:15,16
232:18 233:4 235:4
238:24 242:3,22 246:13,
20 248:14,23 250:20
252:8

**understandably** 169:18

**understanding** 30:16
31:19,22 45:20 65:22
66:7,8,14 85:9 101:25
103:5 105:15 110:23
111:15,20 118:7 149:16
150:21 152:18 170:19
171:4 172:15 183:2
194:1 195:8 212:11
223:14 245:6 248:21

**understandings** 189:20

**understood** 22:7 54:22
56:5 65:19 77:25 89:13
95:18 107:15 112:2
118:17 138:3 145:21,24
151:19 153:1 160:5
184:2 187:7 192:2
196:19,20 248:24
255:19

**undertake** 88:3 109:6

**undertaking** 48:9 156:24

**undertook** 34:23 74:23
103:1 116:21

**unemployed** 25:22

**unemployment** 25:9,20
26:4

**unidentified** 19:17 37:20
38:25

**uniformly** 216:14

**unique** 122:19 194:9
257:17,23,24 259:23

**units** 23:12

**universe** 58:19 146:16
154:8

**unlike** 168:22 243:22

**unnecessarily** 10:7

**unnecessary** 172:17

**unquote** 117:23

**unreasonable** 94:1

**unreliability** 168:18

**unreliable** 248:4

**unresolved** 250:17

**unsolicited** 14:9

**unsupportable** 200:15

**unsupported** 197:8

**unsystematic** 254:12

**untabbed** 47:23

**update** 57:3

**updated** 113:14

**updates** 188:4

**upside** 180:1,4,10 181:7,
17,21 183:16 184:6,11
189:13 191:1

**upsidedown** 203:8

**upward** 111:5,6 181:3
183:12

**Uranium** 257:24

**user** 17:20 18:3 142:10

**users** 131:22

---

**V**

**vacuum** 239:22

**valuation** 12:25 13:7
14:4,12,18 18:19 19:6,
22,25 21:17 23:25 25:19
26:15,25 27:23 31:12
38:7,14 41:8,10,12 60:7
71:16 86:11 90:19 91:14
103:18 104:7 116:1
144:17 157:8 174:22
184:4 185:7 186:4,23,25
187:1,4 193:6 194:2
195:22 200:3 202:18
203:25 204:23 210:6,7
211:8 213:1,4,10
215:12,16 216:5,10,14,
15 217:9 222:12 223:23
225:22 229:18 232:11
236:6 237:14 239:16
240:6 241:3,11 253:20,

21 255:6 257:18,19
258:6 259:3,6,7

**valuations** 9:4 14:8 35:2
40:8,12 108:8

**valued** 218:7

**values** 36:23 84:22
214:10 221:5 241:13

**valuing** 30:17 36:19,20
37:14,15 39:18 41:2,3
76:7 201:13,21 239:25
240:8

**variable** 38:14 166:2

**variables** 38:8 74:4
190:18 206:18,19
207:10

**varied** 131:7

**varies** 13:10

**verbatim** 43:6

**verify** 155:22 156:5
160:19

**vernacular** 253:19

**version** 79:12,15

**versus** 5:10 23:9,11
71:14 255:24 260:5

**video** 5:14,18 182:18

**video-recorded** 5:8

**view** 61:20 62:2,4,13,25
65:6 66:10 76:6 86:20
156:12 157:15,16
163:10 166:4,9 169:1,6,
9,11 170:1 171:1 200:13
201:10,22 246:25

**viewed** 148:19

**violated** 251:6

**violating** 251:13

**violation** 251:23

**voice** 173:12,19

---

**W**

**WAC** 68:14 69:4 70:14
77:3,8,10,12,13,17 78:9
80:5,7,8 81:13 84:4 92:8

186:5,9,11 256:3

**WACS** 69:7,17

**walk** 125:1

**Wall** 116:14

**Walmart** 119:17 123:22
124:3,24 125:1 132:11

**Walmart's** 120:3

**wanted** 7:15 16:19 23:3
43:19,21 51:17 55:5,10
60:19 74:24 75:7,12,17
82:19 101:24 112:7,8
150:2,14 181:15,16,19
182:8 201:17 208:3
244:23 245:24 247:18
253:3

**warehouse** 154:4

**warnings** 137:9

**warrants** 251:12,16

**Warren** 258:13

**ways** 86:5 95:1,3
182:10,11

**week** 47:13

**weeks** 56:4 67:24 80:3
185:13 186:16 239:4

**weight** 69:14 93:17

**weighted** 69:3 72:12
87:25

**weighting** 70:2

**Weinstock** 29:22 30:22
46:13 47:12,15 202:2
203:6 205:3,10,21,23
206:13,24 207:3,5,7,16
208:25 212:3,9 214:16

**Weinstock's** 30:2,5,21
46:23 202:16,22 204:10
206:8,16 228:6 236:8

**West** 5:6,12

**wholesale** 162:13
164:15

**Willamette** 7:9,23 9:12
18:1 26:10 28:10 33:18
42:23 70:20 144:19
188:24

**Robert Reilly**                                    **Fish, et al. vs. GreatBanc Trust Company**

**Willamette's** 10:8,15
11:21

**Williams** 143:14

**WIS** 152:3

**Wiser** 134:15 139:21
154:15 160:23 161:2,12,
25 162:20 163:10,13
164:6 165:1,14 166:15,
20 167:1,12,13,14
168:16 169:13 170:7,9

**Wiser's** 161:6 166:4,9
167:3 169:1,6 170:1
171:2

**withstand** 187:17

**witnesses** 52:20

**wondering** 35:7 53:15
63:6 76:1 87:20 88:20
92:17 125:17 168:24

**word** 37:22 43:11 85:17
117:8,9 188:1 201:1
253:24 255:3

**words** 79:10 90:23 93:15
94:13 126:12 130:17
135:8 140:18 141:22
178:1 188:17 193:2
198:19 210:12 212:23
213:9 222:4 230:5,24
237:4 241:9 244:6 254:4
255:12 256:21

**work** 8:16 9:6,7,15,19,20
11:9 12:13,14 13:4,5,9
14:5,17 15:6 18:8,11
21:3 28:9,10 30:7 32:19,
24 33:8,9 61:1 82:16
88:21 89:1,5 102:1
106:12 107:19 111:3
175:17 178:2 179:17,19
195:11 196:19 200:3
237:10 258:18

**worked** 8:2,11,23 10:5
15:2,20 26:21 29:8,17,
19,22,25 30:2,3,5 43:1
52:11 112:22 173:17
188:14 206:11

**working** 13:16 52:25
53:1 120:11 174:10
175:25 179:4 188:9,20
189:17

**workpaper** 48:16,22
64:12,13 90:2 115:13
126:2,3 132:15 145:22
152:21 153:7

**workpapers** 49:7 53:24
54:5 88:18 120:8
152:12,15,20,23 153:16,
20,22 199:8 250:24

**works** 224:3,5

**world** 67:8

**worried** 188:10

**worse** 193:6

**worth** 19:20,21 214:4
220:12 224:12,22 257:7
259:18,19,21

**wrap** 61:10

**write** 60:17 62:20 89:22
149:10 199:18

**writes** 163:3,6 164:10,17
168:4

**writing** 27:7 71:12
135:1,2,7 166:21

**writings** 215:10,11

**written** 63:16 247:7
249:8 254:25 260:11

**wrong** 67:6 93:3 94:19
95:16 160:3 183:6 190:3
192:18 195:9 239:18

**wrote** 167:23,25 248:24

**Y**

**year** 10:16,23 11:1,23,25
12:1,16 13:10 57:25
100:12 111:22,24
125:19 141:5 155:10
164:16 185:7,8,9,12
186:25 203:19 209:23
210:3 213:21,25 250:24

**year-to-year** 111:21

**years** 8:13 9:16,21 10:4
11:10 13:14 14:8 15:3,9
16:6,7 18:2 22:9 24:3,4
27:11 28:14 29:17 30:4
31:6,14 55:7 102:18
105:21 111:22 112:21

125:10,18 126:13,14
135:6 140:13 141:5
144:1 147:12,14,18
155:6 162:23 169:13,23
170:9 171:21 173:18
175:23 190:8 211:23
227:8

**yielded** 40:2

**yields** 163:5

**York** 116:15

**Yorker's** 201:1

**Z**

**Zanni** 43:2,13

**zone** 167:25