# EXPERT WITNESS REPORT OF
## Jeffrey M. Risius, CPA/ABV, CFA, ASA

**June 1, 2015**

**Presented in:**

## Bonnie Fish, Christopher Mino, Monica Lee Woosley, Lynda D. Hardman, Evolve Bank & Trust v. GreatBanc Trust Company, Lee Morgan, Asha Moran, Chandra Attiken, and the Morgan Family Foundation

**CASE NO. 1:09-cv-01668**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**



STOUT | RISIUS | ROSS



DEPOSITION
EXHIBIT
Risius 845
9/18/15    K



**SRR**
STOUT | RISIUS | ROSS

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

## Table of Contents

I. SCOPE OF OPINION AND DISCLOSURES REQUIRED UNDER RULE 26(A)(2)(B) ...............5

II. QUALIFICATIONS ...............................................................................................................7

III. SUMMARY OF EXPERT OPINIONS..................................................................................9

III.A. REVIEW OF THE DUFF & PHELPS FAIRNESS OPINION .....................................................9
III.B. CRITIQUE OF THE REILLY REPORT.............................................................................10

IV. BACKGROUND OF THE COMPANY AND THE ANTIOCH ESOP (THROUGH 2003).........12

IV.A. BACKGROUND OF THE COMPANY ..............................................................................12
IV.A.1. Creative Memories Division..............................................................................12
IV.A.2. Direct Sales Method .......................................................................................13
IV.A.3. The Antioch Company Employee Stock Ownership Plan .......................................13
IV.B. ANTIOCH'S FINANCIAL PERFORMANCE – 1998 THROUGH 2003.....................................13
IV.B.1. Revenue ......................................................................................................15
IV.B.2. Gross Profit...................................................................................................15
IV.B.3. EBITDA ........................................................................................................16
IV.B.4. Total Assets..................................................................................................16
IV.C. ANTIOCH'S HISTORICAL ESOP VALUATIONS – 1979 THROUGH 2002 .............................17
IV.C.1. 2000 Through 2002 Antioch ESOP Valuations...................................................18
IV.D. THE TRANSACTION..................................................................................................19

V. THE DUFF & PHELPS FAIRNESS OPINION .......................................................................24

V.A. OVERVIEW OF THE FAIRNESS OPINION .......................................................................24
V.B. DUE DILIGENCE PROCESS ........................................................................................25
V.B.1. Due Diligence ...............................................................................................25
V.B.1.a. Collection and Review of Company Information.............................................26
V.B.1.b. Management Interviews ............................................................................26
V.B.1.c. Conclusion..............................................................................................27
V.B.2. Analysis of the Subject Company's Fundamentals..............................................28
V.B.3. Financial Statement Analysis and Adjustments..................................................29
V.B.3.a. Historical Financial Statement Analysis and Adjustments................................29
V.B.3.b. Projected Financial Statement Analysis and Adjustments ...............................30
V.B.3.b.i. Reasonableness of Duff & Phelps' Projected Financial Statements ...........31
V.B.3.b.ii. Actual Results v. Prior Management Projected Financial Statements........32
V.B.3.b.iii. Duff & Phelps v. Management Projected Financial Statements ...............34
V.B.3.c. Repurchase Obligation and Projected Benefit Expense....................................38
V.B.3.d. Conclusion .............................................................................................38
V.C. COMPANY VALUATION ANALYSIS ...............................................................................38
V.C.1. Company Valuation Methodologies...................................................................38
V.C.1.a. Income Approach.....................................................................................38
V.C.1.a.i. Discounted Cash Flow Method ...............................................................39
V.C.1.a.i.1. Projected Cash Flows......................................................................39
V.C.1.a.i.2. Required Rate of Return...................................................................39
V.C.1.a.i.2.1.Required Rate of Return on Equity ...............................................41
VC.1.a.i.2.1.1.Risk-free Rate of Return .........................................................41
VC.1.a.i.2.1.2.Long-term Market Equity Risk Premium ...................................42
VC.1.a.i.2.1.3.Beta .......................................................................................42
VC.1.a.i.2.1.4.Small Stock Risk Premium........................................................42
VC.1.a.i.2.1.5.Company-Specific Risk Premium ..............................................43
V.C.1.a.i.2.2.Required Rate of Return on Debt...................................................43
V.C.1.a.i.2.3.Capital Structure .........................................................................44
V.C.1.a.i.2.4.WACC Conclusion .......................................................................44
V.C.1.a.ii. Conclusion .......................................................................................45
V.C.1.b. Market Approach.....................................................................................45
V.C.1.b.i. Comparable Company Method ...............................................................46
V.C.1.b.i.1. Selection of Comparable Companies .................................................46
V.C.1.b.i.2. Analysis of Valuation Multiples .........................................................47
V.C.1.b.i.3. Conclusion....................................................................................50
V.C.2. Conclusion of Duff & Phelps' Company Valuation Analysis ...................................50



Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

V.D. VALUATION OF THE CONSIDERATION IN THE PROPOSED TRANSACTION ....................................51
   V.D.1. Analysis of the Cash Option .........................................................................................51
   V.D.2. Analysis of the Consideration Package ........................................................................52
   V.D.3. Conclusion of Duff & Phelps' Analysis of the Consideration.......................................52
V.E. OVERALL CONCLUSION OF THE FAIRNESS OPINION ...............................................................53

**VI. CRITIQUE OF THE REILLY REPORT..............................................................................................54**

VI.A. MR. REILLY'S REVIEW OF THE DUFF & PHELPS VALUATION.....................................................55
VI.B. MR. REILLY'S INDUSTRY ANALYSIS ........................................................................................58
VI.C. MR. REILLY'S FIRST FLAW ....................................................................................................59
   VI.C.1. Mr. Reilly's First Flaw - Projected Cash Flows ...........................................................59
      VI.C.1.a. The Deloitte Projections...................................................................................59
      VI.C.1.b. The Buchanan Report Projections ....................................................................61
      VI.C.1.c. The Unreasonableness of Mr. Reilly's Projected Cash Flows............................66
   VI.C.2. Mr. Reilly's First Flaw - Discount Rates .....................................................................67
   VI.C.3. Mr. Reilly's First Flaw - Valuation Conclusion............................................................68
      VI.C.3.a. The Unreasonableness of Mr. Reilly's Valuation Conclusion............................68
   VI.C.4. Mr. Reilly's First Flaw - Damages Conclusion ............................................................70
VI.D. MR. REILLY'S SECOND FLAW ................................................................................................71
VI.E. MR. REILLY'S THIRD FLAW....................................................................................................81
VI.F. OTHER ITEMS OF NOTE IN THE REILLY REPORT .....................................................................81

**VII. CRITIQUE OF MR. REILLY RELATED TO POST-TRANSACTION EVENTS .....................83**

VII.A. HISTORICAL ANTIOCH ESOP VALUATIONS – 2002 THROUGH 2007 .......................................83
VII.B. DEBT FINANCINGS AND REPURCHASE OBLIGATION PAYMENTS ..............................................84
VII.C. FACTORS CONTRIBUTING TO ANTIOCH'S ACTUAL FINANCIAL PERFORMANCE SUBSEQUENT TO
   THE TRANSACTION.................................................................................................................88
   VII.C.1. Timeline of Key Events.............................................................................................88
   VII.C.2. Facebook and Shutterfly – Case Studies .................................................................89
      VII.C.2.a. Facebook ........................................................................................................89
      VII.C.2.b. Shutterfly.........................................................................................................91
   VII.C.3. Scrapbooking Industry Developments......................................................................92
   VII.C.4. Industry Valuation Multiples – 1998 Through 2008 ...................................................92
   VII.C.5. The Great Recession ...............................................................................................93
VII.D. CONCLUSION.....................................................................................................................96

**VIII. CONCLUSIONS........................................................................................................................98**

VIII.A. REVIEW OF THE DUFF & PHELPS FAIRNESS OPINION ...........................................................98
VIII.B. CRITIQUE OF THE REILLY REPORT ......................................................................................98

**IX. ASSUMPTIONS AND LIMITING CONDITIONS ......................................................................99**



**Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation**

**Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA**

**June 1, 2015**

## Appendices & Exhibits

Appendix 1…....……………...…….……………….List of Documents Relied Upon
Appendix 2……….....………….….……………...….……………….……Curriculum Vitae

Exhibit A…....………….....……...……..…..Antioch's Audited Financial Statements
Exhibit B……..……………..……...………..Comparable Public Company Information

4



STOUT | RISIUS | ROSS

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

## I. Scope Of Opinion and Disclosures Required Under Rule 26(a)(2)(B)

1. I have been retained by defendants Lee Morgan, Asha Moran, Chandra Attiken, the Morgan Family Foundation, and GreatBanc Trust Company ("GreatBanc" or the "ESOP Trustee") (collectively, the "Defendants") through their counsel Keating Muething & Klekamp PLL and Drinker Biddle & Reath LLP (collectively, "Counsel").

2. This report concerns claims asserted against the Defendants in litigation titled *Bonnie Fish, Christopher Mino, Monica Lee Woosley, Lynda D. Hardman, Evolve Bank & Trust v. GreatBanc Trust Company, Lee Morgan, Asha Moran, Chandra Attiken, and the Morgan Family Foundation*, Case No. 1:09-cv-01668, pending in the United States District Court for the Northern District of Illinois.

3. This report presents my expert opinions regarding certain of the allegations made by plaintiffs Bonnie Fish, Christopher Mino, Monica Lee Woosley, Lynda D. Hardman, and Evolve Bank & Trust (collectively, the "Plaintiffs") against the Defendants.

4. I understand that the claims of the Plaintiffs are described in their Second Amended Complaint, dated August 27, 2014 (the "Second Amended Complaint").

5. The claims of the Plaintiffs relate to a redemption transaction involving the Antioch Company, Inc. ("Antioch" or the "Company") on December 16, 2003 (the "Transaction Date") (the "Transaction").[1]

6. Counsel has asked me to:

   a. review and comment on the financial and valuation analysis prepared by Duff & Phelps, LLC ("Duff & Phelps") related to the Transaction (the "Fairness Opinion")[2] in order to form an opinion as to whether the Fairness Opinion conclusion rendered by Duff & Phelps was reasonable.

   b. form an opinion with respect to the validity of certain claims and conclusions made in a report prepared by Robert F. Reilly ("Mr. Reilly") of Willamette Management Associates submitted on April 20, 2015 (the "Reilly Report") and a report prepared by Michael Buchanan ("Mr. Buchanan") of FTI Consulting submitted on April 20, 2015 (the "Buchanan Report").

---

[1] When referencing the Transaction prior to its finalization, the term "Proposed Transaction" is sometimes utilized herein.

[2] The Fairness Opinion encompasses a document titled "Preliminary Review of Proposed Recapitalization of the Antioch Company: Presentation to GreatBanc Trust Company," dated October 27, 2003 (Deposition Exhibit 119), as well as the actual Fairness Opinion letter, dated December 16, 2003 (Deposition Exhibit 131).

5



**Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation**

**Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA**

**June 1, 2015**

7.  This report contains the facts and data I relied upon in the development of my opinions and a statement of qualifications. My opinions, detailed herein, are based on the data available to me as summarized in this report.

8.  A detailed list of the sources of information relied upon is presented in **Appendix 1**.

9.  My curriculum vitae and lists of recent testimony, publications, and presentations are presented in **Appendix 2**.

10. Stout Risius Ross, Inc. ("SRR") is compensated at a rate of $650 per hour for time incurred by me. Other individuals from SRR also provided assistance in this matter; their hourly rates range from $75 per hour to $575 per hour.

11. I reserve the right to supplement and/or revise my report if additional information becomes available. I also may be asked to testify at deposition and trial, as well as to prepare demonstratives in this matter.



STOUT | RISIUS | ROSS

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

## II. Qualifications

12.    I have extensive experience in the field of valuation, litigation advisory services, and mergers and acquisitions. My advisory experience encompasses a broad range of industries and has been performed for numerous purposes including fairness and solvency opinions, estate and gift taxation, Employee Stock Ownership Plans ("ESOP"), marital dissolution, shareholder disputes, fraudulent conveyance matters, breach of contract matters, intellectual property disputes, tortious interference cases, disputes related to business transactions, bankruptcy and reorganization, purchase price allocation, purchase and sale advisement, and other tax, corporate, and litigation related matters.

13.    I am a Managing Director in the Valuation & Financial Opinions Group at SRR. SRR is a financial advisory firm serving a range of clients from Fortune 500 corporations to privately held companies in numerous industries around the world. SRR focuses in the areas of (1) Valuations & Financial Opinions; (2) Investment Banking; and (3) Dispute Advisory & Forensic Services. SRR has over 300 professionals located in multiple offices throughout the United States. For the second time in the last three years, SRR was recognized as the #1 fairness opinion advisor in the United States according to Thomson Reuters M&A Financial Advisory Review (Year End 2014). I sit on SRR's Fairness Opinion Committee, which sets internal policy for SRR and also reviews the draft opinions that are reached by members of SRR's Transaction and ESOP Advisory practices before they are issued to clients.

14.    I received a Bachelor of Science Degree in Accounting with Honors at Indiana University's School of Business. I also received a Master of Business Administration with an emphasis in Finance at Indiana University's Graduate School of Business.

15.    I am on the Board of the Financial and Estate Planning Council of Metropolitan Detroit and currently serve as its president. I am also a past Vice President of the Michigan Chapter of The ESOP Association and a past member of the Valuation Advisory Committee of The ESOP Association. I am a senior member of the American Society of Appraisers (ASA) and a member of the American Institute of Certified Public Accountants, the Association of Insolvency & Restructuring Advisors (AIRA), the Michigan Association of CPAs (MICPA), the CFA Institute, the CFA Society of Chicago, and the American Bankruptcy Institute (ABI).

16.    Among other publications, I have authored a book titled Business Valuation: A Primer for the Legal Professional, published by the Business Law Section of the American Bar Association. I have lectured and presented numerous continuing education seminars on the subjects of valuation, litigation advisory services, succession planning, and transaction advisory services. In addition, I have testified as an expert witness at trial in state and federal courts, public service hearings, arbitration, and in deposition.



Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

17. With the aforementioned education, training, and experience I am well established to offer opinions regarding the disputes identified in this matter.

18. My Curriculum Vitae is located in **Appendix 2** to this report.



Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

## III.  Summary of Expert Opinions

19.     The Plaintiffs seek to recover monetary damages from the Defendants for allegedly breaching their fiduciary duties as an ESOP trustee or fiduciary and for allegedly engaging in a prohibited transaction as trustee, fiduciary, and/or as knowing parties in interest to a prohibited transaction.[3]  The Plaintiffs' damages expert, Mr. Reilly, attempts to measure the damages suffered as a result of these alleged wrongdoings.  Mr. Reilly is critical of the valuation and financial analysis undertaken by Duff & Phelps that it conducted in rendering its Fairness Opinion in support of the Transaction; Mr. Reilly then prepares his own valuation of Antioch stock, both before and after the Transaction, in order to calculate the damages allegedly suffered by the Plaintiffs.

20.     As described in more detail in this report, it is my opinion that Mr. Reilly's criticisms of the Fairness Opinion are not valid, thereby invalidating his damage calculations. Based on my analyses and conclusions summarized herein, it is my opinion that the Plaintiffs suffered no damages.

### III.A. *Review of the Duff & Phelps Fairness Opinion*

21.     In order to form an opinion as to whether the Fairness Opinion was reasonable, I considered whether:

    a.  the information utilized by Duff & Phelps was adequate;

    b.  the valuation methodologies employed by Duff & Phelps were appropriate and properly applied;

    c.  the projections utilized by Duff & Phelps were reasonable based on what was known or knowable as of the Transaction Date;

    d.  the primary inputs and assumptions utilized by Duff & Phelps in its application of its valuation methodologies were reasonable;

    e.  the framework utilized by Duff & Phelps to assess fairness from a financial point of view to the Antioch Employee Stock Ownership Plan (the "Antioch ESOP") was appropriate; and

    f.   the calculations in the Duff & Phelps valuation models were accurate.

22.     Based on my detailed review and analysis as described herein, it is my opinion that the Fairness Opinion was reasonable and supports the conclusions that the consideration paid for the non-ESOP shares of the Company's common stock in the Transaction was fair to the Antioch ESOP from a financial point of view and that the terms and conditions of the

---

[3] Second Amended Complaint, page 3

9



**SRR**
STOUT│RISIUS│ROSS

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

Transaction were fair and reasonable to the Antioch ESOP from a financial point of view.

## III.B. *Critique of the Reilly Report*

23. In order to calculate the damages allegedly suffered by the Plaintiffs, Mr. Reilly estimates the Fair Market Value of the Antioch common stock just prior to the Transaction Date. As detailed further in this report, Mr. Reilly's analysis and opinions in this regard are unreasonable for many reasons, including:

   a. His criticism of the Fairness Opinion for not adequately considering the industry technological and consumer preference changes facing the Company without presenting one credible, contemporaneous piece of market evidence supporting his opinions as of the Transaction Date.

   b. His reliance on information to support his opinions that was not known or knowable as of the Transaction Date.

   c. His reliance on unreasonable projections to perform his valuation of the Company, including:

      i. Downside projections prepared by one of the Company's advisors, Deloitte & Touche ("Deloitte"), that were prepared for assessing the feasibility of the Transaction from a cash flow perspective; Mr. Reilly mischaracterizes these projections as being the most recent set of base case projections.

      ii. Projections summarized in the Buchanan Report that were 1) prepared using a statistical technique that is unreliable for producing long-term projections and 2) not relevant in the context of a Fair Market Value analysis based on how actual market participants in the real world negotiate and price deals.

   d. His application of an unsupported and completely subjective input into his Weighted Average Cost of Capital calculation (i.e., the company-specific risk premium) which is used to calculate the present value of future cash flows under Mr. Reilly's Discounted Cash Flow ("DCF") Method.

24. In order to calculate the damages allegedly suffered by the Plaintiffs, Mr. Reilly also estimates the Fair Market Value of the Antioch common stock just after the Transaction Date. Mr. Reilly's analysis is wholly incorrect and unreliable as he treats the repurchase liability of the Company as an expense that is relevant to the valuation of Antioch, which it is not. Mr. Reilly's opinion in this regard is counter to the independent valuation analyses of the Company performed by at least four different firms near the Transaction Date, is counter to respected valuation treatises, and is contrary to publications Mr. Reilly has authored himself.

25. Mr. Reilly inappropriately uses hindsight to validate his projections relative to actual results by using information that was not known or knowable as

10



STOUT | RISIUS | ROSS

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

of the Transaction Date. However, Mr. Reilly fails to consider that the Company continued to perform well subsequent to the Transaction Date, as evidenced by its ability to pay its debts as they became due and to negotiate better credit terms with its lenders. Further, Mr. Reilly fails to consider certain general macroeconomic, industry specific, and changing lifestyle and consumer preference dynamics that had a material impact on the Company subsequent to the Transaction that were not known or knowable as of the Transaction Date.

26. Based on the foregoing and as further described in more detail in this report, I conclude that the conclusions in the Reilly Report are unreasonable and unreliable, and that the Antioch ESOP suffered no damages as a result of the Transaction.

11



Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

## IV. Background of the Company and the Antioch ESOP (Through 2003)

### IV.A. *Background of the Company*

27. Antioch was founded in 1926 and was incorporated in the State of Ohio in 1946. Prior to 1985, Antioch was best known as a producer of bookplates, bookmarks, book covers, and calendars. After certain acquisitions between 1985 and 1990, Antioch's predominant product became photo albums. However, after 1995, Antioch's core business changed again and became primarily direct marketing of scrapbooks and accessories sold through the party plan direct sales method by thousands of independent sales "consultants."[4]

28. By 2003, Antioch had over 1,200 full-time employees and maintained domestic manufacturing and/or distribution facilities in Yellow Springs, Ohio; St. Cloud, Minnesota; Sparks, Nevada; Richmond, Virginia; and Lenexa, Kansas, as well as four separate international facilities.[5]

29. Antioch elected to become an IRS Subchapter S Corporation ("S Corporation") on January 1, 1999.[6] S Corporations do not incur an income tax liability on earnings, but rather shareholders of S Corporations incur personal income tax liability on their proportionate share of the S Corporation's earnings. Historically, the Company made distributions to its shareholders to enable the outside shareholders other than the Antioch ESOP (the "Non-ESOP Shareholders") to pay their respective individual income taxes arising from corporate profit.[7]

30. Below is Antioch's organizational chart as of the Transaction Date.



The Antioch Company Corporate Structure

The Antioch Company

| Antioch Publishing, Inc. | Creative Memories, Inc. | zeBlooms, Inc. | Our Own Image, Inc. |

Source: Deposition Exhibit 66, page 17.

### IV.A.1. Creative Memories Division

31. Antioch's Creative Memories ("CM") division is a direct seller of scrapbooks, craft materials, and decorative scrapbook accessories through thousands of independent sales consultants via the party plan direct sales method. CM's selling strategy is the instruction and guidance of consumers in how to preserve, present, organize, and display their family photos in an

---

[4] Second Amended Complaint, pages 4-5
[5] Second Amended Complaint, page 5
[6] Second Amended Complaint, page 10
[7] Second Amended Complaint, page 10



**SRR**
STOUT | RISIUS | ROSS

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

appealing manner and at the same time create a graphic family record and history.[8]

## IV.A.2. Direct Sales Method

32. As mentioned previously, Antioch, and more specifically CM, utilized a party plan direct sales method to market and sell its products. The consultants would begin with product kit samples and selling tools provided by CM. The consultants would then host parties similar to Tupperware or Mary Kay. These parties would typically take place in a consultant's home or, for larger groups, in seminars and workshops at a local hall or meeting room in a hotel.[9]

33. As of 2002, the average revenue per consultant at one of these gatherings was between $307 and $377. Consultants were paid on a tri-level commission structure. Consultant turnover was low at the Company, at approximately 36%, compared to the 100% per year average for mature direct sales organizations.[10]

## IV.A.3. The Antioch Company Employee Stock Ownership Plan

34. The Antioch ESOP was established in 1979 as the principal employer-funded retirement savings benefit for Antioch's employees. By its very nature as an ESOP, it was designed to invest primarily in Antioch's stock.[11]

35. Because the Antioch ESOP was a shareholder of the Company, Antioch was required to make a similar income tax-related distribution to the Antioch ESOP as it did to the Non-ESOP Shareholders in proportion to the percentage of shares the Antioch ESOP owned. Unlike the Non-ESOP Shareholders, however, the Antioch ESOP was a tax-exempt entity that incurred no tax liability on any of Antioch's income.[12] Because the Antioch ESOP was not subject to federal income taxation, it retained the tax distributions and allocated it to fund individual Antioch ESOP accounts.[13] Between 1999 and 2002, the Antioch ESOP allocated any dividends or distributions paid on the common stock held in the Antioch ESOP 75% based on the annual compensation of each participant and 25% based on the account balances of each participant.[14]

## IV.B. Antioch's Financial Performance – 1998 through 2003

36. Antioch experienced significant growth in the years leading up to the Transaction. The following paragraphs present some of the Company's key events by year.

---

[8] Deposition Exhibit 116, page 2
[9] Deposition Exhibit 116, page 3
[10] Deposition Exhibit 116, page 3
[11] Deposition Exhibit 32, page 6
[12] Deposition Exhibit 32, MOR001191
[13] Deposition Exhibit 32, page 20
[14] Deposition Exhibit 32, page 20

13



**Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation**

**Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA**

**June 1, 2015**

a. *1999*

   i. CM introduced a new career plan for compensating its consultants.
   ii. International revenue increased 68%.
   iii. CM had over 44,000 consultants in five countries selling products to over five million individuals.[15]

b. *2000*

   i. Increased capacity by completing a 28,000 square-foot office addition in Yellow Springs, Ohio.
   ii. Further increased capacity by opening a 121,000 square-foot east coast manufacturing and distribution operation near Richmond, Virginia.
   iii. Operated or had distributors in seven foreign countries.[16]

c. *2001*

   i. International revenue increased by 43%.[17]
   ii. CM world headquarters building expansion in St. Cloud, Minnesota.[18]

d. *2002*

   i. International revenue increased by 42%.
   ii. Launched ZeBlooms, a direct sales, party-plan division selling silk and artificial flower products.
   iii. The Antioch Company Foundation was incorporated.[19]

e. *2003*

   i. Launched Our Own Image, a direct sales, party-plan division selling products celebrating the shared experience of the African-American community.
   ii. Launched a photo album imprinting service called Persona as a division of CM.
   iii. Completed move into 316,000 square-foot manufacturing facility in St. Cloud, Minnesota.[20]
   iv. Transaction completed on December 16, 2003.

37. The following paragraphs detail the Company's historical financial results for the fiscal years ended December 31, 1998 through December 31, 2002, and estimates prepared by management during the Transaction process for the year ending December 31, 2003.

---

[15] 1999 Annual Report, DP_A011942
[16] 2000 Annual Report, page 5
[17] Deposition Exhibit 135, page 1
[18] Deposition Exhibit 135, MOR0010753
[19] 2002 Annual Report, DP_A009198
[20] Deposition Exhibit 132A, P-WOOSLEY-000039-40


STOUT|RISIUS|ROSS

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

## IV.B.1. Revenue

38.  Antioch's revenue increased in every year between 1998 and 2002, from $164.3 million in 1998 to $351.2 million in 2002, representing a compound annual growth rate ("CAGR") of 20.9%. Further, management projected revenue to be $381.2 million in 2003.



Source: 1998 Annual Report; 1999 Annual Report; 2000 Annual Report; Deposition Exhibit 135; 2002 Annual Report; and CHA00085.

## IV.B.2. Gross Profit

39.  The Company experienced increases in gross profit and gross profit margin in each year from 1998 through 2002 as well. Specifically, gross profit increased from $87.6 million in 1998 to $209.0 million in 2002. During this same timeframe, gross profit margin increased from 53.3% to 59.5%. Management projected gross profit and gross profit margin to be $226.3 million and 59.4%, respectively, in 2003.



Source: 1998 Annual Report; 1999 Annual Report; 2000 Annual Report; Deposition Exhibit 135; 2002 Annual Report; and CHA00085.

15



**Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation**

**Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA**

**June 1, 2015**

## IV.B.3. EBITDA

40. Earnings before interest, taxes, depreciation, and amortization ("EBITDA") is often a preferred measure of a company's earnings because it focuses on results before interest expense and taxes in order to eliminate the effects of different capital structures and special tax situations, respectively, for benchmarking and valuation purposes. Further, the use of financial results prior to the consideration of depreciation and amortization adjusts for varying levels of capital investment, amounts of depreciable and amortizable assets, and differing depreciation methods across varying companies.

41. Similar to both revenue and gross profit, Antioch's reported EBITDA increased during the 1998 through 2002 timeframe. Specifically, reported EBITDA increased from $31.9 million, or 19.4% of revenue, in 1998 to $85.2 million, or 24.3% of revenue, in 2002. Management projected EBITDA to be $85.6 million, or 22.5% of revenue, in 2003.



Source: 1998 Annual Report; 1999 Annual Report; 2000 Annual Report; Deposition Exhibit 135; 2002 Annual Report; and CHA00085.

## IV.B.4. Total Assets

42. Antioch's total assets increased from $72.6 million in 1998 to $150.2 million in 2002. Management projected total assets to be $156.0 million as of December 31, 2003.



Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015



IV.C. *Antioch's Historical ESOP Valuations – 1979 through 2002*

43.    On an annual basis, Antioch engaged an outside valuation consultant to determine the Fair Market Value of the common stock of the Company.[21] The purpose of these valuations was to determine the Fair Market Value of the common stock of Antioch held indirectly by employee participants through the Antioch ESOP.[22] Since at least 1998, this annual valuation was performed by Business Valuations, Inc. ("BVI").[23]

44.    The following chart depicts the concluded price per share determined for the Antioch ESOP between 1979 and 2002. As is evident, Antioch's price per share increased significantly starting in the mid-1990s.

---

[21] Deposition Exhibit 116, GBT06755

[22] Deposition Exhibit 116, page 1

[23] Post-Transaction, annual ESOP valuations were performed by Prairie Capital Advisors, Inc. ("Prairie Capital")



**Bonnie Fish, Christopher Mino, Monica Lee Woosley, Lynda D. Hardman, Evolve Bank & Trust v. GreatBanc Trust Company, Lee Morgan, Asha Moran, Chandra Attiken, and the Morgan Family Foundation**

**Expert Report of Jeffrey M. Risius, CPA/ABV, CFA, ASA**

**June 1, 2015**



Source: Deposition Exhibit 116, Appendix IV; 1999 BVI Report, p. 25; 2000 BVI Report, p. 25; 2001 BVI Report, p. 25; and Deposition Exhibit 116, p. 25.



Source: Deposition Exhibit 116, Appendix IV; 1999 BVI Report, p. 25; 2000 BVI Report, p. 25; 2001 BVI Report, p. 25; and Deposition Exhibit 116, p. 25.

### IV.C.1. 2000 Through 2002 Antioch ESOP Valuations

45. I reviewed the projected income statements presented in the 2000 through 2002 BVI annual valuation reports in order to gain a sense of the expected future performance of the Company at various points in time prior to the Transaction. I considered the projected revenue and projected EBITDA for the years ending December 31, 2003 through December 31, 2008.

46. The following charts present the projected revenue for Antioch included in the 2000, 2001, and 2002 BVI valuation reports. For example, the projected revenue figures in 2003 represent the third projected year in the 2000 BVI valuation report whereas they represent the first projected year in the 2002 BVI valuation report. As the following chart displays, the

18



Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

revenue projections for the Company were continually increasing during this timeframe; suggesting that the outlook for the Company was continually improving.



47.    Similar to projected revenue, projected EBITDA was continually increasing during this timeframe as well.



### IV.D. *The Transaction*

48.    In January 2003, Antioch held a meeting known as the "ESOP Summit" to explore its options related to the Antioch ESOP in light of the changed IRS position on dividend allocation. At the meeting, Company representatives, lawyers, and professionals from Deloitte discussed legal issues that had



Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

arisen with the way that Antioch's distributions to the Antioch ESOP were allocated among Antioch ESOP participants.[24] As noted, since 1999 distributions had been allocated to participants' Antioch ESOP accounts based 75% on compensation and 25% on existing account balance.[25] However, in late 2002, Antioch learned that the IRS recently issued rulings that such distributions must be treated as dividends and therefore must be allocated among the Antioch ESOP participants' accounts based solely on account balances.[26]

49.    At the ESOP Summit, the professionals from Deloitte described a potential transaction that would resolve the allocation problem caused by the IRS rulings and provide other benefits to the Company.[27] Under Deloitte's proposal, the Antioch ESOP would become a 100% owner of Antioch's stock. The meeting participants discussed how that transaction might work and what the potential advantages and disadvantages were.[28]

50.    Shortly after the ESOP Summit, Antioch retained Deloitte as a professional financial advisor for exploring the Transaction, and ultimately to execute it. Antioch engaged McDermott Will & Emery ("MWE") as legal counsel to provide the board of directors of Antioch (the "Board") with advice regarding the Transaction.[29]

51.    Deloitte created the outline for the general structure of the Transaction. Deloitte found several prospective advantages to going forward with the transaction, including, but not limited to: (i) providing Antioch with greater flexibility to allocate Antioch ESOP contributions; (ii) avoiding the requirement to pay S Corporation tax dividends to cover Non-ESOP Shareholders' tax liabilities, which in turn would eliminate the concern about the allocation of such dividends to Antioch ESOP participants' accounts and which could also improve Antioch's cash flow; (iii) eliminating corporate income tax; and (iv) providing the Non-ESOP Shareholders with a fair value for their shares.[30]

52.    The point person at Antioch for the Proposed Transaction was Nancy Blair, Director of Corporate Strategy. In a memorandum detailing meeting notes and outstanding questions regarding the 100% ESOP question in June 2003, Ms. Blair articulated Antioch's goals in pursuing the transaction as: (i) maintaining the long-term security and stability of the Company; (ii) ensuring control and succession planning; and (iii) sharing the gains and wealth of the Company through broad-based employee ownership.[31]

---

[24] Deposition Exhibit 298 and Deposition Exhibit 299
[25] Deposition Exhibit 32, page 20
[26] Deposition Exhibit 298, Deposition Exhibit 299, Karen Ng Deposition, February 20, 2012, pages 35-36, and Helen Morrison Deposition, March 11, 2015, pages 69-71
[27] Deposition Exhibit 299
[28] Deposition Exhibit 299
[29] Deposition Exhibit 498
[30] DT2417-18
[31] Deposition Exhibit 106



**SRR**
STOUT|RISIUS|ROSS

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

53. Antioch's Board engaged GreatBanc as an independent institutional ESOP trustee to negotiate the Transaction on behalf of the Antioch ESOP. At GreatBanc's request, Antioch engaged Duff & Phelps as an independent financial advisor to the ESOP Trustee for the purpose of considering the proposed Transaction. Duff & Phelps was to determine, among other things, whether the Transaction was fair to the Antioch ESOP from a financial point of view.[32] GreatBanc engaged Jenkens & Gilchrist as its legal counsel on the matter.

54. Antioch hired Houlihan Lokey Howard & Zukin Financial Advisors, Inc. ("HLHZ") as a financial advisor to determine whether the consideration paid for the non-ESOP shares was fair to the Non-ESOP Shareholders from a financial point of view.[33]

55. MWE, GreatBanc, Duff & Phelps, HLHZ, and other advisors participated in an extensive due diligence investigation to evaluate the Proposed Transaction. The Transaction was a heavily negotiated transaction.[34]

56. On October 27, 2003, Duff & Phelps provided GreatBanc with a preliminary opinion that the Transaction, as negotiated, was fair to the Antioch ESOP from a financial point of view.[35] HLHZ also provided its analysis and opinion that the Transaction, as negotiated, was fair to the Non-ESOP Shareholders from a financial point of view.[36]

57. On October 30, 2003, after extensive presentations from advisors and discussion among the Board members, Antioch's Board preliminarily voted without dissent to go forward with the Transaction.[37] The material terms, as described to the Board, were as follows: [38]

   a. The Company would make a tender offer to all shareholders to redeem their shares for $850 per share.

   b. Selling shareholders would have the option to receive $850 in cash or a package which consisted of $280 in cash, a $280 subordinated note, and a warrant valued at $290 (the "Consideration Package").

   c. The maximum number of warrants, and consequently the maximum number of shares that could be exchanged for the Consideration Package, was 155,000.

   d. The ESOP Trustee would decline to tender any shares of common stock owned by the Antioch ESOP if it ultimately determined that the transaction was fair to the Antioch ESOP from a financial point of view.

[32] Deposition Exhibit 81 and Deposition Exhibit 131
[33] Deposition Exhibit 54
[34] Lee Bloom Deposition, November 18, 2010, page 44
[35] Deposition Exhibit 119, page 38
[36] Deposition Exhibit 66, page 12
[37] Deposition Exhibit 500, pages 1-3
[38] Deposition Exhibit 22, pages 8, 11, 20

21



**SRR**
STOUT | RISIUS | ROSS

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

e. Following the tender offer, the Company would go through a cash out merger, ensuring that the Antioch ESOP owned 100% of all outstanding shares of common stock. Employee owners would direct the ESOP Trustee on the cash-out merger vote.

f. Antioch would pay a one-time $8 million dividend to the Antioch ESOP prior to December 31, 2003, and an annual $2.5 million dividend to the Antioch ESOP from 2004 through 2008.

g. During a three-year period from 2004 through 2006, any departing Antioch ESOP participants would receive the negotiated price directly tied to Fair Market Value in exchange for the Antioch stock in their Antioch ESOP accounts. If they terminated between December 31, 2002 and September 30, 2004, they would receive the greater of Fair Market Value or $840.26 per share ($850 less a pro-rata share of the dividend received by the Antioch ESOP). If they terminated between October 1, 2004 and September 30, 2005, they would receive Fair Market Value plus $21.80 per share. If they terminated between October 1, 2005 and September 30, 2006, they would receive Fair Market Value plus $12.80 per share (the "Put Price Protection" or "PPP").

h. Antioch would also make a contribution of 21% of compensation to the Antioch ESOP in 2004.

58. GreatBanc also attended the October 30, 2003 Antioch Board meeting to inform the Board that it had preliminarily approved the Transaction on behalf of the Antioch ESOP and that, as a result, the Antioch ESOP would likely decline to participate in the tender offer.[39]

59. The details of the Transaction are described in the Offer to Purchase and Proxy Statement that were sent to all Antioch shareholders, both inside and outside of the Antioch ESOP, including to all Antioch ESOP participants.[40]

60. As of November 14, 2003, the Antioch ESOP beneficially owned 205,330 shares of the Company's common stock, representing approximately 42.8% of all outstanding shares.[41] The remaining 57.2% of outstanding shares of common stock were owned by outside or Non-ESOP Shareholders.[42]

61. On December 4, 2003, Antioch's Board gave final approval for the Transaction, unanimously voting in favor of it. At the meeting, Chief Financial Officer ("CFO") Barry Hoskins presented the financing structure for the Transaction, which included a $170 million credit facility ($120 million term note, $30 million revolving line of credit, and $20 million Euro currency revolving line of credit) (the "2003 Financing"). The Board

---

[39] Deposition Exhibit 500, page 2
[40] Deposition Exhibit 32
[41] Deposition Exhibit 32, page 66
[42] Deposition Exhibit 32, page 66



**STOUT|RISIUS|ROSS**

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

unanimously approved resolutions necessary for the 2003 Financing as well.[43]

62. On December 9, 2003, Duff & Phelps confirmed to GreatBanc that it still held the opinion that the consideration to be paid to the Non-ESOP Shareholders was within the range of Fair Market Value and that the terms and conditions of the Transaction were fair and reasonable to the Antioch ESOP from a financial point of view.[44] On December 16, 2003, Duff & Phelps gave GreatBanc its final opinion that: 1) the consideration to be paid by the Company for the shares of common stock held by the Non-ESOP Shareholders was fair and reasonable to the Antioch ESOP from a financial point of view; and 2) the terms and conditions of the Proposed Transaction were fair and reasonable to the Antioch ESOP from a financial point of view.[45]

63. All Non-ESOP Shareholders tendered their shares of common stock to the Company in response to the tender offer.[46] GreatBanc declined to tender the shares held by the Antioch ESOP. On December 15, 2003, a majority of the shareholders approved the merger, and the Transaction closed on the Transaction Date.[47]

---

[43] Deposition Exhibit 503
[44] Deposition Exhibit 77
[45] Deposition Exhibit 131
[46] Deposition Exhibit 402
[47] Deposition Exhibit 402

23



**Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation**

**Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA**

**June 1, 2015**

## V. The Duff & Phelps Fairness Opinion

64. I have been asked to review and comment on the financial and valuation analysis prepared by Duff & Phelps in order to form an opinion as to whether the Fairness Opinion conclusion rendered by Duff & Phelps was reasonable. As part of this review, I considered whether:

   a. the information utilized by Duff & Phelps was adequate;

   b. the valuation methodologies employed by Duff & Phelps were appropriate and properly applied;

   c. the projections utilized by Duff & Phelps were reasonable based on what was known or knowable as of the Transaction Date;

   d. the primary inputs and assumptions utilized by Duff & Phelps in its application of its valuation methodologies were reasonable;

   e. the framework utilized by Duff & Phelps to assess fairness from a financial point of view to the Antioch ESOP was appropriate; and

   f. the calculations in the Duff & Phelps valuation models were accurate.

### V.A. *Overview of the Fairness Opinion*

65. Duff & Phelps was engaged by GreatBanc to provide independent financial advisory services in connection with the Transaction. Duff & Phelps was engaged by and was solely responsible to GreatBanc as the ESOP Trustee. Duff & Phelps was specifically asked to render an opinion as to:

   a. whether the consideration to be received for the non-ESOP shares of the Company's common stock in the Transaction was fair and reasonable to the Antioch ESOP from a financial point of view; and

   b. whether the terms and conditions of the Transaction were fair and reasonable to the Antioch ESOP from a financial point of view.[48]

66. In the Fairness Opinion, Duff & Phelps outlined the Proposed Transaction, provided background information related to the Company's operations and its history, and included an overview of the industry-specific conditions at the time of the issuance of the Fairness Opinion. In order to arrive at its opinion, Duff & Phelps reviewed and analyzed Antioch's historical and projected financial statements, as well as certain other publicly available information.[49] Duff & Phelps considered two commonly accepted valuation methodologies in deriving its opinion.[50]

67. Duff & Phelps also analyzed the proposed structure of the Transaction. In order to determine whether the consideration received for the non-ESOP shares of the Company's common stock in the Transaction was fair and

[48] Deposition Exhibit 119, page 9
[49] Deposition Exhibit 119, page 10
[50] Deposition Exhibit 119, page 17

24



Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

reasonable to the Antioch ESOP from a financial point of view, Duff & Phelps measured:

a. Whether the post-Transaction aggregate economic value of the Antioch ESOP as a whole is not less than the pre-Transaction value of the Antioch ESOP immediately after the Transaction Date; and

b. Whether, to the extent there is any decline in the Fair Market Value of an individual share of common stock as a result of the Transaction, the terms of the Transaction appropriately compensate participants for the decline in value.[51]

68.  Duff & Phelps ultimately opined that: "(i) the consideration[52] to be received for the non-ESOP shares of Antioch common stock in the Proposed Transaction is fair and reasonable to the ESOP from a financial point of view and (ii) the terms and conditions of the Proposed Transaction are fair and reasonable to the ESOP from a financial point of view."[53]

69.  The remainder of this section presents my detailed review of the Fairness Opinion.

### V.B. *Due Diligence Process*

70.  At times, contemplated transactions involving an ESOP include an assessment of the fairness, from a financial perspective, of the proposed transaction. In these instances, an independent financial advisor typically will perform financial due diligence and analysis and issue a fairness opinion.

71.  The engagement process followed by a financial advisor during its development of a fairness opinion, similar to any valuation-related engagement, consists of several major categories which include, but are not limited to:  due diligence; analysis of the subject company's fundamentals; financial statement analysis and adjustments; valuation analysis; and reporting the results of the financial analysis.

### V.B.1. Due Diligence

72.  Often, it is impossible to define at the outset all of the relevant details of the valuation assignment.[54] This is especially true with respect to transaction-related engagements. Often, the terms and structure of a transaction are evolving up to the minute the transaction ultimately closes. Typically, valuation advisors request and gather information related to company-specific data, data about the company's industry and economic

---

[51] Deposition Exhibit 119, page 28

[52] The proposed consideration of the Transaction was $850 per share (Deposition Exhibit 119, page 5)

[53] Deposition Exhibit 119, page 38

[54] Shannon P. Pratt, Robert F. Reilly, and Robert P. Schweis, Valuing A Business – The Analysis and Appraisal of Closely Held Companies, Fourth Edition (New York, NY: McGraw-Hill, 2000), page 21

25



**SRR**
STOUT|RISIUS|ROSS

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

environment, and data regarding the subject company's market.[55] This information is commonly outlined and collected via a detailed information request provided to the subject company by the valuation advisor, and/or via management interviews.

### V.B.1.a. Collection and Review of Company Information

73. In its information request, Duff & Phelps requested information which fell into six broad categories: financial information, management, operations and facilities, stock ownership, ESOP, and other.[56] The specific information outlined in this request is typical for a transaction advisory related valuation engagement. However, at the early stages of a valuation engagement, it is difficult for a financial advisor to prepare an information request which encompasses all information required to complete that specific engagement. Lee Bloom echoed this sentiment in his deposition testimony.

   Q. "Well, then what I'd like to do instead is try to get a general sense from you as to the types of documents that Duff & Phelps requested and received from Antioch in order to perform its engagement with GreatBanc?

   A. Well, the initial request would have been pretty generic, pretty generic, and eventually we would add more onto it as we understood the nature of the transact - - the exact nature of the issues. But, we would typically - - actually many of the items that are on here, historical financial statements, preferably audited financial statements, some breakdown by division, especially if the company was operating in fairly distinct business units. We would want to understand the management structure so we would ask for a management organization chart, a listing of their facilities, discussion on various benefit plans and pretty - - I'd say pretty a wide ranging set of information. But not, for example, as in-depth or as broad as maybe a legal kind of due diligence might go into. We were trying to understand the nature of the business and the financial performance of the company. So that's really what our request would focus on."[57]

### V.B.1.b. Management Interviews

74. It is not uncommon for the initial information request and review to be supplemented through management interviews. Gaining a broader perspective of the business and its operations is the primary objective of management interviews. Further, any details absent from material already provided can be filled in through management interviews and any additional

---

[55] Shannon P. Pratt, Robert F. Reilly, and Robert P. Schweis, Valuing A Business – The Analysis and Appraisal of Closely Held Companies, Fourth Edition (New York, NY: McGraw-Hill, 2000), page 60

[56] Deposition Exhibit 132

[57] Lee Bloom Deposition, November 18, 2010, page 22



Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

information or steps can be identified or some previously planned steps can be dismissed.[58]

75. Duff & Phelps appropriately conducted management interviews, as evidenced by the following deposition testimony of Lee Bloom, the managing director at Duff & Phelps who lead the engagement.

> Q. "In addition to documentary information, did Duff & Phelps conduct any interviews as part of its engagement?
>
> A. We met with management of the company. The management is a broad term here. So as we talked about earlier in this deposition, we went to St. Cloud and met with the management team that was primarily responsible for the creative memories, the scrapbooking business. [We] talked to marketing sales, the operations manager, Lee Morgan, Asha Moran, Chandra. We met with various disciplines. And then we met also, of course, with the financial types of the company. So the head of financial reporting and accounting so that we could walk through the financial statements to make sure we could understand them.
>
> Q. For what purpose did you meet with the nonfinancial management and employees of the company?
>
> A. ...the bulk of the time discussing the business part of Antioch. What do they do day to day, where did they come from historically, and what are the prospects of the future of Antioch, for the scrapbooking business? We wanted to make sure we understood the competitive arena. And in order to do that, you meet with the business people, not so much the finance people."[59]

76. As outlined in the deposition testimony above, Duff & Phelps conducted numerous management interviews, not only with the financial management of the Company, but also with nonfinancial management and employees of the Company.

77. In addition to conducting management interviews, Duff & Phelps also toured the facilities of Antioch; spending two days in St. Cloud and one day in Yellow Springs.[60]

### V.B.1.c. Conclusion

78. Duff & Phelps provided a detailed initial information request and supplemented it with numerous interviews with financial and nonfinancial management and employees of the Company. Further, Duff & Phelps was not restricted in any way with respect to the information gathering process, as outlined in the following deposition testimony of Lee Bloom.

---

[58] Shannon P. Pratt, Robert F. Reilly, and Robert P. Schweis, Valuing A Business – The Analysis and Appraisal of Closely Held Companies, Fourth Edition (New York, NY: McGraw-Hill, 2000), pages 76-77

[59] Lee Bloom Deposition, November 18, 2010, page 23

[60] Lee Bloom Deposition, November 18, 2010, page 24



STOUT|RISIUS|ROSS

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

Q.     "Do you recall any information that you requested from Antioch Company that you did not receive?

A.     No. They were good about giving us information we asked for."[61]

## V.B.2. Analysis of the Subject Company's Fundamentals

79.    When analyzing a subject company's fundamental position, valuation advisors typically consider items such as the subject company's capitalization and ownership, history and operations, and outlook.

80.    The Fairness Opinion considers all of the items listed above. Specifically, Duff & Phelps provides great detail with respect to the Company's background, history, and current operations, as well as a review of the Proposed Transaction. Duff & Phelps discussed Company-specific items such as the ownership structure of Antioch as of the date of the Fairness Opinion, the Company's historical share price trend, the state of the Antioch ESOP (including the aggregate balances of major accounts), and the Company's status as an S Corporation.[62]

81.    Duff & Phelps further provides a detailed analysis of the strengths, opportunities, and risks facing Antioch as of the date of the Fairness Opinion. Specifically, Duff & Phelps notes that the Company's brand and quality of its products and services, mission and culture, direct sales network, and international growth are potential strengths and opportunities. On the contrary, Duff & Phelps considered increased competition, digital computer and scanner technology, and potential saturation to be the biggest risks facing Antioch at the time of the Fairness Opinion.[63]

82.    Duff & Phelps' assessment of Antioch's strengths and weaknesses at the time of the Fairness Opinion is corroborated through various industry articles and publications (discussed later in this report).

83.    Duff & Phelps appropriately considered the major strengths, opportunities, and risks of Antioch as of the date of the Fairness Opinion. However, based on at least one respected source for market research, Duff & Phelps may have overstated the risk of digital technology to Antioch in conducting its work. Despite the potential risk of digital photography, a report prepared by IBISWorld ("IBIS") discussed the potential that scrapbooking and digital photography would grow hand in hand going forward. IBIS noted that people who participate in scrapbooking "generally take more pictures when they become involved in the craft as their skills improve and they make extra copies of their prints." Further, IBIS forecasted that "this hobby will continue to experience positive growth and will stimulate demand for digital cameras." [64]     Therefore, it was reasonable to expect that digital photography could actually enhance the growth potential of the

---

[61] Lee Bloom Deposition, November 18, 2010, page 24

[62] Deposition Exhibit 119, pages 1-4

[63] Deposition Exhibit 119, page 14

[64] IBIS World Industry Report, *Camera and Photographic Supplies Stores in the US*, September 8, 2003, page 23



Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

scrapbooking industry, not hinder it, as reflected by Duff & Phelps in its analysis.

### V.B.3. Financial Statement Analysis and Adjustments

84.    The purpose of analyzing financial statements is to better understand and interpret the earning power of the subject company, since earning power is usually the most important element of the value of a business.[65]

### V.B.3.a. *Historical Financial Statement Analysis and Adjustments*

85.    Duff & Phelps reviewed the Company's audited historical financial statements for the fiscal years ended December 31, 1999 through 2002 and the Company's internally prepared latest-twelve-month ("LTM") period ended September 30, 2003 (the "LTM Period").[66] In analyzing Antioch's historical financial statements, Duff & Phelps considered and analyzed the Company's historical revenue CAGR and EBITDA margins, among other items.[67] Duff & Phelps only made one adjustment to Antioch's historical financial statements, which related to the Company's ESOP benefit expense (to be discussed later in this report section.)[68]

86.    Duff & Phelps also considered common-sized financial statements[69] and calculated key financial statement ratios when analyzing Antioch's historical financial statements. When used properly, analysis of a company's financial statement ratios can be a useful tool in a business valuation. The use of financial ratio analysis can assist a valuation advisor in identifying a company's trends with respect to improvement or deterioration, as well as comparing a subject company's financial ratios relative to its peers.[70]

87.    In appendix A-3 of the Fairness Opinion, Duff & Phelps calculates and presents key historical financial statement ratios. Specifically, Duff & Phelps calculates and presents growth, profitability, activity, leverage, and return on investment ratios for Antioch from 1999 through the LTM period. All of these ratio categories are common and widely accepted within the valuation industry.

---

[65] Shannon P. Pratt, Robert F. Reilly, and Robert P. Schweis, Valuing A Business – The Analysis and Appraisal of Closely Held Companies, Fourth Edition (New York, NY: McGraw-Hill, 2000), page 110

[66] Deposition Exhibit 119, Exhibit A

[67] Deposition Exhibit 119, Exhibit A

[68] Deposition Exhibit 119, page 15

[69] Common-sized financial statements typically present individual line items as a percentage of total sales (for common-sized income statements) or total assets (for common-sized balance sheets) (Shannon P. Pratt, Robert F. Reilly, and Robert P. Schweis, Valuing A Business – The Analysis and Appraisal of Closely Held Companies, Fourth Edition (New York, NY: McGraw-Hill, 2000), page 133).

[70] Shannon P. Pratt, Robert F. Reilly, and Robert P. Schweis, Valuing A Business – The Analysis and Appraisal of Closely Held Companies, Fourth Edition (New York, NY: McGraw-Hill, 2000), page 132

29



STOUT|RISIUS|ROSS

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

88. Duff & Phelps also commented on Antioch's historical financial results relative to its peers, noting that the Company's inventory turnover ratio was well above the median of its peers, the Company's debt as a percentage of its total capital was lower than the capital structure of its peers, and Antioch's working capital requirements were consistent with industry levels. Duff & Phelps also made it a point to comment on Antioch's historical capital expenditures, denoting any large one-time capital expenditures recognized during the past three years.[71]

### V.B.3.b. *Projected Financial Statement Analysis and Adjustments*

89. Duff & Phelps conducted diligent research and analysis with respect to developing the projections utilized in the Fairness Opinion, as outlined in the deposition testimony of Lee Bloom.[72]

   Q. "How was the projections regarding each year developed?
   A. We interviewed management. The company provided us with their projections. We looked at other sources of expectations for the economy and for the hobby industry and the - - I don't remember what this industry is called. The party. The party sales industry. And based on that research and understanding management's projections, we created our own set of *base case projections* for what we, what we as independent analysts would expect this company to do going forward."[73]  (emphasis added)

90. In developing the projections utilized in the Fairness Opinion, Duff & Phelps conducted numerous management interviews to gain an understanding of the risks and opportunities of Antioch.

   Q. "Why did you feel it was important to understand those aspects of Antioch's business?
   A. A big part of our analysis is the forecast, is the projections of the business, the ten-year discounted cash flow analysis that we did has to be consistent with the opportunities for the business and the risks of achieving those opportunities. And in order to make an informed projection, we have to have those discussions and we have to learn as much as we can about the business and the industry and the competitive environment."[74]

91. In its analysis, Duff & Phelps first considered the projected financial statements developed by management. Using these projections as a baseline, Duff & Phelps then made several adjustments, which are outlined below.

   a. Duff & Phelps adjusted revenue growth downward for the international and new venture businesses as it believed that there was greater risk

---

[71] Deposition Exhibit 119, page 16

[72] At the time of the Fairness Opinion, Lee Bloom was a managing director in charge of Duff & Phelps' Chicago office (Lee Bloom Deposition, November 16, 2010, page 7).

[73] Lee Bloom Deposition, November 16, 2010, pages 121-122

[74] Lee Bloom Deposition, November 18, 2010, pages 23-24



**SRR**
STOUT|RISIUS|ROSS

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

associated with achieving these growth targets projected by management. Duff & Phelps also reduced growth for all businesses approaching the terminal year to be consistent with the expected long-term, steady-state growth.[75]

b. Duff & Phelps noted that its gross margin assumptions were consistent with historical performance and management's strategic plan. It is noted in the Fairness Opinion that gross profit margins were projected to decline over the forecast period to reflect increasing competition and lower margins associated with international operations.[76]

c. The EBITDA margins projected in the Fairness Opinion also were projected to decline, due primarily to the projected declines in gross profit margin and increased operating expenses required to grow international and new venture business. The Company's projected EBITDA was also adjusted downward to reflect a benefit expense in the form of an annual contribution to the Antioch ESOP equal to 21% of eligible compensation and an annual 401k match equal to 4% of eligible compensation.[77] While the 21% ESOP contribution expense was only contractual for 2004, Duff & Phelps included it in every year of the projection period. By including the ESOP benefit expense in the projections, Duff & Phelps implicitly assumed that this expense represented a market level of compensation, despite the fact that it was an incremental benefit that was specifically negotiated on behalf of the Antioch ESOP. As such, this was a conservative assumption by Duff & Phelps that lowered the value of Antioch.

92. Capital expenditures were projected to be 9.2% of net revenues in 2003, which Duff & Phelps noted was significantly higher than historical levels, due to the building of a new manufacturing and distribution facility for CM in St. Cloud, Minnesota. Thereafter, Duff & Phelps projected capital expenditures to gradually decrease to a level of 3.0% of revenue by 2009.[78]

93. Duff & Phelps utilized a 40.5% projected tax rate in its analysis.[79]

### V.B.3.b.i. Reasonableness of Duff & Phelps' Projected Financial Statements

94. As the following table presents, Duff & Phelps projected five-year revenue and EBITDA CAGRs of 10.3% and 5.5%, respectively, compared to Antioch's actual five-year historical revenue and EBITDA CAGRs of 17.4% and 21.0%, respectively. Also, Duff & Phelps projected the five-year average EBITDA margin for Antioch to be 17.8%, compared to Antioch's actual five-year historical average of 19.0%.

---

[75] Deposition Exhibit 119, page 19
[76] Deposition Exhibit 119, page 20
[77] Deposition Exhibit 119, page 20
[78] Deposition Exhibit 119, page 20
[79] Deposition Exhibit 119, page 20



**STOUT | RISIUS | ROSS**

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

| Historical v. Projected Financial Results | | |
|---|---|---|
| | Antioch Historical Average | Duff & Phelps Projected Average |
| 5-Year Revenue CAGR | 17.4% | 10.3% |
| 5-Year EBITDA CAGR | 21.0% | 5.5% |
| 5-Year Average EBITDA Margin | 19.0% | 17.8% |
| Source: Deposition Exhibit 119, D&P_A002740. | | |

95. Duff & Phelps' projected financial statements are conservative compared to Antioch's historical results, as presented in the previous table. In general, the purpose of a fairness opinion is to gauge whether the value of a company's stock (typically on a per-share basis) is fair, from a financial point of view, to the interested parties. While it is common for a valuation advisor to rely on management's unadjusted projected financial statements when developing its analysis, a valuation advisor may also adjust management's projected financial statements downward to be conservative upon completion of the due diligence process and a detailed analysis of the subject company, its industry, and the general economy.

96. In preparing the Fairness Opinion, Duff & Phelps ultimately relied on projected financial results that were lower than management's projected financial statements, [80] suggesting that Duff & Phelps' analysis was conservative. On page 19 of the Fairness Opinion, Duff & Phelps noted as much, stating, "the projections employed in the DCF analysis are conservative (i.e., lower) relative to the projections provided by management."[81] Holding all else constant, utilizing lower projections will result in a lower conclusion of value.

### V.B.3.b.ii. Actual Results v. Prior Management Projected Financial Statements

97. As the following tables demonstrate, when Antioch management developed revenue projections as part of the annual Antioch ESOP valuations prepared by BVI, the Company was consistently able to meet its projections over the years 1999 through 2003. Whether the first year projections (e.g., the 1999 projection prepared in 1998, the 2000 projection prepared in 1999, etc.) or the second year projections (e.g., the 2000 projection prepared in 1998, the 2001 projection prepared in 1999, etc.) are considered, the Company never missed a revenue projection by more than 5%, and had years that actual results were above projection by over 10%. These actual results demonstrate management's ability to develop reasonable, "down the middle," projections given that some years were above budget and some years were below budget. This contrasts a

---

[80] Lee Bloom Deposition, November 16, 2010, page 222

[81] Deposition Exhibit 119, page 19



**STOUT | RISIUS | ROSS**

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

situation whereby management's projections are always above or always below actual results.

98. With respect to Antioch's EBITDA projections utilized by BVI for the annual Antioch ESOP valuations, the Company demonstrated an improving trend over the years 1999 through 2003. Considering both historical first year projections and second year projections, the Company got closer to prior projections in 1999 and 2000, and significantly exceeded prior projections in 2001 through 2003.

**First Projection Year v. Actual Results**

*In Thousands of U.S. Dollars*

| Revenue | 12/31/1999 | 12/31/2000 | 12/31/2001 | 12/31/2002 | 12/31/2003 |
|---|---|---|---|---|---|
| 1 Projection - Per BVI Reports [a] | $ 204,986 | $ 241,488 | $ 268,501 | $ 309,843 | $ 383,650 |
| 2 Actual [a][b] | 200,904 | 240,850 | 278,865 | 344,385 | 374,537 |
| 3 Variance | (4,082) | (638) | 10,364 | 34,542 | (9,113) |
| 4 Variance % | -2.0% | -0.3% | -3.9% | 11.1% | -2.4% |
| **EBITDA** | | | | | |
| 5 Projection - Per BVI Reports [a] | $ 41,909 | $ 47,501 | $ 54,679 | $ 61,533 | $ 71,205 |
| 6 Actual [a][b] | 40,640 | 48,366 | 59,993 | 84,693 | 82,859 |
| 7 Variance | (1,269) | 865 | 5,314 | 23,160 | 11,654 |
| 8 Variance % | -3.0% | 1.8% | 9.7% | 37.6% | 16.4% |

[a] 1998 BVI Report, FT007749; 1999 BVI Report, FT007867; 2000 BVI Report, FT007733; 2001 BVI Report, FT007669; and Deposition Exhibit 116, Appendix II.
[b] Actual results for 2003 are based on Antioch's 2004 Annual Report (Deposition Exhibit 140).

**Second Projection Year v. Actual Results**

*In Thousands of U.S. Dollars*

| Revenue | 12/31/1999 | 12/31/2000 | 12/31/2001 | 12/31/2002 | 12/31/2003 |
|---|---|---|---|---|---|
| 1 Projection - Per BVI Reports [a] | n/a | $ 250,083 | $ 292,283 | $ 300,721 | $ 349,911 |
| 2 Actual [a][b] | n/a | 240,850 | 278,865 | 344,385 | 374,537 |
| 3 Variance | n/a | (9,233) | (13,418) | 43,664 | 24,626 |
| 4 Variance % | n/a | -3.7% | -4.6% | 14.5% | 7.0% |
| **EBITDA** | | | | | |
| 5 Projection - Per BVI Reports [a] | n/a | $ 48,556 | $ 58,514 | $ 58,466 | $ 66,217 |
| 6 Actual [a][b] | n/a | 48,366 | 59,993 | 84,693 | 82,859 |
| 7 Variance | n/a | (190) | 1,479 | 26,227 | 16,642 |
| 8 Variance % | n/a | -0.4% | 2.5% | 44.9% | 25.1% |

[a] 1998 BVI Report, FT007749; 1999 BVI Report, FT007867; 2000 BVI Report, FT007733; 2001 BVI Report, FT007669; and Deposition Exhibit 116, Appendix II.
[b] Actual results for 2003 are based on Antioch's 2004 Annual Report (Deposition Exhibit 140).

99. I analyzed the Company's actual performance relative to the third and fourth projection year inherent in management projections prepared between 1998 and 2002 as well and observed similar trends with the Company outperforming its projections.

33



Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

### V.B.3.b.iii. Duff & Phelps v. Management Projected Financial Statements

100.  The following chart compares the projected revenue provided by management and the projected revenue relied upon by Duff & Phelps in its analysis.



Source: CHA00085; HLHZ Fairness Opinion Presentation, p. 65; and Deposition Exhibit 119, D&P_A002740

101.  As is evident in the preceding chart, Duff & Phelps' projected revenue increasingly diverged from management's projected revenue in the later years of the projection period. The following chart depicts the difference between the EBITDA projected by management and the EBITDA projected by Duff & Phelps.



Source: CHA00085; HLHZ Fairness Opinion Presentation, p. 65; and Deposition Exhibit 119, D&P_A002740

34



Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

102. Further, Duff & Phelps' projections are conservative when compared to the projections utilized by BVI in its annual Antioch ESOP valuations prior to the Transaction. In addition, management generally lowered its projections during 2003 relative to 2002 levels. Yet, as noted in the preceding charts, Duff & Phelps lowered management's projections even further in its Fairness Opinion analysis. Refer to the following charts.



Source: 2000 BVI Report, FT007733; 2001 BVI Report, FT007669; Deposition Exhibit 116, Exhibit II; CHA00085; HLHZ Fairness Opinion Presentation, p. 65; and Deposition Exhibit 119, D&P_A002740.



Source: 2000 BVI Report, FT007733; 2001 BVI Report, FT007669; Deposition Exhibit 116, Exhibit II; CHA00085; HLHZ Fairness Opinion Presentation, p. 65; and Deposition Exhibit 119, D&P_A002740.

103. Industry articles and publications at the time of the Transaction further corroborate that the projected financial statements utilized by Duff & Phelps were conservative. Further, Bank One, NA, National City Bank, Fifth Third Bank, and LaSalle Bank National Association (the "2003 Lenders")



**Bonnie Fish, Christopher Mino, Monica Lee Woosley, Lynda D. Hardman, Evolve Bank & Trust Company, Lee Morgan, Asha Moran, Chandra Attiken, and the Morgan Family Foundation**

**Expert Report of Jeffrey M. Risius, CPA/ABV, CFA, ASA**

**June 1, 2015**

described management's projections as "conservative" in their due diligence on the Company, [82] which would imply that Duff & Phelps' projections were ultra conservative.

104.    At the time of the Transaction, revenue of scrapbooking supplies had quadrupled over the past five years to an estimated $2.0 billion. In fact, the Hobby Industry Association stated that scrapbooking was the fastest growing hobby in the country. Further, in December 2003, the Hobby Industry Association projected that scrapbooking revenue would increase at 40% to 80% annually over the next five years.[83]

105.    The favorable outlook for the scrapbooking industry was evidenced by the fact that the world's largest retailer for do-it-yourself home decorators and crafts made a significant move in 2003 to further penetrate the scrapbooking industry. Michaels Stores, Inc. ("Michaels") launched a new standalone scrapbooking store concept called ReCollections to offer more than 10,000 scrapbooking and paper-crafting products for hobby enthusiasts.[84] The first store was opened in the summer of 2003, with others planned to follow. As such, the largest retailer in the industry was clearly betting on the growth of scrapbooking in 2003. Due to the emergence of new scrapbooking products and strong customer demand, Michaels planned on opening an additional 10 ReCollections stores within the next year.[85]

106.    In rating Michaels a "Strong Buy" as of December 1, 2003, Adams, Harkness & Hill stated the following: "The ReCollections scrapbooking store format… could provide additional long-term unit growth vehicles… In addition, we think the craft industry remains healthy and crafting remains a mainstream consumer activity, not a post 9/11 fad."[86] Further, Piper Jaffray communicated its approval of this strategy noting that it was a "great market to enter."[87]

107.    As part of a comprehensive survey conducted by Unity Marketing, it was noted that as compared to other stationary products, approximately 44% of consumers noted they were spending more on scrapbooking than they did in the past.[88] Within the stationery and greeting card market, scrapbookers spent the most, on average, on scrapbooking supplies compared to other

[82] Credit Analysis Memorandum dated September 2, 2003, CHA00056
[83] *Business; Catering to a Love Affair With the Past*, The New York Times, December 28, 2003
[84] *Michaels Opens New ReCollections Store Amid a Scrapbooking Boom*, Display & Design Ideas, August 1, 2003
[85] *Business; Catering to a Love Affair With the Past*, The New York Times, December 28, 2003
[86] Better Living Industry Commentary, Adams, Harkness & Hill, December 1, 2003
[87] Cutting Through The Noise, Piper Jaffray, March 13, 2003
[88] The Greeting Card and Stationery Report, 2003: The Market, The Competitors, The Future Trends, Unity Marketing, 2003, page 18



Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

stationery and greeting card categories, as evidenced in the following chart.[89]



The Greeting Card and Stationery Report, 2003: The Market, The Competitors, The Future Trends, Unity Marketing, 2003, page 16

108. The surveys conducted by Unity Marketing in 2003 indicated that "scrapbooking will continue to pick up steam in the years ahead."[90] Unity Marketing noted that scrapbooks, up to that point, had been a big missed opportunity for craft and hobby stores. Scrapbooking was considered at the time to be the fastest growing stationery category and the one that offered the greatest promise from the consumers' point of view.[91] Unity Marketing pegged scrapbooking as the number one trend for the stationery and greeting card market going forward.[92]

109. Further, a report prepared by IBIS noted during September 2003 that the U.S. had recently experienced a rise in the popularities of hobbies, such as scrapbooking, and that the hobby would continue to experience positive growth.[93] Also, leading newspaper periodicals such as the Chicago Tribune and Newsweek noted that "pieces all fit for boom in scrapbooking"[94] and that there were approximately 2,000 scrapbook stores across the nation, up from 300 five years ago.[95]

---

[89] The Greeting Card and Stationery Report, 2003: The Market, The Competitors, The Future Trends, Unity Marketing, 2003, page 16

[90] The Greeting Card and Stationery Report, 2003: The Market, The Competitors, The Future Trends, Unity Marketing, 2003, page 18

[91] The Greeting Card and Stationery Report, 2003: The Market, The Competitors, The Future Trends, Unity Marketing, 2003, page 61

[92] The Greeting Card and Stationery Report, 2003: The Market, The Competitors, The Future Trends, Unity Marketing, 2003, pages 158-160

[93] IBIS World Industry Report, Camera and Photographic Supplies Stores in the US, September 8, 2003, page 23

[94] The Chicago Tribune, Pieces all fit for boom in scrapbooking, November 24, 2003

[95] Newsweek, Beyond the Quilting Bee, October 20, 2002



Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

### V.B.3.c. *Repurchase Obligation and Projected Benefit Expense*

110.  Based on negotiations between Antioch and the Antioch ESOP as part of the Transaction, the Company agreed to make a contribution equal to 21% of eligible compensation to the Antioch ESOP in 2004.[96] Any future contributions beyond 2004 would be discretionary. Despite this fact, Duff & Phelps included this expense in every year of its DCF analysis. All else equal, the inclusion of this expense perpetually has the effect of lowering value.

111.  Further, with respect to the repurchase obligation, Duff & Phelps analyzed several downside scenarios in order to test whether the Company could handle its debt obligations and repurchase obligation going forward. Duff & Phelps' analysis implied that, from a cash flow feasibility perspective, there was significant cushion for the Company to meet its obligations even if events in the future were not as positive as reasonably anticipated as of the Transaction Date.[97]

### V.B.3.d. *Conclusion*

112.  Based on the foregoing, it is my opinion that Duff & Phelps reasonably, adequately, and appropriately developed Antioch's projected financial statements in performing its Fairness Opinion analysis.

### V.C. **Company Valuation Analysis**

### V.C.1. **Company Valuation Methodologies**

113.  Valuation theory includes consideration of several valuation approaches, including an Income Approach, a Market Approach, and an Asset Approach. A description of each approach is discussed below. Further, for each section below, I provide an in-depth analysis of the Fairness Opinion in the context of these industry accepted valuation methodologies.

### V.C.1.a. *Income Approach*

114.  The Income Approach is a valuation technique in which the value of a company is estimated based on the earning capacity of that company. Duff & Phelps performed a DCF analysis,[98] which is a form of the Income Approach. Employing a multiple-period discounting model (i.e., the DCF analysis) was appropriate with respect to the valuation of Antioch given that the Company had demonstrated varying rates of historical growth, and varying rates of earnings growth were projected in the years following the Transaction Date.

---

[96] Deposition Exhibit 22, page 20

[97] Lee Bloom Deposition, November 18, 2010, page 45 and Lee Bloom Deposition, November 16, 2010, pages 126 and 127

[98] Deposition Exhibit 119, page 17



Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

### V.C.1.a.i. Discounted Cash Flow Method

115. Generally speaking, a DCF method is a multiple-period discounting model in which the value of a company is estimated based on the present value of its expected future economic benefits. There are two main inputs required in a DCF method in order to estimate the value of a company: projected cash flows and the required rate of return.

### V.C.1.a.i.1. *Projected Cash Flows*

116. As noted previously, Duff & Phelps first considered the projected financial statements developed by management. As previously discussed, using these projections as a baseline, Duff & Phelps then made several downward adjustments to management's projections. These adjusted projected financial statements were then utilized in Duff & Phelps' DCF analysis.

### V.C.1.a.i.2. *Required Rate of Return*

117. When applying the DCF method, the cash flows expected to be generated by a business are discounted to their present value equivalent using a rate of return that reflects the relative risk of the investment, as well as the time value of money. This return is an overall rate based upon the individual required rates of return for invested capital (equity and interest-bearing debt). The return, known as the weighted average cost of capital ("WACC"), is calculated by weighting the required returns on interest-bearing debt and equity in proportion to their estimated percentages in an expected capital structure.

118. Below is an excerpt from Lee Bloom's deposition with respect to Duff & Phelps' development of the discount rate utilized in its analysis.

   Q. "How do you consider risk in developing a discount rate for a client?
   A. I apply the capital asset pricing model which derives a discount rate based on a number of characteristics. Actually, it's a very small number of characteristics. The risk free rate that is prevailing in the market at the time of the valuation or as of the valuation date, that's typically the treasury rate, a long-term treasury rate. That's actually the not risky part of the discount rate. Then I apply to that a risk premium which is a factor that results from multiplying beta, I'll talk about beta in a minute, to the long-term expected market risk premium which is the rate of return that the market generates above the risk free rate for the market as a whole. And I'm really talking about the broad market, the S and P. That would be around, I don't know, six or seven. Depends on when you're looking and what sources you're looking at. I don't remember what we used here. And then you apply a beta which is a measure of the relative riskiness of this particular asset as compared to the market as a whole or this particular industry really as compared to the market as a whole. And then you might adjust for, make a further adjustment for the size of the business. The general observation is that a smaller company is riskier than a larger company. And there



**SRR**
STOUT|RISIUS|ROSS

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

are sources of information that provide how much additional risk you might associate with that. That's the methodology I [apply] in capital asset pricing model for determining the equity risk in a business. Then we also have the debt component. And what I would typically do is make - - assume that the company is going to have some particular debt to equity structure, depends on the purpose of valuation and the particular circumstances, and look at the required rate of return to the debt of the company at that particular debt to equity structure, adjust it for the tax benefits associated with interest, and take the weighted average of those two numbers. The debt number on the one hand and the equity rate on the other hand. And the combination on a weighted basis, the combination of those is what we refer to as weighted average cost of capital which I would then apply as a discount factor to the cash flows, the net operating cash flows of the business."[99]

119.  Lee Bloom's description of the development of the discount rate utilized in the Fairness Opinion is consistent with the standard WACC calculation.

120.  The general formula for calculating the WACC is:

$$\text{WACC} = (k_e * w_e\%) + (k_d * w_d\%)$$

where:

| | | |
|---|---|---|
| WACC | = | Weighted average cost of capital; |
| $k_e$ | = | Required return on equity; |
| $w_e\%$ | = | Percentage (or weight) of equity to the sum of the debt and preferred and common equity ("total invested capital"); |
| $k_d$ | = | After-tax cost of debt; and |
| $w_d\%$ | = | Percentage (or weight) of debt to the total invested capital. |

121.  The steps involved in deriving an appropriate WACC include estimating: (1) the required return on equity; (2) the cost of debt; and (3) an appropriate capital structure.

122.  Duff & Phelps utilized a WACC in the range of 12.0% to 14.0% in its DCF analysis.[100] While the individual components of the WACC calculated by Duff & Phelps are not presented in the Fairness Opinion, I was able to locate the backup for Duff & Phelps' WACC calculation in its work papers.[101]

---

[99] Lee Bloom Deposition, November 16, 2010, pages 167-168
[100] Deposition Exhibit 119, page 20
[101] Refer to D&P_A002961-2962

40



**STOUT|RISIUS|ROSS**

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

**V.C.1.a.i.2.1.** Required Rate of Return on Equity

123. As Lee Bloom discussed in his deposition testimony, Duff & Phelps utilized the Capital Asset Pricing Model ("CAPM") to determine the required rate of return on equity for Antioch.

124. The CAPM estimates the required rate of return on equity by adding the risk-free rate of return to an adjusted market (equity) risk premium. This premium is calculated by first subtracting the risk-free rate of return from the market rate of return, and then multiplying by an appropriate "beta." Beta ("β") is a risk measure that reflects the sensitivity of returns on an investment in a company's stock to returns on an investment in the stock market as a whole. The CAPM-derived required return on equity is calculated using the formula:

$$k_e = r_f + \beta * (r_m - r_f) + SSP + CSRP$$

where:

| | | |
|---|---|---|
| $k_e$ | = | Required rate of return on equity; |
| $r_f$ | = | Risk-free rate of return; |
| $\beta$ | = | Beta or systematic risk for this type of equity investment; |
| $r_m - r_f$ | = | Long-term market risk premium; the expected return on a broad portfolio of stocks in the market ("$r_m$") less the risk-free rate ("$r_f$"); |
| SSP | = | Small stock risk premium; the difference in the expected common stock return of small companies and large companies; and |
| CSRP | = | Company-specific risk premium. |

125. Duff & Phelps does not detail its calculation of the WACC utilized in its DCF analysis in its entirety in the Fairness Opinion. For purposes of determining the reasonableness of the WACC range concluded upon by Duff & Phelps, I have supplemented the information presented in the Fairness Opinion with the Excel model utilized by Duff & Phelps in developing the Fairness Opinion.[102] In addition, I have also calculated my own WACC in order to further test the reasonableness of Duff & Phelps' analysis. The following paragraphs detail the assumptions utilized by Duff & Phelps and the assumptions I utilized in calculating my independent WACC.

**VC.1.a.i.2.1.1.** Risk-free Rate of Return

126. Duff & Phelps utilized a risk-free rate of return of 5.4% in its analysis. While it is unclear the exact date of this yield, it is clear that this yield is associated with a 20-year Treasury Bond given the ranges of Treasury bond yields at

---

[102] Refer to Bates D&P_A002962 and Deposition Exhibit 119, page 20



**SRR**
STOUT | RISIUS | ROSS

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

the time of the Transaction. Utilizing a 20-year Treasury Bond is a commonly accepted practice in the valuation community. I utilized a risk-free rate of return of 5.1%, as reported by the Federal Reserve, for my independent WACC analysis, which is based on the yield of a 20-year Treasury bond as of the Transaction Date.

**VC.1.a.i.2.1.2.** Long-term Market Equity Risk Premium

127. Duff & Phelps utilized a long-term market equity risk premium of 7.0%, which was based on a study conducted by Morningstar, Inc. ("Morningstar") as published in its *Stocks, Bonds, Bills, and Inflation Valuation Edition*: 2003 Yearbook ("SBBI"), which estimated a market equity risk premium of 7.0%. Morningstar's SBBI publication was a commonly accepted source for the long-term market equity risk premium in the valuation community in 2003. I utilized this same long-term market equity risk premium in my independent WACC analysis.

**VC.1.a.i.2.1.3.** Beta

128. Application of the CAPM to a privately held business requires the identification of comparable companies with similar investment risk characteristics. This is due to the fact that a freely traded price is necessary to calculate beta directly. For a private company, it is possible to draw inferences regarding the appropriate beta through an analysis of the betas of comparable publicly traded companies.

129. Duff & Phelps utilized an unlevered beta of 0.85 based on its identified comparable public companies (the "Duff & Phelps Comparable Public Companies"). Duff & Phelps then relevered this beta based upon the capital structure selected for the Company (to be discussed later in this section). This resulted in a relevered beta of 0.88, which Duff & Phelps relied upon in its WACC calculation. Determining an unlevered beta first and then relevering the unlevered beta to reflect the company-specific capital structure is an appropriate, common practice in the valuation industry.

130. I selected a relevered beta of 0.74 to utilize in my independent WACC analysis, which reflects consideration of both the median relevered beta of the comparable public companies outlined in Exhibit B (the "Comparable Public Companies") and the median beta for the companies listed in SIC 3681 as presented in Morningstar's *Cost of Capital Yearbook, Quarterly Update December 2003*. Note that I excluded the relevered beta of Home Interiors & Gifts Inc. as this beta was not available. Refer to Exhibit B.3 for a presentation of the Comparable Public Companies' betas.

**VC.1.a.i.2.1.4.** Small Stock Risk Premium

131. Duff & Phelps estimated a small stock risk premium of 1.52% based on information compiled by Morningstar, as published in SBBI. This premium is based on the historical returns (in excess of the return on the S&P 500 Index) of the "low-cap" size group on the New York Stock Exchange ("NYSE"), NYSE MKT LLC (formerly the American Stock Exchange), and



**SRR**
STOUT|RISIUS|ROSS

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

NASDAQ exchanges (i.e., between $314 million and $1.1 billion in equity market capitalization), as published in SBBI. Morningstar's SBBI publication is a commonly accepted source for the small stock risk premium in the valuation community.

132.    I selected a small stock risk premium of 2.1% in my independent WACC analysis, based upon information compiled by Morningstar as published in SBBI. This premium is based upon the 8th decile (i.e., between $314 million and $521 million in equity market capitalization). I chose to utilize the 8th decile as opposed to the low-cap size group in order to narrow the equity market capitalization range of publicly traded companies.

**VC.1.a.i.2.1.5.** Company-Specific Risk Premium

133.    The CSRP accounts for risk factors specific to the subject company (i.e., unsystematic risk factors) not captured in the equity risk premium, beta, or the small stock risk premium.

134.    Duff & Phelps concluded upon a CSRP of 0.0%. I also concluded that no CSRP was warranted. Typically, a CSRP is applied when the other elements of the cost of equity calculation are deemed to not incorporate company-specific risk factors or when the valuation advisor considers the projections provided by management to be unreasonable or "pie in the sky" projections. Given management's historical track record of achieving or exceeding its projected financial statements, the downward adjustments made by Duff & Phelps to management's projected financial statements, and the general optimism surrounding the scrapbooking industry as of the Transaction Date, no CSRP would be warranted.

**V.C.1.a.i.2.2.** Required Rate of Return on Debt

135.    The cost of debt is the rate that a prudent investor would require to lend money to the Company on an after-tax basis. Typically, the cost of debt is analyzed on an after-tax basis because interest payments are tax deductible. Therefore, the estimated after-tax cost of debt is typically calculated using the following formula:

$k_d = k * (1 - t)$

where:

$k_d$ = after-tax cost of debt;

$k$ = pre-tax cost of debt; and

$t$ = effective income tax rate.

136.    Duff & Phelps utilized an after-tax cost of debt of 4.1% in its WACC calculation, which was derived from a pre-tax cost of debt of 6.95% and a tax rate of 40.5%.



**Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation**

**Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA**

**June 1, 2015**

137.    To estimate the Company's marginal cost of debt, I relied upon the corporate bond yield for Baa-rated securities, as reported by the Federal Reserve, which was 6.6% as of the Transaction Date. I then adjusted this pre-tax rate using a 40.5% tax rate to calculate the Company's after-tax cost of debt of 3.9%, which is slightly lower than the after-tax cost of debt utilized by Duff & Phelps in its WACC analysis.

### V.C.1.a.i.2.3. Capital Structure

138.    When determining the appropriate capital structure to utilize in calculating a company's WACC, the valuation advisor typical considers the subject company's actual capital structure, the optimal industry capital structure, or some combination of the two.

139.    Duff & Phelps assumed a capital structure of 5.0% debt and 95.0% equity in the Fairness Opinion, consistent with Antioch's actual capital structure prior to the Transaction.[103] For my independent WACC analysis, I also chose to utilize a capital structure of 5.0% debt and 95.0% equity, consistent with Antioch's actual capital structure.

140.    Holding all else constant, utilizing Antioch's capital structure in calculating the Company's WACC is conservative. The median capital structure of the Comparable Public Companies was approximately 12.5% debt and 87.5% equity as of the Transaction Date.[104] Given that a capital structure with a higher weighting of debt capital will result in a lower WACC (as the cost of debt for a company is lower than its cost of equity), utilizing Antioch's actual capital structure will result in a lower concluded value of equity (due to a higher required rate of return, or WACC).

### V.C.1.a.i.2.4. WACC Conclusion

141.    The following table summarizes the assumptions and calculation of Duff & Phelps' WACC analysis and my independent WACC analysis.

---

[103] Deposition Exhibit 119, page 20
[104] Refer to Exhibit B.3



**STOUT | RISIUS | ROSS**

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

## Weighted Average Cost of Capital

### Required Return on Equity

| Modified Capital Asset Pricing Model | | | | |
| --- | --- | --- | --- | --- |
| | | SRR | | Duff & Phelps |
| 1 Risk-Free Rate of Return | | 5.1% | | 5.4% |
| 2 Long-Term Market Equity Risk Premium | 7.0% | | 7.0% | |
| 3 Selected Equity Beta | 0.74 | 5.2% | 0.88 | 6.2% |
| 4 Small Stock Risk Premium | | 2.1% | | 1.5% |
| 5 Company-Specific Risk Premium | | 0.0% | | 0.0% |
| 6 Concluded Required Return on Equity | | 12.3% | | 13.1% |

### Cost of Debt

| Corporate Bond Yields | | | | |
| --- | --- | --- | --- | --- |
| | | SRR | | Duff & Phelps |
| 7 "Baa"-Rated Corporate Bond Yield | | 6.6% | | 7.0% |
| 8 Less: Income Tax Factor | 40.5% | -2.7% | 40.5% | -2.8% |
| 9 Concluded Cost of Debt | | 3.9% | | 4.1% |

### Weighted Average Cost of Capital

| | | SRR | | Duff & Phelps |
| --- | --- | --- | --- | --- |
| 10 Equity Allocation of Capital Structure | 95.0% | 11.7% | 95.0% | 12.4% |
| 11 Debt Allocation of Capital Structure | 5.0% | 0.2% | 5.0% | 0.2% |
| 12 Weighted Average Cost of Capital | | 11.9% | | 12.6% |
| 13 Weighted Average Cost of Capital Range | | | | 12.0% - 14.0% |

142. My independent WACC analysis falls at the lower end of the concluded WACC range utilized by Duff & Phelps in the Fairness Opinion, suggesting that Duff & Phelps' range was conservative. Further, Duff & Phelps' own calculation falls below the midpoint of the range that was ultimately utilized in its DCF analysis.[105]

### V.C.1.a.ii. Conclusion

143. Based on the foregoing, it is my opinion that Duff & Phelps reasonably, adequately, and appropriately considered and employed the DCF method in developing the Fairness Opinion.

### V.C.1.b. *Market Approach*

144. The ideal methodology employed in valuing a company's equity is to observe the prices paid for its shares in daily transactions in the open market. However, when valuing shares of a privately held company, no such marketplace exists. In general, the Market Approach is a valuation technique whereby the value of the subject company is calculated based on the prices of actual transactions for similar companies. These

---

[105] D&P_A002962



Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

observations make it possible to determine the value of shares that have no active market.

### V.C.1.b.i. Comparable Company Method

145. One form of the Market Approach is the Comparable Company method, which is a valuation technique whereby the value of a company is estimated by comparing it to similar publicly traded companies. Criteria for comparability in the selection of comparable publicly traded companies include operational characteristics, growth patterns, relative size, earnings trends, markets served, and risk characteristics. However, exact comparability is not required under this method. Once a set of comparable companies is selected, pricing multiples are developed by dividing the market value of equity or enterprise value ("EV") by appropriate measures of financial results, such as EBITDA. After analyzing the risk and return characteristics of the comparable companies relative to the subject company, appropriate pricing multiples are applied to the operating results of the subject company to determine its value.

#### V.C.1.b.i.1. Selection of Comparable Companies

146. Duff & Phelps considered a Comparable Company method in its analysis. Duff & Phelps considered two comparable company groups: direct sales companies and retail craft/hobby companies. [106] Three direct sales organizations (the "DSO Group") and five retail craft/hobby companies (the "Retail Group") were selected by Duff & Phelps. [107] It should be noted that Duff & Phelps only considered the Comparable Company method in the context of comparing it to the results derived via the DCF method, and did not rely on this method in forming its concluded range of EV for the Company. [108]

147. Duff & Phelps' selected comparable companies are both reasonable and warranted. As noted previously, the Company markets and sells its products through its consultant sales force. The Company's consultants utilize the direct selling method. That is, they sell Antioch products person-to-person, away from a fixed retail location. The three comparable companies which fall under the DSO Group are Avon Products ("Avon"), Blyth Inc. ("Blyth"), and Tupperware Corporation ("Tupperware"). Avon is a manufacturer and marketer of beauty and related products; Blyth manufactures, markets, and distributes a line of candles and home fragrance products; and Tupperware makes and markets household products. While none of these products are directly comparable to the products the Company offers, the consideration of these comparable companies is still relevant given their distinct and directly comparable method of selling their products.

148. The Retail Group consisted of A.C. Moore Arts and Crafts, Inc., Hancock Fabrics Inc., Jo-Ann Stores Inc., Michaels, and Rag Shops Inc. These

---

[106] Deposition Exhibit 119, page 17
[107] Deposition Exhibit 119, page 22
[108] Deposition Exhibit 119, page 25



Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

comparable companies all offer products that share similarities to those offered by Antioch. In fact, as mentioned previously, as of the Transaction Date, Michaels recently opened two stand-alone scrapbooking stores and was anticipating opening several more in the coming year.

149. In order to analyze whether the selected Duff & Phelps Comparable Public Companies were reasonable, I performed my own independent comparable company search. I also considered the comparable companies relied upon by other valuation advisors to the Company and its shareholders around the time of the Transaction. Refer to the following table.

| Comparable Companies | | | | | |
|---|---|---|---|---|---|
|  | Category | Duff & Phelps | HLHZ | BVI | Prairie Capital |
| A.C. Moore Arts and Crafts, Inc. | Retail | X | | X | |
| Avon Products | DSO | X | X | | X |
| Blyth Inc. | DSO | X | X | X | X |
| CPAC Inc. | DSO | | | X | |
| Hancock Fabrics Inc. | Retail | X | | X | |
| Home Interiors & Gifts, Inc. | DSO | | X | | |
| Jo-Ann Stores Inc. | Retail | X | | X | |
| Michaels Stores Inc. | Retail | X | | X | |
| Nu Skin Enterprises, Inc. | DSO | | X | | |
| Rag Shops Inc. | Retail | X | | | |
| The Nautilus Group, Inc. | DSO | | | | X |
| Tupperware Corporation | DSO | X | X | X | X |
| Yankee Candle Company, Inc. | Retail | | | | X |

Source: Deposition Exhibit 119, p.24; HLHZ Fairness Opinion Presentation, p. 29; Deposition Exhibit 116, GBT06804; and Prairie Capital 2003 Report, CHA00386.

150. Based on the table above, there is only one comparable public company utilized by Duff & Phelps that was not also relied upon by another financial analyst analyzing the value of the Company (i.e., Rag Shops Inc.). Therefore, based on this as well as my own analysis, it is my opinion that the Duff & Phelps Comparable Public Companies were reasonable. However, given that none of the potential comparable public companies are a perfect match for Antioch's business model, I have also considered a broader set of comparable public companies (i.e., the "Comparable Public Companies"), which consists of all of the companies presented above, in my analysis of the reasonableness of the multiples implied by the Duff & Phelps DCF conclusion, as discussed in the following paragraphs.

### V.C.1.b.i.2. *Analysis of Valuation Multiples*

151. Once the comparable companies were selected, Duff & Phelps compared Antioch's historical and projected financial performance to that of the Duff & Phelps Comparable Public Companies.[109] Based on this analysis, Duff & Phelps noted that EBITDA multiples below the median and revenue

---

[109] Deposition Exhibit 119, page 23



**SRR**
STOUT|RISIUS|ROSS

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

multiples near the median of the ranges established by the Duff & Phelps Comparable Public Companies would be most appropriate to apply to Antioch's historical and projected financial results. [110]

152. I reviewed Antioch's historical and projected financial results presented in the Fairness Opinion as compared to the historical and projected financial results of the Comparable Public Companies.

153. When selecting the appropriate multiples to use in a Comparable Company analysis, it is prudent to consider differences between the subject company and the comparable public companies in terms of financial size, historical and projected growth, risk, and profitability.

154. As the following table demonstrates, the majority of the Comparable Public Companies are larger than Antioch with respect to total assets, revenue, and EBITDA. All else held constant, investors are willing to pay a higher multiple for a larger company vis-à-vis a smaller company.

| Size Comparison | | | |
| --- | --- | --- | --- |
| In Millions of U.S. Dollars | Total Assets | Revenue | EBITDA |
| Maximum | $ 3,581.6 | $ 6,845.1 | $ 1,184.6 |
| Upper Quartile | 974.1 | 1,476.6 | 151.1 |
| Average | 829.5 | 1,444.4 | 197.3 |
| Median | 451.5 | 801.0 | 109.5 |
| Lower Quartile | 235.7 | 442.3 | 35.4 |
| Minimum | 40.6 | 90.4 | (0.4) |
| Antioch | $ 198.0 | $ 381.2 | $ 78.7 |

Source: S&P Capital IQ, Inc. and Deposition Exhibit 119, Exhibits B-2 and B-3. Refer to Exhibit B of this report for further detail.

155. Everything else held constant, a company with a higher expected growth rate generally warrants a higher applicable multiple. [111] As is evident in the following table, Antioch's historical revenue and EBITDA growth rates are above the upper quartile established by the Comparable Public Companies. Antioch's projected revenue growth rates are also near the upper quartile of the range established by the Comparable Public Companies. However, the Company's projected EBITDA growth rates are near the bottom of the range established by the Comparable Public Companies. In assessing the value of an investment, anticipated future growth is generally more relevant than historical growth.

---

[110] Deposition Exhibit 119, page 25

[111] Shannon P. Pratt, The Market Approach to Valuing Businesses, Fourth Edition (New York, NY: John Wiley & Sons, Inc., 2001), page 82



**STOUT | RISIUS | ROSS**

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

**Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA**

June 1, 2015

**Growth Comparison**

|  | 5-Yr Hist Revenue CAGR | LTM to '04 Revenue CAGR | LTM to '05 Revenue CAGR | 5-Yr Hist. EBITDA CAGR | LTM to '04 EBITDA CAGR | LTM to '05 EBITDA CAGR |
|---|---|---|---|---|---|---|
| Maximum | 39.1% | 19.7% | 19.5% | 35.2% | 39.6% | 20.3% |
| Upper Quartile | 10.7% | 13.1% | 9.6% | 18.1% | 35.4% | 19.0% |
| Average | 9.2% | 6.1% | 5.6% | 5.0% | 23.4% | 15.6% |
| Median | 5.8% | 5.5% | 7.3% | 8.5% | 25.2% | 15.7% |
| Lower Quartile | 2.9% | -1.0% | 3.1% | -6.3% | 11.4% | 12.3% |
| Minimum | -4.7% | -7.2% | -12.9% | -45.4% | 2.7% | 10.8% |
| Antioch | 17.4% | 12.5% | 11.4% | 21.0% | 8.5% | 6.9% |

Source: S&P Capital IQ, Inc. and Deposition Exhibit 119, Exhibits B-2 and B-3. Refer to Exhibit B of this report for further detail.

156. All else being equal, greater expected profitability translates to a higher applicable multiple due to the ability of a high margin company to weather an economic downturn or competitive pressures. Moreover, profitability is a particularly relevant factor to consider in the selection of an EV to revenue multiple. All else held constant, investors are typically willing to pay a higher relative price for a company that is able to generate an increased level of earnings on an otherwise comparable base level of revenue. As the following chart demonstrates, Antioch's historical and projected EBITDA margin was above the maximum of the Comparable Public Companies.

**Profitability Comparison**

|  | LTM EBITDA Margin | 5-Yr Avg. EBITDA Margin | Projected 2004 EBITDA Margin |
|---|---|---|---|
| Maximum | 17.3% | 24.8% | 17.7% |
| Upper Quartile | 13.6% | 16.0% | 15.1% |
| Average | 10.3% | 12.1% | 12.9% |
| Median | 11.8% | 12.1% | 13.3% |
| Lower Quartile | 7.8% | 6.6% | 10.4% |
| Minimum | -0.4% | 1.7% | 7.9% |
| Antioch | 20.6% | 19.0% | 19.9% |

Source: S&P Capital IQ, Inc. and Deposition Exhibits 119, Exhibit B-2 and B-3. Refer to Exhibit B of this report for further detail.

157. I also reviewed the valuation multiples for the Comparable Public Companies in relation to Antioch during the 1998 through 2003 timeframe. During this timeframe, Antioch experienced EV / LTM EBITDA multiples consistent with the lower end of the range established by the Comparable Public Companies based on the annual Antioch ESOP valuations prepared by BVI and the Fairness Opinion prepared by Duff & Phelps.

49



Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015



EV / LTM EBITDA Multiples Inherent In Antioch Valuations v. Comparable Public Companies

Source: S&P Capital IQ, Inc.; 1998 BVI Report, FT007792; 1999 BVI Report, FT007867; 2000 BVI Report, FT007733; 2001 BVI Report, FT007669; Deposition Exhibit 116, GBT06800; Deposition Exhibit 119, Exhibit p. 25; 1998 BVI Report. p. 23; 1999 BVI Report. p. 24; 2000 BVI Report. p. 24; 2001 BVI Report. p. 24; Deposition Exhibit 116, p. 25; and Deposition Exhibit 119, Exhibit B-2.

158. In its Fairness Opinion, Duff & Phelps concluded that Antioch would warrant an EV / EBITDA multiple below the median established by the Duff & Phelps Comparable Public Companies. However, based on Duff & Phelps' DCF analysis, the implied EV / EBITDA multiple in the Fairness Opinion was actually below the range of the Duff & Phelps Comparable Public Companies as opposed to being within the range. If you consider the broader set of Comparable Public Companies that I included (as defined previously), Antioch's implied EV / LTM EBITDA multiple was consistent with the minimum of the range.

### V.C.1.b.i.3. *Conclusion*

159. Based on the foregoing, it is my opinion that Duff & Phelps reasonably, adequately, and appropriately considered the Comparable Company method in developing the Fairness Opinion, showing that its DCF analysis was reasonable and in fact conservative.

### V.C.2. **Conclusion of Duff & Phelps' Company Valuation Analysis**

160. In order to determine the equity value of the Company from its concluded EV, Duff & Phelps subtracted debt, added cash, and added the proceeds from the exercise of options.[112] It should be noted that Duff & Phelps did not consider the approximately $20 million of cash surrender value of life insurance that was on the Company's balance sheet as of the Transaction Date.[113] Because this item represents a nonoperating asset of Antioch,

[112] Deposition Exhibit 119, page 21

[113] Barry Hoskins Deposition, September 16, 2011, pages 363 and 432, CS000761, and HL049547



Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

this amount should have been added to the EV in Duff & Phelps' analysis in order to derive the equity value of the Company. This adjustment would have increased the value of Antioch's equity, implying that Duff & Phelps' conclusion is conservative for omitting this addback to value.

161. Duff & Phelps concluded that the Fair Market Value per share of Antioch's common stock was between $774 and $932.[114] Based thereon, Duff & Phelps concluded that the $850 per share value inherent in the Proposed Transaction was within the range of Fair Market Value for the common stock of the Company pre-Transaction.[115]

162. For the reasons discussed herein, it is my opinion that Duff & Phelps reasonably, adequately, and appropriately determined the Fair Market Value per share of Antioch's common stock pre-Transaction.

## V.D. *Valuation of the Consideration in the Proposed Transaction*

163. Duff & Phelps determined that the consideration to be received for the non-ESOP shares of the Company's common stock in the Proposed Transaction was fair and reasonable to the Antioch ESOP from a financial point of view. The framework that Duff & Phelps appropriately utilized to make this determination was to measure:

    a. Whether the post-Transaction aggregate economic value of the Antioch ESOP as a whole was not less than the pre-transaction value of the Antioch ESOP immediately after the Transaction closed; and

    b. Whether, to the extent there is any decline in the Fair Market Value of an individual share of the common stock as a result of the Proposed Transaction, the terms of the Proposed Transaction appropriately compensated participants for the decline in value.[116]

164. In order to assess whether the Proposed Transaction was dilutive to the Antioch ESOP post-Transaction, it was necessary to perform a valuation of the consideration to be received for the shares of the Non-ESOP Shareholders.

## V.D.1. Analysis of the Cash Option

165. As discussed throughout this section, Duff & Phelps performed a DCF analysis, corroborated with a Comparable Company analysis, to determine that the proposed $850 share price was within the range of Fair Market Value. Duff & Phelps appropriately determined that the option of receiving $850 in cash did not result in a decline in Fair Market Value of the stock of Antioch post-Transaction, and that the post-Transaction aggregate

---

[114] Deposition Exhibit 119, page 21
[115] Deposition Exhibit 119, page 29
[116] Deposition Exhibit 119, page 28

51



Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

economic value of the Antioch ESOP was not less than the pre-Transaction value of the Antioch ESOP.[117]

### V.D.2. Analysis of the Consideration Package

166.  As mentioned previously, the Consideration Package consisted of $280 in cash, a subordinated note payable in the amount of $280, and one warrant valued at $290. In order to determine whether the Consideration Package was fair and reasonable to the Antioch ESOP, Duff & Phelps analyzed whether the sum of the individual components of the Consideration Package was consistent with the value of the consideration already determined to be fair (i.e., $850 per share).

167.  Based on the market yields of similarly rated issuances, the financial condition of the Company, and the average term of the loan, Duff & Phelps concluded that the interest rate associated with the Non-ESOP Shareholder notes of 8% was a reasonable yield and thus concluded that the value of the Non-ESOP Shareholder notes were equal to their face value.

168.  Duff & Phelps utilized the Black-Scholes Option Pricing Model to value the warrant component of the Consideration Package and to analyze whether the warrants were dilutive to the Antioch ESOP post-Transaction. Based on this analysis, Duff & Phelps concluded that the warrant component of the Consideration Package in the Proposed Transaction was dilutive to the Antioch ESOP shareholders post-Transaction by $22.67 per share, or $4.7 million.[118]

169.  I reviewed the methodologies, inputs, and assumptions utilized by Duff & Phelps in its analysis of the individual components of the Consideration Package. All of the methodologies, inputs, and assumptions utilized by Duff & Phelps were based on commonly accepted methodologies, were appropriately employed, and were reasonably selected.

### V.D.3. Conclusion of Duff & Phelps' Analysis of the Consideration

170.  To evaluate the fairness of the Transaction to the Antioch ESOP from a financial point of view, Duff & Phelps measured the incremental benefit that the Antioch ESOP would derive as a result of the Transaction related to the incremental tax benefit it would enjoy as a result of its S Corporation status. Duff & Phelps concluded that the economic value that the Antioch ESOP would realize over the ten years after the close of the Transaction related to incremental S Corporation tax benefits would more than offset the

---

[117] Deposition Exhibit 119, page 29
[118] Deposition Exhibit 119, page 31



Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

dilution related to the warrant component of the Consideration Package post-Transaction.[119]

171. I reviewed the calculations of the economic value of the incremental tax benefit and conclude that the calculations were accurate and the inputs inherent in the analyses were reasonable, and in fact conservative.

172. Duff & Phelps noted in its analyses that if an ESOP participant were to redeem shares soon after the close of the Transaction, the participant would not have been around long enough post-Transaction to enjoy the economic value of the incremental future tax savings but would still be wholly impacted by the dilutive warrants in the Proposed Transaction. The impact of this was that for these participants, they would be worse off post-Transaction.[120] Accordingly, Duff & Phelps negotiated another benefit for the Antioch ESOP by insisting that the PPP provisions be added to the Transaction terms.

173. I reviewed the financial framework and calculations that Duff & Phelps performed and conclude that Duff & Phelps' analyses and conclusions were reasonable.

### V.E. *Overall Conclusion of the Fairness Opinion*

174. In summary, I have reviewed the financial and valuation analysis prepared by Duff & Phelps as presented in the Fairness Opinion and conclude that:

    a. the information utilized by Duff & Phelps was adequate;

    b. the valuation methodologies employed by Duff & Phelps were appropriate and properly applied;

    c. the projections utilized by Duff & Phelps were reasonable based on what was known or knowable as of the Transaction Date;

    d. the primary inputs and assumptions utilized by Duff & Phelps in its application of its valuation methodologies were reasonable;

    e. the framework utilized by Duff & Phelps to assess fairness from a financial point of view to the Antioch ESOP was appropriate; and

    f. the calculations in the Duff & Phelps valuation models were accurate.

---

[119] Deposition Exhibit 119, page 34
[120] Deposition Exhibit 119, page 35



STOUT | RISIUS | ROSS

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

## VI. Critique of the Reilly Report

175. As stated in the Reilly Report, the objectives of Mr. Reilly's analyses were as follows:[121]

   a. To estimate the Fair Market Value of the Antioch common stock just prior to the Transaction;

   b. To estimate the Fair Market Value of the Antioch common stock just after the Transaction;

   c. To review and critique the Duff & Phelps Fairness Opinion issued to the ESOP Trustee and dated December 16, 2003; and

   d. To estimate the amount of economic damages, if any, suffered by the Antioch ESOP participants related to the Transaction.

176. Based on his analysis, Mr. Reilly offers the following two opinions in the Reilly Report:[122]

   a. The GreatBanc analysis was fundamentally flawed.[123]

   b. Duff & Phelps erroneously concluded that:

      i. The Transaction consideration paid by Antioch ($850 per share or the exchange consideration) for the Company's shares held by shareholders other than the Antioch ESOP was fair and reasonable to the Antioch ESOP participants, from a financial point of view; and

      ii. The terms and conditions of the Transaction were fair and reasonable to the Antioch ESOP, from a financial point of view.

177. In support of his opinions, Mr. Reilly identifies three flaws that he perceives to exist in the GreatBanc analysis:[124]

   a. Mr. Reilly's "First Flaw" - The GreatBanc analysis did not adequately consider:

      i. Industry technological changes facing Antioch;

      ii. Industry consumer preference changes facing Antioch; or

      iii. Company financial projections that were prepared closer to—and were known and knowable as of the Transaction Date.

---

[121] Reilly Report, page 6

[122] Reilly Report, page 11

[123] Given that virtually all of the commentary in the Reilly Report relates to the valuation analysis performed by Duff & Phelps related to the Transaction prepared for its client GreatBanc, when discussing the valuation analysis we will, hereinafter, address it as analysis prepared by Duff & Phelps.

[124] Reilly Report, page 11



**STOUT|RISIUS|ROSS**

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

    b.  Mr. Reilly's "Second Flaw" - The GreatBanc analysis did not adequately incorporate consideration of the PPP rights in the amount of the post-Transaction ESOP repurchase liability.

    c.  Mr. Reilly's "Third Flaw" - The GreatBanc analysis did not adequately address the risk to the Company due to the likelihood of failing the Internal Revenue Code Section 409(p) test.

178.    The three alleged flaws in the Reilly Report can be boiled down to three simple statements. In Mr. Reilly's opinion:

    a.  The Duff & Phelps valuation utilized projections for Antioch that were too high (according to Mr. Reilly), leading to the First Flaw damages;

    b.  Duff & Phelps did not perform a valuation of Antioch just after the Transaction that subtracted the present value of the expected repurchase obligation payments to be made over the 10 year-period subsequent to the Transaction (which Mr. Reilly claims is relevant), leading to the Second Flaw damages; and

    c.  Duff & Phelps did not explicitly consider the nebulous risks related to Internal Revenue Code Section 409(p) in its analysis. However, no damages were quantified with respect to the Third Flaw.

179.    Based on his two opinions, Mr. Reilly calculates two economic damages to the Antioch ESOP participants and to the Company:

    a.  The Fair Market Value per share of Antioch was $500 just prior to the Transaction, resulting in damages of $95.5 million (i.e., ($850 - $500) per share * 272,836 shares redeemed).[125]

    b.  The Fair Market Value per share of Antioch was $468 just after the Transaction, resulting in damages of $7.1 million (i.e., ($500 - $468) per share * 222,547 shares remaining outstanding).[126]

180.    As will be demonstrated in this section of the report, Mr. Reilly's opinions on these topics are unreliable, misleading, opposed to standard practice in the industry, and contrary to his own writings.

### VI.A. *Mr. Reilly's Review of the Duff & Phelps Valuation*

181.    As part of his work in preparing the Reilly Report, Mr. Reilly reviewed the Duff & Phelps valuation of Antioch that was prepared for its client GreatBanc. One of Mr. Reilly's primary critiques of the Duff & Phelps valuation is that the Duff & Phelps Fairness Opinion did not explicitly take into consideration the risk factors Antioch was facing as of the Transaction Date.[127] Specifically, the Reilly Report states that, "I could find no evidence that the GreatBanc analysis incorporated any of the stated risk factors or

---

[125] Reilly Report, page 13
[126] Reilly Report, page 14
[127] Reilly Report, pages 22 and 23

55



**SRR**
STOUT | RISIUS | ROSS

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

gave these risk factors appropriate weight in its Antioch common stock valuation analysis." [128] However, this criticism by Mr. Reilly is unreasonable, as he is implying that there should be a line item deduction from value for each and every risk facing the Company. This is not done by valuation practitioners because it is simply not useful or practical to derive valuation indications both before and after consideration of a list of multiple particular risk factors so that the valuation detriment associated with each can be measured. Based on my experience, this is simply not how valuation analyses are prepared by financial analysts conducting a fairness opinion.

182. As discussed in detail in Section V of this report, Duff & Phelps performed extensive due diligence on the Company, and in particular on the projections prepared by management. In that due diligence, Duff & Phelps uncovered certain risk factors that it took into account in its valuation, both with respect to assessing the projected cash flows as well as with respect to the appropriate discount rate. Specifically, Duff & Phelps reduced management's revenue and EBITDA projections based on certain risks that were identified.[129] Further, Duff & Phelps utilized a discount rate based on economic, industry, and company-specific factors. As such, Duff & Phelps certainly accounted for the risks that it identified in the valuation.

183. Further, Duff & Phelps was not the only independent party at the time of the Transaction to identify and consider potential risks that Antioch faced. In its 2002 valuation report, BVI noted that computer and scanner technology could become a threat to Antioch.[130] BVI also noted that there were few barriers to entry in the scrapbook and accessory lines, and the rise of digital photography could eventually restrict CM's growth rate.[131] However, BVI also noted that CM management had found that many users of digital cameras print out some of their digital images and place them in scrapbooks.[132] Ultimately, after considering the above risk factors, BVI accepted management's projections without modification in its 2002 analysis.[133]

184. It should be noted that Duff & Phelps and BVI handled what they perceived to be risks to the Company differently in their respective analyses. Duff & Phelps, as mentioned previously, accounted for potential risks facing Antioch by adjusting the projections provided by management downward for specific items that were identified, while BVI applied a CSRP of 3.0% to

---

[128] Reilly Report, page 23

[129] Risks specifically identified by Duff & Phelps in support of reducing management's projections were international revenue growth and new venture success. Duff & Phelps also considered risks associated with increased competition, digital computer and scanner technology, and potential saturation in retention of independent consultants in its analysis (Deposition Exhibit 119, page 14).

[130] Deposition Exhibit 116, page 5

[131] Deposition Exhibit 116, page 10

[132] Deposition Exhibit 116, page 5

[133] Deposition Exhibit 116, page 15



Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

its rate of return. Both of these approaches lower the value of the Company based on specifically identified risks.

185. Mr. Reilly, however, utilized the projections prepared by Duff & Phelps that were already risk-adjusted (i.e., lowered) and then still incorporated a CSRP of 5.0% to risk-adjust the projections again. This is a clear mistake and double-counts the potential risk factors facing Antioch. Refer to the following excerpt from a publication written by Mr. Reilly:

> "The analyst should be careful to distinguish between those factors that influence the *magnitude* of the projection (the numerator in the model) and those factors that affect the *degree of uncertainty* of achieving the mathematical expectation projection (that is, the *risk*, which determines the discount rate, the denominator in the model). The analyst must be especially careful to avoid undue double counting, such as reflecting a negative factor fully by a reduction in the economic income projection, and then magnifying the effect by an increase in the discount rate–for the negative factor."[134]

186. As part of the 2003 Financing, the 2003 Lenders conducted a credit analysis to assess any potential risks associated with Antioch in order to make a lending decision. While the 2003 Lenders noted several risks in this analysis, there was also a mitigating factor associated with every risk that allowed the 2003 Lenders to get comfortable with management's projections.[135] The 2003 Lenders noted threats related to computer and scanner technology, competitive risks, an unknown product cycle, and the ESOP repurchase obligation.[136] Ultimately, the 2003 Lenders were comfortable with the mitigating factors for each of these risks, and described management's projections as "conservative."[137] In addition, in assessing the repurchase obligation, the 2003 Lenders stated that, "the likelihood of the FMV of the company's stock being valued at less than $850/shar[e] at FYE 03 is deemed minimal."[138]

187. As demonstrated in more detail later in this section, the projections relied upon by Duff & Phelps, which were lower than management's projections, were much more reasonable than the projections relied upon in the Reilly Report based on what was known or knowable as of the Transaction Date.

188. While Mr. Reilly claims that Duff & Phelps did not account for the risks of the Company in its valuation, he fails to mention that Antioch also had significant strengths which serve to mitigate risk. Among other strengths, the Company had a very strong brand, lower-than-average turnover among its direct sales network, and significant international growth

---

[134] Shannon P. Pratt, Robert F. Reilly, and Robert P. Schweis, Valuing A Business – The Analysis and Appraisal of Closely Held Companies, Fourth Edition (New York, NY: McGraw-Hill, 2000), page 181

[135] It should be noted that the 2003 Lenders got comfortable with management's projections, not the projections prepared by Duff & Phelps that were lower.

[136] CHA00053-54 and CHA00063

[137] CHA00056

[138] CHA00054



**Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation**

**Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA**

**June 1, 2015**

opportunities.[139] I can find no evidence that Mr. Reilly was aware of any of these strengths or gave these strengths any consideration in his Antioch common stock valuation analysis.

189. Throughout the entire Reilly Report, there are virtually no citations to independent treatises, or even the factual record in this case. Mr. Reilly's only citations to treatises to support his premises are to his own firm's quarterly newsletters. Mr. Reilly also consistently makes statements such as, "Based on my observations, the D&P report cash flow projection overstated the Antioch financial prospects compared to the big downside scenario cash flow projection."[140] However, Mr. Reilly cites no facts or data that led to this observation, and simply asks us to rely on his observations with blind faith. On the same page in the Reilly Report, Mr. Reilly states that, "There were two different financial projection scenarios presented at the December 4, 2003, Antioch board meeting: (a) a so-called downside scenario projection and (b) a so-called upside projection. I refer to the downside scenario financial projection presented on December 4, 2003, as an alternative financial projection. This alternative financial projection more specifically, the downside scenario projection presents a more re[a]sonable cash flow projection than the cash flow projection prepared by Duff & Phelps."[141] Mr. Reilly's belief that the downside projection is more reasonable is unfounded and there is no basis or support for this contention. Further, the fact that Mr. Reilly gives no weight, and provides no analysis or discussion to the upside scenario, brings into question the credibility of his analysis. Despite claiming that a company should prepare scenario analysis, which Antioch's Board did, Mr. Reilly inexplicably adopts the downside scenario as his base case, and gives no weight whatsoever to the Company's actual base case scenario, let alone the upside scenario.

## VI.B. *Mr. Reilly's Industry Analysis*

190. In Mr. Reilly's analysis of the scrapbooking industry, he does not present a single source that projected the scrapbooking market to decline as of December 2003.[142] In contrast, in Section V of this report, I noted many positive trends and bullish outlooks for the scrapbooking industry as of the Transaction Date. Despite the lack of evidence of an anticipated decline in the scrapbooking industry, Mr. Reilly concludes based on his observations of the industry that Antioch was facing significant industry risk factors that Duff & Phelps did not address, rendering the Duff & Phelps analysis fundamentally flawed. I wholeheartedly disagree with Mr. Reilly's opinion on this topic. First, Duff & Phelps identified many risk factors in performing its valuation of Antioch, and therefore did not disregard the risks facing the Company. As such, the valuation prepared by Duff & Phelps acknowledged the risks facing Antioch and incorporated the impact into the

---

[139] Deposition Exhibit 119, page 14
[140] Reilly Report, page 27
[141] Reilly Report, page 27
[142] Reilly Report, pages 33-35

58



Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

analysis. [143]   Second, Mr. Reilly does not present any meaningful indications of an expectation of a decline in the scrapbooking industry based on information that was known or knowable as of the Transaction Date. Finally, as presented in Section V of this report, the reality is that virtually all industry participants in late 2003 were expecting the scrapbooking industry to continue the recent trend of significant growth, and Duff & Phelps reasonably included these expectations in its valuation.

## VI.C. *Mr. Reilly's First Flaw*

191.   As noted above, Mr. Reilly's First Flaw alleges that the Duff & Phelps valuation utilized projections for Antioch that were too high. In order to support this allegation, the Reilly Report includes five alternative DCF analyses based on Mr. Reilly's own projected cash flows and discount rates.

### VI.C.1. Mr. Reilly's First Flaw - Projected Cash Flows

192.   Because Mr. Reilly alleges that the projected cash flows in the Duff & Phelps valuation were too high, he presents four[144] alternative projections for Antioch as of the Transaction Date:

   a.   Deloitte big downside projections as of October 2, 2003[145]

   b.   Deloitte downside projections as of December 2, 2003[146]

   c.   FTI Sales Forecast 1[147]

   d.   FTI Sales Forecast 2[148]

### VI.C.1.a. *The Deloitte Projections*

193.   With respect to the two projections prepared by Deloitte, Mr. Reilly's main premise appears to be that Duff & Phelps did not utilize the most current projections that existed as of the Transaction Date in its valuation. Mr. Reilly claims that two sets of projections prepared by Deloitte were more appropriate because they were created closer to the Transaction Date than the projections relied upon by Duff & Phelps. However, the facts show that this claim by Mr. Reilly is completely misleading and incorrect.

194.   Mr. Reilly claims that there were two sets of projections that were prepared by Deloitte that Duff & Phelps should have relied on. However, both of these sets of projections, as of October 2, 2003 and December 2, 2003,

---

[143] Deposition Exhibit 119, see page 14 for a discussion of Antioch's business risks, as well as pages 20 and 23-25 for how those risks were explicitly factored into the analyses.

[144] The fifth alternative DCF analysis prepared by Mr. Reilly uses the same projections as those used by Duff & Phelps, but with a higher discount rate.

[145] Deposition Exhibit 682, DT3057

[146] Deposition Exhibit 549, DT3081

[147] Reilly Report, page 36

[148] Reilly Report, page 36



STOUT | RISIUS | ROSS

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

were **downside scenarios** prepared by Deloitte. In fact, the October 2, 2003 projections were literally titled "big downside"[149] projections. Clearly, this was an analysis that was performed to consider what the Company's future financial position would look like if a "big downside" occurred; these projections did not replace the Company's base case projections. Further, the December 2, 2003 projections were titled "downside" projections. Again, as demonstrated in the testimony below, these were projections that were put together to analyze a scenario where the world changed from the status quo in a way that was adverse to the Company, not to analyze the expected outcome. In addition, the Deloitte downside scenarios were performed for purposes of analyzing the feasibility of the Transaction, not for purposes of valuation analysis. The purposes of a feasibility analysis include analyzing a company's cash flow under various scenarios to assess its ability to pay debts as they become due, assessing its ability to handle the repurchase obligation, and assessing the various tax implications associated with the transaction. It is telling that in both of the Deloitte downside scenarios that are addressed by Mr. Reilly, the value of Antioch's stock is a given (i.e., an input) in the model, and not what is being analyzed (i.e., they are not valuation models). This further proves that the downside projections are not relevant for valuing Antioch, but were instead used for scenario analysis to assess the risk of the Transaction under different possible future outcomes.

195.    As explained by Peter Abrahamson, one of the Deloitte professionals involved in the Transaction, the purpose of the downside scenarios was to understand the sensitivity of the projections, not to supersede and replace the base case projections, as Mr. Reilly claims.

    Q.    "So is it fair to say, for example, that a model using the title 'Downside' was intended to inform the reader that the modeling was based on numbers that management provided to you to sensitivity test the effect of the transaction on the company if its base case projections turned out to be too optimistic?
    A.    Yes, that's correct."[150]

    Q.    "Do you understand that the reason the company gave you lowered projections of forecasted revenue in Exhibit 549 was to run a downside scenario analysis through your models?
    A.    Yes, that would be reasonable to do.
    Q.    And do you recall that that's what the company asked you to do?
    A.    Yes.
    Q.    Okay. Was that typical in engagements that you had had experience with similar to the Antioch model?
    A.    Yes, but not all. But typically a management board would be interested in looking at a downside scenario.
    Q.    Why?

---

[149] Deposition Exhibit 682, DT3057

[150] Peter Abrahamson Deposition, March 13, 2015, page 206

60



STOUT | RISIUS | ROSS

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

A.  Presumably and for prudence to see if the downside scenario -- if the transaction structure still works in a downside scenario.

Q.  And I'm not sure -- I really don't want to put words in your mouth. I've just forgotten how you characterized it. Did you say it would be prudent to do so or reasonable to do so or used words to those effect?

A.  Yes, prudent, reasonable and normal course that's commonly done."[151]

196.  At the request of the Antioch Board, as part of their due diligence on the Transaction, Deloitte prepared certain downside financial projections in order to understand what the financial position might look like in a downside scenario. In my experience, this is a standard and customary action for a board of directors to take when evaluating a transaction to determine whether or not, under reasonable downside scenarios, the company would still be able to pay its debts as they come due while leaving enough capital in the business to support necessary capital expenditures, working capital, repurchase obligations, etc. It is common for a board of directors to want to know what a downside scenario would look like for the company in order to assess risk. However, in my experience, by no means does the consideration of a downside scenario mean that the base case projections have been superseded and are no longer relevant. For Mr. Reilly to claim that the downside scenario projections superseded the base case projections simply because they were prepared later than the base case projections is unreasonable.[152] Mr. Reilly completely disregards the base case projections that were provided to Duff & Phelps, HLHZ, and the 2003 Lenders and latches on to these downside scenario projections included in the Deloitte analysis (even though they are titled "big downside"). Mr. Reilly's contention that the downside scenario projections were the only relevant projections to be utilized in the valuation is completely unsupportable.

### VI.C.1.b. *The Buchanan Report Projections*

197.  With respect to the other two projections discussed previously, Mr. Reilly relies on the Buchanan Report. Mr. Buchanan was engaged by the Plaintiffs to forecast total gross sales revenue of CM, for certain years after the Transaction. In forming his opinions, Mr. Buchanan performed two time-series models (utilizing the Box-Jenkins/ARIMA approach) to forecast the U.S. gross sales of CM from January 2004 to December 2012. Based on this statistical analysis, as well as other analyses described in the Buchanan Report, Mr. Buchanan concludes upon two separate sales forecasts for CM – one which includes consideration of the projected number of U.S. sales consultants ("FTI Sales Forecast 2") and one which does not ("FTI Sales Forecast 1").

---

[151] Peter Abrahamson Deposition, March 13, 2015, pages 212-213
[152] In fact, in footnote 17 of the Reilly Report, Mr. Reilly cites an article his own firm published that describes the necessity of performing sensitivity analyses related to a company's projected performance to assess future cash flows and to assess transaction and feasibility risk.



Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

198.    In preparing his valuation analysis and calculation of damages for the alleged First Flaw, Mr. Reilly relies upon the FTI Sales Forecast 1 projection because it, "incorporated all known and knowable financial information near the D&P report analysis date."[153] (While Mr. Reilly also presents a valuation and damages scenario based on the FTI Sales Forecast 2 projection, his ultimate damage conclusion is not based on this scenario. The Reilly Report notes that the FTI Sales Forecast 2 relies on certain information that may not have been provided to Duff & Phelps and that the statistical analysis related to this forecast involves a more complicated procedure than the statistical analysis performed for FTI Sales Forecast 1.)[154]

199.    As detailed in an expert report prepared by Harris Antoniades of Stout Risius Ross, Inc., the Buchanan Report is unreliable, does not rely on sufficient facts and data, and is not reasonable. Based thereon, the Buchanan Report should not be relied upon (as Mr. Reilly does in performing his valuation and damages analysis).

200.    In addition, two people that were involved in forecasting the Company's results in the 2000s agreed that ARIMA was an unreliable method to forecast a company's revenue into the future and that ARIMA would not have caused the Company to change its projections in December 2003 based on what was known or knowable at that time. First, Richard Wiser ("Mr. Wiser"), a vice president at CM from March 2005 through July 2007,[155] testified to the following in his deposition:

    Q.    "And you note just below that, 'The ARIMA model that projects trend seasonality and cycles currently yields a 2006 forecast of $230 million, a 15 percent decline.' You then write, 'Since we have just finished May 2005, the ARIMA mod -- the ARIMA 2006 model is too far in the future to be reliable.' Did I real -- did I read that correctly?
    A.    That was my opinion, yes.
    Q.    And does that go to what you testified to little bit -- or a lot bit earlier, that ARIMA -- doesn't have particularly good reliability the further out you go with projections into the future?
    A.    No forecast technique will. There is a new trend and thought in forecasting that you should use only the most recent data rather that the longer term data.
    Q.    I -- yeah.
    A.    I --
    Q.    Yeah. My concern is only what you knew and your current state of knowledge was when you were preparing and distributing this report?
    A.    At that point?

---

[153] Reilly Report, page 61
[154] Reilly Report, pages 46 and 47
[155] Richard Wiser Deposition, March 9, 2015, page 79



**SRR**
STOUT|RISIUS|ROSS

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

Q. Yeah.
A. That was quite far in the future."[156]

201. Second, Wayne Alan Luce, a board member of Antioch from August 2003 through June 2008,[157] testified to the following in his deposition:

Q. "Do you know whether applying an ARIMA analysis to the data that was available to the Board and to the Antioch Company in 2003 would have changed your view as to whether or not the company should pursue the transaction that ultimately closed in December 2003?

A. I believe that if Richard [Wiser] had been on the staff at the time and applied the ARIMA analysis, his conclusion would have been that the projections were far too conservative.

Q. Why do you believe that?

A. Well, because Richard and I frequently had very similar results using our differing methods of analyzing and predicting the sales forecast. I used basically linear regression and just my experience in reading the trends on the development of the paid as leaders in your sales force. Our findings were frequently quite close. Sometimes remarkably close. When I used my own methods of determining the sales forecast back in 2003 based upon the financial data of the prior three years of the company, I believe that our forecasts at that time were being very, very modest, very conservative. I believe if Richard had applied ARIMA to the same set of facts his conclusion would have been that we were putting forward a very conservative forecast."[158]

202. Based on this testimony from Mr. Luce and Mr. Wiser, it appears that based upon statistical forecasting methods that existed at the time of the Transaction, Antioch's management projections may have been considered conservative. Further, Mr. Wiser points out that as of May 2005, ARIMA analysis could not even reliably predict what 2006 sales might be. Despite the fact that Mr. Wiser believes that an ARIMA model is not even reliable to project sales out for 18 months, the Buchanan Report uses ARIMA analysis to project out nine years of sales results. Given that Mr. Buchanan cites a paper written by Mr. Luce and Mr. Wiser in the Buchanan Report, he clearly believes them to be authorities on this subject. As such, these significant flaws cause the Buchanan Report to be unreliable.

203. Even ignoring Mr. Antoniades' critique of the Buchanan Report and the testimony from Mr. Luce and Mr. Wiser from a statistical perspective, it is my opinion that Mr. Reilly's reliance on the Buchanan Report to criticize the projections incorporated in the Fairness Opinion is completely unreasonable. While historical monthly sales data was certainly "known or knowable" as of the Transaction Date (terms that are used in the Reilly Report), it is my opinion that actual market participants in live deals simply

---

[156] Richard Wiser Deposition, March 9, 2015, pages 246-247
[157] Wayne Alan Luce Deposition, February 17, 2015, page 11
[158] Wayne Alan Luce Deposition, February 17, 2015, pages 133-134



**SRR**
STOUT | RISIUS | ROSS

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

do not rely on the statistical techniques performed by Mr. Buchanan to perform valuation analyses and negotiate market value deal terms. In the case at hand, not only did Duff & Phelps not attempt to perform statistical time-series models like those applied in the Buchanan Report to forecast revenue, but neither did other contemporaneous market participants around the time of the Transaction, outside of the context of litigation, including Deloitte, HLHZ, BVI, or Prairie Capital, when they performed financial analyses and projections. This is consistent with my experience. In fact, in my 25 plus years of experience both performing and reviewing others' valuation and financial analyses related to transaction advisory services outside of the context of litigation, I have never relied upon nor seen other valuation and financial advisors rely upon the statistical forecasting techniques that the Reilly Report relies upon in forming his opinions.

204. As the Reilly Report appropriately points out, the definition of Fair Market Value requires the financial analyst to only rely upon what was known or knowable as of the subject valuation date. However, what the Reilly Report ignores is that Fair Market Value has to bear some resemblance to the actual real world market based on willing buyers and willing sellers having reasonable knowledge of the relevant facts. It is wholly unreasonable for Mr. Reilly to assume that willing buyers and willing sellers would rely upon the theoretical statistical analyses that he relies upon in forming his conclusions.

205. Mr. Reilly states in his report that he understands that the FTI Sales Forecast 1 incorporates other management-directed and Deloitte-prepared financial statement information, the progression of Company performance as of the Transaction Date, and the direction of the industry as of the Transaction Date.[159] However, as to Mr. Reilly's first understanding, similar to my critique of the Reilly Report related to the Deloitte downside scenarios, the Buchanan Report completely mischaracterizes the significance and/or the nature of the Deloitte projections that are referenced. Mr. Buchanan treats each of the Deloitte projections as if they were base case projections and uses them to attempt to justify and support his own declining projections. However, as discussed previously, the Deloitte downside projections were prepared for purposes of assessing the feasibility of the Transaction and assisting the Board in evaluating transaction risk, and did not supersede the Company's base case projections. By implying that the Deloitte projections were the most recently revised management projections completely mischaracterizes the nature of the Deloitte work. The Deloitte projections were not revised, but completely independent projections prepared for a different purpose (i.e., sensitivity analyses).

206. As discussed above, Mr. Reilly also understands that the Buchanan Report reflects industry trends as of the Transaction Date.[160] However, the only discussion in the Buchanan Report about supporting evidence as it relates

---

[159] Reilly Report, page 36
[160] Reilly Report, page 36



**SRR**
STOUT|RISIUS|ROSS

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

to industry trends is in paragraphs 48 and 49. The sum total of what Mr. Buchanan terms "supporting evidence" related to industry trends as of mid-2003 is based on phone calls he had in December 2014 and April 2015 with two former employees of the Company, Mark Mizen and Rhonda Anderson, about the industry and the impact of digital photography. It is wholly unreasonable for Mr. Reilly to rely on the FTI Sales Forecast 1 concluded upon in the Buchanan Report when Mr. Buchanan's so-called supporting evidence as it relates to industry factors is so clearly unreliable. First, the summary of the phone conversations makes it very unclear as to when these individuals allegedly had formed their opinions. Second, even if clear timelines were established in the interviews, which they were not, the "memories" of these interviewees from more than 10 years earlier would clearly be infected with hindsight bias.

207. On pages 22 through 25 of the Buchanan Report, Mr. Buchanan again reaches for commentary in order to attempt to support his pessimistic sales projections. Mr. Buchanan claims that "at least some" of the members of the sales force had concerns, without any evidence or qualification of this beyond a few e-mails. Notwithstanding the fact that virtually all of Mr. Buchanan's examples of consultant concerns are from after the Transaction Date (and therefore irrelevant from a valuation perspective), Antioch had approximately 75,000 consultants.[161] The fact that a handful of examples of unhappy consultants are provided hardly proves that there was a problem with Antioch's sales force. Mr. Buchanan provides no data to show that the level of concern amongst the consultant base was any greater in December 2003 than it was at any point in 2000, 2001, or 2002 when sales continued to grow at a dramatic pace. When a company has 75,000 salespeople spread across the country, the fact that some of them sent e-mails of concern or voiced their issues to the management team of Antioch is hardly proof that Mr. Buchanan's negative sales projections are reliable. It is wholly unreasonable for Mr. Reilly to rely on the FTI Sales Forecast 1 concluded upon in the Buchanan Report, given Mr. Buchanan's clear lack of credibility by representing that the information on consultant satisfaction was relevant as supporting evidence to his opinions.

208. One final fact, which clearly demonstrates Mr. Reilly's unreasonable reliance on the FTI Sales Forecast 1, is that Mr. Reilly fails to take into account the non-CM business units of Antioch that are not addressed or included in the Buchanan Report at all.[162] This mathematical error causes Mr. Reilly to inappropriately exclude certain revenue of Antioch unrelated to CM in conducting his valuation and forming his damage opinions. The Buchanan Report only addresses the CM business units of Antioch,[163] and thus, the conclusions reached in the Buchanan Report exclude any consideration of Antioch's publishing division (sometimes referred to as "PAWM") and its various new business ventures, including ZeBlooms and Our Own Image. The projected revenues from these non-CM business

---

[161] Deposition Exhibit 119, page 13
[162] It should be noted that, while Mr. Reilly puts no weight on FTI Sales Forecast 2 in his final opinion, FTI Sales Forecast 2 suffers from the same flaw as FTI Sales Forecast 1.
[163] Buchanan Report, page 2



**Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation**

**Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA**

**June 1, 2015**

units (in management's projections) that Mr. Reilly excludes in forming his final opinion based on FTI Sales Forecast 1 totaled approximately $15 million in 2004, increasing to approximately $45 million by 2008. [164] Nowhere in the Reilly Report are these revenue sources addressed at all.

209. In summary, based on the above, it is my opinion that it was inappropriate for Mr. Reilly to rely upon the Buchanan Report to form his opinions, which causes the valuation analysis and damages conclusions in the Reilly Report to be unreliable and unreasonable.

### VI.C.1.c. *The Unreasonableness of Mr. Reilly's Projected Cash Flows*

210. As discussed in detail in Section V, the projections relied upon in the Duff & Phelps DCF analysis were reasonable. The following chart shows Antioch's historical EBITDA trend along with the projections relied upon by Duff & Phelps and Mr. Reilly (as reflected by FTI Sales Forecast 1). As the chart demonstrates, aside from proof that there was information that was known or knowable as of the Transaction Date that Antioch's financial results were destined to diverge materially from the Company's track record over the last five years, Mr. Reilly's projections are unreasonable in light of Antioch's historical results, management's track record of consistently hitting its projections, and the positive outlook for the industry.



Deposition Exhibit 119, D&P_A002740; Reilly Report, p. 87; CHA00085; and HLHZ Fairness Opinion Presentation, p. 65.

211. After considering all four of the potential sets of projections from Deloitte and the Buchanan Report, Mr. Reilly puts 100% weight on the FTI Sales Forecast 1 projections (denoted as "Reilly" in the previous chart) in his damages analysis. As discussed in detail in Section V of this report, the projections utilized by Duff & Phelps in its valuation were reasonable, reliable, and based on sufficient facts and data. As such, there is no

---

[164] D&P_A009999



STOUT | RISIUS | ROSS

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

credible reason to change the projections in the Duff & Phelps DCF analysis.

## VI.C.2. Mr. Reilly's First Flaw - Discount Rates

212. In addition to questioning the projected cash flows in the Duff & Phelps valuation, Mr. Reilly also contends that the discount rate utilized by Duff & Phelps was inappropriate for use with its projected cash flows. However, in doing so, Mr. Reilly completely corroborates the appropriate discount rate to be used in valuing Antioch with respect to its actual base case projected cash flows.

213. As discussed in Section V of this report, Duff & Phelps utilized a WACC range of 12% to 14% in its DCF analysis. Mr. Reilly performed his own analysis of the appropriate WACC to be applied to Antioch's cash flows and concluded on a WACC of 13%.[165]

214. Based thereon, Mr. Reilly clearly has no issue with the methodology of determining a WACC or the actual WACC that Duff & Phelps utilized in its DCF analysis, as Mr. Reilly utilized the exact midpoint of Duff & Phelps' WACC range to discount all four of his alternative projected cash flows. As such, given that I have already shown that the Duff & Phelps projections were reasonable to rely on, the Duff & Phelps WACC range is corroborated and supported by Mr. Reilly's own analysis.

215. Despite this, Mr. Reilly alleges that in order to appropriately discount the projected cash flows in the Duff & Phelps DCF, he needs to add a 5% company-specific risk premium ("CSRP"). As noted previously, the CSRP accounts for risk factors specific to the subject company (i.e., unsystematic risk factors) not captured in the equity risk premium, beta, or the small stock risk premium. Mr. Reilly provides no support for this 5% CSRP, and simply asks us to rely on this assumption blindly. Courts have long been skeptical of valuation experts lumping on a CSRP to the calculated discount rates, even stating that, "To judges, the company specific risk premium often seems like the device experts employ to bring their final results into line with their clients' objectives, when other valuation inputs fail to do the trick."[166] Even if a CSRP were to be accepted, courts seem to require that some level of analysis be done, as opposed to simply adding an arbitrary 5% premium with no explanation. Another court ruling stated the following when denying the inclusion of a CSRP in a DCF analysis: "Even if I were to have found persuasive the arguments defendants have made for inclusion of a company-specific risk premium, I would be especially skeptical of the 3% risk premium which defendants advocate. Mr. Reilly

---

[165] It should be noted that Mr. Reilly utilized two methods to estimate the Antioch cost of equity: the Modified Capital Asset Pricing Model and what he calls the Standard & Poor's Corporate Value Consulting, Risk Premium Report, 2003 (which is commonly known as the Build-Up Method). Had he utilized only the Capital Asset Pricing Model as Duff & Phelps did, his WACC would have been only 11.2%. All else equal, a lower WACC would have generated a higher value for Antioch.

[166] Delaware Open MRI Radiology Associates, P.A. v. Howard B. Kessler, et al., Delaware Chancery Court, April 26, 2006



Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

provided no specific, quantitative explanation for why 3% is the appropriate level for a company-specific risk premium. It is important for any proposed company-specific risk premium to be based on a specific financial analysis, so that the Court can verify both the propriety of including the risk premium and the appropriate level of the premium."[167]

216.    Based on the data presented above, Mr. Reilly's WACC fully corroborates the WACC utilized by Duff & Phelps in its valuation of Antioch when excluding Mr. Reilly's unsupported CSRP.

217.    One other item worth noting is that, in order to help corroborate his equity rate of return conclusion, Mr. Reilly compares his work to the 2002 BVI Antioch ESOP valuation.[168]  In so doing, Mr. Reilly inherently validates that the BVI valuation analysis is credible and meaningful in order to be able to justify it as a corroborative data point. As will be described later in this section, the Reilly Report produces a valuation conclusion that is wholly inconsistent with the 2002 BVI valuation. Assuming that the BVI valuation in 2002 is a reasonable and credible analysis, a view that Mr. Reilly appears to endorse, the valuation conclusion in the Reilly Report is not reasonable.

### VI.C.3. Mr. Reilly's First Flaw - Valuation Conclusion

218.    Based on Mr. Reilly's use of the FTI Sales Forecast 1 projections and a WACC at the exact midpoint of the Duff & Phelps range, the Reilly Report presents a concluded EV of $216.2 million just before the Transaction. Based thereon, Mr. Reilly concludes on a total equity value of $250.0 million, or a value per share of $500.[169]

### VI.C.3.a. The Unreasonableness of Mr. Reilly's Valuation Conclusion

219.    As noted previously, there were several other valuations of Antioch performed by independent parties in relatively close proximity to the Transaction. In fact, given that Antioch was an ESOP company, the equity of the Company was valued every year for purposes of ESOP administration. The following charts shows the history of Antioch's EV and equity value per share over the five-year period from 2000 through 2004, along with Mr. Reilly's unsupportable conclusions. As I have already noted, Mr. Reilly used elements of the 2002 BVI valuation as justification for the reasonableness of his own work, thereby implicitly acknowledging that the 2002 BVI valuation was reliable.

---

[167] In Re Sunbelt Beverage Corp. Shareholder Litigation, Delaware Chancery Court, January 5, 2010
[168] Reilly Report, page 42
[169] Reilly Report, page 103



**Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation**

**Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA**

**June 1, 2015**



2000 BVI Report, p. 24; 2001 BVI Report, p. 24; Deposition Exhibit 116, p. 25; 2003 Prairie Capital Report, p. 34; Deposition Exhibit 70, p36; and Reilly Report, p. 103.



2000 BVI Report, p. 25, 2001 BVI Report, p. 25, Deposition Exhibit 116, p. 25, 2003 Prairie Capital Report, p. 40, Deposition Exhibit 70, p. 43, and Reilly Report, p. 103.

220.   Given Mr. Reilly's validation of the 2002 BVI valuation, one particular item to note in the above charts is the dramatic difference between Mr. Reilly's concluded values as of December 16, 2003 compared to the BVI conclusions as of December 31, 2002. Despite Antioch's sales and EBITDA remaining consistent from 2002 to 2003, and despite the S&P 500 increasing by 22%, and despite the median EV / LTM EBITDA multiple of the Comparable Public Companies increasing from 7.5x to 8.8x, Mr. Reilly

69



**SRR**
STOUT | RISIUS | ROSS

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

would have you believe that the EV of Antioch declined from $333.2 million[170] as of December 31, 2002 to $216.2 million[171] as of December 16, 2003. Mr. Reilly makes no attempt to account for this dramatic, 35% decline in the EV of the Company over the prior 12 months. These facts show that the conclusions in the Reilly Report are completely unreasonable and inconsistent with the contemporaneous opinions of multiple financial analysts outside of the context of litigation.

### VI.C.4. Mr. Reilly's First Flaw - Damages Conclusion

221. While Mr. Reilly purports to utilize multiple analyses in his First Flaw damages determination, ultimately the Reilly Report puts 100% weight on the FTI Sales Forecast 1 projected cash flows discounted at a WACC that is equal to the exact midpoint of the Duff & Phelps WACC range. Based on this analysis, the Reilly Report determines the value of Antioch to be $500 per share as of the Transaction Date. Based thereon, Mr. Reilly's damages are $350 per share multiplied by 272,836 shares of Company stock that were redeemed as part of the Transaction.[172]

222. Based on my critique above, Mr. Reilly's damages conclusion related to the First Flaw is unreliable and does not rely on sufficient facts and data. Mr. Reilly's valuation conclusion is materially lower than all other indications of value that existed around the Transaction Date, and Mr. Reilly cannot reconcile his results with other independent parties that valued Antioch at that time. Mr. Reilly's analysis is unduly influenced by hindsight bias, as not even he could point to any contemporaneous information that existed prior to the Transaction that shows that the projections utilized by Duff & Phelps were not a reasonable expectation for Antioch at that time. As demonstrated above, the FTI Sales Forecast 1 is not a reasonable base case projection to be utilized in a DCF analysis for Antioch as of the Transaction Date. Further, Mr. Reilly's WACC is only relevant to be applied to a true base case analysis, which the FTI Sales Forecast 1 clearly is not.

223. Had Mr. Reilly used his concluded WACC without a CSRP to discount the Duff & Phelps projections, he would have determined that the $850 price utilized in the Transaction was reasonable, and that no damages exist. Refer to the following table which demonstrates the impact that the inclusion of Mr. Reilly's CSRP in the DCF analysis has on the Antioch per share value, assuming the Duff & Phelps' cash flow projections are appropriately relied upon.

---

[170] Deposition Exhibit 116, page 25
[171] Reilly Report, page 99
[172] Reilly Report, page 103


**SRR**
STOUT | RISIUS | ROSS

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

| Impact of CSRP on Per Share Value | | | |
|---|---|---|---|
| | Reilly With CSRP | Reilly Without CSRP | Duff & Phelps Midpoint |
| WACC | 18.0% | 13.0% | 13.0% |
| Company Specific Risk Premium | 5.0% | 0.0% | 0.0% |
| Equity Value Per Share | $ 590 | $ 845 | $ 845 |

Source: Deposition Exhibit 119, Exhibit B and the Reilly Report, Exhibit 14 and 20.

## VI.D. *Mr. Reilly's Second Flaw*

224. While Mr. Reilly's First Flaw damages analysis was unreasonable and inappropriate, Mr. Reilly's Second Flaw is simply incorrect, and even completely contrary to his own writings on this topic. In fact, virtually every component of Mr. Reilly's argument with respect to his Second Flaw is inappropriate.

225. Mr. Reilly appears to contend that the PPP that was negotiated by the ESOP Trustee, as a benefit to the Antioch ESOP participants, as part of the Transaction had a materially negative impact on the value of Antioch's stock post-Transaction. The following are some of the obvious flaws with this claim:

   a. The PPP was a beneficial term of the Transaction negotiated by the ESOP Trustee, for the benefit of the Antioch ESOP participants, not a negative term to the Antioch ESOP participants as Mr. Reilly contends;

   b. Mr. Reilly provides no causal link between the PPP terms of the Transaction and any purported increase in the Company's repurchase obligation post-Transaction;

   c. The PPP was not even relevant in the first year after the Transaction, as the independently determined value of Antioch's stock was well in excess of the minimum value guaranteed by the PPP based on the first Antioch ESOP valuation update post-Transaction prepared by Prairie Capital, as of December 31, 2003.[173] Further, the increment to Fair Market Value in the second and third years (i.e., $21.00 in 2004 and $12.80 in 2005) after the Transaction were immaterial relative to the base Fair Market Value of the stock in those years;

   d. When an ESOP is redeeming stock (as opposed to recycling its shares), as Antioch was, the repurchase obligation is a capital transaction, not an expense of the Company or a dilutive factor to other shareholders, and therefore has no impact whatsoever on the value of company stock as measured by Mr. Reilly;

---

[173] Prairie Capital 2003 ESOP Valuation, page 40

71



Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

e. Mr. Reilly inexplicably claims that the present value of the entire amount of expected repurchases from Antioch ESOP participants over the nine years after the Transaction should be included as a separate reduction to EV in the valuation of Antioch's stock as of the Transaction Date; and

f. Mr. Reilly completely ignores the approximately $65 million of cash inside the Antioch ESOP[174] and the approximately $20 million of cash surrender value of life insurance owned by the Company[175] that was available and earmarked to satisfy the repurchase obligation.

226. Mr. Reilly has no basis for his Second Flaw. In my experience, Mr. Reilly's treatment of the Company's repurchase obligation in his valuation is contrary to standard practice in the industry. Further, at least two of Mr. Reilly's books that he has written, and listed in his report on this matter, state valuation practices for ESOP companies that are in opposition to the position that he is taking in this case. As such, Mr. Reilly's Second Flaw is inappropriate and unsupported by the facts in this case and the standards in the industry.

227. The following quotes from the Reilly Report represent his inappropriate claims related to an ESOP company's repurchase obligation and the impact on the value of an ESOP company's stock:

a. "The PPP made it more attractive for employees to leave Antioch in significantly greater numbers than at any time prior to the transaction."[176]

i. Mr. Reilly provides no facts or data to support this claim. The following are the terms of the PPP:

a. Any Antioch ESOP participant who terminated employment after December 31, 2002 and prior to October 1, 2004 and who consented to a distribution, shares would be purchased at the greater of Fair Market Value or $840.26 per share;

b. Any Antioch ESOP participant who terminated employment after October 1, 2004 and prior to October 1, 2005 and who consented to a distribution, shares would be purchased at Fair Market Value plus $21.00 per share; and

c. Any Antioch ESOP participant who terminated employment after October 1, 2005 and prior to October 1, 2006 and who consented to a distribution, shares would be purchased at Fair Market Value plus $12.80 per share.[177]

---

[174] Deposition Exhibit 268, page 2, Barry Hoskins Deposition, September 15, 2011, pages 80, 84, 171, 172, 175, 202, and Barry Hoskins Deposition, September 16, 2011, pages 372, and 550

[175] Barry Hoskins Deposition, September 16, 2011, pages 363 and 432, CS000761, and HL049547

[176] Reilly Report, page 48

[177] Second Amended Complaint, pages 15-16 and Reilly Report, pages 20-21



**SRR**
STOUT|RISIUS|ROSS

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

ii. In fact, the PPP was wholly irrelevant in the first year after the Transaction. Given that the Antioch ESOP value determined by Prairie Capital as of December 31, 2003 was $894 per share, the $840.26 per share value guaranteed by the PPP did not even come into play, and could not have served to motivate anyone to leave the Antioch ESOP. Further, the per share value determined by Prairie Capital as of December 31, 2004 and December 31, 2005 was $943 and $786, respectively.[178] Based thereon, the PPP only represented an incremental value of 2.2% (i.e., $21.00 / $943) and 1.6% (i.e., $12.80 / $786) per share relative to the value determined by Prairie Capital in 2004 and 2005, respectively. Mr. Reilly's assertion that this immaterial incremental value incentivized employees to terminate their employment is totally unsupported.

b. "The PPP rights would be expected to have a negative impact on the Antioch stock fair market value."[179]

   i. This is simply incorrect. As will be discussed in further detail later in this section of the report, Antioch had a historical track record of redeeming stock from Antioch ESOP participants that left the Company, and this was expected to continue going forward as of the Transaction Date (with the exception of the Antioch ESOP using its own cash to buyout Antioch ESOP participants, which is also addressed later in this section). Given that the redemption of an ESOP participant is a capital transaction, there is no impact on the value of the stock. The following table presents a simple example to illustrate this point.

| Impact of Share Redemption | | | | | | |
|---|---|---|---|---|---|---|
| | Before | | Redemption | | After | |
| Aggregate Equity Value | $ | 100 | $ | 10 | $ | 90 |
| Number of Shares Outstanding | | 10 | | 1 | | 9 |
| **Value per Share** | $ | 10.00 | $ | 10.00 | $ | 10.00 |

c. "The GreatBanc analysis failed to consider the impact of the PPP rights on the Antioch common stock value."[180]

   i. The reality is that there is nothing to consider, as the PPP had no impact on the value of Antioch's stock as of the Transaction Date.

d. "In order to incorporate the repurchase obligation in the GreatBanc analysis, the Duff & Phelps financial projections include an expense line related to the annual stock repurchase expenditures. In other words, the Duff & Phelps analysis financial projections included a line for 'benefit expense equal to 21% of eligible compensation.' That expense

---

[178] Deposition Exhibit 70, page 43 and Deposition Exhibit 73, page 52
[179] Reilly Report, page 48
[180] Reilly Report, page 48

73



**STOUT | RISIUS | ROSS**

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

was intended to account for the annual payments related to the repurchase liability."[181]

i. Almost every part of this Reilly Report quote is factually inaccurate and misleading. The only true statement in this paragraph is that the Duff & Phelps financial projections included a line for benefit expense equal to 21% of eligible compensation. However, this was not described as, and was never intended to be, an estimate for the entire annual repurchase obligation.[182] Duff & Phelps included an expense in its DCF analysis based on the negotiated compensation expense that the Antioch ESOP had secured for 2004. The Duff & Phelps valuation describes this as a benefit expense equal to 21% of eligible compensation.[183] Nowhere in the Duff & Phelps valuation is this in any way presented as an estimate of the entire annual repurchase obligation. Mr. Reilly changes the name of the line item in his report to attempt to reclassify the actual Duff & Phelps compensation expense to a repurchase obligation payment, which is misleading and inaccurate. Despite the fact that this compensation expense was only guaranteed for 2004, Duff & Phelps included the expense in every year of the projections, which, all else equal, lowers the value of the Company. Mr. Reilly's claim that this expense in the Duff & Phelps valuation was intended to account for the entire annual repurchase obligation is patently false and not supported by the factual record in this case. This expense is a form of compensation to the Company's employees. By including the ESOP benefit expense in the projections, Duff & Phelps implicitly assumed that this was a market level of compensation, despite the fact that it was an incremental benefit that was negotiated on behalf of the Antioch ESOP. As such, this was a conservative assumption by Duff & Phelps that lowered its valuation conclusion for Antioch.

e. "Therefore, the Duff & Phelps underestimation of the repurchase liability caused the GreatBanc analysis to overestimate the Antioch common stock fair market value by approximately $80.1 million."[184]

i. As discussed previously, the repurchase obligation does not impact the Fair Market Value of the stock of a company that is repurchasing and redeeming its shares from ESOP participants into treasury. As will be demonstrated later in this section of the report, Antioch had a historical track record of redeeming the stock of departing Antioch ESOP participants. Further, the stock value of the Company in the Duff & Phelps valuation was already lowered by the inclusion of the ESOP benefit expense that was projected to be contributed to the Antioch ESOP post-Transaction. As such, this opinion by Mr. Reilly is unreliable.

---

[181] Reilly Report, page 49
[182] Deposition of Lee Bloom, November 18, 2010, page 47
[183] Deposition Exhibit 119, page 15
[184] Reilly Report, page 50



Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

228. While there are clearly numerous serious flaws associated with Mr. Reilly's opinion that the existence of the PPP caused the value of Antioch post-Transaction to be overstated by $80.1 million, one of the most clear issues is this: *Mr. Reilly himself has written in multiple books that the repurchase obligation for a company that redeems its ESOP shares from participants is not an expense of the company, does not cause dilution to the other shareholders, and is value neutral.*

229. The following excerpt is from a book published by Mr. Reilly in 2000:

> *"Does repurchase liability affect the fair market value of ESOP stock? This has been a long debated and still unanswered question. However, today there is a better understanding of the repurchase liability and its impact on the economics of the ESOP company.*
>
> *The repurchase liability is created by the employer's obligation to purchase shares from the ESOP trust at the time the participant receives a distribution. There are two methods that can be used by the company to satisfy the obligation. The general effect of each of these transactions on fair market value is discussed below.*
>
> *The first method is called a repurchase or recycling transaction. In a 'repurchase,' the ESOP trust purchases the shares of withdrawing participants and recycles them to other ESOP participants in the plan. The trust's cash for the purchase comes from the company in the form of a deductible employer contribution. If the amount of this employer contribution is in excess of a market level of employee benefits, the recycling transaction can be dilutive. The recycling transaction is a transfer of ownership between former and current ESOP participants...*
>
> *The second method is called a redemption transaction. In a 'redemption,' the shares are purchased directly by the company and then canceled. Redemptions by design are nondilutive...*
>
> *Although redemptions do not use tax-deductible contributions, since the shares are no longer considered outstanding, **the net effect on fair market value should be negligible** if the transaction occurs at fair market value. The transfer of ownership in the redemption transaction is between former participants and all remaining shareholders. Since the shares are canceled in the redemption, the percentage ownership of all remaining shareholders, including ESOP participants, increases. However, the amount of the ESOP trust's ownership percentage declines.*
>
> *When the ESOP company decides to recycle shares, a compensation event occurs. **The redemption more closely resembles a capital transaction.**"[185]* (emphases added)

---

[185] Shannon P. Pratt, Robert F. Reilly, and Robert P. Schweis, Valuing A Business – The Analysis and Appraisal of Closely Held Companies, Fourth Edition (New York, NY: McGraw-Hill, 2000), pages 712-714



**STOUT | RISIUS | ROSS**

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

230. The following excerpt is from a book published by Mr. Reilly in 2007:

> "In meeting its repurchase obligation, the employer corporation can select one, or any combination of, the following options with regard to the shares that are 'put' by the ESOP participant:
>
> 1.     'Redeem' the employer corporation shares directly (referred to hereafter as 'redeeming')
>
> 2.     'Recycle' the employer corporation shares using current sponsor company funding (referred to hereafter as 'recycling')
>
> 3.     'Recycle' the employer corporation shares using cash already in the ESOP (referred to hereafter as 'ESOP Investing')
>
> While these employer corporation options appear somewhat similar at first, there are specific employer stock valuation implications of each option.     The differences between the three alternatives can be significant from both (1) an employer corporation stock fair market value perspective and (2) an ESOP employer corporation ownership dilution perspective…
>
> In the redeeming option, the employer corporation purchases the shares and subsequently cancels them (e.g., the shares are retired into the employer corporation treasury). The redeeming option changes the legal ownership of the employer corporation share. **Therefore, the redeeming option is a capital transaction**…
>
> **The value of the ESOP-owned employer corporation shares, on a shareholder level, does not change in a redemption.** This statement is true if the employer corporation pays fair market value for the shares.     The total equity value of the employer corporation is reduced by the amount of the redemption (which is paid for either through additional debt or from the employer corporation cash balance).
>
> However, the redemption of the plan participant's employer corporation shares increases each remaining shareholder's relative ownership position.     **This ownership change makes the redemption transaction nondilutive at the shareholder level**…
>
> A recycle transaction is typically tax deductible to the employer corporation.     This tax treatment is due to the fact that **a recycle is considered an employee compensation expense. The value of the employer corporation is reduced in a recycle transaction by the amount of the repurchase.** And, the number of employer corporation shares outstanding remain the same.     **As a result, the recycle transaction is dilutive at the shareholder level.**
>
> In the ESOP investing option, the plan participant's 'put' shares are repurchased by the ESOP trust with ESOP cash. The source of cash for ESOP investing would generally be from the employer corporation

76



**SRR**
STOUT|RISIUS|ROSS

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

*distributions.* **An ESOP investing transaction is nondilutive***. This is because it is a transaction between two third-parties (i.e., the ESOP trust and the retiring employee)…*

**Therefore, the ESOP investing transaction is nondilutive at the shareholder level and nondilutive at the employer corporation level***…*

*Similar to the redemption option, the ESOP investing option is a* **capital transaction that does not change the employer corporation's cost structure (i.e., not an expense).***"*[186] (emphases added)

231. The following table summarizes the impact of the ESOP repurchase obligation on valuation analysis, as presented in Mr. Reilly's own publication.

The Effects of Employer Stock "Put" Option Repurchase Alternatives

| | Redeeming Option | Recycling Option | ESOP Investing Option |
|---|---|---|---|
| Change in number of employer corporation shares outstanding | Yes | No | No |
| Change in % of total shares owned by the ESOP | Yes | No | No |
| Directly affects income statement | No | Yes | No |
| Shares cancelled (into the employer corporation treasury) | Yes | No | No |
| Transaction tax deductible | No | Yes | No |
| Transaction dilutive to per share equity value | No[1] | Yes[2] | No[1] |
| Reallocate shares to current ESOP participants | No | Yes | Yes |
| Share reallocation method based on | N/A | Compensation | Ownership |
| Type of transaction (for income tax purposes) | Capital | Expense | Capital |

Notes:
1. Assumes that a fair market value price is paid for the shares redeemed and that there is adequate employer corporation liquidity.
2. Unless the recycling option replaces an identical employer corporation employee benefit cost.
Source: Robert F. Reilly and Robert P. Schweins, Guide to ESOP Valuation and Financial Advisory Serves, Second Edition (Chicago, IL: Willamette Management Associates Partners, 2007)

232. As presented in the previous table, if a company redeems the shares of an ESOP participant or the ESOP trust uses its own cash, then there is no impact on that company's income statement. Further, under the redeeming option and the ESOP investing option, the transaction is nondilutive to the per share equity value. The fact that Mr. Reilly contradicts his own publications in this matter and subtracts the entire ESOP repurchase obligation as an expense in his analysis despite Antioch's track record of redeeming Antioch ESOP participants, thus causing dilution to the Fair Market Value of Antioch's stock post-Transaction, demonstrates the unreasonableness of the conclusions presented in the Reilly Report.

233. In addition to Mr. Reilly's own publications, Lee Bloom, the financial advisor leading the Duff & Phelps team that issued the Fairness Opinion, also explained the impact of the repurchase obligation on valuation depending

---

[186] Robert F. Reilly and Robert P. Schweis, Guide to ESOP Valuation and Financial Advisory Services, Second Edition (Chicago, IL: Willamette Management Associates Partners, 2007), pages 218-224

77



Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

on whether the company redeems or recycles in his deposition. Mr. Bloom's deposition testimony is consistent with Mr. Reilly's publications.

Q.      "What is the consensus? Could you describe for me? And this is like the present day consensus I'm asking for.

A.      So the present day consensus on the impact of repurchase obligation on valuation is that the repurchase obligation needs to be understood from the context of whether the company is buying the stock back into the company or buying it or ranging for the ESOP to buy it back into the ESOP and how those two approaches are being funded. So, for example, in the simplest example, if the company is simply buying all the stock back into the company, it's just redeeming it. That's the redeem scenario. Then it's pretty simple. It really has no impact on value. And that's because you're buying stock -- you're buying part of your capital back at its fair market value. So while you're shrinking your capital base, so you have less capital, but you also have fewer shares outstanding. So the impact on a remaining share of stock should be zero. Maybe a little positive, maybe a little negative, but really, for the most part, it should just be zero. If you are funding the repurchase through the ESOP, then you have to look at how are you funding it. If you are contributing -- let's take the easiest example. If you're paying dividends into the ESOP and using those dividends to purchase the stock back into the ESOP, that also will have no impact on the remaining value, and that's because dividends are shared by all shareholders, and those dividends are just being used to buy back stock at fair market value. So that's even. So everybody, every shareholder and every individual share just gets treated equally in that context. But the last case is if you are contributing cash into the ESOP -- and I'm using the term contributing here to refer to a benefit contribution. So you're providing benefits to your employees in the form of a cash contribution into the plan, and that cash contribution is then being used to what's called recycle the stock. And recycle means that you're recycling it through the ESOP. To the extent that that contribution, the amount of money that you have to put in each year to meet that year's repurchase obligation to the extent that that amount of money meets your -- the company's retirement benefit objectives. So, you know, the amount of money that you would typically expect to pay to employees in the form of benefits in that year, to the extent that that contribution matches up with that target contribution level, again, you'll have no impact on the value of a share of stock. To the extent, though, that that year's contribution exceeds the target contribution level for a company in your business or this particular company, that excess contribution which is only going to the ESOP, and actually within the ESOP is really only going to the current active employees. It's really a portion of their wages. That extra amount has to come from someplace. And where it comes from is the shareholders. So that extra amount must be in some way dilutive to the share price. It's pretty hard to actually

78



Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

figure out how dilutive it is, but that is the source of post -- of dilution that might result from a repurchase obligation."[187]

234. Based on Mr. Reilly's books and Mr. Bloom's deposition testimony, the relevant question becomes whether or not Antioch had a history and intention of redeeming stock from the Antioch ESOP participants or recycling the shares. The following testimony from the Company's CFO at the time of the Transaction, Barry Hoskins, answers this question.

Q.  "But the Antioch Company never recycled?
A.  No, we did not.
Q.  Was there ever a time while you were CFO while there was a consideration of the possibility of recycling?
A.  Well, I heard it talked about in the ESOP community, but we never -- we had never done that.
Q.  And do you know why the Antioch Company never considered instituting recycling?
A.  It was because of my feeling of the repurchase obligation and trying to make sure that I was reducing the number of shares outstanding inside the ESOP and managing the repurchase obligation.
Q.  So when shares were redeemed, it took them out of the ESOP and took them out of circulation?
A.  Yes."[188]

235. Despite Mr. Reilly's contention that the value of the repurchase obligation must be subtracted from the value of Antioch's equity as part of his Second Flaw analysis, the factual record in this case is clear that Antioch had a historical track record of redeeming Antioch ESOP shares during Barry Hoskins' tenure, and not recycling. Further, the Duff & Phelps projections already included as an expense the ESOP benefit expense of 21% of compensation, thereby conservatively lowering the value of the Company (by assuming that the entire 21% of compensation was a market benefit expense). As such, Mr. Reilly's analysis in this regard is unreliable, and impugned by his own writings. Given that the *only* difference between the Duff & Phelps valuation and Mr. Reilly's valuation just after the Transaction as part of his Second Flaw analysis is Mr. Reilly's subtraction from EV of the present value of the entire amount of expected repurchases from Antioch ESOP participants over the nine years subsequent to the Transaction, once that difference is removed, the analyses are identical, and there can be no damages.

236. Another fundamental issue with Mr. Reilly's inclusion of the repurchase obligation as a deduction from the Antioch equity value is that it is inconsistent with the standard of Fair Market Value. The standard of Fair Market Value assumes a transaction between a hypothetical willing buyer and a hypothetical willing seller. Because the repurchase obligation is an obligation that is unique to ESOP-owned companies, a hypothetical willing buyer of an ESOP-owned company would not deduct the present value of

---

[187] Lee Bloom Deposition, November 18, 2010, pages 8-10
[188] Barry Hoskins Deposition, September 15, 2010, page 26

79



**SRR**
STOUT | RISIUS | ROSS

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

future repurchase obligation payments from what they would be willing to pay to acquire the company's stock. As such, Mr. Reilly's inclusion of such a deduction is inconsistent with the standard of Fair Market Value by which he is bound. The Reilly Report does, however, appear to hold to the standard of Fair Market Value elsewhere in his analysis in a manner that causes the value of Antioch to be lower. Specifically, as a 100% ESOP-owned S Corporation, Antioch paid no income taxes whatsoever.[189] However, despite the fact that Antioch was a completely tax-free entity, Mr. Reilly subtracted a full income tax burden from his projected cash flows in the DCF analysis. Applying a hypothetical tax expense to a tax-free entity in this manner is appropriate under the Fair Market Value standard because no willing hypothetical buyer – assumed to be a tax-paying entity at either the corporate or shareholder level, as nearly all corporations are – would be willing to pay a premium for tax-free cash flows that only a 100% ESOP-owned S Corporation could realize. Likewise, because no hypothetical buyer would assume the ESOP repurchase liability, it should not be deducted from value. If, however, one were to suspend the Fair Market Value standard for argument's sake like Mr. Reilly does when he deducts the repurchase obligation, one would also have to remove the income tax expense from the DCF analysis in order to maintain internal consistency.[190]

237. Even assuming that Mr. Reilly's flawed inclusion of the repurchase obligation into the valuation of the stock of an ESOP that is redeeming participants were correct, Mr. Reilly completely misses another material factor in his analysis. In December 2003, the Antioch ESOP had approximately $65 million in cash inside the trust that was available to repurchase the shares of departing Antioch ESOP participants.[191] In fact, that was the purpose for which the cash inside the Antioch ESOP was intended.[192] As described in Mr. Reilly's book as quoted previously, this is an ESOP investing transaction, which would be nondilutive. In addition, the Company had approximately $20 million in cash surrender value of life insurance that was also available to fund the repurchase obligation.[193] Based on these facts, the Company and the Antioch ESOP had approximately $85 million in cash available to fund the repurchase obligation, without even considering any cash flow from Antioch's operations whatsoever. Mr. Reilly completely ignores these facts.

---

[189] The Company paid no income taxes at the corporate level because of its pass-through entity status as an S Corporation and an ESOP, the sole shareholder of the Company post-Transaction, did not pay taxes on the pass-through income due to its tax exempt status.

[190] Putting this line of reasoning aside, it is still inappropriate to deduct the repurchase obligation since the Company was redeeming shares and not recycling.

[191] Deposition Exhibit 268, page 2, Barry Hoskins Deposition, September 15, 2011, pages 80, 84, 171, 172, 175, 202, and Barry Hoskins Deposition, September 16, 2011, pages 372 and 550

[192] Barry Hoskins Deposition, September 16, 2011, page 306

[193] Barry Hoskins Deposition, September 16, 2011, pages 363 and 432, CS000761, and HL049547



**SRR**
STOUT | RISIUS | ROSS

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

### VI.E. *Mr. Reilly's Third Flaw*

238.    Mr. Reilly's Third Flaw has no damages associated with it; therefore, it is unclear the purpose that it serves in the Reilly Report. Further, Mr. Reilly's Third Flaw is not supported by facts, and simply relies on sweeping, uncited assumptions and claims by Mr. Reilly. This is demonstrated in the Reilly Report in ways such as Mr. Reilly's claim that, "The fact that a significant number of Antioch employees would likely decide to terminate their employment post-transaction to enjoy the economic benefits provided by the PPP rights enhanced this income-tax-related risk factor."[194] While Mr. Reilly claims this initially to be a "fact," he has to use qualifiers such as "would likely" because he has no support for the claim. Despite claiming it to be a fact, Mr. Reilly provides no citations to any of his claims in this section of his report that are based on any of the facts in evidence in this case. As such, Mr. Reilly's Third Flaw is clearly not based on sufficient facts and data, and is unreliable. Further, given that Mr. Reilly's Third Flaw has no damages associated with it, it is also irrelevant.

### VI.F. *Other Items of Note in the Reilly Report*

239.    In Exhibits 6b through 6f of the Reilly Report, Mr. Reilly purports to "present the Antioch projected net cash flow position assuming the ESOP repurchase obligation was correctly incorporated in the financial projections" over the three year PPP period.[195] However, there are a number of fatal flaws in Mr. Reilly's analysis.

  a.  As discussed previously, in a valuation, it is appropriate to subtract a hypothetical level of income taxes in order to get to the cash flow that would be considered by a hypothetical buyer to be utilized in a DCF analysis. However, the reality is that Antioch was not going to pay income taxes in the real world. As such, in order to assess the actual available cash flow that Antioch was expected to generate, subtracting taxes lowers the net cash flow projection for an item that Antioch would not actually have to pay. As such, when assessing actual future cash flow for Antioch (not hypothetical cash flow that a buyer would consider) it is inappropriate to subtract income taxes that the Company would not actually incur.

  b.  In Exhibit 6b, Mr. Reilly presents the Duff & Phelps projections that were utilized in determining that the $850 per share value of Antioch was fair. However, in Exhibits 6c through 6f, utilizing the Deloitte downside projections and the flawed Buchanan Report projections, the projected cash flows are materially lower than the cash flows included in the Duff & Phelps DCF analysis. As such, the implied per share value would also be materially lower. Given that the repurchase obligation study relied upon in the Reilly Report was based on an $850 share price as a starting point, the level of the annual repurchase obligation would be materially lower under a scenario where the cash flow and equity value of Antioch is lower than the Duff & Phelps valuation. As such,

---

[194] Reilly Report, page 15.
[195] Reilly Report, page 50

81



**STOUT | RISIUS | ROSS**

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

presenting lower cash flow projections and then subtracting a repurchase obligation based on a materially higher stock price is a significant inconsistency that renders Mr. Reilly's analysis meaningless.

240.  Finally, even under Mr. Reilly's unreasonable downside scenario projections, every scenario that Mr. Reilly creates in Exhibits 6b through 6f of his report shows Antioch producing positive cash flow over the three year PPP period, despite his inclusion of materially lower projected cash flows, the subtraction of taxes that will not actually be paid, and overstated and inconsistent repurchase obligation payments. As such, even in these unreasonable downside scenarios that mix low projected cash flows with high repurchase obligations, Mr. Reilly cannot create a scenario that shows Antioch generating anything other than positive cash flow over the three year PPP period.



Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

## VII. Critique of Mr. Reilly Related to Post-Transaction Events

241. The Reilly Report states the following with regard to the performance of Antioch subsequent to the Transaction:

> "Although the following information would not be available in December 2003, I also considered (a) how Antioch actually performed following the transaction and (b) how actual Antioch performance compared to the Antioch projections used in the GreatBanc analysis. The actual 2004 and 2005 Antioch financial performance indicates significant decreases in sales, earnings, and cash flow in the two years following the transaction. This comparison of actual 2004 and 2005 Antioch performance (that would not be known in December 2003) is presented in Table 2. This comparison is presented solely for the purpose of testing the reasonableness of the financial projection relied on in the GreatBanc analysis.[196]

242. While Mr. Reilly admits that this information was not known or knowable to Duff & Phelps when performing its analysis, Mr. Reilly utilizes hindsight to "prove" that his projections are reasonable. However, Mr. Reilly fails to consider certain general economic, industry specific, and changing lifestyle and consumer preference dynamics that had a material impact on the Company subsequent to the Transaction that were not known or knowable as of the Transaction Date. Further, the Reilly Report inexplicably fails to recognize certain positive events that occurred after the Transaction that demonstrate the Company's strength for a period of time after the Transaction Date, and discounts the fact that the Company continued to operate and pay its debts as they became due for five years after the Transaction.

### VII.A. *Historical Antioch ESOP Valuations – 2002 through 2007*

243. As discussed previously, as of the Transaction Date, the Company, the scrapbooking industry, and the general economic outlook were positive. In light of this, Antioch's equity value per share increased from $680 in 2002

---

[196] Reilly Report, page 32



**STOUT | RISIUS | ROSS**

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

to \$943 in 2004. Thereafter, the Company's price per share declined in 2005 and 2006, before plummeting to \$114 in 2007.

| Annual Antioch ESOP Valuations | | |
|---|---|---|
| Year | | Equity Value Per Share |
| 2002 | \$ | 680 |
| 2003 | | 894 |
| 2004 | | 943 |
| 2005 | | 786 |
| 2006 | | 725 |
| 2007 | | 114 |

Source: Deposition Exhibit 116, p. 25, 2003
Prairie Capital Report, p. 40, Deposition Exhibit
70, p. 43, Deposition Exhibit 73, p. 52,
Deposition Exhibit 95, p. 59, and Deposition
Exhibit 96, p. 67.

## VII.B. *Debt Financings and Repurchase Obligation Payments*

244. Despite the Company's decline in revenue during the mid-2000s, Antioch made all scheduled periodic payments on its secured bank debt and the newly issued promissory notes to redeemed Antioch ESOP participants (the "ESOP Notes") in a timely manner from the Transaction Date through June 2008.[197]

245. As part of the Transaction, Antioch assumed \$120.0 million of bank debt due in quarterly installments, plus interest at LIBOR plus 1.75%, through June 2007. The Company also assumed \$43.4 million of Non-ESOP Shareholder subordinated notes due in annual installments, plus quarterly interest at 8%, through December 2013 (i.e., the subordinated note component of the Consideration Package).[198]

246. The following table details the Company's interest-bearing debt components from 2002 through 2007.

---

[197] Wayne Alan Luce Deposition, February 17, 2015, pages 144-145, Nancy Blair Deposition, May 26, 2011, pages 306-310, Asha Moran Deposition, June 21, 2012, page 22, and Timothy Miller Deposition, December 18, 2012, pages 467-468
[198] Deposition Exhibit 132A, page 23



**SRR**
STOUT | RISIUS | ROSS

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

**Total Antioch Debt - 2002 through 2007**

| In Thousands of U.S. Dollars | 12/31/2002 | 12/31/2003 | 12/31/2004 | 12/31/2005 | 12/31/2006 | 12/31/2007 |
|---|---|---|---|---|---|---|
| Pre-Transaction Long-Term Debt | $ 9,010 | $ 690 | $ 0 | $ 0 | $ 0 | $ 0 |
| Pre-Transaction Line of Credit | 7,386 | 16,218 | 0 | 0 | 0 | 0 |
| 2003 Financing - Term Loan | 0 | 120,000 | 81,000 | 0 | 0 | 0 |
| 2003 Financing - Line of Credit | 0 | 0 | 19,218 | 0 | 0 | 0 |
| 2005 Refinancing - Term Loan | 0 | 0 | 0 | 38,000 | 14,000 | 0 |
| 2005 Refinancing - Line of Credit | 0 | 0 | 0 | 12,000 | 40,000 | 0 |
| 2007 Refinancing - Term Loan | 0 | 0 | 0 | 0 | 0 | 34,000 |
| 2007 Refinancing - Line of Credit | 0 | 0 | 0 | 0 | 0 | 18,000 |
| Non-ESOP Shareholder Notes | 0 | 43,400 | 39,060 | 52,729 | 52,174 | 51,618 |
| ESOP Notes | 0 | 0 | 34,931 | 48,902 | 54,665 | 21,171 |
| **Total Debt** | **$ 16,396** | **$ 180,308** | **$ 154,209** | **$ 151,631** | **$ 160,839** | **$ 124,789** |

Source: Deposition Exhibit 152A, p. 23; Deposition Exhibit 140, p. 15; Deposition Exhibit 152, p. 11; Deposition Exhibit 153, p. 12; and Antioch's 2007 Consolidated Financial Statements, TAC-CC-0001416.

247. The total debt on Antioch's balance sheet was reduced from $180.3 million in 2003 to $154.2 million in 2004. This net reduction occurred despite the issuance of $34.9 million of ESOP Notes.[199] As mentioned previously, approximately 70 employees either retired or terminated their employment during 2004, resulting in payments of $108 million of cash[200] and additional borrowings.[201,202] Despite this cash outflow and $34.9 million in additional borrowing, Antioch was still able to make payments on its bank loans and Non-ESOP Shareholder notes in the amount of $64.0 million, which was $30.2 million more than the scheduled payments, which was possible due to the performance of the Company.[203]

248. In 2005, despite the significant outflows associated with the Company's repurchase obligation in 2004, Antioch refinanced and paid off its loans formerly held by the 2003 Lenders with a syndicate of three banks led by National City Bank (the "2005 Refinancing").[204] The following table details the key terms of the 2005 Refinancing compared to the 2003 Financing.

---

[199] Deposition Exhibit 140, page 7

[200] A significant portion of these payments was serviced by the cash held at the Antioch ESOP.

[201] Deposition Exhibit 140, page 1

[202] The Antioch ESOP plan stipulated that the Company could pay retirees with account balances over $1.0 million and terminees with account balances over $50,000 over a five year term (Deposition Exhibit 343). The ESOP Notes relate to these notes issued to retirees and terminees to satisfy the repurchase obligation (Deposition Exhibit 140, page 15).

[203] Deposition Exhibit 140, page 7

[204] Deposition Exhibit 152, page 11



**STOUT | RISIUS | ROSS**

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

| 2003 Financing v. 2005 Refinancing | | |
| --- | --- | --- |
| | 2003 Financing | 2005 Refinancing |
| **Amount Outstanding** | $120,000,000 | $38,000,000 |
| **Interest Rate** | LIBOR + 1.75% | LIBOR + 1.75% |
| **Financial Covenants** | | |
| Total Leverage Ratio | Maximum ratio of 2.5 to 1, declining on an annual basis to 1.75 to 1 by December 31, 2006 | Maximum ratio of 2.75 to 1, declining on an annual basis to 2.0 to 1 by December 31, 2006 |
| Senior Leverage Ratio | Maximum ratio of 1.75 to 1 declining to 1.0 to 1 by December of 2006 | Maximum ratio of 2.25 to 1 declining to 1.5 to 1 by December of 2006 |
| Fixed Charge Coverage Ratio | Minimum ratio of 1.20 to 1 | Minimum ratio of 1.20 to 1 |
| **Revolver** | Up to $50,000,000 | Up to $30,000,000 [a] |
| **Revolver Interest Rate** | LIBOR + 1.75% | LIBOR + 1.75% |

Source: Deposition Exhibit 132A, p. 23; Deposition Exhibit 152, p. 11, Deposition Exhibit 248, pages 98-100, and Deposition Exhibit 250, pages 85-86.
[a] Later amended to $42,500,000 (Amendment No. 4 to 2005 Credit Agreement, FT009016).

249.   As the preceding table demonstrates, the Company was able to secure better financial covenant terms in the 2005 Refinancing compared to the 2003 Financing, with all other major terms remaining constant. Further, during 2005, the Company made payments of $32.5 million on its long-term debt and $6.8 million on its line of credit.[205]

250.   By the end of 2006, Antioch had made approximately $185 million in ESOP repurchase obligation payments.[206] Despite this outflow in cash and additional borrowing, the Company was still able to make payments on its long-term debt in 2006 in the amount of $39.0 million.[207] Further, the Company made payments on its long-term debt in the amount of $28.1 million during 2007[208] and once again refinanced and paid off its debt related to the 2005 Refinancing with three participating banks (Bank of America, Fifth Third, and National City Bank), consisting of a $40.0 million term note and a $30.0 million revolving line of credit (the "2007 Refinancing").[209] The Company utilized the proceeds from the 2007 Refinancing to pay off the remaining balance of the 2005 Refinancing and pay down the ESOP Notes issued in 2004 and 2005. This was the third time over a four-year period that multiple lenders were willing to refinance the Company's existing debt.

---

[205] Deposition Exhibit 152, page 8
[206] Deposition Exhibit 153, page 4
[207] Deposition Exhibit 153, page 9
[208] Antioch Consolidated Financial Statements, December 31, 2007, TAC-CC-0001409
[209] Deposition Exhibit 153, page 13



**SRR**
STOUT | RISIUS | ROSS

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

251. It is also important to consider deposition testimony of Barry Hoskins, Antioch's CFO, regarding the impact the Transaction had on the financial viability of the Company.

Q. "When did you start to become concerned with the number of employees who were terminating?

A. I wasn't concerned in 2004, although, we were actually in a better financial position than we were at the time of the transaction even though we made significant distributions to terminated participants. Our debt had been reduced from 120 million dollars down to around 65 million dollars. We were 20 million dollars ahead of schedule... We were doing so well that I was able to renegotiate the terms of the lending agreement in the winter of '05... and actually got better covenants, less restrictive covenants..."[210]

Q. "Barry, as the CFO of the company both at the time of the transaction and as of December 31, 2004, how would you describe the company's or, rather, Antioch's financial position or condition as of the transaction?

A. I think we were in equal or better financial position that what we were at the time of the transaction."[211]

Q. "So nothing about the transaction in 2003 would have caused a reduction in sales the following year? Is that my understanding of your testimony?

A. That's correct."[212]

Q. "Is there any element or term of the transaction that closed in 2003 that caused the company's net income to decline in 2005 when measured against 2004's net income or the company's decline in sales in 2005 when measured against its sales in 2004?

A. Nothing from the transaction should have affected sales in 2004 or 2005.

Q. Let me ask you if it should have or shouldn't have. I asked you if you have a view of whether or not, in fact, it did.

A. Oh. No, it couldn't have. It could not."[213]

252. As the preceding testimony clearly shows, despite the unexpected financial performance of the Company by 2007 and the higher than anticipated repurchase obligation payments subsequent to the Transaction, Antioch still made all of its scheduled payments on its secured bank debt and ESOP Notes. In fact, the Company was able to refinance its bank debt in early

---

[210] Barry Hoskins Deposition, March 11, 2010, pages 101-102
[211] Barry Hoskins Deposition, September 15, 2011, page 190
[212] Barry Hoskins Deposition, September 15, 2011, page 195
[213] Barry Hoskins Deposition, September 15, 2011, page 199



Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

2005 to more favorable terms. Then, in early 2007, the Company was once again able to refinance its debt. Finally, the Company made all of its payments on the bank debt and ESOP Notes and never defaulted during Barry Hoskins' tenure (which ended in December 2005 as CFO and September 2006 as ESOP trustee).[214] This outcome was consistent with Duff & Phelps' analysis completed in its Fairness Opinion which implied that from a cash flow feasibility perspective, there was significant cushion for the Company to meet its obligations even if events in the future were not as positive as reasonably anticipated as of the Transaction Date.[215]

## VII.C. Factors Contributing to Antioch's Actual Financial Performance Subsequent to the Transaction

253.    While Antioch's financial performance ultimately declined subsequent to the Transaction, there is no evidence that supports that this was related to the Transaction. There were several systematic factors (i.e., market factors not specific to the Company) which ultimately contributed to Antioch's actual financial performance subsequent to the Transaction Date.

### VII.C.1. Timeline of Key Events[216]

254.    The following paragraphs detail key events and noteworthy trends related to the Internet and social media from 2004 through 2008.

255.    2004:

- Harvard student Mark Zuckerberg launched thefacebook.com. Approximately 1,200 Harvard students signed up within the first 24 hours. Facebook, Inc. ("Facebook") would go on to become the world's biggest social networking site, but did not even exist as of the date of the Transaction.[217]
- Google went public with an initial public offering ("IPO").
- Shutterfly, Inc. ("Shutterfly") first launched its flagship photo books product.[218]

256.    2005:

- Broadband connections surpassed dial-up connections.
- News Corp. bought Myspace, one of the first large-scale social networking websites, for $580 million.
- YouTube was founded.

---

[214] Barry Hoskins Deposition, September 15, 2011, pages 187-189
[215] It should be noted that Duff & Phelps analyzed several downside scenarios in order to test whether the Company could handle its debt obligations and repurchase obligation (Lee Bloom Deposition, November 18, 2010, page 45 and Lee Bloom Deposition, November 16, 2010, pages 126 and 127)
[216] The Pew Research Center, World Wide Web Timeline, March 11, 2014
[217] A further discussion on Facebook can be found later in this section.
[218] Shutterfly's website.

88



**SRR**
STOUT | RISIUS | ROSS

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

257.  *2006:*

- Shutterfly, Inc. ("Shutterfly") went public with an IPO.
- Google acquired YouTube for $1.65 billion.
- Twitter was launched.

258.  *2007:*

- Apple released the first iPhone.

259.  *2008:*

- 19% of cellphone owners said they had gone online with their phones.
- Apple launched the App Store.

260.  Coupling increased Internet speeds associated with more accessible broadband connections and the rise of social media companies such as Facebook and Shutterfly, consumers now had a timely, cost-effective way to share their memories with their family and friends in a way that was largely unknown at the time of the Transaction.

### VII.C.2. Facebook and Shutterfly – Case Studies

261.  The following case studies of Facebook and Shutterfly highlight the impact that the Internet and the widespread availability of broadband had on companies which operated in the digital social media space.

### VII.C.2.a. *Facebook*

262.  As noted previously, Facebook was founded in February 2004. [219] Facebook enables people to connect, share, discover, and communicate with each other on mobile devices and personal computers. One of the most popular aspects of Facebook is the ability to upload and creatively share pictures with one's social network. With the significant growth in broadband Internet during the mid and late-2000s, Facebook went from a

---

[219] Facebook, Inc., Amendment No. 5 to Form S-1, May 3, 2012, page 47



**SRR**
STOUT | RISIUS | ROSS

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

relatively niche college campus networking site to a global social networking giant.

| Facebook Timeline of Key Events - 2004 Through 2008 | |
|---|---|
| Date | Event |
| Feb 2004 | Founded at Harvard |
| Sep 2004 | Began to expand to colleges and universities around the country |
| May 2005 | Grew to support more than 800 college networks |
| Apr 2006 | Launched Facebook Mobile |
| Sep 2006 | Registration open to the general public |
| May 2007 | Launched Facebook Platform with 65 developers and 85 applicators |
| Apr 2008 | Launched Chat |
| Dec 2008 | Launched Facebook Connect |

Source: Facebook, Inc., Amendment No. 5 to Form S-1, May 3, 2012, page 47.

263. The size of Facebook's user base and its users' level of engagement is critical to its success.[220] One of the metrics Facebook utilizes to measure its user base is monthly active users ("MAUs"). Below is a table depicting the growth in Facebook's monthly active users from 2004 through 2008.



Source: Facebook, Inc., Amendment No. 5 to Form S-1, May 3, 2012, page 47.

264. One of the factors that Facebook attributed to its historical and anticipated MAU growth is increases in worldwide Internet users and, in particular, from increasing broadband penetration and usage of mobile devices in developing markets.[221]

265. A key component impacting Facebook users' level of engagement is uploading and sharing photos. In April 2012, Facebook acquired Instagram, Inc., a mobile-phone based photo-sharing service, for 22,999,412 shares of Facebook common stock, worth approximately $700

---

[220] Facebook, Inc., Amendment No. 5 to Form S-1, May 3, 2012, page 12
[221] Facebook, Inc., Amendment No. 5 to Form S-1, May 3, 2012, page 49



**SRR**
STOUT | RISIUS | ROSS

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

million, and \$300 million in cash. Facebook noted that it would maintain Instagram, Inc.'s products as independent mobile applications to enhance its photo product offerings and to enable users to increase their level of mobile engagement and photo sharing.[222]

### VII.C.2.b. *Shutterfly*

266. Shutterfly was incorporated in 1999 and is an Internet-based social expression and personal publishing service. Shutterfly enables consumers to share, print, and preserve their memories by leveraging their technology, manufacturing, and web-design merchandising capabilities. Specifically, Shutterfly provides a wide range of personalized photo-based products and services that make it easy and convenient for consumers to upload, edit, enhance, organize, find, share, create, print, and preserve their memories in a creative and thoughtful manner.[223]

267. The following table from Shutterfly's website displays a timeline of key events prior to Shutterfly's initial public offering in 2006.



268. The following chart depicts Shutterfly's revenue from 2002 through 2008.



269. As is clearly evident in the preceding chart, Shutterfly began to experience significant growth during the time that broadband Internet access began to become more widely available and when it launched its flagship photo

---

[222] Facebook, Inc., Amendment No. 5 to Form S-1, May 3, 2012, page 66
[223] Shutterfly, Inc. Form 10-K, March 20, 2007, page 1

91



Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

books product in 2004, subsequent to the Transaction Date. In fact, Shutterfly noted that the consumer trends that supported this growth were, "the proliferation of digital cameras, higher broadband penetration and greater adoption of Internet related e-commerce and communication services"[224] and that its business is highly dependent upon the availability of affordable broadband access to consumers.[225]

### VII.C.3. Scrapbooking Industry Developments

270. As noted previously, at the time of the Transaction, industry participants were bullish on the outlook of the scrapbooking industry. However, with the significant growth in broadband Internet and social media during the mid to late-2000s, the demand for and interest in physical scrapbooking began to dissipate.

271. In a November 2004 article by Forbes, an industry insider noted, "after four consecutive years of doubling, industry wide sales will cool to a mere 25% rise in 2004." While still significant growth, this was an early sign that the growth in scrapbooking was potentially about to slow. This same article noted that 1,000 of the current 4,000 to 4,500 small scrapbooking retailers could close within the next 18 months. [226]

272. In November 2006, JP Morgan initiated coverage of Shutterfly. In this analyst report, JP Morgan noted that it believed, "consumers will find online photo storage an attractive backup option for their photographs as the quality of digital cameras (and therefore photo quality and size) continues to increase." Further, this report noted that "as broadband penetration continues to increase and online photo sharing becomes more mainstream, we expect the percentage of consumers uploading their photos to the Internet to increase." JP Morgan noted that International Data Corporation expected photos uploaded to the Internet to increase by nearly one-third between 2006 and 2009.[227]

273. The increased popularity of uploading photos to the Internet had an adverse impact on the traditional scrapbooking industry. In October 2007, Michaels noted that it would be exiting its concept business Recollections to refocus on its core retail operations.[228]

### VII.C.4. Industry Valuation Multiples – 1998 Through 2008

274. Another input to consider is the trend in EV / LTM EBITDA multiples subsequent to the Transaction. The following table presents the EV / LTM EBITDA multiples of the Comparable Public Companies (i.e., the same broad set of comparable public companies I analyzed as discussed previously). As is evident in the following chart, the multiples of the

---

[224] Shutterfly, Inc. Form 10-K, March 20, 2007, page 6

[225] Shutterfly, Inc. Form S-1, June 29, 2006, page 16

[226] *Thanks for the Memories*, Forbes, November 29, 2004

[227] Zoom in on Shutterfly, Initiating at Overweight, JP Morgan, November 8, 2006

[228] *Michaels closing two of its concept business*, The Dallas Business Journal, October 16, 2007



Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

Comparable Public Companies began to decline significantly in late 2006. Further, Antioch's EV / LTM EBITDA multiple based on the annual Antioch ESOP valuations followed a nearly identical trend to that of the Comparable Public Companies.



**EV / LTM EBITDA Multiples Inherent In Antioch Valuations v. Comparable Public Companies**

Source: S&P Capital IQ, Inc., 2003 Prairie Capital Report, p. 34; Deposition Exhibit 70, p. 43; Deposition Exhibit 73, p. 45; Deposition Exhibit 95, p. 52; Deposition Exhibit 96, p. 62; 2003 Prairie Capital Report, CHA00379; Deposition Exhibit 70, Exhibit B-4; Deposition Exhibit 73, Exhibit B-4; Deposition Exhibit 95, Exhibit B-4; and Deposition Exhibit 96, Exhibit B-4.

### VII.C.5. The Great Recession

275.  Beginning in late 2007, the United States was experiencing a large-scale financial crisis (the "Great Recession"). Due to rising mortgage defaults and foreclosures, the value of mortgage-backed securities ("MBS") decreased throughout 2008. MBS had been a significant source of earnings growth in recent years for many financial institutions. As a result, these financial institutions maintained substantial MBS positions. As these securities lost value, declining capital positions caused banks to tighten lending standards and reduce the availability of credit.

276.  In March 2008, The Bear Stearns Companies, Inc. ("Bear Stearns") was one of the largest securities firms in the U.S., with reported total consolidated assets of nearly $400 billion. Financial conditions for the firm deteriorated significantly during the first quarter of 2008. On March 13, 2008, Bear Stearns notified the Federal Reserve that it expected that it would not have enough funding or liquid assets to meet its financial obligations the following day. Given the presence of Bear Stearns in several important financial markets and the threat of contagion, the Federal Reserve Board authorized the Federal Reserve Bank of New York to extend credit to Bear Stearns through JPMorgan Chase Bank, N.A. on March 14, 2008. Despite this effort, the financial condition of the company deteriorated further over the following two days, which ultimately led to



**SRR**
STOUT | RISIUS | ROSS

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

JPMorgan Chase and Co. merging with Bear Stearns on March 17, 2008.[229]

277.   On July 11, 2008, IndyMac Bancorp Inc. ("IndyMac") became the second-biggest federally insured financial company to be seized by U.S. regulators after a run by depositors left the California mortgage lender short on cash. The lender accumulated almost $900 million in losses as home prices tumbled and foreclosures climbed to a record. According to the Federal Deposit Insurance Corporation ("FDIC"), IndyMac became the largest Office of Thrift-regulated savings and loan to fail.[230]

278.   In early September 2008, the U.S. government placed both the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") into conservatorship of the Federal Housing Finance Agency.[231] This U.S. government intervention aimed to stabilize Fannie Mae and Freddie Mac in order to increase the pool of funds available to potential home buyers and stabilize home prices.[232]

279.   Subsequently, investor concerns increased with the bankruptcy of Lehman Brothers Holdings Inc. ("Lehman Brothers"), which filed under Chapter 11 of the United States Bankruptcy Code.[233] Similarly, several other well-respected financial institutions faced potential liquidity crises, leading to the announced acquisition of Merrill Lynch & Co., Inc. ("Merrill Lynch") by Bank of America Corporation ("Bank of America").[234] In addition, the U.S. government provided a loan to American International Group, Inc. ("AIG"), to which many other financial institutions were subject to significant counterparty risk in the case of AIG's insolvency due to its role as an insurer of asset-backed securities and other credit derivatives.[235]

280.   The U.S. government considered a number of steps in an attempt to stabilize the financial system, including 1) guaranteeing the share price of certain money market mutual funds, 2) purchasing troubled assets from financial institutions, 3) raising the limits on federal deposit insurance of bank accounts, and 4) lowering the federal funds target rate. The following outlines some of the significant developments in this regard.

---

[229] Board of Governors of the Federal Reserve System, "Bear Stearns, JPMorgan Chase, and Maiden Lane LLC",
<http://www.federalreserve.gov/newsevents/reform_bearstearns.htm>
[230] Ari Levy and David Mildenberg, "IndyMac Seized by U.S. Regulators; Schumer Blamed for Failure", *Bloomberg L.P.*,
<http://www.bloomberg.com/apps/news?pid=newsarchive&sid=aAYLeK3YAie4>
[231] Hernandez, Saundra, "Ten-Year Treasuries Gain on Concern Takeover Won't Halt Slide," September 8, 2008, *Bloomberg L.P.*, <http://www.bloomberg.com>
[232] Ellis, David, "U.S. Seizes Fannie and Freddie", 8 September 2008, *CNN Money*, < http://money.cnn.com/2008/09/07/news/companies/fannie_freddie/>
[233] Securities and Exchange Commission, *Lehman Brothers Holdings Inc.*, Form 8-K, September 15, 2008
[234] Securities and Exchange Commission, *Merrill Lynch & Co., Inc.*, Form 8-K, September 14, 2008
[235] Securities and Exchange Commission, *American International Group, Inc.*, Form 8-K/A, September 18, 2008



**SRR**
STOUT | RISIUS | ROSS

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

a. September 19, 2008:    The U.S. Department of the Treasury ("Treasury") announced the Temporary Guarantee Program for Money Market Funds on September 19, 2008. Under this program, Treasury guaranteed the share price of any publicly eligible money market mutual fund for funds that choose to participate in the program. The guarantee is applicable only to investments made in funds as of September 19, 2008. This program was created in response to losses from certain money market mutual funds caused by defaults of certain large borrowers (e.g., Lehman Brothers).[236]

b. September 20, 2008: Treasury submitted legislation on September 20, 2008 to Congress requesting authority to purchase troubled assets from financial institutions with the intended effect of promoting lending and enhancing liquidity.[237]

c. October 3, 2008:    Congress passed the Emergency Economic Stabilization Act on October 3, 2008, authorizing Treasury to manage the newly created Troubled Asset Relief Program ("TARP") in response to the legislation submitted by Treasury on September 20, 2008. This legislation granted the U.S. government the authority to directly purchase troubled assets or inject capital into U.S. financial institutions, among other items.[238] In addition, this legislation raised the basic limit on federal deposit insurance coverage from $100,000 to $250,000 per depositor, effective October 3, 2008 and extending through December 31, 2009.[239]

d. October 8, 2008:    Central banks for several of the world's largest economies, including the Bank of Canada, the Bank of England, the European Central Bank, the Federal Reserve, Sveriges Riksbank (Sweden), and the Swiss National Bank, announced reductions in policy interest rates on October 8, 2008. As such, the Federal Reserve's federal funds rate target was reduced by 0.5% to 1.5%.[240]

e. October 14, 2008:    On October 14, 2008, Treasury announced the voluntary Capital Purchase Program to clarify the provisions of the TARP pertaining to the purchase of equity interests in financial institutions.    Under this program, Treasury could purchase senior

[236] "Treasury Announces Temporary Guarantee Program for Money Market Funds," September 29, 2008, *U.S. Department of the Treasury*, <http://www.treas.gov/press/releases/hp1161.htm>
[237] "Fact Sheet: Proposed Treasury Authority to Purchase Troubled Assets," September 20, 2008, *U.S. Department of the Treasury*, <http://www.treas.gov/press/releases/hp1150.htm>
[238] Christie, Rebecca and Robert Schmidt, "Treasury to Hire Asset Management Firms to Jumpstart Rescue," October 4, 2008, *Bloomberg L.P.*, <http://www.bloomberg.com>
[239] "Deposit Insurance Coverage Temporary Increase in Coverage," October 3, 2008, *Federal Deposit Insurance Corporation*, <http://www.fdic.gov/news/news/financial/2008/fil08102.html>
[240] "Federal Reserve and Other Central Banks Announce Reductions in Policy Interest Rates," October 8, 2008, *Board of Governors of the Federal Reserve System*, <http://www.federalreserve.gov/newsevents/press/monetary/20081008a.htm>



**SRR**
STOUT|RISIUS|ROSS

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

preferred shares in qualifying financial institutions in an effort to increase lending to businesses and consumers.[241]

f. October 29, 2008: Following the lowering of the federal funds target rate on October 8th, the Federal Reserve further reduced its federal funds rate target to 1.0% on October 29, 2008, its lowest rate since June 2004.[242]

g. November 12, 2008: Based on a policy update per Treasury Secretary Henry M. Paulson, Treasury determined that the Capital Purchase Program was a more effective way to use the TARP funds than directly buying distressed assets from financial institutions.[243]

h. November 23, 2008: Shares of Citigroup Inc. ("Citigroup") fell 60% during the week ended November 21st to a 16-year low. Investor confidence decreased significantly during the month of November due to fears related to the values of Citigroup's loans and securities. In order to instill confidence in the company, Citigroup reached an agreement with Treasury, the Federal Reserve Board, and the FDIC on November 23, 2008 that provided the bank with a package of guarantees, liquidity access, and capital, including protection against the possibility of unusually large losses on an asset pool of $306 billion. Citigroup had already received $25 billion in TARP funds.[244,245]

i. December 19, 2008: Treasury announced that it would provide up to $13.4 billion in loans to GM and up to $4.0 billion to Chrysler Holding LLC ("Chrysler") using authority provided by the TARP.[246,247]

### VII.D. *Conclusion*

281. As detailed above, the Company continued to perform well subsequent to the Transaction Date, as evidenced by its ability to pay its debts as they became due and to negotiate better credit terms with its lenders. Further, Mr. Reilly fails to consider certain general macroeconomic, industry specific, and changing lifestyle and consumer preference dynamics that

---

[241] "Treasury Announces TARP Capital Purchase Program Description," October 14, 2008, *U.S. Department of the Treasury*,
<http://www.treas.gov/press/releases/hp1207.htm>

[242] "Open Market Operations," October 29, 2008, *The Federal Reserve Board*,
<http://www.federalreserve.gov/fomc/fundsrate.htm>

[243] "Remarks by Secretary Henry M. Paulson, Jr. on Financial Rescue Package and Economic Update," November 12, 2008, *U.S. Department of the Treasury*,
<http://www.treas.gov/press/releases/hp1265.htm>

[244] "Citigroup Tries to Steady Stock," November 22, 2008, *The Wall Street Journal*,
<http://www.wsj.com>

[245] "Joint Statement by Treasury, Federal Reserve, and the FDIC on Citigroup," *U.S. Department of the Treasury*, November 23, 2008

[246] "Secretary Paulson Statement on Stabilizing the Automotive Industry," December 19, 2008, *U.S. Department of the Treasury*,
<http://www.treas.gov/press/releases/hp1332.htm>

[247] "Indicative Summary of Terms for Secured Term Loan Facility," December 19, 2008, *U.S. Department of the Treasury*, <http://www.treas.gov/press/releases/hp1333.htm>



**STOUT | RISIUS | ROSS**

Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation

Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA

June 1, 2015

had a material impact on the Company subsequent to the Transaction that were not known or knowable as of the Transaction Date. Based thereon, Mr. Reilly's use of hindsight to attempt to validate his projections relative to actual results by using information that was not known or knowable as of the Transaction Date is inappropriate and unreasonable.


STOUT|RISIUS|ROSS

**Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation**

**Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA**

**June 1, 2015**

## VIII. Conclusions

### VIII.A. *Review of the Duff & Phelps Fairness Opinion*

282.    Based on my detailed review and analysis as described herein, it is my opinion that the Fairness Opinion was reasonable and supports the conclusions that the consideration to be received for the non-ESOP shares of the Company's common stock in the Transaction was fair to the Antioch ESOP from a financial point of view and that the terms and conditions of the Transaction were fair and reasonable to the Antioch ESOP from a financial point of view.

### VIII.B. *Critique of the Reilly Report*

283.    Based on my detailed review and analysis as described herein, I conclude that the conclusions in the Reilly Report are unreasonable and unreliable, and that the Antioch ESOP suffered no damages as a result of the Transaction.

98



**Bonnie Fish,
Christopher Mino,
Monica Lee Woosley,
Lynda D. Hardman,
Evolve Bank & Trust
v. GreatBanc Trust
Company, Lee
Morgan, Asha Moran,
Chandra Attiken, and
the Morgan Family
Foundation**

**Expert Report of
Jeffrey M. Risius,
CPA/ABV, CFA, ASA**

**June 1, 2015**

### IX. Assumptions and Limiting Conditions

284.  My conclusions are based on the information received to date. I reserve the right to change those conclusions should additional information be provided.

285.  No one that worked on this engagement has any known financial interest in the Company, the Antioch ESOP, or any related entities, or the outcome of the analysis. Further, Stout Risius Ross, Inc.'s compensation is neither based nor contingent on the results of the analysis.

286.  This report is solely for use in the cited dispute, for the purpose stated herein, and is not to be referred to or distributed, in whole or in part, without prior written consent.

Jeffrey M. Risius, CPA/ABV, CFA, ASA
Managing Director
Stout Risius Ross, Inc.

99

**APPENDIX 1**

**LIST OF DOCUMENTS RELIED UPON**

# Appendix 1 – List of Documents Relied Upon

1.  Responses to Interrogatories
2.  Second Amended Complaint
3.  1999 Annual Report
4.  2000 Annual Report
5.  2001 Annual Report
6.  2002 Annual Report
7.  2003 Annual Report
8.  2004 Annual Report
9.  2005 Annual Report
10. 2006 Annual Report
11. Antioch's 2007 Consolidated Financial Statements
12. 1998 BVI Report
13. 1999 BVI Report
14. 2000 BVI Report
15. 2001 BVI Report
16. 2002 BVI Report
17. 2003 Prairie Capital Report
18. 2004 Prairie Capital Report
19. 2005 Prairie Capital Report
20. 2006 Prairie Capital Report
21. 2007 Prairie Capital Report
22. Asha Moran Deposition, June 21, 2012
23. Peter Abrahamson Deposition, March 13, 2015
24. Nancy Blair Deposition, May 26, 2011
25. Barry Hoskins Deposition, September 15, 2011
26. Barry Hoskins Deposition, September 16, 2011
27. Barry Hoskins Deposition, March 11, 2010
28. Karen Ng Deposition, February 20, 2012
29. Helen Morrison Deposition, March 11, 2015
30. Lee Bloom Deposition, November 18, 2010
31. Lee Bloom Deposition, November 16, 2010
32. Wayne Alan Luce Deposition, February 17, 2015
33. Richard Wiser Deposition, March 9, 2015
34. Glenn Pollack Deposition, February 2, 2015
35. Julie Williams Deposition, April 13, 2015
36. Stephen Spencer, March 3, 2015
37. Michael Powe, December 3, 2014
38. Denis Sanan, February 24, 2015
39. Timothy Miller Deposition, December 18, 2012
40. Buchanan Report
41. Reilly Report
42. Deposition Exhibit 22
43. Deposition Exhibit 32
44. Deposition Exhibit 54
45. Deposition Exhibit 66
46. Deposition Exhibit 70
47. Deposition Exhibit 73
48. Deposition Exhibit 77
49. Deposition Exhibit 81
50. Deposition Exhibit 95
51. Deposition Exhibit 96

# Appendix 1 – List of Documents Relied Upon

52. Deposition Exhibit 106
53. Deposition Exhibit 116
54. Deposition Exhibit 119
55. Deposition Exhibit 131
56. Deposition Exhibit 132
57. Deposition Exhibit 132A
58. Deposition Exhibit 140
59. Deposition Exhibit 152
60. Deposition Exhibit 153
61. Deposition Exhibit 248
62. Deposition Exhibit 250
63. Deposition Exhibit 268
64. Deposition Exhibit 298
65. Deposition Exhibit 299
66. Deposition Exhibit 343
67. Deposition Exhibit 402
68. Deposition Exhibit 498
69. Deposition Exhibit 500
70. Deposition Exhibit 503
71. Deposition Exhibit 549
72. Deposition Exhibit 682
73. CHA00053
74. CS000756
75. DP_A002913
76. DP_A009999
77. HL049546
78. Shannon P. Pratt, Robert F. Reilly, and Robert P. Schweis, Valuing A Business – The Analysis and Appraisal of Closely Held Companies, Fourth Edition (New York, NY: McGraw-Hill, 2000)
79. Shannon P. Pratt, The Market Approach to Valuing Businesses, Fourth Edition (New York, NY: John Wiley & Sons, Inc., 2001)
80. Robert F. Reilly and Robert P. Schweis, Guide to ESOP Valuation and Financial Advisory Services, Second Edition (Chicago, IL: Willamette Management Associates Partners, 2007)
81. Delaware Open MRI Radiology Associates, P.A. v. Howard B. Kessler, et al., Delaware Chancery Court, April 26, 2006
82. In Re Sunbelt Beverage Corp. Shareholder Litigation, Delaware Chancery Court, January 5, 2010
83. The Greeting Card and Stationery Report, 2003: The Market, The Competitors, The Future Trends, Unity Marketing, 2003
84. IBIS World Industry Report, Camera and Photographic Supplies Stores in the US, September 8, 2003
85. Business; Catering to a Love Affair With the Past, The New York Times, December 28, 2003
86. Michaels Opens New ReCollections Store Amid a Scrapbooking Boom, Display & Design Ideas, August 1, 2003
87. Better Living Industry Commentary, Adams, Harkness & Hill, December 1, 2003
88. Cutting Through The Noise, Piper Jaffray, March 13, 2003
89. The Chicago Tribune, Pieces all fit for boom in scrapbooking, November 24, 2003
90. Newsweek, Beyond the Quilting Bee, October 20, 2002
91. The Pew Research Center, World Wide Web Timeline, March 11, 2014

## Appendix 1 – List of Documents Relied Upon

92. Thanks for the Memories, Forbes, November 29, 2004

93. Zoom in on Shutterfly, Initiating at Overweight, JP Morgan, November 8, 2006

94. Michaels closing two of its concept business, The Dallas Business Journal, October 16, 2007

95. Board of Governors of the Federal Reserve System, "Bear Stearns, JPMorgan Chase, and Maiden Lane LLC",
http://www.federalreserve.gov/newsevents/reform_bearstearns.htm

96. Ari Levy and David Mildenberg, "IndyMac Seized by U.S. Regulators; Schumer Blamed for Failure", Bloomberg L.P.,
http://www.bloomberg.com/apps/news?pid=newsarchive&sid=aAYLeK3YAie4

97. Hernandez, Saundra, "Ten-Year Treasuries Gain on Concern Takeover Won't Halt Slide," September 8, 2008, Bloomberg L.P., http://www.bloomberg.com

98. Ellis, David, "U.S. Seizes Fannie and Freddie", 8 September 2008, CNN Money, < http://money.cnn.com/2008/09/07/news/companies/fannie_freddie/>

99. Treasury Announces Temporary Guarantee Program for Money Market Funds," September 29, 2008, U.S. Department of the Treasury,
http://www.treas.gov/press/releases/hp1161.htm

100. "Fact Sheet: Proposed Treasury Authority to Purchase Troubled Assets," September 20, 2008, U.S. Department of the Treasury,
http://www.treas.gov/press/releases/hp1150.htm

101. Christie, Rebecca and Robert Schmidt, "Treasury to Hire Asset Management Firms to Jumpstart Rescue," October 4, 2008, Bloomberg L.P., http://www.bloomberg.com

102. "Deposit Insurance Coverage Temporary Increase in Coverage," October 3, 2008, Federal Deposit Insurance Corporation,
http://www.fdic.gov/news/news/financial/2008/fil08102.html

103. "Federal Reserve and Other Central Banks Announce Reductions in Policy Interest Rates," October 8, 2008, Board of Governors of the Federal Reserve System,
http://www.federalreserve.gov/newsevents/press/monetary/20081008a.htm

104. "Treasury Announces TARP Capital Purchase Program Description," October 14, 2008, U.S. Department of the Treasury, http://www.treas.gov/press/releases/hp1207.htm

105. Open Market Operations," October 29, 2008, The Federal Reserve Board,
http://www.federalreserve.gov/fomc/fundsrate.htm

106. "Remarks by Secretary Henry M. Paulson, Jr. on Financial Rescue Package and Economic Update," November 12, 2008, U.S. Department of the Treasury,
http://www.treas.gov/press/releases/hp1265.htm

107. "Citigroup Tries to Steady Stock," November 22, 2008, The Wall Street Journal,
http://www.wsj.com

108. "Joint Statement by Treasury, Federal Reserve, and the FDIC on Citigroup," U.S. Department of the Treasury, November 23, 2008

109. "Secretary Paulson Statement on Stabilizing the Automotive Industry," December 19, 2008, U.S. Department of the Treasury,
http://www.treas.gov/press/releases/hp1332.htm

110. "Indicative Summary of Terms for Secured Term Loan Facility," December 19, 2008, U.S. Department of the Treasury, http://www.treas.gov/press/releases/hp1333.htm

111. Stocks, Bonds, Bills and Inflation Valuation Edition, Morningstar, Inc.

112. Various SEC Filings

113. S&P Capital IQ, Inc.

114. Bloomberg, L.P.

115. Other publicly available information cited in this report

**APPENDIX 2**

**CURRICULUM VITAE**



**Managing Director**

**Education**

M.B.A.
Indiana University
Graduate School of
Business
*Finance*

B.S.
Indiana University
School of Business
*Accounting (with Honors)*

**Professional
Designations**

Certified Public
Accountant
*Accredited in Business
Valuation*

Chartered Financial
Analyst

Accredited Senior
Appraiser

# Jeffrey M. Risius, CPA/ABV, CFA, ASA

Jeffrey M. Risius is a Managing Director and leads the firm's Valuation & Financial Opinions Group. He has extensive experience in the field of valuation, litigation and related expert testimony, and mergers & acquisitions. His valuation advisory experience encompasses a broad range of industries and has been performed for numerous purposes including fairness and solvency opinions, estate and gift taxation, Employee Stock Ownership Plans, purchase price allocation, purchase and sale advisement, restructuring, and other corporate, tax, and shareholder planning. He specializes in valuation in a litigation setting; his related experience includes shareholder disputes, fraudulent conveyance matters, transaction disputes, bankruptcy related valuation litigation, and other litigation involving complex valuation issues.

Among the many industries Mr. Risius has served are automotive, banks and thrifts, broadcasting, communications, computer software, construction, consumer products, entertainment, food and beverage distribution, food processing, graphics and printing, healthcare, manufacturing, oil and gas, publishing, retailing, security systems, staffing, textiles, metal stamping, motion picture theaters, plastics, steel, technology, tire and rubber manufacturing, transportation, and wholesale distribution.

Among other publications, Mr. Risius authored a book titled Business Valuation: A Primer for the Legal Professional, published by the Business Law Section of the American Bar Association. Mr. Risius has lectured and presented numerous continuing education seminars on the subjects of valuation, litigation advisory services, succession planning, and transaction advisory services. In addition, Mr. Risius has testified as an expert witness at trial in state and federal courts, public service hearings, arbitration, and in deposition.

Prior to joining SRR, Mr. Risius was a senior manager with Price Waterhouse in its Valuation Services Group in Chicago. During his tenure with Price Waterhouse, he planned, performed, and supervised valuation and litigation consulting engagements.

Mr. Risius is on the Board of the Financial and Estate Planning Council of Metropolitan Detroit. Mr. Risius is also a past Vice President of the Michigan Chapter of The ESOP Association and a past member of the Valuation Advisory Committee of The ESOP Association. He is a senior member of the American Society of Appraisers (ASA) and a member of the American Institute of Certified Public Accountants, the Association of Insolvency & Restructuring Advisors (AIRA), the Michigan Association of CPAs (MICPA), the CFA Institute, the CFA Society of Chicago, and the American Bankruptcy Institute (ABI).

Investment
Banking

Valuation
& Financial Opinions

Dispute Advisory
& Forensic Services

Atlanta | Baltimore | Chicago | Cleveland | Dallas | Denver | Detroit
Houston | Los Angeles | New York | Tysons Corner | Washington D.C.

www.SRR.com



**STOUT | RISIUS | ROSS**

**Jeffrey M. Risius, CPA/ABV, CFA, ASA**
**Managing Director**

# Jeffrey M. Risius, CPA/ABV, CFA, ASA

## Testimony Experience:

SII Liquidation Company, John B. Pidcock, not individually but as the creditor trustee of the Schwab Industries, Inc. Creditor Trust v. Jerry A. Schwab, Donna L. Schwab, and David A Schwab, United States Bankruptcy Court, Northern District of Ohio, Eastern Division, 2015

Chris A. Davis v. 24 Hour Fitness Worldwide, Inc., U.S. District Court, District of Delaware, 2014

Bob Smith Automotive Group, Inc., Giant GMC, Inc. and William Lee Denny v. Ally Financial Inc., Circuit Court for Talbot County, Maryland, 2014

Adrian Steel Company v. Shelby M. Balik and William Philpott, et al., State of Michigan, Lenawee County Circuit Court, 2014

Thomas W. Charron, Jr., Individually and as Trustee of the Thomas W. Charron Jr. Grantor Retained Annuity Trust Dated July 8, 2010 v. Sallyport Global Holdings, Inc., Gian Paul DeBlasio (a/k/a John P. DeBlasio), et al., U.S. District Court, Southern District of New York, 2014

The Antioch Company Litigation Trust, W. Timothy Miller, Trustee v. Lee Morgan, et al., U.S. District Court, Southern District of Ohio, Western Division, 2013

The Brown Publishing Company Liquidating Trust v. Roy E. Brown, et al., U.S. Bankruptcy Court, Eastern District of New York, 2013

Micheal J. Demil, Henri James Demil, Sarah Mae Demil, Hannah Rene Demil, and Savannah Lynn Demil v. RMD Holdings, Ltd. and Robert E. Demil, State of Michigan, Circuit Court for the County of Macomb, 2013

Estate of Franklin Z. Adell, Deceased, Kevin R. Adell, Temporary Co-Personal Representative v. Commissioner of Internal Revenue, United States Tax Court, 2012

Police and Fire Retirement System and General Retirement System of the City of Detroit v. Donald V. Watkins, Watkins Aviation, LLC, Northpoint Advisors, LLC, Adrian Anderson, and Jeffrey Conry, U.S. District Court, Eastern District of Michigan, Southern Division, 2011

John F. Korachis v. Basil T. Simon, Stephen P. Stella, Peter N. Zingas, and Simon, Stella & Zingas, P.C. and Simon, Stella & Zingas, P.C. v. Law Offices of John F. Korachis and Associates, PLLC, State of Michigan, 3rd Circuit Court for the County of Wayne, 2011

Liccardi Motors, Inc. v. Chrysler Group LLC, American Arbitration Association, New Jersey, 2010



**STOUT | RISIUS | ROSS**

Jeffrey M. Risius,
CPA/ABV, CFA, ASA
Managing Director

# Jeffrey M. Risius, CPA/ABV, CFA, ASA

**Testimony Experience:**

Midtown Motors, Inc., dba John Howard Motors v. Chrysler Group LLC, American Arbitration Association, West Virginia, 2010

Richard D. Nelson, as Trustee of Petro Acquisitions, Inc. v. Walnut Investment Partners, L.P., U.S. District Court, Southern District of Ohio, 2010

U.S. Securities and Exchange Commission v. Delphi Corporation, et al., U.S. District Court, Eastern District of Michigan, 2009

Craig London, James Hunt, and MA Federal, Inc. v. Michael Tyrrell, Patrick Neven, and Walter Hupalo, State of Delaware, Court of Chancery for the County of New Castle, 2009

ILSBio, LLC v. Asterand, Inc., et al., U.S. District Court, Eastern District of Michigan, 2009

Idearc, Inc., et al., The Official Committee of Unsecured Creditors, on behalf of Idearc, Inc. v. JPMorgan Chase Bank, N.A. as Administrative Agent for Lenders, U.S. Bankruptcy Court, Northern District of Texas, Dallas Division, 2009

Craig London, James Hunt, and MA Federal, Inc. v. Michael Tyrrell, Patrick Neven, and Walter Hupalo, State of Delaware, Court of Chancery for the County of New Castle, 2009

Jay E. Link v. L.S.I, Inc., et. al., State of South Dakota, Circuit Court for the County of Jerauld, 2009

Global Link Logistics, Inc., et al. v. Olympus Growth Fund III, L.P., et al., American Arbitration Association, Illinois, 2008

Anthony Carmen, Jr. v. Tecnoma, LLC, et al, State of Michigan, Circuit Court for the County of Oakland, 2008

Aaron H. Gershenson Trust v. Ramco-Gershenson, Inc., and Ramco Gershenson Properties Trust, Private Arbitration, Michigan, 2007

Gary J. Grosicki v. Trident Systems, Inc., et al., State of Virginia, Circuit Court for the County of Fairfax, 2007

Mark A. Hiner v. Ashland Broadcasting Corporation, et al., U.S. District Court, Southern District of Ohio, Columbus Division, 2006

Global Technovations, Inc., et al., v. Onkyo U.S.A. Corporation, et al., U.S. Bankruptcy Court, Eastern District of Michigan, Southern Division, 2006



**STOUT | RISIUS | ROSS**

**Jeffrey M. Risius, CPA/ABV, CFA, ASA**
**Managing Director**

# Jeffrey M. Risius, CPA/ABV, CFA, ASA

**Testimony Experience:**

David Brent Leininger, Jennifer Lynne Hauser, and Stephen Andrew Leininger v. Jon Channing Utter, Dean P. Baker, and Joseph S. Northrop, Individually and as the Trustees of the Revocable Agreement of Kay Joan Brown, State of Indiana, Circuit Court for the County of Huntington, 2006

Kenneth Meade v. Deborah Meade, State of Michigan, Circuit Court for the County of Ogemaw, 2006

Martin F. Fiascone and Edmund J. Sweeney v. John S. Stafford, Jr., individually, John S. Stafford, III, individually, and John S. Stafford, Jr., and John S. Stafford, III doing business as Stafford Trading Group, and Ronin Capital, LLC, successor in interest to Stafford Trading Group, State of Illinois, Circuit Court for the County of Lake, 2006

G. Jeff Mennen, et al. v. Onkyo Corporation, et al., U.S. District Court, Southern District of Florida, 2005

Global Technovations, Inc., et al., v. Onkyo America, Inc., U.S. Bankruptcy Court, Eastern District of Michigan, Southern Division, 2005

Hirsh Industries, Inc. et al., U.S. Bankruptcy Court, Southern District of Indiana, Indianapolis Division, 2005

Horiba Instruments, Inc., v. AVL North America, Inc., U.S. District Court, Central District of California, 2005

Q Sales & Leasing, L.L.C. v. Quilt Protection, Inc. and Robert Grady, U.S. District Court, Northern District of Illinois, Eastern Division, 2004

Joseph Henry & Michael Malinky v. Champlain Enterprises, Inc. dba CommutAir, et al., U.S. District Court, Northern District of New York, Albany Division, 2004

Magnex Corporation, et al. v. Joseph Pinkerton, et al., State of Michigan, Circuit Court for the County of Wayne, 2003

Torretta v. Torretta, State of Michigan, Circuit Court for the County of Oakland, 2002

Branford Townhouses Cooperative v. City of Taylor, Michigan Tax Tribunal, 2002

Raymond J. Martin, et al., v. Martin Bros. Container & Timber Products Corp., an Ohio Corp., et al., U.S. District Court, Northern District Of Ohio, Western Division, 2002

Xcel Manufacturing v. Homedics, Inc., U.S. District Court, Eastern District of Michigan, Southern Division, 2002



**STOUT | RISIUS | ROSS**

**Jeffrey M. Risius,
CPA/ABV, CFA, ASA
Managing Director**

# Jeffrey M. Risius, CPA/ABV, CFA, ASA

## Testimony Experience:

Ameritech Corporation, et al. v. George F. Riley, et al., U.S. District Court, Eastern District of Michigan, Southern Division, 2002

Bruce A. Miller and Norton J. Cohen v. Martens, Ice, Geary, Klass, Legghio & Gorchow P.C., State of Michigan, Circuit Court for the County of Oakland, 2002

Federal-Mogul Global Inc., et al., Debtors, U.S. Bankruptcy Court, District of Delaware, 2001

Noble v. National Auto Glass & Mirror, Inc., et al., State of Michigan, Circuit Court for the County of Oakland, 2001

Joseph Marasco v. Dales & Graphic Systems, L.L.C., State of Michigan, Circuit Court for the County of Wayne, 2001

Plastech Exterior Systems, Inc. v. Grupo Antolin Kentucky, Inc., State of Michigan, Circuit Court for the County of Oakland, 2001

Amway C Corporation v. Procter & Gamble, et al., U.S. District Court, Western District of Michigan, 2001

Robert B. McQueen, et al. v. Thomas Horn, et al., U.S. District Court, Western District of Kentucky, 2001

Paul Murray v. Susan Murray, State of Michigan, Circuit Court for the County of Isabella, 2000

Russell P. Dippel, Jr. v. Orsco, Inc., State of Michigan, Circuit Court for the County of Macomb, 1998

Brody v. Brody, State of Michigan, Circuit Court for the County of Oakland, 1998

Estate of George Riff v. St. John Hospital and Medical Center, State of Michigan, Circuit Court for the County of Wayne, 1998

Kotsonis v. Kotsonis, State of Michigan, Circuit Court for the County of Macomb, 1998

CMS Gas Transmission and Storage v. Abate, et al., Michigan Public Service Commission, 1997

Mackin v. Mackin, State of Michigan, Circuit Court for the County of Oakland, 1997



**STOUT | RISIUS | ROSS**

Jeffrey M. Risius,
CPA/ABV, CFA, ASA
Managing Director

# Jeffrey M. Risius, CPA/ABV, CFA, ASA

**Publications:**

"Adelphia Fraudulent Transfer Litigation: A 'Poster Child' Situation for Exclusion of the Discounted Cash Flow Method," *The SRR Journal*, Fall 2014

"Another Tax Court Case Addresses the Question of Whether Identified Intangible Value is Business Goodwill or Personal Goodwill," *The SRR Journal*, Fall 2014

"The Orchard Enterprises, Inc.: The Delaware Court Analyzes Valuation and Whether or Not Only a Bum Would Utilize the BUM," *The SRR Journal*, Spring 2013

"Just Care, Inc.: Shareholders Lose Argument Regarding Inadequate Offering Price," The SRR Journal, Fall 2012

"Valuation's Crucial Role in the Bankruptcy Process," Valuation Strategies, March/April 2012

"Mirant Corporation Bankruptcy: A Thorough Review of Valuation by the Bankruptcy Court," The SRR Journal, Spring 2012

"The Use of Personal Goodwill as a Tax Savings Opportunity in a Transaction: Recent Case Law Highlights the Importance of Good Facts and Economic Support," *The SRR Journal*, Fall 2011

"Significant Valuation and Expert Witness Credibility Issues in Chemtura Corp. Bankruptcy," *The SRR Journal*, Spring 2011

"Valuation in Bankruptcy", *Business Valuation*, edited by Ronald S. Longhofer, New York: Law Journal Press, 2010

"Impact of Recent Market Trends on Section 1111(b)(2) Elections Involving Real Property," *The SRR Journal*, Fall 2010

"Business Valuation Issues", *Buying and Selling a Business in Michigan*, edited by Thomas G. Appleman, Charles W. Borgsdorf, and Michael A. Idenbaum, 2nd ed., Michigan: The Institute of Continuing Legal Education, 2010

"Class Battle of Valuation Experts: TOUSA, Inc., Fraudulent Conveyance Case," *The SRR Journal*, Spring 2010

"Business Valuation 101 for Attorneys," *The SRR Journal*, Fall 2009

"Valuation – The Cornerstone of the Bankruptcy Process," *The SRR Journal*, Fall 2009

"Business Valuation: Why "Cookie Cutter" Approaches Are Ineffective," *Expert Witness*, 2009 Annual Review



**SRR**
STOUT | RISIUS | ROSS

**Jeffrey M. Risius,
CPA/ABV, CFA, ASA
Managing Director**

# Jeffrey M. Risius, CPA/ABV, CFA, ASA

**Publications:**

"What Price Phelps' Gold," *Trusts & Estates*, October 2008

"Business Valuation: A Primer for the Legal Professional", *Chicago: ABA Publishing, American Bar Association Section of Business Law*, 2007

"The Definitions of Value in Bankruptcy," *AIRA Journal*, Association of Insolvency and Restructuring Advisors, June/July 2006

"Ignoring the Value of Personal Goodwill Can Result in Unnecessary Tax Burdens to Sellers in Certain C-Corporation Sales," *The SRR Journal*, Fall 2005

"Intangible Asset Valuation is a Critical Issue In Supporting a Worthless Stock Deduction," *The SRR Journal*, Fall 2005

"Blind Application of Valuation Multiples Can Blur the Result," *AIRA Journal*, Association of Insolvency and Restructuring Advisors, August/September 2005

"Obsolescence ID: How to Identify and Measure Economic Obsolescence in Underperforming Assets," *Insights (online)*, Illinois CPA Society, May/June 2005

"Trends in Purchase Price Allocations under SFAS 141: Goodwill Remains the Most Significant Portion of the "Intangible Gap," The SRR Journal, Spring 2005

"International Cost of Equity: Bringing the Pie out of the Sky," The SRR Journal, Fall 2004

"Voila! Identifying and Measuring Economic Obsolescence with Underperforming Global Assets," The SRR Journal, Fall 2004

"Level of Value Implications in Light of Eckelkamp," ESOP Report, May 2003

"Double-dipping Is Not Just A Problem With Ice Cream: Evaluating Duplicative Claims For Economic Damages," *Michigan Defense Quarterly*, October 2002

"Primer for the Attorney to Understand Financial Statements in the Context of Commercial Litigation," Litigation Section of the State Bar of Michigan's '*The Litigation Newsletter*', Spring 2001

"Stock Premiums and Estate Planning," *Michigan Lawyers Weekly*, November 1999

"Family Limited Partnerships Can Offer Savings on Estate, Gift Taxes," *Business First* (Columbus, Ohio), November 1999

"Valuation Issues Associated With Family Limited Partnerships," *Michigan Tax Lawyer*, First Quarter 1997



**Jeffrey M. Risius,**
**CPA/ABV, CFA, ASA**
**Managing Director**

# Jeffrey M. Risius, CPA/ABV, CFA, ASA

**Publications:**

"How Family Limited Partnerships Can Be Used to Reduce Gift/Estate Taxes," *The Tax Advisor*, July 1995

"IRS Intangible Asset Settlement Guidelines Impact on Broadcasters," *Broadcast Cable Financial Management Journal*, May 1994

**Speeches and Seminars:**

"Personal Goodwill Valuation Implications Based on Recent Tax Court Decisions," presented to the Estate and Trust Committee of the Taxation Section of the Michigan Bar Association (Southfield, MI) October 30, 2014

"Business Valuations and Appraisals," presented to the ICLE Business Boot Camp (Plymouth, MI), January 14, 2014

"Business Valuations and Appraisals," presented to the ICLE Business Boot Camp (Grand Rapids, MI), November 5, 2013

"To Merge or Not to Merge", presented at the World Services Group (WSG) Annual Meeting (Rio de Janeiro, Brazil), September 20, 2013

"Use of Market Evidence in Distressed Business Valuation," presented at the Association of Insolvency & Restructuring Advisors (AIRA) 29th Annual Bankruptcy & Restructuring Conference (Chicago, IL), June 7, 2013

"Business Valuation Issues in Bankruptcy," Business Valuation Resources Webinar, March 1, 2012

"Business Valuation Issues in Bankruptcy Context," presented at the American Society of Appraisers (ASA) 30th Annual Advanced Business Valuation Conference (Chicago, IL), October 12, 2011

"Business Valuations and Appraisals," presented to the ICLE Business Boot Camp (Grand Rapids, MI), November 9, 2010

"Estate and Gift Tax Valuation: Pressing Issues, Financial Explanations, and Typical IRS Inquiries," presented to the United States Law Firm Group (Bloomfield Hills, MI), September 30, 2010

"Business Valuation Issues Relevant for Estate Planners," presented at the Annual Conference of The Estate Planning Council of Central New York (Syracuse, NY), May 19, 2010

"Valuation of Family Limited Partnerships and Family Limited Liability Companies," presented at ICLE After Hours Tax Law Series: Hot Topics in Estate & Gift Tax (Plymouth, MI), February 23, 2010



**Jeffrey M. Risius, CPA/ABV, CFA, ASA**
Managing Director

# Jeffrey M. Risius, CPA/ABV, CFA, ASA

**Speeches and Seminars:**

"Estate and Gift Tax Valuation: How the 'Black Box' Actually Works!," presented at the Notre Dame Tax and Estate Planning Institute (South Bend, IN), October 1, 2009

"Business Valuation Issues in Bankruptcy," presented at the Business Valuations Seminar hosted by the CPA Associates International (CPAAI) (Baltimore, MD), July 20-21, 2009

"Estate of Litchfield v. Commissioner: The Latest Development in the Evolution of Case Law Recognizing Built-in Gains Tax Liabilities," SRR Webinar, April 22, 2009

"Business Valuation Issues in Bankruptcy," presented at the Columbus Bar Association – Bankruptcy Committee (Columbus, OH), March 12, 2009

"Business Valuation Issues for Attorneys to Understand," presented at the ICLE Business Boot Camp Program (Plymouth, MI), February 26, 2009

"Business Valuation Issues for Attorneys to Understand," presented at the ICLE Business Boot Camp Program (Grand Rapids, MI), February 12, 2009

"Business Valuations Issues with Pass-Through Entities," presented at the Michigan Bar's 2008 LLC and Business Entity Update (Plymouth, MI), February 26, 2008

"Business Valuations Issues with Pass-Through Entities," presented at the Michigan Bar's 2008 LLC and Business Entity Update (Grand Rapids, MI), February 8, 2008

"Business Valuation Issues in Bankruptcy Context," presented at the American Institute of Certified Public Accountants (AICPA) National Business Valuation Conference (New Orleans, LA), December 2, 2007

"Advanced Business Valuation Issues," presented at the MACPA Litigation & Business Valuation Conference (Livonia, MI), June 12, 2007

"Increasing the Value of Manufacturing Companies – Business Experts Discuss How to Increase Value Before a Manufacturer's Merger or Acquisition," presented at the Small Business Forum of the Business Law Section of the State Bar of Michigan (Birmingham, MI), May 23, 2007

"Valuation Issues in Litigation," presented at the ICLE After Hours Tax Series (Plymouth, MI), February 27, 2007

"Reconciling Income Approach Methodologies," presented at the AICPA National Business Valuation Conference (Austin, TX), December 4, 2006

"Valuation Principles," presented at the ICLE Fundamentals of Closely Held Business Practice Seminar (Plymouth, MI), November 1, 2006



STOUT | RISIUS | ROSS

**Jeffrey M. Risius,
CPA/ABV, CFA, ASA
Managing Director**

# Jeffrey M. Risius, CPA/ABV, CFA, ASA

**Speeches and Seminars:**

"Valuation Discounts in Estate/Gift Tax Contexts," presented at the MACPA Advanced Tax Forum (Novi, MI), October 26, 2006

"Succession Planning Options for Closely-held Companies," presented at the 46th Annual Probate and Estate Planning Institute Conference, (Troy, MI), June 9, 2006

"A Basic ESOP Primer - Just about everything you absolutely need to know, or else!," presented at the 18th Annual Business Law Institute Conference, (Mt. Pleasant, MI), June 2, 2006

"Succession Planning Options for Closely-held Companies - Advantages and Disadvantages," presented at the 46th Annual Probate and Estate Planning Institute Conference, (Traverse City, MI), May 18, 2006

"Current Business Valuation Issues Including Latest on AICPA Proposed Statement on Standards for Valuation Services," presented at the Michigan Association of CPA's Current Accounting Issues Conference, (Lansing, MI), May 11, 2006

"Business Valuations and Appraisals," presented at the ICLE Business Boot Camp I, (Detroit, MI), February 27, 2006

"Business Valuations and Appraisals," presented at the ICLE Business Boot Camp I, (Grand Rapids, MI), February 8, 2006

"Valuation Issues in Tax Reporting Contexts," presented to the Tax Executives Institute Detroit Chapter, October 19, 2005

"Valuation Issues in Tax Reporting Contexts," presented to the Tax Executives Institute Western Michigan Chapter, September 8, 2005

"Business Valuation 101," presented at the MACPA's Summer Management Information Show, June 29, 2005

"Valuation Issues Surrounding Buy/Sell Agreements," presented at the ICLE's 17th Annual Business Law Institute Conference, June 3, 2005

"Business Valuation in Bankruptcy Situations," presented at the TMA/RMA Spring Symposium, May 25, 2005

"Valuation Issues Surrounding Family LLC's and FLP's," presented to the Estates and Trusts Committee - Tax Section of Michigan State Bar, April 20, 2005

"Recent Court Decisions Involving Valuation Issues," presented to the Business Entities Committee - Taxation Section of Michigan Sate Bar, April 7, 2005



**Jeffrey M. Risius,
CPA/ABV, CFA, ASA
Managing Director**

# Jeffrey M. Risius, CPA/ABV, CFA, ASA

**Speeches and Seminars:**

"Business Succession Planning Options in the Current Economic Environment," presented to The Financial and Estate Planning Council of Macomb, March 10, 2005

"Fiduciary Review of Valuation Reports," presented at The ESOP Association – The 2004 Two Day Conference (Las Vegas, NV), November 4, 2004

"Roundtable Presentation: Hot Topics in Business Valuation," presented at the ICLE – After Hours Tax Conference (Lansing, MI), October 19, 2004
"Understanding Your Role as An ESOP Trustee," presented to the MI ESOP Association (Lansing, MI), October 12, 2004

"Business Succession Options in the Current Economic Environment," presented at the 17th Annual Summer Tax Conference, June 25, 2004

Drop in ESOP Share Value Post-Transaction," presented at the 27th Annual Conference of the ESOP Association (Washington, D.C.), May 13, 2004

"Current Issues Surrounding FLPs/FLLCs," presented to the Estate and Probate Section of the Oakland County Bar, January 26, 2004

"Appraising ESOP Shares and Communicating the Value to Employees," presented at The ESOP Association – The 2003 Two Day Conference (Las Vegas, NV), November 20, 2003

"Valuing ESOP Shares and Communicating That Value to Employee Owners," presented at The ESOP Association Annual Fall Conference (Lansing, MI), October 22, 2003

"Business Valuation Issues: Experience Exchange Workshop," presented at the MACPA: Litigation & Business Valuation Conference (Lansing, MI), June 17, 2003

"SFAS 141 and 142 Valuation Issues," presented at the MACPA: Litigation & Business Valuation Conference (Lansing, MI), June 17, 2003

"Fiduciary Issues for Internal Trustees," presented at the 26th Annual Conference of the ESOP Association (Washington, D.C.), May 1, 2003

"Cash Flow: The Driver of Intangible Asset Value and Economic Obsolescence," presented at the Michigan Department of Treasury/IPT: Michigan One-Day Tax Seminar, April 24, 2003

"Valuation of Intellectual Property," presented to the Intellectual Property Section of the Washtenaw County Bar, April 15, 2003

"Business Valuation Primer for Attorneys," presented at the ICLE – Business Boot Camp (Grand Rapids, MI), February 18, 2003



**STOUT | RISIUS | ROSS**

**Jeffrey M. Risius, CPA/ABV, CFA, ASA**
**Managing Director**

# Jeffrey M. Risius, CPA/ABV, CFA, ASA

**Speeches and Seminars:**

"Business Valuation Primer for Attorneys," presented at the ICLE – Business Boot Camp (Detroit, MI), February 14, 2003

"Appraising ESOP Shares and Communicating Value," presented at The ESOP Association – The 2002 Two Day Conference (Las Vegas, NV), November 14, 2002

"The Repurchase Obligation and Stock Value," presented at the MACPA: Fall Accounting Conference (Michigan), October 23, 2002

"Latest Developments in FLP and FLLC Arena," presented at the Workshop for Managing Closely-Held Business Interests in Estates and Trusts (Michigan), September 26, 2002

"Succession Strategies for Closely-Held Companies," presented to the Ohio Society of CPAs, June 18, 2002

"How to Use Financial Statements in the Financial Decision-Making Process," presented at the MACPA: Current Accounting Issues Conference (Troy, MI), June 13, 2002

"Valuation of Fractional Interests in Real Estate," presented at the National Real Estate Conference (Detroit, MI), May 17, 2002

"Expert Testimony and Preparing an Expert Witness," presented at the MACPA: Fraud Issues Conference (Troy, MI), May 17, 2002

"Business Valuation Issues for the Accountant," presented at the MACPA: Current Accounting Issues Conference (Lansing, MI), May 13, 2002

"Latest Developments in FLP and FLLC Arena," presented to the Estate Planning, Probate and Trust Law Section of the Cleveland Bar Association, January 15, 2002

"How to Communicate Business Valuations to Clients," presented at the MACPA: Management Information Shows (Livonia, MI), June 28 and 29, 2001

"How to Use Financial Statements," presented at the MACPA: Current Accounting Issues Conference, June 21, 2001

"Business Valuation Issues for the Accountant," presented at the MACPA: Current Accounting Issues Conference (Troy, MI), June 21, 2001

"Measurement of Economic Damages," presented at the MACPA: Valuation/Litigation Conference (Lansing, MI), June 12, 2001

"Buy-Sell Agreements and Other Business Valuation Issues," presented at the ICLE – Choice of Entity Conference (Austin, TX), May 4, 2001



**STOUT | RISIUS | ROSS**

**Jeffrey M. Risius,
CPA/ABV, CFA, ASA
Managing Director**

# Jeffrey M. Risius, CPA/ABV, CFA, ASA

**Speeches and Seminars:**

"Solving the Business Valuation Problem," presented to the ICLE – Succession Planning for Family Businesses, December 12, 2000

"How to Work with a Business Valuation Professional to Obtain Optimum Results," presented at the 2000 Notre Dame Tax and Estate Institute, September 14, 2000

"Business Valuation Issues with ESOPs," presented at the Huntington Bank ESOP Conference, March 13, 2000

"Hot Topics Involving Family Limited Partnerships," presented to the Columbus Estate Planning Council II, March 8, 2000

"Resolution of Real Estate Partnership and Membership Disputes," presented to the State Bar of Michigan – Real Property Law Section, February 10, 2000
"Valuation Issues Associated with Pass-Through Entities," presented at the 'Back to Basics' Partnership, LLC & S-corporation Seminar Presented by CCH (Las Vegas, NV and Chicago, IL), September 27, 1999 and October 25, 1999

"Business Valuation Issues in Estate Planning," presented at the American Bar Association – 1999 Annual Meeting (Atlanta, GA), August 6, 1999

"Valuation of Privately Held Companies," presented at the CLFER&L Seminar for Independent Accountants Association of Michigan, June 22, 1999

"How to Review a Business Valuation Report and Other Hot Topics in Business Valuation," presented to the Cleveland Estate Planning Council, June 8, 1999

"Business Valuation Issues," presented to the Washtenaw Estate Planning Council, May 6, 1999

"Estate Planning and Related Valuation Issues," presented at the MACPA – Income & Estate Taxation Conference, May 4, 1999

"Estate Planning and Valuations," presented to the Estate Planning Council of Columbus # 1, March 17, 1999

"Valuation of Closely Held Businesses, Limited Liability Companies, Family Limited Partnerships, and Related Entities," presented to the Colorado Bar Association CLE – Estate Planning for Family Owned Businesses, March 5, 1999

"Estate Planning and Valuations," presented to The Northeastern Michigan Estate Planning Council, January 28, 1999 "Estate Planning and Valuations," presented at the Ohio CLE Institute – Workshop Series, December 1, 1998



**STOUT | RISIUS | ROSS**

**Jeffrey M. Risius,
CPA/ABV, CFA, ASA
Managing Director**

# Jeffrey M. Risius, CPA/ABV, CFA, ASA

**Speeches and Seminars:**

"Valuation of Closely Held Businesses," presented at the MACPA – CPA/Attorney Conference, November 6, 1998

"Valuation of Closely Held Businesses, Limited Liability Companies, Family Limited Partnerships, and Related Entities," presented at the 24th Annual Notre Dame Tax & Estate Planning Institute, October 29, 1998

"Estate Planning and Valuations," presented at the Taxation Section of the State Bar of Michigan – Summer Tax Conference, June 19, 1998

"Estate Planning and Business Valuation," presented at The Institute of Continuing Legal Education – Annual Probate and Estate Planning Seminar, May 1, 1998

"Business Valuation Issues," presented to the Oakland County Bar Probate and Estate Planning Section, April 27, 1998

"Valuation Discount Issues Involving FLPs and FLLCs," presented to the Partnership, Corporation and Real Estate Tax Sections of Michigan State Bar, March 26, 1998

"Estate Planning and Valuation," presented to the Washtenaw County Estate Planning and Probate Section, February 23, 1998

"Estate Planning and Business Valuation," presented to the MACPA Education Monthly Meeting Group, November 20, 1997

"Business Valuation Issues," presented to the Livonia Bar Association, May 20, 1997

"Asset Valuation Issues," presented to the Indiana Continuing Legal Education Forum, January 28, 1997

**EXHIBIT A**
**ANTIOCH'S AUDITED FINANCIAL STATEMENTS**

**Exhibit A.1 - Reported Balance Sheets**

*In Thousands of U.S. Dollars*

| | | | | | As of | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 12/31/1998 | 12/31/1999 | 12/31/2000 | 12/31/2001 | 12/31/2002 | 12/31/2003 | 12/31/2004 | 12/31/2005 | 12/31/2006 | 12/31/2007 |
| 1 Cash and Cash Equivalents | $ 9,533 | $ 2,216 | 12,572 | $ 12,237 | $ 33,334 | $ 26,597 | $ 4,359 | $ 3,118 | $ 5,843 | $ 7,563 |
| 2 Accounts Receivable | 4,586 | 4,555 | 3,955 | 2,308 | 2,692 | 3,433 | 2,899 | 3,956 | 3,983 | 3,135 |
| 3 Related Party Receivable | 0 | 0 | 0 | 1,865 | 1,976 | 0 | 0 | 0 | 0 | 0 |
| 4 Other Receivables | 5,235 | 1,359 | 419 | 1,240 | 794 | 2,271 | 808 | 1,121 | 761 | 4,615 |
| 5 Inventories, Net | 18,380 | 25,760 | 28,014 | 42,246 | 43,414 | 42,604 | 46,194 | 45,644 | 36,713 | 31,158 |
| 6 Prepaid Expenses and Other Current Assets | 1,593 | 1,982 | 2,987 | 6,628 | 1,924 | 1,746 | 3,729 | 4,302 | 5,956 | 5,024 |
| 7 **Total Current Assets** | **39,327** | **35,872** | **47,947** | **66,524** | **84,134** | **76,651** | **57,999** | **58,141** | **53,256** | **51,495** |
| 8 Land | 1,143 | 1,445 | 1,445 | 1,445 | 2,951 | 2,974 | 4,265 | 3,929 | 4,021 | 1,897 |
| 9 Building | 13,304 | 13,481 | 17,392 | 17,745 | 25,426 | 40,306 | 39,211 | 33,582 | 33,287 | 10,095 |
| 10 Equipment, Fixtures, and Computer Software | 26,502 | 34,913 | 42,754 | 48,242 | 54,418 | 69,812 | 80,153 | 79,370 | 78,325 | 68,799 |
| 11 Construction in Progress | 0 | 0 | 0 | 3,298 | 10,218 | 2,848 | 584 | 1,098 | 1,134 | 770 |
| 12 Less: Accumulated Depreciation | (15,030) | (21,465) | (28,431) | (35,582) | (42,691) | (49,161) | (58,552) | (62,845) | (68,837) | (60,015) |
| 13 **Net Property and Equipment** | **27,919** | **28,374** | **33,160** | **35,148** | **50,322** | **66,779** | **65,664** | **55,134** | **47,930** | **21,546** |
| 14 Total Other Assets | 5,346 | 6,554 | 8,313 | 12,281 | 15,784 | 21,563 | 25,262 | 21,858 | 17,509 | 27,058 |
| 15 **Total Assets** | **$ 72,592** | **$ 70,800** | **$ 89,420** | **$ 113,953** | **$ 150,240** | **$ 164,993** | **$ 148,925** | **$ 135,133** | **$ 118,695** | **$ 100,099** |
| 16 Notes Payable | $ 0 | $ 4,000 | $ 0 | $ 2,878 | $ 7,386 | $ 16,218 | $ 19,218 | n/a | n/a | n/a |
| 17 Accounts Payable | 4,960 | 4,412 | 8,015 | 9,189 | 14,000 | 11,172 | 11,074 | 15,176 | 11,279 | 9,246 |
| 18 Accrued Payroll and Payroll Taxes | 2,138 | 2,084 | 2,576 | 3,159 | 4,082 | 4,864 | 3,942 | 3,769 | 3,804 | 2,986 |
| 19 Accrued Contributions to ESOP and Profit-Sharing Plans | 3,137 | 2,745 | 3,661 | 4,357 | 6,201 | 5,172 | 13,122 | 2,752 | 1,007 | 1,745 |
| 20 Accrued Sub S Distribution | 10,937 | 4,583 | 4,949 | 7,350 | 5,641 | 4,297 | 5,000 | 2,500 | 2,500 | 2,500 |
| 21 Accrued Expenses - Other | 7,544 | 9,698 | 16,821 | 18,842 | 13,519 | 22,246 | 23,810 | 21,718 | 26,126 | 24,644 |
| 22 Current Maturities of Long-Term Debt | 1,040 | 1,885 | 1,395 | 2,245 | 1,886 | 33,830 | 41,873 | 38,946 | 10,608 | 12,615 |
| 23 **Total Current Liabilities** | **29,756** | **29,397** | **37,417** | **48,020** | **52,715** | **97,789** | **118,039** | **84,861** | **55,324** | **53,736** |
| 24 Long-Term Debt | 5,465 | 3,580 | 8,935 | 6,185 | 7,124 | 130,260 | 93,118 | 112,685 | 150,231 | 112,174 |
| 25 Other Liabilities | 282 | 301 | 327 | 368 | 1,512 | 12,158 | 9,936 | 15,141 | 14,755 | 38,858 |
| 26 Deferred Revenue | 2,193 | 2,063 | 1,951 | 1,898 | 1,734 | 1,661 | 2,477 | 2,043 | 1,896 | 1,684 |
| 27 **Total Long-Term Liabilities** | **7,940** | **5,944** | **11,213** | **8,451** | **10,370** | **144,079** | **105,531** | **129,869** | **166,882** | **152,716** |
| 28 **Total Liabilities** | **37,696** | **35,341** | **48,630** | **56,471** | **63,085** | **241,868** | **223,570** | **214,730** | **222,206** | **206,452** |
| 29 Warrants | 0 | 0 | 0 | 0 | 0 | 44,950 | 44,950 | 32,334 | 32,334 | 32,334 |
| 30 Common Stock | 3,104 | 3,104 | 3,104 | 2,266 | 2,266 | 975 | 975 | 975 | 975 | 975 |
| 31 Additional Paid-In Capital | 2,176 | 4,159 | 4,270 | 4,954 | 6,807 | 4,625 | 4,625 | 4,258 | 4,122 | 3,539 |
| 32 Restricted Stock Award | (1,230) | (1,060) | (890) | (720) | (550) | 0 | 0 | 0 | 0 | 0 |
| 33 Treasury Stock | (9,869) | (28,184) | (39,805) | 0 | 0 | (127,425) | (45,564) | (68,117) | (101,086) | (109,740) |
| 34 Retained Earnings | 40,535 | 57,440 | 74,111 | 50,582 | 92,260 | | (79,631) | (49,047) | (39,854) | (42,451) |
| 35 **Total Stockholders' Equity** | **34,896** | **35,459** | **40,790** | **57,482** | **87,155** | **(76,875)** | **(74,645)** | **(79,597)** | **(103,511)** | **(106,353)** |
| 36 **Total Liabilities & Stockholders' Equity** | **$ 72,592** | **$ 70,800** | **$ 89,420** | **$ 113,953** | **$ 150,240** | **$ 164,993** | **$ 148,925** | **$ 135,133** | **$ 118,695** | **$ 100,099** |

Source: 1998 Annual Report, 1999 Annual Report, 2000 Annual Report, Deposition Exhibit 135, 2002 Annual Report, Deposition Exhibit 132A, Deposition Exhibit 132A, Deposition Exhibit 140, Deposition Exhibit 152, Deposition Exhibit 153, Ambor's 2007 Consolidated Financial Statements.

**Exhibit A-2 - Reported Income Statements**

*In Thousands of U.S. Dollars*

For the Fiscal Year Ended

| | 12/31/1998 | % | 12/31/1999 | % | 12/31/2000 | % | 12/31/2001 | % | 12/31/2002 | % | 12/31/2003 | % | 12/31/2004 | % | 12/31/2005 | % | 12/31/2006 | % | 12/31/2007 | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 Total Net Sales | $ 164,276 | n/a | $ 209,904 | 100.0% | $ 240,850 | 100.0% | $ 278,865 | 100.0% | $ 351,229 | 100.0% | $ 374,537 | 100.0% | $ 363,798 | 100.0% | $ 336,018 | 100.0% | $ 268,111 | 100.0% | $ 230,514 | 100.0% |
| 2 Growth Rate | n/a | | 22.3% | | 19.9% | | 15.8% | | 25.9% | | 6.6% | | -2.9% | | -7.8% | | 20.2% | | -14.0% | |
| 3 Depreciation | 5,527 | 3.4% | 6,712 | 3.3% | 7,349 | 3.1% | 7,887 | 2.8% | 8,014 | 2.3% | 9,719 | 2.6% | 12,037 | 3.3% | 12,104 | 3.6% | 10,813 | 4.0% | 8,582 | 3.7% |
| 4 Other Cost of Sales | 71,183 | 43.3% | 64,874 | 42.2% | 99,510 | 41.3% | 111,499 | 40.0% | 134,172 | 38.2% | 137,952 | 36.8% | 134,749 | 37.0% | 128,272 | 38.2% | 108,196 | 40.4% | 97,093 | 42.1% |
| 5 Total Cost of Sales | 76,710 | 46.7% | 91,586 | 45.6% | 106,859 | 44.4% | 119,386 | 42.8% | 142,186 | 40.5% | 147,671 | 39.4% | 146,786 | 40.3% | 140,376 | 41.8% | 119,009 | 44.4% | 105,675 | 45.8% |
| 6 Gross Profit | 87,566 | 53.3% | 109,318 | 54.4% | 133,991 | 55.6% | 159,479 | 57.2% | 209,043 | 59.5% | 226,866 | 60.6% | 217,010 | 59.7% | 195,642 | 58.2% | 149,102 | 55.6% | 124,839 | 54.2% |
| 7 Marketing and Selling | 42,103 | 25.6% | 56,249 | 28.0% | 72,423 | 30.1% | 84,732 | 30.4% | 98,267 | 28.0% | 109,807 | 29.3% | 113,405 | 31.2% | 114,303 | 34.0% | 97,464 | 36.4% | 87,033 | 37.8% |
| 8 Administrative | 16,106 | 9.8% | 15,742 | 7.8% | 15,837 | 6.6% | 16,640 | 6.0% | 23,171 | 6.6% | 29,894 | 8.0% | 29,289 | 8.1% | 23,227 | 6.9% | 23,662 | 8.8% | 23,784 | 10.3% |
| 9 Total S.,G&A Expenses | 58,209 | 35.4% | 71,991 | 35.8% | 88,260 | 36.6% | 101,372 | 36.4% | 121,438 | 34.6% | 139,701 | 37.3% | 142,694 | 39.2% | 137,530 | 40.9% | 121,126 | 45.2% | 110,817 | 48.1% |
| 10 Operating Income | 29,357 | 17.9% | 37,327 | 18.6% | 45,731 | 19.0% | 58,107 | 20.8% | 87,605 | 24.9% | 87,165 | 23.3% | 74,316 | 20.4% | 58,112 | 17.3% | 27,976 | 10.4% | 14,022 | 6.1% |
| 11 Other Income (Expense) | (2,994) | -1.8% | (3,338) | -1.7% | (5,084) | -2.1% | (6,346) | -2.3% | (10,416) | -3.0% | (14,025) | -3.7% | (17,810) | -4.9% | (16,772) | -5.0% | (8,018) | -3.0% | (4,553) | -2.0% |
| 12 EBIT | 26,363 | 16.0% | 33,989 | 16.9% | 40,647 | 16.9% | 51,761 | 18.6% | 77,189 | 22.0% | 73,140 | 19.5% | 56,506 | 15.5% | 41,340 | 12.3% | 19,958 | 7.4% | 9,469 | 4.1% |
| 13 Interest Expense, Net | (688) | -0.4% | (326) | -0.2% | (485) | -0.2% | (641) | -0.2% | (260) | -0.1% | (778) | -0.2% | (8,166) | -2.2% | (9,559) | -2.8% | (10,988) | -4.1% | (12,224) | -5.3% |
| 14 Earnings Before Taxes | 25,685 | 15.6% | 33,663 | 16.8% | 40,162 | 16.7% | 51,120 | 18.3% | 76,929 | 21.9% | 72,362 | 19.3% | 48,340 | 13.3% | 31,781 | 9.5% | 9,000 | 3.4% | (2,755) | -1.2% |
| 15 Income Taxes | (100) | -0.1% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| 16 Net Income | $ 25,585 | 15.6% | $ 33,663 | 16.8% | $ 40,162 | 16.7% | $ 51,120 | 18.3% | $ 76,929 | 21.9% | $ 72,362 | 19.3% | $ 48,340 | 13.3% | $ 31,781 | 9.5% | $ 9,000 | 3.4% | $ (2,755) | -1.2% |
| 17 EBIT | $ 26,363 | 16.0% | $ 33,989 | 16.9% | $ 40,647 | 16.9% | $ 51,761 | 18.6% | $ 77,189 | 22.0% | $ 73,140 | 19.5% | $ 56,506 | 15.5% | $ 41,340 | 12.3% | $ 19,958 | 7.4% | $ 9,469 | 4.1% |
| 18 EBITDA | $ 31,890 | 19.4% | $ 40,701 | 20.3% | $ 47,996 | 19.9% | $ 59,648 | 21.4% | $ 85,203 | 24.3% | $ 82,859 | 22.3% | $ 68,543 | 18.8% | $ 53,444 | 15.9% | $ 30,771 | 11.5% | $ 18,051 | 7.8% |

Source: 1998 Annual Report; 1999 Annual Report; 2000 Annual Report; Deposition Exhibit 135; 2002 Annual Report; Deposition Exhibit 132A; Deposition Exhibit 152; Deposition Exhibit 140; Deposition Exhibit 153; Antioch's 2007 Consolidated Financial Statements.

**Exhibit A.3 - Reported Statements of Cash Flows**

*In Thousands of U.S. Dollars*

| | For the Fiscal Year Ended | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 12/31/1998 | 12/31/1999 | 12/31/2000 | 12/31/2001 | 12/31/2002 | 12/31/2003 | 12/31/2004 | 12/31/2005 | 12/31/2006 | 12/31/2007 |
| 1 Net Income: | $ 25,595 | $ 33,663 | $ 40,162 | $ 51,120 | $ 76,929 | $ 72,362 | $ 48,340 | $ 31,781 | $ 9,000 | $ (2,755) |
| 2 Depreciation and Amortization | 5,527 | 6,712 | 7,346 | 7,887 | 8,014 | 9,792 | 12,133 | 12,293 | 11,011 | 8,794 |
| 3 Amortization of Deferred Grant Revenue | (68) | (130) | (112) | (53) | (164) | (73) | (18) | (169) | (108) | (212) |
| 4 Balance of Stock Award Expense | 170 | 318 | 170 | 170 | 170 | 340 | n/a | n/a | n/a | n/a |
| 5 Realized Gain On Sale of Available-For-Sale Investments | 0 | 0 | 0 | 0 | 0 | n/a | n/a | n/a | (202) | 0 |
| 6 Loss on Sale of Property, Plant, and Equipment | 486 | 58 | 244 | 124 | 138 | 1,584 | 697 | (1,481) | 1,426 | 1,830 |
| 7 (Increase) Decrease in Cash Surrender Value of Life Insurance | 0 | 0 | 1,176 | 1,117 | 2,996 | (903) | 221 | 1,173 | 341 | 438 |
| 8 Increase (Decrease) in Accrued Stock Compensation Expense | 0 | 0 | 0 | 249 | 2,002 | 4,646 | n/a | n/a | n/a | n/a |
| 9 Increase (Decrease) in Accounts Receivable | (3,901) | 3,906 | 1,540 | 1,328 | (339) | (741) | 534 | (1,057) | (27) | 848 |
| 10 (Increase) Decrease in Other Receivables | 0 | 0 | 0 | 0 | 0 | n/a | n/a | n/a | (36) | (39) |
| 11 (Increase) Decrease in Inventories | (2,336) | (7,379) | (2,254) | (14,233) | (1,158) | 2,107 | (3,590) | 550 | 8,931 | 5,555 |
| 12 (Increase) Decrease in Prepaid Expenses and Other Assets | (443) | 403 | (2,377) | (4,419) | 3,704 | (526) | (1,908) | (774) | (1,939) | 178 |
| 13 Increase (Decrease) in Accounts Payable | (1,573) | 2,225 | 3,603 | 1,174 | 4,811 | (2,828) | (98) | 4,102 | (3,897) | (2,033) |
| 14 Increase (Decrease) in Accrued Expenses | 649 | 1,383 | 2,094 | 1,031 | 2,766 | (247) | 7,028 | 578 | (1,638) | 2,685 |
| 15 Increase (Decrease) in Accrued Liabilities | 471 | (612) | 7,161 | 2,311 | (4,179) | 7,415 | 1,842 | 5,388 | 6,573 | (80) |
| 16 Net Cash Provided by (Used in) Operating Activities | 24,577 | 40,548 | 58,756 | 47,815 | 95,681 | 92,927 | 65,083 | 52,344 | 29,742 | 15,209 |
| 17 Purchases of Property, Plant and Equipment | (9,494) | (7,228) | (12,378) | (19,000) | (23,328) | (26,335) | (11,911) | (5,169) | (4,891) | (3,080) |
| 18 Proceeds from Sale of Property, Plant, and Equipment | 59 | 0 | 0 | 0 | 0 | 0 | 508 | 4,518 | 21 | 903 |
| 19 Investment Purchases | 0 | 0 | 0 | 0 | 0 | n/a | n/a | n/a | (23) | (122) |
| 20 Proceeds from Sale of Investments | 0 | 0 | 0 | 0 | 0 | n/a | n/a | n/a | 843 | 3 |
| 21 Life Insurance Premiums | 0 | (2,045) | (2,709) | (4,316) | (5,646) | (4,042) | (2,986) | (2,121) | (1,311) | (525) |
| 22 (Increase) / Decrease in Related Party and Other Receivables | 0 | 0 | 0 | (2,365) | 288 | 499 | 1,463 | (313) | n/a | n/a |
| 23 Goodwill Associated With Business Acquisitions | 0 | 0 | 0 | 0 | 0 | n/a | 0 | (1,104) | n/a | n/a |
| 24 Proceeds from Life Insurance Policies | 0 | 0 | 0 | 0 | 0 | n/a | 0 | 0 | n/a | 9,759 |
| 25 Issuance of Loans to ESOP | 0 | 0 | 0 | 0 | 0 | n/a | 0 | (4,320) | 0 | (3,816) |
| 26 Payments Received on Loans to ESOP | 0 | 0 | 0 | 0 | 0 | n/a | n/a | n/a | 4,320 | 0 |
| 27 Net Cash Provided by (Used in) Investing Activities | (9,375) | (9,271) | (14,687) | (16,681) | (28,686) | (29,878) | (12,938) | (8,509) | (1,031) | 2,823 |
| 28 Increase (Decrease) in Bank Overdraft | (1,148) | 0 | 0 | 0 | 0 | n/a | n/a | n/a | n/a | 0 |
| 29 Net (Payments) / Borrowings on Lines of Credit | (5,000) | 4,000 | (4,000) | 2,878 | 4,508 | 4,335 | 2,688 | (6,849) | 27,627 | (12,440) |
| 30 New Borrowings, Long-Term | 0 | 0 | 7,000 | 0 | 8,825 | 124,289 | 15 | n/a | n/a | n/a |
| 31 Payments on Long-Term Debt | (1,040) | (1,040) | (2,105) | (1,990) | (2,245) | (5,810) | (64,030) | (32,502) | (39,986) | (28,058) |
| 32 Proceeds from Loan Against Life Insurance Policies | 0 | 0 | 0 | 0 | 0 | n/a | 0 | 10,015 | 582 | 0 |
| 33 (Increase) / Decrease in Restricted Cash and Other Assets | 1,040 | 46 | 744 | 0 | 0 | n/a | 0 | n/a | 0 | 0 |
| 34 Proceeds on Assets Subject to Sales Contract | 0 | 0 | 0 | 0 | 0 | n/a | n/a | n/a | 0 | 26,000 |
| 35 Payment of Deferred Financing Obligation | 0 | 0 | 0 | 0 | 0 | n/a | n/a | n/a | 0 | (1,296) |
| 36 Distributions | (712) | (23,088) | (23,265) | (21,366) | (38,931) | (40,910) | (11,787) | (2,500) | (2,500) | 0 |
| 37 Purchase of Treasury Stock | (1,379) | (19,561) | (12,864) | (11,621) | (14,235) | (148,135) | (10,646) | (13,623) | (12,985) | (678) |
| 38 Issuance of Treasury Stock | 0 | 1,672 | 167 | 598 | 458 | 981 | n/a | n/a | n/a | n/a |
| 39 Issuance of Common Stock | 2,553 | 0 | 0 | 0 | 0 | n/a | n/a | n/a | n/a | 0 |
| 40 Effect of Translation on Cash | 17 | (22) | 140 | (38) | (276) | (716) | (611) | 373 | 276 | 118 |
| 41 Net Cash Provided by (Used in) Financing Activities | (5,669) | (38,594) | (33,713) | (31,469) | (45,598) | (69,786) | (74,373) | (45,086) | (25,986) | (16,312) |
| 42 Net Increase (Decrease) in Cash and Cash Equivalents | 9,533 | (7,317) | 10,356 | (335) | 21,097 | (6,737) | (22,228) | (1,251) | 2,725 | 1,720 |
| 43 Cash and Cash Equivalents at Beginning of Year | 0 | 9,533 | 2,216 | 12,572 | 12,237 | 33,334 | 26,597 | 4,369 | 3,118 | 5,843 |
| 44 Cash and Cash Equivalents at End of Year | $ 9,533 | $ 2,216 | $ 12,572 | $ 12,237 | $ 33,334 | $ 26,597 | $ 4,369 | $ 3,118 | $ 5,843 | $ 7,563 |

Source: 1998 Annual Report, 1999 Annual Report, 2000 Annual Report, Deposition Exhibit 135, 2002 Annual Report, Deposition Exhibit 132A, Deposition Exhibit 140, Deposition Exhibit 152, Deposition Exhibit 153, Moody's 2007 Consolidated Financial Statements.

EXHIBIT B
COMPARABLE PUBLIC COMPANY INFORMATION

# Exhibit B.1 - Summary of Comparable Public Companies Multiples

## Analysis of Multiples - EV / LTM EBITDA

| | 12/31/98 | 12/31/99 | 12/31/00 | 12/31/01 | 12/31/02 | 12/31/03 | 12/31/04 | 12/31/05 | 12/31/06 | 12/31/07 | 12/31/08 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 AC Moore Arts & Crafts Inc. | 4.8x | 4.8x | 5.5x | 15.0x | 7.9x | 11.4x | 16.3x | 8.6x | 17.1x | 11.1x | 0.9x |
| 2 Avon Products Inc. | 19.1x | 11.7x | 14.4x | 13.1x | 13.7x | 14.9x | 14.0x | 9.8x | 13.1x | 14.7x | 6.9x |
| 3 Blyth, Inc. | 12.0x | 8.0x | 6.6x | 7.8x | 7.0x | 8.8x | 7.9x | 7.0x | 7.5x | 6.1x | 3.1x |
| 4 CPAC, Inc. | 4.0x | 4.4x | 2.8x | 4.0x | 3.7x | 5.4x | NM | 12.4x | 7.5x | NA | NA |
| 5 Hancock Fabrics Inc. | 7.7x | 9.9x | 3.3x | 9.8x | 8.2x | 8.1x | 13.0x | NM | NM | NM | NM |
| 6 Home Interiors & Gifts Inc. | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| 7 Jo-Ann Stores, LLC | NA | NA | NA | NA | NA | 5.3x | 5.8x | 5.5x | 17.6x | 5.3x | 4.3x |
| 8 Michaels Stores, Inc. | 5.7x | 7.3x | 4.6x | 10.5x | 7.0x | 8.5x | 9.6x | 9.4x | NA | NA | NA |
| 9 Nu Skin Enterprises Inc. | 15.3x | 4.3x | 4.0x | 7.0x | 7.9x | 9.1x | 11.6x | 7.8x | 10.7x | 9.8x | 5.0x |
| 10 Rag Shops, Inc. | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| 11 Nautilus Inc. | NA | 8.8x | 8.1x | 11.5x | 2.4x | 4.7x | 13.7x | 9.5x | 10.9x | NM | NM |
| 12 Tupperware Brands Corporation | 8.6x | 7.0x | 7.6x | 8.6x | 6.9x | 9.3x | 9.4x | 8.9x | 10.5x | 10.7x | 6.6x |
| 13 Yankee Holding Corp. | NA | 15.9x | 9.0x | 14.5x | 8.2x | 10.9x | 11.0x | 7.9x | 10.0x | NA | NA |
| 14 Maximum | 19.1x | 15.9x | 14.4x | 15.0x | 13.7x | 14.9x | 16.3x | 12.4x | 17.6x | 14.7x | 6.9x |
| 15 Upper Quartile | 12.8x | 9.6x | 8.0x | 12.7x | 8.1x | 10.1x | 13.5x | 9.5x | 13.1x | 11.0x | 6.2x |
| 16 Median | 8.2x | 7.6x | 6.0x | 10.1x | 7.5x | 8.8x | 11.3x | 8.7x | 10.7x | 10.2x | 4.6x |
| 17 Mean | 9.7x | 8.2x | 6.6x | 10.2x | 7.3x | 8.8x | 11.2x | 8.7x | 11.6x | 9.6x | 4.5x |
| 18 Lower Quartile | 5.5x | 5.3x | 4.2x | 8.0x | 6.9x | 6.8x | 9.5x | 7.9x | 10.0x | 7.0x | 3.4x |
| 19 Minimum | 4.0x | 4.3x | 2.8x | 4.0x | 2.4x | 4.7x | 5.8x | 5.5x | 7.5x | 5.3x | 0.9x |

Source: S&P Capital IQ, Inc.
EV = Enterprise Value
LTM = Latest 12-Months
EBITDA = Earnings Before Interest, Taxes, Depreciation, and Amortization
NA = Not Available
NM = Not Meaningful

Exhibit B.2 - Comparable Public Companies Relative Rankings

In Millions of U.S. Dollars



Source: S&P Capital IQ, Inc. and Depcorpse Exhibit 110; SAP _N00274d.41 . As applicable, results reported in foreign currency are converted at the prevailing exchange rate on the Valuation Date.

# Exhibit B.3 - Comparable Public Companies Capital Structure and Beta Analysis

| Company or SIC Code | Ticker | 5-Year Debt / EV | 5-Year Debt / Equity | Beta (L) | Beta [c] Beta (UL) | Beta (RL) |
|---|---|---|---|---|---|---|
| **Comparable Public Companies [a]** | | | | | | |
| 1 AC Moore Arts & Crafts Inc. | ACMR | 2.1% | 2.1% | 0.87 | 0.86 | 0.89 |
| 2 Avon Products Inc. | AVP | 9.9% | 11.0% | 0.61 | 0.57 | 0.59 |
| 3 Blyth, Inc. | BTH | 18.3% | 22.3% | 0.75 | 0.66 | 0.68 |
| 4 CPAC, Inc. | CPAK | 24.7% | 32.8% | 0.26 | 0.21 | 0.22 |
| 5 Hancock Fabrics Inc. | HKFI | 8.1% | 8.8% | 0.47 | 0.45 | 0.46 |
| 6 Home Interiors & Gifts Inc. | Home | n/a | n/a | n/a | n/a | n/a |
| 7 Jo-Ann Stores, LLC | JAS | 94.8% | 1807.6% | 0.76 | 0.06 | 0.07 |
| 8 Michaels Stores, Inc. | MIK | 13.2% | 15.2% | 1.21 | 1.11 | 1.15 |
| 9 Nu Skin Enterprises Inc | NUS | 12.5% | 14.2% | 0.61 | 0.56 | 0.58 |
| 10 Rag Shops, Inc. | RAGS | 2.9% | 3.0% | 0.22 | 0.22 | 0.23 |
| 11 Nautilus Inc. | NLS | 0.0% | 0.0% | 1.22 | 1.22 | 1.26 |
| 12 Tupperware Brands Corporation | TUP | 24.9% | 33.2% | 0.73 | 0.61 | 0.62 |
| 13 Yankee Holding Corp. | YCC | 12.9% | 14.8% | 0.77 | 0.71 | 0.73 |
| 14 Median | | 12.7% | 14.5% | 0.74 | 0.59 | 0.61 |
| 15 Average | | 18.7% | 163.8% | 0.71 | 0.60 | 0.62 |
| **SIC Codes [b]** | | | | | | |
| 16 SIC Code 3681 - Latest | | n/a | n/a | n/a | n/a | 0.88 |
| 17 SIC Code 3681 - 5-Year Avg. | | n/a | n/a | n/a | n/a | 0.88 |
| **18 Selected** | | **5.0%** | | | | **0.74** |

EV = Enterprise Value
L = Levered
UL = Unlevered
RL = Relevered

[a] Source: S&P Capital IQ, Inc and Bloomberg, L.P. Betas represent five-year betas based on weekly volatility measurements.
[b] Cost of Capital Yearbook: Quarterly Supplement, Morningstar, Inc.
[c] Unlevered Beta = Initial "Unadjusted" Beta / (1+D/E*(1-T))

Where: D = Debt plus Preferred Stock of Comparable Company
E = Market Value of Equity of Comparable Company
T = Tax Rate = 40.5%

Relevered Beta = (Unlevered Beta)*(1+(Target D/E)(1-T))
Where: Target D/E= 5.3%