**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| BONNIE FISH, et al.,<br>        Plaintiffs,<br><br>        vs.<br><br>GREATBANC TRUST COMPANY, et al.,<br>        Defendants. | Case No. 1:09-cv-01668<br><br>Honorable Jorge L. Alonso<br><br>Honorable Maria Valdez |

## DEFENDANTS LEE MORGAN, ASHA MORAN AND CHANDRA ATTIKEN'S MOTION FOR JUDGMENT ON PARTIAL FINDINGS

### I.    PRELIMINARY STATEMENT

This is a motion by Defendants Lee Morgan, Asha Moran and Chandra Attiken for a defense judgment on all claims at the close of Plaintiffs' case pursuant to Federal Rule of Civil Procedure 52(c). That Rule allows the Court, sitting as the trier of fact, to enter judgment at the end of the plaintiff's case in accordance with its own view of the evidence, and is designed to "streamline[] bench trials by authorizing the judge, having heard all the evidence the plaintiff has to offer, to make findings of fact adverse to the plaintiff, including determinations of credibility, without waiting for the defense to put on its case, since the evidence presented by the defendant would be unlikely to help the plaintiff." *Wsol v. Fiduciary Mgmt. Assocs.*, 266 F.3d 654 (7th Cir. 2001). A judgment pursuant to Rule 52(c) is reviewed under the highly deferential clear error standard.

As described in Defendants' opening statement, Plaintiffs' claims against the remaining Defendants all require proof that GreatBanc, the sole named fiduciary with responsibilities to the plan for purposes of the 2003 transaction, breached a duty to the plan. With respect to Plaintiffs' ERISA section 404 prudence claim, Defendants can have no direct liability because the Antioch

Board of Directors amended the plan to add section 5(f) so that as of August 20, 2003 GreatBanc had the sole discretion to tender the plan's shares to the Company. The evidence also proves that GreatBanc and Defendants acted in accordance with that Plan Amendment. As a result, Defendants are entitled to judgment on Plaintiffs' prudence claim.

Because the evidence entitled Defendants to judgment on the prudence claim, the only remaining basis for liability under section 404 is a derivative duty-to-monitor claim. The law is clear that proving such a claim against Defendants requires Plaintiffs to show that GreatBanc breached a duty to the plan. The Court should enter a defense judgment on this claim because Plaintiffs failed to introduce any evidence of an underlying breach by GreatBanc through any fact or expert witness. Plaintiffs' evidentiary failure in this regard likewise dooms its claim for co-fiduciary liability under ERISA section 405, another clear-cut derivative claim under ERISA.

Furthermore, even if Plaintiffs did put on evidence sufficient to prove a breach of duty by GreatBanc, the only entity with a duty to monitor GreatBanc was Antioch's Board of Directors, not the ESOP Advisory Committee. Rather than sue the entire board, Plaintiffs chose to cherry-pick two of its members, Mr. Morgan and Ms. Moran (Ms. Attiken was never a member of Board, so she had no duty-to-monitor). The evidence in Plaintiffs' case, however, proved that the Board monitored GreatBanc throughout 2003 both directly (meetings with and regarding GreatBanc) and through corporate officers like Nancy Blair, who was in constant communication with GreatBanc and frequently reported to the Board.

Likewise, Plaintiffs' have no direct section 406(a) prohibited transaction claim against the Defendants because, as noted, the evidence was that they were not fiduciaries and therefore did not have discretion to "cause" the plan to engage in the 2003 transaction. Accordingly, Plaintiffs remaining "prohibited transaction" claim against the Defendants is derivative. This

means that only equitable relief against Defendants under section 409 is available to Plaintiffs, but only if Plaintiffs could prove by a preponderance of the evidence that GreatBanc breached section 406(a). Applying the plain language of ERISA section 406(a), however, Plaintiffs failed to show that GreatBanc "caused" the plan to enter into a transaction with parties in interest. In fact, the evidence in Plaintiffs' case-in-chief showed that GreatBanc actually caused the plan *not* to enter into the transaction by determining that it would not tender the ESOP shares to the Company in the 2003 transaction.

Furthermore, the evidence of the 2003 transaction structure showed indisputably that the plan did not engage in any transaction at all, much less one with a party in interest. Accordingly, there is no basis to proceed to the defense case on a section 406(a) claim because Plaintiffs have not and cannot show that the plan engaged in a transaction with any party in interest. The evidence showed that the plan did not buy or sell any shares in the 2003 tender offer. The non-ESOP selling shareholders tendered their shares to the Company, and received consideration from the Company. As a result, Plaintiffs have failed to carry their burden to prove a section 406(a) claim against GreatBanc, and Defendants are therefore entitled to judgment on Plaintiffs' derivative claim against Defendants for equitable relief under ERISA section 409.

Finally, Plaintiffs' claim based on an alleged duty to inform GreatBanc of information within the possession of the sponsor company, presumably arising under ERISA section 404, is also without merit as a matter of law and as a matter of fact for failure of proof. Plaintiffs put on no evidence that the ESOP Advisory Committee had a duty under ERISA to inform the trustee generally. Nor did Plaintiffs point to any provision in the plan that imposes a general or specific duty to inform the trustee of sponsor company information. Likewise as to the Board's so-called duty to inform. Moreover, Plaintiffs duty to inform claim related to the Board has been

discredited in recently well-reasoned opinions of two District Courts that held no such explicit duty exists in the ERISA statute. Moreover, the evidence in Plaintiffs' case in chief was that Antioch's Board put in place a process to assure that GreatBanc would receive all the information it requested. To find that Defendants as corporate directors breached a duty to inform under these circumstances would be to impose upon corporate fiduciaries a duty, completely divorced from the plain language of ERISA and its multitude of regulations, to know themselves what specific information expert financial advisors require to make their decisions.

But perhaps equally compelling is (i) the evidence that GreatBanc knew or should have known of the existence of most, if not all, of the information Plaintiffs claim that GreatBanc did not receive, and (ii) Plaintiffs failure to put any evidence in their case that the alleged failure to inform damaged the plan. Not a single witness testified and not a single document provides evidence that the information GreatBanc supposedly did not have or know about would have either changed the terms of the transaction or would have prompted GreatBanc to tender the shares, thereby stopping the transaction.

And with respect to causation generally, Plaintiffs have failed to put on any credible evidence that the company's financial decline was proximately caused by the transaction or any term of the transaction. Instead, the evidence has shown that the decline was caused by the Company's decline in sales. Said another way, Plaintiffs put in the record no proof that the Company's double-digit decline in sales beginning in 2006, more than two years after the transaction, was proximately caused by any term of the 2003 transaction. In fact, Plaintiff Monica Woosley admitted as much when she testified that neither the sales decline nor the decline in share price beginning in 2005 was caused by the transaction or its terms. The proofs show that external factors such as expansion of broadband internet, explosion of social media as

the largest repository of photographs and smart phones (not cell phones with cameras), lead not only to Antioch's decline, but the decline of American corporate icons like Kodak and Polaroid, and the failure of scrapbooking businesses like Archivers and ReCollections.

Plaintiffs' position also has important negative policy implications. They effectively ask the Court to impose on Defendants the exact same responsibility and liability under this transaction structure as if the Company had never retained GreatBanc. A judgment against Defendants would serve as a powerful *disincentive* to any company to add an independent, institutional trustee for an ESOP in a future transaction—why retain necessary independence and expertise when it will have no legal benefit should the transaction be challenged?

The law and evidence at trial have shown that Plaintiffs cannot recover on any of their claims against Defendants. Their belated attempt to repackage their case as some sort of corporate mismanagement case, tasking the ESOP Advisory Committee with everything from scouring the market to assure the sponsor company has statistically based projection software to monitoring the inherently corporate function of sales and income forecasting to prophesying the broadband internet explosion and its effect on scrapbooking, must fail. For the reasons below, the Court should grant Defendants Rule 52(c) motion and enter judgment in their favor.[1]

---

[1] The Court may grant judgment to Defendants in advance of January 12 (the scheduled beginning of the defense case) and enter that judgment before putting on an opinion and/or findings and conclusions. Under this procedure, the judgment would become appealable only upon entry of the Court's findings and conclusions. That would achieve party and judicial efficiency in terms of not moving forward with an unnecessary defense case and allow the Court the time to state its findings and conclusions on a schedule convenient with the Court's calendar. The Seventh Circuit recently approved just such a procedure.

In *Healix Infusion Therapy, Inc. v. Heartland Home Infusions, Inc.*, 733 F.3d 700 (7th Cir. 2013), the district court put on a minute entry granting a defense judgment. *See Healix Infusion Therapy, Inc. v. Heartland Home Infusions, Inc.*, N.D. Ill. 1:10-cv-03772, Doc. 256. About two months later, the trial court entered written findings and conclusions. *Id.* at Doc. 260. The Seventh Circuit affirmed.

## II.  APPLICABLE LEGAL STANDARD FOR A MOTION FOR JUDGMENT ON PARTIAL FINDINGS

Federal Rule of Civil Procedure 52(c) enables a court to enter judgment in a non-jury trial when the non-moving party has presented but has failed to prove its case. The Seventh Circuit promotes Rule 52(c) as a tool for streamlining bench trials by allowing a court to rule against a plaintiff without waiting for the defense to put on its case. *Wsol*, 266 F.3d at 654. The Rule presents the opportunity for substantial efficiency, particularly in lengthy proceedings. "When a party has finished presenting evidence and that evidence is deemed by the trier insufficient to sustain the party's position, the court need not waste time, but, rather, may call a halt to the proceedings and enter judgment accordingly." *Feliciano v. Rullan*, 378 F.3d 42, 59 (1st Cir. 2004).

Unlike a motion in a jury trial for judgment as a matter of law, a court considering entry of judgment under Rule 52 affords no special inferences in favor of the nonmoving party but, rather, makes findings in accordance with its own view of the evidence. *Pinkston v. Madry*, 440 F.3d 879, 890 (7th Cir. 2006). In ruling on a Rule 52 motion, "the court is within its prerogative to weigh the evidence, resolve any conflicts in it, and decide for itself where the preponderance lies." *Int'l Union of Operating Eng'rs. Local Union 103 v. Indiana Constr. Corp.*, 13 F.3d 253, 257 (7th Cir. 1994).

A district court's factual findings pursuant to Rule 52(c) will not be set aside absent clear error. *Fillmore v. Page*, 358 F.3d 496, 503 (7th Cir. 2004). "In addition, where the district court 'correctly states the law, then his findings as to whether the facts meet the legal standard will be disturbed only if they are clearly erroneous.'" *Pinkston*, 440 F.3d at 888 (*quoting Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1269 (7th Cir. 1991)). "Clear error is an extremely deferential standard of review," and requires the district court's judgment to be affirmed as long as "the

district court's account of the evidence is plausible in light of the record viewed in its entirety." *Id.* (*citing Anderson v. City of Bessemer*, 470 U.S. 564, 573 (1985)).

As the text of Rule 52(c) indicates, a "judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a)." In turn, Rule 52(a) states that the court "must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court." Defendants stand ready to provide proposed findings of fact and conclusions of law upon the Court's request.

## III.  ARGUMENT

### A.  Plaintiffs Have Failed to Offer Evidence Sufficient to Prove Their ERISA Section 404 Claim.

#### 1.  *Plaintiffs Failed to Establish That Defendants Were ERISA Fiduciaries for Purposes of the 2003 Transaction.*

Plaintiffs failed to offer evidence that Defendants were fiduciaries with respect to the transaction, and have therefore failed to carry their burden of proof that Defendants breached the prudence standard of ERISA section 404.

"In every case charging breach of ERISA fiduciary duty, . . . the threshold question is . . . whether [the defendant] was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000). Here that analysis is simple as the evidence conclusively establishes that the Board of Directors stripped Defendants of duties with respect to the 2003 transaction.

Prior to the amending the plan, plan section 5(b) provided that the trustee may sell company shares in the ESOP to the company, but only at the direction of the Committee. (JX-3, at 13.) The evidence of record shows that the Board amended the plan as of August 20, 2003 by adding section 5(f), which states that, "Notwithstanding the provisions of Section 5(a) and (b),

the decision whether or not to tender shares of Company Stock to the Company in December 2003 *shall be effected by [GreatBanc] (without directions from the [ESOP Advisory] Committee)*, based on [GreatBanc's] determination (in the exercise of its reasonable judgment) that such decision is in the best interests of the Plan and the Participants…[.]" (JX-39 (Amendment No. 1 to the Amended and Restated Plan) at (1) (emphasis added). The Board likewise amended the Antioch Company Employee Stock Ownership Trust Agreement. (JX-18 at (B)(6).) There is no evidence that Defendants interpreted these amendments as anything other than GreatBanc assuming discretionary authority on behalf of the ESOP. *Challenger v. Local Union No. 1 of Int'l Bridge, Structural, & Ornamental Ironworkers*, 619 F.2d 645, 649 (7th Cir. 1980) ("The trustees do not breach their fiduciary duties by interpreting the plan in good faith, even if their interpretation is later determined to be incorrect."); *Peterson v. Petry*, No. 06-2072, 2007 U.S. Dist. LEXIS 75204, at *14-15 (C.D. Ill. Oct. 10, 2007) ("As concerns a trustee's fiduciary duty with regard to interpretation of the terms of a plan, trustees do not breach their fiduciary duties by interpreting the plan in good faith, even if their interpretation is later determined to be incorrect." (internal quotation and citation omitted)).[2]

Of course, the Court must apply the plain language of the plan because "it is well established that it is the language of an ERISA plan that controls." *Cozzie v. Metropolitan Life Ins. Co.,* 140 F.3d 1104, 1109 (7th Cir. 1998). Both the plan and the trust agreement are in evidence, and the plain language of each stripped the Committee of the discretion it had under the pre-amended plan to direct the trustee to sell ESOP stock to the company in the 2003 tender offer. Judgment for Defendants on the section 404 prudence claim is therefore appropriate.

---

[2] Unreported Lexis cases cited in this brief are attached as Exhibit A.

That Defendants were not fiduciaries for this transaction is consistent with the statutory definition of fiduciary under ERISA. The statute "defines fiduciary status in functional terms," *Brooks v. Pactiv Corp.*, 729 F.3d 758, 765 (7th Cir. 2013), by conferring fiduciary status only on those that exercise "discretionary authority" in a particular function. *See* 29 U.S.C. § 1002(21)(A)(i) and (iii). "The power to act for the plan is essential to status as a fiduciary under ERISA." *Klosterman v. Western Gen. Mgmt.*, 32 F.3d 1119, 1123 (7th Cir. 1994).

Defendants had no ability "to act for the plan" because that responsibility was expressly conferred by the Board of Directors on GreatBanc. The evidence showed that the Company's decision in this regard was purposeful and based on advice of corporate counsel, Marsha Matthews, who recommended that the Company retain an independent, institutional trustee to make decisions on the plan's behalf with respect to the Transaction. (Tr. 2472:21–2473:3.) This amendment was specifically intended to *remove* Defendants from the transaction process so that their potential conflicts of interest as sellers could not either influence a directed trustee or interfere with an independent trustee's decision of whether or not to tender the plan's shares. (Tr. 2473:16–2474:13; 1489:19-1490:19; 1534:24-1535:17.) And all the evidence introduced in Plaintiffs' case is that GreatBanc did exercise the fiduciary responsibility for the ESOP in connection with the 2003 Transaction. GreatBanc negotiated and analyzed the terms of the transaction for the ESOP and GreatBanc (with the input of its independent financial advisor and legal counsel) elected to not tender the ESOP shares in the transaction. (*See* JX-39; JX-18; DX-250; DX-37; Tr. 1221:23-1228:10.) Only GreatBanc, not the Defendants, had "power to act for the Plan[.]" *Klosterman*, 32 F.3d at 1123. Defendants' lack of discretionary authority means they were not fiduciaries to the plan with respect to the 2003 transaction. This requires a defense judgment on the section 404 claim. *Neil v. Zell*, 677 F. Supp. 2d 1010, 1024 (N.D. Ill. 2010)

(dismissing benefits committee when fiduciary duties had been delegated to an independent trustee).[3]

### 2. *Business Decisions Are Not ERISA Fiduciary Functions.*

The business mismanagement evidence introduced by Plaintiffs at trial is irrelevant in establishing that Defendants breached an ERISA-based fiduciary duty of prudence because they were not acting as ERISA fiduciaries in performing as corporate officers and directors.

The law makes clear that corporate officers "wear two hats, and . . . they assume fiduciary status only when and to the extent that they function in their capacity as plan administrators, not when they conduct business that is not regulated by ERISA." *Fletcher v. Kroger Co.*, 942 F.2d 1137, 1139 (7th Cir. 1991). Business decisions, "even when they affect a plan's financial health," are not ERISA fiduciary functions. *Neil*, 677 F. Supp. 2d at 1022 (*citing Ames v. Am. Nat'l Can Co.*, 170 F.3d 751, 757 (7th Cir. 1999)).

Much of the evidence Plaintiffs introduced challenged, if anything, Defendants' conduct as corporate managers, not as ERISA fiduciaries. Plaintiffs three lead-off witnesses are examples in this regard. Ms. Anderson criticized the Company for being insufficiently attentive to supposed dissatisfaction among consultants, Dr. Mizen complained the Company was slow to adopt digital technology, and Ms. Harris criticized the Company's product offerings.[4] Each of

---

[3] Plaintiffs focused on Defendants' status as ESOP Advisory Committee members. This is irrelevant. And although the ESOP Advisory Committee was a named fiduciary under the plan, ERISA liability can only be imposed where the defendant "was acting as a fiduciary . . . when taking the action subject to complaint." *Peagram*, 530 U.S. at 226. Moreover, "a fiduciary is not a fiduciary for every purpose but only to the extent that he performs one of the described functions." *Klosterman*, 32 F.3d at 1123. In other words, "a person can be a fiduciary for some purposes but not others." *King v. Nat'l Human Res. Comm., Inc.*, 218 F.3d 719, 723 (7th Cir. 2000) (*citing Lockheed Corp. v. Spink*, 517 U.S. 882 (1996)). The "purpose" at issue in this case was the 2003 Transaction and Defendants were not a fiduciary for that purpose.

[4] Because the evidence is irrelevant, we pause only briefly to address the business mismanagement testimony offered by these witnesses. With respect to Ms. Anderson, there is no dispute that she was a valuable part of Creative Memories' business. But her principal role was as an ambassador, not day-to-day business management. Moreover, while management did take into account her views, the Company also had many objective, non-anecdotal ways to measure consultant satisfaction. (Tr. 1657:17-1658:1; 2141:14-22; 3116:17-3119:11.) With respect to

these items—relationship management, corporate strategy, product offerings—is a pure business function and even missteps in performing that function are not conduct regulated by ERISA.[5]

Plaintiffs criticized the Company's financial projections. There are a number of threshold problems with this position. First, Plaintiffs failed to sufficiently link the projections to Defendants. The evidence established that the Company's business projection process involved many steps including business unit leaders, the finance department, TAC management, and finally approval by the Company Board of Directors. (Tr. 3033:3-3034:3, 3042:16-3047:14; JX-58.) Plaintiffs have not shown that Defendants themselves were responsible for the projections or, even if they wanted to challenge them, could have done anything about the projections as two-ninths of the Board of Directors or the Vice President of Human Resources.

Beyond this, Plaintiffs have not and cannot cite any authority that the development of business projections is an ERISA function. And the suggestion that projecting future business revenue is a retirement plan function and not a business function strains all credulity.

---

products, no doubt Ms. Harris was right to emphasize the importance of quality products, which is exactly why the Company hired her to manage that corporate function and worked to develop new products. Some were very successful. (Tr. 3129:4-8.) Ms. Harris's critique is only valid if the Company was not trying to find the market, which it clearly was. As for Dr. Mizen, in his words that strangely disappeared from the video version of his 2003 presentation, Creative Memories was a leader in digital technology in 2003. (DX-752; DX-753; Tr. 678:1-685:8.) The company also considered digital technology on many occasions. (PX-14; JX-22; DX-71; Tr. 640:10-651:10.) That includes at strategy conferences only weeks before the 2003 Transaction. (Tr. 1428:3-1461:15; PX-149; PX-160; JX-16.) The decline in the company's sales was an unforeseeable event caused by unforeseeable changes in the marketplace. Indeed, in the words of Mr. Reilly, Plaintiffs' expert, "I don't know that anyone was able to predict 2006 and 2007 because the company's results were a lot lower than any projection, any forecast indicated." (Tr. 3991:21-24.)

[5] We suspect it was not lost on the Court that Plaintiffs' mismanagement/inadequate projection case is essentially built on a closed feedback loop. Out of a few thousand people that worked at the Antioch Company from 2000-2010, just a handful of them were called by Plaintiffs to testify. Plaintiffs' counsel signed them all up as clients, the experts relied on phone calls with these individuals for their facts (never mind reading some or all of the sworn deposition testimony), one expert was referred by one of the client witnesses, the experts rely on one another's work, the lawyers sponsor the experts and represent the factual sources, and so on. When one peels back the layers, nearly the entire factual foundation is based on Dr. Mizen and Ms. Anderson espousing, in hindsight, different views than the following people who in 2003 were not pessimistic about the Creative Memories business: GreatBanc, Duff, Houlihan the banks lending into the transaction, any person taking the "package" in the deal (tying their future interests to the Company), the nine-member Board of Directors that approved a financial plan calling for growth, the management team that invested in infrastructure to build more capacity, and the 70,000 or so people who served as consultants for the Company.

There is also no evidence suggesting that the future business projections were unreasonable.[6] The lending syndicate clearly did not think so when it lent the Company funds in connection with the transaction. (*See, e.g.*, DX-132 at JPMC0004 ("based on the Company's conservative projection…"); Powe Dep. 182:2-184:9.) Peter Abrahamson of Deloitte did not think so. (Tr. 1363:3-6.) Nancy Blair told the Court that among Duff and Houlihan, "there were a lot of contentious issues in this transaction. The projections were not one of them."[7] Ms. Moran testified as to how the Company's future financial performance was projected to slow relative to past performance. (Tr. 3076:13-3079:20; PX-317 at PX-317-0032.) Even Plaintiffs' expert, Mr. Reilly, could not criticize the forecasts.[8] And perhaps most importantly, the evidence is that Duff did not rely on management's forecasts but rather generated their own in connection with that firm's diligence on the transaction. (JX-37.)

### 3. *Plaintiffs' Duty to Monitor Claim Is Legally and Factually Unsupported.*

A duty to monitor claim is a derivative claim. *In re BP ERISA Litig.*, No. 4:10-cv-4214, 2015 U.S. Dist. LEXIS 147819, at *34 (S.D. Tex. Oct. 30, 2015). "To prevail on these derivative

---

[6] The testimony of Plaintiffs' witness, Michael Buchanan, does not change this conclusion. Mr. Buchanan's method for forecasting sales—ARIMA—is not useful for predicting corporate sales. This is why, when pushed, Mr. Buchanan could not identify, in literature or in his experience, even one example of a corporation utilizing ARIMA to forecast corporate sales (other than a place he had not worked for 17 years). (Tr. 3797:9-3801:10.) Moreover, Mr. Buchanan's approach is suspect because he did not compare relative quality of models with less variables to determine if a different model (that would have different forecasts) was better (Tr. 3815:15-3833:14.) . Moreover, one can see why ARIMA is not useful for corporations to project sales because the confidence band is so wide as to be nearly useless (Tr. 3809:07-3811:23.) Finally, his methodology for international sales was flawed in its application (he used data he should not have) and simplistic to a fault (there is no way any company would project five years of sales off four months of results compared to plan) (Tr. 3833:18-3838:12.)

[7] Indeed as multiple parties have testified, the principal point of negotiation was over terms related to the warrants. By Duff insisting on a higher valuation for the warrant and insisting on a relatively low cap on the warrant—and Houlihan negotiating hard on the point—the principal negotiating parties were expressing substantial optimism about the future of the Company, each side trying to obtain for their constituency the largest slice of the Company after ten years. (Tr. 1022:12-1028:2, 1578:14:1-1581:4.)

[8] *See* Tr. 4147:14-19 (testifying that at the time he was deposed after he had completed his analysis and opinions, he was "unable to identify any document or testimony in the record [] showing that the projections management provided to the advisors in this case were unsupportable"). *See also* Tr. 3991:21-24; Tr. 4053:1-15; 4056:7-4060:22; DX-747; Tr. 4080:10-18; JX-37.

claims, Plaintiffs must adequately state a claim for an underlying breach of fiduciary duty by the appointed fiduciary." *Id.* (internal quotation marks omitted). *See also Rinehart v. Akers,* 722 F.3d 137, 154 (2d Cir. 2013), vacated and remanded on other grounds, *Rinehart v. Akers,* 134 S. Ct. 2900 (2014) (duty to monitor claim dismissed as derivative of failed duty of prudence claim); *Perez v. Bruister,* 54 F. Supp. 3d 629, 671 (S.D. Miss. 2014) ("Claims for breach of the duty to monitor and for co-fiduciary liability are derivative claims necessitating first some breach of fiduciary duty."). Because GreatBanc is the fiduciary that the Antioch Board—we show below that only the Board had a duty to monitor—is alleged to have insufficiently monitored, Plaintiffs can only prevail on their duty to monitor claim if they establish that GreatBanc breached its fiduciary duty.

a. The ESOP Advisory Committee Had No Duty to Monitor.

It is well-settled that the duty to monitor applies only to a person or entity that has the power to appoint and remove an ERISA fiduciary. *Howell v. Motorola, Inc.*, 633 F.3d 552, 573 (7th Cir. 2011) ("There is no doubt that those who appoint plan administrators have an ongoing fiduciary duty under ERISA to monitor the activities of their appointees.") The Department of Labor ("DOL") has similarly issued guidance affirmatively stating that in instances where the board of directors is responsible for selecting and retaining plan fiduciaries, the board has a limited fiduciary duty to monitor the selected fiduciaries. 29 C.F.R. §2509.75-8 (D-4). Here it is undisputed on the record that the Antioch Board of Directors, not the ESOP Advisory Committee, appointed GreatBanc and it is therefore the only entity with a duty to monitor GreatBanc. *See supra* at 7-8. As such, the ESOP Advisory Committee had no duty to monitor GreatBanc. *Howell*, 633 F.3d at 573. The Court should therefore grant judgment to Defendants on the duty to monitor claim in their capacity as members of the ESOP Advisory Committee. *Id.*;

*Chesemore v. Alliance Holdings, Inc.*, 886 F. Supp. 2d 1007, 1050 (W.D. Wis. 2012) (no duty to monitor because defendant's trustees were not "the appointing fiduciary").

<blockquote>

b.    Plaintiffs' Duty to Monitor Claim Failed Because Plaintiffs Failed to Establish That GreatBanc Breached Any Duty.

</blockquote>

As noted above, because a duty to monitor claim is derivative, it requires proof of a breach by GreatBanc. Though this is settled law, Plaintiffs profess not to agree and have litigated accordingly.[9] Plaintiffs have focused their entire case against the remaining Defendants and have failed to present any evidence that GreatBanc breached its fiduciary duties to the plan. Consider that in Plaintiffs' operative Second Amended Complaint—which, fairly read, almost entirely challenges the conduct of GreatBanc—they allege 19 different breaches by GreatBanc. (Doc. 380 at ¶ 119.) Plaintiffs left the record silent in regard to plead breaches.

For example, Plaintiffs called Marilyn Marchetti to testify but asked her almost nothing about what GreatBanc did or did not do. Certainly they did not examine Ms. Marchetti on what the GreatBanc ESOP Committee took into account at the three meetings it had over two months to approve the transaction. (DX-204; DX-250; DX-327.) Plaintiffs did not proffer testimony of any kind from any of the five members of the GreatBanc ESOP Committee other than Ms. Marchetti, or from any of GreatBanc's independent legal counsel from Jenkens and Gilchrist that advised GreatBanc during the transaction, or subpoena Lee Bloom—the engagement lead for Duff—to testify even though he resides in Chicago and is within the Court's subpoena power.

Although Plaintiffs' expert witness Robert Reilly criticizes the work that Duff performed in analyzing the transaction on GreatBanc's behalf, Plaintiffs presented no evidence from an expert or otherwise that *Duff's* alleged failures to adequately account for industry and company-

---

[9] When examining Marilyn Marchetti, Plaintiffs' counsel asked her if she was aware that Defendants took the position that Plaintiffs needed to prove GreatBanc's liability, then represented that they "certainly don't agree with" that position. (Tr. 947:25-948:8.)

specific risks is evidence that *GreatBanc* breached any duty. When a trustee is tasked with evaluating the prudence of an action on behalf of a plan, the duty of care may require the trustee to engage independent professional advisors. *Chesemore*, 886 F. Supp. 2d at 1041-42. Although engaging such an advisor does not provide the trustee a complete defense, doing so serves as evidence of prudence. *Id.* at 1042. The trustee must still investigate the advisor's qualifications, ensure that the advice it gets is reasonably justified under the circumstances, and ultimately exercise its own discretion about the proposed plan action. *Id.*

Plaintiffs failed to present any evidence that GreatBanc neglected to perform these duties. To the contrary, Ms. Marchetti testified that GreatBanc engaged Duff and Phelps because it was one of the top two financial advisors in the industry (the other being Houlihan, who represented the non-ESOP shareholders). (Tr. 1111:19-1112:1.) GreatBanc had previously engaged Lee Bloom, the team lead for Duff, and Ms. Marchetti considered him to be "as intelligent, as savvy, and as expert as anybody in the industry." (Tr. 1097:16-24.)

Plaintiffs failed to connect any alleged mistakes by non-fiduciary Duff with a fiduciary breach by GreatBanc, a connection that requires expert testimony. Plaintiffs rested without sponsoring any expert in that regard, and put in no factual evidence that allows the Court to connect Duff's alleged errors with a breach of prudence by the plan fiduciary, GreatBanc.

As to the factual evidence as it stood when Plaintiffs rested their case, Ms. Marchetti's testimony was unequivocal and unchallenged with respect to the process GreatBanc employed to vet the advice that Duff provided. GreatBanc's ESOP Committee met at least three times with Duff to discuss Duff's analysis. (DX-204, DX-250, and DX-327.) During those meetings, the committee reviewed the "very detailed" analysis presented by Duff and was "very heavy with questions and discussion." (Tr. 1214:11-1215:18.) The "modus operandi" was to review every

part of Duff's analysis "line by line [] [a]nd there's nothing that's not covered, presented, and discussed." (Tr. 1221:12-19, 1224:1-8.) Far from a rubber stamp, the committee employed its multidisciplinary background (in areas of finance, law, ESOPs, etc.) to challenge Duff's analysis until it was satisfied that its questions had been answered. (Tr. 1218:9-1219:12.) In fact, Ms. Marchetti testified that she found it "outrageous" that anyone could accuse GreatBanc of failing to seriously challenge or rigorously question Duff about its advice. (Tr. 1219:13-22.)[10]

Plaintiffs' failure to link its criticisms of Duff to any alleged breach by GreatBanc requires judgment in favor of Defendants on any duty-to-monitor claim. There is no basis in this record to find any breach of duty by GreatBanc, and accordingly Plaintiffs' claims fail.

### c.  Defendants Satisfied the Duty to Monitor.

The question of GreatBanc's breach aside, the Plaintiffs are required to put on evidence independent of GreatBanc's breach that the Board breached its duty to monitor. A breach by the fiduciary is not evidence of the Board's breach of its duty to monitor.

The Seventh Circuit has recognized that a duty to monitor is narrow. For example, in *Howell v. Motorola, Inc*., 633 F.3d 552, 573 (7th Cir. 2011), the court criticized the plaintiffs for "essentially ask[ing] us to recognize a duty to monitor that would require every appointing Board member to review all business decisions of Plan administrators." *Id*. This attempted to define the duty to monitor "much too broadly," a position that "border[ed] on frivolous." *Id*. The Seventh Circuit in *Howell* affirmed the district court's decision in *Lingis v. Motorola, Inc.*, 649 F. Supp. 2d 861, 881–82 (N.D. Ill. 2009), which found an annual review of the appointed fiduciary

---

[10] Though not our burden to establish GreatBanc's prudent conduct, for other indicia of prudence, consider that: GreatBanc selected a leading financial advisor ((Tr. 1097:8-22; Tr. 1111:19-1112:1; Tr. 1358:15-1359:10; Tr. 2479:10-2480:6) and experienced counsel (Tr. 1112:2-15; Tr. 2480:8-17; Tr. 2546:2-5); GreatBanc and its advisers were active in due diligence (PX-171; PX-174; JX-97; DX-154; Tr. 1228:7-10; DX-240; DX-326; PX-397; DX-111; DX-121; PX-209; DX-140; DX-141; DX-136; DX-154; DX-229; JX-61; PX-154; Williams Dep. 40:3-41:11); GreatBanc rejected a prior version of the transaction as unfair to the ESOP (DX-204; JX-30, DX-206; DX-209; DX-216; DX-217; DX-222; DX-223; DX-225; DX-226; DX-230; DX-234; DX-235); and GreatBanc and Duff diligently reviewed the terms of the Transaction (DX-253; DX-204; DX-250; DX-327; DX-329; DX-348; JX-37).

satisfied the duty to monitor. *Id.* at 882–83. The duty to monitor requires only monitoring "at reasonable intervals" to ensure that "performance has been in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan." *Id.* (*citing* 29 C.F.R. § 2509.75-8 at FR-17 (Department of Labor questions and answers)).

Plaintiffs have failed to prove that the Antioch Board breached the modest duty to monitor the activities that GreatBanc performed pursuant to plan section 5(f). There were only four months between GreatBanc's retention and consummation of the 2003 Transaction. In that time, GreatBanc representatives met with the Board of Directors on two separate occasions. (Tr. 1198:16-1200:25; JX-20; JX-21; JX-22; JX-40.) Moreover, members of Antioch's management team were in frequent communication with GreatBanc and it advisors during the negotiation of this transaction and reported to the Board. (Tr. 1489:4-7.) In addition, at an important Board meeting on October 16, 2003, the management "transaction team" presented the Board with a written and verbal report about GreatBanc's negotiating positions and GreatBanc's financial and analytical rationales supporting its position. (JX-33; JX-34.)

The foregoing evidence at the close of Plaintiffs' case in chief does not support Plaintiffs' claim that Lee Morgan and Asha Moran, in their capacities as members of Antioch's Board of Directors, breached their duty to monitor GreatBanc.

### 4. *Plaintiff's Duty to Inform Claim*

The second facet of Plaintiffs' derivative ERISA section 404 claims alleges that Defendants breached their ERISA duties by failing to provide certain information to GreatBanc. Plaintiffs' claim fails because there is no ERISA provision that supports a so-called duty to inform on Defendants. That legal issue aside, the evidence shows that GreatBanc or its financial or legal advisors knew or should have known of the allegedly missing information. And, in any event, Plaintiffs have failed to carry their burden of proof that GreatBanc's decision not to tender

17

the shares would have been different with the allegedly missing information in hand. In other words, Plaintiffs' failed to carry their burden to show that the alleged failure to inform proximately caused loss to the plan.

a.    There is No Duty to Inform Under ERISA Section 404.

Plaintiffs' claim based on the alleged failure of Defendants to inform GreatBanc of certain information fails at the outset as a matter of law because ERISA contains no such duty. Two very recent decisions rejected the concept of a duty to inform as unsupported by the plain language of ERISA after a thorough analysis.

First, in *In re Lehman Brothers Security and ERISA Litigation*, No. 08-cv-5598, 2015 WL 4139978 (S.D.N.Y. July 10, 2015) the court examined an appointing fiduciary's duty to inform as an aspect of the duty to monitor and stated "nothing in ERISA itself or in traditional principles of trust law creates such a duty [to inform]." *Id*. at *14. As in the case before the Court, "Plaintiffs' conception of the proposed duty to inform would transform [the appointing fiduciary's] limited obligations under ERISA into all-encompassing ones. Whenever [the fiduciary] received information in any business capacity, he would have been obliged to consider whether ERISA required disclosure of that information to the Plan Committee." By "effectively turning *all* of [the fiduciary's] business duties into ERISA duties, plaintiffs' proposed duty to inform would stretch the concept of fiduciary duty far beyond what ERISA contemplates." *Id*. (emphasis in original). Moreover, noting that ERISA is already a comprehensive and elaborate statute, the court reasoned that "[a]dding additional requirements to this complex statutory scheme is not to be undertaken lightly." *Id*. at 15.

The second opinion is *In re BP ERISA Litigation*, No. 4:10-cv-4214, 2015 U.S. Dist. LEXIS 147819 (S.D. Tex. Oct. 30, 2015). This opinion was the subject of our notice of supplemental authority (Doc. 603) and we incorporate that by reference. As noted in that

document, the *BP ERISA* court undertook an exhaustive review of the law and found that a duty to inform was not supported by case law or statute, holding that ERISA's duty to monitor "does not impose a duty on monitoring fiduciaries to keep their appointees apprised of material, non-public information" in the possession of a sponsor company like Antioch. *Id.* at *36.

These two opinions are particularly persuasive for two reasons. First is that they fit neatly within the Seventh Circuit's narrow definition of a duty to monitor imposing an ERISA-based duty on Board members of the sponsor company who otherwise have no ERISA-based fiduciary duties. Second, the decisions are product of impressive statutory analysis.

In their trial brief, Plaintiffs cited just one case purportedly supporting a so-called duty to inform. But that case, *Brieger v. Tellabs, Inc.*, 629 F. Supp. 2d 848, 867 (N.D. Ill. 2009), contains just two paragraphs with respect to the duty to monitor and makes only a passing reference to a duty to provide information, with no analysis. *Id.*[11] The court, however, did not apply the duty to inform concept in that case, instead finding that the duty to monitor claims are derivative of otherwise dismissed claims and granting judgment on that basis.[12] And the two cases to which *Brieger* cites likewise fail to support the notion of a duty to inform. In fact, the court in *Howell v. Motorola, Inc.*, 337 F. Supp. 2d 1079, 1099 (N.D. Ill. 2004), later issued an opinion granting summary judgment to the defendants in that case, expressing "skepticism" that fiduciaries based "on their power to appoint and remove members of the Committee [] could owe Plan beneficiaries a duty to inform the Committee of facts…[.]" *Lingis v. Motorola*, 649 F. Supp.

---

[11] (Doc. 523 (Pls.' Trial Br.) at 2, 7, 18.)

[12] To the extent *Brieger* is relevant to anything, it is for its statement that duty to monitor claims are only viable upon a breach of duty by the monitored fiduciary. *Id.* at 867.

2d 861 (N.D. Ill. 2009).[13] The Seventh Circuit affirmed the *Lingis* opinion and, as noted earlier, stated that the plaintiffs were trying to stretch the duty to monitor much too broadly. *Howell*, 633 F.3d at 572-73. As such, the language to which Plaintiffs cite in *Brieger* is nothing more than unapplied dicta in an opinion that should not be interpreted as expanding the duty to monitor.

In sum, a "duty to inform" has never been expressly recognized by the Seventh Circuit. Moreover, the Seventh Circuit's narrow interpretation of the duty to monitor in *Howell* strongly suggests that the duty to monitor is not to be expanded, as Plaintiffs seek to do here, beyond interval-timed review of the appointed fiduciary. This interpretation of the duty to monitor is fully consistent with the Seventh Circuit cases and DOL guidance stressing the limited nature of the duty and the rejection of the duty to inform in *In re Lehman Brothers Sec. and ERISA Litig* and *BP ERISA*. Because ERISA does not impose a duty to inform, judgment is appropriate for Defendants as a matter of law.

        b.      If a Duty to Inform Exists Generally, Mr. Morgan and Ms. Moran
              Were Prudent Under the Circumstances

Even if the Court holds that the duty to inform is a part of the duty to monitor, Plaintiffs failed to prove that Mr. Morgan and Ms. Moran breached such a duty because their conduct was reasonable under the circumstances. In considering this issue, it is important to recall that the reason the duty to monitor exists is so that an appointing fiduciary "cannot escape liability by passing the buck to another person and then turning a blind eye." *Howell*, 633 F.3d at 573. Nothing like that occurred here.

Instead, rather than turning a blind eye, the Board of Directors put in place important procedural safeguards to ensure GreatBanc was informed. First, the Board authorized one of its

---

[13] The case names can be confusing because the named plaintiff changed a number of times. For background and confirmation, *see Lingis v. Motorola, Inc.*, 649 F. Supp. 2d at 868-69.

own directors, Nancy Blair, to leave the Board to take on the full-time role of managing the project and the diligence process from the Company's perspective. (JX-21; Tr. 1512:22-1513:21.) Second, the Board of Directors approved the retention of talented, independent advisors for itself, the ESOP and the selling shareholders that the evidence established all had significant experience with ESOP transactions. (JX-20, JX-21; DX-241; Tr. 1111:19-1112:1; Tr. 1194:19-1195:9; Tr. 1488:5-1490:24). As a result, as Mr. Morgan and Ms. Moran testified, neither McDermott nor Deloitte, two advisors specifically chosen because of their expertise and experience in ESOP transactions and who were aware of the information at issue, ever advised the Board that it should be provided to GreatBanc, nor were they ever informed of information to lead them to believe that information that was material to GreatBanc was withheld. (Tr. 1561:16-23; 2294:22-2296:23; 3097:10-3098:4.)

This is not to say that monitoring directors may "turn[] a blind eye." Obviously they cannot. *Howell*, 633 F.3d at 573. And were the facts of this case different—had the Company not designated a transaction lead, had the Company not set up a war room, had the Company not hosted broad diligence meetings, were there no independent advisors retained, if the ESOP trustee was a stooge, were there not independent directors—then perhaps it could be said that Mr. Morgan and Ms. Moran acted inappropriately. But taking in all of the facts and procedural safeguards, on the specific facts of this case, the Board directors, including Mr. Morgan and Ms. Moran, acted prudently with respect to a duty to inform knowing that the talented advisors were free to request what they wanted or needed, and that others were responsible for providing information. On these facts, this cannot be considered a "blind eye." *Id*. Because Plaintiffs' evidence was insufficient to prove that the Board breached a duty to inform, judgment on the claim at the close of Plaintiffs' case is proper.

21

    c.  Plaintiffs Failed to Prove that GreatBanc Was Not Informed and in any Event, that the Information was Material.

Plaintiffs' duty to inform claim also fails because the evidence shows that GreatBanc actually had or should have known of the information Plaintiffs highlight. *See* Exhibit B (chart outlining each category of allegedly undisclosed materials identified in Plaintiffs' trial brief and the record evidence showing that GreatBanc knew or should have known of the information).

Moreover, Plaintiffs did not provide the Court with *any* evidence that the information they claim was not provided to GreatBanc was or would have been material to GreatBanc's analysis of the transaction on behalf of the ESOP and would have resulted in GreatBanc accepting the tender offer or demanding a change in the deal terms.

Plaintiffs had two ways they could have tried to establish materiality of the allegedly missing information: expert opinion or fact evidence. On the former, expert opinion, Plaintiffs could have retained an expert—an experienced ESOP transactional trustee perhaps—to review the factual information that was provided to GreatBanc, then review the material that Plaintiffs claim should have been provided but supposedly was not, and seek the expert's opinion on whether the claimed-to-be-missing information would have been material to a trustee in the expert's view. Plaintiffs do not have such an expert.

As to fact evidence, Plaintiffs failed to subpoena Mr. Bloom and ask him if the missing information was material. Ms. Marchetti testified that she did not know what the effect of receiving the information would have been. Indeed she was unable to testify that even one particular piece of information would have made a difference in GreatBanc's analysis. For example, Plaintiffs asked Ms. Marchetti many different ways about whether the Deloitte models were material or would have changed the deal in some way. She never said anything approaching what Plaintiffs might need to prove materiality or causation. For instance, Ms. Marchetti testified

that "If we had been provided those four documents [the Deloitte models], which I assume were the lower projections, it would have generated additional discussion. I can't speculate as to what the results would have been of those further discussions." (Tr. 1044:3-6; *see also* Tr. 1041:12-15, Tr. 1042:4-6, Tr. 1044:12-15.)

Ms. Marchetti's answer was the same as it relates to the Board of Director's December 4 sensitivity analysis: "I can't speculate as to what the questions might have been if I had seen this. It just would have generated more inquiry." (Tr. 1050:17-19.) Perhaps most notably, Ms. Marchetti was asked, without the proper context, about a line from the December 4 Board presentation suggesting that under a certain downside scenario, the ESOP might be "worse off" under the transaction relative to the status quo. Ms. Marchetti testified: "I would have liked to have seen the statement so that I could ask additional questions. I don't know if it is or isn't material and I can't speculate." (Tr. 1054:3-5.)[14]

Plaintiffs similarly failed to elicit any evidence from Ms. Marchetti that the Plan Amendment or the revised repurchase obligation study would have influenced GreatBanc's analysis in any way, or in what measure. Plaintiffs have failed their burden of proof to show by a preponderance of evidence that the allegedly missing information was material to GreatBanc's or Duff's fairness analysis, or would have caused GreatBanc to either renegotiate the deal or tender the shares. As such, judgment for Defendants is appropriate on the duty to inform claim on this ground too. *Keach v. U.S. Trust Co.*, 419 F. 3d 626, 638 (7th Cir. 2005) (materiality of missing information a prerequisite to liability).

---

[14] Ms. Marchetti's answers here emphasize just how little GreatBanc and Duff were relying on company financial information. Instead, as makes total sense under the circumstances, Duff ran their own independent analysis. As the Duff presentation to GreatBanc makes clear, Duff did its own Company forecasts for the ten-year transaction period. (JX-37.)

**B.    Plaintiffs Have Failed to Offer Evidence Sufficient to Prove Their ERISA Section 406(a) Claim.**

As with the 404 prudence claim, Plaintiffs' claim against Defendants under section 406(a) is dependent upon proof that GreatBanc violated ERISA section 406(a). Plaintiffs did not offer any evidence to support a GreatBanc violation, so liability against Defendants for equitable relief under ERISA section 409 for GreatBanc's violation of ERISA section 406(a) has no support in the record at the close of Plaintiffs' evidence.

Pursuant to 29 U.S.C § 1106(a)(1)(A), "a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect sale or exchange, or leasing, of any property between the plan and a party in interest." Judgment for Defendants on this claim is appropriate because: (1) the Defendants did not "cause" the plan to engage in the 2003 Transaction; and/or (2) the 2003 Transaction was not a direct or indirect transaction between the plan and a party in interest.

**1.    *Defendants Did Not Cause the Plan to Engage in Any Transaction.***

The Supreme Court, mindful of Congress' balance of competing interests in drafting ERISA, has held that courts must apply the plain text of the statute. *Mertens v. Hewitt Assoc.*, 508 U.S. 248, 261–62 (1993). The plain language of section 406(a) imposes liability only on a fiduciary that "cause[s]" the "plan" to "engage" in a transaction. Here, neither Defendants nor GreatBanc "caused" the plan to do anything.

"Cause" is defined in a general sense as "to make something happen."[15] Consistent with this basic definition, a person cannot "cause" a prohibited transaction unless he or she "exercise[s] discretionary authority or control" over whether the plan enters into the transaction. *Sommers Drug Stores Co. Emp. Profit Sharing Trust v. Corrigan*, 883 F.2d 345, 352 (5th Cir.

---

[15] http://www.merriam-webster.com/dictionary/cause.

1989) ("The jury's finding that the defendants did not exercise discretionary authority or control over the trustees' decision to sell the trust stock is also a finding that they did not 'cause' the plan to enter into such a transaction."). Here the only evidence in Plaintiffs' case is that GreatBanc, and not Defendants, exercised *all* discretionary authority to determine whether the ESOP would engage in the 2003 transaction by tendering the ESOP shares to the Company. (JX-39 (Amendment No. 1 to the Amended and Restated Plan).) Because discretionary authority over the decision to effectuate the transaction is absent, Defendants did not "cause" the plan to engage in a transaction and judgment for Defendants on the prohibited transaction claim is appropriate. *See Chesemore*, 886 F. Supp. 2d at 1050-51 (party without discretionary control "did not cause" the transaction and was thus not liable under section 406). A defense judgment at this point of the case is therefore appropriate.

### 2. *The Plan Did Not Engage In a Transaction With a Party In Interest.*

There is an additional statutory problem with Plaintiffs' prohibited transaction claim. The plan did not "engage" in a transaction, as the statute requires. Plaintiffs have never identified a single judicial decision imposing section 406 liability in a transaction like the 2003 Transaction.

With respect to the structure of the transaction, the evidence at the trial came in exactly as Defendants said it would in opening statements. The Antioch Company extended a tender offer to its shareholders. (JX-40 (GBT00111).) All of the non-ESOP shareholders accepted the tender offer while GreatBanc exercised its discretionary authority on behalf of the ESOP *not* to tender the ESOP's shares. (Tr. 2492:3-2493:5.) GreatBanc's decision meant that only the *Company* "engaged" in a transaction with non-ESOP selling shareholders. (*Id.*) The ESOP—the only party relevant for purposes of the prohibited transaction analysis—made an explicit decision through GreatBanc *not* to engage in a transaction. (*Id. See also* JX-40.)

25

Because the ESOP did not *engage* in a transaction of any sort, it logically follows that the ESOP did not engage in a transaction with a party in interest. The only transaction that occurred was a typical corporate transaction between a sponsor company and its non-ESOP shareholders. The ESOP did not buy or sell shares in the transaction. Structurally, the evidence shows that the number of shares and amount of assets was the same after the transaction as it was before it. The evidence in Plaintiffs' case actually showed that the ESOP did not come into possession of the selling shareholders' shares of stock in the Company, even indirectly through a third-party intermediary, nor did the selling shareholders receive assets of the ESOP directly or indirectly. This lack of a sale or exchange of plan property is fatal to a prohibited transaction claim. *Middleton v. J. Hoyt Stephenson*, No. 2:11-CV-313 TS, 2011 U.S. Dist. LEXIS 141495, at *4–7 (D. Utah Dec. 8, 2011) (finding no prohibited transaction because "a sale or exchange between a plan and a party in interest would involve an exchange of some form of *plan property*" which was absent) (emphasis in original).

Nor was there an *indirect* prohibited transaction, a concept that is not some general catchall. Rather, "Section 406 specifically includes indirect transactions in order to prevent parties from avoiding its restrictions through 'the interjection of a third party into an otherwise prohibited transaction.'" *Neil v. Zell*, 677 F. Supp. 2d 1010, 1027 (N.D. Ill. 2010) (*quoting Brock v. Citizens Bank of Clovis*, 841 F.2d 344, 347 (10th Cir. 1988)). For example, says *Zell*, "just as a plan could not purchase an aircraft from a party in interest, neither could it buy the aircraft from a third party that had purchased it from the party in interest in an attempt to avoid ERISA's restrictions." *Id*. (*citing McDougall v. Donovan*, 552 F. Supp. 1206, 1216 (N.D. Ill. 1982)).

In other words, even in an alleged indirect prohibited transaction, a plaintiff must still demonstrate that the plan participated in a transaction and a party in interest received plan property. The plaintiff in *Zell*, for example, showed that the ESOP made a $250 million payment at the time of the transaction at issue. *Id.* at 1027. And the court in *McDougall* found an indirect prohibited transaction when the plan purchased an airplane from a party in interest for nearly $3 million with both the plane and the purchase funds routed through an intermediary. 552 F. Supp. at 1216. In both instances, the plans at issue "engaged" in transactions and parted with assets as set forth in section 406(a). And in both instances, the plans' assets found their way to the hands of a party in interest indirectly, through a third party. These circumstances constituted an indirect prohibited transaction. The circumstances here are different because the plan never parted with any assets and Defendants did not receive any plan assets.[16] A defense judgment is appropriate.

## C. Plaintiffs Have Failed to Offer Evidence Sufficient to Prove Their ERISA Section 405 Claim.

Plaintiffs presented no evidence to support their co-fiduciary claim pursuant to 29 U.S.C. § 405(a)(1-3). Liability under §405 requires that a fiduciary have actual knowledge of a breach. *Mejia v. Verizon Mgmt. Pension Plan*, No. 11C3949, 2012 U.S. Dist. LEXIS 61090, at *32 (N.D. Ill. May 2, 2012); *Keach v. U.S. Trust Co., N.A.*, 240 F. Supp. 2d 840, 844 (C.D. Ill. 2002); *Donovan v. Cunningham*, 716 F.2d 1455, 1475 (5th Cir. 1983). In fact, courts have referred to liability arising under § 405(a) as "knowing participation liability." *In re Touch Am. Holdings,*

---

[16] This all goes to also show that the Plaintiffs' position, as plead, that the 2003 tender offer was in "economic substance" a transaction with the plan is contrary to the plain statutory language of section 406(a) that this and other courts and bound to apply.

*Inc.*, No. CV-02-106, 2006 U.S. Dist. LEXIS 94707, at *37 (D. Mont. June 15, 2006).[17] Moreover, a section 405 claim is indisputably derivative in nature.

As described above, Plaintiffs failed to meet their burden of proof to establish a breach of duty by GreatBanc. Beyond that, when Plaintiffs examined Ms. Attiken, Mr. Morgan and Ms. Moran, they did not attempt to elicit testimony regarding any knowledge they had of a supposed breach of duty by GreatBanc (much less actually establish evidence of an actual breach). Because Plaintiffs did not prove (1) an actual breach by GreatBanc and (2) Defendants' actual knowledge of any such breach, the Court should enter judgment for Defendants.

### D.    Plaintiffs Have Not Proved That the Transaction Caused Any Damages.

ERISA makes a fiduciary liable only for losses "resulting from" a breach, a causal connection is required to award damages or impose monetary liability. 29 U.S.C. § 1109(a); *see Brandt v. Grounds*, 687 F.2d 895, 898 (7th Cir. 1982) ("a causal connection is required between the breach of fiduciary duty and the losses incurred by the plan"). Here Plaintiffs claim that the breach of section 404—in whatever capacity—caused Plaintiffs damages. But the per share value of the stock held by plan participants was $44 greater two weeks after the transaction and nearly $100 more a year later. (JX-63; JX-74; Tr. 2611:21-2613:13.) It was not until 2006 that the Company experienced a double digit sales decline no witness has linked to the transaction. (Tr. 2576:23-2578:2; Tr. 3991:21-24 (Reilly: "I don't know that anyone was able to predict 2006 and 2007 because the company's results were a lot lower than any projection, any forecast indicated."); Pollack Dep. 98:2-99:20.)

---

[17] It is not sufficient for a plaintiff to claim that merely because one fiduciary committed a breach, each co-fiduciary is also liable under §405(a). Instead, the plaintiff must plead facts establishing both the underlying breach and the grounds giving rise to the co-fiduciary liability. *Howell v. Motorola, Inc.*, 337 F. Supp. 2d 1079, 1102 (N.D. Ill. 2004).

Plaintiffs bear the burden of establishing that damages resulted from the breach as opposed to competitive pressures within the industry or the broader economic collapse occurring at the same time. And they have failed to do so. Despite seeking to obtain a nine-figure judgment against Defendants, Plaintiffs failed to engage any sort of expert witness to make the connection between the transaction or any term of the transaction and the subsequent sales decline that led to Antioch's eventual demise five years later. And even if Plaintiffs could somehow prove this causal link without an expert, they have failed to develop any factual evidence that can bridge that gap. In fact, Plaintiff Monica Woosley admitted that she "did not connect the decline in sales to the 2003 transaction." (Tr. 2576:23-2577:6.)

*Chesemore v. Alliance Holdings, Inc.*, 948 F. Supp. 2d 928, 942 (W.D. Wis. 2012) is instructive on Plaintiffs' failure to prove causation to the exclusion of other possible causes. In that case the court held that plaintiffs did not meet their burden of proof on causation because they "ignore[d] the tsunami that was the 2008 financial crisis." The court indicated that even if the company stock owned by the ESOP was initially overvalued, that the company held its position for two years, only collapsing after the financial crisis had really arrived. Accordingly, a judgment for plaintiffs would award them "the entire purchase price of Trachte despite the 2008 recession being the principal cause of its precipitous loss in value." *Id.*

All of the same facts exist in this case. Antioch stock appreciated twice after the transaction. Even three years later the stock was valued at $786 per share. By this time, no reasonable connection to the transaction exists (and certainly not in a way that Plaintiffs have tried to quantify). Only when the financial crisis hit and the iPhone (2006) and social media combined to alter substantially customer behavior did the Company really decline financially. Plaintiffs, as is their burden, cannot sort out one cause of decline from another. Judgment in the

entire amount of the transaction price cannot be entered under those circumstances. Plaintiffs' position is untenable and unreasonable and must be rejected. [18]

### E. Plaintiffs' Claims Fail Because of Lack of Proof of Damages.

#### 1. *Plaintiffs Have No Viable Damages Theory*

Even if they were able to establish liability against Defendants, Plaintiffs have a burden with respect to proving their damages that they failed to carry.

Plaintiffs' pretrial order (Doc. 521, PAGEID# 20142-43) indicates the damages theories Plaintiffs sought to prove in their case-in-chief. The primary remedy Plaintiffs were to prove is rescission of the 2003 Transaction, seeking a cash award of $233,483,100, representing the cash, notes, and warrants said to have been received by the selling shareholders. Plaintiffs are not entitled to such relief.

"A rescission is an avoidance of a transaction. . . . Except as the parties might agree to the contrary, rescission will normally be accompanied by restitution on both sides." *Griggs v.*

---

[18] Because it is a recent case from within this Circuit challenging an ESOP transaction, the parties and the Court have had occasion to cite to different opinions in the *Chesemore* litigation. The Court may find it notable to compare just how different the facts of that case are compared to the present. David Fenkell was in the business of buying control of ESOP companies. He and his affiliated companies (Alliance) would "buy companies with an ESOP, fold these ESOPs into the Alliance ESOP, hold and expand the companies over a relatively short period of time and then flip them at a profit, benefitting Alliance generally and Fenkell in particular as he personally redeems phantom stock." *Chesemore v. Alliance Holdings*, 886 F. Supp. 2d 1007, 1012 (W.D. Wis. 2012). Alliance purchased a company called Trachte and merged the Trachte ESOP participants into the Alliance ESOP. A few years later Fenkell and Alliance were trying to double their money. Through a series of complex transactions—that included using participant shares as collateral for loans—the Trachte ESOP purchased equity from Alliance. *Id.* at 1012-13.

"All of this might have been fine, except that Alliance also orchestrated the parties so that no independent person was looking out for the employees' interests in the Alliance or the Trachte ESOP." *Id.* at 1013. Just a week before the transaction, Alliance appointed two individuals beholden to it as the sole members of the Trachte board of directors. The board then adopted a new ESOP and appointed new ESOP trustees. These trustees realized "at the eleventh hour" that they were under a conflict. They attempted to hire an independent fiduciary but the party hired had essentially no relevant experience. *Id.* at 1030.

Though there is more, it is sufficient to stop there in distinguishing *Chesemore*. In this case there was no profit motive established by any selling shareholder. There was no corporate raiding going on. Lee Morgan specifically wanted *not* to leverage the ESOP. The Antioch Board of Directors had nine, mostly independent members. Alliance named two non-independent directors as the sole members. The sale process in Chesemore was rushed and there was no independent, qualified advisor representing the ESOP; here, there is no dispute that Antioch hired the best. *Chesemore* is a case where one can understand why the ESOP plaintiffs prevailed (in part). But the facts are so different from the current case as to compel a defense judgment here.

*E.I. DuPont de Nemours & Co.,* 385 F.3d 440, 445 (4th Cir. 2004) (*citing* Dan B. Dobbs, Handbook on the Law of Remedies § 4.3 at 254 (West 1973)).

Plaintiffs' rescission claim simply does not fit the facts of this case. Since the ESOP did not part with any assets, Defendants are not in possession of any Plan assets to return to the ESOP. Also, because Defendants tendered their non-ESOP Antioch shares to the Company, Plaintiffs are not in possession or control of those shares to return to Defendants to effectuate a rescission remedy. Accordingly, because Plaintiffs failed to show in their case in chief that Defendants are in possession and control of Plan assets and that the Plan, or Plaintiffs, are in possession and control of the Antioch shares tendered by Defendants to the Company in 2003, a rescission theory of damages does not fit with the evidence Plaintiffs put in the record in their case. Judgment in Defendants' favor under Rule 52(c) is appropriate since Plaintiffs have failed to meet their burden. *See Zell,* 2010 U.S. Dist. LEXIS 80744, at *7 ("Plaintiffs cannot explain why they are entitled to repayment of funds that originated with [the company]."); *Chesemore,* 948 F. Supp. 2d at 947 (rescission inappropriate where Plaintiff was unable to return stock).)[19]

Plaintiffs' alternative damages theories also suffer from legal and factual impediments. One such proposed damages model is to recover cash that was in the ESOP that was used to pay ESOP repurchase liability in 2004. This damages theory does not work. The evidence in Plaintiffs' case is that in 2004, the ESOP redeemed shares *put to the ESOP* by employees and the ESOP thereafter recycled the shares into participant accounts. (Hoskins Sept. 16, 2011 Dep. 303:21-304:16.) Said another way, the ESOP simply replaced one asset (cash) with another (Antioch stock) in participant accounts, and in fact the Antioch stock that was substituted for

---

[19] In addition, rescission is inappropriate because Plaintiffs do not seem to seek return of the notes and warrants that Defendants received; they want a cash asset when Defendants received a combination of cash, notes and warrants. Moreover, Plaintiffs' figure of over $200 million includes assets received by parties that are not before the Court.

cash at $894 grew to a value of $943 per share, thereby *increasing* the account's value. (JX-63; JX-74.) Multiple witnesses have testified that the ESOP recycling that was used in 2004 is a common method for satisfying an ESOP's repurchase obligation. (Tr. 1638:11-1639:15; Tr. 3367:3-13.) For these reasons, and because Plaintiffs have no evidence on a participant-by-participant basis whether some, none, or all participants preferred cash as opposed to the Antioch shares that had been increasing in value over the prior ten years in their accounts, Plaintiffs' damages theory based on the ESOP recycling must fail.[20]

Plaintiffs also identified several additional damages theories that all fail for lack of sufficient causation evidence. ERISA makes a fiduciary liable only for losses "resulting from" a breach, a causal connection is required to award damages or impose monetary liability. 29 U.S.C. § 1109(a); *Brandt v. Grounds*, 687 F.2d 895, 898 (7th Cir. 1982) ("a causal connection is required between the breach of fiduciary duty and the losses incurred by the plan"). By way of example only, Plaintiffs assert a proper measure of damages is the difference in net plan assets available in 2003 compared to today when that number is $0. Plaintiffs failed to offer evidence that will delineate between what loss to the ESOP was proximately caused by what term or provision of the 2003 Transaction and what loss is attributable to any other possible cause. *See e.g., Chesemore,* 948 F. Supp. 2d at 941 (plaintiffs did not meet burden of proof on causation because they "ignore[d] the tsunami that was the 2008 financial crisis"). Plaintiffs' failure to prove a single, viable damages theory compels judgment in Defendant's favor, in addition to all the other independent reasons discussed above.

### 2.    *Plaintiffs' Lack of Evidence Through Mr. Reilly*

Plaintiffs' expert Robert Reilly fails to offer a viable measure of damages under both his "first flaw" and his "second flaw."

---

[20] The evidence also shows that the ESOP recycling in 2004 was authorized under the Plan. (JX-71; JX-72; JX-73.)

Reilly's five discounted cash flow scenarios – which he uses to compute a range of pre-transaction share values under his "first flaw" – are methodologically flawed and unsupportable. Two of his DCF scenarios (FTI1 and FTI2), including the one he ultimately chose for his damages calculation (FTI1), are based on an ARIMA methodology that no witness has established is appropriate for projecting corporate sales 10 years in the future.[21] Instead, the trial testimony has been just the opposite. (Tr. 1944:16-1945:17; 3154:2-3164:20; 3797:9-3801:17; 4048:9-4051:16; 4141:24-4142:9; 4155:23-4156:15; DX-423; DX-424; DX-432; DX-441; DX-448; DX-456.) Moreover, it is undisputed that Antioch did not have the software or capabilities for using ARIMA or econometric modeling at the time of the 2003 transaction. (Tr. 3464:7-13; 3467:20-3468:1; 3654:16-24, DX-456.)

The two DCFs based on Deloitte's "Downside" and "Big Downside" feasibility models are likewise unsupportable. It is undisputed that these downside scenarios did not incorporate any specific risks or reasonable expectations of the company's future business, but were merely scenario analyses to test the cash flows should the company's performance fall in one case below, and in the other case far below, what management expected performance to be. (Tr. 1302:9-1303:1; Tr. 1555:15-1557:15; 4144:24-4145:13.) In fact, Reilly testified he was prepared to work with any of the 25-plus Deloitte models and adjust them to reach his intended value conclusions, but only chose the downsides because they required less of a "Robert Reilly" discount rate adjustment which, he believed, would therefore subject him to less cross examination. (4145:16-4146:11; 4150:23-4152:6.)

---

[21] Because Mr. Reilly relied blindly on Mr. Buchanan's projections and did not do any independent analysis to confirm the reliability of those forecasts, his opinion should be excluded or given no weight. *TK-7 Corp. v. The Estate of Ishan Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993) (opinion improper under Fed. R. Ev. 703 when "there [wa]s no indication in the record that Dr. Boswell had any familiarity with the methods or reasoning used by Mr. Werber in arriving at his projections."). Indeed, not only did Mr. Reilly do no analysis of ARIMA, he had no experience with it before. (Tr. 4048:9-4051:16.) This makes the opinion improper.

Reilly's fifth and final DCF analysis also fails to offer a viable measure of damages. After a couple of telephone calls of unknown length with Mark Mizen, Rhonda Anderson, and Richard Wiser, a purported review of the "industry" and company trends facing Antioch in 2015 based on selective documents provided by Plaintiffs' counsel, and without the benefit of interviewing management or any other businesspeople at the company in 2003, Reilly took Duff & Phelp's DCF analyses and simply applied a "Robert Reilly" 5% company specific risk premium ("CSRP"). (Tr. 4064:6-4065:7; 4074:3-25; 4078:11-15; 4150:23-4152:6; 1532:4-1535:17; JX-17; JX-37). This single change based "entirely" on Reilly's judgment lowered the per-share value from $845 to $590. (PX-870, at Ex. 14, 19b, 20.) Reilly made this drastic adjustment, yet admitted that at the time of his deposition when all of his opinions were complete, he could not identify *any* document or testimony in this record that the projections management provided to Duff & Phelps were unsupportable – projections which he also admitted were *materially higher* than the projections Duff & Phelps used for purposes of their fairness analysis. (Tr. 4147:14-19; 4117:11-4121:19; JX-37; PX-213.) Ultimately, Reilly testified that apart from the purported failure to adequately account for a few discrete risks, he completely agreed with all of Duff & Phelps' analysis (including their adjustment for the risk of international and new business ventures). (Tr. 3931:1-3934:8.) In his opinion, the difference between his analysis and that of Duff & Phelps ultimately came down to a reasonable difference of business judgment between two skilled valuation experts. (Tr. 4114:1-23.)

Reilly's "second flaw" damages are similarly flawed and unsupportable. As a first step, Reilly completely excludes from his analysis a third of the repurchase obligation scenarios run

by Plaintiffs' expert David Weinstock.[22] (PX-870, at ¶ 216; Tr. 4157:5-18.) Reilly then takes David Weinstock's remaining repurchase obligation scenarios cherry-picked by Plaintiffs' counsel, averages them, discounts them to present value, concludes that Duff & Phelps used a repurchase obligation projection that was $80 million dollars too low, and then deducts that full $80 million dollars directly from the Company's enterprise value. (PX-870, at Ex. 6a, 7, 21; Tr. 4157:19-4158:11.) *No* other valuation professional in this case involved with the Antioch company outside the context of litigation accounted for the potential future repurchase obligation in this manner. (Tr. 4164:22-4165:11.) And the way that Reilly then proceeds to calculate the share value post transaction is methodologically flawed and patently unfair. Reilly directly deducts the full $80 million dollar potential future repurchase obligation he calculated from the Company's enterprise value, but he does not give the Company anything in return. In other words, even though the Company would use that $80 million dollars to redeem and therefore reduce the total number of outstanding shares, Reilly does not reduce the total number of shares outstanding in his analyses. (Tr. 4160:22-4163:17; PX-870, at Ex. 21.)

Even if Plaintiffs had been able to prove liability and causation, both Reilly's "first flaw" and "second flaw" damages calculations are unsupportable and fail to establish a viable claim of damages.

## IV.  **CONCLUSION**

Plaintiffs failed to meet their burden of proof on their section 404, 405, and 406 claims against Defendants. The Court should grant judgment to Defendants pursuant to Rule 52(c).

---

[22] Reilly also apparently does not understand David Weinstock's repurchase obligation analyses. Reilly repeatedly testified that the starting share price assumption in Weinstock's scenarios was $680 per share, even thought it was in fact $840.26 per share. (Tr. 4190:25-4191:11; PX-868, at Exhibit III.)

Respectfully Submitted,

KEATING MUETHING & KLEKAMP, PLL

By: ___/s/ Michael L. Scheier_____
      Michael L. Scheier
      Brian P. Muething
      Anthony M. Verticchio
      Jacob D. Rhode
      One East Fourth Street, Suite 1400
      Cincinnati, Ohio 45202
      mscheier@kmklaw.com
      bmuething@kmklaw.com
      averticchio@kmklaw.com
      jrhode@kmklaw.com
      *Attorneys for Defendants Lee Morgan,*
      *Asha Morgan Moran, and Chandra Attiken*

## CERTIFICATE OF SERVICE

I hereby certify that on December 21, 2015, I caused true and correct copies of the foregoing to be filed electronically using the Court's CM/ECF system and to thereby be served upon all registered participants identified in the Notice of Electronic Filing in this matter on this date. This document is available for viewing and downloading on the CM/ECF system.

      /s/ Michael L. Scheier_____
      Michael L. Scheier

6437726.10

36