UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| BONNIE FISH, et al., <br>         Plaintiffs, <br><br> vs. <br><br> GREATBANC TRUST COMPANY, et al., <br>         Defendants. | Case No. 1:09-cv-01668 <br><br> Honorable Jorge L. Alonso <br><br> Honorable Maria Valdez |

**DEFENDANTS LEE MORGAN'S, ASHA MORAN'S
AND CHANDRA ATTIKEN'S POST-TRIAL BRIEF**

The Court has already received from Defendants approximately 100 pages of briefing that details the substantial deficiencies with Plaintiffs' claims. (Docs. 522, 625-1, 638.) And with this brief, Defendants are simultaneously submitting Proposed Findings of Fact and Conclusions of Law that cover the entire trial. Defendants refer to and incorporate those documents into this brief. The Proposed Findings and Conclusions in particular present a detailed analysis of all the relevant evidence and testimony at the trial. This brief presents a summary of that evidence and the arguments that compel a defense verdict.

**A.     The Evidence in Plaintiffs' Case: Irrelevant, Disjointed, Inadequate**

With perspective on the entire case that Plaintiffs prosecuted, it is clear that much of Plaintiffs' evidence did not even relate to proving ERISA liability. Instead Plaintiffs attempted to prove a corporate mismanagement case and hoped that sufficed. In this ERISA case, with Plaintiffs bearing a heavy burden to impose liability of more than one hundred million dollars on three individuals and their families, litigating about hobbyists, kitnapping and the strategic business judgment of corporate fiduciaries is insufficient to establish ERISA liability.

In a sense, if they were intent on trying a case against Defendants, Plaintiffs had no choice but to focus on Defendants' corporate roles. As the Court heard, the Company made a reasoned decision to remove Defendants' discretionary authority with respect to the 2003 Transaction and place that in the hands of GreatBanc. (Defs.' Proposed Findings of Fact and Conclusions of Law ("FFCL") ¶¶ 46-50, 307-312.) That left Defendants with no discretion to act on behalf of the ESOP in connection with the 2003 Transaction. With Defendants having no role on behalf of the ESOP with respect to the Transaction—Defendants did not negotiate or analyze the Transaction for the ESOP and certainly did not make the decision on behalf of the ESOP not to tender the ESOP shares in the 2003 Transaction—Plaintiffs could hardly contend that Defendants fell short in discharging duties related to those tasks.

Stranger still is the way Plaintiffs spent their case introducing evidence that they seem to have abandoned. For example, Plaintiffs developed testimony from five former employees of the Company: Rhonda Anderson, Mark Mizen, Suzanne Harris, Monica Woosley, and Richard Wiser. (As an aside, these witnesses represented just the tiniest fraction of those individuals who worked at Antioch at times relevant to the litigation). These witnesses had barely anything to say about the Transaction challenged in Plaintiffs' Complaint, though all of them who had a choice voted in favor of the deal when given the opportunity. (DX-291; DX-296; Tr. 316:15-317:17, 639:7-10, 2571:3-9.) Though they criticized the Company's business decisions, none of that has anything to do with an ERISA case.

And even if their testimony was relevant, the Court could hardly rely on those witnesses to establish a nine-figure liability. None of them were actual third-party witnesses—Plaintiffs' counsel signed them all up as clients, presumably so that their preparation could be kept

confidential.[1] (Tr. 180:8-20, 623:13-19, 840:9-15, 3566:23-3567:12.) Mr. Wiser was hardly critical of Defendants and, in any event, did not even work at the Company until years later. (Tr. 3202:7-11, 3584:18-3585:18.) Ms. Anderson was, as Plaintiffs pointed out often, not involved with corporate management (and certainly not the 2003 Transaction), but instead on a bus tour. (Tr. 175:1-11.) While she spoke in broad generalities about consultant satisfaction, it is implausible to believe that Ms. Anderson had meaningful contact with any more than a tiny percentage of Creative Memories more then 65,000 consultants, and the evidence bore out that she was only one of several field "touch points" corporate management had in place. (Tr. 1655:21-1656:1, 1657:13-1658:1, 1669:25-1670:10, 3115:25-3119:11.) Indeed Ms. Anderson also admitted at her deposition that, with respect to matters relevant to the litigation, she "[couldn't] distinguish who I heard what from and what is the honest truth." (Tr. 340:3-342:3.) And though she testified at trial that she could "say emphatically that I have never read one thing on FaceBook about [the litigation]," she was impeached with her deposition testimony that she "could have learned half of [what she knew about the litigation] on FaceBook." (*Id.*)

As to credibility, Dr. Mizen deserves special mention. As he acknowledged during his testimony, while at Antioch, all but one of his direct reports accused him of using dishonest practices. (Tr. 575:9-14.) And then there is the issue of the video file he produced in discovery. As the Court knows, a line from a 2003 speech he gave that undercut his entire testimony— "Creative Memories is a leader in digital technology"—was deleted from the video file. (DX-752; DX-753; Tr. 681:17-684:3.) Spoliation issues aside, his contemporaneous statement in 2003 undercuts his testimony.

---

[1] By contrast, Defendants' third-party witnesses were actual third parties, none of whom had any particular stake or motivation in testifying.

3

Put these two things together—a corporate mismanagement case and unreliable witnesses—and the factual record is obviously insufficient to establish liability in this ERISA case. Even Plaintiffs seem to realize that. Plaintiffs filed a 37-page brief opposing Defendants' Rule 52 motion. (Doc. 637.) In that brief, the names of Mr. Wiser, Dr. Mizen, Ms. Harris, Ms. Anderson, and Ms. Woosley appear a combined zero times. (*Id.*) Plaintiffs also did not mention ARIMA (despite two witnesses focused on ARIMA), 409(p), or Peter Abrahamson, and mentioned Mr. Weinstock once in passing. (*Id.*) Plaintiffs put on day after day of witnesses and when the time came to explain to the Court how the evidence meets their burden, Plaintiffs had nothing to say about almost the entirety of their witnesses.

This would be incredible enough if Plaintiffs relied on these witnesses only for their factual case. But these witnesses—Dr. Mizen and Ms. Anderson in particular—serve as the foundation for the work of Plaintiffs' experts. Mr. Buchanan, for example, said that the conclusions in his ARIMA model were corroborated by phone calls with those individuals. (Tr. 3795:11-3796:7, 3823:17-3824:11, 3838:13-3843:11.) Mr. Reilly said he based much of his work on the unsworn statements he heard in those unrecorded calls. (Tr. 4064:6-4065:7, 4084:1-7, 4090:24-4093:4.) We said once that this was a closed feedback loop. (Doc. 624, PAGEID# 31807 n.5.) But perhaps the better analogy is a house of cards, with a tenuous foundation built almost entirely on Dr. Mizen and Ms. Anderson. Just the slightest nudge to the credibility or the depth of knowledge of those witnesses, the house tumbles down. So it is here. Those individuals' testimony is too remote, too attenuated, too biased, and too unreliable to support the entirety of Plaintiffs' factual and expert case. And in any event, and perhaps most important, none of the evidence from these witnesses proved any violation of ERISA.

## B. Crucial Facts and Elements Plaintiffs Never Proved

With Plaintiffs spending almost all of their case developing an irrelevant factual record that they have abandoned, they left the ERISA case against the Defendants unproven.

### 1. *Plaintiffs Never Proved Defendants Were ERISA Fiduciaries*

Plaintiffs never proved that Defendants were ERISA fiduciaries for purposes of this Transaction. (*See* Doc. 625-1 at PAGEID# 31958-61; Doc. 638 at PAGEID# 32445-47; FFCL ¶¶ 305-312.) It is settled that they cannot be a fiduciary without both "discretionary authority" (29 U.S.C. § 1002(21)(A)), and "[t]he power to act for the plan…[.]" *Klosterman v. Western Gen. Mgmt.*, 32 F.3d 1119, 1123 (7th Cir. 1994). Defendants in this case had neither. This was particularly apparent in Plaintiffs' opposition to the Rule 52(c) Motion where the entirety of their fiduciary status argument was premised on a "please find enclosed" letter from Lee Morgan as CEO and an ESOP Advisory Committee meeting having nothing to do with whether the Transaction moved forward. (Doc. 637 at PAGEID# 32358-59; Doc. 638 at PAGEID# 32445-47.) These grounds for establishing an ERISA fiduciary duty—the best Plaintiffs had—are not serious arguments and can be summarily dismissed. Plaintiffs cannot escape that Defendants had no authority to act for the ESOP in regard to the Transaction, which means they did not breach any duty to the ESOP.[2]

### 2. *Plaintiffs Never Established GreatBanc's Liability*

As previously established by Defendants, Plaintiffs' duty-to-monitor claim under ERISA section 404 and their co-fiduciary claim under section 405 depend on their proving that

---

[2] As noted in our Rule 52(c) briefing, were the Court to find that Defendants were fiduciaries in connection with the 2003 Transaction, it would give the appointment of GreatBanc no effect and hold Defendants to the same standard whether an independent transactional trustee was retained or not. That result is inconsistent with prior cases urging the appointment of an independent trustee as the solution for potential conflicts of interest. *Leigh v. Engle*, 727 F.2d 113, 125 (7th Cir. 1984) ("fiduciaries may need to step aside, at least temporarily, from the management of assets where they face potentially conflicting interests."). That result would also establish bad policy as described in the Rule 52(c) Motion. (*See* Doc. 625-1 at PAGEID# 31956.)

GreatBanc breached its fiduciary duty. (Doc. 625-1 at PAGEID# 31963-64, 31978-79; Doc. 638 at PAGEID# 32448-49, 32463-65.) Defendants have previously shown why Plaintiffs' section 404 and 405 claims are deficient in this regard. (Doc. 625-1 at PAGEID# 31963-68, 31978-79; Doc. 638 at PAGEID# 32448-54, 32463-65.)

Plaintiffs refused to accept during the trial that they had to prove GreatBanc breached a duty. (Tr. 947:25-948:8.) Perhaps this is why they hardly even tried to prove GreatBanc did anything wrong. For example, Plaintiffs subpoenaed Ms. Marchetti to testify. Plaintiffs did not criticize her work. Indeed, Ms. Marchetti passionately defended GreatBanc's work, even on direct examination, describing the thoroughness of its efforts and the depth of its analysis. (FFCL ¶¶ 106, 188, 193.) The 2003 Transaction was, as Ms. Marchetti testified, "one of the most scrutinized, heavily discussed, heavily negotiated, heavily analyzed transaction [sic] that was ever done at GreatBanc." (Tr. 1227:19-1228:10.) This from the *Plaintiffs'* witness.

Mr. Bloom confirmed the extensive work done by GreatBanc and Duff in connection with this Transaction. (FFCL ¶¶ 101-184.) Mr. Bloom's testimony also proved GreatBanc's meticulousness in studying, questioning and understanding Duff's valuation and fairness conclusions. His testimony was never disputed by another fact or any expert witness.

The testimony of Ms. Marchetti and Mr. Bloom is corroborated by the documentary evidence: the substantial analyses of the Transaction prepared by Duff, the detailed minutes of GreatBanc's ESOP Committee meetings, the emails showing vibrant, arms-length negotiations, and extensive diligence presentations to GreatBanc from its legal counsel at Jenkens & Gilchrist, including analysis of Antioch's business and future prospects. (*Id*.)

Plaintiffs could have bolstered their case with an expert on fiduciary conduct to testify that GreatBanc's conduct fell below the applicable standard of care. They have no such expert.

Plaintiffs have to show GreatBanc breached its duty to prevail in this case. They did not.

### 3. *Plaintiffs Did Not Prove Their Prohibited Transaction Claim*

Plaintiffs did not prove the *prima facie* elements of their prohibited transaction claim.

First, as we have previously noted, the statute extends section 406 liability only to those that "cause" the plan to enter into a transaction. (Doc. 625-1 at PAGEID# 31975-76; Doc. 638 at PAGEID# 32459-60.) It is an express aspect of the statute and the Court's task is to give effect to the entire statute drafted by Congress. Defendants simply did not "cause" anything to happen.

Second, Plaintiffs did not prove a transaction involving a "sale or exchange . . . of any property between a plan and a party in interest." 29 U.S.C. § 1106(a)(1)(A). That the Plan was not a purchaser or seller in the 2003 Transaction, and certainly did not purchase any assets from Defendants, defeats their claim. (FFCL ¶¶ 377-385.) Indeed Defendants' expert, Greg Brown, opined that transactions like the one in this case are customary and typical. (FFCL ¶¶ 32-33.)

Plaintiffs have suggested that the Company's purchase of the shares is the same as the Plan's purchase of shares from Defendants. Plaintiffs face three problems. First, Plaintiffs attempt to eliminate the line between a company and its shareholder(s) even though the law recognizes them as separate and distinct. *Northbound Group, Inc. v. Norvax, Inc.*, 795 F.3d 647, 651 (7th Cir. 2015). Second, Defendants' expert Richard May opined that a transaction between a company and a party-in-interest is simply not the same as a purchase by the ESOP. (DX-667 at 32-36; FFCL ¶¶ 383-384.) Third, and perhaps most important, Plaintiffs' argument is an invitation to judicial rewriting of the statute. Congress could have drafted a statute that included as a prohibited transaction those transactions between ESOP-owned companies and ERISA parties-in-interest. It did not. Plaintiffs' arguments throughout the trial are "inadequate to overcome the words of [a statute] regarding the specific issue under consideration. This is especially true with legislation such as ERISA, an enormously complex and detailed statute that

7

resolved innumerable disputes between powerful competing interests—not all in favor of potential plaintiffs." *Mertens v. Hewitt Assoc.*, 508 U.S. 248, 261-62 (1993) (citing cases).

### C. Plaintiffs' Duty to Monitor Claim

Having litigated a corporate mismanagement case, and having failed to prove crucial aspects of their case, Plaintiffs focused almost entirely on their duty to monitor claim, including a so-called duty to inform that Plaintiffs have tried to wedge into the statute. We have previously briefed this issue at length and incorporate that into this brief. (Doc. 625-1 at PAGEID# 31968-74; Doc. 638 at PAGEID# 32454-58.) But we summarize the important points here.

First, the ESOP Advisory Committee had no duty to monitor. Such a duty arises from the power to appoint which only the Antioch Board held. (Doc. 625-1 at PAGEID# 31964-65; FFCL ¶¶ 43, 314-316.) For Ms. Attiken, that ends the analysis because she was not a Board member. (*Id.*)

Second, a claim for breach of the duty to monitor is indisputably a derivative claim, and Plaintiffs have not proven GreatBanc breached any duty, as shown above. (Doc. 625-1 at PAGEID# 31963-68, 31978-79; Doc. 638 at PAGEID# 32448-54, 32463-65; FFCL ¶¶ 318-334.)

Third, courts takes a narrow view of the duty to monitor, including rejecting a plaintiff's attempt to turn the duty to monitor into a duty to broadly review decisions of the appointed fiduciary. (*See* Doc. 625-1 at PAGEID# 31967-68 (*citing Howell v. Motorola, Inc.*, 633 F.3d 552, 573 (7th Cir. 2011)); FFCL ¶¶ 335-341.) Monitoring need only be done at "reasonable intervals." *Lingis v. Motorola, Inc.*, 649 F. Supp. 2d 861, 881-82 (N.D. Ill. 2009). In *Lingis*, a decision affirmed by the Seventh Circuit, annual review of the appointed fiduciary satisfied the duty to monitor. *Id*.

Fourth, the evidence in the record shows substantial acts of monitoring, including the Board meeting with GreatBanc multiple times during GreatBanc's four-month engagement.

(FFCL ¶¶ 335-341.) Greg Brown, in an opinion that Plaintiffs failed to rebut, testified that the Board engaged in typical and customary monitoring in regard to GreatBanc. (FFCL ¶¶ 338-339.) The monitoring acts in this case, as observed by Mr. Brown, meet the modest duty to monitor.

The duty to monitor is limited and Plaintiffs failed to meet their burden of showing that Defendants, as two of nine board members, breached it.

### D.     Plaintiffs' So-Called Duty To Inform Claim

If their post-trial brief is anything like their opposition to Defendants' Rule 52 motion, Plaintiffs will place most or all of their hopes on the so-called duty to inform. Defendants have already shown that this "duty" is not recognized under the law. (Doc. 625-1 at PAGEID# 31969-71; Doc. 638 at PAGEID# 32454-56; FFCL ¶¶ 342-360.) The Court will recall that one very recent opinion rejecting the duty to inform (with a thorough analysis of how a claim for breach of duty to inform was not supported by statute or traditional trust law) was *In re Lehman Brothers Securities & ERISA Litigation*, No. 08-cv-5598, 2015 U.S. Dist. LEXIS 90109 (S.D.N.Y. July 10, 2015). That decision was affirmed by the Second Circuit since the Rule 52 briefing. The Second Circuit stated, "ERISA does not impose a duty on appointing fiduciaries to keep their appointees apprised of nonpublic information." *Rinehart v. Lehman Bros. Holdings Inc.*, ---, F.3d ---, 2016 U.S. App. LEXIS 5114, at *17 (2d Cir. Mar. 18, 2016).

There is no circuit split on this point; it is not as if the Seventh Circuit has recognized a duty to inform like Plaintiffs rely on in this case. To the extent there is any arguable precedent from this district supporting such a duty, it stems from *Keach v. U.S. Trust Co.*, 313 F. Supp. 2d 818 (C.D. Ill. 2004), where the court held that defendants met that duty because they "instructed the management and other employees of F&G to provide access to anything and everything that was requested." *Id.* at 864-65. That is exactly what Defendants did here. (Tr. 1515:2-1535:17; 2296:16-23; 2301:6-2302:14; 3176:15-21.).

9

Beyond that, the evidence showed that essentially everything Plaintiffs contend was not provided to GreatBanc is either information it did in fact know or is information it should have known. (Doc. 624-2; Doc. 625-1 at PAGEID# 31973; Doc. 638 at PAGEID# 32456; FFCL ¶¶ 112-130, 350.) A duty to inform claim either does not exist, or it exists and Defendants satisfied it. Either way, a defense judgment is appropriate.

Finally, Plaintiffs lack the materiality evidence they need. (Doc. 625-1 at PAGEID# 31973-74; Doc. 638 at PAGEID# 32457-58; FFCL ¶¶ 351-360.) Ms. Marchetti consistently testified that she could not say that any of the supposedly missing information was material to GreatBanc. (*Id.*; FFCL ¶ 351.) With respect to the downside scenarios on which Plaintiff focused, Mr. Bloom made clear that these scenarios would not have been material, that he would not have expected to receive them, and is not sure what he would have done with them. (FFCL ¶ 353.) Mr. Bloom also testified that, if anything, the Company's Plan amendment would have made him *more* comfortable with the Transaction, and that Duff was well aware of what the Company's future repurchase obligation could be if the unexpected happened, but the Company had sufficient cash flexibility to handle it. (FFCL ¶ 356.) Plaintiffs have *no* evidence of materiality. And certainly they do not have proof that any particular fact would have changed Duff's fairness opinion or GreatBanc's decision not to tender the shares.

Plaintiffs could have retained someone experienced as an independent trustee or a fairness expert and asked that person to opine on whether this missing information was material. They do not have this opinion. Indeed the only expert opinion at all on this issue is Mr. Brown's view that he would *not* have expected the Company to share its sensitivity analyses or revised repurchase obligation presentation with GreatBanc and Duff. (FFCL ¶ 119.)

Finally, even if Plaintiffs would be able to establish that Defendants had a duty to inform that was breached and the information was material (all of which Plaintiffs cannot do), the Seventh Circuit teaches that the allegedly missing information must be placed "within the context of the totality of the circumstances of [the fiduciary's] valuation process." *Keach v. U.S. Trust Co.*, 419 F.3d 626, 637 (7th Cir. 2005). Plaintiffs have not proven how the supposedly missing information affected Duff's valuation or GreatBanc's conclusion to not tender shares.

ERISA does not impose a duty to inform on the Board. Alternatively, if it does exist then it was satisfied, and if the information was not provided, then there is no evidence of materiality. Any one of these alternatives requires a defense judgment.

### E. **Defendants Proved Adequate Consideration During Their Case**

Because Plaintiffs did not prove the elements of their section 406 claim, it is unnecessary to consider Defendants' adequate consideration defense under section 408(e). But if the Court reaches the issue, there is more than a preponderance of evidence showing that the Company did not pay more than fair market value for the Antioch shares and that the fair market value was determined in good faith. (FFCL ¶¶ 131-304, 369-417.)

In this regard, the evidence showed that GreatBanc engaged Duff to analyze the Transaction. (FFCL ¶ 133.) No one questions that Duff was a leading valuation firm. (FFCL ¶ 396.) The evidence further showed that Duff opined that $850 was within the range of fair market value for Antioch stock. (FFCL ¶¶ 183.) GreatBanc did not blindly accept Duff's conclusions, but rigorously scrutinized Duff's analysis. (FFCL ¶¶ 188-195.)

Defendants also put forth the expert opinion of Jeff Risius. (FFCL ¶¶ 244-304.) As described in the FFCL, and as even more extensively detailed in his report, Mr. Risius opined that the fairness and valuation opinions Duff gave to GreatBanc were methodologically sound and customary. (FFCL ¶¶ 245-267.) Indeed, for multiple reasons, Mr. Risius opined that Duff's

11

valuation analysis was conservative. (FFCL ¶¶ 245, 250-260.) Based on Mr. Risius' independent research, review of the record, and DCF and comparable company analyses, he concluded that $850 per-share was at the "very low end" of the fair market value range for Antioch stock. (FFCL ¶¶ 245-260.)

There is still additional evidence in the record proving that Antioch did not pay more than fair market value for the shares. Houlihan Lokey was retained to as a fairness advisor to analyze the consideration to be paid to the non-ESOP shareholders. Like GreatBanc and Duff, Houlihan went to considerable effort to understand Antioch's business. (FFCL ¶¶ 198-201.) Houlihan undertook its own valuation and fairness analysis and concluded that $850 fell within a reasonable range of value for both the cash and non-cash consideration. (FFCL ¶¶ 196-216.) Further still, the independent valuation firm Prairie Capital determined that the fair market value of Antioch stock was $894 per share as of December 31, 2003, and $943 per share as of December 31, 2004. (FFCL ¶¶ 275, 278, 289, 404.) Plaintiffs never questioned the methodologies of Houlihan or Prairie Capital.

In contrast to all of this evidence, Plaintiffs' expert Robert Reilly concluded that a share of Antioch stock was worth $500 in 2003—just about the same per-share value for Antioch stock as in 2001, when shares were $496, and the Company's revenue was substantially lower and its profits far less than in 2003 (or 2004). (FFCL ¶¶ 14-15, 208.) In other words, just as we indicated in our pre-trial brief would be the case, Mr. Reilly presents an "I'm right and everyone else is wrong" opinion. (Doc. 522 at PAGEIE# 20486-88.) Crucially, the valuations of Houlihan, Duff, and Prairie were all done contemporaneous with the Transaction and outside the context of litigation, without the opportunity for hindsight bias.

Mr. Reilly's methodology was also flawed. His uncritical reliance on ARIMA sales projections in two of his five models was unreasonable. (FFCL ¶¶ 232-237, 414.) In two other models he used as his base case scenarios the revenue line from two Deloitte models called "Downside" and "Big Downside" even though these were not management's base case. (FFCL ¶¶ 238.) A fifth Reilly model used an unreliable and unjustified CSRP. (FFCL ¶¶ 271, 273, 414.) He also failed to perform a comparative company analysis. (FFCL ¶¶ 227, 274, 412.) The evidence shows that Mr. Reilly's opinions are based on unsound and unproven valuation methodologies. (FFCL ¶¶ 407-415.)

The flaws with Mr. Reilly's approach are extensively detailed in the FFCL, and we only provide a summary here. The important point is that Mr. Reilly's analysis does not credibly contradict the extensive and contemporaneous evidence of value in the record. If reached, Defendants established the adequate consideration defense under ERISA section 408(e).

### F. Plaintiffs Failed to Prove Their Damages

If the Court were to determine that Plaintiffs established a liability case against Defendants, Plaintiffs can still not prevail because they did not prove causation or damages.

With respect to section 406, Plaintiffs' damages theories, through Mr. Reilly, are flawed and not credible. This is discussed in part above and Paragraph 419 of the FFCL collects further evidentiary support.

With respect to sections 404 and 405, ERISA makes a fiduciary liable only for losses "resulting from" a breach; a causal connection is required to award damages or impose monetary liability. 29 U.S.C. § 1109(a); *see also Brandt v. Grounds*, 687 F.2d 895, 898 (7th Cir. 1982) ("a causal connection is required between the breach of fiduciary duty and the losses incurred by the plan"). Plaintiffs cannot prove causation between the alleged breaches of duty and the claimed damages. Indeed, the evidence at trial showed the Company continued to prosper following the

13

Transaction, and that events unrelated to the Transaction caused the Company's decline and ultimate reorganization of its capital structure through a bankruptcy proceeding five years after the Transaction closed. (FFCL ¶¶ 278, 289-304.) For example, the two valuations following the Transaction showed the per-share price increasing, to the benefit of the ESOP and its participants. (FFCL ¶ 278.) The company was also able to satisfy the unpredictably large repurchase obligation and pay down debt ahead of schedule. (FFCL ¶¶ 279-295.) The company refinanced in 2005 on more favorable terms. (FFCL ¶¶ 289-295.)

There are other facts showing the post-Transaction health of the Company. It was only multiple years after the Transaction when the Company's financial health suffered as a result of a sales decline driven by unforeseeable changes in the scrapbooking marketplace, the same financial downturn seen in comparable companies at that time as Mr. Risius's testimony established. (FFCL ¶¶ 296-304.) And Antioch was far from alone in 2003 in its bullish outlook on the future of the scrapbooking market. One example of this was Michaels' "Recollections" stores, which were devoted strictly to memory-keeping and scrapbooking, and which began to open in 2003. (Tr. 732:4-23.) Moreover, the worldwide economy suffered a historic collapse between the 2003 Transaction and the bankruptcy. *Chesemore v. Alliance Holdings, Inc.*, 948 F. Supp. 2d 928 (W.D. Wis. 2012) (plaintiffs failed to prove causation because they "ignore[d] the tsunami that was the 2008 financial crisis.").

With respect to Plaintiffs' rescission remedy, there are multiple flaws. Since the ESOP did not part with any assets, Defendants are not in possession of any Plan assets to return to the ESOP. Also, because Defendants tendered their non-ESOP Antioch shares to the Company, Plaintiffs are not in possession or control of those shares to return to Defendants to effectuate a rescission remedy. Accordingly, because Plaintiffs failed to show in their case in chief that

Defendants possess Plan assets and that the Plan, or Plaintiffs, are in possession and control of the Antioch shares tendered by Defendants to the Company in 2003, a rescission theory of damages does not fit with the evidence. *See Neil v. Zell,* No. 08 C 6833, 2010 U.S. Dist. LEXIS 80744, at *7 (N.D. Ill. Aug. 9, 2010) ("Plaintiffs cannot explain why they are entitled to repayment of funds that originated with [the company]."); *see also Chesemore,* 948 F. Supp. 2d at 942 ("Complete rescission of the entire transaction is similarly inappropriate here, because it would award plaintiffs the entire purchase price . . . despite the 2008 recession being the principal cause of its precipitous loss in value.").)

\*\*\*

The Court should see things for what they are. The case Plaintiffs filed was about GreatBanc. A review of the Complaint—focused almost entirely on GreatBanc—makes that clear. And while GreatBanc did nothing wrong, at least a complaint focused on GreatBanc challenged, in an ERISA case, the party that exercised discretionary authority on behalf of an ESOP plan.

When GreatBanc was no longer a defendant, Plaintiffs had a trial date on the horizon, and the only remaining Defendants did not exercise any discretionary authority on behalf of the ESOP. So they litigated a business mismanagement case and hoped the slightest whiff of impropriety—regardless of the law, regardless of whether Defendants were acting as corporate managers, and not ERISA fiduciaries, regardless of an evidentiary record that belied its concocted business management claims—might lead this Court to a liability finding. This was insufficient to establish ERISA liability. A defense judgment is appropriate for all Defendants.

Respectfully Submitted,

KEATING MUETHING & KLEKAMP, PLL


By: */s/ Michael L. Scheier*
    Michael L. Scheier
    Brian P. Muething
    Anthony M. Verticchio
    Jacob D. Rhode
    One East Fourth Street, Suite 1400
    Cincinnati, Ohio 45202
    mscheier@kmklaw.com
    bmuething@kmklaw.com
    tverticchio@kmklaw.com
    jrhode@kmklaw.com
    *Attorneys for Defendants Lee Morgan,*
    *Asha Morgan Moran, and Chandra Attiken*

## **CERTIFICATE OF SERVICE**

      I hereby certify that on April 4, 2016, I caused true and correct copies of the foregoing to be filed electronically using the Court's CM/ECF system and to thereby be served upon all registered participants identified in the Notice of Electronic Filing in this matter on this date. This document is available for viewing and downloading on the CM/ECF system.

                                        /s/ Michael L. Scheier
                                        Michael L. Scheier

6724234