UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| BONNIE FISH, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>GREATBANC TRUST COMPANY, et al.,<br><br>Defendants. | Case No. 1:09-cv-01668<br><br>Honorable Jorge L. Alonso<br><br>Honorable Maria Valdez |

**DEFENDANTS LEE MORGAN'S, ASHA MORAN'S AND
CHANDRA ATTIKEN'S RESPONSE TO PLAINTIFFS' POST-TRIAL BRIEF**

I.      **Introduction**

Plaintiffs' post-trial filings rehash unproven allegations tied to legally unsupportable arguments that Defendants have already addressed in the comprehensive merits briefs filed before, during and after trial. In this final merits brief, we will cover Plaintiffs' departure from the trial record. In addition, this brief will address several new arguments in Plaintiffs' post-trial filings, or arguments that received new emphasis. (*See* Docs. 663 & 664.)

II.     **The Inaccuracies in Plaintiffs' Brief and Proposed Findings**

Many of the factual findings that Plaintiffs ask the Court to make are either distortions or not in the record.

First is an example of a distortion. Plaintiffs ask the Court to adopt a finding of fact that "[n]o due diligence interviews were conducted with . . . Dr. Mark Mizen . . . or . . . Susan [*sic*] Harris . . . [.]" (Doc. 663 at ¶ 162.) Ms. Harris testified that she was interviewed during due diligence. (*See* Tr. 833:19-22 (Harris).)[1] Beyond that, the due diligence meeting schedule for August 20-22 shows both of their names on it (JX-17), and the Houlihan meeting notes show they were both interviewed. (DX-109; DX-745.) Notably, these interview notes have Ms. Harris and Dr. Mizen speaking positively about the Company, and certainly nothing approaching their trial testimony 12 years later after becoming clients of Plaintiffs' counsel. If Plaintiffs cannot be counted on to accurately present facts that are so indisputable, then it is difficult to place any reliance on Plaintiffs' post-trial filings.

Second is an example of speculation. Plaintiffs have the Court finding that a "reasonably prudent fiduciary" in GreatBanc's position "would not have simply accepted" Mr. Bloom's financial analysis without inquiry. (Doc. 663 at ¶ 188.) Unlike the evidence of GreatBanc's rigor

---

[1] Here is part of the record in regard to Ms. Harris: "Q: And do you recall when, in fact, you ended up meeting with any of the ESOP advisors or the 2003 transaction advisor? A: I recall meeting with them." (Tr. 833:19-22.) The quoted language comes directly from the cite proffered by Plaintiffs.

in scrutinizing Duff's work and Mr. Brown's expert testimony about it, Plaintiff put on no fact or expert or rebuttal evidence about the custom and practice independent fiduciaries used in 2003 to scrutinize a valuation and fairness analysis from its expert financial advisor. The Court therefore has no evidentiary basis to make the finding. Moreover, Plaintiffs present a finding, again untethered to the record, that a proper "analysis" by GreatBanc "would have included a reassessment" of Duff's analysis. *Id.*

There is no effective way to download in 15 pages the line-by-line analysis we have done.[2] And we know this is ultimately unnecessary because the Court heard the evidence and will make its own findings. To assist the Court in that regard, we will provide a flash drive that contains Defendants' proposed factual findings with live hyperlinks that will open the cited exhibit or testimony as a separate PDF. We want to make it as easy as possible for the Court to (1) access the actual evidence in the record, and (2) give Defendants' proposed factual findings the exacting review that it should give to Plaintiffs' post-trial representations.

### III. Certain Issues Emphasized by Plaintiffs in Their Briefing

#### A. "Risks" TAC Was Facing

##### 1. *The Risks Were Identified, Planned For, and Disclosed*

Plaintiffs devoted substantial trial days and now space in both their proposed findings and in their trial brief to cataloguing the "risks" TAC was facing in 2003. We imagine the Court might be disappointed if we did not, one final time, say that this entire line of evidence is irrelevant to proving ERISA claims against the three specific defendants before the Court.

But even if this case were about proving *corporate* or *management* imprudence, not ERISA liability, merely cataloguing potential risks facing the Company in 2003 does nothing for

---

[2] Given that the Court asked for only closing briefs and denied a request to make specific responses to the opposing party's findings of fact, and has not expanded the page limits, Defendants limit this response to 15 pages and do not attach supporting appendices.

Plaintiffs unless they can say more, like that the corporate managers were unreasonably blind to the risks or failed to plan for them. Plaintiffs cannot say anything like that.

With respect to perceiving potential risks, Plaintiffs' filings recognize that the Company appreciated the risk factors Plaintiffs identify in their submissions. Indeed Plaintiffs begin their factual summary in the trial brief with a heading that says "The Risks TAC Understood It Was Facing in 2003." (Doc. 664 at 3.)[3] So Plaintiffs cannot contend that the Company's managers had their heads in the sand.

And management took these potential risks into account, substantially lowering future projections as compared to historic performance. For example, in the Company's ten-year projections, the Company assumed revenue growth rates of between 11% and 13% for the first 7 years following the Transaction, eventually slowing to a 6% annual rate. These assumptions were conservative when compared to the growth rates that the Company had experienced in the years preceding the Transaction, including a 26% revenue growth rate in 2002, a 16% increase in 2001, a 20% increase in 2000, and a 22% increase in 1999. (Doc. 661 at ¶ 60.)[4]

Nor can it be said that the Company failed to address business risks. For example, the Court heard substantial testimony about the meetings and retreats where company stakeholders (including Dr. Mizen and Ms. Harris) considered Creative Memories' future strategy. (*See* Doc. 661 at ¶ 58; PX-148; PX-150; PX-165.) The strategic plan for Creative Memories coming out of this process was to continue to focus on its core business while also planning to reach out to new

---

[3] Plaintiffs also state that "*TAC's management knew* that the U.S. market could not support continued growth…[.]" (emphasis added). The Company also understood "that the competitive landscape was shifting profoundly." *Id*. The Company further understood, as Plaintiffs acknowledge, that it had a challenge in managing future ESOP repurchase obligation. *Id*. at 4. As if there was any doubt, the Company's tender offer risk section outlined the exact risks identified by Plaintiffs (and others still). (JX-49 at MOR001282-1294.)

[4] That the Company lowered its projections in the face of a more challenging environment makes irrelevant all of Plaintiffs' loose talk of "plateaus"—the evidence showed that the Company understood that it could not keep pace with its historic performance and disclosed as much.

markets and incorporate additional digital products in the coming years, which it did. (*See, e.g.*, PX-165; JX-22 at D&P_A010832-42; Tr. 671:1-17; Luce Dep. 320:15-324:2; DX-758; JX-80 at P-Woosley-000107; PX-163 at 0032, 0040; JX-71 at 0004.)[5] This plan was presented to the Board of Directors at a meeting on August 21, 2003 attended by Transaction advisors, including GreatBanc. (*See* JX-21 (board minutes); JX-22 & DX-121 (meeting slides given to advisors).)[6]

The foregoing risks (and others) Plaintiffs identify were widely disclosed by the Company in connection with the Transaction. (*See* Doc. 661 at ¶¶ 103-111.) Even Plaintiffs acknowledge this in their proposed findings. (*See* Doc. 663 at ¶¶ 84-94, 104, 109, 113, 183, 185.) Certainly the only finding supported by the record is that GreatBanc and Duff understood the risks that Plaintiffs identify, and more importantly incorporated those exact risks into their fairness and valuation analyses. (*See, e.g.,* Doc. 661 at ¶¶ 103-111, 137-139, 152.)

The point is that while in 2016 Plaintiffs cite to risks the Company faced, the indisputable trial record shows that management fully understood and accounted for the impact of these risks (especially when considered with opportunities and strengths), as did Transaction advisors and lenders. They all believed in the Company's strong future prospects and ability to meet these potential risks head on. If relevant, that evidence eliminates any suggestion of an imprudent process.

---

[5] Indeed, the cited evidence shows the Company executed on its strategic plan exactly as set out prior to the Transaction by incorporating digital technology and introducing digital products in the 2005-2007 time frame, such as a platform for customers to store their photographs online (Creative Memories Photo Center - 2005), a software program that allowed customers to manipulate and edit their digital images (Memory Manager - 2005-2006), and an advanced software with further editing, artistic, and creative abilities that also allowed for the production and printing of a digital scrapbook (Storybook Creator and Storybook Creator Plus - 2006-2008). (*Id.*)

[6] Just like with Creative Memories, the Company developed thoughtful and detailed strategic plans for each of its business units, which were also provided to the advisors and which Duff relied upon in their independent analysis. (DX-110; Tr. 4300:14-4302:22; Doc. 661 at ¶ 58.)

4

        2.    *Plaintiffs Do Not Link the Risks to the Alleged Imprudence of the Transaction*

In any event, the risks that Plaintiffs cite fail to help them carry their burden because they never link them to the alleged imprudence of the 2003 Transaction. They have left a gaping evidentiary hole never filled with evidence that the Company—facing business risk before the Transaction just like any organization—would be less able to address these risks if it went forward with the Transaction instead of maintaining the status quo. They simply invite the Court to speculate that it is so since they put on no supporting evidence, and therefore cite to none. (*See* Doc. 663 at 60 ¶ 233.)

Indeed there is compelling evidence that—because of the anticipated tax savings—it would have been imprudent for the Company to *not* pursue the Transaction. There is no dispute that Deloitte (the source of the transactional structure) advised the Company that it should anticipate substantial tax benefits that could be as much as $130 million if it became 100% ESOP-owned. (*See* Luce Dep. 127:16-129:5; JX-38 at 40.) Even Plaintiffs recognized the tax benefits in their opening statement. (Tr. 25:20-22 ("Management had a desire to take advantage of the 100% ESOP owned S corporation tax benefits. Nothing wrong with that. We're not complaining about that.").) In other words, the Transaction offered management an opportunity to open a cash source that could be (and actually was) used to address business risks that would exist independent of the Transaction. The weight of evidence actually proves that the Transaction was a potential *solution* to risk faced by both the Company and ESOP participants, not a *cause* of risk.

        3.    <u>*No Contemporaneous Criticism of Projections in the Record*</u>

Finally, if the point of Plaintiffs' attention to the "risks" is to suggest that the Company's projections in 2003 were unreasonable, this is unsupported by the record. No advisor contended

that the projections were unreliable. There is no contemporaneous evidence that the projections deviated from management's sincerely held belief about anticipated performance, that any Antioch employee, other than Mr. Mizen who had no role in Antioch budgeting, voiced concern over management's business expectations, or that the projections were anything other than the product of a thoughtful process starting with the individual business units up to Cheryl Lightle as CM's president and through the Board's review and approval. The banking syndicate lent money to the Company based on those projections. Plaintiffs' current criticism is infected with hindsight and bias. But "as in all cases, the test of prudence is one of conduct, not results . . . . The focus of the inquiry is how the fiduciary acted, not whether his investments succeeded or failed." *Hill v. Hill Bros. Constr. Co.,* No. 3:14CV213, 2016 U.S. Dist. Lexis 40225, at *25 (N.D. Miss. Mar. 28, 2016) (*citing Donovan v. Cunningham*, 716 F.2d 1455 (5th Cir. 1983)).[7]

### B. Repurchase Obligation

Plaintiffs also devote many pages to the Company's repurchase obligation, but fail to tie that issue to an ERISA violation. No one disputes that the repurchase obligation existed with or without the Transaction because Antioch was an ESOP company.

Crucially though, Plaintiffs misrepresent and misconstrue the impact of the future projected repurchase obligation on the per-share valuation of Antioch stock. Plaintiffs argue that Duff erred in its conclusion that the *pre*-Transaction share price of $850 was within the range of fair market value in part because it did not appropriately factor into its DCF analysis the projected repurchase obligation of the Company, and that Risius made this same error. (*See, e.g.*, Doc. 663 at ¶¶ 245, 247; Doc. 664 at 26-27.) However, no witness testified or opined that the

---

[7] Plaintiffs frequently attempt to prove unreasonableness of the 2003 projections with post-Transaction results. This is classic hindsight bias because Plaintiffs never have reconciled their use of hindsight with evidence of either what was known and knowable about the Company in 2003 (hefty rises in every financial metric in the years before the Transaction) or the 2003 projections showing a slowdown of revenue and EBITDA in the post-Transaction era.

6

projected repurchase obligation should be considered valuation of the *pre*-Transaction stock or Transaction price (*i.e.*, $850), as Plaintiffs now argue. Indeed, Reilly unequivocally testified that the projected future repurchase obligation of the Company *only* relates to his *post*-Transaction valuation of Antioch stock, not the $850 *pre*-Transaction valuation (even he did not account for the repurchase obligation in his pre-Transaction DCF models). (*See* PX-870; Tr. 4158:8-11 ("Q…that entire analysis only goes to the company's post transaction value, right? A. Yes.").) Although the way Reilly factors the projected repurchased obligation into the *post*-Transaction valuation of Antioch stock is methodologically flawed and unreliable (*see* Doc. 661 at ¶¶ 240-243), there can be no dispute that it has nothing to do with his *pre*-Transaction value opinion regarding the $850 stock price, which is the entire basis for Plaintiffs' argument that Defendants did not satisfy the Section 408(e) defense.[8]

### C. Post-Transaction Valuations

Plaintiffs have no evidence that the Transaction caused Antioch to suffer post-Transaction financial setbacks. In fact, their contention is belied by the post-Transaction valuations of the Company stock that they simply fail to even mention, much less consider. As the Court knows, the end-of-year 2003 valuation was $894 and then $943 (2004), $786 (2005) and $725 (2006).[9] The Company's per share value *appreciated* and then held steady in the years

---

[8] Although Duff included in its DCF analysis an expense payment from the Company to the ESOP in the amount of 21% of eligible compensation, this was *not* a line item to partially or fully account for the impact of the projected future repurchase and redemption of shares, which is the contingent liability Plaintiffs wrongly argue should have been included in the DCF analysis (contrary to Reilly and the evidence from every other valuation professional). The 21% expense line item was simply a conservative balance sheet assumption by Duff that the Company would make those payments to the ESOP every year in the future (which could have been used for recycling shares, among other things), and all else equal, had the effect of lowering Duff's per share value conclusion. (Doc. 661 at ¶¶ 160, 255.)

[9] The post-Transaction valuations highlight just how far off Mr. Reilly's $500 valuation is. Years later, facing falling sales, independent valuations said the Company was still 50% more valuable than Mr. Reilly states as of 2003.

following the Transaction. So many weeks of trial failed to yield evidence to hang Antioch's sales decline on the Transaction that closed years earlier. Plaintiffs did not meet their burden to show that the Transaction caused Antioch's sales to decline as opposed to evidence of innumerable intervening, and superseding causes. (Doc. 661 at ¶¶ 296-304.) Plaintiffs point to no non-hearsay evidence linking the 2003 Transaction with the Company's decline years later, nor did they have an expert opinion on point. Their proposed findings in that regard are speculative.[10]

## IV. Section 404 Claim

Plaintiffs' brief confirms that the Section 404 claim is based only on alleged breaches of the duties to monitor and inform. Not even Plaintiffs can persist with the idea that Defendants had any role in connection with consideration or approval of the Transaction itself, which is an important concession given that ERISA requires the exercise of discretion on behalf of the plan before liability could be imposed. (*See* Doc. 661 at ¶¶ 305-312.)[11]

Not only is Plaintiffs' characterization of the duty to monitor well beyond its outer bounds identified in case law, Plaintiffs also failed to establish a duty to monitor claim because they did not carry their evidentiary burden to prove a breach by GreatBanc (necessary to prove a breach of the duty to monitor). (Doc. 661 at ¶ 318.) As we have previously shown, GreatBanc's

---

[10] It is also unfair for the ESOP, for whose benefit Plaintiffs have sued, to have ESOP participants reap the benefits of those valuations only to later claim they do not accurately reflect fair market value. (*See*, *e.g.*, Doc. 663 at ¶ 222 (alleging the Company paid out approximately $106 million to ESOP participants from 2004-2006 based on the $894, $943, and $786 valuations).)

[11] Although Plaintiffs concede that their section 404 claim goes only to the alleged duties to monitor and inform, they nevertheless shoehorn in an argument that Defendants violated their section 404 duties because the EAC alone had the all duties related to the ESOP until October 30, 2003, including the responsibility for the decision of whether or not to tender the ESOP's shares. This ignores the record as to the allocation of functional duties from the moment that GreatBanc was retained in early August 2003. *Brooks v. Pactiv Corp.*, 729 F.3d 758, 765 (7th Cir. 2013) (ERISA "defines fiduciary status in functional terms"). It further ignores that the Plan specifically contemplated and allowed retroactive amendments, and that the Plan and Trust Agreement were both amended retroactively in order to comport with the allocation of fiduciary functions that began in August. (Doc. 661 ¶¶ 48-49.)

diligence and process was thorough and exacting. Tellingly, Plaintiffs almost ignore this evidence entirely, as if it never entered the record. Instead, Plaintiffs almost exclusively attack Duff's work with allegations based principally on lawyer speculation. But Plaintiffs have no evidence or expert opinion suggesting that GreatBanc's reliance on Duff's work was at all unreasonable or fell below the conduct accepted of a trustee in the circumstances then prevailing.

With respect to the duty to inform, such a duty is unrecognized and there was no breach of the duty if it exists because the allegedly missing information was provided (notably, Plaintiffs have never responded to our arguments showing how the information was actually known or should have been known).[12] But Plaintiffs' biggest problem with respect to the duty to inform has been and continues to be the lack of materiality evidence. In Plaintiffs' brief they try to address this issue by saying Defendants made it "impossible" to know what GreatBanc and Duff would have done had the information been provided. But that is just not true. Ms. Marchetti testified; Plaintiffs asked her what effect the information would have had; and Plaintiffs could not get the evidence that might have helped them. Same with Mr. Bloom's testimony. And, finally, Plaintiffs could have retained a fiduciary or financial expert to opine that the supposedly missing information was material but they do not have such an expert. This "impossibility" argument comes only now because Plaintiffs took their shot and missed.[13]

---

[12] The case law Plaintiffs cite for the duty to inform relate to the disclosure of benefits information to plan participants and has no application to this case. Moreover, this line of cases requires an intent on behalf of the defendants to injure or deceive participants—a case that Plaintiffs did not even arguably present. *Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 642 (7th Cir. 2004).

[13] In fact, this was not a case where defendants destroyed information going to alleged breaches, such as the downsides, the December 2003 repurchase study and the plan amendment. These are not "innocent" Plaintiffs who could not get their hands on evidence they claim they needed to prove a breach. Plaintiffs had all of that information. What they needed to do was therefore not "impossible." They needed an expert to testify about the materiality of the information, or a fact witness. They introduced neither at their peril. Plaintiffs also add a couple of new allegations regarding supposedly missing information—the 2004 business plan and the recycling of shares in the future. Neither of these occurred prior to the closing of the Transaction. (Doc. 661 at n.3; JX-71; JX-72.) In any event, no evidence exists that either would have been material to Duff's analysis. (Doc. 661, ¶¶ 61, 436.)

V.     **Plaintiffs' Section 406 Claim**

   A.     **Plaintiffs Cannot Prove Their Prima Facie Case**

We have consistently said that ERISA section 406 does not apply to a straight corporate redemption transaction by an ESOP company where no ESOP shares are exchanged. Plaintiffs' briefing of their 406 claim is perhaps the best confirmation yet that ERISA does not apply to a straight up corporate redemption.

First, Plaintiffs put nearly all their eggs in the basket of the Seventh Circuit's opinion in this case. That decision is not evidence. And, as the Seventh Circuit noted, it construed Plaintiffs' allegations deferentially in Plaintiffs' appeal of the district court's summary judgment that the three-year "actual knowledge" statute of limitations barred Plaintiffs' claims. The appeal was not a review of the merits, and therefore does not give rise to law of the case. *Zamora-Mallari v. Mukasey*, 514 F.3d 679, 695-96 (7th Cir. 2008) (law of the case inapplicable where prior decision did not reach merits). Indeed the Seventh Circuit knew that the ultimate facts at the trial might not support the statements in the appellate opinion, which is why the court stated, "We do not necessarily vouch for the objective accuracy of all factual statements here, but defendants moved for summary judgment, which requires that we view the evidence in this harsh light." *Fish v. GreatBanc Trust Co.*, 749 F.3d 671, 674 (7th Cir. 2014). *This* Court has the fully developed factual record that the Seventh Circuit was without and must apply the facts actually proven at trial without consideration of prior court decisions where "the objective accuracy of all factual statements" was in question and the merits not at issue. *Id*.

Beyond the Seventh Circuit decision, faced with a statute that even they nearly admit does not apply, Plaintiffs invent an entirely new standard. Rather than ERISA making illegal a "prohibited transaction," Plaintiffs say that the "key fact is the net intended effect of the

10

Transaction." (Doc. 664 at 22.) Surely there is no case giving rise to liability for a "prohibited net intended effect" and Plaintiffs do not cite one.

Plaintiffs also rewrite the "cause" phrase in section 406. The Court will recall Plaintiffs previously suggested section 406 liability arose from "allowing" the Transaction to proceed. That was not factually true and also quite clearly not what the statute prohibits. Plaintiffs have now dropped this and instead argue that Defendants *caused* the *Transaction*. (Doc. 664 at 22-23.) That is not what the statute requires—"caused the transaction" is not what the statute prohibits, rather the statute says a "fiduciary with respect to a plan shall not cause the plan to engage in a transaction." Plaintiffs do not and cannot suggest that Defendants "cause[d] the plan" to enter into the Transaction.

Plaintiffs say that a defense judgment on the section 406 claim would elevate form over substance. (Doc. 664 at 22.) This is the back-against-the-wall argument of a group that realizes, finally, that the statute simply does not apply to these facts. If Congress had intended corporate tender offers to fall within the prohibited transaction statute, it could have written the statute that way or can amend the statute in the future. But this Court cannot judicially expand this carefully drafted statute. *Mertens v. Hewitt Assoc.*, 508 U.S. 248 261-62 (1993).[14]

### B. Defendants Are Entitled to the Section 408 Exemption

If the Court reaches the section 408 exemption, Defendants easily carried their burden.

Plaintiffs do not and cannot critique or challenge the contemporaneous, independent, and non-litigation valuation and financial analysis performed by Houlihan (concluding $850 was fair value and within a fair market value range of $824 to $953), the 2003 fair market valuation of $893 per share, or the 2004 fair market valuation of $943 per share. Yet Plaintiffs ask this Court

---

[14] And, in any event, the "substance" of ERISA is protection of plan assets, which were absolutely not used in this Transaction.

to find that *all* of these unchallenged valuations that corroborate and verify Duff's work and the $850 Transaction price are wrong, and that the fair market value of Antioch stock at the time of the Transaction was $500—a value equivalent to the fair market value of Antioch stock two years earlier in 2001, and materially lower than the 2002 ($680), 2005 ($786), and 2006 ($725) fair market valuations, which Plaintiffs also do not critique or challenge in any way.

Plaintiffs tellingly say nothing in their post-trial filings as to why this Court should conclude that Reilly's $500 valuation is correct and all contemporaneous, independent valuations between 2002 and 2006 are wrong (Plaintiff put on no evidence that they are wrong as a matter of substance or procedure). Indeed, of the 150-plus pages of briefing, Plaintiffs barely mention Reilly and his analysis. Given the series of methodological and reliability issues with his work, it is hard to fault them. (*See*, *e.g.*, Doc. 661 at ¶¶ 222-243, 268-277, 407-415.) Instead, Plaintiffs cobble together lawyer-made arguments and conclusory assertions as to why Defendants did not meet the requirements of section 408(e).

First, although Plaintiffs rightly assert that the Seventh Circuit and other courts look to a Department of Labor proposed regulation for guidance as to section 408's requirement of "adequate consideration," they disregard what that proposed regulation expressly states. Plaintiffs claim because Duff and Risius concluded that $850 was within an acceptable range of fair market value—at the conservative end of that range (in the case of Duff) and at the absolute "very low end" of that range (in the case of Risius)—instead of arriving at a single value conclusion above $850, Defendants failed to satisfy section 408. (Doc. 664 at 24.) Contrary to Plaintiffs' allegation, this is not "fatal to Defendants' claim of exemption"—it is *exactly* what the

DOL proposed regulation and subsequent courts have stated is the proper method for determining fair market value.[15]

Second, Plaintiffs manufacture allegations about purported shortcomings and flaws in Duff and GreatBanc's analysis that lack any supporting fact or expert testimony. For example, Plaintiffs make conclusory assertions such as "GBT did not conduct a diligent review" of Duff's work or the Company's 2003 performance (Doc. 663 at ¶¶ 180, 188), despite the great weight of evidence demonstrating GreatBanc's extensive diligence and critical analysis (including of the Company's 2003 performance) and the unwavering testimony from Marilyn Marchetti (their witness) that the Transaction "was one of the most scrutinized, heavily discussed, heavily negotiated, heavily analyzed transaction[s] that was ever done at GreatBanc." (*See* Doc. 661 at ¶¶ 106, 132-141, 188-195.) Plaintiffs also go to great lengths to allege Duff failed to implement "best practices" because Lee Bloom did not use what he described in the abstract as potentially the ideal or "best way" to conduct a DCF. (Doc. 663 at ¶ 239.) Of course, Plaintiffs ignore Mr. Bloom's explanation of why that approach was neither practicable nor appropriate in this case (Tr. 4894:23-4897:25), and disregard the fact that Reilly (and every other financial expert) also did not use that type of DCF or criticize Duff on that basis. Plaintiffs similarly have no factual or expert support for their allegations that Duff and GreatBanc somehow failed to request and/or were "denied critical information" and therefore were "not well informed" in their financial and valuation analyses, or that any particular piece of information would have altered Duff and GreatBanc's conclusions that $850 was fair value. And certainly not that any lack of information "render[ed] the DP analysis meaningless" as Plaintiffs brazenly and baselessly declare. (Doc.

---

[15] *See* Doc. 661 at ¶ 389 ("The Department is aware that the fair market value of an asset will ordinarily be identified by a range of valuations rather than a specific, set figure. It is not the Department's intention that only one valuation figure will be acceptable as the fair market value of a specified asset . . . Rather . . . the valuation assigned to an asset must reflect a figure within an acceptable range of valuations for that asset.")) Lee Bloom also confirmed this approach was the industry standard in 2003 and continues to remain the industry standard. (*Id.* at ¶ 161.)

664 at 25; *see also* Doc. 663 at ¶¶ 187-188.) Indeed, Reilly opined just the opposite—that Duff was in fact completely informed about the risks, but erred by not sufficiently lowering its projections or increasing its discount rate in light of that knowledge. (Doc. 661 at ¶ 109.)[16]

## VI. Plaintiffs Failed to Prove Their Claimed Damages

Plaintiffs argued in their opposition to Defendants' Rule 52(c) Motion that they need not prove causation on their claims under ERISA sections 404 and 405, and once again make that claim here. In Defendants' reply memorandum on that Motion, they made clear that in the Seventh Circuit the plaintiff carries the causation burden. (Doc. 638 at 22-24.) Plaintiffs offer no retort to those Seventh Circuit cases, or to the Supreme Court's view that only Congress may shift a burden of proof from a Plaintiff to a Defendant. Defendants have already briefed Plaintiffs' failure to prove that the Transaction caused the Plan's losses, and refer the Court to that filing. (Doc. 661 at ¶¶ 423-429.) Plaintiffs simply fail to draw a non-speculative link between the Transaction and the bankruptcy that occurred five years later.[17]

Also, Defendants have already briefed in detail and therefore will not repeat why Plaintiffs are not entitled to recover the damages figures calculated by Reilly (what they call

---

[16] Plaintiffs also attempt to compare and contrast "projections" figures from the Company versus Duff for the three years immediately after the Transaction (2004-2006), suggesting that because it appears Duff's projections for some of those initial years were slightly higher than the Company, Duff's valuation analysis and fair market value conclusions were somehow flawed or unreasonably "rosy." This is pure lawyer speculation and say-so—no fact or expert witness makes this assertion. Indeed, Plaintiffs completely disregard that *at least seven of the ten years in Duff's DCF (2007-2013) contain lower projections* than the Company's projections, diverging materially by hundreds of millions of dollars in the later years (a fact Reilly himself admitted at trial). (*See* Doc. 661 at ¶¶ 155, 239.) Plaintiffs also pick and choose internally inconsistent and inaccurate figures for their purported comparisons of Company versus Duff projections, further demonstrating the irrelevance and lack of credibility of such an analysis. (*Compare, e.g.,* Doc. 663 at ¶ 193 ("TAC Projections Sales" Row) *with* Doc. 663 at ¶ 240 ("TAC Gross Sales" Row).) (*Compare also* Doc. 663 at ¶ 193 ("TAC Actual Sales" Row - using alleged actual sales figures for TAC from a document not admitted for the truth of the matter asserted) *with* JX-80 at P-WOOSLEY-000124 (showing very different and higher actual sales figures for TAC from the Independent Auditors' Report section of the 2006 Annual Report).)

[17] In their sole support for burden shifting, Plaintiffs cite to *Nedd v. United Mine Workers*, 556 F.2d 190 (3d Cir. 1977), a non-ERISA case from outside the Seventh Circuit.

"make whole" damages), to recover the approximately $63 million used in 2004 for ESOP recycling, or to rescind the Transaction. (*See* Doc. 522 at 27-30; Doc. 625-1 at 28-35; Doc. 638 at 22-28; Doc. 661 at ¶¶ 418-437; Doc. 662 at 13-15.) Plaintiffs also request that, in addition to their alternative claim for rescission, the Court impose a "constructive trust" or other similar equitable remedy upon Defendants. (Doc. 663 at ¶ 107; Doc. 664 at 33-35.) But Plaintiffs never developed any relevant evidence at trial identifying the location or amount of any specific property over which they ask this Court to impose a constructive trust, which is fatal to their alternative claim for equitable relief. *See Montanile v. Bd. of Trs. of the Nat'l Elevator Indus. Health Ben. Plan*, 136 S. Ct. 651, 658-59 (2016) ("Equitable remedies are, as a general rule, directed against some specific thing . . . rather than a right to recover a sum of money generally out of the defendant's assets." (internal quotation marks and citation omitted)).

Indeed, other than Reilly's calculations (which are set forth in his report), in their post-trial briefing Plaintiffs remarkably provide no specificity or justification for how they calculated, or why they are entitled to recover, the specific figures presented. (*See* Doc. 663 at ¶¶ 94-106.) Simply proclaiming that they are entitled to specific nine-figure amounts without *any* evidentiary support clearly does not satisfy their burden of *proving* damages, or give this Court a basis for awarding them.

**VII. Conclusion**

Defendants are entitled to judgment on all of Plaintiffs' claims, and an award of their attorneys' fees and costs under ERISA section 502(g)(1).

        Respectfully Submitted,

        KEATING MUETHING & KLEKAMP, PLL

By:  */s/ Michael L. Scheier*
     Michael L. Scheier
     Brian P. Muething
     Anthony M. Verticchio
     Jacob D. Rhode
     One East Fourth Street, Suite 1400
     Cincinnati, Ohio 45202
     mscheier@kmklaw.com
     bmuething@kmklaw.com
     tverticchio@kmklaw.com
     jrhode@kmklaw.com
     *Attorneys for Defendants Lee Morgan,*
     *Asha Morgan Moran, and Chandra Attiken*

## **CERTIFICATE OF SERVICE**

      I hereby certify that on April 25, 2016, I caused true and correct copies of the foregoing to be filed electronically using the Court's CM/ECF system and to thereby be served upon all registered participants identified in the Notice of Electronic Filing in this matter on this date. This document is available for viewing and downloading on the CM/ECF system.

                                      /s/ Michael L. Scheier
                                      Michael L. Scheier