**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **BONNIE FISH, CHRISTOPHER MINO, MONICA LEE WOOSLEY, LYNDA D. HARDMAN,  EVOLVE BANK AND TRUST,** | ) ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| | ) | **No. 09 C 1668** |
| **v.** | ) ) | **Judge Jorge L. Alonso** |
| **GREATBANC TRUST COMPANY, LEE MORGAN, ASHA MORGAN MORAN, CHANDRA ATTIKEN, MORGAN FAMILY FOUNDATION,** | ) ) ) ) ) | |
| **Defendants.** | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs Bonnie Fish, Lynda Hardman, Chris Mino, and Monica Lee Woosley were employees of the Antioch Company ("Antioch" or "the Company") and vested participants in Antioch's Employee Stock Ownership Plan ("ESOP" or "the Plan").  In December 2003, Antioch purchased all outstanding shares of its stock held outside of the ESOP as part of a tender offer transaction designed to leave the Company 100% ESOP-owned ("the Transaction"). Plaintiff Evolve is the successor trustee to the Antioch ESOP.

In the years preceding the Transaction, Antioch had experienced dynamic growth in sales and virtually every other financial metric, including its share price.  In the years following the Transaction, however, sales dropped precipitously, and the share price dropped along with them. In late 2008, Antioch reorganized its capital structure through a Chapter 11 bankruptcy, and the new capital structure did not include an ESOP.   Contending that the ESOP's shares of Antioch stock became worthless due to the Transaction, plaintiffs bring this action against defendants Lee

Morgan, Asha Morgan Moran and Chandra Attiken, all of whom were either former members of the Board of Directors at Antioch and/or Antioch's internal ESOP Advisory Committee ("EAC"). Plaintiffs claim that, based on the actions defendants took in connection with the 2003 tender offer transaction, defendants are liable for breaching their fiduciary duties to the ESOP, enabling other fiduciaries' breaches, and causing a prohibited transaction, in violation of sections 404, 405 and 406 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1104, 1105 & 1106.

The case was tried in a bench trial over 34 trial days stretching from November 2, 2015 to February 1, 2016. Following the close of evidence, the parties submitted proposed findings of fact and conclusions of law, collectively totaling over 247 pages. The Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52. To the extent (if any) that the proposed findings of fact as stated may be deemed conclusions of law, they shall also be considered conclusions of law, and vice versa.

## I. PARTIES AND CLAIMS

1.      Plaintiffs Bonnie Fish, Christopher Mino, Monica Lee Woosley and Lynda Hardman were participants in the ESOP and bring this lawsuit in a representative capacity on behalf of the ESOP. Plaintiff Evolve Bank and Trust was appointed trustee for the ESOP in 2008.

2.      At the time of the Transaction, defendants Lee Morgan, Asha Moran, and Chandra Attiken comprised the ESOP Advisory Committee ("EAC"). Likewise at the time of the Transaction, Mr. Morgan served as CEO and Chairman of Antioch's Board of Directors, Ms. Moran was the Chief Operating Officer of Creative Memories, the Company's largest division, and Ms. Attiken was Antioch's Vice President of Human Resources. Mr. Morgan and Ms. Moran (Mr. Morgan's daughter) were also members of the Board of Directors.

2

3.     Defendant GreatBanc & Trust Company was the ESOP's transactional trustee in 2003. The Antioch Board gave GreatBanc the independent discretion to determine whether to tender the ESOP's shares in the Transaction. Because the Transaction would not close if GreatBanc tendered the ESOP shares, GreatBanc was given effective veto power over the Transaction. GreatBanc exercised its discretion to decline the tender offer and it thereby allowed the Transaction to close. GreatBanc and plaintiffs settled shortly before trial.

4.     Plaintiffs alleged that defendants violated ERISA sections 404, 405 and 406 in connection with the Transaction. Plaintiffs also seek the equitable remedies of disgorgement, rescission and/or constructive trust under ERISA section 409.

5.     ERISA section 404 requires plan fiduciaries to discharge their duties solely in the interests of the plan participants and for the exclusive purpose of providing benefits to participants and their beneficiaries, "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104.

6.     ERISA section 405 governs co-fiduciary breaches, and gives rise to liability if certain conditions accompany an underlying breach by a co-fiduciary. 29 U.S.C. § 1105.

7.     ERISA section 406(a) prohibits transactions between a plan and a party in interest where a fiduciary causes the plan to engage in any transaction that constitutes a direct or indirect sale or exchange of property between a plan and a party in interest, or use of plan assets by or for the benefit of a party in interest. 29 U.S.C. § 1106(a). Section 406(a) claims are subject to an affirmative defense in ERISA section 408. Under section 408, the defendants are not liable for a

prohibited transaction as long as the plan receives adequate consideration for whatever plan assets it parted with in the transaction at issue. 29 U.S.C. § 1108(e).

8.      For the reasons set forth below, the Court will enter judgment for the defendants Lee Morgan, Asha Moran, and Chandra Attiken on all of plaintiffs' claims.

## II. FINDINGS OF FACT

### A. Background of the Antioch Company

9.      Antioch was founded in 1926 by Lee Morgan's father, Ernest Morgan, and incorporated in Ohio in 1946. (JX-49 at MOR001269.) Lee Morgan succeeded his father as the Company's CEO in 1970. (Tr. 1969:12-14.) Prior to 1985, Antioch manufactured and sold bookplates, bookmarks, book covers, and calendars. (JX-49 at MOR001269.)  By the mid-80's, Antioch's sales amounted to just under $11 million. (PX-68:14.)

10.      Antioch purchased the assets of Holes-Webway, a company that manufactured Webway brand photo albums, out of a bankruptcy sale in 1985, and Antioch continued to manufacture these albums thereafter. (Anderson Tr. 185:19-186:13; Hoskins Dep. Sep. 15, 2011, 65:6-9.)

11.      In 1987, Rhonda Anderson, a Webway customer who had direct-selling experience with Tupperware and a number of other direct-selling organizations, taught friends and neighbors how to make scrapbooks out of Webway photo albums, and she observed that there was overwhelming interest in these scrapbooks among the young mothers in her community.  (Anderson Tr. 182:14-183:5; 185:17-190:10.)  She approached Cheryl Lightle, who managed Antioch's Holes-Webway unit in St. Cloud, Minnesota, about selling scrapbooks and related materials through in-home direct selling, and, in the summer of 1987, Antioch launched its Creative Memories ("CM") division, with Anderson and Lightle serving as co-founders. (Anderson Tr. 190:11-191:1.)

12.     By 1995, Antioch's core business became primarily direct marketing of scrapbooks and accessories through CM.  (JX-49 at MOR001269.)  CM sold its products primarily through the party-plan, direct-sales method, using thousands of independent sales "consultants." (JX-49 at MOR001269.)  As with other party-plan, direct-sales companies such as Tupperware or Mary Kay, consultants would host sales parties, typically in the consultant's home. (*Id.* at MOR001270.) CM's selling strategy was the instruction and guidance of consumers in how to preserve, present, organize and display their family photos in an appealing manner, and at the same time create a graphic family record and history. (*Id.* at MOR001269-1270; Hoskins Sep. 15, 2011 Dep. 60:16-62:9.)

13.     With Lee Morgan serving as CEO, Antioch experienced substantial and prolonged growth in the late 1990s and early 2000s. Antioch's revenue increased in every year between 1998 and 2002, from $164.3 million in 1998 to $351.2 million in 2002, representing a compound annual growth rate ("CAGR") of 20.9%. (DX-668 at ¶ 38.) The Company experienced increases in gross profit and gross profit margin in each year from 1998 through 2002 as well. Specifically, gross profit increased from $87.6 million in 1998 to $209.0 million in 2002. (*Id.* at ¶ 39.) Like both revenue and gross profit, Antioch's reported earnings before interest, taxes, depreciation, and amortization ("EBITDA") increased from $31.9 million in 1998 to $85.2 million in 2002. (*Id.* at ¶ 40-41.)

14.     Because Antioch was not a publicly traded stock, every year the Company engaged an independent valuation company to determine the fair market value of its common stock. This value would then be used to determine the amount of money owed to ESOP participants who put the stock in their ESOP account to the Company for redemption upon termination or retirement. (JX-8 at GBT06757.) The fair market value of Antioch stock grew

from less than $190.00 per share at the end of 1997 to $680.00 per share at the end of 2002. (DX-35 at D&P_A009214.)

15.     By the beginning of 2003, Antioch had over 1,200 full-time employees and over 70,000 consultants. The Company maintained domestic manufacturing and/or distribution facilities in Yellow Springs, Ohio, St. Cloud, Minnesota, Sparks, Nevada, Richmond, Virginia and Lenexa, Kansas, as well as four separate international facilities. (JX-8 at GBT06759; JX-63 at PR0001190-1191.)

**B.     The Antioch Company Employee Stock Ownership Plan**

16.     As CEO, Lee Morgan cultivated a corporate culture of openness and transparency, and he instilled a philosophy of broad-based employee ownership to allow all to share in and profit from the Company's generation of wealth, from low wage employees to upper management. (Bevelhymer Dep. 193:13-194:6; Fish Dep. 109:8-110:5, 135:1-16; Hardman Dep. 53:22-54:21, 148:18-23, 201:13-204:5; Holthaus Dep. 164:23-166:5; Hoskins Sep. 15, 2011 Dep. 16:21-17:5; Jennett Dep. 178:12-179:6; Lipson-Wilson Dep. 38:6-39:9, 58:19-60:8, 78:9-79:2, 86:23-89:8; Luce Dep. 29:22-31:14; Ng Dep. 45:16-19.)

17.     For example, Antioch's Board was comprised of 5 outside directors, 2 members of management, and 5 employee-owners elected by staff (two of whom were voting members.) (JX-64 at P-WOOSLEY-000041.) All Board meetings were open for anyone to attend, and the Company also held quarterly employee-owner meetings. (Lipson-Wilson Dec. 5, 2011 Dep. 59:5-60:8.) On its intranet site, the Company made available to every employee its annual reports, monthly narratives from the CEO Lee Morgan, and detailed financial, sales, and product margin information. (Woosley Tr. 2595:15-2597:14.) The St. Cloud, Minnesota office was also configured so that every employee in the building had a cubicle (even top-level management),

with the goal of improving communication and visually portraying that no one was more important than any other person. (Woosley Tr. 2599:2-19; Hardman Dep. 201:13-204:5.)

18.     Antioch's philosophy of openness and broad-based employee ownership was perhaps best exemplified by Antioch's historical use of an ESOP, which was created from newly issued stock from the Company gifted to the ESOP that diluted the Morgan family's ownership of Antioch. (Morgan Tr. 1982:1-1983:5; Hoskins Sep. 15, 2011 Dep. 77:5-78:2.)

19.     Antioch's ESOP was established in 1979 as the principal employer-funded retirement benefit for Antioch's employees. By its very nature as an ESOP, it was designed to invest primarily in Antioch's stock. (DX-1; JX-49 at MOR001219.)

20.     Antioch elected to become an IRS Subchapter S Corporation on January 1, 1998 after Congress authorized S corporations to have ESOPs. (May Tr. 5273:6-9; Hoskins Sept. 15, 2011 Dep. 30:1-3.) IRS Subchapter S Corporations do not incur income tax liability on earnings; rather, shareholders of S Corporations incur personal income tax liability on their proportionate share of the S Corporation's earnings. (JX-49 at MOR001219.) Historically, as is typical in S corporations, the Company made distributions to its non-ESOP shareholders to pay their individual income taxes arising from corporate profit. (*Id.*; Risius Tr. 6075:18-6076:4.)

21.     Because the Antioch ESOP was a shareholder, Antioch was required to make a similar income tax-related distribution to the ESOP as it did to the non-ESOP shareholders in proportion to the percentage of shares the ESOP held. (Tr. 6075:14-6076:16; Holthaus Dep. 156:18-159:3; 160:5-164:8.) Unlike the non-ESOP shareholders, however, the ESOP was a tax-exempt entity that incurred no tax liability on any of Antioch's income. (*Id.*) Because the ESOP was not subject to federal income taxation, it retained the tax distribution and allocated it to individual ESOP accounts. (Morrison Dep. 69:23-71:3.)

22.     Between 1999 and 2002, the Antioch ESOP allocated any dividends or distributions paid on the common stock held in the Antioch ESOP 75% based on the annual compensation of each participant and 25% based on the account balances of each participant. (Blair Tr. 1465:13-22; Hoskins Sept. 15, 2011 Dep. 78:20-79:24.) The allocation method fit with Antioch's corporate culture because it allowed newer employees at Creative Memories, who had smaller account balances, to share more in Antioch's increasing revenue and profits. (PX-101; Tr. 1465:13-1466:3; Hoskins Sept. 15, 2011 Dep. 78:20-79:24, 116:7-117:24.) The IRS approved the amended plan and method of allocation, and the change was implemented in January 1999. (Hoskins Sept. 15, 2011 Dep. 79:4-24.)

23.     At some point in late 2002, however, Antioch became aware of an IRS Technical Advice Memorandum ("TAM"), in which the IRS ruled that a similar method of allocating subchapter S distributions was improper and, instead, distributions must be allocated 100% on account balance—a method of allocation that, in the case of Antioch, would enrich long-tenured employees (among them, Lee Morgan) at the expense of the newer employees who were driving the Company's recent success. (PX-101; Blair Tr. 1465:13-1466:7; Holthaus Dep. 162:14-164:8, 164:23-165:12; Morrison Dep. 72:10-17, 320:20-321:11, 326:18-327:11; Sanan Dep. 33:5-34:8, 35:2-37:5.)

24.     A TAM describes the IRS's position only with respect to a specific taxpayer, and this particular TAM did not address or bind Antioch, but Antioch's advisors agreed that it was nevertheless prudent for Antioch to reconsider its practices.  Although it binds only one company, a TAM may be an "indication of the . . . position" the IRS might adopt with regard to similarly-situated companies.  (Morrison Dep. 299:15-310:11, 320:9-321:11.)  Helen Morrison, an ESOP specialist with Deloitte who served as one of Antioch's advisors in 2003, explained that

even though Antioch's subchapter S distribution plan may have been approved by an IRS determination letter in 1999, the TAM shed light on the "larger issue" of allocating a dividend in accordance with compensation rather than strictly in accordance with the number of shares held, which, in fact, may "[n]ever [have been] appropriate."[1] (Morrison Dep. 305:1-7, 320:9-18.)

## C. Overview Of The 2003 Transaction

### 1. Genesis of the Transaction

25. In January 2003, Antioch held a meeting known as the "ESOP Summit" to explore its options related to the ESOP in light of the legal issues with its allocation method, including the IRS position on dividend allocation. (DX-39; PX-103; Blair Tr. 1465:13-22; Morrison Dep. 326:18-327:11.)

26. At the meeting, company representatives, lawyers, and professionals from Deloitte & Touche discussed different concepts that would resolve the apportionment problem caused by the IRS ruling. (PX-103; Tr. 1463:24-1464:19.) Under one of Deloitte's proposals, the ESOP would become the 100% owner of Antioch's stock. (Morgan Tr. 2281:7-11; Holthaus Dep. 170:15-171:4, 173:9-11; PX-103 at 0005-06.)

27. Shortly after the ESOP summit, Antioch retained Deloitte as a professional financial advisor for exploring and, ultimately, executing the 100% ESOP Transaction. (JX-7.) Deloitte's Helen Morrison was well renowned for her ESOP expertise. (Marchetti Tr. 1113:17-

---

[1] Plaintiffs have argued that this logic is faulty and defendants' explanation for abandoning the 75/25 method of allocation is not credible because the TAM did not apply to Antioch, so there was no change in the law that warranted changing Antioch's method of allocation subchapter S distributions. The Court disagrees. It would be entirely logical and prudent to reconsider an allocation method that the IRS had specifically criticized; perhaps the IRS was reconsidering its position on the matter since Antioch received its 1999 determination letter. This Court certainly does not ignore decisions of other district courts or appellate courts outside the Seventh Circuit merely because their decisions are not binding on it. The Court does not doubt that, as numerous witnesses testified, Antioch truly feared that it might run into legal or taxation issues based on its method of allocating its subchapter S distributions after becoming aware of the TAM disapproving of a similar method.

9

1114:22, Blair Tr. 1468:15-1469:5, Morgan Tr. 2288:7-16, Matthews Tr. 2484:11-2485:14; Holthaus Dep. 173:12-174:17; vonMatthiessen Dep. 39:18-40:8, 40:21-41:2.)

28. Antioch also engaged McDermott Will & Emery ("MWE") as legal counsel to provide the Board with advice regarding the Transaction. (JX-9.) MWE and its lead counsel in the engagement, Marsha Matthews, likewise possessed substantial experience and expertise in advising corporate sponsor companies considering a transaction like the one being contemplated by Antioch. (Blair Tr. 1471:19-1472:2, Matthews Tr. 2462:20-2464:8; vonMatthiessen Dep. 40:9-20.)

29. Deloitte created the outline for the general structure of the Transaction. It presented several prospective advantages to going forward with the Transaction, including: (i) eliminating corporate income tax and therefore providing increased cash flow to the Company; (ii) providing Antioch with greater flexibility to allocate ESOP contributions; (iii) providing the opportunity to avoid making distributions to the ESOP based entirely on account balance and instead make performance-based contributions to the ESOP; (iv) providing the non-ESOP shareholders with fair value for their shares; and (v) increasing ESOP value in the long term. (DX-62 at MM0039696.)

30. The Transaction also addressed several Antioch business objectives, such as: (i) helping ensure the long-term stability and security of the Company; (ii) maintaining broad-based employee ownership; (iii) providing maximum flexibility for performance-based benefit allocation; and (iv) maintaining governance control for the Morgan family, including a smooth leadership transition from Lee Morgan to Asha Moran. (*Id.* at MM0039695.)

31. Maintaining governance control was not merely an objective for Mr. Morgan and Ms. Moran, it was a desire that was widespread among Antioch's employees, who viewed Mr.

Morgan as a "patriarch" who ran the Company in the employees' best interests. (Lipson-Wilson Dec. 5, 2011 Dep. 85:12-88:4.) (*See also* Bevelhymer Dep. 193:13-194:6.) Mr. Morgan and Ms. Moran had guided the Company's robust success over the past decade and the Company wanted to ensure that the Transaction did not threaten their leadership's continuity by making it susceptible to any sort of takeover. (Holthaus Dep. 175:7-176:17; Hoskins Sep. 15, 2011 Dep. 146:16-147:7; Lipson-Wilson Dec. 5, 2011 Dep. 86:9-22.)

32. As structured by Deloitte, the Company—not the ESOP—would purchase the shares sold in the Transaction. (DX-39 at DT2404.) Helen Morrison recalled two reasons that this route was chosen. First, the Antioch ESOP had never been leveraged, and the Company had no desire for it to take on debt and become leveraged as a result of the Transaction. Second, structuring the Transaction with a leveraged ESOP would have had a significant dilutive effect on the existing shares, which was also contrary to management's aim. (*Id.*; Morrison Dep. 58:11-63:19.)

33. Defendant's expert Greg Brown opined on the structure of the Transaction based upon his experience in advising various constituencies in dozens of ESOP transactions over the course of his career. (DX-776 at 10; Tr. 4982:18-4985:11.) He testified that this type of transaction, in which a company's ESOP comes to own 100% of its sponsor company in order to enjoy tax benefits, is not uncommon or unusual. (DX-776 at 10; Tr. 5001:9-5003:13.) Mr. Brown further testified that a 100% ESOP transaction may be structured so that either the company or the ESOP purchases all of the non-ESOP shares of stock; both alternatives are common, in his experience. (DX-776 at 10; Tr. 4980:20-4982:17.)

34. Mr. Brown observed that because, in Antioch's case, the proposed transaction involved the issuance of warrants, it was necessary to have the sponsor company buy the non-ESOP shares because only the company, not the ESOP, can issue warrants. (Tr. 4986:9-4987:5.)

35. Additionally, Marsha Matthews explained during the pre-Transaction due diligence stage that another reason it might be beneficial for the sponsor company, rather than the ESOP, to purchase the non-ESOP shares is that, when the ESOP is not a purchaser, the transaction is not prohibited under ERISA section 406(a)(1), and therefore the ESOP is not required by law to obtain a fairness opinion. (DX-745 at 78 (HL001147); Tr. 4580:22-4581:25.) Although this structure can save the sponsor company the expense of a financial advisor to the ESOP, the Antioch Board decided to retain advisors anyway, as described below.

36. Mr. Morgan and Ms. Moran, either individually or indirectly through estate planning trusts, held shares outside of the ESOP and would therefore participate in the transaction as selling shareholders. Mr. Brown testified that it is not improper or even unusual for non-ESOP shares in a private company to be held by officers and directors of the company. (DX-776 at 10; Tr. 5000:6-5001:7.) Defendants' ownership of non-ESOP shares was well known and was explicitly disclosed to ESOP participants. (JX-49 at MOR001217, 1279, 1295.)

37. Antioch's Board of Directors began considering the Transaction shortly after the ESOP Summit. The nine-member Board at Antioch consisted of a number of highly qualified individuals, including two employee-owners with full voting rights, two management employees (Mr. Morgan and Ms. Moran), and five outside directors—Ben Carlson, Alan Luce, Jeanine McLaughlin, Denis Sanan, and Malte von Matthiessen. Mr. Carlson brought to Antioch specialized experience and skills in human resources management. (Luce Dep. 26:6-28:3; Sanan Dep. 29:11-21.) Mr. Luce had vast direct-selling experience, having been a high-level executive

at direct selling companies and a board member for the Direct Selling Association, and he was held in high regard in direct selling communities as both a practitioner and as an attorney. (Luce 13:12-17:8, 19:18-24; Sanan Dep. 31:14-20.) Ms. McLaughlin's background in manufacturing, logistics and industrial operations directly related to CM's production activities. (Luce Dep. 26:6-27:19; Sanan Dep. 29:22-30:5.) Mr. Sanan formerly worked as a senior executive in the direct selling industry, and also served on the board of the Direct Selling Association. (Luce Dep. 26:6:21; Sanan Dep. 18:20-20:12.) And Mr. von Matthiessen had particular experience with ESOP issues, being the CEO for an ESOP company, and having served on the board of directors for the National Center for Employee Ownership. (Luce Dep. 26:6-25; Sanan Dep. 29:5-9; von Matthiessen Dep. 6:21-8:7, 25:9-26:8.)

38. At the January 30, 2003 Board meeting, Lee Morgan reported to the Board that members of management met with various advisors to discuss issues with S-corporation distributions, and that the meeting produced the idea of transitioning to a 100% ESOP-owned company. (DX-41 at ASP000160.) The Board instructed management to continue studying the proposal. (*Id.*; Sanan Dep. 42:19-25.)

39. At the July 17, 2003 Board meeting, management introduced the Board to representatives from Deloitte and MWE. (JX-13 at ASP000185.) The Deloitte presentation gave detailed information about the Sub-S distributions issue, the Transaction terms, and the effect that the Transaction would have on the Company's stock price as compared to the status quo. (JX-12.) It also highlighted the tax savings of nearly $140 million that the Transaction was expected to bring to the Company over a ten-year period. (*Id.* at TAC-CC-0239675.) The presentation also contained a sensitivity analysis, testing the Transaction's effect on the Company's various constituencies in the event that the Company's projected, continued growth

13

failed to materialize. (*Id.* at TAC-CC-0239694-98.) GreatBanc subsequently received this presentation, which included the sensitivity testing slides. (DX-773; Moran Tr. 3150:8-3151:25.)

40.     The Board engaged in considerable discussion regarding the various alternatives to the 100% ESOP Transaction that the Company could choose to pursue, such as conversion to a sub-chapter C corporation, compliance with the IRS allocation method (which would not have allowed the Company's 75% compensation/25% account balance distributions), or going public through an IPO. (JX-12 at TAC-CC-0239666; Luce Dep. 74:2-75:24; JX-42 at MOR0015303.)

41.     Also at this meeting, Marsha Matthews of MWE recommended that the Company retain an independent trustee for purposes of evaluating the proposed transaction on the ESOP's behalf. (JX-12 at TAC-CC-0239686; Sanan Dep. 86:22-87:16.) As she explained at trial, the retention of GreatBanc was specifically intended to *remove* defendants and Barry Hoskins, the directed ESOP trustee (who was also Antioch's CFO), from the transaction process so that their potential conflicts of interest as selling shareholders could not influence or interfere with an independent trustee's decision of whether or not to tender the Plan's shares. (Blair Tr. 1489:19-1490:19, 1534:24-1535:17, Matthews Tr. 2473:16–2474:13.)  Board members and management agreed (Luce Dep. 47:1-24; Blair Tr. 1489:19-1490:6), and, after considering potential trustees, the Company engaged GreatBanc on August 4, 2003. (JX-14; Hoskins Feb. 15, 2010 Dep. 37:18-38:9.) Antioch's Board, not the EAC, possessed the power to appoint and remove GreatBanc. (Blair Tr. 1916:20-22; Moran Tr. 2724:1-4.)

42.     GreatBanc engaged Duff & Phelps ("Duff"), as an independent financial advisor to the ESOP Trustee for the purposes of the Transaction. (JX-26; Marchetti Tr. 1097:16-24, 1111:19-1112:1.) Duff was to determine, among other things, whether the Transaction was fair

to the ESOP from a financial point of view. (*Id.*) GreatBanc also engaged Jenkens & Gilchrist ("J&G") as its legal counsel. (DX-94; Tr. 1112:2-15.)

43.     Antioch hired Houlihan Lokey Howard & Zukin ("Houlihan" or "Houlihan Lokey") as a financial advisor to determine whether the consideration to be paid for the non-ESOP shares was fair to the non-ESOP shareholders from a financial point of view. (DX-87.)

**2.     Antioch's Board Amended the Plan to Give GreatBanc Authority To Decide How To Vote ESOP Shares With Respect to the Transaction**

44.     At the time that the Transaction was under consideration, the Plan as Amended and Restated as of January 1, 2002 was the document that governed operation of Antioch's ESOP. (JX-3.) As stated above, defendants were the members of Antioch's EAC which, pursuant to the Plan, was charged with administering the ESOP. (*Id.* § 18 at MOR000225.) Subsection (b) of Section 5 conferred upon the EAC the power to, subject to Board approval, direct the ESOP's trustee to sell shares of Company stock to any person, including the Company. (*Id.*; Tr. 3091:12-22.)

45.     In connection with its engagement of GreatBanc, the Board unanimously approved Amendment No. 1 to the Plan, effective October 1, 2003, which added subsection (f) to Section 5. (JX-39; JX-40.) That subsection states as follows:

> 2003 Tender Offer – Notwithstanding the provisions of Section 5(a) and (b), the decision whether or not to tender shares of Company Stock to the Company in December 2003 shall be effected by the Trustee (without directions from the Committee) based on the Trustee's determination (in the exercise of its reasonable judgment) that such decision is in the best interests of the Plan and the Participants and is in compliance with all applicable requirements of the Code and ERISA.

(*Id.*)

46.     Antioch's Employee Stock Ownership Trust Agreement similarly contained a section B governing the trustee's investment of trust assets. The Trust Agreement was amended

and restated as of August 20, 2003 to include subparagraph (6) of section B. (JX-18.) This subparagraph contains language essentially identical to the language in Section 5(f) of the Plan. (*Id.*)[2]

47.     The amendments to the Plan and the Trust Agreement allocated to GreatBanc the decision whether to tender the ESOP's shares to the Company as part of the Transaction, in accordance with MWE's advice to the Board.

### 3.     The Company and Its Advisors Engage in Due Diligence

48.     The Board's next meeting occurred on August 21, 2003. At that meeting, the additional advisors retained by the Company introduced themselves to the Board and explained their roles in the transaction. (JX-21 at ASP000188.)  It is undisputed that the various advisors were widely considered to be among the best in the ESOP field. (*E.g.*, Luce 52:20-54:13; Morrison Dep. 75:10-76:15, 78:2-79:14.) Marilyn Marchetti testified that she considered the Antioch Board to have assembled "the A team on all sides of the transaction."  (Tr. 1114:18-22.)

49.     Also at that meeting, it was announced that Nancy Blair had resigned her position as a Board member to become Antioch's Director of Corporate Strategy. (JX-21 at ASP000186.) In this position, she served as the Company's lead for the Transaction. (Marchetti Tr. 1173:24-1174:5; Luce 65:13-66:8.) Board member Denis Sanan testified that Ms. Blair was assigned the task of overseeing the Transaction and making sure that "every loose end was considered and tied." (Sanan Dep. 91:11-92:12.) Board members were confident in Ms. Blair's ability to manage the assignment efficiently and seriously. (*Id.* 93:8-94:2; von Matthiessen Dep. 122:3-123:9.)

---

[2] Both of these amendments were made retroactively, which the Plan specifically contemplated and allowed in the Plan itself. (JX-3 at section 21 ("The Company specifically reserves the right to amend the Plan and the Trust Agreement retroactively in order to satisfy any applicable requirements of the Code and ERISA."); Moran Tr. 3099:16-3101:9.)

50.     Ms. Blair oversaw the due diligence process, along with Barry Hoskins, and provided the advisors with everything that they requested, which was a vast amount of material and information. (Blair Tr. 1515:2-1516:25, 1517-1535:17; Morgan Tr. 2296:16-23, 2301:6-2302:14; Moran Tr. 3176:15-21; Bloom Tr. 4269:16-4270:1; Treemarcki Tr. 4684:4-12.) Ms. Blair testified that she relied on the advisors to tell her what they needed during due diligence, and relied on their experience and expertise. (Tr. 1517:1-1518:2.) Board member Alan Luce testified that Board members were not themselves tasked with the job of providing information to advisors as that would be inconsistent with ordinary and customary corporate governance procedures. (Luce Dep. 95:25-96:24.) Instead, the task was delegated to certain members of Company management. (*Id.*)

**4.     The Company Provides Financial Projections to the Advisors**

51.     As part of due diligence, Antioch provided financial forecasts to the advisors. Antioch prepared five-year financial forecasts in the ordinary course of business. (Blair Tr. 1535:18-1536:5.) In part because the term of the Transaction was ten years (*i.e.*, that was the waiting period before all the warrants could be exercised, and if that happened, the Company would no longer be 100% ESOP-owned), the Company also developed ten-year projections to be used for analyzing the Transaction (Tr. 1536:10-1537:11.)

52.     In the five years prior to the Transaction, the Company demonstrated an ability to reasonably and accurately forecast its financial performance, both one and two years ahead, coming out sometimes above and sometimes below forecast. (DX-668 at ¶¶ 98-99; Risius Tr. 5752:4-5763:18) The Company demonstrated a similar ability to reasonably and accurately forecast its EBITDA. (DX-668 at ¶ 98; Tr. 5755:21-5757:25, 5760:13-5761:5.)

53.     Preparation of the ten-year projections was principally a joint effort between Nancy Blair and Antioch's finance team, including CFO Barry Hoskins and corporate manager

Kim Lipson-Wilson. The starting point for these projections were the forecasts put together by Antioch's individual business units in the normal course of their business planning, and which took into account all the strengths, weaknesses, opportunities and threats facing those business units.[3] (Blair Tr. 1537:24-1542:24, 1731:10-21; 1959:18-1960:10; Moran Tr. 3042:23-3046:23.)

54.     CM's projections were informed by an intensive strategic planning effort in the summer of 2003. (DX-61; DX-71; DX-81; PX-160; Blair Tr. 1432:7-1434:1, 1440:22-1448:7, 1456:3-1460:15; Moran Tr. 2761:23-2763:23, 3124:3-3131:2.) CM's strategy sessions included meetings held over multiple days, detailed presentations from various members of management on such topics as the scrapbook, digital photography and technology, and direct sales industries, and extended discussions focused on articulating and evaluating CM's internal and external opportunities and threats, as well as the strategic direction and key areas of focus for 2003-2008. (*Id.*)

55.     In taking the individual business unit projections and developing and extending the projections over the ten-year Transaction period, Ms. Blair testified that the Antioch team, in an attempt to be conservative in light of the future risks the Company was facing, such as the impact of increased competition, the potential for a plateau, the uncertainty of international expansion, and emerging digital technology and photography, intentionally ratcheted down the revenue and operating margin projections. (Tr. 1537:24-1542:24, 1731:10-21, 1959:18-1960:10.) (*See* Moran Tr. 3042:23-3046:23.) Although Company management was aware of and discussed the potential for a sales plateau due to market saturation, management and the Board did not believe that the Company had reached that point yet, and would continue to experience a reasonable rate of growth and profit performance, as reflected in the Company's dynamic growth

---

[3] Those individual business units included Our Own Image, ZeBlooms, Antioch Publishing, Creative Memories US, and Creative Memories International.

in recent years and Antioch's financial forecasting. (Blair Tr. 1441:1-1442:18; Sanan Dep. 158:1-159:15; von Matthiessen Dep. 57:17-60:9.)

56.     In the ten-year projections, the Company assumed revenue growth rates of between 11% and 13% for the first 7 years following the Transaction, eventually slowing to a 6% annual rate. (PX-309 at 0011-12.) These assumptions were conservative when compared to the growth rates that the Company had experienced in the years preceding the Transaction, including a 26% revenue growth rate in 2002, a 16% increase in 2001, a 20% increase in 2000, and a 22% increase in 1999. (JX-64 at P-Woosley-000067.)

57.     The Board of Directors also considered the revenue projections used in analyzing the Transaction to be conservative, and intentionally wanted to use conservative projections in assessing whether the Company would be able to service its debt in the future. (Luce Dep. 121:1:122:17, 123:6-124:5.) A presentation to the Board at the October 30, 2003 Board meeting showed that in analyzing the Transaction, management used a 10.4% CAGR projection for sales over the next ten years even though the previous five years yielded a 17.4% sales CAGR. (JX-38 at D&P_A006619.) Similarly, management assumed a 6.6% EBIT CAGR over the next ten years, which paled in comparison to the 23.0% EBIT CAGR that the Company experienced from 1999-2003. (*Id.*)

58.     Ms. Blair sent to all the Transaction advisors a first draft of the ten-year projections dated August 26, 2003, a slightly revised version on September 4, 2003, and another slightly revised version on October 2. (DX-141; PX-213; PX-250.) The base-case ten-year projections sent on October 2 did not change again prior to the closing of the Transaction,[4]

---

[4] Although Plaintiffs did introduce into evidence a five-year plan that was purportedly approved at the December 4 Board meeting (PX-391; PX-391A) and that included lower projections for future sales than those that were sent to the transaction advisors, there was some uncertainty at trial as to whether that five-year plan was actually approved at the December 4 meeting or the next Board meeting in January 2004. The projections in PX-391A are dated

although, as the Court will discuss further below, Duff did receive a brief telephone update concerning reduced sales expectations for the end of 2003 and 2004 from Hoskins on December 10, 2003 (PX-154:7).

59.     Based on their own independent due diligence, research and expert analysis, Duff and its lead on the engagement, Lee Bloom, concluded that management's ten-year Transaction projections were "reasonable and reliable." (Tr. 4309:3-4311:24.)

60.     Kreg Jackson and Terry Treemarcki, two of the Houlihan analysts who worked on the Transaction, testified at trial that Houlihan likewise concluded based on their own independent due diligence, research, and analysis, that management's ten-year Transaction projections were reasonable. (Tr. 4545:16-21, 4709:3-14.)

61.     In addition, Deloitte's team never had any concern about the reasonableness of the Company's projections, or of using those projections in the models it developed to test the feasibility of the Transaction, in part due to a comparison of the projections to the Company's recent historical results. (Abrahamson Tr. 1365:7-1369:6; Holthaus Dep. 184:1-14.)

62.     The syndicate of lenders in the Transaction that together committed $170 million dollars to the Company also concluded management's ten-year Transaction projections were reasonable. (DX-181 at FTB0002859; PX-254 at -0007; Blair Tr. 1549:3-14; Hoskins Sep. 15, 2011 Dep. 158:2-11; Parker Dep. 36:18-38:15; Powe Dep. 27:19-30:16, 181:20-184:1.) Those lenders, which included Bank One, National City Bank, Fifth Third Bank, LaSalle Bank, Wachovia Bank, PNC Bank, and Keybank, each conducted their own credit analysis. (Hoskins

---

January 18, 2004, about a month after the Transaction closed. (PX-391A at -0034), and Nancy Blair and Asha Moran testified that they did not recall seeing PX-391A at the December 4, 2003 Board meeting; rather, they recall a PowerPoint summary of those projections. (JX-59; JX-65; Tr. 1785:11-21, 1836:11-1838:15, 2733:3-12.)   In any case, the Court will assume, *arguendo*, that the five-year-plan was presented in substance to the Board on December 4, 2003, prior to the transaction, and that the Board had notice of a slight reduction in projections since the due diligence process earlier in the fall.

Dep. 15, 2011 Dep. 166:10-23; Powe Dep. 164:19-165:5; Parker Dep. 18:13-23, 23:8-12; Jennett Dep. 23:10-18.) For example, as the lead bank in the syndicate, Bank One assessed the potential risks to Antioch's business—including digital photography and technology, competition, an unknown product cycle, and the repurchase obligation—noted the mitigating factors for each of these risks, and ultimately concluded that management's projections were "conservative." (DX-132 at JPMC0001-02, 04, 11, 13-14; Powe Dep. 181:20-184:1.)

### 5. The Company's Various Constituencies Enter Into Negotiations

63. The Transaction was heavily negotiated because, even though it was a closing condition that the ESOP not tender shares, GreatBanc believed that the proposed transaction as structured by Deloitte would unfairly dilute the ESOP post-Transaction. (DX-169; DX-187; DX-188; DX-190; DX-196; DX-206; DX-209; Marchetti Tr. 1147:8-18, 1159:15-1180:24, 1194:14-1195:7, 1227:19-1228:10.)

64. At the October 16, 2003 Board meeting, Ms. Blair provided the Board a detailed update on the status of negotiations. (JX-34; JX-35 at GBT00098.) Her presentation informed the Board about the negotiating positions taken by GreatBanc, and the key points of contention before a deal could be finalized. (JX-34; Blair Tr. 1591:21-1592:12.)

65. GreatBanc and Duff felt that the Package of cash, notes and warrants diluted the ESOP's share value. (DX-190; JX-34 at DT1369; Marchetti Tr. 1167:24-1168:21.) They valued the warrants, *i.e.*, the Company's future prospects, higher than the value proposed at the time, and therefore demanded that the number of warrants available to selling shareholders be fewer than contemplated in Deloitte's transaction model. Lowering the number of warrants would allow the ESOP to have a bigger stake in the Company going forward once the warrants were eventually exercised. (Marchetti Tr. 1027:12-1028:1, 1167:24-1168:21; Blair Tr. 1578:19-1581:12.) Management opposed a more restrictive cap on warrants in part because many non-

ESOP shareholders intended to exchange shares for the Package rather than tendering for cash (a scenario where less cash would be needed to fund the Transaction). (Tr. 1580:23-1581:12; Morgan Tr. 2283:13-2286:11; Hoskins Sep. 15, 2011 Dep. 142:3-12, 148:7-13; Lipson-Wilson Dec. 5, 2011 Dep. 88:21-89:8.) The Morgan family intended to remain invested in the future of the Company and exchange as many of its shares for the Package as possible. (*Id.*)

66.     Board members testified that this lack of agreement evidenced arm's length negotiation by GreatBanc on behalf of the ESOP. (Sanan Dep. 121:24-122:4; vonMatthiessen Dep. 42:14-44:5.) They further testified that, based on the presentation regarding the parties' negotiating positions, they felt that they were fully informed and understood the positions that GreatBanc was taking on behalf of the ESOP. (Luce Dep. 109:1-110:25; Sanan Dep. 124:9-15, 126:3-8, 128:20-130:9.) And Board members testified that, based on GreatBanc's negotiating, they were satisfied that GreatBanc was doing its job of appropriately representing the ESOP's best interests. (Sanan Dep. 125:17-126:2, 126:9-127:8; vonMatthiessen Dep. 42:14-45:8.)

67.     After the October 16 meeting, negotiations turned to the addition of put price protection terms that GreatBanc and Duff deemed necessary to protect ESOP participants who might leave in the immediate aftermath of the transaction, before they had a chance to realize the economic benefits of the transaction from the tax savings. (Blair Tr. 1592:18-1593:22; JX-37 at D&P_A002728-002734.) A put price protection is a commonly used measure in ESOP transactions to help mitigate the dilution of post-transaction stock value that commonly follows this type of deal, and to assure that employees leaving shortly after a transaction realize the economic benefits of it. (Brown Tr. 4995:17-4997:10.)  In the Antioch Transaction, GreatBanc and Duff insisted on the inclusion of put price protection because they independently concluded that the value of the shares in plan participant accounts who left the Company in the first few

years following the Transaction would not reflect the tax benefits that the Transaction provided. (JX-37 at D&P_A002728-002734; Marchetti Tr. 1029:10-25, 1193:4-16; Blair Tr. 1592:23-1593:22; Bloom Tr. 4380:22-4381:2.)

68.     Ultimately, the put price protection included a floor price of $850 for employees who departed the Company before October 1, 2004, a $21.00 increase over fair market value for employees departing between October 1, 2004 and September 30, 2005, and a $12.80 increase over fair market value for employees departing between October 1, 2005 and September 30, 2006. (JX-38 at D&P_A006645.)

### 6.     The Parties Agree to the Transaction's Terms

69.     The parties continued to negotiate over the value of the warrants, the post-Transaction PPP terms, and other terms extrinsic to the tender offer, and after several back-and-forth proposals, they reached an agreement. (DX-222; DX-225; DX-226; DX-230; DX-241; DX-768; Marchetti Tr. 1186:10-1190:15, 1191:7-1195:15.) The Board convened on October 30, 2003 to vote on the Transaction. (JX-40.) Again, all of the Transaction advisors to each constituency, including GreatBanc, attended the meeting so that the Board could scrutinize the Transaction with advisors present to respond to any questions. (*Id.*; Tr. 1198:16-1200:25.) Representatives from GreatBanc, Houlihan, and MWE all presented on the Transaction and informed directors at the meeting of the conclusions that they reached. (*Id.*)

70.     Board members questioned the advisors and debated the pros and cons of the Transaction. (Luce Dep. 62:19-63:9.) The assumptions and analysis that went into the projection of the Company's future tax savings of $130 million received particular scrutiny. (*Id.* at 128:14-129:5.)

71.     Barry Hoskins presented on the financing that was obtained to fund the Transaction. (JX-40.) Board members gained further comfort with the prudence of sanctioning

the Transaction as a result of the banks' willingness to lend the Company such substantial sums. (Hoskins Sep. 15, 2011 Dep. 161:17-162:6; Sanan Dep. 147:19-149:14.) As stated by Denis Sanan, "That said to me immediately, we have another outside bunch looking at the process and saying, this deal is good. We're going to lend our money and we're going to get it back." (*Id.* at 148:18-149:14.) Additionally, Houlihan reported to the Antioch Board that, in Houlihan's opinion, the Transaction was fair to the non-ESOP shareholders and the Transaction share price of $850 was within the range of fair market value for Antioch stock, which was between $825 and $920 per share. (JX-40 at GBT00103; Jackson Tr. 4541:16-4542:2.)

72. A few days prior to the October 30 Board meeting, Duff had provided GreatBanc with a preliminary opinion that the 2003 Transaction, as negotiated, was fair to the ESOP from a financial point of view. Duff concluded that: (i) the $850 per-share price was within the fair market per share value range of $774 to $932 for Antioch stock; (ii) the consideration to be paid by the Company for shares of the Company's common stock held by stockholders other than the ESOP in the Transaction was fair and reasonable to the ESOP from a financial point of view; and that, (iii) the terms and conditions of the Proposed Transaction were fair and reasonable to the ESOP from a financial point of view. (JX-37 at D&P_A002735.)) Based upon these findings, GreatBanc informed the Board that it had preliminarily approved the Transaction on behalf of the Antioch ESOP and that the Antioch ESOP would likely decline to participate in the tender offer. (JX-240 at GBT00103.)

73. After these presentations from advisors and discussion among the Board members, Antioch's Board preliminarily voted without dissent to go forward with the Transaction. The material terms, as described to the Board, were as follows:

> a. The Company would make a tender offer to all shareholders to redeem their shares for $850.00 per share.

    b.   Selling shareholders would have the option to receive $850 in cash or a Package consisting of $280 in cash, a $280 subordinated note and a warrant valued at $290.

    c.   The maximum number of warrants, and consequently the maximum number of shares that could be exchanged for the Package, was 155,000.

    d.   The ESOP Trustee GreatBanc would decline to tender any shares of common stock owned by the Antioch ESOP if it ultimately determined that the transaction was fair to the Antioch ESOP from a financial point of view.

    e.   Following the tender offer, the Company would go through a cash-out merger, ensuring that the Antioch ESOP owned 100% of all outstanding shares of common stock. Employee owners would direct the ESOP Trustee GreatBanc on the cash-out merger vote.

    f.   Antioch would pay a one-time $8 million contribution to the ESOP prior to December 31, 2003, and an annual $2.5 million dividend to the Antioch ESOP from 2004 through 2008.

    g.   During a three-year period from 2004 through 2006, any departing Antioch ESOP participants would receive the negotiated price directly tied to fair market value in exchange for the Antioch stock in their Antioch ESOP accounts. If they terminated between December 31, 2002 and September 30, 2004, they would receive the greater of fair market value or $840.26 per share ($850 less a pro rata share of the dividend received by the ESOP). If they terminated between October 1, 2004 and September 30, 2005, they would receive fair market value plus $21.80 per share. If they terminated between October 1, 2005 and September 30, 2006, they would receive fair market value plus $12.80 per share (the "Put Price Protection" or "PPP").

    h.   Antioch would also make a 21% of compensation contribution to the Antioch ESOP in 2004.

(JX-28, at D&P_A006596, 006599-601, 608.)

    74.   In a further exercise of caution, Board members requested at the October 30 Board meeting that management run a sensitivity analysis to help the Board determine the Company's position in the event of a downside scenario and an upside scenario. (Blair Tr. 1563:6-25; Moran Tr. 2812:7-14; Luce Dep. 136:5-138:22; Sanan Dep. 186:14-188:2; vonMatthiessen Dep. 177:10-179:7, 185:1-11.)

75.     Nancy Blair also communicated to Lee Bloom around the time of the October 30 Board meeting that the Company was running sensitivity analyses. (Blair Tr. 1559:8-1561:23.) Mr. Bloom testified that it was his expectation the Company was running its own sensitivity testing in connection with the Transaction, but he did not expect to receive that sensitive testing and did not ask for it because Duff was running its own independent sensitivity testing. (Tr. 4321:12-4323:8, 4324:10-4325:25.)

76.     Mr. Bloom testified that it was not common practice and would be "very unusual" for a sponsor company or its financial advisor to provide scenario analyses to the independent trustee or its fairness advisor, and that he could not recall a single transaction where he worked as the financial advisor to an independent ESOP trustee and received sensitivity analyses run by the sponsor company or its financial advisor. (*Id*.)

77.     Kreg Jackson of Houlihan confirmed that he would not expect to see a company's sensitivity testing in a fairness opinion engagement. (Tr. 4551:8-10.)

## 7.     Antioch's Board Gives Final Approval to the Transaction

78.     The Board met on December 4, 2003 to give final approval to the Transaction, unanimously voting in favor of it. (JX-59.) At the meeting, CFO Barry Hoskins presented the finalized financing structure for the Transaction, which included a $170 million credit facility. The Board unanimously approved all resolutions necessary for financing. (*Id.*)

79.     Mr. Hoskins presented a revised repurchase obligation study at this meeting. When a participant leaves an ESOP sponsored by a privately-held company, the sponsor company is obligated to repurchase the ESOP participant's shares under a fair valuation formula pursuant to IRC § 409(h)(1)(B).  This repurchase obligation is legally required and set forth in the plan document for each ESOP. (Hoskins Dep. Feb. 15, 2010, 19:21-20:6.)   Shares

26

repurchased from former participants can be either redeemed by the sponsor or kept in circulation by recycling the shares back into the ESOP. (Hoskins Dep. 9/15/2011, 22:25-23:19.)

80. Hoskins was responsible for forecasting and monitoring TAC's repurchase obligation. He used specialized "PERLS" software to prepare repurchase studies that projected 20 years out, based upon relevant historical data and assumptions for the future, in order to estimate the financial obligation that would be created in the future as a result of ESOP participants departing and putting their shares to the Company. (Hoskins Dep. 9/15/2011, 12:7-13:10; 13:23-14:15.)

81. The revised study that Hoskins presented at the December 4, 2003 meeting differed from an earlier estimate provided to the advisors in due diligence in that it estimated higher levels of distributions in the few years immediately following the Transaction. (*Compare* PX-197 at D&P_A010065 *with* JX-56 at PR0001074.)

82. Also at the December 4 Board meeting, Nancy Blair presented the sensitivity analysis of upside and downside scenarios for the Company's future performance that the Board had requested at the previous meeting. (JX-55; JX-59.) The sensitivity analysis showed that, even in the downside scenario, the Company was still able to meet its debt commitments and repurchase obligations, and that the stock price would be higher under the Transaction than under the status quo. (JX-55 at MOR001426, 1428-29; JX-59 at ASP000244; Blair Tr. 1622:1-4, 1622:12-1623:1.)

83. A final item of note that occurred at the December 4 meeting was the Board's Amendment No. 2 to the Plan. (JX-59 at ASP002243, 000275-77.) Before Amendment No. 2, the Plan dictated that for departing participants who had not reached the retirement age and with account balances over $50,000, payment would be distributed in a single lump sum following the

allocation date of the plan year in which he or she attained age 50, or, if earlier, the allocation date of the sixth plan year following the plan year in which service was terminated. (JX-3 at § 12(a), MOR000209.) For departing participants who *had* reached the retirement age (or who suffered disability or death), the Plan allowed the EAC to either make the participant's distribution as a lump-sum payment or in substantially equal, annual installments not to exceed five years (or a combination of those methods). (*Id.* at § 12(b), MOR000209-10; Morgan Tr. 2272:19-2273:17.)

84.     Amendment No. 2 amended Section 12(a) of the Plan so that, during the time period covered by the put price protection (through October 1, 2006), distributions to departing participants under the retirement age would be made in the same manner as to retiring employees. (JX-59 at ASP000276.)

85.     As a result of the Put Price Protection terms and "byzantine" S-corporation rules, Helen Morrison of Deloitte advised the Company that continuing to follow the current Plan distribution provisions posed a danger that the Company might be deemed to have two classes of stock, which would compromise the Company's S-corporation status. (DX-267; DX-271; Blair Tr. 1603:11-1605:16; Moran Tr. 2874:5-12; Morrison Dep. 81:7-82:16, 84:11-85:9, 89:2-25.) Ms. Blair testified that, after considering Ms. Morrison's advice and weighing its options, the Company decided to amend the Plan (Amendment No. 2, or "the Plan Amendment") in order to eliminate the risk of losing its S-corporation status.[5] (Tr. 1605:18-1608:25.) The Company analyzed whether doing the Transaction with the Plan Amendment was more favorable than

---

[5] The EAC did not have the power to amend the distribution policy to departing plan participants under age 50, because prior to Amendment No. 2, the Plan did not allow any such change. Only the Board could alter the method of distributions for these non-retiree participants. (Morgan Tr. 2270:5-16.) As noted above, the EAC did, however, have the pre-existing discretion under the Plan to make payments to participants who left the Company in substantially equal, annual installments not to exceed five years, as opposed to a single lump-sum payment, which it chose to do as a cash-flow management strategy. (Morgan Tr. 2255:12-2256:10.)

remaining in the status quo without the Transaction and concluded that the Transaction was still "a very good deal and very fair for all the various stakeholders." (Blair Tr. 1609:2-1611:18.)

86.     On or about December 9, 2003, Duff confirmed to GreatBanc that, after updated due diligence and analysis that included an interview with Antioch's CFO Barry Hoskins, it still held the opinions expressed in its October 27, 2003 preliminary fairness analysis. (JX-61.[6]) On December 16, 2003, Duff gave GreatBanc its final opinions that: (i) the consideration to be paid by the Company for shares of the Company's common stock held by stockholders other than the ESOP in the Transaction was fair and reasonable to the ESOP from a financial point of view; and (ii) the terms and conditions of the Transaction were fair and reasonable to the ESOP from a financial point of view. (JX-62.)

### 8.      Participants Vote in Favor of the Transaction and the Transaction Closes

87.     Plan participants were entitled to vote whether to allow the merger that would serve as the final step in the Transaction. (JX-46; JX-47; JX-48; Blair Tr. 1627:22-1628:12.)

88.     To allow Plan participants to make an informed voting decision, the details of the Transaction were fully described in a 200-plus page package of materials that included the Offer to Purchase and Proxy Statement, which was sent to all Antioch shareholders both inside and outside of the ESOP, including to all Antioch ESOP participants. (JX-45; JX-49; Blair Tr. 1631:23-1633:1.) The Company and GreatBanc also held numerous meetings and presentations to fully inform all Antioch employees about the Transaction. (*E.g.*, JX-50; JX-51; Harris Tr. 836:18-837:6.)

89.     Of the ballots cast by Antioch ESOP participants directing GreatBanc on the merger portion of the Transaction, 88% of the ESOP stock owned was voted, and 90% of

---

[6] This memo is dated December 9, 2003, although it refers to a telephone conversation that took place on December 10, 2003. One date or the other must be incorrect, but the precise dates are immaterial, in any case.

employees voted "for" the Transaction, including plaintiffs Bonnie Fish, Monica Lee Woosley, and Christopher Mino. (JX-64 at P-WOOSLEY-000040; DX-319; JX-52; JX-60.)

90.     All outside, non-ESOP shareholders tendered their shares of common stock to the Company in response to the tender offer. (JX-64 at P-WOOSLEY-000040.)

91.     GreatBanc declined to tender the shares held by the ESOP, and the Transaction closed on December 16, 2003. (Marchetti Tr. 1213:14-18; 4383:2-12.)

92.     Prior to the Transaction, the Antioch ESOP beneficially owned 205,330 shares of the Company's common stock, representing approximately 42.8% of all outstanding shares. (JX-49 at MOR001279; JX-64 at P-WOOSLEY-000060.) The result of the Transaction, in which the Company purchased and retired all outstanding shares of stock outside the ESOP, was that the Antioch ESOP still owned the same 205,330 shares of the Company's common stock, but these shares represented 100% of all outstanding shares. (JX-64 at P-WOOSLEY-000040, 60.)

93.     The Morgan family never viewed the Transaction as a means to liquidate their position in the Antioch Company—as noted above, one of the principal reasons for the Transaction was to avoid concentrating all the wealth with the largest ESOP account holders (such as Lee Morgan) instead of with the newer employees who were actually driving the Company's success, and the Morgan family took as much of the Package consideration as they could. (Morgan Tr. 2283:13-2286:11; Holthaus Dep. 164:23-166:5; Lipson-Wilson Dep. 86:23-89:8; Bevelhymer Dep. 174:5-177:4; Luce Dep. 73:6-74:1)

94.     The Antioch ESOP did not borrow money, pledge assets, purchase or acquire shares, or sell any of its shares in the Transaction. (DX-776 at 9-10; Bloom Tr. 4255:10-17, 4263:4-12; Brown Tr. 4982:9-17; New Dep. 17:13-18:8.) The Antioch ESOP did not pay any cash to the non-ESOP shareholders or part with any assets—the Company alone paid the non-

ESOP shareholders for their stock out of a combination of corporate assets and borrowed funds. (*Id.*; Tr. 4265:4-24.)

**D.    The Due Diligence Process and the Information that Antioch Provided to its Advisors Prior to Approval of the Transaction**

95.    As noted above, prior to the closing of the Transaction, the advisors to the interested parties engaged in extensive due diligence. Nancy Blair and Barry Hoskins were primarily responsible for compiling and distributing material responsive to the advisors' due diligence requests. (DX-88; Blair Tr. 1515:2-1516:25, 1517-1535:17; Morgan Tr. 2296:16-23, 2301:6-2302:14; Moran Tr. 3176:15-21; Bloom Tr. 4269:16-4270:1; Treemarcki Tr. 4684:4-12.) Ms. Blair responded to of all the initial and supplemental due diligence requests from the advisors for both the ESOP and outside shareholders. Among other things, Ms. Blair answered emails, organized interviews, shipped out voluminous and comprehensive mailings, and provide updated financial statements. (*See, e.g.,* DX-88; DX-108; DX-111; DX-116; DX-133; DX-136; DX-138; DX-157; DX-163; DX-185; Tr. 4269:16-4270:1, 4684:4-12.) The Company also set up a "war room" that was accessible at any time to all the advisors and the outside lenders, which consisted of additional information and materials such as contracts, legal documents, stock records, and especially sensitive information. (DX-136; Tr. 1518:20-1519:12.)

96.    GreatBanc and its advisors, along with Houlihan Lokey, received and carefully examined Company financials, projections, and strategy analyses; made on-site visits to Company facilities, which included meetings with members of financial and non-financial management; held telephonic meetings with members of management and management's legal and financial advisors; and had extensive email communications with management and management's legal and financial advisors. (*See, e.g.,* DX-109; DX-110; DX-112; DX-117; DX-121; DX-136; DX-140; DX-141; DX-154; DX-167; DX-168; DX-169; DX-190; DX-240; DX-

277 at HL000563; DX-326; JX-17; JX-37 at D&P_A002707; JX-61 at D&P_A005458-005459; PX-154; PX-171; PX-174; Tr. 1123:8-1124:17, 1515:2-1535:21, 4267:18-4285:16, 4548:24-4550:1, 4566:23-4568:1, 4593:19-4594:24, 4684:4-12, 4689:4-14.)

97.     Lee Bloom testified that Duff never received any pushback from the Company or failed to obtain any information that it had requested, financial or otherwise, and found Company management and employees trustworthy and forthcoming. (Tr. 4270:2-4273:19.) According to Lee Bloom, Duff had "access to all the information we requested and might have reasonably requested." (Tr. 4284:25-4285:16.) Nancy Blair also confirmed that she provided all information that was requested by Duff and the other advisors, that she would have readily provided any additional information that had been requested, and that no one from Company management in any way hid any information from the advisors or influenced any employees to hide information from the advisors. (Tr. 1518:9-1520:6, 1534:6-1535:17, 1548:1-1549:19, 1551:3-7, 1560:22-1561:15.)

### 1.     The Risks and Threats Facing Antioch at the Time of the Transaction

98.     At the time that the Transaction reached the due diligence stage, the Company was aware of the following risks and threats to the business.

#### a.     *The Growing Repurchase Obligation*

99.     Along with CM's explosive sales growth in the years prior to the Transaction came a similar rise in share price and number of employees participating in the ESOP. (JX-49:37; PX-68:4, 20; JX-56:4.) As the share price and number of employees grew, the repurchase obligation grew with it.

100.     As early as 1999, Morgan recognized in that year's Annual Report that Antioch's repurchase obligation had become "a huge liability not shown on our balance sheet." (DX-8:D&P A011942.)

101.     In a 2000 presentation that Morgan, who considered himself an "advocate" for ESOPs (Tr. 1985:23), prepared in order to present Antioch as a "case study in corporate change" (PX-68:3), he referred to RO as one of the elements of the "dark side" of the ESOP because, even as an ESOP company prospers and its stock appreciates, the "reality" remains that the company "[has] to repurchase that stock at some point." (Morgan Tr. 1988:21-1992:22; PX-68:33.)

102.     In the 2001 Annual Report, Morgan stated that: "The biggest cloud over our organization, in my opinion, is our obligation to repurchase our stock from both ESOP participants as they retire and from other stockholders . . . The potential impact on our cash position is huge." (Morgan Tr. 1992:23-1994:18; JX-2:05)

103.     By 2002, 38 ESOP participants had balances over $1 million and an additional 28 had balances over $500,000. (PX-382:08.) Ten percent of the participants held 80 percent of the ESOP value. (Marchetti Tr. 1054:9-23; JX-37:5; Blair Tr. 1679:21-1680:2.)

104.     In considering the Transaction, Morgan, Moran and others worried about "the cash flow implications of 'big' retirements . . . ." (Morgan Tr. 1996:8-1998:18, 2003:5-13; Blair Tr. 1861:4-21; PX-128:2.).   They knew that some ESOP participants were members of the "working poor" who were "sitting on 7 figure retirement accounts and would like to improve their life style sooner rather than later" by abruptly terminating their employment or retiring early in order to access their ESOP retirement accounts. (PX-336:2.)

105.     Blair, Morgan and others at Antioch knew there was a possibility that a substantial amount of participants might leave at once, causing a "run on the bank." (Blair Tr. 1861:4-1862:20; Treemarcki Tr. 4695:15-4698:16; PX-291:1; PX-328:1.)

b.    *Indications of Consultant Dissatisfaction*

106.    In order to take the "pulse of the field," Rhonda Anderson spent 18 months during 2002 through the summer of 2003 in an RV traveling across the country listening to concerns from the consultant leadership. She conducted 160 meetings, which allowed her to directly converse with approximately 80% of the consultant leadership. (Anderson Tr. 175:1-176:4; 225:21-226:4.)

107.    During her trip, Anderson communicated by phone and in writing directly with the senior CM corporate leadership about the "climate" in the field on at least a weekly basis. (Anderson Tr. 243:4-245:19, 247:10-248:10.) She also consistently reported to Morgan, Moran, and others that the consultant leaders were alarmed about their future and the future of CM. The consultants were frustrated with shortcomings in the CM product line and new product introductions, increased competition, the impact of digital photography, and the CM compensation plan. (Anderson Tr. 176:5-177:19; 245:9-247:9; 248:11-22; Harris Tr. 743:17-744:4, 760:14-761:19.)

108.    At the CM Forward Conference, a 2003 strategic planning meeting led by Asha Moran, "[c]onsultant profitability, simplicity and productivity" was identified by senior leadership as a "must discuss" issue. (PX-149:1.)

c.    *The Rise of Digital Photography*

109.    The market that supported CM's robust growth in the sale of traditional scrapbooks for display of 4" x 6" prints in the 1990s began a momentous shift as the digital camera became accepted. This had a disruptive effect upon the photographic industry because, rather than developing a roll of film, people suddenly had a memory card of photos from their digital cameras that could be used in any number of ways. (Mizen Tr. 385:9-25.)

110.     Since the bulk of CM's business involved the printing of 4" x 6" prints for display on blank scrapbook pages and the making of double prints for family and friends, the digital camera provided a less costly alternative that could limit the use of traditional scrapbooks and the need for multiple prints. (Mizen Tr. 385:21-386:11.) Digital technology also provided the advantage that consumers could see the images they took and send the desired images to on-line companies for printing, storing and sharing. (Mizen Tr. 427:6-429:2.)

111.     Dr. Mark Mizen was the Director of Technology for CM from 1998 through the time of bankruptcy in 2008. (Mizen Tr. 352:6-9; 367:17-21; PX-57.) Through attending industry meetings and staying current with industry news reports, Mizen became aware of the advancements in digital technology that were disruptive to the photographic industry. (Mizen Tr. 360:9-361:16; 397:15-398:20.)

112.     By 2000, Mizen recognized that digital technology was a threat to CM's traditional scrapbooking business and told TAC senior management, including Morgan. (Mizen Tr. 385:9-20, 397:1-399:1, 459:21-460:6, 483:15–484:15.)  Over the ensuing years, he attempted to keep senior management updated on developments in the field. (Mizen Tr. 360:25-361:16, 376:11-21, 411:21-413:6; PX-25.)

113.     By 2001, Luce advised Morgan that incorporating digital imaging capability into CM's program of products and services was a "strategic given" (Morgan Tr. 2132:13-2134:15; PX-54:1), and CM should include a digital product in its line "as soon as a viable product was available." (Luce Dep., 211:6-214:21; PX-51.) Luce believed CM would have three distinct advantages over its competition if it brought a digital product to the market quickly: (1) create the impression CM listens to its newer, younger consultants; (2) create a new excitement about

the future of CM; and (3) expand the product line beyond the thinking of more conservative consultants. (Luce Dep., 213:15-214:15; PX-51 (Dep. ex. 582).)

114.    Morgan agreed that digital imaging had become a fact of life and that CM needed to incorporate digital imaging capability into its program of products and services. (Morgan Tr. 2128:20-213:12, 2134:16-2135:4.)

115.    At the CM Forward Conference, the "Impact of digital photography" was identified by senior leadership at CM as a "must discuss" issue. (PX-149:1.) Mizen gave a presentation on that issue at the CM Forward, and his "bottom line" was that digital photography was a "potential threat" that needed to be addressed, and that CM needed to "give solutions to [their] customers and Consultants." (*Id.* at 2.)

d.    *Dramatic Increases in Competition Were Emerging in 2003*

116.    At the time of the Transaction, CM was facing new or increased competition from (1) big-box retailers like Wal-Mart and Target who sold similar products at lower prices, (2) other direct sales companies, and (3) smaller retailers moving into CM's business space. (Harris Tr. 712:16-714:4, 724:1-13, 729:23-730:1, 737:71-12, 762:12-20, 770:11-21.)

117.    Illustrating this heightened risk to CM before the Transaction, Michael's, a craft retailer, was growing rapidly and had opened a line of specialty stores called Recollections devoted strictly to memory-keeping and scrapbooking. (Harris Tr. 730:2-21; 732:4-15.) Also, two direct sales companies in the same memory preservation space—Stampin' Up and Close to My Heart—experienced substantial growth in revenue from 2002 to 2003. (Harris Tr. 737:17-739:24.)

118.    CM expected in 2003 that this increased competition might increase pressure of CM's business and could lead to lower prices and lower margins that might have a material adverse effect on CM's business. (JX-49:95.)

36

119.    At the CM Forward Strategic Meeting on July 21-22, 2003, "Competing against retail and dotnet" was identified by senior leadership at TAC as a "must discuss" issue. (PX-149:1.) "Competition" and "Other Direct Sales companies" were also identified as primary threats facing the Company. (*Id.* at 4.)

e.    *Signs of Product Fatigue*

120.    CM's Vice President of Marketing Suzanne Johnson Harris concluded that CM's business model was also threatened in 2003 by a lack of new products as well as higher-priced products and limited selection relative to CM's competitors. (Harris Tr. 769:14-23.)

121.    CM's products were "viewed as very basic," according to Harris, and there was limited innovation relative to the competitive marketplace. (Harris Tr. 720:24-721:9.)

122.    As a direct sales business, CM was highly dependent upon the motivation of its volunteer sales force and the appeal of its products to maintain and grow sales. (Wiser Tr. 3116:5-16; Anderson Tr. 209:5-291:25; Luce Dep., 185:3-186:3, 196:17-197:3; PX-493:1-2.)

123.    CM was aware in 2003 that product innovation was a weakness of the Company. Indeed, during his work as a business consultant for TAC in 2001-2002, Luce detected signs of productivity decline and noted the lack of innovation from the product development group. He reported this problem to Morgan and Moran in 2002. (Blair Tr. 1815:13 - 1817:10; JX-16:5; Luce Dep., 280:9-282:3; PX-592.)

124.    At the CM Forward Conference, the "Product Plan" was identified by senior leadership at CM as a "must discuss" issue. (PX-149:1.) The need for "wow" products was identified as a threat to CM. (*Id.* at 4.)

f.    *Fear of Market Saturation and Deceleration in U.S. Sales Growth*

125.    Morgan, Moran and other key CM leaders worried that CM's U.S. unit ("CM US") was near a sales plateau, or even had already entered one. (Blair Tr. 1810:23-1811:6,

1926:16-1927:9; Marchetti Tr. 990:4-991:16, 1135:1-11.)   Luce testified that it is relatively common for direct-sales companies to plateau when their product lines get tired, and Lee Morgan had worried (prematurely, as it turned out) that CM was reaching a plateau as early as 1994 or 1995.  (Luce Dep. 222:7-223:18.)

126.   At the CM Forward conference, the "possible plateau" in sales was identified by senior leadership at TAC as a "must discuss" issue. (PX-149:1.) In addition, the possible plateau was identified as one of the two "[b]iggest threats" to CM in addition to digital photography. (*Id.* at 6.)

127.   Marchetti recalled that, during due diligence for the Transaction, Moran and other CM managers told GBT that future growth had to come from overseas expansion "because they were saturated in the U.S." (Marchetti Tr. 1135:1-11.)

128.   However, other evidence shows that CM told advisors in due diligence that it believed its U.S. market potential lay somewhere between $475 million and $500 million, more than $100 million above the projected 2003 revenue, and that its sales growth would only begin to level off after a number of years.   (Williams Dep., 71:9-21; PX-154:13,45/DX-748:13,45; Treemarcki Tr. 4740:18-4642:3; PX-194:6.)   As late as July 2004, Luce advised Morgan and Moran that he did not believe that "CM US has come anywhere close to topping out its sales potential in the US." (PX-495:1.)

129.   Antioch's sales continued to grow in 2003, finishing above prior year (Moran Tr. 2913:22-2914:12; Lipson-Wilson Dep., 259:21-260:15; Hoskins Dep. 9/16/11, 507:10-14), but the Company's sales growth was slower than anticipated, and Antioch's sales failed to meet expectations throughout 2003.

130.    CM's monthly sales fell short of plan in nine of the first eleven months in 2003. (Morgan Tr. 2075:25-2078:19; PX-401:3; PX-154:7; JX-35:3; JX-22; PX-118; PX-597.) CM U.S. sales were $28.4 million below plan by the time the Transaction closed. (Morgan Tr. 2087:23-2088:20; Moran Tr. 2906:14-2907:17; PX-370.)

131.    By September 9, 2003, TAC dropped its projected sales for 2004 from $443 million to $425 million. (Marchetti Tr. 1016:2-1025:4; compare JX-11:6 to PX-220:6; PX-220:214.) Then TAC again dropped its projection for 2004 to $418 million in the 2004 Business Plan presented to the Board on December 4, 2003.  (PX-391:34; PX-154:7.)

g.    *Soft Creative Memories International Sales and Uncertain Growth in New International Markets*

132.    Regardless of precisely how much more growth there was in the domestic market, CM knew that it would reach a domestic saturation point eventually, and it was counting on international expansion for most of its future growth.  Prior to the end of 2003, Canada and Australia were the only two foreign markets where CM had operations that had broken even or made a profit (Morgan Tr. 2090:9-2094:19, 2096:15-2097:6, 2590:19-2591:9; PX-483:71-74.). Sales in most other international markets were consistently below plan on a monthly and year-to-date basis. (PX-483:41-79.)

133.    CM faced numerous barriers when attempting to penetrate into new international markets. These included unfavorable regulations, cultural and language differences, unfavorable social attitudes toward direct selling in general and questionable viability of the party plan method. By August 2003, CM's international unit's ("CMI") strategic plan called for operations to start up in many new markets in the coming years, but CM ultimately only entered new markets in a few countries, and none of those markets were profitable. (Moran Tr. 2582:12-2584:19; PX-176:9.)

134.     Growth in international markets after 2004 was projected in countries where CM had fledgling operations (such as the U.K., Taiwan, Germany and Japan) or in markets that had not yet even launched (such as Austria, Mexico, Switzerland, South Africa, Spain, the Netherlands, Sweden, Denmark, South Korea, Finland, Norway, Belgium, Portugal and Chile). (PX-176:13-16.) As such, these growth projections were "uncertain." (Blair Tr. 1824:14-1828:22; PX-176:14.) Nevertheless, CMI adopted a 5-year plan calling for international sales in these unproven markets to more than triple from $38 million in 2003 to $116 million in 2007. (Blair Tr. 1824:14-1828:22; PX-176:14.)

h.     *New Ventures Were Not Succeeding*

135.     At the time of the Transaction, TAC had two new start-up ventures: Our Own Image ("OOI") and ZeBlooms. (Blair Tr. 1530:24-1531:18.)

136.     In 2003, sales and profitability for these new ventures were not strong. (*See* PX-370:5 and 7.)  Management knew, prior to the Transaction, that the success of these ventures was uncertain and that they faced significant risks. (Williams Dep. at 72:18-23; PX-154:45-46; Morgan Tr. 2099:6 - 2108:6; PX-512:30; Marchetti Tr. 1086:7-21; Blair Tr. 1741:14-1745:5.)

**2.     The Company Disclosed the Threats Facing Antioch**

137.     At the first Board meeting attended by GreatBanc on August 21, 2003, Asha Moran gave a detailed presentation about Creative Memories and its year-to-date performance and projections. (*Id.*; JX-22.) This presentation contained a wealth of financial information about Creative Memories U.S., including that:

▪     Gross sales for Creative Memories U.S. had steadily increased from approximately $70 million in 1996 to over $306 million in 2002, and were expected to hit over $331 million in 2003. (JX-22 at D&P_A010811.)

▪     Operating income for Creative Memories U.S. had steadily increased from approximately $13 million in 1996 to over $83 million in 2002, and was expected to hit over $92 million in 2003. (JX-22 at D&P_A010819.)

40

- Each month's actual gross sales year-to-date had exceeded the previous year's sales for that month, and year-to-date sales exceeded the same time period in 2002 by 5.94%. (*Id.* at D&P_A010813, 10821.)

- Each month's actual sales year-to-date had failed to meet the Company's forecasts for that month, other than February and March, and year-to-date sales fell short of the forecast for that time period by 6.33%. (*Id.*)

- The consultant productivity metric had fallen from $727 in 2001 and $719 in 2002 to $663 in 2003 year-to-date. (*Id.* at D&P_A010817.)

138. Antioch also told GreatBanc and all advisors about the decline in consultant productivity throughout due diligence. (DX-154 at GBT06331; PX-154 at D&PA007948-7949; Marchetti Tr. 1139:9-19.)

139. The Company continued to provide updated financial information to the advisors in subsequent months. (DX-163; DX-185.) As reflected in Duff's December 9, 2003 memo to GreatBanc, Duff was aware of the state of the Company's financials as late as a few days before the Transaction closed. That memo communicated the fact that the Company's sales had missed its plan in nine of the 11 months to date in 2003. (JX-61 at D&P_A005458; *see also* PX-154 at D&P_A007937.) It likewise communicated that Antioch's earnings were nevertheless ahead of plan. (*Id.*)

140. Marilyn Marchetti testified that Duff and GreatBanc specifically took into account the Company's consultant productivity metric and other metrics and the operations of Creative Memories up against plan for the first 11 months of 2003 in conducting their analysis of the Transaction, and that the Company's performance in 2003 was very much part of the due diligence process and discussions at GreatBanc ESOP Committee meetings. (Tr. 1231:14-1232:21).

141. In addition to providing detailed financial information, the August 21 presentation also contained a SWOT analysis, management's identification and analysis of strengths,

weaknesses, opportunities and threats facing CM. (JX-22 at D&P_A010837.) Digital photography and scrapbooking competitors were the first two threats described in the presentation. (*Id.*)

142. Duff's analysts asked Ms. Moran for a copy of her board presentation and she provided it to them and Houlihan the following day. (DX-121; Moran Tr. 3051:5-3052:23.)

143. The potential threats posed by more robust competition were frequently discussed with GreatBanc and Duff during due diligence, where the advisors had a "very good opportunity to speak very openly with the management teams." (Bloom Tr. 4280:9-19.) Defendants presented at trial numerous examples of company representatives, including defendants themselves, discussing the threat of competition with GreatBanc and Duff. (DX-117 at HL001190; DX-154 at GBT06329; DX-745 at HL001221-22; PX-154 at D&P_A007975; Marchetti Tr. 1132:20-1134:6; Bloom Tr. 4275:12-4276:12, 4279:6-13; Treemarcki Tr. 4701:14-4703:6.) In Duff's Preliminary Fairness Opinion, it discussed as a risk that "[c]ompetition will likely increase as several direct sales organizations could enter the market as could other album and scrapbook companies. Craft stores, such as Michaels, are experimenting with scrapbook retail outlets that offer value-added services such as workshops." (JX-37 at D&P_A002711.) Plaintiffs' expert witness, Robert Reilly, admitted that Duff and GreatBanc knew about the threats to Antioch's business. (Tr. 3931:1-3934:8.)

144. The potential threat of digital photography and technology was also openly discussed during due diligence. The advisors' notes taken contemporaneous with the Transaction and the advisors' testimony makes clear that the potential threat (and potential opportunity) of digital photography and technology was disclosed and considered by Duff in its financial analysis. (DX-140 at GBT06912; Bloom Tr. 4277:7-4279:13, 4285:23-4287:7.)

145.    Duff's preliminary fairness opinion likewise makes clear that Duff was well aware of the potential threat from digital photography and technology. (JX-37 at D&P_A002711.) And the management presentation made at the August 21 Board meeting that GreatBanc attended confirms that digital photography and technology, increased competition and consultant productivity were among the risks identified in conjunction with the Transaction. (JX-38 at D&P_A006634.)

146.    In the end, the undisputed evidence showed that Duff and GreatBanc were well aware of the potential threats of competition and digital photography and technology. Duff's own Preliminary Fairness Opinion, which was shared and discussed with GreatBanc, specifically discusses these risks. (JX-37 at D&P_A002711.)

147.    Lee Bloom testified that Duff considered and accounted for these risks in the financial analysis underlying Duff's fairness opinion. (Tr. 4285:23-4287:7, 4296:13-17.)  Notes from Marilyn Marchetti of GreatBanc and Lee Bloom and Julie Williams of Duff reflect these threats as topics of discussion internally and with Antioch personnel during their due diligence investigations. (DX-140 at GBT06912; DX-154 at GBT06329; PX-154 at D&P_A007975; Tr. 1133:13-1134:6,   4275:12-4276:12,4277:7-13,   4285:23-4287:7,   4292:4-4293:3,   4294:17-4296:17,  4373:20-4374:15,  4891:2-4892:1,  4909:11-4910:10.)  And the proxy materials themselves spelled out a host of risks that the Company faced in 2003, including detailed discussions of competition and digital photography and technology. (JX-49 at MOR001280-1285.)

### 3.    Plaintiffs' Allegation That the Company Failed to Provide Certain Materials to GreatBanc

148.    At the December 4, 2003 Board meeting, certain materials were discussed that plaintiffs claim were not provided to GreatBanc and/or Duff: (i) the sensitivity analysis requested

by the Board at the October 30 Board meeting; (ii) the Plan Amendment regarding the method of distribution for departing employees under the age of 50; (iii) a revised repurchase obligation presentation, and (iv) the 2004 business plan. Plaintiffs called Marilyn Marchetti as a witness. Ms. Marchetti was GreatBanc's lead in the Antioch engagement. (JX-14.) She is an attorney. She is not an economist or valuation professional. (Marchetti Tr. 942:24-25, 945:5-18.)

149.   As part of GreatBanc's settlement with plaintiffs shortly before trial, Ms. Marchetti voluntarily agreed to a private interview with plaintiffs' counsel after which she provided them with a sworn affidavit that plaintiffs would not share with defense counsel. (Tr. 948:17-19; ECF No. 495.)

150.   Ms. Marchetti testified that as trustee she expects to see "everything that exists" and "everything having to do with the company." (Tr. 969:3-14.) This broad expectation included the materials discussed at the December 4 meeting. Ms. Marchetti stated that receipt of the sensitivity analysis would have generated more inquiry, but she could not speculate even as to what the additional discussions would have entailed, much less if it would have an impact on Duff's analysis. (Tr. 1041:12-15, 1044:3-6, 1044:12-15, 1050:9-19, 1054:3-5.) She also stated that she would have liked to have known about the Plan Amendment and the revised repurchase obligation study, but never stated that the information would have influenced GreatBanc's analysis in any way, or to what measure. (Tr. 1066:4-7, 1067:8-13, 1070:21-23.)

151.   There is some evidence suggesting that Ms. Marchetti at least had notice of the fact that some of these materials existed or probably existed, and so could have requested them if she really wanted them.  But in any event, the materiality of these items to GreatBanc's and its advisors' review was disproven by testimony from several professionals who worked on the Transaction, most importantly among them GreatBanc's financial advisor, Duff & Phelps.

152.    First, with respect to the sensitivity analysis, Ms. Marchetti was present at the October 30 Board meeting at which the sensitivity analysis was requested, so she could have asked to attend the December 4 Board meeting or asked for the analysis itself if she or GreatBanc's advisors deemed the sensitivity analysis material to their consideration of the Transaction.

153.    In any case, the sensitivity analysis was not material. Lee Bloom knew that the Company was running sensitivity analyses and had no desire to see them, did not expect to see them, and testified that he would not have known what to do with the analyses had he received them. (Tr. 1559:9-1561:23, 4321:12-4322:9, 4325:17-25.) Duff was running its own sensitivity testing in the financial analysis underlying its fairness opinion, and therefore Mr. Bloom testified that he had no use for the Company's analyses. (Tr. 4321:12-18, 4324:10-4325:16.)

154.    GreatBanc's and Duff's lack of interest in obtaining the Company's sensitivity testing is further demonstrated by its receipt of due diligence materials showing the findings of previous sensitivity testing by the Company. (DX-773.) GreatBanc did not ask for the underlying data associated with that sensitivity testing, nor did it include any request for sensitivity testing in its written due diligence requests. (DX-111; DX-133.)

155.    Defendant's expert witness, Greg Brown, testified based on his experience in advising various constituencies in ESOP transactions that he would not have expected the Company to share its sensitivity analyses with GreatBanc and Duff. (Tr. 4980:11-19, 4982:18-4983:20, 5175:21-5176:25.)

156.    As to the Plan Amendment, Ms. Marchetti does not recall receiving notice of it, but some evidence suggests that she may at least have had notice that it was under consideration. Nancy Blair testified that she recalled a late-night phone call with Lee Bloom (who would

presumably have passed on the info to his client GreatBanc) and Helen Morrison in which the amendment was discussed as a necessary response to the put price protection unless an alternative transaction structure was adopted. (Tr. 1609:21-1610:13.)

157.    Other evidence indicates that GreatBanc and its advisors may have had notice at least of the fact of the Plan Amendment, but the evidence is, at best, inconclusive.  Helen Morrison instructed Karen Ng, the ESOP's legal counsel, to send the Plan Amendment to GreatBanc and Duff (DX-272; Morrison Dep. 157:6-17, 160:20-161:11), but the evidence does not confirm whether Ng actually did so.   A closing checklist sent to J&G and Marilyn Marchetti lists "Board approval of new amendment to ESOP regarding distribution provisions" at (I)(1)(e) of the checklist (DX-318; Matthews Tr. 2513:23-2516:1), and GreatBanc's October 27, 2003 ESOP Committee notes state that J&G had reviewed the Plan and "would be reviewing amendments to be adopted in connection with the tender offer" (DX-250 at GBT08388); however, the evidence does not confirm whether J&G or GreatBanc were ever actually provided any clear, specific notice of the Plan Amendment and change in distribution policy.

158.    In any case, Lee Bloom testified that the Plan Amendment and change in distribution policy would not have impacted the analysis that went into Duff's fairness opinion, and, if anything, would have *increased* his confidence in issuing the opinion, because the Plan Amendment provided important flexibility for Antioch in dealing with future cash flows. (Tr. 4395:7-4397:8, 4399:9-22.)   This testimony is credible, as it is corroborated by Hoskins's testimony that the banks financing the transaction had the same interpretation of the distribution policy change, as the Court will discuss in more detail below.

159.    Plaintiffs presented evidence that certain members of Antioch management feared "a bit of a run on the bank" in conjunction with the Plan Amendment and change in distribution

46

policy. (PX-328.) But the Court finds that plaintiffs failed to prove, through expert testimony or otherwise, that the Plan Amendment and change to the distribution policy actually *caused* a run on the bank. Rather, as defendants' expert Richard May explained and as the Court will discuss in more detail below, the evidence is that, although the Company did experience a massive spike in repurchase obligation in 2004, the Plan Amendment and change in distribution policy did ***not*** cause the Company's unusual and unpredictably high repurchase obligation in that year.

160.    There is likewise no evidence that the Board did not properly consider or account for those concerns. Nor did plaintiffs introduce any expert or fact evidence that such a concern should have caused the Board or GreatBanc to abandon the Transaction.

161.    Moreover, Mr. Bloom was well aware that a "run on the bank" was always a possibility at Antioch, as he warned Nancy Blair of that possibility himself. (PX-291; Blair Tr. 1854:5-15, 1857:22-1858:1.) Terry Treemarcki of Houlihan Lokey explained to the Court that concerns about a "run on the bank" are inherent in any company with an ESOP, because the only way that employees at an ESOP company can liquidate their shares is by leaving the company. (Tr. 4697:21-4698:17.) The potential for a "run on the bank" was also far from a secret given the fact that defendant Chandra Attiken disclosed concerns about that in due diligence meetings with Duff and GreatBanc as early as September 2003. (DX-109 at HL001253; Treemarcki Tr. 4696:4-4697:16.)

162.    In addition, defendants' expert Greg Brown testified that based on his experience, it would not be customary or usual for the Company to share revised repurchase obligation runs with Duff or GreatBanc after determining that Antioch would be able to service even the revised estimates of that future obligation. (Tr. 5177:1-5183:14.)

163.    Finally, as for the 2004 business plan, the Company continued to update Duff and GreatBanc regarding its future financial projections throughout due diligence (*compare* PX-213 at HL006477-82 *with* DX-141 at GBT06094-95 *and* PX-250), up to just a few days before the Transaction closed. Just prior to the Transaction's closing, the Company informed GreatBanc and Duff that it made a downward adjustment to its internal 2003 and 2004 sales forecasts. (DX-329; PX-154 at D&P_A007937; Bloom Tr. 4880:6-4882:4.)  Julie Williams of Duff met with Barry Hoskins for a final update before the Transaction closed. As Ms. Williams' notes reflect, she was told at that meeting that actual Antioch sales for 2003 projected to be $376 million, down from $381 million in the most recent projection. (*Compare* PX-154 at D&P_A007937 *with* PX-213 at HL006477-82.) Mr. Hoskins also informed her that the 2004 revenue projection had been lowered from $425 million to $418 million. (*Id.*) Duff considered that information in deciding whether to render its final fairness opinion to GreatBanc. (Tr. 4882:14-18.)  Thus, even if Duff and GreatBanc did not receive the full 2004 business plan (which, as the Court discussed above at footnote 4, it is not clear that the Board even received prior to the Transaction), it did receive the substance of the news of the Company's downward adjustments to the 2004 forecast.[7]

## E.    The Process and Analysis Undertaken By GreatBanc And Its Advisors

164.    Because, as further explained below, defendants' liability to plaintiffs under both sections 404 and 405 of ERISA may depend upon finding an underlying breach of fiduciary duty by GreatBanc, the Court must make a detailed review of the process and analysis in which GreatBanc engaged during its tenure as trustee of the ESOP, despite the fact that GreatBanc is no

---

[7] Although Plaintiffs principally focused at trial on the categories of information discussed, above, in their Complaint and Pretrial Memorandum they also identified the potential for a violation of Internal Revenue Code section 409(p) and the allegedly slipping sales and profits in international markets as categories of information that were purportedly "withheld" from GreatBanc. The evidence at trial established that these categories of information were in fact disclosed, and that international sales and profits were in fact rising at the time of the Transaction. (Doc. 624-2.)

longer a defendant. The process and analysis of GreatBanc and its advisors regarding the consideration provided to the non-ESOP shareholders in the Transaction is also relevant to defendants' affirmative defense to plaintiffs' ERISA section 406 claim.

### 1. GreatBanc Hired Qualified Advisors and Engaged in Due Diligence to Gain an Appropriate Understanding of the Company

165.    At the outset of GreatBanc's tenure as trustee, it sought to retain industry-leading financial and legal advisors to help it assess whether the transaction was in the best interests of the ESOP. It selected Duff to serve as its independent financial advisor; the firm and Mr. Bloom were nationally recognized leaders in the ESOP community. (JX-26; Marchetti Tr. 1097:8-24, 1111:19-1112:1; Abrahamson Tr. 1358:15-1359:10; Matthews Tr. 2479:10-2480:6; Reilly Tr. 4046:9-22.) Lee Bloom served as the lead financial analyst for Duff.

166.    GreatBanc also selected Jenkins & Gilchrist as its legal counsel; the firm and lead attorney David Ackerman were nationally recognized leaders in the ESOP community. (DX-94; Marchetti Tr. 1112:2-15, 2480:8-17, 2546:2-5.)

167.    Because the court has already detailed much of GreatBanc, Duff, and J&G's actions around and participation in due diligence, it need not do so again.  It will suffice to say here that, after initial detailed analysis and consideration, on October 13, 2003, GreatBanc and Duff concluded that without changes, the Transaction as originally proposed would not be fair to the ESOP. (DX-204; JX-30; JX-31; Marchetti Tr. 1209:9-1219:12.)

168.    After this preliminary conclusion, GreatBanc and its advisors diligently and aggressively negotiated benefits for the ESOP external to the tender offer to ensure that the Transaction would not harm ESOP participants and was fair from a financial perspective to the ESOP. These benefits included Put Price Protection, a one-time dividend, and recurring contributions to ensure that the ESOP participants shared in the tax benefits of the Transaction.

(DX-206; DX-209; DX-217; DX-222; DX-225; DX-226; DX-229; DX-230; DX-241; DX-768; Tr. 1172:23-1195:9.)

169.    As discussed further below, Duff took all Antioch's known strengths, weaknesses, opportunities and threats into account in performing its fairness and valuation analysis, including in its independent development of financial projections and an appropriate discount rate to be used in its discounted cash flow ("DCF") analysis. (Bloom Tr. 4285:17-4296:17, 4300:13-4304:24, 4824:6-25.)

### 2.    Duff's Preliminary Fairness Opinion

170.    On October 27, 2003, Duff provided GreatBanc with a preliminary opinion that the Transaction, as further negotiated, was fair to the ESOP from a financial point of view. (DX-250; DX-254; JX-37; Bloom Tr. 4349:6-4381:5.)

171.    Duff ultimately concluded that the $850 per share price was within the range of Antioch's fair market value, the consideration to be paid the selling shareholders was fair and reasonable to the ESOP, and the terms and conditions of the Transaction were fair and reasonable to the ESOP from a financial point of view. (JX-37 at D&P_A002726, D&P_A002735.)

### a.    *Analysis of Company Fundamentals*

172.    Duff & Phelps reviewed and analyzed Company-specific items such as the ownership structure of Antioch, the Company's historical share price trend, the state of the Antioch ESOP (including the aggregate balances of major accounts), and the Company's status as an S Corporation. (JX-37 at D&P_A002698-002701.)

173.    Duff also provided a detailed analysis of the strengths, opportunities and risks facing Antioch that it learned about through the course of due diligence. Specifically, Duff noted that the Company's brand and quality of its products and services, mission and culture, direct

sales network, and international growth were potential strengths and opportunities. On the other hand, Duff considered increased competition, digital computer and scanner technology, and potential saturation to be some of the risks facing Antioch. (JX-37 at D&P_A002711.)

     b.  *Analysis of Historical Financial Statements*

174. Duff reviewed the Company's audited historical financial statements for the fiscal years ended December 31, 1999 through 2002 and the Company's internally prepared latest-twelve-month ("LTM") period ended September 30, 2003 (the "LTM period"). Duff considered and analyzed the Company's historical revenue CAGR and EBITDA margins, among other items. Duff calculated key financial statement ratios, such as growth, profitability, activity, leverage and return on investment ratios for Antioch from 1999 through the LTM period. (JX-37 at D&P_A002712-002713, 2736-2738.) Duff also commented on Antioch's historical financial results relative to its peers, noting that, by a number of different measures, Antioch's results were consistent with or better than those of industry peers. (*Id.* at D&P_A002713.)

     c.  *Independent And Conservative Financial Projections*

175. Duff conducted detailed research, analysis, and due diligence of the industry and Company to develop its own set of independent financial projections. (JX-37 at D&P_A002707-18.)

176. Although Duff considered the ten-year projections provided by Antioch management not only to be "reasonable and reliable" but also to be conservative and to account further for potential industry and Company-specific risks such as competition, digital photography and technology,[8] market saturation, and international and new business expansion, Duff developed and used a set of projections that were lower than management's projections and

---

[8] In part based on Mr. Bloom's prior position as an equity research analyst in Duff's technology research group, prior to the Transaction he had specifically gained familiarity with emerging technologies in the area of photography. (Tr. 4929:14-4930:9.)

the Company's five-year historical experience. (*Id.*; Bloom Tr. 4294:4-4296:17, 4309:3-4311:24, 4365:25-4367:19, 4371:3-16, 4824:6-25, 4900:3-4901:2; Williams Dep. 112:16-114:25.)

177.    According to Mr. Bloom, company-specific risks should be reflected in downward adjustments to future cash flows, which is what Duff did when developing its independent financial projections. (Tr. 4286:3-4290:16, 4291:14-4292:3.)

178.    Duff projected five-year revenue and EBITDA CAGRs of 10.3% and 5.5%, respectively, compared to Antioch's actual five-year historical revenue and EBITDA CAGRs of 17.4% and 21.0%, respectively. Also, Duff projected the five-year average EBITDA margin for Antioch to be 17.8%, compared to Antioch's actual five-year historical average of 19.0%. (DX-668 at ¶ 94; JX-37 D&P_A002740.)   In particular, Duff reduced the growth projections for Antioch's new ventures and CM International, to account for the fact that these units were largely unproven.  (Bloom Tr. 4292:4-4295:8.)

179.    Based on Duff's concern that projections become inherently riskier as they extend further in to the future, Duff's revenue projections increasingly diverged downward from management's projected revenues for both the Transaction and internal company purposes in the later projection years (*i.e.*, from 2007-2013) Antioch management projected revenues of approximately $593 million in 2007, $667 million in 2008, $762 million in 2009, $847 million in 2010, $926 million in 2011, $993 million in 2012, and $1.053 billion in 2013. On the other hand, Duff used substantially lower projected revenues of approximately $580 million in 2007, $625 million in 2008, $670 million in 2009, $709 million in 2010, $745 million in 2011, $774 million in 2012, and $805 million in 2013. (DX-138 at HL006478-006479; JX-37 at D&P_A002740; PX-391A at 0043; Bloom Tr. 4901:7-4909:1.)

         d.    *DCF Analysis*

180.    One of the two generally accepted valuation methodologies that Duff performed was a DCF, which is a model that provides an estimate of the fair market value of a company based on its projected cash flows, discounted to present value. (JX-37 at D&P_A002714.)

181.    As described above, Duff developed a set of independent and conservative projections for the Antioch Company. Duff then discounted these projections to their present value equivalent by developing and applying a discount rate, or weighted average cost of capital ("WACC"). (JX-37 at D&P_A002717-18; Tr. 4286:3-4287:20.)

182.    Using the Capital Asset Pricing Model ("CAPM"), Duff developed a WACC range of 12% to 14%. In choosing this range, Duff assessed the industry, which required looking at the required rates of return on comparable companies (and adjusting based on the size of Antioch), as well as determining the estimated level of systematic risk to the Company, among other considerations. (*Id.*; DX-668 at ¶¶ 117-141; Tr. 4287:8-4291:12, 4377:22-4379:5.)

183.    As noted above, Duff accounted for Company-specific risks by lowering the Company's projections, which according to Lee Bloom, was and is the best way to account for company-specific risks in a DCF analysis. Duff therefore did not apply a company-specific risk premium ("CSRP") to its 12%-14% WACC because that would have amounted to inappropriate double-counting. (Tr. 4291:14-4296:17.)

184.    Based on negotiations between Antioch and GreatBanc as part of the Transaction, the Company agreed to make a contribution equal to 21% of eligible compensation to the Antioch ESOP in 2004. Duff assumed this 21% contribution could be used to repurchase shares from retiring and terminating ESOP participants, which would then be recycled to remaining participants in the ESOP. However, any future contributions beyond 2004 by the Company were discretionary. Despite this fact, Duff conservatively included this expense in every year of its

DCF analysis. All else equal, the inclusion of this expense every year after 2004 had the effect of lowering Duff's value conclusion. In other words, had Duff not assumed the Company would make a contribution to the ESOP equal to 21% of eligible compensation every year from 2005-2013, it would have arrived at a higher per-share value conclusion than it did because the Company would have had more free cash in years after 2004. (JX-37 at D&P_A002716; Tr. 4326:1-4330:6.)

185.    Using its conservative projections and a discount rate of 12%-14%, Duff calculated that the fair market value of Antioch ranged from $774 to $932 per share (and $845 per-share using a 13% WACC). (JX-37 at D&P_A002718.) Duff thus concluded that the $850 per-share price was within the range of fair market value for the Company. (*Id.* at D&P_A002726.) According to Mr. Bloom, it was the industry custom in 2003 and still remains the industry custom today to provide the ESOP trustee with a range of fair market value to determine whether or not a transaction price is consistent with fair market value. (Tr. 4919:16-4921:16.)

e.    *Comparable Company Analysis*

186.    As a check on the reasonableness of its DCF analysis, Duff also performed a comparable company analysis, which is a valuation methodology whereby the value of a private company like Antioch is estimated by comparing it to similar publicly traded companies. (JX-37 at D&P_A002714; Tr. 4330:7-20.)

187.    According to Lee Bloom, the best practice for a valuation professional is to perform two different analyses—a DCF analysis, and a comparable company analysis. The results from those two valuations should come out close to each other, and if not, it serves as a signal that one of the analyses is unreasonable and should be re-evaluated. (Tr. 4331:12-4332:21, 4369:12-4371:2.)

188.    Duff considered two comparable company groups, direct sales companies and retail craft/hobby companies, and found what Lee Bloom called a "good set" of public companies within these groups from which to select comparables. (JX-37 at D&P_A002719-2722, 2752-2767; DX-254 at D&P_A008637-8640, 8676-8691; Tr. 4330:7-4331:11.)

189.    Duff selected three direct sales organizations and five retail craft/hobby companies as comparables. (*Id.*) In selecting these eight companies, Duff considered, among other things, the business model, size, markets served and related product lines, and risk profile of Antioch versus other potentially comparable companies in the direct sales and retail craft/hobby industries. (*Id.*; *see also* Tr. 4335:6-4336:5.)

190.    The three comparable direct sales companies Duff selected were Avon Products ("Avon"), Blyth Inc. ("Blyth"), and Tupperware Corporation ("Tupperware"). In 2003, Avon manufactured and marketed beauty and related products; Blyth manufactured, marketed, and distributed a line of candles and home fragrance products; and Tupperware made and marketed household products. Although these products were not the same as the products Antioch sold, finding a perfect comparable company is very rare in valuation practice, and the consideration of these comparable companies was relevant and reasonable given their distinct and directly comparable method of selling their products. (*Id.*; *see also* Tr. 4892:7-4894:17.)

191.    The retail craft/hobby companies Duff selected were A.C. Moore Arts and Crafts, Inc., Hancock Fabrics Inc., Jo-Ann Stores Inc., Michaels, and Rag Shops Inc. In 2003, these comparable companies all offered products that shared similarities with those offered by Antioch. In fact, Michaels had recently opened two stand-alone scrapbooking stores and was anticipating opening several more in the coming year. (*Id.*)

192.     Once the comparable companies were selected, Duff compared the range of valuation multiples for the comparable publicly traded companies it selected with its DCF multiples, and concluded that the DCF multiples were generally below the range of valuation multiples for the publicly traded companies. This indicated that the $850 per-share price was fair, and if anything, too low—in other words, if the Transaction price was unfair to anyone, it was unfair to the selling shareholders, not the ESOP. (Tr. 4332:4-21, 4335:22-4336:5, 4379:6-4380:7.)

f.     *Analysis of Warrants and Put Price Protection*

193.     As stated above, the optional Package consideration consisted of $280 in cash, a subordinated note payable in the amount of $280, and one warrant valued at $290. To determine whether the Package was fair and reasonable to the Antioch ESOP, Duff analyzed whether the sum of the individual components of the Package was consistent with the value of the consideration it already determined was fair (*i.e.*, $850 per share) to the ESOP. (JX-37 at D&P_A002726-002734.)

194.     Duff concluded that the cash and note components of the Package were appropriately valued, but the warrants were under-valued, and therefore dilutive to the Antioch ESOP shareholders post-Transaction. (*Id.* at D&P_A002727-28; DX-668 at ¶ 168.)

195.     However, Duff calculated that the aggregate incremental economic benefit the ESOP would derive as a result of the Transaction over a ten-year period was approximately $1.6 million greater (or approximately $8.00 per share greater) than the dilution caused by the warrant component of the Package. (JX-37 at D&P_A002729-2731.)

196.     To protect participants who left the Company in the three years immediately following the Transaction (2004, 2005, 2006), and who would not yet have realized sufficient economic benefits from the tax savings the Transaction would generate to compensate for the

dilution caused by the warrant component of the Package, Duff and GreatBanc negotiated for the Put Price Protection terms. Duff determined that the PPP was economically necessary to remedy the dilution caused by the Transaction (and in particular the valuation of the warrant component of the package) in the years after the Transaction. (DX-250; JX-37 at D&P_A002732-2734; Tr. 4354:6-4360:5, 4380:8-4381:4.)

g.    *Consideration of the Projected Repurchase Obligation*

197.    Because the Company was redeeming the shares of terminated employees (purchasing them and retiring them into treasury), the future repurchase obligation of the Company had no effect on the per-share value of Antioch. (Tr. 4326:1-4327:23, 4330:2-6, 4389:10-4391:16.)

198.    However, as noted above, in its DCF analysis Duff conservatively assumed that the Company would make a contribution to the ESOP equal to 21% of eligible compensation every year from 2005-2013, which could be used in part or in whole to fund the repurchase obligation. This assumption had the effect of lowering Duff's per-share value conclusion.

199.    Duff also ran downside scenarios to test whether the Company could handle its debt obligations and repurchase obligation going forward if operations fell below expectations. (Tr. 4317:24-4325:25.)  Contrary to the projections used in Duff's DCF analysis, Mr. Bloom testified Duff did not (and he has never) performed a DCF valuation based solely upon downside revenue flows from a downside scenario, as there is "no basis" for using cash flows that are not the expected case, and "all that it could possibly do is give me a value that's too low." (Tr. 4393:24-4394:16.)[9]

---

[9] As discussed in more detail below, Plaintiffs' expert Robert Reilly erroneously uses downside revenue flows from two downside scenarios in two of his DCF valuations, which has the effect, in the words of Mr. Bloom, of producing "a value that's too low."

200.     Duff expressly recognized that the top ten account balances were currently valued in excess of $50 million, and that management estimated that 10% of active employees held over 80% of the shares in the ESOP. Duff concluded that from a cash flow feasibility perspective there was significant cushion for the Company to meet its obligations even if events in the future were not as reasonably anticipated, including a higher than projected repurchase obligation, or global operations falling below management's expectations. (JX-37 at D&P_A002699; Tr. 4363:4-4365:23, 4367:24-4368:15.)

### 3.     Duff's Further Diligence And Final Fairness Opinion

201.     Before finalizing its fairness analysis, and as noted briefly above, Duff met with Antioch's CFO Barry Hoskins on or about December 9, 2003 to obtain: (i) an update on the status of the proposed Transaction, and (ii) an update on Antioch's business and financial performance through November 2003 and any changes regarding future prospects. (JX-61; PX-154 at 00007-08; Tr. 4915:12-4916:4.)

202.     Mr. Bloom considered Mr. Hoskins forthcoming in response to the questions that he and his associate Julie Williams asked during the December 2003 meeting. (Tr. 4916:5-8.)

203.     Duff learned that although the Company's sales were below plan for nine of the eleven months completed in 2003, the Company was still expecting to exceed its 2003 profit plan by $2.5 million due to strong margins and aggressive expense management. In addition, Duff learned that the Company's balance sheet for the year would be much stronger than anticipated with the cash balance higher than forecast by $20 million. Mr. Hoskins also informed Duff that the 2004 revenue projection had been lowered from $425 million to $418 million. (*Compare* PX-154 at 00007 *with* PX-213 at 00008-13.)

204.     Duff also conducted an independent review of the interest rate environment and current public market prices and valuation statistics for public companies comparable to Antioch

as of December 9, 2003, and concluded that the changes in valuation multiples were immaterial and would not change the conclusions presented in the October 27, 2003 preliminary fairness report. (JX-61 at D&P_A005458-5459; Tr. 4916:9-4925:3.)

205.    Duff drew a final conclusion that the proposed Transaction price of $850 per share was within the range of fair market value of the Company as of the December 16, 2003 closing date, and that the estimated value of the warrants as of the December 16, 2003 closing date had not changed since the October 27, 2003 preliminary fairness report. (*Id.*)

206.    As a result, Duff issued its final fairness opinion to GreatBanc. (JX-62.) Duff stated that nothing had come to its attention during the scope of its analysis to suggest that it was not reasonable to rely on the information furnished by Company management, including management's projections and other business-related reports, and that Duff had exercised its independent judgment in using this information. (*Id.* at D&P_A005608.)

### 4.    Jenkens & Gilchrist's Legal Due Diligence

207.    Alongside GreatBanc and Duff, J&G conducted substantial legal due diligence of Antioch, including a review of the Company's finances, performance, corporate structure, employee benefits, human resources, intellectual property, vendor and supplier contracts; corporate contracts; and real estate holdings and lease arrangements, among other information. (DX-240; DX-326; PX-397.)

208.    J&G's October 24, 2003 Due Diligence Memo to GreatBanc summarized their detailed analysis regarding the Company, and included bolded and bracketed notes for items of interest or follow-up. As part of their due diligence, J&G conducted an in-depth review of the corporate minutes from 2002 and 2003 and financial statements for 2001 and 2002, making notes and comments for follow-up in areas such as financial performance, international markets, and inventory issues. (DX-240.)

59

209.    J&G's December 11, 2003 Due Diligence Memo to GreatBanc summarized their final due diligence findings, and included responsive bold and bracketed summaries of the analysis conducted and conclusions reached regarding the issues raised in the October 24, 2003 memorandum. (DX-326; Tr. 1091:25-1093:10)

### 5.    GreatBanc's Decision to Decline the Tender Offer

210.    GreatBanc did not blindly rely upon Duff or J&G. In addition to Ms. Marchetti directly participating in the due diligence meetings and investigation, GreatBanc worked closely with both Duff and J&G and stayed in contact with those advisors throughout the process. (Tr. 1123:6-1124:17.)

211.    GreatBanc's ESOP Committee, a multidisciplinary body made up of professionals of diverse professional backgrounds in areas of finance, law, ESOPs, businesses, etc. to consider GreatBanc's ESOP-related decisions, met at least three times to discuss the proposed Transaction and the analyses it received from its legal and financial advisors—October 13, 2003, October 27, 2003, and December 12, 2003. Members of GreatBanc's ESOP Committee were provided with Duff's presentations and analyses and J&G's due diligence memoranda in advance of their ESOP Committee meetings to assess the information. Lee Bloom and David Ackerman attended the ESOP Committee meetings to present and explain their reports, and to respond to questions from Committee members and if necessary revise the reports according to feedback received from the ESOP Committee. (DX-204; DX-240; DX-250; DX-253; DX-326; DX-327; JX-30; JX-31; JX-37; Marchetti Tr. 1211:1-1232:21; Bloom Tr. 4340:6-4360:21, 4381:25-4383:19.)

212.    GreatBanc carefully reviewed the analysis, methodology and assumptions used by Duff in assessing the Transaction at all stages, including the analysis of Company performance during the 12 months before the Transaction closed. (*Id.*; DX-185; JX-61; Tr. 1091:25-1095:17, 1231:14-1232:20.)

213.    During GreatBanc's ESOP Committee meetings, the ESOP Committee reviewed the detailed analysis presented by Duff page-by-page and was engaged in discussion and questioning with Duff's representatives. (Tr. 1214:11-1215:18, 1221:12-19, 1224:1-8, 4342:16-4343:17, 4349:25-4350:15.) Far from rubber-stamping Duff's analysis, the committee challenged Duff until it was satisfied that its questions had been answered. (DX-204; DX-250; DX-327; Tr. 1218:9-1219:22, 1228:1-10, 4340:6-4343:17.) The ESOP Committee also engaged with J&G regarding their legal due diligence findings. (DX-250; DX-327.)

214.    For example, during the October 13, 2003 meeting Mr. Bloom explained in detail the proposed terms of the Transaction and Duff's analysis and opinion that the Transaction as proposed was not fair to the ESOP from a financial point of view. (DX-204.) The GreatBanc ESOP Committee then engaged in a thorough discussion of how to structure a revised proposal and the various alternatives that would make the Transaction fair to the ESOP. (*Id.*) Likewise, during the October 27, 2003 meeting, the GreatBanc ESOP Committee examined and probed each page of Duff's preliminary fairness analysis (Tr. 1221:12-19) (*see also* 1216:1-7), and also engaged with Mr. Ackerman regarding J&G's legal due diligence investigation and the issues identified for follow-up. (DX-250.) And in the December 12, 2003 meeting, the GreatBanc ESOP Committee similarly probed and considered Duff's updated due diligence and analysis since the October 27, 2003 preliminary fairness report and the Company's recent financial performance, as well as the legal due diligence findings presented by Mr. Ackerman. (DX-327)

215.    Marilyn Marchetti testified that the Antioch Transaction was one of the most scrutinized, heavily discussed, heavily negotiated, and heavily analyzed transactions that was ever done at GreatBanc. (Tr. 1228:1-10.)

61

216. GreatBanc, Duff, and J&G also all reviewed and provided comments to the tender offer proxy materials. (Tr. 1226:15-1227:14.)

217. On December 12, 2015, after final and thorough discussion of the financial and legal affairs of Antioch, and full consideration of the expert opinions and analysis from Duff and J&G, GreatBanc's ESOP Committee voted to decline to tender the shares of the Company held by ESOP in response to the Company's tender offer. (DX-327; Tr. 4381:25-4383:19.)

**F. Houlihan Lokey Also Concluded That $850 Per Share Was Fair Value**

218. Duff and GreatBanc's conclusion that the $850 per share value used in the Transaction was fair is buttressed by the fact that Houlihan Lokey reached the same conclusion in its independent analysis of whether the consideration to be paid to the non-ESOP shareholders was fair from a financial point of view. (DX-87.) Plaintiffs do not dispute that Houlihan Lokey was an experienced and highly qualified valuation firm, recognized as one of the premier financial advisory firms in the ESOP industry. (DX-75; DX-87; Tr. 1111:19-1112:1, 1112:23-1113:12, 4046:23-4047:15, 4675:7-4679:10.) Houlihan went through the due diligence process alongside Duff, with its analysts attending many of the same meetings and receiving the same documents. (DX-88; DX-109; DX-112; DX-116; DX-117; DX-277 at HL000563; DX-745; PX-171; PX-174; Tr. 4565:11-4587:1, 4684:4-4703:21.)

219. Then, just like Duff, Houlihan went through the process of analyzing the data to determine whether $850 was a fair transaction share price. It concluded that the range of fair market value of Antioch spanned from $825 per share to $920, thus putting the $850 per-share price well within the range. (JX-40 at GBT00103; DX-278 at HL000550.) Houlihan also analyzed the Package of cash, notes and warrants and affixed a value range for the Package of $836 to $869, also encompassing the $850 per share value. (*Id.* at GBT00103; DX-278 at HL000550.) It therefore gave the opinion that the cash consideration and the Package

consideration to be received by the selling shareholders was fair to them from a financial point of view. (*Id.*) Although plaintiffs argue there were flaws in Duff's valuation and fairness conclusions through their expert Robert Reilly, they presented no evidence suggesting that Houlihan Lokey did anything wrong in reaching its valuation and fairness opinions.

220.    Like Duff, Houlihan constructed a written fairness analysis that provided a summary of the Transaction and its terms, a description of the due diligence performed by Houlihan, an overview of the Company's operations, history, and of the industry-specific conditions at the time. The analysis included Antioch's historical and projected financial statements, as well as other publicly available information. Also like Duff, Houlihan's analysis included both a DCF and a comparable company analysis. (DX-277.)

221.    After completing a diligence process to understand Antioch's management's financial projections, Houlihan determined that it could reasonably rely upon the Company's projections for valuation purposes. (Tr. 4544:25-4545:21, 4692:15-21, 4709:3-14.)

222.    Both Kreg Jackson and Terry Treemarcki, two Houlihan analysts who worked on the Transaction, testified that they have experienced situations in which the projections provided by a company in connection with a fairness opinion were not reasonable. (Tr. 4545:22-4546:22, 4709:15-4710:14.) In such cases, Houlihan's practice is to further diligence the projections in an attempt to understand them. (Tr. 4546:12-22.) If Houlihan is still uncomfortable with the reasonableness of the projections, it either attempts to persuade the company to alter the projections, or will simply not use the projections and forgo a DCF analysis. (Tr. 4709:15-4710:14.) With Antioch, Houlihan Lokey accepted the projections as reasonable and incorporated them into its analysis. (Tr. 4547:9-19, 4709:3-14.)

### 1. Houlihan's DCF Analysis

223. Houlihan used these projections to perform a DCF valuation. (DX-277 at HL000591.) Houlihan developed a WACC range of 10% to 12%—slightly lower than the WACC used by Duff (meaning that the future cash flows would be discounted less than in Duff's model yielding a higher enterprise and price share value for Antioch). (*Id.* at HL000591, 605.) However, Houlihan, unlike Duff, also included a CSRP of 3%, which had the effect of increasing the discount rate to a level more similar to Duff's. Thus, Houlihan, like Duff, concluded that the $850 per-share price was well within the range of fair market value of the Company, and in fact toward the lower end of that range. (JX-40 at HL000591.)

### 2. Houlihan's Comparable Company Analysis

224. Houlihan performed a comparable company analysis in addition to a DCF analysis, just as Duff did. (DX-277 at HL000586, 588-89, 607-16.) Jackson and Treemarcki testified that it is Houlihan's standard practice—and it is generally prudent, when valuing a private company—to use at least two valuation methods to determine a company's value. (Tr. 4611:13-4612:1, 4706:16-4707:1.)

225. Houlihan found five companies to use as comparables, and it described them in detail, detailing their similarities to Antioch in a number of categories such as sales strategy (*i.e.*, party-plan selling), number of sales representatives, sales representative growth rates, sales per representative, sales representative turnover, and average order size. (DX-277 at HL000582, HL000607-616; Tr. 4611:1-12.) Among those five companies were Avon, Blyth and Tupperware, three of the comparable companies used in Duff's analysis. (DX-277 at HL000607-616.). (DX-277 at HL000582.)

226. Like Duff, Houlihan assessed the range of valuation multiples for the comparable publicly traded companies it selected, and assigned to Antioch a DCF multiple that was below

the median multiple for the comparable companies. (*Id.* at HL000584.) This conservative valuation approach reflected a number of risks and threats to the Company, including increased competition in the industry. (*Id.*)

227. The comparable companies analysis yielded a per-share value of $820 to $888 per share. (DX-277 at HL000586.) Again, the $850 value used in the Transaction fell squarely within this range. The comparable company method's range was also highly similar to the range obtained through the DCF approach, particularly at the low end of the range. (*Id.*) This gave further assurance that Houlihan was valuing the Company appropriately.

### 3. Houlihan's Fairness Review Committee Approves Its Fairness Opinion

228. Before Houlihan issues any fairness opinion, the Houlihan team seeking to issue the opinion must present its analysis for scrutiny to Houlihan's Fairness Review Committee. (Tr. 4712:2-13.) The Committee is comprised of experienced, senior officers in Houlihan's fairness opinion practice group who are not part of the team that worked on the fairness opinion at issue. (Tr. 4587:14-4588:22.)

229. Houlihan's Fairness Review Committee approved the fairness conclusion reached by Houlihan's Antioch team and accordingly, Houlihan issued its fairness opinion to the Board. (DX-278; Tr. 4589:20-24.) Plaintiffs present no evidence that Houlihan did anything wrong in reaching its valuation opinion, and the valuation therefore serves as a contemporaneous data point indicating that the Company received adequate consideration when it paid $850 per share in the tender offer.

### G. The Testimony of Plaintiffs' Expert Robert Reilly and Defendants' Expert Jeffrey Risius Regarding Duff & Phelps's Analysis

230. Both plaintiffs and defendants offered expert testimony regarding Duff's analysis and conclusions.

65

1.      **Plaintiffs' Expert Robert Reilly**

231.    Plaintiffs' expert Robert Reilly testified that, based on his experience and expertise, he always found Lee Bloom to be a competent valuation professional. (Tr. 4046:9-22.) Reilly, however, testified that Lee Bloom and Duff's financial analysis in this case suffered from three "flaws." (PX-870; Tr. 3965:19-3966:21, 3994:13-17, 4033:17-4034:17.) Mr. Reilly did not provide any testimony or opinion regarding GreatBanc's prudence in relying upon Duff's conclusions.

a.      *Industry and Company Risks*

232.    Reilly described the so-called "first flaw" in Duff's analysis as a failure to properly account for three risks facing the Company at the time of the Transaction: (i) industry technological changes; (ii) industry consumer preference changes; and (iii) certain company-specific business trends involving its consultants. (Tr. 4066:23-4070:10, PX-870.)

233.    Other than the alleged failure to sufficiently account for these three risks, Reilly testified that he agreed with the rest of Duff's DCF analysis, including their adjustment for the risk of international and new business ventures. (Tr. 3931:1-3934:8.) Indeed, Reilly testified that ultimately the difference between his analysis and that of Duff could be characterized as "two reasonable and skilled analysts" reaching a different conclusion. (Tr. 4114:1-23.)

234.    The principal bases for Reilly's conclusion that Duff overvalued the Antioch stock pre-Transaction are: (i) industry research from 2003 that he found in 2015 indicating a growing scrapbooking industry but increased competition from larger retailers; (ii) a review of selected Antioch consultant sales and productivity figures from 2003; and (iii) a few unrecorded telephone calls of unknown length with Mark Mizen, Rhonda Anderson, and Richard Wiser more than ten years after the Transaction. (PX-870 at ¶¶100-131.) Mark Mizen, Rhonda Anderson, and Richard Wiser are all former Antioch employees who testified for plaintiffs at

trial, and Richard Wiser was not at the Company at the time of the Transaction and had no firsthand knowledge of what occurred prior to the Transaction. (Tr. 3578:12-3583:14.) Reilly did not have the benefit Duff did of interviewing management and other businesspeople at the Company in 2003. (Tr. 4074:12-15.)

235.    Reilly developed and ran five DCF analyses, four of which used significantly lower ten-year revenue projections for Antioch than Duff and one of which used a significantly higher discount rate than Duff. Mr. Reilly's adjustments resulted in significantly lower per-share value conclusions than the median $845 per share that Duff calculated. Reilly's per-share value conclusions from his five DCFs ranged from $315 per share to $590 per share. (PX-870 at ¶¶ 35-42, Exs. 14-20.)

236.    Reilly relied solely on the DCF method of valuation; he did not perform a comparable company analysis or any other analytical check on his DCF conclusions. (PX-870 at ¶155; Tr. 4127:9-13.)

237.    Reilly opined that the most reasonable and reliable per-share value of Antioch stock immediately prior to the Transaction is $500. Reilly acknowledged his 2003 valuation is lower than the 2002 fair market valuation of $680 per share (which he did not take issue with) and about equivalent to an independent appraiser's fair market valuation of Antioch stock in 2001 ($496 per share), a year when the Company had substantially less revenue, gross profit, EBITDA, and total assets than it had in 2003. (PX-870 at ¶¶ 41-42; JX-8 at GBT06809; Tr. 4171:1-25)

238.    Like Duff, Reilly used the Capital Asset Pricing Model to come up with an appropriate discount rate to use in his five DCF analyses. Reilly calculated a WACC of 13%, right in the middle of Duff's 12%-14% range. (Tr. 3968:11-3971:13; PX-870 at Ex. 19a.)

239. However, in the first of his five DCF models (the one that used Duff's independently calculated revenue projections), Mr. Reilly incorporated a 5% CSRP to his WACC calculation, resulting in an 18% discount rate to the ten-year cash flows he borrowed directly from Duff. (PX-870 at Ex. 19b.) Mr. Reilly's CSRP-based DCF was identical to Duff's except for the addition of this 5% CSRP, which alone had the effect of drastically lowering the per-share value conclusion (from $845 to $590). (PX-870 at Ex. 20; Tr. 3983:2-3984:12.)

240. Reilly testified that this 5% CSRP could be called the "Robert Reilly estimate"— it is not based on any specific formula or quantification of the specific risk factors he claimed Duff failed to sufficiently account for in its analysis, nor is it based on any generally accepted methodology. (Tr. 4150:15-4152:6.) He was unable to explain, on cross-examination, why he chose a 5% CSRP rather than, for instance, a 4% CSRP or a 6% CSRP, other than admitting it was "entirely a matter of [his] judgment." (Tr. 4151:5-9.)

241. In four of his other five DCF analyses, Reilly used his (and Duff's) 13% WACC calculation but applied the 13% WACC to significantly lower revenue projections than Duff used in its analysis. (PX-870 at Ex. 20.) Two of those four DCF analyses are labeled "FTI-1" and "FTI-2" because they borrow revenue projections derived from 10-year sales projections calculated by one of plaintiffs' other experts, Michael Buchanan of FTI Consulting. (Tr. 3960:15-3961:23; PX-870 at ¶132, Ex. 20.) Buchanan developed his 10-year sales projections using a hybrid that combined an autoregressive integrated moving average ("ARIMA") time-series statistical methodology for domestic sales, and a non-ARIMA based extrapolation from limited data for international sales. (Tr. 3709:19-22; PX-869.) ARIMA is a forecasting methodology that, in its classic form, is based only on past results; thus, a sales forecast based on a classic ARIMA methodology relies on past sales as the only input. Sophisticated ARIMA

analyses can introduce additional variables, but the method essentially uses past performance to forecast future performance.

242.    Reilly used Buchanan's ten-year projections for two of his DCFs—including FTI-1, which he determined was the most reasonable and reliable—despite testifying that he: (i) has never worked with Buchanan before and did not review or critique the data in Buchanan's report before using it in his analysis; (ii) could not recall a single engagement or transaction in his experience where ARIMA projections were used in the valuation of a company or its stock; (iii) and has never contracted for a statistician or other professional to use ARIMA to project corporate sales in any engagement or transaction he has worked on. (Tr. 4048:9-4051:21.)

243.    Moreover, every other witness who was asked—including members of Antioch management, Lee Bloom, the experts, and representatives of the Company's lenders—testified that they had never seen an ARIMA or ARIMA-type methodology used to project corporate sales for ten years in the future. (Blair Tr. 1944:19-1945:17, Moran Tr. 3154:2-3164:20, Buchanan Tr. 3700:3-3701:1, 3797:13-3801:17, 3804:10-19, Bloom Tr. 4387:3-4388:17, Risius Tr. 5867:6-5870:6, 5873:1-18, Jennett Dep. 219:19-220:14, Powe Dep. 32:22-24.) Nor had any witness seen ARIMA used to value a company in a transaction or to price a deal. (DX-668, at ¶ 203; Blair Tr. 1944:19-1945:17, Reilly Tr. 4050:1-4051:21, Bloom Tr. 4387:3-4388:17, Risius Tr. 5867:6-5870:6, 5873:1-18.)

244.    The greater weight of evidence showed that ARIMA, while useful for determining whether sales are trending in one direction or another, is not a reliable methodology to project sales revenue out for a multi-year period, as Mr. Buchanan did in this case (he has never used it to project out more than 5 years in the ordinary course of his non-litigation work). (DX-423; DX-424; DX-432; DX-441; DX-448; Tr. 1944:19-1945:17; 3154:2-3164:20.)

245.    Furthermore, Antioch did not have the software or capabilities for using ARIMA or econometric modeling at the time of the 2003 Transaction. (Tr. 3464:7-13, 3467:20-3468:1, 3654:16-24.)

246.    With respect to Buchanan's projections of international sales through extrapolation, Buchanan admitted that his analysis was based on incomplete data and that he does not know how the analysis might be affected by using the data he did not have. (Tr. 3834:24-3836:13.)

247.    With respect to Buchanan's overall approach—combining ARIMA projections for domestic sales and an extrapolation of how certain months compared to plan—Buchanan testified that this approach is not something he has ever seen before and is not a method he has personally applied in his work or used to perform services for a non-litigation client. (Tr. 3844:21-3845:19.)

248.    The other two DCF analyses in which Reilly applied his 13% WACC contain projections from two downside feasibility models that Deloitte prepared for the Company. They were contemporaneously labeled "Downside" and "Big Downside." (Tr. 4188:20-24; PX-870 at Exs. 15, 16, 20.)

249.    Despite his opinion that Duff's financial projections were too high and did not sufficiently account for certain industry and business-specific risks, Reilly was unable to identify any evidence that indicated the projections management provided to Duff were unreasonable— projections which he confirmed were materially higher than the projections Duff used for purposes of its fairness analysis. (Tr. 4147:14-19; 4117:11-4121:19; JX-37; PX-213.) Reilly also testified "I don't know that anyone was able to predict 2006 and 2007 because the company's results were a lot lower than any projection, any forecast indicated." (Tr. 3991:21-23.)

b.      *Reilly's Post-Transaction Valuation*

250.    Reilly testified that the so-called "second flaw" in Duff's fairness analysis was its post-Transaction valuation of Antioch. According to Mr. Reilly, Duff insufficiently considered the Company's projected repurchase obligation. (Tr. 3994:13-17.) Reilly opined that an appropriate consideration of the Company's projected repurchase obligation would have resulted in a per-share valuation immediately post-Transaction that was $32 lower than his $500 value conclusion (or $468 per-share), which he opined results in an additional $7.1 million dollars in economic damages suffered by ESOP participants. (PX-870 at ¶¶ 43-49.)

251.    Reilly relied upon repurchase obligation scenarios generated by plaintiffs' expert David Weinstock, a third-party administrator for Benefit Concepts Systems, Inc. (Tr. 4005:19-4006:6; PX-870 at ¶ 45.) As a first step, at the instruction of plaintiffs' counsel and without any explanation as to why, Reilly excluded from his analysis all of Weinstock's repurchase obligation scenarios based on the industry standard retirement age of 65. (PX-870 at ¶ 216; Tr. 4157:5-18.) Reilly then took Weinstock's remaining repurchase obligation scenarios chosen by plaintiffs' counsel, averaged them, discounted them to present value, concluded that Duff used a repurchase obligation projection that was $80 million dollars too low, and then deducted that full $80 million dollars directly from the Company's enterprise value immediately post-Transaction as determined by Duff. (PX-870 at Exs. 6a, 7, 21; Tr. 4157:19-4158:11.) Reilly made this $80 million dollar direct deduction, but made no concomitant reduction to the total number of outstanding shares that would have been purchased with the $80 million dollars he projected Antioch would need to redeem shares and retire them into treasury. (PX-870 at Ex. 21; Tr. 4160:22-4163:17.)

252.    Specifically, Reilly deducted $80,065,000 from Duff's post-Transaction enterprise value estimate of approximately $395 million, made numerous other deductions and

additions that Duff had also made, and arrived at a "Corrected Fair Market Value of Common Equity" of $104,056,000. Reilly then divided this figure by the number of fully diluted common shares outstanding immediately after the Transaction (222,547) to arrive at a per-share value of $468. Reilly thus decreased the Company's enterprise value by $80,065,000 for the projected future repurchase of ESOP participant shares, without accounting for the fact that the Company could not incur a repurchase obligation of that amount without a corresponding reduction in the number of shares which would be purchased and retired into treasury in exchange for the $80,065,000. (*Id.*)

253. Reilly admitted that no other valuation professional in this case—Houlihan, Duff, Business Valuations, Inc. ("BVI") (which appraised the Company's stock at the end of 2002), or Prairie Capital (which appraised the Company's stock at the end of 2003)—accounted for the projected future repurchase obligation in this manner in their contemporaneous, non-litigation based, valuations of Antioch. (Tr. 4164:22-4165:19.)[10]

## H.   Defendants' Expert Jeffrey Risius

254. Defendants' expert Jeffrey Risius (a managing director at Stout Risius Ross ("SRR")) offered opinions regarding the analysis and valuation work performed by Duff, as well as Reilly's criticisms of that work. (DX-667; Tr. 5688:4-5931:24, 6111:23-6138:6.) Plaintiff Evolve retained SRR in 2008 to conduct a "peer review" of Prairie Capital's year-end 2007 valuation for Antioch. (New Dep. 48:3-17.) Michael New of Evolve testified that Evolve engaged SRR because they have "one of the best reputations in the ESOP valuation world" and had a reputation within the ESOP community as "the best game in town." (*Id.* at 48:22-50:9.)

---

[10] Reilly opined that the "third flaw" in Duff's analysis was an insufficient consideration of IRC Section 409(p). (Tr. 4033:17-4034:17.) However, Reilly testified that he was giving no opinion that Duff's alleged "third flaw" damaged the Company or the ESOP in any way. (Tr. 4165:20-4166:8.) Nor could he, given the fact that the Company never violated section 409(p), and was able to effectively manage the issue. (Morgan Tr. 2167:12-2168:6.)

Mr. New similarly lauded SRR in 2008 when recommending Antioch hire SRR, stating that "SRR has the reputation of being the best in the ESOP industry." (DX-585; New Dep., 49:13-50:13.)

### 1.    Opinion Regarding Duff's Analysis and Opinions

255.    Risius opined that based on his review of the Duff work files and reports, as well as his own independent analyses and market research, all aspects of Duff's process for reaching its fairness and valuation opinions were methodologically sound and customary, and were reasonable and appropriate, and that Duff's methodology and valuation opinions were conservative based on what was known or knowable as of the Transaction date. (Tr. 5710:17-5711:18; DX-668 at ¶¶ 64-174.)

#### a.    *Duff's Due Diligence*

256.    Risius opined that Duff appropriately provided a detailed initial information request and supplemented it with numerous interviews with financial and nonfinancial management and employees, as well as in-depth independent market and industry research. Through this process, Duff familiarized itself with the Company's strengths, weaknesses, opportunities, and threats—all of which were factored into its valuation and fairness analysis. Risius also concluded that Duff was not restricted in any way with respect to the information gathering process. (DX-668 at ¶¶ 70-78; Tr. 5716:23-5721:20, 5729:19-5730:22.)

#### b.    *Duff's Analysis Of Company Fundamentals*

257.    Risius opined that Duff appropriately considered the major strengths, weaknesses, opportunities, and threats to Antioch—including risks such as competition, digital photography and technology, market saturation, and international and new business expansion. Risius further opined that based on his independent analysis of the industry and market at the time of the

Transaction, Duff may have actually overstated the risk of digital photography to the Company. (DX-668 at ¶¶ 79-83; Tr. 5716:23-5721:20, 5729:19-5730:22.)

### c. *Duff's Analysis Of Historical Financial Statements*

258.     Risius opined that analyzing historical financial statements helps a valuation professional better understand and interpret the earning power of the subject company, which is usually the most important element of a business valuation. Risius concluded that Duff appropriately reviewed the Company's audited historical financial statements from 1999 through the latest-twelve-month period of 2003, and carefully considered and evaluated such metrics as historical revenue CAGR and EBITDA margins, as well as key historical financial statement ratios. (DX-668 at ¶¶ 84-88.)

### d. *Duff's Financial Projections*

259.     Risius testified that at the time of the Transaction, management had demonstrated a long historical track record of preparing "down the middle" reasonable projections compared to actual results, which he studied from the perspective of both one and two years out. Moreover, Risius noted that at the time of the Transaction other contemporaneous advisors and lenders concluded that management's future projections were reasonable. Risius opined that Duff nonetheless independently developed and relied on significantly lower projections than both management's projections and the Company's historical results suggested would be achieved, adjusting them downward for industry and company-specific risks. Risius opined that his own independent analysis, industry research, and valuation work suggested Duff's downward adjustments contributed to a very conservative valuation of Antioch (*i.e.*, a lower per share value). In Risius's expert opinion, Duff therefore applied a methodologically sound approach to developing its own set of conservative financial projections that were reasonable and appropriate. (DX-668 at ¶¶ 89-112; Tr. 5734:3-5750:10, 5756:6-5779:11, 5783:25-5785:3.)

## 2. Duff's DCF Analysis and Comparable Company Analysis

260.    Risius opined that Duff reasonably applied a methodologically sound DCF analysis in developing its fairness and valuation opinions. (DX-668 at ¶¶ 114-143.) In addition to his opinion that Duff's financial projections were reasonable and conservative, Risius testified that Duff's determination of an appropriate discount rate or WACC was likewise reasonable, conservative from a valuation perspective, and methodologically sound. (DX-668 at ¶¶ 117-143; Tr. 5785:4-5808:2.)

261.    Risius reviewed Duff's work papers and analysis and concluded that Duff derived its WACC in the range of 12% to 14% by a methodologically sound application of the commonly used CAPM formula. (*Id.*)

262.    Risius also conducted his own independent analysis and calculation of the WACC to use in a DCF for purposes of valuing the Antioch stock prior to the Transaction. Risius concluded that an appropriate WACC would have been 11.9%, which is below the 12% to 14% range Duff used in its DCFs, and all else equal results in a higher per-share fair market value than Duff's upper range figure of $932 per share. (*Id.*)

263.    Risius further opined that based on Duff's significantly lower projections compared to management and the general optimism surrounding the scrapbooking industry at the time of the Transaction, in his expert opinion Duff's 0% CSRP was appropriate. Similar to Mr. Bloom, Risius testified that to apply a CSRP of any percentage to Duff's independently downward adjusted revenue projections would have amounted to a methodologically improper double-counting of risk, a "textbook" or "classic . . . double-count of risk," which would produce an artificially low and unsupportable value conclusion. (Tr. 5796:22-5802:9; DX-668 at ¶¶ 133-134, 212-223.)

264.     Risius also testified that, if Reilly had used the quantitative formula for calculating a potential CSRP from a preeminent valuation treatise by Shannon Pratt (which plaintiffs admitted into evidence) rather than selecting a CSRP based on what was essentially his own gut feeling, he would have reached a conclusion similar to Duff's and Risius's. (PX-979; Tr. 5994:17-5998:4; 6118:6-6127:18.)[11]

265.     Risius further opined that Duff's valuation was also conservative because Duff included in its DCF analysis a projected benefit expense equal to 21% of eligible compensation every year from 2005-2013, which the Company was not obligated to make, and which all else equal had the effect of lowering Duff's per-share conclusions of value. (DX-668 at ¶¶ 91, 110.)

266.     Moreover, Risius testified that Duff was additionally conservative in its value conclusions because it did not account for the approximately $20 million dollars that the Company had on its balance sheet as a non-operating asset from the cash surrender value of corporate owned life insurance ("COLI"). Inclusion of this $20 million dollars would have increased Duff's value conclusion. (DX-668 at ¶ 160; Tr. 5824:12-5826:6.)

267.     In addition to Duff's DCF analysis, Risius also concluded that Duff reasonably used a methodologically sound comparable company analysis to confirm that its DCF-driven valuation was reasonable and conservative. (DX-668 at ¶¶ 145-159; Tr. 5808:22-5824:11.)

268.     Risius testified that it is customary and prudent for a valuation professional to use a comparable company analysis as a check on the reasonableness of a DCF valuation, like Duff did. The comparable company method serves as a "market reality check" to make sure the DCF conclusions are supportable and reasonable. (Tr. 5816:3-25.) Risius noted in relevant part that in selecting its comparable companies, there was only one company that Duff used in its analysis

---

[11] Mr. Reilly did not use or refer to the quantitative, more objective CSRP formula developed by Mr. Pratt in his treatise. Mr. Pratt is a recognized valuation expert. (Risius Tr. 5994:17-5995:6, 6126:2-7.)

that was not also used by other financial analysts valuing the Company at or around the same time and outside the litigation context, which included Houlihan, BVI, and Prairie Capital. (DX-668 at ¶ 150.)

269.    Although Risius determined that Duff's analysis was reasonable and methodologically sound, he also conducted his own independent comparable company analysis using the broader group of companies than Duff, Houlihan, BVI, and Prairie Capital did in their comparable company analyses. (DX-668 at ¶¶ 145-159, Ex. B; Tr. 5817:1-5824:11.) Even though Risius used a broader set of comparable companies than Duff, he too concluded that the EBITDA multiple implied by Duff's DCF analysis was at the low end of the range of EBITDA multiples for the comparable companies, demonstrating that Duff's DCF value conclusions were reasonable and conservative. (*Id.*)

270.    Based on Risius' independent research, review of the record, and DCF and comparable company analyses, he concluded that $850 per-share was at the "very low end" of the range of fair market value for Antioch stock at the time of the Transaction. (Tr. 5824:12-5829:12, 5832:7-5834:16.)

a.    *Duff's Analysis of the Package Consideration and PPP*

271.    Risius opined that based on his review of Duff's analysis of the individual components of the Package, he concluded that all the methodologies, inputs, and assumptions Duff used were based on commonly accepted methodologies, were reasonably selected and were appropriately applied. (DX-688 at ¶¶ 166-174; Tr. 5834:18-5837:10.)

272.    Risius also concluded that Duff reasonably and appropriately negotiated for the PPP provisions as a benefit for the Antioch ESOP to protect participants who left the Company in the three years immediately following the Transaction, and who would not yet have realized the economic benefit of the Transaction to the Company (in particular the tax savings) that Duff

77

determined counter-balanced the per-share dilution caused by the warrant component of the Package. (*Id.*)

      b.    *Duff's Consideration of The Projected Repurchase Obligation in Post-Transaction Valuation*

273.    As noted above, Duff considered Antioch's post-Transaction obligation to repurchase shares of departing employees to test the feasibility of the Transaction in a downside scenario analysis—in other words, to test whether Antioch would be able to meet its obligations, including its repurchase obligation, if its future operations fell short of reasonable expectation.

274.    From a feasibility perspective, Risius concluded that Duff appropriately ran downside scenarios to test whether the Company could handle its debt obligation and repurchase obligation going forward if Antioch's performance fell below the expected outcome. (DX-668 at ¶ 111, 252 n. 215; Tr. 5837:11-25.) (*See also* Bloom Tr. 4324:14-4325:25.) It is clear that there was a significant cash cushion available to the Company to meet its obligations if future events did not turn out as Duff reasonably anticipated post-Transaction.

275.    Like all of the valuation professionals in this case, and unlike Mr. Reilly, Duff did not account for Antioch's projected repurchase obligation in its calculation of the Company's post-Transaction value. From a valuation perspective, Risius agreed with Mr. Bloom that it is improper to account for a company's projected future repurchase obligation when that company is redeeming shares of departing ESOP participants at fair market value, as the Antioch Company did before and after the Transaction. This is because share redemption at FMV inherently has no per share valuation impact.[12]

---

[12] In 2004, the Company also amended the Plan to allow for a short time a method of dealing with the repurchase of shares from retiring and terminating participants referred to as "ESOP recycling." Like redeeming shares, this methodology also had no impact on per-share valuation nor on the Company's aggregate equity value, as the Court will discuss further below.

276. By way of illustration, Risius demonstrated that if a company's aggregate equity value is $100 and that equity is divided equally among 10 shares, each share is worth $10.00. If an employee of that company with one share retires and the company repurchases that share for $10 dollars and retires it to treasury (i.e., redeems the share as Antioch did), the company would be left with an aggregate equity value of $90 divided equally among 9 shares – each share would still be worth $10 even though the company's total equity value decreased as it typically does in a redemption at fair market value. (DX-668 at ¶ 227; Tr. 5880:13-5882:22.)

277. In sum, Risius concluded that as it relates to the financial and valuation analysis prepared by Duff and presented to GreatBanc as part of its final fairness opinion: (i) the information used by Duff was adequate; (ii) the valuation methodologies employed by Duff were appropriate and properly applied; (iii) the projections used by Duff were reasonable based on what was known or knowable at the time of the Transaction; (iv) the primary inputs and assumptions used by Duff in its application of its valuation methodologies were reasonable; (v) the framework used by Duff to assess fairness from a financial point of view to the Antioch ESOP was methodologically sound; and (vi) the calculations in the Duff valuation models were accurate. (DX-668 at ¶ 174.)

**3.     Risius's Rebuttal to Reilly's Critique of Duff's Analysis and Opinions**

278. Risius also testified that based on his review of Reilly's report and supporting documents, Reilly's conclusions are unreasonable and unreliable, and the Antioch ESOP suffered no damage as a result of the Transaction. (DX-668 at ¶¶ 23-26, 175-281, 283; Tr. 5711:19-5712:13.)

a.     *Risius's Rebuttal to Reilly's So-Called "First Flaw" Opinion*

279. Risius opined that Duff accounted for all the company- and industry-specific risks it identified in its valuation and fairness analysis, in addition to the Company's significant

strengths which Reilly ignored in his analysis. Risius explained that Duff uncovered Company and industry-specific risk factors in its extensive due diligence process, which it then took into account through its conservative financial projections and a discount rate (WACC) based on economic, industry, and company-specific factors. (DX-668 at ¶¶ 181-190; Tr. 5716:23-5721:20, 5785:4-5788:2.) Risius opined that valuation analysts simply do not make line-item deductions from value for each and every risk facing the Company as a matter of customary practice, but that risks are customarily and properly accounted for in exactly the way the Duff accounted for them in its valuation analysis. (*Id.*)

280.    Risius pointed out that Reilly's report contained virtually no citations to the factual record for his assertion that Duff's financial projections were unreasonable based on what was known or knowable at the time of the Transaction, and asserted that Reilly does not present a single source that projected the scrapbooking market to decline as of December 2003—rather, industry research from December 2003 shows just the opposite. (DX-668 at ¶¶ 83, 103-109, 189-190; Tr. 5768:12-5779:11.) The new ventures into the scrapbooking arena in 2003 from large competitors such as Michael's also belie Reilly's contention that a decline in the scrapbooking industry could have been reasonably foreseen in 2003. (*Id.*)  There was increased competition in the scrapbooking industry because the prevailing wisdom was that the industry was growing.

281.    Risius also opined that four of Reilly's DCF models are flawed because they are based on unsupportable cash flow projections, and Reilly's fifth DCF model is flawed because it incorporated a methodologically unsupportable 5% CSRP. (DX-668 at ¶¶ 192-223; Tr. 5862:8-5879:21, 5796:22-5802:9.) Risius asserted that the two DCFs which use revenue projections from two of Deloitte's downside models are methodologically unsound, as those projections were not reasonably expected base case results and were not prepared for purposes of valuation

analysis (the evidence is that they were prepared for feasibility purposes and had the valuation of $850 as an input), which makes them inappropriate for use in a DCF analysis. (DX-668 at ¶¶ 193-196; Tr. 5862:8-5867:5.) (*See also* Tr. 1556:16-1559:7.)

282.    Risius also opined that the two DCFs based on revenue projections derived from the projections prepared by plaintiffs' expert Michael Buchanan were similarly unsupportable, citing among other things (i) the deposition testimony from Richard Wiser and Alan Luce that it is inappropriate to use ARIMA to project corporate sales ten years in the future, and (ii) the fact that no other market participants involved with the Company before or after the Transaction used ARIMA in their financial analyses and projections, including Deloitte, Duff, Houlihan, BVI, or Prairie Capital. (DX-668 at ¶¶ 197-209; Tr. 5867:6-5873:18.)

283.    Risius asserted that he has never relied upon or seen other valuation financial advisors or market participants rely upon the ARIMA statistical forecasting techniques Reilly relies upon from Buchanan. (DX-668 at ¶ 203; Tr. 5869:12-5870:6, 5873:1-18.) And as noted above, Risius also concluded that Reilly's fifth and final DCF analysis was likewise methodologically unsound because the discount rate incorporated a completely subjective and unwarranted 5% CSRP applied to Duff's already risk-adjusted revenue projections. (DX-668 at ¶¶ 212-223; Tr. 5796:22-5802:9.)

284.    Had Mr. Reilly undertaken a comparable company analysis, it would have indicated that the values for Antioch derived from his DCFs were unsound.  (Risius Tr. 5814:6-5815:18; 5821:13-5824:11; DX-668 at Ex. B; JX-37 at D&P_A002722.)

285.     Risius opined that the unreliability of Mr. Reilly's DCF value conclusions is underscored by the fact that they are materially lower than all other indications of fair market value that existed around the date of the Transaction, such as Duff's median valuation of $845

and Houlihan's low range valuation of $825 and high range valuation of $920. Risius concluded that Reilly's analysis is unduly influenced by hindsight bias. (DX-668 at ¶¶ 219-222; Tr. 5875:2-5878:20, 5887:23-5888:16, 5900:8-5901:12.)

       b.    *Risius's Rebuttal to Reilly's so-called "Second Flaw" Opinion*

286.    Risius testified that Reilly's "second flaw" analysis is incorrect and even contrary to Reilly's own writings on the topic. As stated above, Risius explained that when a company is redeeming the shares of ESOP participants at fair market value (as Antioch did before and after the Transaction), it is well-established that there is no impact on the per-share value of the company. Risius pointed out that Reilly himself acknowledges this well-established principle in his writings. Thus, Risius opined that Reilly's deduction of the projected repurchase obligation of the Company from its post-Transaction enterprise value was inappropriate. (DX-668 at ¶¶ 224-237; Tr. 5880:13-5887:22.)

287.    From a feasibility perspective, Risius also testified that even when using the future repurchase obligation projections from Weinstock—which defendants' expert Richard May opined are methodologically unsound and also unreliable based on what was known or knowable as of the Transaction date (as the Court will discuss further below)—the tables appended to Reilly's report show that there would *still* be positive cash flow in the Company for the three years following the Transaction. (PX-870 at Ex. 6; DX-668 at ¶ 240; Tr. 5838:3-5847:20.)[13]

---

[13] Risius did not offer any rebuttal opinion on Reilly's "third flaw" other than noting that opinion has no alleged damages associated with it and is based on assumptions and assertions by Reilly with no supporting facts or data. (DX-668, at ¶ 238.) Marilyn Marchetti also testified that, based on her experience seeing over 250 valuations a year, she has never seen a valuation that applied a risk factor in light of potential IRC section 409(p) violation risks, as Reilly suggests Duff should have done. (Tr. 1228:23-1229:25.)

## I.      Post-Transaction Events

### 1.      The Fair Market Value of Antioch Stock From 2003-2006

288.    Following the Transaction, the fair market value of Antioch stock continued to rise. (Morgan Tr. 1970:22-25; Moran Tr. 2650:16-20.)  The independent valuation firm Prairie Capital determined that the fair market value of Antioch stock was $894 per share as of December 31, 2003 (two weeks after the Transaction closed at $44 less per share).  A year later Prairie Capital determined that the fair market value of Antioch stock had risen even higher, to $943 per share as of December 31, 2004. (JX-74.) In other words, terminating employees in 2004 (entitled to the year end 2003 price) and 2005 (entitled to the year end 2004 price) received greater value per share than the non-ESOP shareholders in the Transaction. The year-end 2005 fair market value of Antioch stock dropped to $786 per share (DX-462), and again to $725 per share at the end of 2006. (JX-80 at P-WOOSLEY-000106.)

### 2.      The Company's Management of the Repurchase Obligation

289.    In the years after the Transaction, the Company experienced much larger than predicted levels of share redemptions. In 2004 alone, departing ESOP employees put approximately $109 million in ESOP shares to the Company. (JX-75 at P-WOOSLEY-000072.)

290.    No evidence exists that the increased number of shares put were caused by any Transaction term, by the PPP or by the Plan Amendment and change in distribution policy made in conjunction with the Transaction.

291.    Defendants' expert Richard May testified that prior to the Transaction, the Company had followed best practices by focusing informed and detailed attention on its repurchase obligation, which included not just using state-of-the-art software and analysis of historical behavior to project what the future repurchase obligation might be, but perhaps more

importantly, implementing all of the best cash management planning tools. (DX-667 at 10-15; Tr. 5308:6-5427:17, 5359:15-5373:13.)

292.    As to projecting what the amount of the repurchase obligation might be in the future after the Transaction, May explained that although the total repurchase obligation of a 100% ESOP owned company is 100% of its value (since the Company has an obligation to buy back all the shares of ESOP participants when they terminate employment), the goal is to estimate what the reasonably expected amount of the repurchase obligation will be each year. In other words, what the reasonably anticipated amount of cash is that the Company will need each year to pay retiring and terminating ESOP participants for their shares of Antioch stock. (DX-667 at 5-8; Tr. 5287:3-5289:11.) May opined that the Company reasonably and adequately projected its future repurchase obligation by tasking the correct person (CFO Barry Hoskins) who was specifically qualified to prepare the studies and did so according to best practices at the time, and also by employing the best tools available.[14] (DX-667 at 10-14; Tr. 5308:6-5327:17.) Unlike projecting corporate sales, May explained that projecting a future repurchase obligation is much more difficult given that it depends on many inherently unpredictable variables, including the unpredictable choices of individual employees about whether to retire or leave the

---

[14] May also opined as to why the repurchase obligation projections presented by Plaintiffs' expert David Weinstock, as contrasted to the Company's repurchase obligation projections, were inherently unreasonable and methodologically unsound and unreliable. May explained that Weinstock's repurchase obligation projections suffered from many flaws, principally that they used unsupportable assumptions which drastically deviated from the Company's historical experience and what might reasonably be expected to happen in the future as of 2003. For example, May demonstrated that Weinstock's assumptions were disconnected from reality and, at times, not supported by any historical experience or facts either before or even *after* the Transaction (*e.g.*, in some scenarios Weinstock predicted more than 50% of all employees would leave Antioch the very first year after the Transaction—which was unreasonable to assume in 2003, and in reality did not come close to happening in 2004.) (DX-667, at 43-48; Tr. 5395:23-5421:4.) In fact, it appears many of Weinstock's assumptions were dictated by Plaintiffs' counsel and Plaintiffs' expert Robert Reilly, none of whom are a repurchase obligation expert nor qualified to conduct repurchase obligation studies. (DX-634; DX-639; DX-641; Weinstock Tr. 3348:2-3349:11, 3360:23-3364:25; Reilly Tr. 4158:13-21.)  To the extent that Weinstock's opinion is in conflict with May's, the Court finds May's opinion more credible, based both on its substance and on May's superior qualifications. (*Compare* May Tr. 5245:2-5278:6 *with* Weinstock Tr. 3316:20-3324:1.)

Company—which can and does change from month-to-month and year-to-year, based on their own unique personal and professional situations.[15] (DX-667 at 5-8, 15; Tr. 5294:15-5297:15.)

293.     May opined that although the repurchase obligation of the Company exceeded the forecasted projections in the three years after the Transaction—most drastically the $109 million obligation in 2004—that level of repurchase obligation was impossible to predict based on the historical data and the information known or knowable as of the Transaction date, as well as the numerous deterrents and disincentives to employees leaving the Company, such as the tax penalties for early access to the retirement account value and the desire to maintain salaried employment. (DX-667 at 15-23; Tr. 5327:20-5359:12.)[16]

294.     May explained that the unusually large repurchase obligation was not caused by a "stampede" of employees leaving the Company (the employee turnover percentage was consistent with historical experience, and fewer employees left in 2004 and 2005 than in 2001), nor by any aspect of the Transaction, including the PPP terms or the Plan Amendment allowing those under the age of 50 to begin receiving 20% of their distributions right away. (*Id.*) Weinstock and plaintiff Monica Woosley both testified that the PPP terms alone would not have caused any employee to leave the Company. (Tr. 2610:21-2615:23, 3366:13-24.) Rather, May explained the unusual repurchase obligation was caused by an unpredictable change in behavior of a small group of high-share-balance employees. (DX-667 at 15-23; Tr. 5327:20-5359:12.)

295.     But even though the Company was faced with this unprecedented and unpredictable repurchase obligation, Antioch was able to handle it and thrive because it had

---

[15] Additionally, Karen Ng testified that she does ***not*** advise her clients to investigate whether particular high-balance ESOP participants are considering retiring because, in her experience, (a) the information participants provide in response to such inquiries is unreliable, and (b) participants might get nervous and wonder why they are being asked.  (Ng Dep. 254:24-255:12.)
[16] Indeed, May noted that Plaintiffs Bonnie Fish, Chris Mino, and Monica Woosley, along with numerous other employees such as Mark Mizen and Rhonda Anderson, chose not to terminate their employment following the Transaction because they loved working for the Company and were not ready to end their careers and stop receiving a steady paycheck. (DX-668, at 17 n.32; Tr. 5342:21-5343:12.)

prudently implemented a set of cash management tools. One such tool that Antioch implemented was pre-funding the future repurchase obligation by building up cash inside the ESOP through distributions made from the Company over a number of years. (Hoskins Sep. 15, 2011 Dep. 80:4-15.) As of the date of the Transaction, the Company had built up approximately $67 million dollars of cash inside the ESOP. (DX-667 at 25.) This cash could be used to fund repurchase obligation payments through a method referred to as "ESOP recycling"—where a share in the ESOP from a terminating or retiring participant (*e.g.*, an $894 dollar share) is exchanged for another asset in the ESOP of the same value (e.g., $894 in cash). (DX-667 at 25-26; Hoskins Sep. 15, 2011 Dep. 80:4-15, 82:12-85:8; Tr. 5307:24-25.).

296. As May and numerous other witnesses explained (including Weinstock and Reilly), this is a common method of handling the repurchase obligation that has no impact on the per-share value of the company's stock. (DX-667 at 25-26, 42-43; Blair Tr. 1638:11-1639:15; Weinstock Tr. 3367:2-3; May Tr. 5301:18-22, 5305:20-5307:3, 5367:23-5369:13; Risius Tr. 5893:19-5895:23; Reilly Tr. 6209:2-23, 6211:18-6212:22.)[17]

297. Additionally, changing the distribution policy to pay all employees who left the Company for their shares with an initial 20% lump sum and the remaining 80% with a promissory note over the following four years, rather than making an immediate lump-sum distribution, had the effect of improving Antioch's ability to manage the repurchase obligation (even though the distribution policy change was not implemented for that purpose). (DX-667 at 27-30; May Tr. 5361:2-5367:10.) As noted above, the Company also procured COLI which

---

[17] May additionally explained, as Lee Bloom and Jeffrey Risius also testified, that redeeming shares at fair market value also has no impact on the per-share value of a company's stock. (DX-667 at 38-39; Tr. 5302:8-5305:11.) Plaintiffs have persistently argued that participants were damaged by the company's recycling in 2004 and plaintiffs should be able to recoup these funds, but after hearing all the evidence, the Court is unable to see the sense in their position—the cash in the ESOP was paid to participants, which is to say it was used to fulfill the purpose of an ESOP. It is not fairly characterized as an amount in which the ESOP was damaged.

could have been surrendered for approximately $20 million in 2004 to help fund the repurchase obligation. (DX-667 at 26-27; Tr. 5369:14-5370:22.)

298.    By using a portion of the cash built up in the ESOP and changing the distribution policy, May explained that of the $109 million dollar repurchase obligation in 2004, the Company only had to pay approximately $13.1 million in cash above the planned 21% ESOP contribution to the terminating employees. (DX-667 at 30-31; Tr. 5370:23-5373:13.)

### 3.    Bank Refinancing

299.    By the end of 2004, the Company was also approximately $30 million ahead of its planned debt repayment schedule, and in compliance with all loan covenants as of December 31, 2004. (DX-668 at ¶ 247; JX-75 at P-WOOSLEY-000078, 86.) The Company had the second highest revenues and gross profits in history, and as noted above, by year-end 2004 the fair market value of Antioch stock had risen to $943 dollars per-share. The Company met all of its repurchase and cash obligations, and there were no defaults on any of its loans. (*Id.*; DX-667 at 24; Hoskins Sep. 15, 2011 Dep. 185:8-186:11.) The total debt on Antioch's balance sheet fell from $180.3 million in 2003 to $154.2 million in 2004, despite the issuance of approximately $34.9 million of promissory notes to ESOP participants who left the Company. (JX-75 at P-WOOSLEY-000078; Risius Tr. 5901:20-5908:5.)

300.    In 2005, despite the cash outflows associated with the Company's repurchase obligation in 2004, Antioch refinanced and paid off its loans formerly held by the 2003 lenders with a syndicate of three banks led by National City Bank (the "2005 Refinancing".) (DX-414.)[18] The 2005 Refinancing not only committed millions of dollars of new money to the Company, but also contained less restrictive financial covenant terms compared to the 2003 financing, with all

---

[18] LaSalle Bank and Fifth Third Bank were the two other lenders that joined National City Bank in the 2005 Refinancing.

other major terms remaining constant. (DX-406 at HL050973; DX-668 at ¶ 249; Blair Tr. 1640:20-1641:12; Hoskins Sept. 15, 2011 Dep. 218:14-219:25; Sanan Dep. 195:1-21; Jennett Dep. 94:12-95:6.) Further, the reduction of lenders from seven to three benefited the Company, as less coordination would be required for any future negotiations with the bank. (DX-419 at MOR0011476; Tr. 1643:2-1644:5; Bevelhymer Dep. 188:9-189:7; Hoskins Sept. 15, 2011 Dep. 185:8-188:20, 218:14-219:25.)

301. Before agreeing to the 2005 Refinancing, the lenders performed independent credit analyses regarding Antioch and its financial condition. (DX-410; Jennett Dep. 30:18-91:5; Parker Dep. 18:5-23, 95:22-98:21.) For example, lead bank National City Bank conducted an in-depth and comprehensive analysis of Antioch's current and projected future financial condition, which included (i) conducting a cash flow analysis (which included explanation of how the Company handled the approximately $109 million repurchase obligation in 2004, and stress testing how the Company would handle future repurchase obligations by independently assuming a "worst case scenario" where *all* the remaining top 50 account balance holders would retire and terminate in 2005); (ii) conducting a debt service analysis; (iii) analyzing the Company's future financial projections and performing a sensitivity analysis, which included testing based on independent consultant metrics such as number of consultants ordering, average monthly consultant count, activity rate, and productivity rate; and (iv) performing industry analysis and benchmarking of the Antioch Company against the industry, which was familiar for National City Bank as it had previous credit relationships with direct selling companies such as Longaberger and Mary Kay. (DX-410 at PNC-000266-311; Jennett Dep. 30:18-91:5.)

302. Following its extensive analysis (more than a year after the Transaction), National City Bank concluded that Antioch was in a strong financial position for the future, evidenced in

part by the continued strong cash flow and the way it handled the unexpectedly high repurchase obligation in 2004 and still managed to aggressively pay down the long-term debt associated with the Transaction ahead of schedule. (*Id.*) Ultimately, as the lead lender, National City Bank committed $35 million of the total $90 million revolving and term loans in the 2005 Refinancing, and approximately $17.4 million of that $35 million constituted completely new funds. (DX-414 at FT000325, Jennett Dep. 46:1-47:2, 92:22-95:6.)

### 4. Sales Decline and Bankruptcy

303.    In 2006, the Company experienced a double-digit sales decline for the first time, which continued in 2007. (DX-668 at 121.) No testimony or evidence links this sales decline to the Transaction, while numerous witnesses testified that the sales decline was in no way linked to the Transaction. (*E.g.*, Hoskins Sep. 15, 2011 Dep. 195:8-21, 198:2-200:22, 204:11-19; Luce Dep. 147:10-148:6, 149:8-150:10; Sanan Dep. 193:6-24; Lipson-Wilson Dec. 5, 2011 Dep. 127:17-129:8; vonMatthiessen Dep. 283:19-24.)

304.    Indeed, plaintiff Monica Woosley testified she did not believe the Company's sales decline was related to the Transaction, and plaintiffs' expert Robert Reilly similarly testified that "I don't know that anyone was able to predict 2006 and 2007 because the company's results were a lot lower than any projection, any forecast indicated." (Tr. 2576:23-2578:2, 3991:21-24.) Defendants' expert Jeffrey Risius likewise testified that based on all of his independent expert research and analysis, there was nothing about the 2003 Transaction that caused the Company's unforeseeable sales decline. (Tr. 5924:13-5925:1.)

305.    During the 2006 through 2008 timeframe, several unforeseeable (as of 2003) systemic market factors unrelated to the Transaction contributed to the Company's decline and ultimate bankruptcy. Defendants' expert Jeffrey Risius explained how the increase in internet speeds through the wide-spread availability of broadband and the unforeseen rise of social media

companies such as Facebook (available to the public in September 2006) and technological advances like the iPhone (first released in 2007) changed the whole landscape of the traditional scrapbook industry by giving consumers a timely, cost-effective way to share their memories with their family and friends. (DX-668 at ¶¶ 253-273; Tr. 5914:24-5917:6; Sanan Dep. 171:7-15.) Indeed, through an analysis of valuation multiples from comparable companies in the industry, Risius demonstrated how the entire scrapbooking industry began to decline significantly in late 2006 and how Antioch's decline mirrored the industry decline. (DX-668 at ¶ 274; Tr. 5917:10-5922:12.)

306.    This new technology disrupted Antioch's business, which was based around the party-plan method of direct selling. (Pollack Dep. 97:13-99:20.) The shift in consumer preference from paper-based products to digital-based experiences was not compatible with party-plan selling, in which consultants host groups of potential customers and spend time with them to explore product offerings and solicit orders, because digital ordering was typically done in isolation rather than in a group setting. (*Id.*) Therefore, the unforeseeable changes in technology directly led to a maturation of Antioch's business and declines to its revenue. (*Id.*; Hoskins Sep. 15, 2011 Dep. 68:13-70:25.)

307.    Along with these unpredictable market changes, Risius also outlined the large-scale global financial crisis that began in late 2007 (*i.e.*, the "Great Recession"), which was clearly not known or knowable back in December 2003, and which also had a material impact on the Company subsequent to the Transaction. (DX-668 at ¶¶ 275-281; Tr. 5922:16-5924:12.) Risius explained how during this time there was a liquidity crunch and lenders became very nervous, and that there was a large spike in bankruptcy filings as lenders called their loans, rightfully or wrongfully. (*Id.*) Michael New of plaintiff Evolve likewise testified that the market

conditions in 2008 deterred the Company's efforts to find sources of capital, despite the fact that the Company continued to pay off its bank debt and other debt as scheduled. (DX-590; New Dep. 72:2-13, 75:24-76:14.)

308.    Despite the Company's decline in sales, Antioch made all scheduled periodic payments on all of its debt—including its secured bank debt and the newly issued promissory notes to former Antioch ESOP participants—in a timely manner from the date of the Transaction through June 2008. (DX-668 at ¶ 244; Luce Dep. 144:8-145:11; New Dep. 71:21-72:13; Sanan Dep. 195:22-196:5; vonMatthiessen Dep. 281:18-282:13.)  Shortly thereafter, the lenders forced the Company into a pre-packaged Chapter 11 reorganization. (JX-88; New Dep. 74:8-78:10.)

### III.  CONCLUSIONS OF LAW

309.    "ERISA is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans."  *Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 90 (1983); *see* 29 U.S.C. § 1001(b).

310.    One type of employee benefit plan subject to the provisions of ERISA is an employee stock ownership plan ("ESOP"), an ERISA plan that is designed to invest primarily in the employer's stock. 29 U.S.C. § 1107(d)(6)(A).

### A.    ERISA Section 404 Claims

311.    Under ERISA section 402(a), every employee benefit plan shall be established and maintained pursuant to a written instrument, which in turn shall provide for one or more "named fiduciaries" to have authority to control and manage the operation and administration of the plan. 29 U.S.C. § 1102(a).

312.     A person is a fiduciary for purposes of ERISA, by the statute's own terms, if, inter alia, "(i) he [or she] exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or

disposition of its assets, … or (iii) he [or she] has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A)(i), (iii).

313.    ERISA requires a fiduciary acting on behalf of a plan to discharge his or her duties with respect to the plan solely in the interests of the participants and beneficiaries. In addition, the fiduciary must discharge his or her duties:

> (A) for the exclusive purpose of
> > (i) providing benefits to participants and their beneficiaries, and
> > (ii) defraying reasonable expenses of administering the plan;
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; . . . and
> (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA].

29 U.S.C. § 1104(a)(1)(A), (B) & (D).[19]

314.    By requiring fiduciaries to discharge their duties "solely in the interests of the participants" and "with the care, skill, prudence, and diligence . . . that a prudent man . . . would use," ERISA section 404 imposes duties of loyalty and prudence that are "the highest known to the law," *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982). Plaintiffs claim that these duties have two "applications" that are relevant to this case: they require a fiduciary who appoints another fiduciary to make reasonable efforts to monitor the appointed fiduciary, and they require all fiduciaries to provide material information to all co-fiduciaries. (Corrected Opening Post-Trial Br. ECF No. 665-1, at 13-14.)

### 1.    Whether Defendants Were ERISA Fiduciaries for Purposes of the Transaction

315.    First, defendants raise a threshold issue of whether they were fiduciaries at all. They do not dispute that they were members of Antioch's EAC, a named fiduciary of the

---

[19] Subsection (C) of section 404(a)(1) requires ERISA fiduciaries to diversify the plan's investments, but ESOP fiduciaries are exempt from this requirement, as an ESOP plan's very purpose is to hold employer stock. *See* 29 U.S.C. § 1104(a)(2); *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2465-66 (2014).

Antioch Plan. They argue, however, that, despite the fact that they were named fiduciaries as members of the EAC, the Plan provided that the EAC did not have any fiduciary duties with respect to the Transaction.

316. ERISA "defines fiduciary status in functional terms," *Brooks v. Pactiv Corp.*, 729 F.3d 758, 765 (7th Cir. 2013), by conferring fiduciary status only on those that exercise "discretionary authority" in a particular function, 29 U.S.C. § 1002(21)(A). "[A] person can be a fiduciary for some purposes but not others." *King v. Nat'l Human Res. Comm., Inc.*, 218 F.3d 719, 723 (7th Cir. 2000) (*citing Lockheed Corp. v. Spink*, 517 U.S. 882 (1996)). Therefore, a named ESOP fiduciary is not responsible for all fiduciary actions that apply to a plan, but rather has fiduciary duties only with respect to actions for which he or she exercises discretionary authority. *Id.*

317. Defendants contend that they were not ERISA fiduciaries with respect to the Transaction because the Board of Directors explicitly stripped the EAC and its members of their "power to act for the plan," and therefore their fiduciary duty, with respect to the Transaction by amending the Plan and the Trust Agreement to add section 5(f), which states that, "Notwithstanding the provisions of Section 5(a) and (b), the decision whether or not to tender shares of Company Stock to the Company in December 2003 *shall be effected by [GreatBanc] (without directions from the [ESOP Advisory] Committee)*, based on [GreatBanc's] determination (in the exercise of its reasonable judgment) that such decision is in the best interests of the Plan and the Participants…[.]"

318. According to the plain language of this plan amendment, defendants argue, the ability "to act for the plan" in regard to the Transaction was expressly conferred by the Board of Directors upon GreatBanc, which, as independent trustee, independently elected not to tender the

ESOP shares in the Transaction. (DX-37; DX-250; Marchetti Tr. 1221:23-1228:10.)

319.     Because only GreatBanc, not defendants, had the "power to act for the Plan," *Klosterman v. W. Gen. Mgmt., Inc.*, 32 F.3d 1119, 1123 (7th Cir. 1994), and defendants lacked any discretionary authority with respect to the action about which plaintiffs complain, defendants conclude that they were not ERISA fiduciaries with respect to the 2003 Transaction. *Neil v. Zell*, 677 F. Supp. 2d 1010, 1024 (N.D. Ill. 2010) (dismissing benefits committee when fiduciary duties had been delegated to an independent trustee).

320.     Plaintiffs respond that, regardless of the fact that the Plan was amended to strip defendants of any control over the decision whether to tender the ESOP's shares to the Company, defendants remained named fiduciaries as members of the EAC, and they retained plenary fiduciary responsibility to the Plan and its participants.

321.     Further, plaintiffs argue that the EAC *did* exercise its fiduciary authority in a way that was critical to the Transaction by amending the distribution policy to allow employees to receive a "down payment" on their ESOP account balance upon termination rather than wait five years to receive anything.  The EAC also had the authority to appoint an independent appraiser to ensure that the transaction share price was actually set at fair market value, but it did not make any such appointment.[20]   Further, defendants communicated with participants to solicit their support for the transaction, so plaintiffs argue that it cannot be said that they truly had no ability to act for the Plan with regard to the transaction.

322.     In their complaint, plaintiffs' claims against defendants are clearly directed at plaintiffs' actions or omissions in furtherance of or in connection with the Transaction.  It is tempting to agree with defendants that, if responsibility for determining whether the Transaction

---

[20] Of couse, this action would only have been logical if defendants had any reason to believe that GreatBanc was not adequately representing the ESOP's interests, which, as the Court will discuss further below, they did not.

was fair to the ESOP and whether the ESOP should allow the Transaction to proceed expressly lay with the independent trustee GreatBanc under the amended terms of the Plan, then it is nonsensical to conclude that defendants retained discretionary authority with respect to the same transaction.

323.    It is undeniable, as plaintiffs argue, that defendants did take some actions that aided the progress of the Transaction.   Defendants (especially Lee Morgan and Asha Moran, as board members) set the machinery of the Transaction in motion and supported the Transaction, in part by communicating with participants.  (*See, e.g.,* Mizen Tr. 550:9-552:7.)  Additionally, they amended the distribution policy to eliminate the risk of losing S corporation status due to the Transaction. But if GreatBanc's appointment as independent trustee, and the accompanying plan amendment, removed defendants' fiduciary responsibility with respect to the Transaction so that an independent party without any conflicts of interest could determine whether the Transaction was in the ESOP's best interest, then defendants' actions to aid the progress of the Transaction can be characterized as ancillary, non-fiduciary actions that are outside the scope of any fiduciary duty that the Plan allocated to defendants rather than to GreatBanc.

324.    Plaintiffs have cited the Seventh Circuit's recent decision in *Chesemore v. Fenkell*, Nos. 14-3181, 14-3215, 15-3740, 2016 WL 3924308 (7th Cir. July 21, 2016), in support of their position, but the facts of *Chesemore* are significantly different from those of this case. The conduct of the defendant Fenkell, who was not a formal trustee or named fiduciary, was far more extreme then that of defendants.  True, Fenkell orchestrated the buyout transaction, just as defendants are alleged to have done here, but he plainly did so in a way that would ensure that "no one on the other side of the deal would look out for the interests of [the company] or its employees post-[transaction]" and "he effectively controlled both sides of the transaction,"

95

which was so obviously unfair to the plaintiffs that "any involvement by a truly independent fiduciary looking after [the plaintiffs'] interests would have scuttled the deal." *Id.* at *7. In this case, defendants hired a truly independent fiduciary that conducted itself as such.

325. Ultimately, the Court need not decide this issue because, as the following discussion will show, it is clear based on the voluminous evidence the parties have submitted that, even if defendants had a fiduciary duty to plaintiffs or the Plan in any way that was relevant to the Transaction, they did not breach any such duty.

### 2. Whether Defendants Breached a Duty to Monitor GreatBanc

326. As stated above, one of plaintiffs' theories of liability under section 404 is that defendants breached a duty to monitor GreatBanc. For the reasons set forth below, no such breach occurred.

#### a. *Defendant Chandra Attiken Had No Duty to Monitor GreatBanc*

327. It is well settled that ERISA's duty to monitor applies only to a person or entity that has the power to appoint and remove an ERISA fiduciary. *Howell v. Motorola, Inc.*, 633 F.3d 552, 573 (7th Cir. 2011); 29 C.F.R. §2509.75-8 (D-4).

328. The Antioch Board of Directors, not the EAC, possessed the power to appoint and remove GreatBanc.

329. Chandra Attiken was never a member of Antioch's Board, and she therefore had no duty to monitor GreatBanc. Accordingly, any claim against her based upon a supposed duty to monitor must fail. *Howell*, 633 F.3d at 573; *Chesemore v. Alliance Holdings, Inc.*, 886 F. Supp. 2d 1007, 1050 (W.D. Wis. 2012) (no duty to monitor because defendant's trustees were not "the appointing fiduciary"). The Court will enter judgment for Ms. Attiken on this claim.

330. The Court, however, will go on to determine whether the Antioch Board breached its duty to monitor GreatBanc in order to determine whether Lee Morgan and Asha Moran may

be liable for the breach because they were directors during the relevant time period.

     b.    *Whether Plaintiffs Must Prove an Underlying Breach of Fiduciary Duty by GreatBanc*

331.    Defendants argue that a duty-to-monitor claim is a derivative claim, and plaintiffs cannot prevail on their breach of fiduciary duty claim unless they prove that the monitored fiduciary—Greatbanc—breached **its** fiduciary duty. *See In re BP ERISA Litig.,* No. 4:10-cv-4214, 2015 WL 6674576, at *9 (S.D. Tex. Oct. 30, 2015); *Rinehart v. Akers,* 722 F.3d 137, 154 (2d Cir. 2013) (duty to monitor claim dismissed as derivative of failed duty of prudence claim), vacated and remanded on other grounds, *Rinehart v. Akers,* 134 S. Ct. 2900 (2014).[21]

332.    Plaintiffs respond that whether the duty to monitor is breached depends on the facts and circumstances of each case, and their duty to monitor claim is not derivative of an underlying breach of fiduciary duty by the appointed fiduciary, nor does it depend directly on whether the appointed fiduciary committed an underlying breach. *See, e.g., Howell v. Motorola, Inc.*, 633 F.3d 552, 573 (7th Cir. 2011) ("The duty exists so that a plan administrator or sponsor cannot escape liability by passing the buck to another person and then turning a blind eye.")

333.    Regardless of who has the better of this argument, the Court must analyze whether GreatBanc breached its fiduciary duty anyway, in order to resolve plaintiffs' co-fiduciary claim under section 405 of ERISA. For now, the Court will assume *arguendo* that defendants are correct that plaintiffs must prove an underlying breach of fiduciary duty by GreatBanc to prevail in their duty to monitor claim against defendants under section 404.

     c.    <u>*Whether GreatBanc Breached its Fiduciary Duty*</u>

334.    Far from demonstrating a breach of fiduciary duty by GreatBanc, the record shows that GreatBanc conducted a thorough and vigorous review of the Transaction and worked

---

[21] *See also* ECF No. 638 at 5 n. 2 (collecting cases).

diligently to protect the ESOP's interests by negotiating better Transaction terms.

335.    First, GreatBanc engaged top financial and legal advisors in Duff and J&G. While this does not provide GreatBanc a complete defense against a section 404 prudence claim, it provides evidence that GreatBanc acted prudently. *Keach v. U.S. Trust Co.*, 419 F.3d 626, 636-37 (7th Cir. 2005); *Chesemore*, 886 F. Supp. 2d at 1042. Further, the evidence at trial cited above shows that GreatBanc did more than just hire and blindly rely upon competent advisors.

336.    The facts found above show that GreatBanc's ESOP Committee met at least three times with Duff to discuss Duff's interim, preliminary and final analyses. During those meetings, the ESOP Committee scrutinized the detailed analysis presented by Duff and was engaged in discussion and questioning with Duff's representatives.

337.    In addition to challenging Duff's analysis, the evidence shows that GreatBanc also challenged the Company and zealously advocated on the ESOP's behalf. GreatBanc determined that the Transaction terms as originally structured would be unfair to the ESOP. As a result of GreatBanc's advocacy and negotiation, it succeeded in persuading the Company to provide benefits to the ESOP external to the tender offer terms that allowed Duff to deliver a fairness opinion. (Marchetti Tr. 1169:9-1171:17, Blair Tr. 1580:1-6, Bloom Tr. 4516:5-19.)

338.    Plaintiffs argue that GreatBanc breached its fiduciary duty by accepting Duff's fairness opinion and the underlying financial analysis, despite the evidence of GreatBanc's diligence described above.  However, plaintiffs' criticisms of Duff's financial analysis, even if accepted at face value, do not establish any breach by GreatBanc. Plaintiffs failed to connect any alleged mistakes by non-fiduciary Duff with a fiduciary breach by GreatBanc, and advanced no factual or expert[22] evidence that allows the Court to connect Duff's alleged errors with a breach

---

[22] The absence of expert testimony on proper fiduciary conduct is conspicuous. *Cf. Brieger v. Tellabs, Inc.*, 629 F. Supp. 2d 848, 859-60 (N.D. Ill. 2009).

of prudence by the plan fiduciary, GreatBanc. Plaintiffs seem to suggest that the alleged deficiencies in Duff's analysis were so apparent on their face that GreatBanc breached its fiduciary duties in accepting them, but this argument is not supported by the trial record. Even plaintiffs' expert Robert Reilly admitted that his criticisms of Duff's analysis could be characterized as "just two reasonable and skilled analysts making a different judgment on the same set of facts." (Tr. 4114:8-24.)[23]

339. The Company intentionally prepared conservative financial projections in order to analyze the transaction, and then Duff, in turn, adjusted management's base-case projections downward even further by lowering international sales forecasts for each year, new venture forecasts for each year, and consolidated sales forecasts from year five forward. (*Compare* PX-250 (the base-case projections shared with advisors) *with* JX-37 (showing the projections used by Duff in its analysis); Bloom Tr. 4373:5-4375:2; Risius Tr. 5735:23-5736:24.) In fact, the Company's historical, five-year CAGR stood at 17.4% at the time of the Transaction, and Duff's analysis used a 10.3% CAGR for the five-year forecast. (JX-37 at D&P_A002740; Tr. 5746:5-5747:21.)

340. Duff also lowered the projected EBITDA and profit margins for the Company, downward adjusting the EBITDA CAGR from a five-year historical rate of 21.0% to a five-year forecast of just 5.5%. (Risius Tr. 5737:1-10, 5740:4-7, 5747:22-5748:3.) Duff also incorporated the threats facing the Company, such as competition and digital photography and technology, into the projected cash flows that it used in its financial analysis.

341. The evidence of GreatBanc's process for critically analyzing Duff's work through its ESOP Committee and the factual evidence cited in the preceding paragraphs simply does not

---

[23] Moreover, for the reasons discussed below under Plaintiffs' ERISA section 406 claim, the Court finds that Mr. Reilly's criticisms of Duff's analysis and his "corrected" valuation opinions are unreasonable, unreliable, and unworthy of any weight.

support plaintiffs' contention that the financial projections Duff used were so unreasonable that GreatBanc breached a fiduciary duty by not rejecting their use out of hand, and plaintiffs did not introduce any expert that testified to the contrary.

342.    Plaintiffs' criticism of the discount rate that Duff used to value Antioch also falls flat. Mr. Bloom explained that, in his view, it is inappropriate to alter discount rates based on company-specific types of risk.   Instead, company-specific risks should be reflected in downward adjustments to future cash flows, which is what Duff did when valuing Antioch.  But regardless of whether the analyst chooses to account for company-specific risk by altering the discount rate or by adjusting the cash flows, Mr. Bloom testified and Mr. Risius opined that making adjustments to **both** the discount rate **and** future cash flows, in the way that plaintiffs' expert Robert Reilly did, amounts to inappropriate double counting, and the Court agrees.  Thus, plaintiffs did not prove that GreatBanc breached a duty by failing to insist that Duff use a higher discount rate in its DCF, particularly in light of the uncontradicted evidence of GreatBanc's vetting of Duff's analysis, including the discount rate, through its ESOP Committee.

343.    Plaintiffs also fail to show that Duff's treatment of the repurchase obligation was so flawed as to put GreatBanc on notice that it could not accept Duff's analysis. Mr. Bloom explained that the repurchase obligation had no effect on valuation of the Company and that the treatment of repurchase obligation advocated by Mr. Reilly is unsound, and Bloom's testimony was corroborated by the contemporaneous valuation of Houlihan, which did not treat the repurchase obligation projection as Mr. Reilly did and as plaintiffs suggest it should have. In other words, the weight of the evidence shows that Duff's treatment of the repurchase obligation was not something that should have put GreatBanc on notice that there was a problem with Duff's valuation and fairness advice.

344.     In the end, plaintiffs' criticisms of Duff's financial analysis are unfounded, and at best are the result only of "two reasonable and skilled analysts making a different judgment." Nothing about Duff's analysis of the Transaction should have put GreatBanc on notice that it would be imprudent to rely upon its financial expert's fairness opinion.

345.     Plaintiffs have failed to prove that GreatBanc breached any ERISA-based fiduciary duty of prudence to the ESOP.

d.     *Regardless of Whether GreatBanc Breached Its Fiduciary Duty, Defendants Satisfied ERISA's Duty to Monitor*

346.     As described above, defendants contend that plaintiffs' failure to prove that GreatBanc breached its fiduciary duty is fatal to their duty to monitor claim.  Even assuming that plaintiffs did establish an underlying breach by GreatBanc, or that, as plaintiffs have argued, the law does not require them to do so to prevail on their section 404 claim, they have still failed to prove that defendants breached their duty to monitor GreatBanc.

347.     The duty to monitor requires only monitoring "at reasonable intervals" to ensure that "performance has been in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan." *Id.* (*citing* 29 C.F.R. § 2509.75-8 at FR-17 (Department of Labor questions and answers)).  *Howell v. Motorola, Inc.*, 633 F.3d 552, 573 (7th Cir. 2011).  In *Howell*, the court affirmed the district court's decision in *Lingis v. Motorola, Inc.*, 649 F. Supp. 2d 861, 881-82 (N.D. Ill. 2009), which found that an annual review of the appointed fiduciary satisfied the duty to monitor. *Id.* at 882-83.

348.     Plaintiffs failed to prove that the Antioch Board (and therefore Lee Morgan and Asha Moran as directors) breached its duty to monitor the activities that GreatBanc performed in connection with the Transaction. There were only four months between GreatBanc's retention and the closing of the 2003 Transaction. In that time, the evidence shows that GreatBanc

101

representatives met with the Board of Directors on two separate occasions. In addition, at the Board meeting on October 16, 2003, the management team presented the Board with a written and verbal report about GreatBanc's negotiating positions and GreatBanc's financial and analytical rationales supporting its position (which at the time was that the Transaction was not fair to the ESOP). Moreover, Antioch's Board supplemented this monitoring by utilizing members of Antioch's management team as contact points with GreatBanc. Nancy Blair was in frequent communication with GreatBanc and its advisors during the negotiation of terms extrinsic to the tender offer that would allow for a fairness opinion, and reported to Board members about those communications.

349.     Defendants' expert Greg Brown testified that the Board's monitoring activity was completely consistent with usual and customary practice that he has observed in advising the various constituencies involved in ESOP transactions. That is to say, the Board gained a foundational understanding of the nature of GreatBanc's responsibilities, a basic understanding of the work performed by GreatBanc, and an awareness that GreatBanc was acting in the best interests of the ESOP participants. (DX-776; Tr. 5203:3-5215:16.) Plaintiffs presented no fact or expert evidence that convinces the Court otherwise.

350.     Mr. Brown also gave the opinion that a monitoring fiduciary must balance its need to observe the trustee with the need to preserve the trustee's independence by not meddling with the trustee's fulfillment of its duties. (DX-776 at 13; Tr. 5218:17-5219:5.) This was particularly persuasive to the Court because requiring defendants to inject themselves into GreatBanc's decision-making process to satisfy ERISA's duty to monitor is contrary to the very reason an ESOP sponsor should hire an independent fiduciary.

351. Defendants recognized that there was a conflict of interest inherent in the proposed Transaction, which required them to hire GreatBanc as an independent trustee. It would have made no sense to go to the great expense of hiring an independent trustee, only to interfere with the trustee's work—indeed, as Antioch's former legal counsel Marsha Matthews testified, the retention of GreatBanc was specifically intended to *remove* defendants from the transaction process so that their potential conflicts of interest as sellers could not influence or interfere with an independent trustee's decision about whether or not to tender the plan's shares.

352. Setting aside the lack of any underlying breach of fiduciary duty by GreatBanc, defendants have satisfied ERISA's duty to monitor, and judgment for defendants is therefore appropriate.

### 3. Duty to Inform

#### a. *Threshold Issue: Whether Any Duty to Inform Exists*

353. Plaintiffs claim that defendants' fiduciary duties of loyalty and prudence required them to inform all co-fiduciaries of any information material to the actions they took on behalf of the ESOP or its participants.

354. Defendants contend that nowhere in the statutory text or the accompanying regulations does ERISA impose such a "duty to inform" on its fiduciaries, nor does the Plan impose any such duty. Courts have recently rejecting the argument that anything "in ERISA itself or in traditional principles of trust law creates such a duty [to inform]." *In re Lehman Bros. Sec. and ERISA Litig.*, 113 F. Supp. 3d 745, 765 (S.D.N.Y. 2015), *aff'd Rinehart v. Lehman Bros. Holdings Inc.*, 817 F.3d 56, 63 (2d Cir. 2016) ("the District Court correctly concluded that ERISA does not impose a duty on appointing fiduciaries to keep their appointees apprised of nonpublic information" (internal quotation marks and citation omitted)). Imposing a duty to inform into ERISA "would transform [the appointing fiduciary's] limited obligations under

ERISA into all-encompassing ones. Whenever [the fiduciary] received information in any business capacity, he would have been obliged to consider whether ERISA required disclosure of that information to the Plan Committee." *In re Lehman Bros.*, 113 F. Supp. 3d at 765. By "effectively turning *all* of [the fiduciary's] business duties into ERISA duties," the so-called duty to inform "would stretch the concept of fiduciary duty far beyond what ERISA contemplates." *Id.* at 766. *See also In re BP ERISA Litigation*, No. 4:10-cv-4214, 2015 U.S. Dist. LEXIS 147819, at *36 (S.D. Tex. Oct. 30, 2015) ("ERISA does not impose a duty on monitoring fiduciaries to keep their appointees apprised of material, non-public information"); *Lingis v. Motorola*, 649 F. Supp. 2d 861 (N.D. Ill. 2009) (expressing "skepticism" that fiduciaries based "on their power to appoint and remove [a fiduciary] could owe Plan beneficiaries a duty to inform the [appointed fiduciary] of facts…") *aff'd Howell*, 633 F.3d at 572-73.[24]

355.     In light of the above-cited authority, defendants' position is strong. But the Court need not decide today whether ERISA imposes a duty to inform because, even if there is such any such duty, plaintiffs have not proved that defendants breached it.

> b.     *Even If a Duty to Inform Exists as Part of the Duty to Monitor, Lee Morgan and Asha Moran Did Not Breach the Duty*

356.     As members of Antioch's Board of Directors, Mr. Morgan and Ms. Moran (along with their co-directors) put in place important procedural safeguards to ensure GreatBanc received what it requested.

---

[24] Plaintiffs have argued that a number of the above-cited cases finding that there is no duty to provide nonpublic information to co-fiduciaries are distinguishable because they are based on the rationale that providing nonpublic information to co-fiduciaries might be insider trading, in violation of securities law, and this rationale applies only to public companies. However, in a slightly different context, a district court has recently rejected a rigid distinction between the standards of prudence applicable to public companies and closely-held ones, reasoning that the discussions of securities laws and insider trading in cases such as *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2465-66 (2014), were context-specific applications of the legal standard, rather than essential elements of the legal standard the courts were applying. *See Hill v. Hill Bros. Constr. Co., Inc.*, No. 3:14CV213-SA-SAA, 2016 WL 1252983, at *5 (N.D. Miss. Mar. 28, 2016). This Court finds the analysis in *Hill* persuasive.

357.    First, one of the directors, Nancy Blair, in whom the Board had the "utmost confidence" (Morgan Tr. 2146:15; Sanan Dep. 91:11-92:12, 93:8-94:2; von Matthiessen Dep. 122:3-123:9), left the Board to take on the full-time role as the liaison between the Company and GreatBanc. Appointing fiduciaries like the Antioch Board and its members may satisfy their fiduciary obligations by instructing management and other employees of the company to provide access to anything requested by the appointed fiduciary. *Keach v. U.S. Trust Co.,* 313 F. Supp. 2d 818, 864-65 (C.D. Ill. 2004), *aff'd*, 419 F.3d 626 (7th Cir. 2005). That is precisely what the evidence showed happened here. The Antioch Board instructed Ms. Blair to provide GreatBanc and its advisors with anything that they requested, and Ms. Blair did so to the best of her ability.

358.    Second, the Board of Directors approved the retention of talented, independent advisors for itself, the ESOP and the selling shareholders that all had significant experience with ESOP transactions. Neither MWE nor Deloitte ever advised the Board that any of the supposedly missing information should be provided to GreatBanc,[25] nor was the Board ever told of information to lead them to believe that data material to GreatBanc was withheld. (Blair Tr. 1561:16-23; Morgan Tr. 2294:22-2296:23; Moran Tr. 3097:10-3098:4.) Plaintiffs do not point to a single document containing a due diligence request from GreatBanc, Duff, or any other advisor that went unfulfilled by the Company.

359.    Third and most importantly, the record lacks any evidence, from either a fact witness or an expert witness, that the purportedly missing information would have caused GreatBanc to either tender shares and thereby kill the Transaction or renegotiate any of its terms. Ms. Marchetti testified that she did not know what the effect of considering the purportedly

---

[25] True, Helen Morrison did advise Karen Ng at one point to send the Plan Amendment to GreatBanc and Duff, but if in fact Ng failed to do so, there is no evidence that it was anything other than an oversight by Ng, in which the Board and Company were completely uninvolved.  In any case, as discussed further below, any failure to disclose the Plan Amendment was harmless because it was not material to GreatBanc and Duff's review.

missing information would have been. Indeed she was unable to testify that even one particular piece of information would have made a difference in GreatBanc's analysis. At most, she testified that the information would have generated discussions, but she testified that she could not speculate on what the result of those possible discussions might have been.

360.    Consider in further detail the principal pieces of information plaintiffs argue should have been provided to GreatBanc: (i) a number of downside feasibility scenarios run by Deloitte and a sensitivity analysis presented at the December 4, 2003 board meeting; (ii) a pre-Transaction Plan Amendment and change to the distribution policy; (iii) a revised repurchase obligation study presented at the December 4, 2003 Board meeting, and (iv) the 2004 business plan presented at the December 4, 2003 Board meeting.

361.    With regard to the four downside scenarios and the sensitivity analysis, as the Court explained above, Lee Bloom's testimony makes clear that they would not have been material to Duff's independent financial analysis and its ultimate fairness conclusion. Mr. Bloom unequivocally stated that he expected the Company would be running its own downside scenarios in connection with the Transaction, but he never asked the Company for its downside analyses, he would generally have no expectation of seeing those analyses, and he is not even sure what he would have done with the analyses had he received them. Duff's lack of desire to see the Company's downside scenarios makes perfect sense in light of the fact that Duff was running its own downside scenarios, based on the financial information that Antioch did provide.

362.    Plaintiffs have placed great importance on the fact that Ms. Marchetti said that it was an "absolute must" for the Company to produce to GreatBanc the downside scenario projections that the Company had received from Deloitte and that she would have expected to receive them.  But in relying on this testimony, plaintiffs ignore the fact that Ms. Marchetti could

not even speculate as to how those materials might have changed GreatBanc's conclusions, and while she testified that, as an independent trustee, she expects to receive such materials in order to get an "indication of management's thinking," she suggested that these materials certainly would not have *per se* raised a red flag because "[w]e can understand sensitivity runs and there's no reason not to share [them]." (Tr., 1042:17, 1043:13-15.) The net effect of Bloom and Marchetti's testimony on the subject is to suggest that, at best, these downside projections may have been of some interest to GreatBanc, but they would not have been of critical importance in the final analysis.

363. Further, Kreg Jackson, one of the analysts for Houlihan Lokey, testified that Houlihan does not normally request or expect to receive downside scenarios prepared by the sponsor company in the context of a fairness opinion.

364. Defendant's expert witness Greg Brown testified that, based on his experience in advising various constituencies in hundreds of ESOP transactions over the course of his career, he would not have expected the Company to share its sensitivity analyses with GreatBanc and Duff. Plaintiffs presented no expert witness who contradicted this opinion.

365. With regard to the Plan Amendment that the Board adopted on December 4, 2003, Mr. Bloom testified that receiving notice of the Plan Amendment and change in distribution policy would not have impacted the analysis that went into Duff's fairness opinion. In fact, he explained that knowing of the amendment would have made him feel even more comfortable issuing the opinion, because allowing the Company to pay out distributions over time rather than in an immediate lump sum provided important financial flexibility for Antioch. This is consistent with the testimony of Barry Hoskins, who explained that the Plan Amendment eased concerns of the banks that were financing the transaction because the banks wanted the Company to be able

to spread out its repurchase obligation liability over several years to minimize the strain on the Company's free cash if there were an unanticipated spike in terminations or retirements. Plaintiffs presented no contrary fact or expert evidence to persuade the Court otherwise.

366. Finally, Mr. Bloom explained that the Company's future repurchase obligation would not impact Duff's valuation supporting its fairness opinion. Greg Brown likewise testified that he would not have expected, based on his extensive experience, that the Company would have shared any revised repurchase obligation estimate after determining that it would be able to service even the revised estimates of that future obligation in light of the revised future base-case projections.

367. The fact that the December 4, 2003 study, combined with Ms. Attiken's comments at the meeting, tended to show that the repurchase obligation in the coming years might be higher than originally forecast was of little significance. As Mr. Bloom pointed out, sophisticated analysts familiar with ESOPs knew that the repurchase obligation "could always be higher" in any given year (Tr., 4492:9-22), and he took that into consideration.

368. Moreover, Duff closely examined and considered the Company's future repurchase obligation in its fairness and valuation analysis, as the Court will discuss in further detail below, and Lee Bloom also testified that he recalled receiving extensive runs of the repurchase obligation study in a document that was approximately "three inches thick." (Tr. 4439:11-18.) Ms. Marchetti knew that Barry Hoskins frequently ran repurchase obligation studies throughout the year because during due diligence he showed her two gray steel drawers filled with repurchase obligation study runs, and told her "he liked to run the numbers and he did it frequently." (Tr. 1101:18-1103:7.) Thus, if Duff and GreatBanc wanted to see additional runs of repurchase obligation projections before the transaction closed, they knew that Hoskins was

likely to have run the numbers again, and they could have requested any additional runs before giving the Transaction final approval in December. The Court fails to see why defendants were required to anticipate this request that was never made and provide the study, unprompted.

369. Compounding the Court's difficulty in this regard is the fact that this revised repurchase study did not have the earth-shattering significance plaintiffs would ascribe to it. Hoskins's revised study showed that the repurchase obligation in the years after the transaction would rise from over $9 million in 2003 to $11 million in 2004, $22 million in 2005, and $36 million in 2006. Attiken presented additional information (the precise details of which are lost) that suggested that the repurchase obligation from 2004 to 2006 might be as much as $25 million or even $30 million higher over that three-year period. But plaintiffs never explain what was so compelling about these studies that GreatBanc and its advisors needed to know about them, when sophisticated analysts and experienced trustees such as Duff and GreatBanc know that a spike in repurchase obligation liability is always a possibility.

370. When viewed in the full context of the other documents presented at the December 4, 2003 Board meeting, it is still clearer that the revised repurchase study would not have been any sort of dire warning to Duff or GreatBanc, if produced. Even the downside scenario that the Company considered at the December 4, 2003 board meeting showed significant positive cash flow over the 2004-2006 period, and, as defendants' expert Risius testified, in any downside scenario in which revenues dropped precipitously, the repurchase obligation would also drop because the share price would drop. (Tr. 5839:6-5846:5 (discussing PX-870:75 (internal page 74))). Thus, as Risius testified, there remained a significant cash-flow cushion to absorb an unanticipated rise in repurchase obligation. (*See* DX-668 at ¶¶ 111, 252 n. 215; Tr. 5838:3-5849:19.) Hoskins's revised repurchase study, even combined with Attiken's

comments, about which we know few specifics, was hardly a canary in a coal mine, when viewed in its full context, in light of all relevant facts and circumstances.

371. As for the revised 2004 business plan, which showed reduced sales expectations for the coming year, again the Court fails to see the significance. Nothing in the fact that the Company reduced its future projections in the 2004 business plan presented on December 4, 2003, would have so shocked GreatBanc or its advisors that they would have had second thoughts about the Transaction. The best evidence of this is that, as noted numerous times in the above findings of fact, Hoskins *did* tell Duff in his discussion with Julie Williams and Lee Bloom on or about December 9, 2003, that the Company had reduced its expectations for 2004.

372. Further, even leaving aside that discussion, the Company's weaker-than-expected sales in 2003 were still above the prior year's sales, and the Company was coming off years and years of explosive growth. The evidence shows that, ***as it told GreatBanc and its advisors during due diligence***, the Company feared hitting a domestic sales plateau (although it had plans to keep revenue growing in spite of it); it did not fear, as a realistic possibility, a catastrophic sales decline. Reduced expectations in the 2004 business plan would not have been the canary in the coal mine either.

373. At the December 4, 2003 board meeting, the Company used a downside projection showing flat or slightly negative growth to assess whether it had sufficient cash flow to service its debt and pay other operating expenses such as repurchase obligation even if the Company had already hit the dreaded sales plateau, and it determined that it could. Granted, it recognized that the ESOP might end up "worse off," in a sense, if the Company proceeded with the Transaction under such a scenario because the stock growth would not make up for the reduction in annual distributions, but there was still more "future upside" because a cashless

110

exercise of warrants would see the ESOP remain the majority owner of the company with 83% of the outstanding stock, instead of 50% under the expected or "base case" scenario. Taking this information into account and recognizing that the downside scenario it considered was *not* the expected case, the Board decided that it made sense to proceed with the Transaction. (JX-55 at MOR001426, 1428-29.) The Court fails to see why the Board should not have expected GreatBanc and its advisors—who, thanks to the Company's conscientious efforts to respond fully to all due diligence requests, had all the data they asked for to aid their review—to undertake the same analysis and reach a similar conclusion, without the Company's meddling.

374. In sum, even assuming that a duty to inform exists under ERISA, plaintiffs have failed to carry their burden of proving that defendants violated that duty. The facts developed at trial establish that the Antioch Board, and its members including Mr. Morgan and Ms. Moran, instituted procedural safeguards by entrusting senior management with overseeing the Transaction and its associated due diligence, and by engaging reputable advisors to represent the Company and the various constituencies who, based on their experience and expertise in ESOP transactions, could inform the Company of what they needed to do their job. The Company did in fact provide voluminous due diligence material to Duff and GreatBanc, and Duff's lead analyst, Lee Bloom, testified that Duff received everything it asked for and needed to conduct its analysis.

375. Perhaps most important, plaintiffs not only failed to produce evidence that the allegedly withheld information was material, Mr. Bloom's and Ms. Marchetti's testimony proved just the opposite. *Keach v. U.S. Trust Co.*, 419 F. 3d 626, 637-38 (7th Cir. 2005) (materiality of missing information a prerequisite to liability, and allegedly missing information must be placed "within the context of the totality of the circumstances of [the fiduciary's] valuation process").

376.     In light of the foregoing evidence, plaintiffs have failed to carry their burden to prove that defendants violated the so-called duty to inform.

**B.     ERISA Section 405 Co-Fiduciary Claim**

377.     ERISA section 405 allows courts to impose liability on a defendant in any of the following circumstances: "(1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

378.     Co-fiduciary liability claims under ERISA section 405 are derivative of an underlying breach of fiduciary duty, meaning that plaintiffs must prove a breach of fiduciary duty by GreatBanc in order to impose liability on defendants. *Gabriel v. Alaska Elec. Pension Fund*, 773 F.3d 945, 952 n.2 (9th Cir. 2014) (co-fiduciary claims derivative of underlying breach of fiduciary duty); *Monper v. Boeing Co.*, 104 F. Supp. 3d 1170, 1180 (W.D. Wash. 2015) ("Co-fiduciary and failure to monitor are derivative claims that necessarily fail where there is no underlying violation.").

379.     Because, as explained above, plaintiffs failed to prove that GreatBanc breached any duty to the ESOP, no co-fiduciary claim against defendants exists, and the Court will therefore enter judgment for defendants on plaintiffs' section 405 claim.

380.     Even if defendants did establish that GreatBanc breached a duty, they have failed to satisfy any prong of section 405 with respect to actions by defendants.  It is clear from the above discussion that defendants did not have knowledge of any breach by GreatBanc, as the subsections (a) and (c) of section 405 require, nor did defendants do anything to enable any

breach by GreatBanc, as subsection (b) requires. On the contrary, defendants hired GreatBanc in good faith to assess the fairness of the Transaction, they gave GreatBanc and its advisors all the information it requested in order to assess the fairness of the Transaction, and GreatBanc gave them every indication that it was taking all reasonable and prudent actions necessary to competently assess the fairness of the Transaction.

381. Because plaintiffs have failed to prove an underlying breach of fiduciary duty by GreatBanc, and because they have failed to prove that defendants enabled a breach or had any knowledge of a GreatBanc breach, plaintiffs' co-fiduciary claim under ERISA section 405 fails.

## C. ERISA Section 406 Prohibited Transaction Claim

40. Plaintiffs brought a claim against defendants pursuant to 29 U.S.C § 1106(a)(1), which states that "A fiduciary with respect to a plan is not permitted to cause the plan to engage in a transaction, if he or she knows or should know that such transaction constitutes a direct or indirect:

> (A) *sale or exchange, or leasing, of any property between the plan and a party in interest*;
> (B) lending of money or other extension of credit between the plan and a party in interest
> (C) furnishing of goods, services, or facilities between the plan and a party in interest;
> (D) *transfer to, or use by or for the benefit of, a party in interest of any assets of the plan*; or
> (E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of ERISA § 407(a)."

ERISA §§ 406(a)(1)(A)-(E), 29 U.S.C. §§ 1106(a)(1)(A)-(E) (emphasis added).

### 1. Which Subsection Applies?

382. In some of the earlier briefing in this case, the core of the parties' dispute appeared to be whether the Transaction was an indirect "sale or exchange . . . between the plan and a party in interest" under 406(a)(1)(A). Defendants have argued that the Transaction does not fit this description because no plan assets were involved and the ESOP was not a party to the

transaction: *Antioch*, not the ESOP, purchased the outside shareholders' shares of stock, which were then retired into treasury, so the number of shares and amount of assets in the ESOP was the same after the Transaction as it was before it. The ESOP did not come into possession of the selling shareholders' stock in the Company, even indirectly through a third-party intermediary, nor did the selling shareholders receive ESOP assets directly or indirectly.

383.    Plaintiffs have argued that the transaction was an "indirect" transaction between the Plan and a party in interest because, although no plan assets were exchanged, the ESOP participated in the Transaction by agreeing not to tender its shares, and the goal of the transaction was to make the ESOP the owner of 100% of the outstanding shares of Antioch stock, so it was as if the ESOP were indirectly purchasing the outside shareholders' shares of stock. The Court is skeptical of plaintiffs' argument, which finds little support in the plain language of the statute.[26]

384.    Perhaps stronger is plaintiffs' argument, fleshed out for the first time in its closing brief, that, regardless of whether the Transaction was a sale or exchange between the Plan and a party in interest under 406(a)(1)(A), it was a "use" of plan assets "by or for the benefit of . . . a party in interest" under 406(a)(1)(D). Defendants, as selling shareholders, certainly benefited by "using" the ESOP's assets, at least indirectly, as both (i) the reason to initiate the Transaction and sell their shares to Antioch in exchange for cash payments, in the sense that the goal of becoming 100% ESOP-owned and therefore exempt from income tax provided part of the rationale for the

---

[26] Plaintiffs' citation to the Seventh Circuit's 2014 opinion in this case addressing a statute of limitations issue, in which the Seventh Circuit described "the economic substance of the Transaction" as an indirect purchase of stock from the Morgan family and other shareholders by the ESOP, does not diminish the Court's skepticism. *See Fish v. GreatBanc Trust Co.*, 749 F.3d 671, 675 (7th Cir. 2014). The Seventh Circuit was reviewing the timeliness of plaintiffs' claims, not their merits, and it was required to "consider the factual record in the light most favorable to the plaintiffs and give them the benefit of all conflicts in the evidence and reasonable inferences that may be drawn from the evidence," which requires viewing the facts in a "harsh light" towards defendants. *Id.* at 674. The factual record has changed dramatically since the Seventh Circuit last weighed in on this matter two years ago, with a mountain of new evidence having been introduced, and, more importantly, at this stage the Court owes no deference to plaintiffs' account of the facts and is not bound to make any inferences in plaintiffs' favor. This Court's review of the merits of plaintiffs' claims is little affected, if at all, by the Seventh Circuit's review of a decision that did not reach the merits.

Transaction, and (ii) a key component in effectuating the Transaction, in the sense that the Transaction would not have been able to proceed unless the ESOP's independent trustee agreed not to tender any ESOP shares to the Company.

385.   The Court will assume that the Transaction was, if not an indirect sale or exchange between the Plan and a party in interest within the meaning of section 406(a)(1)(A), at least an indirect use of plan assets for the benefit of a party in interest within the meaning of 406(a)(1)(D).

## 2.   Defendants Did Not Cause the Plan to Engage in a Transaction

386.   Defendants also argue that, regardless of which subsection of 406(a)(1) applies, they did not "cause" the ESOP to engage in the transaction, as 406(a)(1) requires.  A person cannot "cause" a prohibited transaction unless he or she "exercise[s] discretionary authority or control" over whether the plan enters into the transaction. *Sommers Drug Stores Co. Emp. Profit Sharing Trust v. Corrigan*, 883 F.2d 345, 352 (5th Cir. 1989) ("The jury's finding that the defendants did not exercise discretionary authority or control over the trustees' decision to sell the trust stock is also a finding that they did not 'cause' the plan to enter into such a transaction.").

387.    According to defendants, they had no discretion in regard to the ESOP as it related to the Transaction, and they took no actions to "cause"—as a matter of fact or law—the Plan to engage in the Transaction. The Antioch Board stripped the EAC (and therefore defendants) of all discretionary authority with respect to the Transaction and gave that authority to GreatBanc. *See Chesemore*, 886 F. Supp. 2d at 1050-51 (party without discretionary control with respect to transaction "did not cause" the transaction and was thus not liable under section 406).

388.    Again, the Court is tempted to agree with defendants.  The whole purpose of engaging GreatBanc as an independent trustee was to ***remove*** defendants from the ESOP's decision as to whether or not to tender its shares in the Transaction because defendants had conflicts of interest.  It would be a bizarre logic that would hold them accountable for "causing" the ESOP to engage in a transaction when they hired an independent trustee for the specific purpose of deciding whether to cause the ESOP to engage in the Transaction (by declining to tender its shares) or not, in accord with the independent trustee's independent determination of which alternative was in the ESOP's best interests.[27]

389.    Nevertheless, the statute does not say what it means by "cause." How near a cause of the ESOP's participation in the Transaction need defendants have been?  Defendants' actions were not the sole or even nearest cause of the transaction, but they were undeniably a "but for" cause of the transaction.   Indeed, they were a "driving force" behind it, as plaintiffs argue. (Corrected Opening Post-Trial Br., ECF No. 665-1, at 23.)

390.    The parties cite little law to help the Court decide this question.  In the end, it need not do so because defendants have clearly established that the Company purchased the outside shareholders' shares for "adequate consideration" within the meaning of the statutory exemption of section 408(e), so the defendants cannot be liable for causing a prohibited transaction under section 406(a).

---

[27] Plaintiffs argue that a fiduciary cannot simply avoid responsibility as a fiduciary by merely delegating it, but this argument misses the point.  Defendants did not delegate responsibility merely to be free of the burden of it; they delegated their authority to decide whether to determine whether it was fair to the ESOP to allow the 2003 Transaction to proceed because they knew that they could not trust their own judgment on the matter.  Plaintiffs ignore this critical distinction.

### 3. Defendants Met the "Adequate Consideration" Defense in ERISA Section 408(e)

391. Even if the Court found that the Transaction was prohibited under ERISA section 406, defendants would still prevail because they have proven that the Transaction satisfied ERISA section 408(e)'s affirmative defense. ERISA provides that an otherwise prohibited transaction does not give rise to liability where the sale or purchase of employer securities is for "adequate consideration." 29 U.S.C. § 1108(e)(1). "For securities with no recognized market, as in this case, ERISA defines 'adequate consideration' to be 'the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with regulations promulgated by the Secretary [of Labor].'" *Keach v. U.S. Trust Co.*, 419 F.3d 626, 636 (7th Cir. 2005) (*quoting* 29 U.S.C. § 1002(18)(B)).

392. "In order to rely on the adequate consideration exemption, a trustee or fiduciary has the burden to establish that the ESOP paid no more than fair market value for the asset, and that the fair market value was determined in good faith by the fiduciary." *Id*. at 636, 636 n.5 (citations omitted); Proposed Regulation Relating To The Definition Of Adequate Consideration, 53 Fed. Reg. 17,632, 17,634 (May 17, 1988).[28]

393. "'Fair market value' is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." *Keach v. United States Trust Co.*, 313 F. Supp. 2d 818, 867 (C.D. Ill. 2004), *aff'd*, 419 F.3d 626 (7th Cir. 2005) (*citing Eyler v. Commissioner*, 88 F.3d 445, 451 (7th Cir. 1996)). *See also* Proposed Regulation, 53 Fed. Reg. 17,632, 17,634 (May 17, 1988).

---

[28] The Seventh Circuit noted in *Keach* that although this proposed regulation ("Proposed Regulation") has yet to be approved for publication in the Code of Federal Regulations, the Seventh Circuit and other courts of appeal look to it for guidance and have adopted its two-part test. *Keach*, 419 F.3d at 636 n.5.

394.     The Proposed Regulation further provides that the "Department is aware that the fair market value of an asset will ordinarily be identified by a range of valuations rather than a specific, set figure, and that it "is not the Department's intention that only one valuation figure will be acceptable as the fair market value of a specified asset." *Id.* "Rather . . . the valuation assigned to an asset must reflect a figure within an acceptable range of valuations for that asset." *Id. See also, e.g.*, *Keach*, 313 F. Supp. 2d at 867-68 (concluding ERISA section 408(e) exemption was satisfied where per-share transaction purchase price fell within a range of fair market value determined by two contemporaneous valuation experts); *Unaka Co. v. Newman*, Dist. No. 2:99-CV-267, 2005 WL 1118065, at *28 (E.D. Tenn. Apr. 26, 2005) ("Fair market value of an asset will ordinarily be identified by a range of valuations rather than a specific, set figure; therefore, the valuation assigned to an asset must reflect a figure within an acceptable range of valuations for that asset.").

395.     "The 'good faith' requirement establishes an objective rather than a subjective standard of conduct, which is assessed in light of all relevant facts and circumstances." *Keach*, 313 F. Supp. 2d at 867 (*citing Montgomery v. Aetna Plywood, Inc.*, 39 F. Supp. 2d 915, 937 (N.D. Ill. 1998)).

396.     "'ESOP fiduciaries will carry their burden to prove that adequate consideration was paid by showing that they arrived at their determination of fair market value by way of a prudent investigation in the circumstances then prevailing.'" *Keach*, 313 F. Supp. 2d at 867 (*quoting Chao v. Hall Holding* Co., 285 F.3d 415, 437-38 (6th Cir. 2002)); *Eyler*, 88 F.3d at 455.

397.     "The ultimate outcome of an investment is not proof that a fiduciary acted imprudently." *Keach*, 313 F. Supp. 2d at 867 (citation omitted). "[T]he fiduciary's duty of care requires prudence, not prescience and the appropriateness of an investment is to be determined

from the perspective of the time the investment was made, not from hindsight." *Id.* (internal quotations and citation omitted); *Keach*, 419 F.3d at 638 ("ERISA's fiduciary duty of care requires prudence, not prescience." (internal quotations and citation omitted)).

398.    "A trustee has a duty to seek independent advice where he lacks the requisite education, experience and skill, but it must ultimately make its own decision based on that advice. Yet before relying an advisor's opinion, the fiduciary must conduct a prudent and sufficient investigation and make certain that reliance on the advisor's advice is reasonably justified under the circumstances." *Keach*, 313 F. Supp. 2d at 867 (*citing Chao*, 285 F.3d at 430; *Cunningham*, 716 F.2d at 1473-74; *In re Unisys Savings Plan Litig.*, 74 F.3d 420, 435 (3d Cir. 1996) ("ERISA's duty to investigate requires fiduciaries to review the data a consultant gathers, to assess its significance and to supplement it where necessary.")).

399.    "Assigning qualified individuals with appropriate experience to work in concert with financial and legal advisors who are also highly experienced is evidence that a trustee conducted a prudent investigation." *Id.* (*citing Howard v. Shay*, 100 F.3d 1484, 1489 (9th Cir. 1996); *Martin v. Feilen*, 965 F.2d 660, 671 (8th Cir. 1992)). *See also Keach*, 419 F.3d at 636-37.

400.    In light of these principles of law and the facts found above, even if plaintiffs had established a violation of ERISA section 406, defendants have met their burden under ERISA section 408(e) to establish that the Company paid fair market value for the non-ESOP shareholders' stock, and that the fair market value was determined in good faith by GreatBanc in reliance upon the advice and opinions from its financial expert Duff & Phelps and legal expert Jenkens & Gilchrist only after GreatBanc scrutinized its advisors' credentials, analysis and conclusions.

401.    The facts found above establish that GreatBanc engaged Duff, a qualified valuation firm with extensive experience in ESOP transactions, to analyze the Transaction from the perspective of the ESOP. Plaintiffs have not suggested Duff was not an experienced and highly qualified valuation firm. Indeed, plaintiffs' own expert Robert Reilly testified that based on his experience and expertise, he found Lee Bloom—the Duff lead—to be a competent analyst and advisor. GreatBanc also engaged J&G, a leading law firm with extensive experience in ESOP transactions, to perform legal due diligence regarding the Transaction. Plaintiffs do not argue J&G was not an experienced and highly qualified firm.

402.    Following an extensive and independent process of due diligence, analysis, and valuation work—as established in the facts found above—Duff issued an opinion indicating that the $850 per-share price was within the range of fair market value of Antioch, which it determined through its DCF analyses to be between $774 and $932 per share. Duff's comparable company analysis confirmed the reasonableness of its DCF value conclusion. This comparable company analysis showed that, if anything, the $850 per share Transaction price was too low. Duff also analyzed the package of cash, notes, and warrants before ultimately advising GreatBanc that it was prepared to offer a fairness opinion.

403.    GreatBanc's ESOP Committee scrutinized the detailed analysis presented by Duff and engaged in substantial discussion and questioning with Duff's representatives to challenge Duff's analysis until it was satisfied that its questions had been answered and it could agree with and accept Duff's conclusions.

404.    Both GreatBanc and Duff went to considerable lengths to understand Antioch's business and independently assess the financial fairness of the Transaction from the ESOP's perspective, including interviewing members of management, visiting Antioch's facilities,

reviewing strategic business plans, and examining and analyzing financial documents and projections. *See Keach*, 313 F. Supp. 2d at 868.

405.    The record is clear that GreatBanc and Duff understood the potential weaknesses and threats facing the Company going forward—including digital photography and technology, industry competition, and internal company trends, as described more fully above in Part II.D.1 of this Order—but also the strengths and opportunities, and properly evaluated, considered and accounted for all of the Company's strengths, weaknesses, risks and opportunities in their analysis of the financial fairness of the Transaction, including the $850 per share price.

406.    While, in light of later events and with the benefit of hindsight, it may seem that GreatBanc, Duff and Antioch should have been more concerned about the risks and threats facing the Company, the Court recognizes that, in 2003, Antioch's numbers were still relatively strong, and the Company was only seeing the first signs of distress, which were so subtle as to be difficult to recognize as such.  In particular, it may seem obvious in hindsight that the emerging technological changes in digital photography would undo CM's business.  But Lee Bloom's testimony concerning why Duff concluded that the opportunities digital photography presented actually outweighed the risks was particularly persuasive to the Court.  When asked whether he had discussed the issue of digital photography with Antioch or CM managers during due diligence, he testified as follows:

> Yeah. We very specifically discussed it. We thought we had them on that one. You know, digital photography is coming; isn't that going to wreck your business. And, I mean, the general answer is, well, digital photography is just another way of taking a picture. What do you do with that picture when you take it. Keep in mind iPhones weren't—they—I don't think Steve Jobs had even thought of the iPhone in 2003. So people didn't have easy ways to present these photos that they were taking. You still had to produce an image somehow and preserve that image. So at the time, the best way to print your digital pictures was people had laser— inkjet printers. Well, inkjet printers, the quality degrades very quickly. ***So***

121

*now we're back to the archival issues. What can you do to print and preserve photo quality images,* to the extent that you're even using photos on a scrapbook page.

  The other issue with digital photography—I kind of chuckle. I've been working with computers since high school in the 1970s. And I wrote some pretty slick programs in high school, as the high school kids do now. . . . And I wanted to preserve these programs that I was writing. So I preserved them on the best system available at the time, which was yellow tape that feeds into a teletype machine. I'm not sure how many people here have even seen a teletype machine. And I have in my basement a bag of these spools of yellow tape that have my programs encoded on them. I have no way to read these spools, but I actually have them preserved someplace. I can never access these—as far as I know, I can't access these programs. . . . *And this was an issue and still is an issue with digital photography; simply taking the image and storing the digits doesn't really make the image available to you.* . . .

  I guess the last thing I'd say is the more pictures that are being taken, the more likely somebody is going to want to take a picture and put it into their scrapbook. So, you know, there were—yeah, there were risks and there were opportunities that came up from digital photography.

(Tr. 4277:13-4279:5 (emphasis added).)

  407.  As Rhonda Anderson testified, from the beginning CM's business was always directed toward memory preservation and keeping an archive of family photos to preserve family history. Digital photography was not the best way to achieve that goal in 2003, nor is it today. No evidence proves that it was obvious or even knowable at the time of the Transaction in 2003 that CM's customers would simply stop caring about CM's tried-and-true methods of memory preservation and family archiving in favor of the convenience of digital picture sharing methods that were unanticipated in 2003. The evidence of increased competition in the industry rather suggested the opposite. And the evidence of the company's internal problems with its products and consultants was, as a whole, inconclusive in 2003: much of it was anecdotal, and, to the extent it was not anecdotal but supported by data, it was not clear from the limited data available in 2003 that the problems were serious, lasting or insoluble. The Court

does not agree with plaintiffs that, in determining whether $850 was a fair transaction price, GreatBanc and Duff failed to account for the risks facing the company.

408.    It is undisputed that GreatBanc and Duff consistently probed and challenged the assumptions and proposals presented by the Company. Through their own independent (and more conservative) financial analysis, GreatBanc and Duff concluded that (a) the $850 per-share price was within the range of fair market value, (b) the consideration paid for the non-ESOP shareholders' stock was fair and reasonable to the ESOP from a financial point of view, and (c) the terms and conditions of the Transaction were fair and reasonable to the ESOP from a financial point of view. The evidence shows that the rigor with which GreatBanc and Duff reviewed and analyzed the Transaction terms and the consideration to be paid by the Company for the non-ESOP shareholders' stock was sufficient to satisfy and exceed the standard of prudence and good faith prescribed by ERISA. *See Keach*, 313 F. Supp. 2d at 868.

409.    In addition to the conduct of GreatBanc and Duff, additional findings of fact establish other persuasive evidence that no more than fair market value was paid for the non-ESOP shareholders' stock in the Transaction, and that this determination was made in good faith.

410.    Separate and apart from GreatBanc's retention of Duff on behalf of the ESOP, the Company hired its own valuation firm with extensive experience in ESOP transactions—Houlihan Lokey—to analyze whether the consideration to be paid to the non-ESOP shareholders was fair from a financial point of view. Plaintiffs do not dispute that Houlihan Lokey was an experienced and highly qualified valuation firm. Houlihan's analysis was as extensive as Duff's, as fully described above. Plaintiffs present no evidence that Houlihan did anything wrong in concluding that $850 per share was fair value.

411. The Court also finds that the opinions of defendants' expert witness Jeffrey Risius provide further credible and persuasive support for its conclusion that no more than fair market value was paid for the non-ESOP shareholders' stock, and that this determination was reached in good faith. Risius' opinion that all aspects of Duff's process for reaching its fairness and valuation opinions were reasonable and appropriate, that Duff's methodology and valuation opinions were conservative based on what was known or knowable as of the date of the Transaction, and that the $850 per-share value was at the "very low end" of the range of fair market value for Antioch stock, are supported by the facts found above and Risius' experience, expertise, and independent research and valuation analysis.

412. As discussed in the findings of fact, plaintiffs' expert Robert Reilly testified Duff's analysis suffered from two principal "flaws" that inflated the per-share fair market value of Antioch stock immediately before and immediately after the Transaction.[29] The Court finds that Mr. Reilly's opinions are not credible because they are not based on sound or commonly applied valuation methodologies, and are improperly determined "from the perspective of . . . hindsight" based in part on telephone conversations with former Antioch employees sympathetic to plaintiffs more than ten years after the Transaction, rather than from "the time the investment was made" in 2003. *Keach*, 313 F. Supp. 2d at 867.

413. As described above, there are methodological and reliability problems with Mr. Reilly's analysis in regard to the four DCFs that were based on ARIMA (FTI 1 and FTI 2) and Deloitte's downside feasibility models (Downside and Big Downside), and for those reasons, the Court does not find his opinions to be sufficiently credible to outweigh the fact and expert

---

[29] Neither Mr. Reilly nor Plaintiffs present any evidence (or even argue) that the package portion of consideration paid to non-ESOP shareholders constituted less than adequate consideration—it did not. They only challenge the $850 per-share cash consideration.

evidence contrary to it that the Transaction price of $850 per share was indeed adequate consideration.

414.    With regard to the ARIMA-based DCFs, the testimony at trial showed that ARIMA is useful for analyzing data to identify trends therein, but because an ARIMA analysis is principally based on past sales, it essentially assumes that the current trend will continue.  There is no dispute that Antioch's sales growth slowed in 2003, so Mr. Buchanan's ARIMA analysis showing that, if the trend in the 2003 numbers continued, the Company's sales would fall (as, in fact, they did), is of little usefulness in determining what was a reasonable projection of the Company's future performance in 2003.  The ARIMA-based DCFs are insufficiently attentive to the possibility of reversing the trend by making transformative efforts to boost sales in the future, whether through promotional activities or expansion into new geographic or product markets or any other means. They do not sufficiently account for the possibility that the current trend in 2003 was just a blip on the radar of no lasting significance, a momentary valley in a trend line consisting of numerous peaks and valleys.  In order to know whether it was reasonable to assume that the current trend would continue, it is necessary to look at the full, holistic Antioch picture at the time of the Transaction, and the evidence at trial did not show that defendants knew or should have known at the time of the Transaction that the risks facing the Company were so dire that the Company should have heard its death knell in a few months of slower-than-expected sales in 2003, despite the fact that it was coming off years and years of explosive growth.

415.    Reilly's uncritical reliance on Michael Buchanan's projections in his DCF models—in light of the weight of evidence (including testimony from Reilly himself) that the modeling techniques Buchanan implemented are not reliable for projecting out 10 years of corporate sales and not used in practice by financial experts for valuing company stock or to

price a transaction—was improper under Federal Rule of Evidence 703 and further undermines the credibility of his pre-Transaction per-share value opinions. *See*, *e.g.*, *TK-7 Corp. v. The Estate of Ishan Barbouti*, 993 F.2d 722, 732-33 (10th Cir. 1993) (opinion improper under Fed. R. Evid. 703 in part because "there is no indication in the record that Dr. Boswell[, who based his expert lost-profits opinion on Mr. Werber's sales figures,] had any familiarity with the methods or reasoning used by Mr. Werber in arriving at his projections" and "there was no evidence that other experts in his field would rely on such a study and would adopt it").

416. With respect to the DCFs based on Deloitte's downside feasibility models, they were never meant to be used as the basis for a DCF analysis; it would be inappropriate to do so, as Risius explained, because the discount rate would be "mismatch[ed]" to the cash flow projections (Tr. 5866:6-5857:5); and the only possible result that could come from using them in that way, as Lee Bloom explained, is to render "a value that's too low" (Tr. 4393:24-4394:16). These DCFs, too, are unreliable.

417. The Court also rejects as unreliable Mr. Reilly's valuation derived from his fifth DCF that is driven by his subjective 5% CSRP. The findings of fact show his 5% CSRP is not supported by any reliable formula or quantitative analysis. Indeed, Risius testified that application of an objective quantitative analysis of the Company's profit margins prior to the Transaction demonstrate that a 0% CSRP is appropriate. This Court can hardly hold that Reilly is right and Risius is wrong based on what is essentially Mr. Reilly's gut feeling. (*Compare* Reilly Tr., 4114:4-23; 4150:23-4151:25 *with* Risius Tr., 5797:3-5799:22; 6120:9-6126:7.)

418. As to Reilly's "second flaw" opinions regarding the post-Transaction per-share value, the Court is persuaded by the testimony of Jeffrey Risius, Lee Bloom, and Richard May that when a company is redeeming and retiring shares put by terminating ESOP participants (like

Antioch did), or implementing ESOP recycling (like Antioch did in 2004), the future repurchase obligation has no impact on per-share value. The Court also finds persuasive the testimony from Risius and Lee Bloom as to the methodological errors with Reilly's "second flaw" calculations. The Court does not find Mr. Reilly's "second flaw" opinion to be credible.

419. Reilly's post-Transaction per-share value opinions are also improper and not credible because he uncritically relies upon repurchase obligation projections from David Weinstock that are methodologically flawed, and therefore unreliable. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 748 (3d Cir. 1994) ("If the underlying data are so lacking in probative force and reliability that no reasonable expert could base an opinion on them, an opinion which rests entirely upon them must be excluded.") (quoting *In re "Agent Orange" Prod. Liab. Litig.*, 611 F. Supp. 1223, 1245) (E.D.N.Y. 1985)). Moreover, at the unexplained instruction from plaintiffs' counsel, Reilly did not incorporate into his averaging analysis an entire study cohort that Weinstock prepared based on a retirement age of 65, presumably to increase the damages conclusion of his post-Transaction valuation.

420. Because the consideration paid for the non-ESOP shareholders' stock was supported by the financial analysis and valuations performed by Duff and Houlihan Lokey and the retrospective valuation analysis performed by Risius, and the record also demonstrates that GreatBanc arrived at its valuation in good faith, the Court finds that no more than adequate consideration was paid for the non-ESOP shareholders' stock. *See Keach*, 313 F. Supp. 2d at 870.

421. Therefore, even if plaintiffs had established a violation of ERISA section 406, the exemption found in ERISA section 408(e) is satisfied. For this reason, plaintiffs' prohibited transaction claim fails and judgment will be entered for defendants.

### D.    Damages and Causation

422.    Because the Court has concluded that defendants' actions and omissions did not violate the standards set in ERISA sections 404, 405 or 406, there is no need to address causation of damages.  Nevertheless, the Court notes briefly that, even if plaintiffs would otherwise have prevailed on their claims, the evidence shows that defendants did not cause any of plaintiffs' alleged damages.

423.    Even assuming that plaintiffs succeeded in proving breaches by defendants under ERISA sections 404 and 405, the evidence shows that any such breaches did not cause[30] any damages because (a) as explained in detail above, the Company did not overpay for the non-ESOP shares, and (b) it was not the Transaction that caused the Company to fail and the ESOP participants' shares to become worthless; rather, the Company failed due to a sales decline caused by market forces and conditions outside the defendants' control and that defendants could not have predicted in 2003.

424.    The Company continued to do well enough following the Transaction that the per share value of the stock held by plan participants as of December 31, 2003, two weeks after the Transaction closed, was $44 greater than the $850 per share Transaction price, and nearly $100 more per share a year later as of December 31, 2004.  The weight of evidence showed that events unrelated to the Transaction caused the Company's decline and ultimate reorganization of its capital structure through a bankruptcy proceeding five years after the Transaction closed.

425.    By the spring of 2005, the Company had weathered a storm in which it had incurred an unpredictable and unprecedented $109 million dollars in repurchase obligations.  Meanwhile, Antioch was able to pay down more than $30 million dollars of its Transaction debt

---

[30] The parties dispute which side has the burden of proving causation, but it makes no difference because, after a bench trial spanning 34 trial days in which both parties introduced massive amounts of evidence, the evidentiary record is so well-developed that there are no evidentiary holes to be held against either party.

ahead of schedule, and to secure a re-financing of that debt under more favorable terms. It was not until 2006 that the Company's sales decline became a serious threat, and the evidence at trial did not connect the sales decline to the Transaction.

426.    *Chesemore v. Alliance Holdings, Inc.*, 948 F. Supp. 2d 928 (W.D. Wis. 2012) is instructive on the issue of causation. In *Chesemore*, the court held that the evidence did not show that "the acquisition debt or overpayment [*i.e.*, the financial aspects of the transaction] *caused* Trachte's collapse," because even if this "placed additional pressure on Trachte," plaintiffs "ignore[d] the tsunami that was the 2008 financial crisis." *Id.* at 942 (emphasis in original). Regardless of whether the company stock owned by the ESOP was initially overvalued, the company held its position for two years and only collapsed after the financial crisis began. Accordingly, the court concluded that the plaintiffs were not entitled to a rescission of the transaction because "the 2008 recession [was] the principal cause of [the company's] precipitous loss in value," not the transaction. *Id.*[31]

427.    This case is similar.  The true cause of Antioch's bankruptcy was not the Transaction but sweeping technological change in the industry, which brought with it equally sweeping changes in consumer preferences that caused a precipitous sales decline.[32]  Like in *Chesemore*, Antioch stock appreciated twice after the Transaction according to two independent valuations. Even three and four years after the Transaction the stock value was independently

---

[31] Although the court in *Chesemore* held that (as in this case) the plaintiffs were not entitled to a rescission of the transaction because the transaction did not cause the company to fail, the court went on to award the plaintiffs the amount that the ESOP overpaid in the transaction.  This distinction is perhaps lost on plaintiffs, who have rushed to apprise the Court of the Seventh Circuit's recent decision affirming the district court in this respect, *see Chesemore v. Fenkell*, Nos. 14-3181, 14-3215, 15-3740, 2016 WL 3924308 (7th Cir. July 21, 2016), but this decision is of no help to plaintiffs.  In this case, there was no overpayment for the shares exchanged in the Transaction; rather, the Transaction price was within the range of fair market value, determined in good faith.  Thus, neither a rescission remedy **nor** an overpayment remedy is available to plaintiffs, and if *Chesemore* helps either side, it helps defendants.

[32] The 2008 financial crisis may also have been a factor in Antioch's bankruptcy, to the extent it contributed to Antioch's difficulty finding sources of capital around the time it was forced into bankruptcy, although it was not the major factor it was in *Chesemore*.

valued only moderately lower at $786 (as of year end 2005 and applicable to terminees in 2006) and $725 per share (as of year end 2006 and applicable to terminees in 2007). By this time, no reasonable connection to the Transaction existed, and there was certainly none that plaintiffs have been able to quantify. Only when the emergence of broadband and social media combined to substantially alter customer behavior did the Company's financial decline become serious. Therefore, even if plaintiffs had proved liability under either section 404 or 405, defendants are entitled to judgment.

428.    As for plaintiffs' section 406 claim, plaintiffs depend on their expert Robert Reilly for evidence of damages. As the Court has already explained at length, the Court finds that Mr. Reilly's opinions are methodologically flawed and unreliable.  For this alternative reason, the Court must enter judgment for defendants on the section 406 claim.

## CONCLUSION

429.    For the foregoing reasons, the Court enters judgment in favor of defendants on all claims.

430.    Plaintiffs have also sued the Morgan Family Foundation as a gratuitous transferee of funds that Asha Moran and Lee Morgan received as payment for their shares in the Transaction.  (*See* Second Am. Compl., ¶¶ 139-151, ECF No. 380.)  The Foundation has moved for summary judgment.  (ECF No. 668.)  At the presentment hearing, all parties agreed that plaintiffs cannot prevail on their claims against the Morgan Family Foundation if the individual defendants are not liable, so the court enters judgment in favor of the Morgan Family Foundation, and the Foundation's pending motion for summary judgment is moot.

431.    At a pretrial status conference on October 21, 2015, plaintiffs represented that, at the close of proceedings, they would present for the Court's approval a plan of allocation of the

proceeds of the settlement with GreatBanc.  A status conference is set for October 11, 2016 at 9:30 a.m. to discuss the matter.

**SO ORDERED.**                                    **ENTERED:   September 1, 2016**

                                             _____
                                             **HON. JORGE ALONSO**
                                             **United States District Judge**